Daniel R. Guadalupe (drguadalupe@norris-law.com)
**NORRIS McLAUGHLIN, P.A.**
721 Route 202/206, Suite 200
P.O. Box 5933
Bridgewater, New Jersey 08807
(908) 722-0700
Fax: (908) 722-0755

John E. Schmidtlein (jschmidtlein@wc.com)
Benjamin M. Greenblum (bgreenblum@wc.com)
Admitted *pro hac vice*
**WILLIAMS & CONNOLLY LLP**
725 Twelfth Street, N.W.
Washington, D.C. 20005
Telephone: (202) 434-5000

*Attorneys for Defendant Celgene Corporation*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| HUMANA INC.,<br><br>Plaintiff,<br><br>v.<br><br>CELGENE CORPORATION,<br><br>Defendant. | Civil No. 2:19-CV-07532-ES-MAH<br>Hon. Esther Salas, U.S.D.J.<br>Hon. Michael A. Hammer, U.S.M.J.<br><br>**CERTIFICATION OF DANIEL R. GUADALUPE ATTACHING UNPUBLISHED OPINIONS**<br><br>**DOCUMENT FILED ELECTRONICALLY** |

**DANIEL R. GUADALUPE**, of full age, hereby certifies as follows:

1.      I am a member of the law firm of Norris, McLaughlin & Marcus, P.A., attorneys for Defendant Celgene Corporation ("Celgene").

2.      I make this Certification in support of Celgene's Corporation's Memorandum of Law in Support of its Motion to Dismiss Humana Inc.'s Complaint.

3.      Attached as Exhibit A is a true and accurate copy of the unpublished opinion *Havens v. Mobex Network Servs., LLC*, No. 11-993 (KSH), 2011 WL 6826104, at *3 (D.N.J. Dec. 22, 2011).

4.      Attached as Exhibit B is a true and accurate copy of the unpublished opinion *In re Lipitor Antitrust Litig.*, No. 3:12-cv-2389 PGS, 2013 WL 4780496 (D.N.J. Sept. 5, 2013).

5.      Attached as Exhibit C is a true and accurate copy of the unpublished opinion *Cable Line, Inc. v. Comcast Cable Commc'ns of Pennsylvania, Inc.*, No. 3:16-CV-1000, 2017 WL 4685359 (M.D. Pa. Oct. 18, 2017).

6.      Attached as Exhibit D is a true and accurate copy of the unpublished opinion *United Food & Commercial Workers Unions & Employers Midwest Health Benefits Fund v. Novartis Pharm. Corp.*, No. 15-CV-12732, 2017 WL 2837002 (D. Mass. June 30, 2017).

7.      Attached as Exhibit E is a true and accurate copy of the unpublished opinion in *Toyo Tire & Rubber Co. v. Atturo Tire Corp.*, No. 14 C 0206, 2017 WL 1178224 (N.D. Ill. Mar. 30, 2017).

8.      Attached as Exhibit F is a true and accurate copy of the unpublished opinion in *In re K-Dur Antitrust Litigation*, No. 01-1652 (JAG), 2007 WL 5297755 (D.N.J. Mar. 1, 2007).

9.      Attached as Exhibit G is a true and accurate copy of the unpublished opinion *Farag v. Health Care Serv. Corp.*, No. 17 C 2547, 2017 WL 2868999 (N.D. Ill. July 5, 2017).

10.      Attached as Exhibit H is a true and accurate copy of the unpublished opinion *Sergeants Benevolent Ass'n Health & Welfare Fund v. Actavis, plc*, No. 15 CIV. 6549, 2018 WL 7197233 (S.D.N.Y. Dec. 26, 2018).

11.      Attached as Exhibit I is a true and accurate copy of the unpublished opinion *H-Quotient, Inc. v. Knight Trading Grp., Inc.*, No. 03 CIV. 5889 (DAB), 2005 WL 323750 (S.D.N.Y. Feb. 9, 2005).

12.      Attached as Exhibit J is a true and accurate copy of the unpublished opinion *In re Magnesium Oxide Antitrust Litig.*, No. 10-5943 (DRD), 2011 WL 5008090, at *25 (D.N.J. Oct. 20, 2011).

13.      Attached as Exhibit K is a true and accurate copy of the unpublished opinion
*In re Aggrenox Antitrust Litig.*, No. 3:14-MD-2516 (SRU), 2016 WL 4204478 (D. Conn. Aug. 9, 2016).

14.      Attached as Exhibit L is a true and accurate copy of the unpublished opinion

*In re K-Dur Antitrust Litigation*, No. CIV.A. 01-1652 (JAG), 2008 WL 2660780 (D.N.J. Feb. 28, 2008).

15.     Attached as Exhibit M is a true and accurate copy of the unpublished opinion

*Sherman v. Ben & Jerry's Franch., Inc.*, No. 1:08-CV-207, 2009 WL 2462539 (D. Vt. Aug. 10, 2009).

16.     Attached as Exhibit N is a true and accurate copy of the unpublished opinion *Cole v. NIBCO, Inc.*, No. 3:13-cv-07871, 2015 WL 2414740 (D.N.J. May 20, 2015).

17.     Attached as Exhibit O is a true and accurate copy of the unpublished opinion *Archer v. Holmes*, No. 1:17-CV-2051-TWT, 2018 WL 534475 (N.D. Ga. Jan. 23, 2018).

18.     Attached as Exhibit P is a true and accurate copy of the unpublished opinion *Pixler v. Huff*, No. 3:11-CV-00207-JHM, 2011 WL 5597327 (W.D. Ky. Nov. 17, 2011).

19.     Attached as Exhibit Q is a true and accurate copy of the unpublished opinion *Rivers v. Amato*, No. CIV. A. CV-00-131, 2001 WL 1736498 (Me. Super. June 22, 2001).

20.     Attached as Exhibit R is a true and accurate copy of the unpublished opinion *A & M Supply Co. v. Microsoft Corp.*, No. 274164, 2008 WL 540883 (Mich. Ct. App. Feb. 28, 2008) (per curiam).

21.     Attached as Exhibit S is a true and accurate copy of the unpublished opinion

*Block v. Jaguar Land Rover N. Am., LLC*, No. 15-5957 (SRC), 2016 WL 3032682, at *4 (D.N.J. May 26, 2016).

22.     Attached as Exhibit T is a true and accurate copy of the unpublished opinion

*Stutzle v. Rhone-Poulenc S.A.*, No. 002768, 2003 WL 22250424 (Pa. Com. Pl. Sept. 26, 2003).

23.     Attached as Exhibit U is a true and accurate copy of the unpublished opinion *J.P. Morgan Chase Bank, N.A. v. Leigh*, No. 11-246ML, 2011 WL 4351584 (D.R.I. Aug. 23, 2011).

I hereby certify that the foregoing statements made by me are true.  I am aware that if the foregoing statements made by me are willfully false, I am subject to punishment.

DANIEL R. GUADALUPE

Date:  May 22, 2019

# EXHIBIT A

2011 WL 6826104
Only the Westlaw citation is currently available.
NOT FOR PUBLICATION
United States District Court, D. New Jersey.

Warren HAVENS, et al., Plaintiffs,

v.

MOBEX NETWORK SERVICES,
LLC, et al., Defendants.

Civ. Action No. 11–993 (KSH).
|
Dec. 22, 2011.

**Attorneys and Law Firms**

Rodney Neill Tendai Richards, Winne, Banta, Hetherington, Basralian, & Kahn, PC, Hackensack, NJ, for Plaintiffs.

Kenneth Friedman, Manatt, Phelps, & Phillips, LLP, New York, NY, for Defendants.

*OPINION*

KATHARINE S. HAYDEN, District Judge.

**I. Introduction**

*\*1* This matter arises from a dispute over Federal Communication Commission ("FCC") licenses that permit the operation of Automated Maritime Telecommunications System ("AMTS") radio frequencies. Plaintiffs Warren Havens, Skybridge Spectrum Foundation, Telesaurus, VPC, LLC, AMTS Consortium, LLC, Intelligent Transportation & Monitoring, LLC, and Telesaurus GB, LLC (collectively "plaintiffs") assert that defendants Mobex Network Services, LLC, Mobex Communications, Inc., Maritime Communications/Land Mobile LLC, Paging Systems, Inc., and Touch Tel Corporation, are engaged in a scheme to hoard certain types of AMTS licenses, in violation of FCC regulations, with the goal of harming plaintiff's business. To that end, plaintiffs assert claims under the Federal Communications Act of 1934 and the Sherman Antitrust Act. In this motion to dismiss, defendants allege that plaintiffs' claims are barred under res judicata and collateral estoppel, and that plaintiffs' complaint fails to put forth an adequate claim on each of its three counts.

**II. Factual Background and Procedural History**

**A. The Facts as Pleaded**

The following facts are derived from plaintiff's second amended complaint.

Plaintiff Warren Havens is in the business of obtaining FCC Geographic licenses in the AMTS radio service. (Second Am. Compl. ¶ 2.) He is "the founder, majority owner, manager, and president of the other Plaintiffs." (*Id.*) Those plaintiffs are each either limited liability companies or nonprofit corporations in the business of obtaining FCC licenses for AMTS radio service "to provide spectrum and wireless telecommunications services to governmental and non-governmental entities within the State of New Jersey and other states." (*Id.* ¶¶ 3–7.)

The case involves three defendants. The first, Paging Systems, Inc. ("PSI"), is the holder of "Site–Based" AMTS licenses, including some with stations designated for location in New Jersey. (*Id.* ¶ 10.) The second, Touch Tel Corp. ("Touch Tel"), constructs and operates PSI's AMTS stations across the country. (*Id.*) Although the complaint equivocates as to precisely who owns each company, that issue is not relevant for purposes of this motion, and it suffices to say that Robert and Susan Cooper, husband and wife, together own and operate the companies in their joint operations. (*Id.*) The third and fourth defendants are Maritime Communications/ Land Mobile, LLC ("MCLM") [1] and Mobex Network Services LLC ("Mobex"). MCLM is t he holder of site-based licenses in New Jersey, which it obtained upon its purchase of Mobex. (*Id.* ¶ 8–9.) The sole owner of MCLM is Rev. Sandra Depriest, though plaintiffs allege that her husband, Donald Depriest, actually controls MCLM's operations. (*Id.* ¶ 8.)

This case revolves around FCC-issued ATMS licenses. "AMTS is a common-carrier Commercial Mobile Radio Service ... licensed throughout the United States, which provides when in operation voice and communications to customers." (*Id.* ¶ 16.) Originally created for the benefit of maritime customers along costal and navigable water routes, it has expanded to include land service along the Northeast Corridor. (*Id.*) AMTS licenses fall into two categories: Site–Based and Geographic. A Site–Based license is a "license issued by the FCC on a first-

Havens v. Mobex Network Services, LLC, Not Reported in F.Supp.2d (2011)

2011 WL 6826104

come, first-served basis, at no cost (except for nominal application processing fees)." (*Id.* ¶ 17.) These licenses provide for operation only at a specific station whose location is provided in the license. (*Id.*) Until 2004, all AMTS licenses were Site–Based. (*Id.* ¶ 18.)

**\*2** The second type of license is a Geographic license, which is "issued by the FCC to a high bidder in a public auction, which authorizes to the licensee exclusive use of specified radio frequencies to construct and operate wireless telecommunications stations within a defined wide geographic area." (*Id.* ¶ 17.) The FCC began auctioning AMTS Geographic licenses in 2004. (*Id.* ¶ 18.)

To protect Site–Based license holders whose licenses incorporate areas located within the same area granted in a Geographic license, FCC regulations provide that Site-based stations are entitled to "continue their station operations without excessively close-spaced co-channel Geographic–Licensed Stations that may cause radio interference." (*Id.*) To that end, "the Geographic Licensee [may] build and operate stations no closer than a certain range of lawful stations operated under a valid co-channel (same frequencies) Site-based AMTS license." (*Id.* ¶ 21.) That distance is the shorter of 120 kilometers and the actual transmitting distance of the Site–Based station as determined through a specific, technical formula. (*Id.* (citing 47 C.F.R. § 80.385).)) If a Site–Based license is terminated, revoked, or found invalid, its covered radio frequencies will revert to the overlapping Geographic license for that area. (*Id.* ¶ 18.)

The plaintiffs in this case collectively hold AMTS Geographic Licenses covering a majority of the United States, including New Jersey. (*Id.* ¶ 19.) Defendants hold the AMTS Site–Based licenses in various places across the country including New Jersey. (*Id.* ¶ 20.) Plaintiffs assert that Site–Based licensees are expected to provide information to the overlapping Geographic licensees so that the Geographic licensees may calculate the Site–Based station's transmitting distance. (*Id.* ¶ 22.)

Plaintiffs and defendants are competitors, and plaintiffs complain that defendants have failed to provide them with the necessary information to allow them to know the protected contour of the defendants' stations. (*Id.* ¶ 23.) Defendants have refused to provide this information notwithstanding three FCC "Cooperation Orders" and the FCC's regulatory disclosure requirements. (*Id.*)

Plaintiffs assert that defendants are "motivated by an anticompetitive purpose and intend to block and restrain Plaintiffs as competitors." (*Id.* ¶ 27.) Specifically, plaintiffs allege that even though FCC regulations require Site–Based AMTS licensees to construct stations within two years of obtaining a license, defendants have not actually constructed those stations and are therefore refusing to disclose their stations' operating contours because such disclosure would reveal that the stations do not exist, thereby resulting in the Site–Based license rights reverting to plaintiffs as the Geographic licensees for the relevant region. (*Id.* ¶¶ 27–30.) This practice is known as "warehousing," and it "occurs when a party acquired spectrum licenses without the intent to utilize them lawfully" and instead "squat[s]' on the spectrum until a buyer is found." (*Id.* ¶ 31.)

**\*3** In the course of discussions with defendants, Havens learned that PSI and the company now known as Mobex were cooperating on management of their licenses, such as that they would locate their stations at the same sites to reduce costs, and that Mobex held an option on PSI's licenses. (*Id.* ¶¶ 36–39.)

Plaintiffs' first count demands an injunction under 47 U.S.C. § 401(b) to require defendants to disclose the information necessary to calculate the contours of their Site–Based stations. (*Id.* ¶¶ 46–54.) Plaintiffs' second count seeks damages for violations of the Federal Communications Act, as permitted under 47 U.S.C. §§ 206–07. (*Id.* ¶¶ 55–63.) Plaintiffs' third count seeks damages for violations of the Sherman Act, 15 U.S.C. § 1–2. (*Id.* ¶¶ 64–73.)

**B. The California Litigation**

In 2005, plaintiffs (except for Skybridge Spectrum Foundation) filed a complaint in California Superior Court against Mobex and MCLM, claiming interference with prospective economic advantage, fraud, negligent misrepresentation, unfair competition, and breach of contract. (Friedman Cert., Ex. A.) Defendants removed the case to the Northern District of California, and the plaintiffs filed an amended complaint and later voluntarily dismissed the action. (Friedman Cert., Exs. A & B.)

In 2007, plaintiffs (except for Skybridge Spectrum Foundation) filed another complaint in California Superior Court against Mobex, MCLM, and PSI, this

2011 WL 6826104

time alleging a violation of the Cartwright Act (a California state antitrust law), two counts of interference with prospective economic advantage, two counts of fraud, negligent misrepresentation, two counts of unfair competition, intentional interference with contracts, and two counts of conversion. (Mauriello Cert., Ex. I.) On June 2, 2008, the California state court dismissed the action, holding that the claims were preempted under the Federal Communications Act ("FCA"), *see* 47 U.S.C. § 332(c)(3)(A), because determination of the matter would require the court to assess whether defendants violated the FCA. (Mauriello Cert., Ex. J.)

### C. Procedural History
On June 20, 2008, plaintiffs filed a complaint in the District of New Jersey, originally under civil docket number 08–3094. On October 14, 2008, plaintiffs filed a first amended complaint. After the California matter concluded and defendants filed a motion to dismiss on February 7, 2011, plaintiffs submitted a second amended complaint under docket number 11–993. Defendants filed a motion to dismiss.

On August 4, 2011, defendants MCLM and Mobex Network Services, LLC submitted to the Court a Notice of Bankruptcy Case Filing. On August 10, 2011, the Court entered an order staying this matter as to those defendants pending the disposition of the bankruptcy matter. On November 7, 2011, the Court lifted the order as to Mobex because only MCLM actually filed for bankruptcy.

### III. Standard of Review
*Federal Rule of Civil Procedure* 8(a)(2) provides that a claim for relief must include "a short and plain statement of the claim showing that the pleader is entitled to relief." Although a plaintiff need not submit "detailed factual allegations" to plead a case, the *Rule* requires that the complaint include "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). Mere " 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do,' " unless the complaint contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Id.* (quoting *Twombly,* 550 U.S. at 556–57, 570). Ultimately, the complaint must contain sufficient facts to

allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.; see also Phillips v. Cnty. of Allegheny,* 515 F.3d 224, 231 (3d Cir.2008).

**\*4** When a court decides a motion under *Rule 12(b)(6),* it "must accept as true all of the allegations contained in a complaint," provided that they are factual allegations and not masked legal conclusions. *Iqbal,* 129 S.Ct. at 1949–50.

### IV. Discussion
Defendants argue first that the Court is barred from deciding this case under principles of res judicata and collateral estoppel. They then argue that plaintiffs have failed to state a claim on each of the three counts in the complaint.

### A. The California Litigation

### 1. Res Judicata
Defendants argue that res judicata applies because the facts underlying this case are the same as the facts upon which the now-dismissed California state litigation was based.

The purpose of res judicata is to "promote[ ] judicial economy and protect [ ] defendants from having to defend multiple or nearly identical lawsuits by 'bar[ing] not only claims that were brought in a previous action, but also claims that could have been brought.' " *Morgan v. Covington Twp.,* 648 F.3d 172, 177 (3d Cir.2011) (quoting *In re Mullarkey,* 536 F.3d 215, 225 (3d Cir.2008)) (third alteration in original). To that end, a second suit is barred "when there exists '(1) a final judgment on the merits in a prior suit involving (2) the same parties or their privies in and (3) a subsequent suit based on the same cause of action.' " *Id.* (quoting *Mullarkey,* 536 F.3d at 225). Res judicata applies whenever "there is an 'essential similarity of the underlying events giving rise to the various legal claims.' " *CoreStates Bank, N.A. v. Huls Am., Inc.,* 176 F.3d 187, 194 (3d Cir.1999) (quoting *United States v. Anthlone Indus.,* 746 F.2d 977, 984 (3d Cir.1984)). In other words, res judicata will prevent a party from re-litigating not only the precise theory of recovery, but also any other theory invoking the same underlying facts.

The doctrine, however, is not without its limitations. "Ordinarily, a party will not be precluded from raising a

Havens v. Mobex Network Services, LLC, Not Reported in F.Supp.2d (2011)

2011 WL 6826104

claim by a prior adjudication if the party did not have the opportunity to fully and fairly litigate the claim." *Id.* at 197 (citing *Restatement (Second) of Judgments* § 26(1)(c)). A claim will not be extinguished if "[t]he plaintiff was unable to rely on a certain theory of the case or to seek a certain remedy or form of relief in the first action because of the limitations on subject matter jurisdiction of the courts." *Restatement (Second) of Judgments* § 26(1)(c).

Here, the complaint alleges claims under the Federal Communications Act ("FCA") and the Sherman Act. Both of these statutes explicitly limit a plaintiff's recourse in court to federal district courts. *See* 15 U.S.C. § 15(a); 47 U.S.C. § 207. These claims could not have been brought to the California state court in the previous action. Defendants acknowledge as much, arguing that "Plaintiffs conveniently ignore that they could have filed (but did not) the California Action in federal district court rather than state court." (Defs.' Reply Br. Supp. Mot. Dismiss 3.) This argument twists the res judicata exception for exclusive federal jurisdiction into a requirement that plaintiffs either bring their initial claims to the federal forum or forfeit their federal cases. Plaintiffs could have sought relief in federal court, but they did not. Instead they brought their claims in a state court that lacked jurisdiction to entertain the FCA and Sherman Act claims. Therefore, res judicata cannot apply.

**2. Collateral Estoppel**

**\*5** Defendants argue that collateral estoppel precludes re-litigation of the following issues because they were decided in the motion to dismiss the California case:

(1) plaintiffs failed to establish a predicate wrong under the Communications Act because they failed to allege facts sufficient to show that the FCC has finally determined that Defendants wrongfully retained cancelled licenses; (2) alleging that certain licenses have 'automatically terminated and were subsequently identified by the FCC as cancelled' is not sufficient to establish a predicate wrong under the Communications Act; and (3) the determination of whether there was a predicate wrong under the Communications Act is a question for the FCC, not a court of law.

(Defs.' Br. Supp. Mot. Dismiss 18.)

Collateral estoppel provides that "once an issue is actually and necessarily determined by a court of

competent jurisdiction, that determination is conclusive in subsequent suits based on a different cause of action involving a party to the prior litigation." *Howard Hess Dental Labs., Inc. v. Detsply Int'l, Inc.,* 602 F.3d 237, 247 (3d Cir.2010) (quoting *Montana v. United States,* 440 U.S. 147, 153, 99 S.Ct. 970, 59 L.Ed.2d 210 (1979)). Application of collateral estoppel requires the satisfaction of four elements: "(1) the identical issue was previously adjudicated; (2) the issue was actually litigated; (3) the previous determination was necessary to the decision; and (4) the party being precluded from relitigating the issue was fully represented in the prior action." *Id.* at 247–48 (quoting *Szehinskyj v. Attorney Gen. of the United States,* 432 F.3d 253, 255 (3d Cir.2005)). [2]

Here, the claim for collateral estoppel fails on the first element because the identical issue has not already been decided. The California court dismissed the case because "the claims set forth in the [Second Amended Complaint] come within the express preemption clause of the Federal Communications Act ("FCA") at 47 U.S.C. § 332(c)(3)(A)." (Mauriello Cert., Ex. J, at 3, 4.) The court's decision was relatively narrow, and defendants overstate its depth. For example, although the court found that plaintiffs' allegation "that certain licenses have 'automatically terminated and were subsequently identified by the FCC as cancelled' " was insufficient to demonstrate that the FCC has made a final decision on the matter, the court addressed that claim only in the context of making certain that the FCC had not decided potentially preempted claims. (*See id.* at 3, 4.) Moreover, the court never said that the determination of a predicate wrong is strictly one for the FCC; rather, it simply observed that state courts are precluded from addressing such questions under 47 U.S.C. § 332(c)(3)(A). (*See id.*)

The California court determined that state courts lack jurisdiction to hear certain claims under the FCA. Because this Court is not a state court, that determination is irrelevant and does not bar this Court's consideration of the issues presented in that prior litigation.

**B. Availability of Relief Under 47 U.S.C. § 401(b)**
**\*6** Defendants argue that plaintiffs are not entitled to relief under 47 U.S.C. § 401(b) because that provision does not provide a private right of action in these circumstances. Section 401(b) provides that

[i]f any person fails or neglects to obey any order of the Commission other than for the payment of money, while the same is in effect, ... any party injured thereby ... may apply to the appropriate district court of the United States for the enforcement of such order. If, after hearing, that court determines that the order was regularly made and duly served, and that the person is in disobedience of the same, the court shall enforce obedience to such order by a writ of injunction or other proper process, mandatory or otherwise, to restrain such person or the officers, agents, or representatives of such person, from further disobedience of such order, or to enjoin upon it or them obedience to the same.

Plaintiffs' complaint seeks to have the Court enter an order "directing Defendants ... to comply with the Cooperation Orders and 47 C.F.R. 80.385(b)(1), and specifically requiring Defendants to provide Plaintiffs the required information to enable Plaintiffs to calculate the protected contour of Defendants' Site–Based AMTS stations and thus the portions of Plaintiffs' same-channel Geographic licenses they may use." (Second Am. Compl. ¶¶ 32–33.) Defendants counter that neither the "Cooperation Orders" nor 47 C.F.R. § 80.385(b)(1) constitute "orders" within the meaning of the FCA.

The definition of the term "order" has generated a circuit split and t he Third Circuit has yet to address the question. In *New England Telephone & Telegraph Co. v. Public Utilities Commission of Maine,* 742 F.2d 1, 4 (1st Cir.1984) (Breyer, J.), the First Circuit held that an FCC decision that arose via the Commission's rulemaking authority was not an "order" under section 401(b). The court based its reasoning on several factors: first, the Administrative Procedure Act defines the word "order" as including "final dispositions ... in a matter other than rulemaking," *New Eng. Tel. & Tel. Co.,* 742 F.2d at 5 (quoting 5 U.S.C. § 551(6)); second, a

broad definition of the term "order" would threaten the principle that enforcement should be left to the FCC, *id.;* third, a broad definition would "threaten[ ] the sound development of a coherent nationwide communications policy," *id.;* fourth, given that review of an FCC decision is obtained through the courts of appeals, "the Act's statutory review provisions can be read more fairly and coherently if 401(b) is construed narrowly" to limit the ability of district courts to engage in interpretation of agency decisions, *id.* at 6; fifth, other provisions of the Communications Act "use the word 'order' in a way that seems to envision Commission decisions requiring specific actions of specific carriers," *id.* at 7; and sixth, a narrower view of the definition helps avoid "issue splitting and procedural complexity," *id.* Accordingly, the court concluded that the term "order" in section 401(b) refers only to "adjudicatory" orders. *Id.* at 9.

**\*7** At the other end, in *Hawaiian Telephone Co. v. Public Utilities Commission of State of Hawaii,* 827 F.2d 1264, 1271 (9th Cir.1987), the Ninth Circuit explicitly rejected the First Circuit's interpretation. Specifically, the Ninth Circuit saw no reason to import definitions from the Administrative Procedure act into section 401(b) and did not share the First Circuit's concern that the broader definition of the word "order" would hinder the FCC's enforcement role. *Hawaiian Tel. Co.,* 824 F.2d at 1271–72. The court ultimately reserved judgment on the issue of "whether every rule, order, or regulation promulgated by the FCC is an enforceable order under § 401(b)," holding that the order immediately at issue met the necessary criteria because it "require[d] particular actions be taken by [defendant] and private carriers providing service to Hawaii." *Id.* at 1272.

In its only case confronting this issue, the Third Circuit concluded that "an agency regulation should be considered an 'order' if it requires a defendant to take concrete actions." *Mallenbaum v. Adelphia Commc'ns Corp.,* 74 F.3d 465, 468 (3d Cir.1996). The court recognized the circuit split but held that it did not need to take sides because the "order" at issue did not require "a particular action to be taken by the defendant." *Id.* at 468 & n. 5.

Here, plaintiffs' section 401(b) claim seeks an order requiring defendants to disclose "the protected contour of [their] Site–Based AMTS stations." To that end, plaintiffs point to three orders. The first order is a response to

2011 WL 6826104

MCLM's request for clarification on FCC rules. (Second Am. Compl., Ex. 1.) The Commission granted the request in part and denied it in part. With regard to one part of the request for clarification, the Commission held that a "geographic licensee's co-channel interference protection obligations" should be based on "actual operating parameters" rather than "maximum permissible operating parameters." (*Id.*) In a footnote to this remark, the Commission cited a prior order in another case and added that "[a]s we noted in that decision, we expect incumbent AMTS licensees 'to cooperate with geographic licenses in order to avoid and resolve interference issues. This includes, at a minimum, providing upon request sufficient information to enable geographic licensees to calculate the site-based station's protected contour.' " (*Id.*)

The second order addressed an application that touched on PSI's site-based AMTS license at the World Trade Center. (Second Am. Com pl., Ex. 2.) The Commission noted that the petitioner in that case "had to make certain assumptions regarding Station WQA216's technical parameters, given the destruction of the WT C on September 11, 2001." (*Id.*) In a footnote to that statement, the Commission again stated that "AMTS site-based incumbents are expected to cooperate with geographic licensees in order to avoid and resolve interference issues.... This includes, at a minimum, providing upon request sufficient information to enable geographic licensees to calculate the site-based station's protected contour." (*Id.*)

**\*8** The third order is a motion for reconsideration regarding the earlier co-channel interference decision. The Commission declined to reconsider its decision to "abandon the use of actual ERP for determining co-channel interference protection," again observing that "AMTS site-based licensees are expected to cooperate with geographic licensees in avoiding and resolving interference issues and that this obligation requires, at a minimum, that the site-based licensee 'provid[e] upon request sufficient information to enable geographic licensees to calculate the site-based station's protected contour.' " (Second Am. Compl., Ex. 3.)

The Court need not decide which circuit's definition of the term "order" is correct because the cited orders fall short under either definition. In each of the three orders, the FCC discussed matters related to the interplay between Site–Based licenses and Geographic licenses,

but the FCC never explicitly confronted the question of how much cooperation is necessary. To be sure, each order offered interpretive guidance, but the orders never required defendants engage in any particular disclosure. Rather, the FCC addressed the cooperation requirements in terms of "expectations," not specific mandates capable of judicial enforcement. Similarly, 47 C.F.R. § 80.385(b) (1) also does not "require[ ] a particular action to be taken by a defendant," *Mallenbaum,* 74 F.3d at 468, because it dictates only where a Geographic licensee may locate its stations, not what technical details the Site–Based licensees must disclose. In the absence of an FCC order against defendants on this issue, the Court may not enter an injunction requiring defendants' compliance, and plaintiffs have failed to state a claim.

## C. **Private Right of Action under 47 U.S.C § 201(b)**
Plaintiffs seek recovery for damages under 47 U.S.C. § 207, which provides that

> [a]ny person claiming to be damaged by any common carrier subject to the provisions of this chapter may either make complaint to the Commission as hereinafter provided for, or may bring suit for the recovery of the damages for which such common carrier may be liable under the provisions of this chapter, in any district court of the United States of competent jurisdiction; but such person shall not have the right to pursue both such remedies.

With regard to liability for damages in general, a common carrier such as defendants, who "do[es], or cause[s] or permit[s] to be done, any act, matter, or thing in this chapter prohibited or declared to be unlawful, or ... omit[s] to do any act, matter, or thing in this chapter required to be done," is "liable to the person or persons injured thereby for the full amount of damages sustained in consequence of any such violation of the provisions of this chapter." 47 U.S.C. § 206.

In substance, plaintiffs claim that defendants violated 47 U.S.C. § 201(b), which states: "All charges, practices,

classifications, and regulations for and in connection with [a common carrier] communication service, shall be just and reasonable, and any such charge, practice, classification, or regulation that is unjust or unreasonable is declared to be unlawful." Therefore, if defendants' alleged conduct is "unjust or unreasonable," then it is unlawful and plaintiffs have stated a claim.

**\*9** Notwithstanding the grant of jurisdiction in section 207, courts are constrained in what they may and may not find to be a violation. Specifically, "the lawsuit is proper if the FCC could properly hold that [the challenged practice] is an 'unreasonable practice' deemed unlawful under § 201(b)." *Global Crossing Telecomms., Inc. v. Metrophones Telecomms., Inc.,* 550 U.S. 45, 52–53, 127 S.Ct. 1513, 167 L.Ed.2d 422 (2007). Accordingly, as the Ninth Circuit stated in a case on which both parties rely, "[I]t is within the Commission's purview to determine whether a particular practice constitutes a violation for which there is a private right to compensation." *N. Cnty. Commc'ns Corp. v. Cal. Catalog & Tech.,* 594 F.3d 1149, 1158 (9th Cir.2010). If a party asks a court to find a violation of section 201(b) in the absence of an FCC determination that the defendant's conduct generally violates that provision, then it is a request "that the federal courts fill in the analytical gap," and such a request cannot be granted because it would "put interpretation of a finely-tuned regulatory scheme squarely in the hands of private parties and some 700 federal district judges, instead of in the hands of the Commission." *Id.* (quoting *Greene v. Spring Commc'ns Co.,* 340 F.3d 1047, 1053 (9th Cir.2003) (quoting *Conboy v. AT & T Corp.,* 241 F.3d 242, 253 (2d Cir.2001))).

To support its claim that it is a violation of section 201(b) to "warehouse" AMTS licenses, plaintiffs cite to FCC determinations that it is a violation of section 201(b) for a party to "warehouse" toll free numbers without identified subscribers. *See, e.g., In re Toll Free Serv. Access Codes,* 12 FCC Rcd 11162 (1997); *Patients Plus, Inc. v. Long Distance Telecomm. Serv.,* 12 FCC Rcd 13258 (1997). Although these determinations support the proposition that the FCC has found warehousing to be disfavored in one particular context, the determinations do not address the precise type of conduct at issue in this case, or even a sufficient number of similar types of conduct for the Court to infer the FCC's distaste for warehousing as a general practice. The Court cannot risk disturbing the delicate regulatory framework that the

Commission is tasked with maintaining. Cf. *Hoffman v. Rashid,* 388 F. App'x 121, 123 (3d Cir.2010) ("[I]t is within the purview of the Federal Communications Commission, not [plaintiff], 'to determine whether a particular practice constitutes a violation for which there is a private right to compensation.' " (quoting *N. Cnty. Comm c'ns Corp.,* 594 F.3d at 1158)). [3]

For the foregoing reasons, plaintiffs' claims under the Federal Communications Act fail, and are dismissed.

### D. Sherman Act

#### 1. Preemption

Defendants argue that the FCA established an elaborate framework under which the FCC regulates radio frequency allocation, and that the FCA therefore preempts Sherman Act claims because those claims may interfere with FCC radio frequency determinations. Absent from defendants' argument, however, is any authority to suggest that a court should abstain from hearing a case within its jurisdiction merely because it touches on an area subject to sophisticated agency regulation. Cf. *Raritan Baykeeper v. Edison Wetlands Ass'n, Inc.,* 660 F.3d 686, 691 (3d Cir.2011) (in context of primary jurisdiction doctrine, noting that "[w]hen 'the matter is not one peculiarly within the agency's area of expertise, but is one which the courts or jury are equally well-suited to determine, the court must not abdicate its responsibility' " (quoting *MCI Telecomms. Corp. v. Teleconcepts, Inc.,* 71 F.3d 1086, 1004 (3d Cir.1995) (further citations omitted))).

**\*10** More to the point, defendants' argument ignores 47 U.S.C. § 152, in which an uncodified amendment states that "nothing in this Act or the amendments made by this Act shall be construed to modify, impair, or supersede the applicability of any of the antitrust laws." Pub.L. No. 104–104, § 601(b)(1) (1996). The amendment further clarifies that the term "antitrust laws" includes the Sherman Act. Pub.L. No. 104–104, § 601(e)(4). The legislative history of this amendment clarifies that when Congress enacted the Telecommunications Act of 1996, it sought to ensure that the FCC could not "confer antitrust immunity" through the course of its decisionmaking. See S.Rep. No. 104–230, at 178–79 (1996) (Conf.Rep.). Thus, Congress envisioned a system in which the FCC could consider antitrust matters when reaching decisions, but that the FCC's decisions would not preclude the operation

Havens v. Mobex Network Services, LLC, Not Reported in F.Supp.2d (2011)

2011 WL 6826104

of independent antitrust statutes. See *Verizon Commc'ns, Inc. v. Law Offices of Curtis v. Trinko, LLP,* 540 U.S. 398, 406, 124 S.Ct. 872, 157 L.Ed.2d 823 (2004) (holding that notwithstanding arguments for implied immunity, "the savings clause preserves those claims that satisfy established antitrust standards" (citation and quotation marks omitted)). Accordingly, the FCA does not preempt plaintiffs' Sherman Act claim.

### 2. Standing

To establish standing, plaintiffs must show that they suffered an antitrust injury, meaning an injury that is "the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful. The injury should reflect the anti-competitive effect either of the violation or of anti-competitive acts made possible by the violation." *Eichorn v. AT & T Corp.,* 248 F.3d 131, 140 (3d Cir.2001) (quoting *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.,* 429 U.S. 477, 489, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977)). This injury must "reflect[ ] an activity's anti-competitive effect on the competitive market," and "an individual plaintiff personally aggrieved by an alleged anti-competitive agreement has not suffered an antitrust injury unless the activity has a wider impact on the competitive market. *Id.* (citations omitted).

Defendants suggest that plaintiffs are complaining about injury to their status as competitors rather than an injury suffered by the overall competitive market. But plaintiffs' complaint pleads a broader injury than that. After recounting defendants' course of conduct, the complaint states that "[t]hese acts produced anti-competitive effects within the relevant geographic market for AMTS, are manifestly anticompetitive and constitute a per se violation of the Sherman Act." (Second Am. Compl. ¶ 66.) The complaint further alleges that the conduct "had a wider impact on the relevant AMTS market." (*Id.* ¶ 69.) These statements are not mere "labels and conclusions," nor are they "a formulaic recitation of the elements of the cause" or " 'naked assertion[s]' devoid of 'further factual enhancement.' " *Iqbal,* 129 S.Ct. at 1949 (quoting *Twombly,* 550 U.S. at 555, 557). Rather, they are the logical and plausible inferences to be drawn from plaintiffs' factual allegations. Plaintiffs allege that defendants have refused to provide necessary information about the contours of their Site–Based stations (Second Am. Compl. ¶ 25), that they have done so to avoid the loss of their licenses (*id.* ¶ 30), and that their ultimate goal is to "warehouse" the licenses to make the

neighboring Geographic licenses "less economically viable to competitors in upcoming auctions, so that [defendants] as the 'Incumbent' Station licensees could succeed in the auctions with less competition and at lower prices" (*id.* ¶¶ 31–33). These allegations, accepted as true, present not only allegations that plaintiffs themselves have suffered harm, but also that defendants' conduct affects the overall competitive market for AMTS frequencies. Accordingly, plaintiffs have established antitrust standing.

### 3. Sherman Act Section 1 Claim

**\*11** A claim under section one of the Sherman Act, 15 U.S.C. § 1, consists of four elements: "(1) concerted action by the defendants; (2) that produced anti-competitive effects within t he relevant product and geographic markets; (3) that the concerted action [was] illegal; and (4) ... [plaintiff] was injured as a proximate result of the concerted action." *Howard Hess Dental Labs., Inc.,* 602 F.3d at 253 (quoting *Gordon v. Lewistown Hosp.,* 423 F.3d 184, 207 (3d Cir.2005)). Defendant alleges that the complaint fails to satisfy the first element because it does not allege that defendants "conspired or agreed to act in concert with any other party, let alone the other defendants." (Defs.' Br. Supp. Mot. Dismiss 39.) *See also Twombly,* 127 S.Ct. at 1961 (in antitrust case, insufficient to allege "parallel conduct unfavorable to competition" without "some factual context suggesting agreement, as distinct from identical, independent action").

The facts here, however, are distinguishable from the facts in *Twombly.* Here, plaintiff has stated sufficient facts to "allow[ ] the court to draw the reasonable inference that" defendants had the requisite intent to act in concert. *Iqbal,* 129 S.Ct. at 1949 (citing *Twombly,* 127 S.Ct. at 556). First, plaintiff alleges specific reasons for the defendants' decisions to act in concert, such as that the defendants made a spectrum-splitting arrangement to allow each to share in the benefits of the AMTS licenses. (*See* Second Am. Compl. ¶ 36.) Moreover, Havens learned through communications with PSI that PSI and Mobex were cooperating and had an intertwined financial stake in the AMTS spectrums at issue. (*Id.* ¶ 38.) Cooperation could also be seen in other areas, such as Mobex and PSI locating stations at the same sites in order to reduce costs. (*Id.* ¶ 39.) This cooperation extended beyond physical interactions, as Mobex and PSI jointly petitioned the FCC on certain matters regarding the licenses. (*Id.* ¶ 41.)

Havens v. Mobex Network Services, LLC, Not Reported in F.Supp.2d (2011)

2011 WL 6826104

The complaint alleges a history of cooperation and interactions between the companies on the very licenses at issue in this case. This makes plausible plaintiffs' allegation of concerted action, and plaintiffs have therefore stated a claim on which relief can be granted.

### 4. Sherman Act Section 2 Claim

Under 15 U.S.C. § 2, it is unlawful to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations." Plaintiffs alleging a conspiracy to monopolize must demonstrate four elements: "(1) an agreement to monopolize; (2) an overt act in furtherance of the conspiracy; (3) a specific intent to monopolize; and (4) a causal connection between the conspiracy and the injury alleged." *Howard Hess Dental Labs.,* 602 F.3d at 253. To plead monopolization, "a plaintiff must allege '(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historical accident.' " *Crossroads Cogeneration Corp. v. Orange & Rockland Cntys. Util., Inc.,* 153 F.3d 129, 141 (3d Cir.1998) (quoting *Schuykill Energy Res. v. Pa. Power & Light Co.,* 113 F.3d 405, 412–13 (3d Cir.), *cert. denied,* 522 U.S. 977, 118 S.Ct. 435, 139 L.Ed.2d 335 (1997)). Similarly, to claim attempted monopolization, "a plaintiff must allege '(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power.' " *Id.* (quoting *Schuykill Energy Res.,* 113 F.3d at 413).

**\*12**  Plaintiffs' complaint specifically cites the "essential facilities doctrine," which requires demonstrating: "(1) control of the essential facility by a monopolist; (2) the competitor's inability practically or reasonably to duplicate the essential facility; (3) denial of the use of the facility to a competitor; and (4) the feasibility of providing the facility." *Ideal Dairy Farms, Inc. v. John Labatt, Ltd.,* 90 F.3d 737, 748 (3d Cir.1996) (quoting *Del. Health Care, Inc. v. MCD Holding Co.,* 893 F.Supp. 1279 (D.Del.1995)).

Here, even assuming that the contour information is an "essential facility," plaintiffs' claim falls short because the complaint does not set forth a case that defendants are monopolists, have established a monopoly, or are attempting to establish a monopoly. Indeed, a claim of attempted monopolization is largely inconsistent with the overall theory of plaintiffs' case. The complaint does not allege that defendants were warehousing AMTS spectrum in order to generate a monopoly. Instead, the complaint states that defendants' goal in warehousing the Site–Based licenses was to make the remaining licenses less attractive to competitors, or to create an opportunity to reap a profit by selling or leasing their licenses to the adjacent Geographic licensees. (Second Am. Compl. ¶ 33.) (Notably, if this were defendant's plan, it apparently failed, as plaintiffs won the auctions for the Geographic licenses and now own them across most of the country.) Although this practice, if true, may serve to give defendants an edge in the market, it does not lay any meaningful groundwork for the establishment of a monopoly, especially because plaintiffs own most of the Geographic licenses for New Jersey and would therefore appear to have a comparable bargaining position to that of defendants. Additionally, the FCC tightly regulates the distribution of the pertinent licenses and could be made aware of any potential abuses. *Cf. Verizon Commc'ns, Inc.,* 540 U.S. at 412 ("One factor of particular importance is the existence of a regulatory structure designed to deter and remedy anticompetitive harm."). Accordingly, plaintiffs have failed to set forth a claim under section two of the Sherman Act.

### E. Administrative Exhaustion and the Primary Jurisdiction Doctrine

Defendants last argue that the Court should dismiss the complaint because plaintiffs have not exhausted their administrative remedies and because the primary jurisdiction doctrine suggests that the matter should be heard by the FCC. Because the Court has determined that plaintiffs failed to state a claim under the FCA, and because the FCC does not have jurisdiction over claims under the Sherman Act, 15 U.S.C. § 15(a), the Court need not address that argument.

### V. Conclusion

For the foregoing reasons, the motion to dismiss is granted as to plaintiffs' claims under the FCA and section 2 of the Sherman Act, and the motion is denied as to plaintiffs' claim under section 1 of the Sherman Act.

Havens v. Mobex Network Services, LLC, Not Reported in F.Supp.2d (2011)

2011 WL 6826104

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 6826104

Footnotes

1   Because of ongoing bankruptcy proceedings in the Northern District of Mississippi, the litigation is presently stayed as to MCLM. MCLM figured in the parties' submissions o n the motion to dismiss because those submissions were filed prior to the entry of the stay order. The stay precludes anything in this opinion from affecting MCLM at this time.

2   The parties cite the five-factor test articulated in California courts. *See Lucido v.Super. Ct. of Mendocino Cnty.,* 51 Cal.3d 335, 272 Cal.Rptr. 767, 795 P.2d 1223, 1225 (Cal.1990), *cert. denied,* 500 U.S. 920, 111 S.Ct. 2021, 114 L.Ed.2d 107 (1991). Because the tests are substantively the same in all respects relevant here, the different articulations do not change the outcome.

3   Defendants assert that plaintiffs' section 207 claim is time-barred under 47 U.S.C. § 415(b). Having found that plaintiffs failed to state a claim under section 207, the Court need not address this issue in depth. The Third Circuit has spoken on the issue, holding that "when a defendant's conduct is part of a continuing practice, an action is timely so long as the last act evidencing the continuing practice falls within the limitations period." *Brenner v. Local 514, United Bhd. of Carpenters & Joiners of Am.,* 927 F.2d 1283, 1295 (3d Cir.1991). Here, plaintiffs' claim is that the defendants' unjust and unreasonable practice is the continuing disregard of Commission regulations and orders, and the continued warehousing of AMTS licenses. Because these are ongoing activities, the statute of limitations has not yet started to run.

---

**End of Document**                                                 © 2019 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT B

In re Lipitor Antitrust Litigation, Not Reported in F.Supp.2d (2013)

2013 WL 4780496, 2013-2 Trade Cases P 78,512

KeyCite Yellow Flag - Negative Treatment

Distinguished by In re Lamictal Direct Purchaser Antitrust Litigation, D.N.J., January 24, 2014

2013 WL 4780496
NOT FOR PUBLICATION
United States District Court, D. New Jersey.

In re LIPITOR ANTITRUST LITIGATION.
This Document Relates to: All
Direct Purchaser Class Actions.

MDL No. 2332.
|
Master Docket No. 3:12−cv−2389 (PGS).
|
Sept. 5, 2013.

MEMORANDUM AND ORDER

SHERIDAN, District Judge.

**\*1** This matter is before the Court on the Direct Purchaser Class Plaintiffs' motion for leave to amend the consolidated class action complaint (ECF No. 435) and a motion to dismiss all Direct Purchaser Complaints brought by Pfizer, Inc., Pfizer Ireland Pharmaceuticals, WarnerLambert Co., and Warner–Lambert Company, LLC. (ECF No. 246).

**INTRODUCTION**

This matter arises out of Defendant Pfizer's [1] sale of a pharmaceutical product under the brand name Lipitor, and out of the sale by Ranbaxy [2] of a generic version of Lipitor. The Judicial Panel on Multidistrict Litigation transferred several related actions to this Court for coordinated and consolidated pretrial proceedings, pursuant to 28 U.S.C. § 1407. Presently pending before the Court are several motions to dismiss the Plaintiffs' various Complaints. This opinion addresses two motions: the Motion to Dismiss the Direct Purchaser Plaintiffs' [3] Claims (Dkt. No. 246) filed by Pfizer pursuant to Fed.R.Civ.P. 12(b)(6), and the Motion for Leave to Amend the Consolidated Class Action Complaint (Dkt. Entry No. 435) filed by the Direct Purchaser Class Plaintiffs. The Court has considered the briefs of the parties, and oral argument held on July 24, 2013.

**BACKGROUND**

On motions to dismiss, the Court accepts as true the plaintiff's material allegations and construes them in the light most favorable to the plaintiff. *Baldwin v. Univ. of Pittsburgh Med. Ctr.,* 636 F.3d 69, 73–4 (3d Cir.2011) (citing *Alston v. Countrywide Fin. Corp.,* 585 F.3d 753, 758 (3d Cir.2009)). A court may also properly look at public records, including judicial proceedings, the relevant patents and the patents' prosecution histories. *See, e.g .,* *Jean Alexander Cosmetics, Inc. v. L'Oreal USA, Inc.,* 458 F.3d 244, 256 n. 5 (3d Cir.2006) (citing *S. Cross Overseas Agencies, Inc. v. Wah Kwong Shipping Group Ltd.,* 181 F.3d 410, 426 (3d Cir.1999)); *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.,* 998 F.2d 1192, 1196–97 (3d Cir.1993). Thus, the following facts are taken from the various Direct Purchaser Complaints and from related public records.

This matter arises from actions brought by purchasers of a pharmaceutical product sold by Pfizer under the brand name Lipitor. Plaintiffs assert that Pfizer violated federal antitrust laws by using patents for or related to Lipitor to block generic competition for the product, and by paying Ranbaxy to settle infringement litigation and stay off the market until an agreed-upon entry date.

Lipitor belongs to a class of drugs called statins, which lower cholesterol by inhibiting a liver enzyme called 3–hydroxy 3–methylglutrayl–coenzyme A reductase ("HMG–CoA reductase"). HMG–CoA reductase controls the rate of the metabolic production of cholesterol; inhibiting HMG–CoA reductase inhibits the production of cholesterol. High cholesterol is thought to be associated with coronary heart disease and atherosclerosis. The active ingredient in Lipitor is called atorvastatin calcium.

**\*2** Pfizer has obtained the following seven patents covering different aspects of the Lipitor product: U.S. Patent No. 4,681,893 (the " #893 patent"); U.S. Patent No. 5,273,995 (the "#995 patent," reissued in part as U.S. Reissue Patent No. 40,667 (the "RE #667 patent' ")); U.S. Patent No. 6,126,971 (the " #971 patent"); U.S. Patent No. 5,686,104 (the " #104 patent"); U.S. Patent No. 6,087,511 (the "#511 patent"); U.S. Patent No. 6,274,740 (the "#740 patent"); and U.S. Patent No. 5,969,156 (the " #156 patent"). *See, e.g.,* Compl. ¶¶ 3, 7–8, 88–89, 179–80, 186–87, 193–95, 323, 326.

Plaintiffs' claims are largely based on allegations concerning the prosecution history of one particular Lipitor Patent—the #995 patent—as well as its relationship to the #893 patent. Compl. ¶¶ 197–281; *Walgreen* Compl. ¶¶ 160–215; *Meijer* Compl. ¶¶ 156–211. The prosecution of the #995 patent was preceded by the issuance of the #893 patent—the original Lipitor patent —to Pfizer in 1987. Compl. ¶ 70. Plaintiffs' claims involve an allegation that Pfizer fraudulently obtained the #995 patent after the issuance of the #893 patent by avoiding the prior art contained in the # 893 patent.

The #995 patent issued on December 28, 1993. *Id.* ¶ 159. Three years later, on December 17, 1996, the FDA approved atorvastatin calcium—"Lipitor"— for the treatment of hypercholesterolemia and mixed dislipidemia. *Id.* ¶ 178. Pfizer listed both the #893 and #995 patents and three other patents (the #971 and #104 patents, covering certain formulations of atorvastatin calcium, and the #156 patent, for its crystalline form) in the FDA publication "Approved Drug Products with Therapeutic Equivalence Evaluations" (the "Orange Book"). [4] *Id.* ¶¶ 179, 192–196. Pfizer also held two patents claiming the process for making Lipitor (the #511 and #740 patents). *Id.* ¶ 195.

The #893 patent expired on March 24, 2010. The #995 patent expired on June 28, 2011. *Id.* Compl. ¶ 180. The remaining patents listed in the Orange Book have not yet expired. Compl. ¶ 322.

### A. Scientific Background

Isomers are chemical compounds that have the same molecular formula (*i.e.,* the same type and number of atoms), but different structural formulas (*i.e.,* different arrangements of those atoms in space). *See Pfizer Inc. v. Ranbaxy Labs. Ltd.,* 405 F.Supp.2d 495, 502 (D.Del.2005), *aff'd in part,* 457 F.3d 1284 (Fed.Cir.2006). Enantiomers are isomers that are mirror images of each other with respect to how their atoms are arranged in space. [5] The two enantiomers in any given enantiomeric pair can be distinguished from one another, and the percentage of each particular enantiomer in a mixture can be ascertained. A mixture with equal amounts of two opposite enantiomers present is called a racemic mixture or racemate.

Pairs of enantiomers share many chemical and physical properties, such as identical melting points, solubility, and colors. However, other properties, such as biological properties, may differ. Enzymes, including HMG–CoA reductase, typically display a preference for interacting with one enantiomer over the other. It is common for one enantiomer (the "active" enantiomer) of an enantiomeric pair to have all or most of the biological activity when interacting with an enzyme, while the other enantiomer (the "inactive" enantiomer) has little or no biological activity.

**\*3** The active ingredient in Lipitor is atorvastatin calcium. Compl. ¶ 178. Atorvastatin is the active enantiomer in the compound, referred to as the "r-trans" enantiomer. Its corresponding inactive enantiomer is referred to as the "s-trans" enantiomer. Because of the structural makeup of atorvastatin, these are two of its four possible enantiomers. Atorvastatin calcium is the particular salt form of the active enantiomer used in Lipitor. *Id* .

### B. Prosecution of the #995 Patent

Pfizer filed a patent application in 1986 for a large group of compounds and pharmaceutical compositions useful in lowering cholesterol. This application led to the issuance of the #893 patent on July 21, 1987. Complaint ¶ 88. Pfizer claimed that the disclosed compounds were useful to lower cholesterol "by virtue of their ability to inhibit the biosynthesis of cholesterol through inhibition" of the HMG–CoA reductase enzyme. The class of compounds covered by the #893 patent is referred to therein as Structural Formula I. Included among the many compounds within the Structural Formula I family was the racemic compound comprised of atorvastatin and its corresponding inactive enantiomer and "pharmaceutically acceptable salt[s]" thereof. *Id.* ¶¶ 76–77, 87, 89, 184.

Exactly two years after issuance of the #893 patent, on July 21, 1989, Pfizer submitted a patent application seeking additional patent protection for just the isolated active enantiomer of atorvastatin, which as stated above is one of the compounds disclosed by the #893 patent. The new patent application claimed atorvastatin calcium, *i.e.,* the active R-trans isomer of atorvastatin in calcium salt form—which is the active ingredient in Lipitor. *Id.* ¶¶ 110–11. The specification disclosed that the R-trans

2013 WL 4780496, 2013-2 Trade Cases P 78,512

isomer displays "unexpected and surprising inhibition of cholesterol biosynthesis." *Id.* ¶ 110.

Plaintiffs allege that this patent application was a direct result of prodding by senior management at Pfizer. After the #893 patent issued, Pfizer internally designated atorvastatin as a "lead compound" for further investigation. *Id.* ¶ 90. Shortly thereafter, senior management at Pfizer asked Roth, the #893 patent inventor, if there was anything about the active enantiomer that would entitle it to an additional period of patent protection. *Id.* ¶ 92–93. Having worked with atorvastatin for years, Roth wasn't aware of any surprising characteristics which would warrant further patent protection. *Id.* So Don Maxwell, the vice president of discovery research, told Roth to go through the old lab books to see if there was some data that showed something surprising. Roth was instructed to provide any surprising data to Pfizer's patent attorney. *Id.*

Plaintiffs claim that in developing Lipitor, Pfizer used several tests[6] to assess and compare the inherent differences among the compounds that would eventually be covered by the #893 patent. The tests measured the ability of the compounds to decrease the production of cholesterol. *Id.* ¶¶ 112, n. 9, 127, 130. Plaintiffs claim that the tests, as well as internal Pfizer research memos confirmed that the R-trans enantiomer was about twice as active as the racemate (*i.e.,* the compound with equal parts s-trans and r-trans enantiomers). *Id.* ¶¶ 114, 123, 125, 127, 129, 130, 132, 167. Plaintiffs claim that this was a result that was expected both based on the state of the knowledge in the field, as well as by Pfizer's own research in studying statins. Plaintiffs allege that despite what the research showed, during the prosecution of that patent application Pfizer represented on at least three different occasions that atorvastatin had unexpected properties. *Id.* ¶¶ 110–111, 143–145, 154–155. Pfizer is alleged to have falsely claimed that activity of the enantiomer was "surprising" and "unexpected, and quantitatively that it was at least ten times more active than the racemate. To support these assertions, Pfizer allegedly submitted only a sub-set of the most favorable, but allegedly flawed, testing data and internal research.

**\*4** The patent specification twice stated that Pfizer "unexpectedly found" that the active enantiomer "provides surprising inhibition" of cholesterol. *Id.* ¶ 110 (quoting specification as saying "[i]t is now unexpectedly

found that the enantiomer ... provides surprising inhibition of the biosynthesis of cholesterol," and "an ordinarily skilled artisan may not predict the unexpected and surprising inhibition of cholesterol biosynthesis of the present invention in view of [prior] disclosures"). The specification also presented a short table (the "CSI table") reporting data showing the active enantiomer (denoted "[R-(R\*R\*) ] isomer") was ten-times more active than the racemate in inhibiting the synthesis of cholesterol. *Id.*

However, Plaintiffs allege that the CSI table "was both affirmatively false and intentionally presented in a misleading manner." *Id.* ¶ 114. The CSI table falsely represents the data Pfizer obtained through its tests. *Id.* ¶¶ 114–124. The very fact that the CSI table does not disclose certain relevant data, or the source of the data that was disclosed, would have misled the patent examiner into concluding that Pfizer had confirmed the data by a number of repeat assays and that the chart fairly depicted all appropriate, relevant data. *Id.* ¶ 115. However, Plaintiffs allege that in fact the table actually contained only limited data "cherry-picked" from multiple flawed tests conducted over several years using different formulations of varying atorvastatin salts. *Id.* ¶ 116. For example, the data for the active and inactive enantiomer were taken from a single run of the same experiment. *Id.* ¶ 117. In contrast, the data collected for the racemate is an "average" of five separate runs. *Id.* Plaintiffs allege that such "averaging" is not standard protocol in the field. Also in contravention of established protocol in the field, Pfizer left out values from at least ten test runs when it reported an "average" for the racemate. Complaint ¶ 121, Fig. 7. Figure 7 in the Complaint is a chart showing the source of the data presented in the CSI Table. If the results of certain test runs had been included in the calculation rather than excluded, there would only have been a twofold increase and no unexpected or surprising result. Likewise if the results of certain included test runs had been omitted, results would show only a twofold increase. *Id.* ¶ 122.

During the #995 patent prosecution, Pfizer conceded early on that atorvastatin was *prima facie* obvious in that any person skilled in the art would have known that the racemic compounds disclosed in the #893 patent could be "split" into their individual "right" and "left" enantiomers, and that one of those enantiomers would be about twice as active as the racemate. *Id.* ¶¶ 102–104, 140–142. Pfizer argued that the *prima facie* obvious objection

In re Lipitor Antitrust Litigation, Not Reported in F.Supp.2d (2013)

2013 WL 4780496, 2013-2 Trade Cases P 78,512

could be overcome because the invention—atorvastatin—possessed a surprising quality. Roth submitted a declaration claiming that the active enantiomer possessed "surprising and unexpected activity" and that the data "indicated activity *at least ten-fold more* than that of the racemate." *Id.* ¶¶ 143–144.

**\*5** The data on which Roth relied in support of the statements in his declaration derived from the results of a CSI assay comparing the inhibition activity of cholesterol synthesis of various compounds. *Id.* ¶¶ 112, 139. Pfizer and Roth later identified the source of the particular CSI assay relied upon in the Roth Declaration as the CSI 118 test. *Id.* ¶ 145. CSI 118 was the only test that compared the active enantiomer, the inactive enantiomer, and the racemate in the same salt form in a head-to-head test. Plaintiffs claim that CSI 118 was "deeply flawed": Pfizer's lab notebooks reported that the compounds did not dissolve completely before the test was conducted; Pfizer did not determine the concentrations of its test solutions before conducting the test; and Pfizer never re-ran the screen to confirm its outcome. *Id.* ¶¶ 146–148. CSI 118 reported activity of the active enantiomer in calcium salt form that was twenty-five times greater than the reported activity of the active enantiomer in sodium salt form. *Id .* ¶ 149. Plaintiffs allege that this difference was an indicator that the screen's outcome was wrong. *Id.* Despite knowledge of the allegedly flawed nature of CSI 118, Pfizer and Roth knowingly used the CSI 118 data to support their claim that the active enantiomer has ten times greater inhibition of cholesterol synthesis than the racemate, and claimed this as a "surprising level of activity" which, in turn, supported patentability. *Id.* ¶¶ 151–152.

The PTO Examiner initially rejected all clams in the application for the # 995 patent as anticipated by, or, in other words, not novel in view of, the #893 patent. Compl. ¶ 153. Pfizer appealed and argued that the patent examiner's objections went to obviousness and Pfizer had already submitted evidence to overcome the objection. Pfizer again claimed the active enantiomer was "surprisingly active" and stated three times that it had "greater than 10 times" the activity of the racemate. *Id.* ¶ 154 (quoting appeal brief as saying "[t]he R isomer as claimed appears to be ... more than *10 times more active* than the mixture," "the present invention describes the particular R isomer *which is found to have greater than 10 times the activity* of the ... racemic mixture," "the compound of the present invention ... has greater than 10

times the activity than the reference compound," and "the R isomer is the most desired and the most surprisingly active isomer of the two possibilities if one is to select from the trans compounds").

The Board reversed, overturning the anticipation rejection and holding that the #893 patent only described the trans racemate, which contained the R-trans and the S-trans isomer in a mixture, but did not disclose which isomer (S or R) was preferred, nor did it explain how one skilled in the art might make a pure optical isomer separately. *Ex parte Roth,* No. 92–2941, at 3–4 (B.P.A.I. Oct. 19, 1993) ("Novelty of an optically pure isomer is not negated by the prior art disclosure of its racemate."). The Board suggested that the Examiner consider a rejection for obviousness because the product was known to be racemic and methods of separating the racemic mixture into its enantiomers were known to those skilled in the art. *Id.* ¶ 157–158. But no such rejection occurred, and the #995 patent issued on December 28, 1993. Compl. ¶ 159. Plaintiffs allege that the patent could not have issued unless the examiner found a basis for overcoming an obviousness rejection and that the only allegedly surprising or unexpected characteristic Pfizer had identified that could possibly overcome an obviousness rejection was the alleged "unexpected" ten-fold difference in activity between the active enantiomer and the racemate. Compl. ¶¶ 160–163.

### C. #995 Patent Infringement Litigation

#### 1. U.S. Litigation

**\*6** On August 19, 2002, Ranbaxy filed the first Abbreviated New Drug Application ("ANDA") to market generic Lipitor. Complaint ¶ 197. Other generic companies followed with ANDAs of their own beginning in 2005. As the first generic to file, Ranbaxy was entitled to six months as the only generic competitor on the market. *Id.* ¶ 198. Ranbaxy's 180 days would not begin to run until either Ranbaxy began marketing its generic Lipitor or a court determined all Orange Book-listed Lipitor patents to be invalid and/or not infringed, whichever came first. *Id.* ¶ 198.

In or around February of 2003, Ranbaxy sent two Paragraph IV certifications to Pfizer, asserting that the sale, marketing, or use of Ranbaxy's generic atorvastatin calcium product would not infringe any valid Lipitor patents listed in the Orange Book. *Id.* ¶ 199. In response,

2013 WL 4780496, 2013-2 Trade Cases P 78,512

Pfizer sued Ranbaxy in the District of Delaware alleging that Ranbaxy's ANDA product would infringe the #893 and #995 patents (but not the other Lipitor patents). *Id.* ¶ 200 .[7] Because Pfizer filed its complaint within 45 days, it triggered an automatic two-and-a-half year stay of FDA approval of Ranbaxy's ANDA. *Id.* ¶ 198.

From 2003 to 2006, the infringement litigation progressed through discovery, a trial (in 2004), a district court decision (in 2005), and an eventual appeal and decision by the Federal Circuit (in 2006). *Id.* ¶ 201. Pfizer maintained that the patent specification did not represent a claim of ten-fold increase in activity but that the data showed that the active enantiomer had surprising activity. Based on the record before it, the district court found the #893 and #995 patents valid, enforceable, and infringed. Complaint ¶¶ 208–209; *Pfizer,* 405 F.Supp.2d at 517, 521. The court also specifically rejected Ranbaxy's claims of inequitable conduct in procuring the #995 patent, claims that are asserted by way of antitrust theories here in this litigation:

> As for the data submission issue, the Court is not persuaded that [Pfizer] manipulated or 'cherry picked' data with deceitful motives to achieve a deceitful result. [Pfizer] had ample data to support the claims it made to the PTO, and it provided the PTO with the data it believed was scientifically sound. The Court is not persuaded that the instances of non-disclosure cited by Ranbaxy are sufficient to demonstrate an intent to deceive the PTO. Pfizer has advanced reasonable and credible grounds for the non-production of certain data that weigh against a conclusion that Pfizer scientists and employees were intentionally deceiving the PTO.

*Pfizer,* 405 F.Supp.2d at 525. The court entered judgment in favor of Pfizer and against Ranbaxy on Ranbaxy's counterclaim of inequitable conduct. *Id.* at 525–26.

On November 2, 2006, the Federal Circuit reversed the district court's ruling on the #995 patent on a

technicality, determining that claim 6—the sole claim that Pfizer claimed Ranbaxy's ANDA product infringed—was invalid for, effectively, a scrivener's error. *Pfizer Inc. v. Ranbaxy Labs.,* 457 F.3d 1284, 1291–1292 (Fed.Cir.2006). The Federal Circuit declined to address the district court's other determinations regarding the #995 patent, such as the court's determination that there was no inequitable conduct before the PTO. *Id.*

**\*7** In late 2006, the district court amended its final judgment order to enjoin the effective date of any approval of Ranbaxy's ANDA for generic Lipitor until March 24, 2010 (the expiry of the #893 patent) and to remove from its final judgment order any prohibition of effective FDA approval of Ranbaxy's ANDA based on the #995 patent. *Id.* ¶ 216. The district court's final judgment order, as amended, was sent to the FDA. *Id.*

### 2. International Litigation

Pfizer also filed several patent infringement lawsuits in other countries involving counterparts to the #995 patent. *Id.* ¶ 23, n. 7. According to the Complaint, the factual record developed in the foreign lawsuits is the basis for many of the allegations of fraud on the PTO in the instant complaints. *Id.* at 23 n. 7.[8] The foreign counterparts to the #995 patent were identical to it in all meaningful respects, including the language in the patent specification addressing surprising and unexpected activity and the table showing a tenfold increase in the activity of the active enantiomer as compared to the racemate. Direct Purchaser Plaintiffs allege that these "lawsuits in foreign jurisdictions reveal [Pfizer's] abuses before the PTO ... [and that] courts in Australia and Canada have concluded that counterparts to the #995 patent were obtained as a result of these material misrepresentations." *See* Compl. ¶ 13. Plaintiffs add that "these decisions post-date a decision to the contrary in the District of Delaware [i.e., Judge Farnam's decision] ... [and are] based on a more comprehensive factual record and analysis [than Judge Farnam's decision]." *Id.* at 3 n. 1.

While the district court in the Ranbaxy litigation was considering its decision, Pfizer sued generic manufacturers Ranbaxy and Novopharm in Canada. *Pfizer Canada Inc. v. Novopharm Ltd.,* 2006 FC 1471 (Dec. 7, 2006) (*available at* http://decisions.fct-cf.gc.ca/en/2006/2006fc1471/2006fc1471.html); *Pfizer Canada Inc. v. Ranbaxy Labs. Ltd.,* 2007 FC 91 (January 25,

2007) (available at www.patenthawk.com/rulings/T–507–05.pdf). Shortly after the Federal Circuit invalidated the #995 patent, the patent's Canadian counterpart (the #546 patent) was ruled invalid by the Canadian trial court in the Canadian Ranbaxy litigation, due to the falsity of the data purportedly supporting the claim of ten-fold surprising activity. *Pfizer Canada Inc. v. Ranbaxy Labs. Ltd.,* 2007 FC 91 (January 25, 2007), ¶ 124. Even though the Canadian decision was based on the falsity of the data supporting claims in the patent specification, the Canadian court found only that the specification of the Canadian equivalent of the #995 patent did not "correctly and fully" describe the claimed invention, but made no finding that Pfizer committed fraud or otherwise acted with intent to deceive. *Id.,* ¶¶ 83, 123–124. On appeal, the Canadian Federal Court of Appeals unanimously reversed the trial court decision, holding that the specification sufficiently identified the claimed invention, advantages of the invention, and methods for producing the patented compounds. *Pfizer Canada Inc. v. Ranbaxy Labs. Ltd.,* 2008 FCA 108 (March 20, 2008), ¶¶ 52–64 (available at http://reports.fja.gc.ca/eng/2009/2008fca108.html). The Canadian Federal Court of Appeals concluded that Pfizer's enantiomer patent was fully valid and enforceable. *Id.* at ¶ 84.

**\*8** Pfizer had also sued Ranbaxy in Australia. On December 20, 2006, the federal court of Australia revoked the Australian counterpart to the #995 patent. *Ranbaxy Australia Pty Ltd. v. Warner–Lambert Comp.,* [2006] FCA 1787 (*available at* http://www.judgments.fedcourt.gov.au/judgments/Judgments/fca/single/2006/2006fca1787). The court found that the counterpart to the #995 patent was invalid under the Australian doctrine of "false suggestion," which unlike *Walker Process* fraud, contains no requirement of a deliberate intent by the patentee to deceive the patent office. *Ranbaxy Australia Pty Ltd. v. Warner–Lambert Comp.,* [2006] FCA 1787 (available at http://www.jud gments.fedcourt.gov.au/judgme nts/Judgments/fca/single/2006/2006fca1787). An Australian appellate court upheld the decision. *Ranbaxy Australia Pty Ltd. v. Warner Lambert Corp. LLC,* [2008] FCAFC 82 (May 28, 2008) (available at http://www.judgments.fedcour t.gov.au/judgments/Judgments/fca/full/2008/2008fcafc0082). While, the Australian appellate court specifically said that it "did not go so far as to conclude" that Pfizer intended to deceive the Australian patent office, the appellate court did uphold the trial court's findings which included that, essentially,

the scientific data available to Pfizer at the time of the patent application did not support a claim of surprising difference in activity between the active enantiomer and the racemate, and that there were no reasonable grounds for Pfizer to make many representations it had made in the specification. *Id.* ¶ 139; *see Ranbaxy Australia Pty Ltd. v. Warner–Lambert Comp.,* [2006] FCA 1787, ¶ 276.

### D. #995 Patent Reissue Proceedings.

In January of 2007, Pfizer initiated reexamination proceedings by filing Reissue Patent Application No. 11/653,830 ("the reissue application") to rectify the error identified by the Federal Circuit in claim 6 of the #995 patent. Compl. ¶¶ 219–20. During reissue proceedings, Ranbaxy filed multiple protests to prevent reissue of the #995 patent, asserting arguments it raised in the Delaware litigation which were never addressed on appeal, including that the #995 patent was anticipated by and obvious in view of the #893 patent, as well as that the #995 patent had been procured through deception. Compl. ¶¶ 224, 237; *see also* Ranbaxy Mem. In Supp. Of Ranbaxy Defs.' Motion To Dismiss Direct Purchaser Pls.' Compl., Master Docket No. 3:12–cv–2389 (PGS/DEA) (Dkt. Entry No. 244), at 7–8, 11–12 (Nov. 16, 2012) ("Ranbaxy Mem."). Pfizer disclosed to the PTO relevant materials from the # 995 patent litigation as well as from the patent proceedings in Australia and Canada involving foreign counterparts of the #995 patent. *See* Supplemental Commc'n, at 21 (June 7, 2007), Declaration of Brendan G. Woodard, dated November 16, 2012 (Dkt. Entry No. 246–2) ("Woodard Decl."), Ex. 1 (description of each patent).Woodard Decl., Ex. 7; Second Info. Disclosure Statement, at 2–3 (June 7, 2007), *id.,* Ex. 8. Pfizer expressly informed the PTO that the Australian decision addressed the issue of whether the foreign counterpart to the #995 patent "was obtained by false suggestion or misrepresentation" under Australian law. Supplemental Commc'n, at 29.

**\*9** In its application, Pfizer stated that it was "not at this point in the reissue rely[ing] for patentability on any comparisons based on CSI," and explained that it had "learned of significant errors in the COR results which neither Pfizer nor the parties adverse to it had discovered before." Compl. ¶ 223. Pfizer did not submit "corrected biological data" because, it explained, it was "not currently relying on the biological data for patentability" (which would include CSI, COR, and AICS data). *Id.* ¶ 226. Instead of relying on the biological data to show a surprising level of activity,

2013 WL 4780496, 2013-2 Trade Cases P 78,512

Pfizer relied upon evidence of Lipitor's commercial success as objective indicia of non-obviousness supporting patentability. Compl. ¶¶ 228, 233.

In April 2008, Pfizer and Ranbaxy entered into a settlement agreement (discussed in more detail below), under which the Plaintiffs allege that Ranbaxy either expressly or impliedly agreed to discontinue its protests to the pending reissuance proceedings. Id. ¶ 238. The PTO then reissued the #995 patent as the #667 reissue on April 6, 2009, despite Pfizer's disavowal of reliance on biological data and its disclosure of findings in the Australian and Canadian proceedings. Id. ¶ 241. The PTO based its ruling to grant the re-issuance of the #995 patent on Pfizer's arguments that the commercial success of Lipitor shows that the #995 patent could not have been obvious. Id. Because the PTO determined reissue based on commercial success, it did not look at the biological data during the reissuance and thus it never explicitly considered or decided whether Pfizer's claims about the active enantiomer's activity were true.

### E. Pfizer's FDA Petition

As the 30–month stay of approval triggered by Pfizer's U.S. suit against Ranbaxy neared its end in August 2005, Pfizer filed a petition with the FDA, which Direct Purchaser Plaintiffs allege was a sham filed in the hopes of further delaying the approval of Ranbaxy's atorvastatin calcium product. Id. ¶¶ 244–246. Any person can submit an unsolicited petition on any topic to FDA. *AstraZeneca Pharmaceuticals, LP v. FDA,* 850 F.Supp.2d 230, 235 (D.D.C.2012) (citing 21 CFR §§ 10.25(a), 10.30); *In re Prograf Antitrust Litig.,* 2012 WL 293850, No. 11–md–2242, *2 (D.Mass. Feb. 1, 2012). Petitions constitute a formal demand on FDA to take, or refrain from taking, a particular action, and require a response. *Biovail Corp. v. FDA,* 448 F.Supp.2d 154, 159–60 (D.D.C.2006) (FDA has 180 days from receipt of petition to approve, reject or issue tentative response indicating why decision cannot be made); *see also* 21 CFR 10.30(e)(2)(i)-(iii). In its petition, Pfizer urged the FDA to view ANDA applicants for generic Lipitor using amorphous atorvastatin calcium with "considerable skepticism," arguing that amorphous forms of atorvastatin "may be susceptible to higher levels of impurities than are found in Lipitor and that may degrade more quickly and thus have inferior stability compared to Lipitor." *Id.* ¶ 268.

**\*10** Salts of atorvastatin are, like salts of many compounds, polymorphic, meaning they can take either amorphous or crystalline forms. Complaint ¶ 249. The FDA generally views different polymorphs of a drug substance as the same active ingredient when evaluating ANDAs. *Id.* ¶¶ 250–258. The FDA reinforced this position over the years, and plaintiffs allege that Pfizer was aware of this. Complaint ¶¶ 251–258, 260, 261. In addition, plaintiffs allege that Pfizer knew from its own research that the amorphous version of atorvastatin presented fewer concerns for patient safety than did the crystalline form. *Id.* ¶ 266. Eventually, on the very first date on which Ranbaxy could enter the market, the FDA rejected Pfizer's petition, citing its longstanding policies for handling polymorphs. *Id.* ¶¶ 277–281. However, the version of generic Lipitor for which Ranbaxy obtained final approval is the crystalline form of atorvastatin calcium covered by the #156 patent *See* Ranbaxy Atorvastatin Label, at 10 (Rev.04/2012), Woodard Decl., Ex. 16.

### F. The Settlement Agreement With Ranbaxy

Finally, Plaintiffs allege that Pfizer filed baseless infringement litigation over process patents, which failed to meet basic Article III requirements, as a vehicle to effectuate an anticompetitive agreement with Ranbaxy behind the pretext of a litigation settlement. On March 24, 2008, Pfizer sued Ranbaxy alleging infringement of the #740 and #511 patents, which covered a particular process for making amorphous atorvastatin calcium that begins with the crystalline form. *Id.* ¶¶ 298–300. Plaintiffs allege that Pfizer's purpose in entering into the lawsuit was not to win this new lawsuit, but to create a pretext for an anticompetitive agreement it would label as a "settlement" of litigation.

At the time of suit in March 2008, Ranbaxy was already enjoined from entering the market until March 24, 2010 when the #893 patent was set to expire, due to Judge Farnan's decision. *Id.* ¶¶ 216, 301. Because the #740 and #511 patents are process patents, which by definition cannot be listed in the Orange Book, in order to keep Ranbaxy off the market past March 24, 2010, Pfizer would need to satisfy the traditional grounds for obtaining a declaratory judgment under patent law—demonstrating the existence of a justiciable case or controversy, and obtaining an injunction including proving a likelihood of success on the merits. Compl. ¶ 295. Plaintiffs allege that Pfizer could not meet this standard, Pfizer knew

2013 WL 4780496, 2013-2 Trade Cases P 78,512

it could not meet the standard—Judge Farnam had previously ruled that the mere threat of litigation over the process patents could not support jurisdiction prior to actual generic market entry—, and that in fact the Complaint contained only conclusory allegations concerning infringement. *Id.* ¶¶ 209, 302–303. Ranbaxy moved to dismiss, pointing out that "any harm to Pfizer from alleged infringement of the [process patents is] much less imminent now than [when Judge Farnam] found no imminent threat of harm or injury." *Id.* ¶ 301.

 **\*11** On June 17, 2008, before the court could rule on Ranbaxy's motion to dismiss, Pfizer and Ranbaxy entered into a "settlement" agreement—what Plaintiffs call the "Delay Agreement." *Id.* ¶¶ 311, 312, 320–322. The agreement was submitted to the Federal Trade Commission and Department of Justice pursuant to 21 U.S.C. § 355 (2010). Plaintiffs allege that the agreement constituted a reverse payment agreement, and that as a result of it, the direct purchasers and members of the class were deprived of the price-reducing benefits of timely generic competition. *Id.* ¶¶ 286–96, 312–22, 324, 327.

The agreement settled global patent proceedings regarding Lipitor including all U.S. patent litigation (although at that time, the only pending litigation concerning United States sales of Lipitor was the process patent action being settled). Compl. ¶¶ 312, 316; Ranbaxy Press Release (June 18, 2008), Woodard Decl., Ex. 9; Pfizer Press Release (Form 8–K) (June 18, 2008), *id.,* Ex. 10. Ranbaxy agreed not to compete with Pfizer, to keep its generic product off the market until November 30, 2011, not to waive or relinquish its first-to-file 180 day marketing exclusivity, and to drop its challenge to the #995 reissuance proceeding. *Id.* ¶¶ 238, 315–316, 324, 325. Plaintiffs allege that in return, Pfizer agreed to forgive outstanding money judgments Pfizer had obtained against Ranbaxy (unrelated to generic Lipitor) and to give Ranbaxy the right to market generic Lipitor in at least eleven international markets. Complaint ¶ 316, 324. The Settlement also resolved U.S. litigation between Pfizer and Ranbaxy pertaining to Ranbaxy's generic Caduet, Pfizer's combination of atorvastatin and amlodipine. Woodard Decl., Ex. 9. Pfizer also agreed to dismiss its action in the District of New Jersey regarding Ranbaxy's launch at risk of a generic version of Pfizer's product Accupril. Compl. ¶¶ 316–17; Woodard Decl., Exs. 9–10.

Plaintiffs allege that if it were not for the settlement, Ranbaxy's generic Lipitor product could have entered the market as early as March 24, 2010, when the #893 patent expired. *Id.* ¶ 298; *see* ¶¶ 316–317. Plaintiffs also allege that the settlement agreement's provision whereby Ranbaxy agreed not to waive its 180 day marketing exclusivity effectively blocked any other ANDA filer from entering the market, until six months after the agreed upon entry date, which was November 30, 2011. *See generally* Complaint ¶¶ 330–350. Other generic competitors could only come to market by obtaining a judgment of invalidity or non-infringement with respect to all the patents listed in the Orange Book (thus triggering Ranbaxy's 180 days), or by convincing the FDA to revoke Ranbaxy's 180 day exclusivity. *Id.* ¶¶ 330–335. Plaintiffs allege that Pfizer and Ranbaxy were able to delay other generics from the market (such as Apotex, Mylan, and Actavis) by delaying other litigation efforts, avoiding court battles over some patents, and settling cases prior to any judgment on the merits. *See id.* ¶ 335.

 **\*12** After the settlement, subsequent ANDA filers could still have triggered Ranbaxy's 180–day exclusivity period and marketed generic Lipitor "by obtaining court decisions that all of the unexpired patents Pfizer listed in the FDA 'Orange Book' claiming Lipitor were invalid or not infringed." Compl. ¶ 331. Eleven subsequent ANDA filers challenged the Lipitor patents and all filers subsequently settled. *See, e.g.,* Compl. ¶ 336–50; End–Payors' Compl. ¶¶ 333–47.

### G. Approval of Ranbaxy's ANDA
Years after Pfizer and Ranbaxy entered into the settlement agreement, Ranbaxy's ANDA was approved by the FDA on November 30, 2011, the day Ranbaxy's license to the unexpired Lipitor patents began. *See* FDA Approval Letter of Ranbaxy ANDA (Nov. 30, 2011), Woodard Decl., Ex. 15. The 30–month stay of FDA approval of Ranbaxy's ANDA had expired back in August 2005. Compl. ¶¶ 244–45.

In 2008, the FDA accused Ranbaxy of data integrity and good manufacturing practices issues at its Paonta Sahib, Batamandi and Dewas, India facilities. Consent Decree, *U.S. v. Ranbaxy Laboratories, Ltd.,* No. 1:12–cv–00250–JFM, ECF No. 2, ¶¶ III, IX (D.Md. Jan. 25, 2012), Woodard Decl., Ex. 12. In September 2008, the FDA then banned Ranbaxy from importing generic drugs due to compliance issues in the Paonta Sahib

and Dewas facilities, and in February 2009, the FDA halted review of all drug applications from the Paonta Sahib site, accusing Ranbaxy of falsifying data and test results. *Id.* ¶¶ XVII, XXVII, XLIX (LI.); Letters from FDA to Ranbaxy, dated September 16, 2008, Woodard Decl. Ex. 13. Ranbaxy's ANDA identified Paonta Sahib as a manufacturing site for atorvastatin. *See* Answer, *Mylan Pharm., Inc. v. FDA*, No. 1:11–cv–00566, ECF No. 14, ¶¶ 46–47 (D.D.C. Mar. 30, 2011), Woodard Decl., Ex. 14. The Complaint alleges on information and belief that despite this apparent obstacle to FDA approval, in 2009 Ranbaxy had moved its manufacturing site for atorvastatin from India to Ranbaxy's wholly-owned subsidiary, Ohm Laboratories in New Jersey, and that when Ranbaxy ultimately received FDA approval to market generic Lipitor in the U.S. it was from the New Jersey facility. Compl. ¶ 363. The Complaint alleges that Ranbaxy would have moved forward with the site transfer even earlier absent Ranbaxy's anticompetitive conduct.

### H. The Instant Complaints

To summarize, the Direct Purchaser Complaints allege that Pfizer obtained the follow-on enantiomer patent—the #995 patent—by fraud in order to extend Lipitor's patent protection 15 months beyond the expiration date of the # 893 patent. Pfizer did so by fabricating lab results, falsely claiming that the atorvastatin enantiomer "surprisingly" inhibited cholesterol ten times more powerfully than its related racemic mixture. Plaintiffs allege that after fraudulently procuring the #995 patent, Pfizer listed it in the Orange Book with the #893 patent that already covered Lipitor to impose regulatory hurdles and enable it to later bring litigation to stall generic competition, even though Pfizer allegedly knew the patent could not reasonably be asserted against generic competitors. In addition, through its citizen petition, Pfizer urged imposition of additional and unwarranted FDA review of amorphous forms of atorvastatin produced by generics even though Pfizer knew there was no reason to justify the heightened scrutiny. Plaintiffs also allege that Pfizer's infringement litigation over the #740 and #511 process patents, was baseless, and was only filed to provide a vehicle for what Plaintiffs allege is an anticompetitive agreement. Plaintiffs allege that the agreement was a "reverse payment" arrangement in which Pfizer paid Ranbaxy to stay off the market until the end of November 2011, and under which Ranbaxy agreed to maintain its 180 day marketing exclusivity. Plaintiffs allege that the agreement, combined with Pfizer's efforts to avoid

judicial determinations on its Lipitor patents, delayed other generic competitors from entering the market for atorvastatin calcium and deprived Plaintiffs of the benefits of competition.

**\*13** The direct purchasers Plaintiffs allege that all of the above amounted to Pfizer, first acting alone and later with Ranbaxy, engaging in a comprehensive anticompetitive scheme to delay generic competition in the market for Lipitor. The complaint asserts violation of sections 1 & 2 of the Sherman Act, 15 U.S.C. §§ 1 & 2. Plaintiffs allege that but for the defendants' conduct, Ranbaxy would have entered the market sooner, as early as March 24, 2010, and Plaintiffs allege that as a direct result, direct purchasers suffered antitrust injury by paying substantial overcharges on their purchases of atorvastatin calcium.

The Direct Purchaser Class Plaintiffs bring this action on behalf of themselves and, under Fed.R.Civ.P. 23(a) and (b)(3), as representatives of a Direct Purchaser Class defined as follows:

> All persons or entities in the United States and its territories who purchased and/or paid for or will pay for Lipitor and/or generic equivalents directly from any of the defendants at any time during the period March 24, 2010 through and until the anticompetitive effects of defendants' conduct cease (the "Class Period").

Compl. ¶ 399.

### I. The Motions to Amend

On August 7, 2013, after briefing, supplemental briefing, and oral argument on the motions to dismiss, Direct Purchaser Class Plaintiffs filed a Motion for Leave to Amend the Consolidated Amended Class Action Complaint (Dkt. Entry No. 435). The Direct Purchaser Class Plaintiffs seek to amend their Complaint to clarify their reverse payment allegations in light of the recent Supreme Court decision in *FTC v. Actavis, Inc. See* —— U.S. ——, 133 S.Ct. 2223, 186 L.Ed.2d 343 (2013). Other Direct Purchaser Plaintiffs have also filed notices

In re Lipitor Antitrust Litigation, Not Reported in F.Supp.2d (2013)

2013 WL 4780496, 2013-2 Trade Cases P 78,512

requesting leave to amend their complaints should the Court grant the motions to dismiss their complaints (Dkt. Entry Nos. 439, 440).

## DISCUSSON

### I. Legal Standard on Motion to Dismiss

To give a defendant fair notice, and permit early dismissal if the complained-of conduct does not provide adequate grounds for the cause of action alleged, a complaint must allege, in more than legal boilerplate, free facts about the defendant's conduct giving rise to liability. *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007); Fed.R.Civ.P. 8(a) and 11(b)(3). These factual allegations must present a plausible basis for relief (i.e., something more than the mere possibility of legal misconduct, and more than mere conclusory allegations). *See Ashcroft v. Iqbal,* 556 U.S. 662, 681, 129 S.Ct. 1937, 1951, 173 L.Ed.2d 868 (2009).

"In its review of a motion to dismiss pursuant to Rule 12(b) (6), the Court must "accept all factual allegations as true and construe the complaint in the light most favorable to the plaintiff." *Phillips v. Cnty. of Allegheny,* 515 F.3d 224, 231 (3d Cir.2008) (quoting *Pinker v. Roche Holdings Ltd.,* 292 F.3d 361, 374 n. 7 (3d Cir.2002)). "In deciding motions to dismiss pursuant to Rule 12(b) (6), courts generally consider only the allegations in the complaint, exhibits attached to the complaint, matters of public record, and documents that form the basis of a claim." *Lum v. Bank of Am.,* 361 F.3d 217, 222 n. 3 (3d Cir.2004).

### II. Choice of Law

**\*14**  In Defendants' opening briefs, they argued that Federal Circuit law applies to the antitrust analysis the Court would undertake. At the time the Defendants made that argument, its primary import was thought to be the resulting decision's effect on Plaintiffs' reverse payment theory, because of the differing standards applied to such claims in the Third and Federal Circuits. *Compare In re K– Dur Antitrust Litigation,* 686 F.3d 197, 218 (3d Cir.2012) (reverse payments are presumptively anticompetitive) *with In re Ciprofloxacin Hydrochloride Antitrust Litigation,* 544 F.3d 1323 (Fed.Cir.2008) (settlements are not anticompetitive unless they exceed the "scope of the patent"). This split has since been resolved by the Supreme Court. *See FTC v. Actavis, Inc.,* —— U.S. ——, 133 S.Ct.

2223, 186 L.Ed.2d 343 (2013). Nevertheless, the question of what law to apply remains, even if the impact of its resolution is less clear.

The United States Court of Appeals for the Federal Circuit has "exclusive jurisdiction of an appeal from a final decision of a district court of the United States ... in any civil action arising under, or in any civil action in which a party has asserted a compulsory counterclaim arising under, any Act of Congress relating to patents." 28 U.S.C. § 1295(a)(1). The corollary of that jurisdictional grant is that a "district court must ... follow Federal Circuit precedent in a case arising under the patent laws." *Foster v. Hallco Mfg. Co., Inc.,* 947 F.2d 469, 475 (Fed.Cir.1991). A case "aris[es] under the patent laws" if a plaintiff's complaint establishes that "plaintiff's right to relief necessarily depends on resolution of a substantial question of federal patent law, in that patent law is a necessary element of one of the well-pleaded claims." *Christianson v. Colt Indus. Operating Corp.,* 486 U.S. 800, 809, 108 S.Ct. 2166, 100 L.Ed.2d 811 (1988). If a plaintiff presents a claim "supported by alternative theories in the complaint," i.e., theories other than patent law theories, that claim does not depend on patent law and accordingly the Federal Circuit lacks jurisdiction. *Id.* at 810. In other words, an antitrust claim only gives rise to Federal Circuit jurisdiction and only necessitates the application of Federal Circuit law, if "patent law is essential to each of [the] theories" of liability under the antitrust claims alleged in the complaint. *Id.*

Here, the DP Complaint alleges, among other things, that Pfizer and Ranbaxy's settlement was a "reverse payment" settlement that gives rise to antitrust liability. A reverse payment theory is independent of patent law. *See Joblove v. Barr Labs., Inc.* (*In re Tamoxifen Citrate Antitrust Litig.*), 466 F.3d 187, 199–200 (2d Cir.2006). Thus, Plaintiffs can obtain relief on their antitrust claims by resting on their non-patent theories, such as the reverse payment theory, without relying on the arguably patent-related aspects of the alleged scheme, such as the *Walker Process* fraud theory. Plaintiffs' *Walker Process* theory is just that, a theory, and one of several theories of recovery alleged in support of the antitrust claim. This theory of recovery does not make Plaintiffs' antitrust claims dependent on patent law. The presence of an "alternative, non-patent theory compels the conclusion that [Plaintiffs' antitrust claims] do not 'arise under' patent law." *Christianson,* 486 U.S. at 813. Accordingly, Third

Case 2:19-cv-07532-ES-MAH Document 18-5 Filed 05/22/19 Page 30 of 300 PageID: 338
In re Lipitor Antitrust Litigation, Not Reported in F.Supp.2d (2013)
2013 WL 4780496, 2013-2 Trade Cases P 78,512

Circuit, not Federal Circuit law, applies to the antitrust claims before the Court.

## III. Section 2 Claims

**\*15** Under section 2 of the Sherman Act, persons "who ... monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of ... trade or commerce," may be subjected to civil liability for their actions. 15 U.S.C. § 2. To state a claim for monopolization, a plaintiff must plead two elements: "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *Race Tires America, Inc. v. Hoosier Racing Tire Corp.,* 614 F.3d 57, 75 (3d Cir.2010) (quoting *Eastman Kodak Co. v. Image Tech. Svcs.,* Inc., 504 U.S. 451, 481, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992)). Plaintiff's Section 2 claims are based on several different theories, including Plaintiffs' allegations of *Walker Process* fraud, sham litigation, a sham citizen petition to the FDA, false Orange Book listing, a reverse payment settlement, and an overarching scheme.

### A. *Walker Process*

In *Walker Process Equipment Inc. v. Food Machinery and Chemical Corp.,* 382 U.S. 172, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965), the Supreme Court specifically addressed monopoly allegations linked to patents that were allegedly procured by fraud. The Court held that proof that a patent holder knowingly and willfully misrepresented facts indicating invalidity to the PTO would deny the patent holder its exemption from the antitrust laws provided by that patent. *Id.* at 176–80. Courts have stated the elements of a *Walker Process* claim as:

> (1) the patent at issue was procured by knowing or willful fraud on the USPTO; (2) the defendant was aware of the fraud when enforcing the patent; (3) there is independent evidence of a clear intent to deceive the examiner; (4) there is unambiguous evidence of reliance, i.e., that the patent would not have issued but for the misrepresentation

or omission; and (5) the necessary additional elements of an underlying violation of the antitrust laws are present.

*Jersey Asparagus Farms, Inc. v. Rutgers Univ.,* 803 F.Supp.2d 295, 306 n. 9 (D.N.J.2011) (quoting *Nobelpharma AB v. Implant Innov., Inc.,* 141 F.3d 1059 (Fed.Cir.1998)). Hence, in addition to alleging that the patent-holder obtained the patent through an actual fraud perpetrated on the PTO, a *Walker Process* plaintiff " 'must also [allege] the basic elements of an antitrust violation defined by the regional circuit's law....' " *Id.* (quoting *Dippin' Dots, Inc. v. Mosey,* 476 F.3d 1337,1346–48 (Fed.Cir.2007).

### 1. *Walker Process* Standing

Pfizer argues that the Direct Purchaser Plaintiffs have no standing to assert their *Walker Process* claim, because "courts have generally held that purchasers have no standing to indirectly challenge pharmaceutical patents through antitrust claims based on fraud on the PTO, particularly absent no prior findings that the patents are 'tarnished' by inequitable conduct." Pfizer Mem. at 19–20.[9] Pfizer argues that this Court should refuse purchaser standing in this case—where, Pfizer says, the patents at issue have been affirmatively upheld as valid and enforceable after litigation and reissue proceedings before the PTO—for at least three reasons: (1) granting standing would conflict with the limits on standing to challenge patents established in the Declaratory Judgment Act and the Hatch–Waxman Act, which Plaintiffs argue limit who can attack patents in order to preserve the incentives to innovate, *see* Pfizer Mem. at 20–23; (2) granting standing would "upset the delicate balance between the patent and antitrust laws," which Plaintiffs say would also "disturb[ ] the incentives for innovation" underlying the patents system, *see id.* at 23 (citing *DDAVP,* 585 F.3d at 688–92); (3) and purchasers' claims are derivative of generic manufacturers' claims, such that purchasers have not "suffer[ed] the sort of 'direct' injury necessary for antitrust standing," *see id.* at 26 (quoting *Kaiser,* 2009 WL 3877513, at \* 4).

**\*16** As a general matter, purchasers of goods or services have standing to assert antitrust overcharge claims under § 4 of the Clayton Act, which has been the case for over

In re Lipitor Antitrust Litigation, Not Reported in F.Supp.2d (2013)

2013 WL 4780496, 2013-2 Trade Cases P 78,512

a century. *Chattanooga Foundry & Pipe Works v. City of Atlanta,* 203 U.S. 390, 396, 27 S.Ct. 65, 51 L.Ed. 241 (1906). Antitrust standing is not limited to competitors of the alleged monopolist. *Blue Shield of Va. v. McCready,* 457 U.S. 465, 478–79, 102 S.Ct. 2540, 73 L.Ed.2d 149 (1982). The Supreme Court has held that direct purchasers are generally the preferred plaintiffs to bring overcharge claims. *Illinois Brick Co.,* 431 U.S. at 725–26; *Hanover Shoe,* 392 U.S. at 489.

More particularly, though, courts have been cautious about exposing patent-holders to ancillary attacks, including antitrust attacks, because the threat of vexatious litigation would "disturb[ ] the incentives for innovation" underlying the patent system. *See DDAVP,* 585 F.3d at 688–92; *see also* U.S. Const., Art. I, § 8; *Therasense,* 649 F.3d at 1288–89; *SCM Corp. v. Xerox Corp.,* 645 F.2d 1195, 1206 (2d Cir.1981). Thus, some courts have declined to "open the door to all direct purchasers otherwise unable to challenge a patent's validity being able to do so by dressing their patent challenge with a *Walker Process* claim." *Kroger Co. v. Sanofi–Aventis,* 701 F.Supp.2d 938, 960–61 (S.D.Ohio 2010); *see also Ciprofloxacin,* 363 F.Supp.2d at 542; *Kaiser,* 2009 WL 3877513, at \*4–5. In *DDAVP,* the Second Circuit narrowly held that where the patent in question *already* had been "tarnished" by a finding of inequitable conduct in the underlying patent case, a direct purchaser could have standing to pursue a *Walker Process* claim. 585 F.3d at 691–92.

Until very recently, only two district courts, both outside the Third Circuit, took the opposite view and granted standing to purchasers without requiring a patent already tarnished by a finding in prior litigation, and neither case involved pharmaceuticals or Hatch–Waxman. *See Molecular Diagnostics Labs. v. Hoffmann–La Roche Inc.,* 402 F.Supp.2d 276 (D.D.C.2005), and *Ritz Camera & Image, LLC v. SanDisk Corp.,* 772 F.Supp.2d 1100 (N.D.Cal.2011). While the instant motions to dismiss were pending, however, the Federal Circuit decided an appeal in the *Ritz Camera* case, and held that the direct purchaser plaintiffs had standing to bring antitrust claims alleging fraud on the PTO. The appeal in *Ritz Camera* was,

imited to a single question: Whether direct purchasers who cannot challenge a patent's validity or enforceability through a declaratory

judgment action (and have not been sued for infringement, and so cannot assert invalidity or unenforceability as a defense in the infringement action) may nevertheless bring a *Walker Process* antitrust claim that includes as one of its elements the need to show that the patent was procured through fraud.

*See Ritz Camera & Image, LLC v. SanDisk Corp.,* 700 F.3d 503, 506 (Fed.Cir.2012). The Federal Circuit held that direct purchasers have standing to pursue antitrust claims stemming from fraud on the PTO, "even if [they] could have not sought a declaratory judgment of patent invalidity or unenforceability." *Id.* at 507. Significantly, whereas "the Second Circuit 'decline[d] to decide whether purchaser plaintiffs *per se* have standing to raise *Walker Process* claims,' and held 'only that purchaser plaintiffs have standing to raise *Walker Process* claims for patents that are already unenforceable due to inequitable conduct,' " the Federal Circuit "[saw] no reason to limit the scope of *Walker Process* standing to cases in which the patents have been 'tarnished' in another proceeding." *Id.* at 507 n. 2 (internal citations omitted) (quoting *DDAVP,* 585 F.3d at 691–92). The Federal Circuit based its broader holding on the fact that *Walker Process* itself suggested no limitation on purchaser standing, and on the court's estimation that "applying such a requirement would have the undesirable effect of subjecting injured parties' claims to the litigation strategies of others ... [and would] be likely to generate unproductive wrangling over what counts as a sufficiently 'tarnished' patent to support a *Walker Process* claim." *Id.*

**\*17** Although this Court is not bound by the Federal Circuit's holding, it is persuasive authority, both by virtue of the Circuit's jurisdiction over many patent appeals and because of its thorough and careful treatment of this issue. The Federal Circuit is correct that the Supreme Court's *Walker Process* decision does not support the argument that the rules governing standing to bring patent validity challenges should be imported into antitrust cases. *See id.* at 506; *Walker Process,* 382 U.S. at 175–76. For this reason, the Court declines to follow other courts in this district that have categorically restricted purchaser standing. *See In re Remeron Antitrust Litig.,* 335 F.Supp.2d 522, 528–29 (D.N.J.2004); *Carrot Components*

*Corp. v. Thomas & Betts Corp.,* 229 U.S.P.Q. 61, 64 (D.N.J.1986). But this Court is not entirely convinced that there should be no limits on purchaser standing. While the Federal Circuit rejected a need for purchaser plaintiffs to show that a patent is already "tarnished", it did not speak to the unique situation now before this Court where Plaintiffs' antitrust claims implicate the enforceability of a patent that has been upheld after extraordinary scrutiny by U.S. and foreign courts, and the PTO. That is, although the Federal Circuit expressly declined to limit standing to purchasers' challenging already tarnished patents, it did not speak to patents whose validity has been confirmed after repeated scrutiny, and where repeated challenges failed to result in findings of intentional misconduct. In *Ritz Camera,* claims that the patent was procured by intentional fraud survived summary judgment in the underlying patent litigation. *Id.* at 506. The Federal Circuit implied that this fact was not necessary to its decision. But, to this Court at least, it is still unclear what the Courts of Appeals would do if, as is the case here, the patent at issue had been subjected to multiple challenges by generic competitors, upheld after a trial on claims of inequitable conduct virtually identical to the purchaser plaintiffs', and the PTO later confirmed the patent's validity and enforceability even though it was on notice of and in possession of the pertinent materials from the foreign and domestic litigations. *See* Compl. ¶ 306.

The Court's decision here, however, does not need to rest on the denial of purchaser standing, and thus it does not. As will be discussed in the next section, Plaintiffs' *Walker Process* claims fail because the allegations are implausible in light of the results of the previous litigations and proceedings before the PTO. As the *Ritz Camera* court noted, any "flood" of *Walker Process* litigation will be discouraged by "the demanding proof requirements of a *Walker Process* claim." *Id.* at 508. Here, although the Court does not deny Plaintiffs standing or require that Plaintiffs show that the #995 patent, or any other, has already been tarnished, the Court explains in the next section that a previous court's determinations that the patent was valid after intense scrutiny had been brought to bear on it, and the PTO's reissuance after same, renders it difficult for the Plaintiffs to make *plausible* allegations that meet "the demanding proof requirements of a *Walker Process* claim." *Id.*

**2. Merits of *Walker Process* Claim**

*18 Defendants challenge the sufficiency of Plaintiffs' *Walker Process* allegations, arguing that they are implausible in light of the District of Delaware's finding of inequitable conduct in the #995 patent litigation. Defendants argue that Plaintiffs here allege the same theory of misrepresentations to the PTO which was advanced by Ranbaxy during previous litigation. Noting that Ranbaxy's allegations of inequitable conduct were decided under what Defendants characterize as the more lenient *Therasense* standard applicable when the Delaware District court issued its decision, Defendants argue that Plaintiffs claim in this litigation must fail under *Walker Process'* s more rigorous standard. *See* DP Opp. at 37–39 (citing *Therasense, Inc. v. Becton, Dickinson & Co.,* 649 F.3d 1276 (Fed.Cir.2011)). Defendants further argue that Pfizer's disclosure to the PTO during reissue proceedings of adverse foreign decisions from Canada and Australia concerning foreign counterparts to the #995 patent, and the PTO's eventual reissuance of the patent, confirm the implausibility of Plaintiffs' allegations. *See id.* at 43–49. In opposition, Plaintiffs argue that they have adequately plead a *Walker Process* allegation, including that they have met the heightened pleading standard of Rule 9(b) as it applies to their claim. Plaintiffs also argue that: (1) they are not bound by Judge Farnam's findings, and in any event his findings support rather than call into question Plaintiffs' allegations; (2) Judge Farnam did not have critical evidence of Pfizer's misconduct before him when he rendered the decision, nor did the foreign courts that have reviewed foreign counterparts to the #995 patent; and (3) reissuance of the #995 patent does not cure Pfizer's alleged violations.

Plaintiffs say that their *Walker Process* claim may one day depend on a jury believing that the active enantiomer possesses a surprising or ten-fold increase in activity over the racemate, but Plaintiffs assert that today is not that day. According to Plaintiffs, "[t]oday's question is whether the complaint alleges that Pfizer's claim of surprising ten-fold activity is false, that Pfizer intended to deceive the PTO, and that the #995 patent would not have issued but for that misrepresentation." DPP Opp. at 42. However, under *Twombly,* the question is actually whether the Complaint *plausibly* alleges these things. *See Twombly,* 550 U.S. at 556–57. A plaintiff's claim "is facially plausible 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.' " *Wyeth Holdings Corp.,* 2012 U.S. Dist. LEXIS 26912, at *11 (quoting

*Iqbal, 556 U.S. at 678).* For the reasons that follow, the Court holds that it is not reasonable to infer that Pfizer is liable for the *Walker Process* fraud alleged in the Complaint.

In essence, Plaintiffs' *Walker Process* claim is premised on the allegation that Pfizer submitted affirmatively "false" or "misleading" CSI data to the PTO to show that the cholesterolsynthesis inhibition activity of the active enantiomer was surprising and unexpected, and submission of that data was intended to, and did, deceive the PTO into issuing the #995 patent. This decision does not rest on any failure on Plaintiffs' part under Fed.R.Civ.P. 8(a) or 9(b) to spell out these allegations. This decision rests on the fact that these allegations were presented at trial in the litigation before Judge Farnam, in Australia and Canada, and in reissue proceedings before the PTO.

**\*19** In the Delaware litigation, Judge Farnam considered whether Pfizer "intentionally withheld certain CSI data and manipulated CSI data that was disclosed to deceive the PTO and support its assertions concerning the activity of atorvastatin calcium." *Pfizer Inc. v. Ranbaxy Labs. Ltd.,* 405 F.Supp.2d 495, 524 (D.Del.2005), *aff'd in part,* 457 F.3d 1284 (Fed.Cir.2006). Ranbaxy also alerted the Court to Pfizer's use of averages rather than head to head comparisons. *Id.* Ranbaxy claimed that Pfizer withheld data from the PTO that contradicted the proposition that the active enantiomer was ten times more active than the racemate, including adverse data from CSI–107 and CSI–118, and from an AICS screen. *Id.* at 522, 524. Judge Farnam was also made aware of solubility issues in CSI–118. *Id.* at 524 n. 12.

Plaintiffs admit that Judge Farnam concluded that the allegations before him were insufficient to support a finding of inequitable conduct under the then-existing standard. Compl. ¶ 208; Walgreen Compl. ¶ 164; Meijer Compl. ¶ 160. Judge Farnam disposed of many, if not all, of the allegations Plaintiffs make here on his way to finding that there was no evidence of any intent to deceive by Pfizer. For example, Judge Farnam disposed of the allegation that Pfizer's decision to use averages rather than head-to-head comparisons of the CSI data was improper. *See Pfizer,* 405 F.Supp.2d at 524. Judge Farnam likewise found no evidence of an intent to deceive with respect to material allegedly withheld from the PTO, such as the CSI–107 assay. *Id.* at 524–25. In addition,

despite Plaintiffs' assertions to the contrary, they have not convincingly shown through the Complaint, briefing, or oral argument, that Judge Farnam lacked any of the alleged evidence of fraud that is now before the Court. [10]

As Plaintiffs' fraud theory is premised on the same allegations that Judge Farnam held did not constitute inequitable conduct in the underlying patent case, it is implausible to suggest that those allegations meet the higher standard for stating a *Walker Process* claim. *See Daiichi Sankyo,* 2009 WL 1437815, at \*6 (dismissing as matter of law *Walker Process* counterclaims in view of prior finding of no inequitable conduct, stating that "if the finding of no inequitable conduct stands, there can be no *Walker Process* fraud"); *Kemin Foods, L.C. v. Pigmentos Vegetales Del Centro S.A.,* 384 F.Supp.2d 1334, 1353–54 (S.D.Iowa 2005) (granting motion to dismiss *Walker Process* counterclaims where patents-at-issue were previously held valid and enforceable).

The Canadian and Australian litigations referenced in the Complaint, during which Plaintiffs say "many of the facts recounted [in the Complaints relating to the alleged fraud] have come to light," do nothing to alter the Court's conclusion that Plaintiffs' *Walker Process* allegations are implausible. *See* Compl. ¶ 13 n. 1, at 28 n. 7; Compl. ¶¶ 209–14; *Walgreen* Compl. at 21 n. 8; *Meijer* Compl. at 19 n. 8. The Canadian decision was overturned on appeal while the #995 patent reissue proceedings were pending, s*ee Pfizer Canada Inc. v. Minister of Health,* Docket: A–79–07, 2008 FCA 108, at 84 (Mar. 20, 2008), Woodard Decl., Ex. 19; and while the Australian court reviewing a counterpart to the #995 patent found that Pfizer was guilty of "false suggestion", the court specifically held that Pfizer did not intentionally misrepresent anything to the relevant patent office.

**\*20** The PTO's reissuance of the #995 patent despite its awareness of all of the foregoing is also instructive and detrimental to Plaintiffs' claims. Pfizer submitted the foreign decisions to the PTO during the reissue prosecution (Ranbaxy also specifically referenced them as well in its protests to reissuance), and the PTO nevertheless reissued the patent. *See* Woodard Decl., Ex. 8, at 2; *id.,* Ex. 7, at 21, 28–31; Ranbaxy Protest (May 21, 2007), Woodard Decl., Ex. 11, 19–20, 25. Pfizer also specifically informed the PTO that it had become aware of other errors in the biological data it had relied on during the Canadian and Australian litigations to show the active

2013 WL 4780496, 2013-2 Trade Cases P 78,512

enantiomer's "unexpected activity" as compared to the racemate (i.e. Pfizer had become aware of errors besides the alleged errors in the CSI data at issue in the Delaware trial). Compl. ¶¶ 223–26; *Walgreen* Compl. ¶¶ 172–74; *Meijer* Compl. ¶¶ 168–70.

Pfizer's disclosures to the PTO of the foreign decisions, as well as its clarifications regarding certain biologic data submitted in support of the # 995 patent, undermines the plausibility of Plaintiff's allegation that Pfizer intended to deceive the PTO. *See Twombly,* 550 U.S. at 556–57; *Iqbal,* 129 S.Ct. at 1949. The PTO's reissuance of the #995 patent also suggests that Plaintiffs' claim that the PTO would not have issued the patent but for the alleged misrepresentations or omissions is implausible. The PTO examines a reissue application in the same manner and subject to the same rules as if being presented for the first time in an original application. 37 C.F.R. § 1.176; MPEP § 1440. Thus reissue examiners independently consider the same issues of patentability an examiner would during examination of an original application, *see In re Tanaka,* 640 F.3d 1246, 1251 n. 1 (Fed.Cir.2011), including whether a reissue patent would be unenforceable because of fraud or inequitable conduct during the original prosecution, *see* MPEP § 2012. The PTO was aware of the findings in the Canadian and Australian decisions and that certain data was allegedly withheld in the original prosecution, and the PTO still reissued the patent. This is contrary to Plaintiffs' allegation that the #995 patent would not have issued if the PTO had been aware of this information during the original prosecution. Of course, inequitable conduct cannot be cured by a reissue or reexamination. *Taro Pharm.,* 2012 WL 2513523, at *4. But reissue of the #995 patent contributes to the Court's determination that Plaintiffs' *Walker Process* claims are implausible, because reissuance of a patent "is dispositive of whether the PTO would have issued the original [patent]," and here the PTO reissued the #995 patent despite being aware of the allegedly new evidence of fraud now before the Court. *RB Rubber Prods., Inc. v. Encore Int'l, Inc.,* No. 11–cv–319, 2012 WL 860416, at *8 (D.Or. Mar.13, 2012).

In sum, Plaintiffs' *Walker Process* claim rests on a glimmer of hope that a factfinder will somehow be convinced that Pfizer intentionally lied to the PTO, when a District Court has already found after a trial that Pfizer did not misrepresent anything to the PTO, let alone that Pfizer lied intentionally. Plaintiffs' claim

also rests on the hope that this Court will find Pfizer's conduct before the PTO fraudulent, when the PTO itself implicitly condoned Pfizer's conduct by reissuing the #995 patent. The Court finds these glimmers of hope to be wholly speculative, indeed, implausible, in light of the facts before it, particularly where Plaintiffs fail to clearly and accurately, let alone convincingly, explain what allegations in the Complaint were not made before Judge Farnam or presented to the PTO during the reissuance process. Accordingly, Pfizer's motion to dismiss the Direct Purchaser Complaints is granted insofar as it argues for dismissal of the *Walker Process* claims.

### B. "Sham" Litigation and False Orange Book Listing

**\*21** Insofar as Plaintiffs allege other theories of liability under Section 2 of the Sherman Act that are based on the fraud theory underlying their *Walker Process* allegation, those theories are also dismissed. Specifically, Plaintiffs' allegations regarding Orange Book listing and "sham" litigation to enforce the #995 patent are based entirely on the purported fraud in obtaining that patent. But listing presumptively valid patents in the Orange Book and enforcing them against infringers are not bases for an antitrust claim; Orange Book listing is a statutory obligation and enforcement is a statutory right. 21 U.S.C. § 355(b)(1) (1992); *see also, e.g., Daiichi Sankyo, Inc. v. Apotex, Inc.,* Civ. No. 030937, 2009 WL 1437815, at *9 (D.N.J. May 19, 2007); *Ciprofloxacin,* 363 F.Supp.2d at 546. Accordingly, these allegations cannot form the basis for antitrust liability and will be dismissed.

The complaint also alleges the process patent suit was meritless and was filed to provide cover for Pfizer and Ranbaxy to reach an agreement not to compete. DPP Opp. at 30–31, 61–63. But to the extent that the "sham" litigation allegation is based on the litigation over the process patents, the claim still must be dismissed. To show that the process patent litigation was a sham, Plaintiffs must establish, among other things, that "no reasonable litigant" could have expected Pfizer to succeed on the merits. *Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.,* 508 U.S. 49, 60, 113 S.Ct. 1920, 123 L.Ed.2d 611 (1993); *Indep. Serv. Orgs. Antitrust Litig.,* 203 F.3d 1322, 1326 (Fed.Cir.2000); *Nobelpharma AB v. Implant Innovations,* 141 F.3d 1059, 1107 (Fed.Cir.1998). Plaintiffs do not meet this standard, as the Complaints allege no plausible basis, and therefore should be dismissed. When Ranbaxy moved to dismiss the infringement claims against it for lack of subject

2013 WL 4780496, 2013-2 Trade Cases P 78,512

matter jurisdiction, arguing that "any harm to Pfizer from alleged infringement of the [process patents is] much less imminent now than in the [#995 patent] case when the Court found no imminent threat of harm or injury," *id.* ¶ 301, the court permitted jurisdictional discovery rather than grant Pfizer's motion to dismiss. This fact alone strongly suggests that the Pfizer's complaint was not objectively baseless. In addition, in making their sham litigation allegation, Plaintiffs make no effort to explain why subject matter jurisdiction was lacking under the standard for declaratory judgment jurisdiction in *MedImmune, Inc. v. Genentech, Inc. See* 549 U.S. 118, 130–32, 127 S.Ct. 764, 166 L.Ed.2d 604 (2007). Finally, Plaintiffs ignore that the timing of the process patent litigation was consistent with the typical duration for litigating infringement claims, and for obtaining an injunction under the process patents to prevent a potential at-risk launch by Ranbaxy in March 2010 when the injunction under the #893 patent expired. The assertion that the process patent litigation was a sham and merely "provided cover" for the settlement is not justified. Pfizer's motion to dismiss the Section 2 claims is therefore granted insofar as the claims are based on sham litigation and false Orange Book listing allegations

### C. "Sham" Citizen Petition

**\*22** Plaintiffs also allege that a citizen petition submitted by Pfizer purporting to alert the FDA to stability and safety issues in certain generic versions of Lipitor was a "sham" and intended to cause the FDA to delay approval of generic ANDAs, including Ranbaxy's. Compl. ¶ 275; *Walgreen* Compl. ¶ 209; *Meijer* Compl. ¶ 205. Defendants argue, however, that Plaintiffs cannot allege that Pfizer's citizen petition was "objectively baseless," which is the applicable standard.

FDA citizen petitions are generally immune from antitrust liability under the *Noerr–Pennington* doctrine subject to a narrow exception, which requires that the petition be: (i) objectively baseless; and (ii) "an attempt to interfere with the business relationships of a competitor through the use of the governmental process—as opposed to the outcome of that process—as an anticompetitive weapon." *DDAVP,* 585 F.3d at 685–86. To be "objectively baseless," a citizen petition must have been such that no reasonable pharmaceutical manufacturer could have "realistically expected the FDA to grant the relief sought." *La. Wholesale Drug Co. v. Sanofi–Aventis,* No. 07 Civ. 7343, 2009 WL 2708110, at \*4 (S.D.N.Y. Aug. 28, 2009).

Here, Plaintiffs argue that Pfizer's citizen petition was objectively baseless because it "lacked any reasonable regulatory, scientific, medical or other reasonable basis," it lacked evidence, and it was "contrary to FDA's expressed views regarding drug substance polymorphic forms," Compl. ¶ 275; *Walgreen* Compl. ¶ 209; *Meijer* Compl. ¶ 205. However, Pfizer's petition was supported by scientific evidence, and was duly considered on its merits (albeit ultimately rejected) by the FDA. *See* Citizen Petition (Nov. 9, 2005), Woodard Decl., Ex. 21, Letter from FDA to Pfizer, Docket No. 2005P–0452/CPI (May 4, 2006), Woodard Decl., Ex. 22. Six months after receiving Pfizer's petition, the FDA stated it had not reached a decision because the petition raised "complex issues requiring extensive review." It then took the FDA a total of more than six years to finally issue a decision on Pfizer's petition. *See* Compl. ¶¶ 272–77. In 2011—more than five years after Pfizer originally submitted the petition—the FDA represented to a federal court in the District of Columbia that it was still reviewing and analyzing the issues in the petition. *See* Woodard Decl. Ex. 23. The FDA's statement shows that it viewed the petition as raising more than trivial concerns, i.e., that the FDA itself did not consider Pfizer's petition objectively baseless. *See La. Wholesale Drug Co. v. Sanofi–Aventis,* No. 07 Civ. 7343, 2009 WL 2708110, at \*4 (S.D.N.Y. Aug. 28, 2009) (objectively baseless petition is one no drug company could have "realistically expected FDA to grant"). The FDA never expressed a view that Pfizer's petition was baseless, despite the fact that the FDA has previously suggested that certain citizen petitions were baseless in its denials and even raised concerns about the anticompetitive intent of the petitioner. *See, e.g., In re Flonase Antitrust Litig.,* No. 08–cv–3301, at 24 (E.D.Pa. July 14, 2008), Woodard Reply Decl. Ex. M (FDA stated petition not supported with evidence and petitioner used regulatory process to "shield its market share" from competing generic drug products in manner inconsistent with "[t]he policies behind Hatch–Waxman"); *La. Wholesale Drug Co. v. Sanofi–Aventis,* No. 07–cv–7343, at 3,6 (S.D.N.Y. Aug. 17, 2007), Woodard Reply Decl. Ex. N (FDA stated petition based on "false premise" and out-of-date citations and "intend [ed] (at least in part) to delay generic competition"); *In re Prograf Antitrust Litig.,* 1:11–md–2242–RWZ, at 9 (D.Mass. Feb. 1, 2012), Woodard Reply Decl. Ex. O (FDA stated petitioner provided no "data or analysis" for certain claims and some studies submitted were "highly

2013 WL 4780496, 2013-2 Trade Cases P 78,512

questionable"). The FDA made no such statements in
response to Pfizer's petition here.

**\*23** As the allegations in the Complaint fail to show that
Pfizer's citizen petition was "objectively baseless", Pfizer's
submission is protected by the *Noerr Pennington* doctrine,
and thus the Pfizer's motion to dismiss Direct Purchaser
Plaintiffs' Section 2 claims is granted insofar as the claims
are based on Pfizer's citizen petition to the FDA.

### D. Remaining Section 2 Claims
The only theories of Pfizer's liability under the Sherman
Act's Section 2 which remain to be addressed are the
Direct Purchaser Plaintiffs' allegation that Pfizer paid
Ranbaxy to settle the process patent litigation and to
stay off the Lipitor market until an agreed upon entry
date, and the allegation that Pfizer is liable for an
overarching anticompetitive scheme consisting of all of
the aforementioned conduct. Plaintiffs so-called "reverse
payment" allegations under Section 2 are identical to the
allegations that underlie their Section 1 claims, so they will
be addressed in the section of this opinion which addresses
the Section 1 claims, *infra.* The Court finds Plaintiffs'
"overarching anticompetitive scheme" allegation to be
without merit. Having already determined that all of the
specific allegations of conduct in violation of Section 2,
except for the reverse payment allegations, are meritless
and insufficient to state a claim for relief, the Court finds
that a claim based on the purported "combined" impact
of Plaintiffs' claims is also without merit. *See e.g., Eatoni
Ergonomics, Inc. v. Research in Motion Corp.,* 486 F. App'x
186, 191 (2d Cir.2012) ("Because these alleged instances
of misconduct are not independently anticompetitive, we
conclude that they are not cumulatively anti-competitive
either."); *Intergraph Corp. v. Intel Corp.,* 195 F.3d 1346,
1367 (Fed.Cir.1999). Accordingly, Pfizer's motion to
dismiss is also granted as to Plaintiffs' Section 2 allegations
insofar as they are based on Pfizer's alleged overarching
anticompetitive scheme, and the only allegations of Direct
Purchaser Plaintiffs that remain to be addressed are the
"reverse payment" allegations. However, before the Court
addresses the reverse payment allegations, it will address
Pfizer's standing arguments as relevant.

### III. Standing
To have standing, Plaintiffs must allege facts sufficient to
show that they suffered the type of injury the antitrust
laws were intended to prevent and that the alleged injury

flows from the Defendants' allegedly unlawful or anti-
competitive acts (*i.e.,* causation). *Alberta,* 826 F.2d at
1249 (citing *Brunswick Corp. v. Pueblo Bowl–O–Mat,
Inc.,* 429 U.S. 477, 489, 97 S.Ct. 690, 50 L.Ed.2d 701
(1977)). Plaintiffs allege that they were injured by the
absence of generic Lipitor between March 24, 2010 (when
the #893 patent expired) and November 30, 2011 (when
Ranbaxy entered the market). However, Pfizer argues
that Plaintiffs lack standing because Plaintiffs cannot
assert that Pfizer's conduct directly caused their injuries.
Instead, Pfizer argues, the failure of generic competitors
to enter the market sooner had independent causes such as
Ranbaxy's failure to obtain FDA approval until its entry
date in November 2011, and perhaps more importantly,
Pfizer's other Lipitor patents (other than the #893 and
#995 patents)—the RE #667, #971, #104 and #156
patents—which gave Pfizer the right to exclude others
from making, using, and selling a generic copy of Lipitor
until January 8, 2017, when the last patent is due to
expire. *See* Compl. ¶ 322; *Walgreen* Compl. ¶ 227; *Meijer*
Compl. ¶ 223; Woodard Decl ., Ex. 4. Pfizer argues that
Plaintiffs' injury allegations are predicated on Plaintiffs'
assertion—which Pfizer labels "speculation"—that upon
expiration of the #893 patent in March 2010, generic
challengers would have been able to secure FDA approval
for and launch generic versions of atorvastatin in the face
of the other Lipitor Patents. Pfizer argues that "[s]uch
speculation fails" because it is either based on the premise
that Ranbaxy could design around the other Lipitor
Patents and obtain FDA approval for a new product or
process before November 30, 2011, which Plaintiffs fail to
support with facts, or on the premise that Ranbaxy would
have prevailed in eventual infringement litigation over
the Lipitor Patents, which is the kind of hypothesizing
about future litigation that is "repeatedly foreclosed by the
courts." Pfizer Br. at 32.

**\*24** The parties each rely heavily on dueling cases
bearing on this issue. Defendants cite *In re Ciprofloxacin
Hydrochloride Antitrust Litig.,* 261 F.Supp.2d 188
(E.D.N.Y.2003), in which a district court in the Second
Circuit rejected as speculative two theories of injury
applicable here—that absent a reverse payment agreement
a generic challenger would have been successful in its
litigation with a brand name manufacturer, and that the
generic challenger would have entered the market upon
FDA approval without awaiting the outcome of the patent
litigation. *See id.* at 199–201. Plaintiffs cite *King Drug Co.
of Florence, Inc. v. Cephalon, Inc. et al.,* 702 F.Supp.2d 514

(E.D.Pa.2010), where a district court in this Circuit found plaintiffs' allegation—that but for a settlement agreement, generic entry would have occurred earlier than it actually did—sufficient at the pleading stage, and dismissed as "conjecture" the defendants' assertion that no generic manufacturer would have entered "at risk." *See id.* at 535, 537. Here, the Court sides with Plaintiff.

The Court disagrees with Pfizer, and holds that Plaintiffs have adequately alleged that their injuries flow from Defendants' anticompetitive conduct. Plaintiffs need only allege that Defendants' conduct was a "material cause" of their injury. *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 114 n. 9, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969); *see also Cardizem,* 332 F.3d at 911; *Greater Rockford Energy & Tech. Corp. v. Shell Oil Co.,* 998 F.2d 391, 401 (7th Cir.1993); *In re Neurontin Antitrust Litig.,* MDL 1479, 2009 WL 2751029 (D.N.J. Aug.28, 2009). In addition, causation is generally a factual issue, and particularly here where Defendants contest the allegation that generic competition would have and could have entered the market sooner but for Defendants' conduct. Specifically, there are factual disputes to be resolved about, *inter alia,* the ability of generic competitors, including Ranbaxy, to design around the Lipitor Patents, to prevail in any infringement litigation, and to gain FDA approval for whatever product they sought to market. Each of these factual issues is addressed in the Complaint, which alleges: (1) generic makers could design around the Orange-book listed Lipitor Patents, Compl. ¶ 196; (2) before entering into the Delay Agreement, Ranbaxy announced its willingness to launch at risk, and gained additional insurance though its partnership with Teva, (who had a history of launching at risk), Complaint ¶¶ 352, 367–369; and (3) in December 2009, before the expiration of the #893 patent, Ranbaxy transferred its manufacturing site for generic Lipitor from India to New Jersey and the FDA later approved that transfer, Complaint ¶ 363–366. Any doubts about these assertions as they relate to causation "should be resolved against the person whose behavior created the problem," at least at this stage of the litigation. *See* III Phillip E. Areeda & Herbert Hovenkamp, ANTITRUST LAW ¶ 651 c. Accordingly, the Court sides with Plaintiffs and follows *King Drug,* in holding that Plaintiffs' allegation—that absent the Defendants' anticompetitive conduct, Plaintiffs would have been able to purchase generic Lipitor at significantly reduced prices—to be sufficient to confer

standing upon Plaintiffs. *King Drug,* 702 F.Supp.2d at 537.

**\*25** However, given the Court's decision to grant Pfizer's motion to dismiss the majority of the theories underlying Plaintiffs' Section 2 claims, including most importantly the allegation that the #995 patent was procured by fraud, and limit the litigation going forward to the "reverse payment" allegations, the potential damages period will begin at the earliest on June 28, 2011, when the reissued #995 patent expired, because the #995 patent was an independent bar to generic entry before that time.

### IV. Reverse–Payment Allegations and Direct Purchaser Class Plaintiffs' Motion For Leave to Amend

Plaintiffs' reverse-payment allegations underlie both their Section 1 and Section 2 claims. In Section 1, the Sherman Act provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1. If read literally, this would make every agreement in restraint of trade illegal. *See Arizona v. Maricopa Cnty. Med. Soc'y,* 457 U.S. 332, 342, 102 S.Ct. 2466, 73 L.Ed.2d 48 (1982). However, the Supreme Court has long construed this section of the Act to prohibit only unreasonable restraints. *See State Oil Co. v. Khan,* 522 U.S. 3, 10, 118 S.Ct. 275, 139 L.Ed.2d 199 (1997).

Whether a restraint qualifies as unreasonable and therefore conflicts with the statute is normally evaluated under the "rule of reason." *Id.* Applying this approach, "the finder of fact must decide whether the questioned practice imposes an unreasonable restraint on competition, taking into account a variety of factors, including specific information about the relevant business, its condition before and after the restraint was imposed, and the restraint's history, nature, and effect." [11] *Id.* Courts have recognized, however, that "[s]ome types of restraints ... have such predictable and pernicious anticompetitive effect, and such limited potential for pro-competitive benefit, that they [should be] deemed unlawful per se." *State Oil Co.,* 522 U.S. at 10. In other situations, courts apply an antitrust analysis that falls between the full rule of reason inquiry and the per se approach. This so-called "quick look" or "truncated rule of reason" analysis has generally been applied where the plaintiff has shown that the defendant has engaged in practices

2013 WL 4780496, 2013-2 Trade Cases P 78,512

similar to those subject to per se treatment, and its application means that plaintiff is not required to make a full showing of anti-competitive effects within the market; rather defendant has the burden of demonstrating pro-competitive justifications. *See Brown Univ.,* 5 F.3d at 669.

When the instant motions to dismiss were originally briefed, different Circuits had reached different conclusions about the application of the antitrust laws to Hatch–Waxman–related patent settlements. *Compare, e.g., FTC v. Watson Pharms., Inc.,* 677 F.3d 1298, 1312 (Fed.Cir.2012) (settlements generally "immune from antitrust attack"), with *In re K–Dur Antitrust Litigation,* 686 F.3d 197, 214–218 (3d Cir.2012) (settlements presumptively unlawful). However, while the motions were pending, the Supreme Court issued its decision in *FTC v. Actavis,* thereby setting the standard for how so-called "reverse payment" settlements must be scrutinized under the Sherman Act. *See FTC v. Actavis, Inc.,* ––– U.S. ––––, 133 S.Ct. 2223, 186 L.Ed.2d 343 (2013).

**\*26** After the parties in this case submitted supplemental briefing to address the Supreme Court's decision in *Actavis,* and after oral argument was held, Direct Purchaser Class Plaintiffs moved to amend their Complaint to clarify their "reverse payment" allegations. *See* Dkt. Entry No. 435. Other Direct Purchaser Plaintiffs have also informed the Court of their desire to amend their respective complaints. Pfizer opposes Plaintiffs' motion to amend. Pfizer argues that the motion should be denied because the amendments would be futile, Plaintiffs have unduly delayed seeking leave to amend, and because Defendants would allegedly be prejudiced if leave to amend is granted.

Federal Rule of Civil Procedure 15(a)(2) permits a plaintiff to amend its complaint with leave of court, and "[t]he court should freely give leave when justice so requires." *See* Fed.R.Civ.P. 15(a)(2). Whether to grant leave to amend is within the Court's discretion. *Sesta v. Bank of America,* 2013 U.S. Dist. LEXIS 91097, \*2, 2013 WL 3288105 (D.N.J. June 28, 2013). "[I]n the absence ... undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of amendment[,]" leave to amend should be "freely given." *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962).

Here, Plaintiffs' seek to clarify and augment the "reverse payment" allegations already contained in the Complaint, because of new information it has learned in discovery. Plaintiffs seek to demonstrate that the Pfizer/Ranbaxy settlement of their Accupril litigation, which was referenced in the Complaint, was, in reality, a payment by Pfizer to Ranbaxy to delay Ranbaxy's launch of its generic version of Lipitor, regardless of the fact that Ranbaxy made a $1 million payment to Pfizer. Defendants argue that the proposed amendment would be futile because the amended allegations still fail to allege an actionable reverse payment under the Supreme Court's standard in *Actavis,* which Defendants say only applies to settlements involving large monetary payments from the brand name manufacturer to the generic. The Court disagrees, and holds that the proposed amendments are not futile; although the Court declines to decide whether the proposed amendments will be sufficient to survive a motion to dismiss, it notes that nothing in *Actavis* strictly requires that the payment be in the form of money, and so it declines to hold that the amendments would be futile on that basis. Nor does the Court agree that Plaintiffs have unduly delayed seeking leave to amend their complaints or that Defendants were prejudiced in any way. It seems that Plaintiffs did not believe they needed to amend their Complaint until Defendants' complained Plaintiffs' allegations were ambiguous at a recent oral argument, and in any event, Defendants have been on notice of the nature of Plaintiffs' amended allegations for many months. As such, Plaintiffs cannot be said to have unduly delayed amendment. In addition, Defendants bear the burden of demonstrating they would be prejudiced by the amendment, and they have not done so. *See Bechtel v. Robinson,* 886 F.2d 644, 652 (3d Cir.1989). Defendants cannot argue that they would be unduly prejudiced by Plaintiffs' amendments because Plaintiffs are not seeking to add a new claim, but are merely seeking to clarify the factual allegations underpinning an already-existing claim —factual allegations that Defendants have been on notice of since at least when Plaintiffs filed their opposition to the motions to dismiss.

**\*27** Simply put, it is the Court's view that justice would be aided by Plaintiffs filing amended complaints focused solely on the "reverse payment" allegations now that the Court has dismissed the remainder of the allegations. After the amended complaints are filed, Defendants may file new motions to dismiss, at which time the Court can

Case 2:19-cv-07532-ES-MAH   Document 18-5   Filed 05/22/19   Page 39 of 300 PageID: 347
In re Lipitor Antitrust Litigation, Not Reported in F.Supp.2d (2013)
2013 WL 4780496, 2013-2 Trade Cases P 78,512

rule on both Plaintiffs' and Defendants' "best shots" which incorporate evidence uncovered in discovery to date as well as their understanding of the law as it was laid out recently in *Actavis*.

## CONCLUSION

For the reasons stated above, the Court grants Pfizer's motion to dismiss the Direct Purchaser's Complaints in part, and denies it without prejudice in part. The Court also grants Direct Purchaser Class Plaintiff's motion to amend. The Court dismisses the Direct Purchaser Complaints insofar as they allege theories of liability premised on anything other than Pfizer's alleged payment to Ranbaxy in connection with their settlement of the process patent litigation, denies Pfizer's motion to dismiss without prejudice insofar as it seeks to dismiss the reverse payment claims, and grants Direct Purchaser Plaintiffs leave to amend only their reverse payment claims. Direct Purchaser Class Plaintiffs, and any other Plaintiffs that wish to, may amend their complaint in a manner consistent with this opinion within thirty days.

## ORDER

IT IS on this 5th day of September, 2013,

**ORDERED** that Pfizer's motion to dismiss (Dkt. Entry No. 246) is GRANTED in part and DENIED without prejudice in part; Pfizer's motion is GRANTED and the claims in the Direct Purchaser Complaints are dismissed to the extent they are based on anything but the Pfizer/Ranbaxy settlement agreement; Pfizer's motion is DENIED without prejudice insofar as it seeks to dismiss claims in the Direct Purchaser Complaints based on the Pfizer/Ranbaxy settlement agreement; and it is further

**ORDERED** that Direct Purchaser Class Plaintiffs' motion for leave to amend (Dkt. Entry No. 435) is GRANTED; and it is further

**ORDERED** that Direct Purchaser Plaintiffs may file amended complaints consistent with this opinion within thirty days.

### All Citations

Not Reported in F.Supp.2d, 2013 WL 4780496, 2013-2 Trade Cases P 78,512

Footnotes

1   This opinion refers to four Defendants collectively or alternatively as "Pfizer": Pfizer Inc., Pfizer Manufacturing Ireland, Pfizer Ireland Pharmaceuticals, Warner–Lambert Company, and Warner–Lambert Company LLC. Pfizer Inc. is a Delaware corporation that sold branded Lipitor. Pfizer Manufacturing Ireland ("Pfizer Ireland"), formerly known as Pfizer Ireland Pharmaceuticals, formerly known as Warner Lambert Export, Ltd., is a partnership organized and existing under the laws of Ireland, and is a wholly-owned indirect subsidiary of Pfizer, Inc; Pfizer Ireland was the exclusive licensee of the #995 patent, which is the patent at issue in this litigation. Warner–Lambert Company is a corporation formerly organized under Delaware law which co-promoted Lipitor with Pfizer and later became a wholly-owned subsidiary of Pfizer by merger in 2000; in 2002, Warner–Lambert Company became a Delaware limited liability company and changed its name to Warner–Lambert Company LLC.

2   This opinion refers to Defendants Ranbaxy, Inc., Ranbaxy Pharmaceuticals, Inc., and Ranbaxy Laboratories, Ltd, collectively or alternatively as "Ranbaxy."

3   At the time the motion to dismiss was filed, three groups of Direct Purchaser Plaintiffs asserted claims in three operative complaints: (1) "Direct Class Plaintiffs": a purported class of direct purchasers identified in Consolidated Amended Class Action Complaint and Jury Demand, No. 3:12–cv–02389–PGS–DEA (Sept. 10, 2012) ("Compl."), (2) "Opt–Out *Walgreen* Plaintiffs": identified in Complaint and Demand for Jury Trial, *Walgreen Co. et al. v. Pfizer Inc. et al.,* No. 3:12–cv–04115– PGS–DEA (July 5, 2012) (*"Walgreen* Compl."); and (3) "Opt–Out *Meijer* Plaintiffs": identified in Complaint and Demand for Jury Trial, *Meijer, Inc. et al. v. Pfizer Inc. et al.,* No. 3:12–cv04537–PGS–DEA (July 19, 2012) (*"Meijer* Compl."). While the motion was pending, an additional group of Direct Purchasers brought suit, and stipulated with Defendants that they would be subject to the decision on this pending motion. *See Rite Aid Corp. et al. v. Pfizer Inc. et al.,* No. 3:12–cv–07561– PGS–DEA (Dkt. Nos. 1 & 9). The facts alleged in all of the Complaints are substantially similar; this decision primarily refers to the Direct Class Plaintiffs' Complaint, although the Court has reviewed and considered all of them.

In re Lipitor Antitrust Litigation, Not Reported in F.Supp.2d (2013)

2013 WL 4780496, 2013-2 Trade Cases P 78,512

4    The Federal Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C. §§ 301–399 (2006), requires a company seeking to
     market a new drug to file information for any patents covering the drug for which a claim for infringement could reasonably
     be asserted, which the FDA lists in the Orange Book. Under Hatch–Waxman, manufacturers seeking to market a generic
     form of an innovator drug before the last expiring Orange Book-listed patent must file a "Paragraph IV Certification" with
     its ANDA, certifying that its product will not infringe any listed patent and/or that the patent is invalid or unenforceable. 21
     U.S.C. § 355(j)(2)(A)(vii)(IV). This constitutes an artificial act of infringement, after which the innovator has 45 days to sue,
     which lawsuit would trigger a 30–month stay of final FDA approval of the ANDA. See id. § 355(j)(5)(B). This allows the
     generic manufacturer to litigate patent validity and infringement to avoid facing an "at risk" product launch and exposure
     to substantial damages. The first generic to file an ANDA containing a Paragraph IV Certification is eligible for 180 days
     of generic marketing exclusivity, during which the FDA may not approve any later-filed ANDAs. See id. § 355(j)(5)(B)(iv).

5    The Complaint provides by way of an analogy and illustration the image of a person's left hand and right hand, which
     are also non-superimposable mirror images of each other.

6    The Complaints list the in vitro COR and CSI assays and the in vivo AICS screen as the primary tests. Id. ¶¶ 127, 130.

7    In total, Pfizer sued eleven generic applicants that filed Lipitor ANDAs containing Paragraph IV Certifications. Compl.
     ¶¶ 200, 300, 336, 340, 347; see Pfizer Inc. v. Ranbaxy Labs. Ltd., No. 1:03–cv–00209–JJF, ECF No. 1 (D.Del. Feb.
     21, 2003); Pfizer Inc. v. Cobalt Pharm., Inc., No. 1:07–00790–JJF, ECF No. 1 (D.Del. Dec. 6, 2007); Pfizer Inc. v. Teva
     Pharm. USA, Inc., No. 1:07–cv–00360–JJF, ECF No. 1 (D. Del. June 7, 2007); Pfizer Inc. v. Teva Pharm. USA, Inc., No.
     08–237–JJF, ECF No. 1 (D.Del. Apr. 25, 2008); Pfizer Inc. v. Apotex Inc., No. 1:08–cv–07231, ECF No. 1 (N.D.Ill.Dec.
     17, 2008); Pfizer Inc. v. Mylan Inc., No. 1:09–cv–00441–LPS, ECF No. 1 (D. Del. June 15, 2009); Pfizer Inc. v. Kremers
     Urban, LLC, No. 1:09–cv–00924–LPS, ECF No. 1 (D.Del. Dec. 3, 2009); Pfizer Inc. v. Dr. Reddy's Labs. Ltd., No. 1:09–
     cv–00943–LPS, ECF No. 1 (D.Del. Dec. 8, 2009); Pfizer Inc. v. Actavis Grp. hf., No. 1:10–cv–00675–LPS, ECF No. 1
     (D.Del. Aug. 11, 2010); Pfizer Inc. v. Aurobindo Pharma Ltd., No. 1:11–cv–00569–LPS, ECF No. 1 (D. Del. June 27,
     2011); Pfizer Inc. v. MSP Singapore Co. LLP, No. 1:11–cv–00713–LPS, ECF No. 1 (D.Del. Aug. 15, 2011); Pfizer Inc. v.
     Macleods Pharm. LTD, No. 1: 11–cv–05662–PKS, ECF No. 1 (S.D.N.Y. Aug. 15, 2011).

8    "Many of the facts recounted in [Section E of the DP Complaint, which is titled "1989–1993: Warner–Lambert obtains
     a follow-on enantiomer patent by fraud,"] have come to light during international patent litigation." Id. (citing Ranbaxy
     Australia Pty Ltd. v. Warner–Lambert Company LLC (Appeal) (2008 FCAFC 82 (May 28, 2008); Pfizer Canada Inc. v.
     Ranbaxy Labs. Ltd., 2007 FC 91 (January 25, 2007); Ranbaxy Australia Pty Ltd. v. Warner–Lambert Company LLC, 2006
     FCA 1787 (December 20, 2006); Pfizer Canada Inc. v. Novopharm Ltd., 2006 FC 1471 (Dec. 17, 2006).

9    Citing, e.g., In re DDAVP Direct Purchaser Antitrust Litig., 585 F.3d 677, 688–92 (2d Cir.2009); Kroger Co. v. Sanofi–
     Aventis, 701 F.Supp.2d 938, 963 (S.D.Ohio 2010); Kaiser Found. v. Abbott Labs., No. CV 02–2443, 2009 WL 3877513,
     at *4–5 (C.D.Cal. Oct.8, 2009); In re Ciprofloxacin Hydrochloride Antitrust Litig., 363 F.Supp.2d 514, 541 (E.D.N.Y.2005);
     In re Remeron Antitrust Litig., 335 F.Supp.2d 522, 528–29 (D.N.J.2004); Carrot Components Corp. v. Thomas & Betts
     Corp., 229 U.S.P.Q. 61, 64 (D.N.J.1986); cf. Asahi Glass Co. v. Pentech Pharm., Inc., 289 F.Supp.2d 986, 990–92
     (N.D.Ill.2003).

10   For examples of allegations and arguments made in the Complaint that Plaintiffs say were not before Judge Farnam,
     but which Defendants have shown were indeed presented to the Court in the Delaware litigation, see Pfizer Reply Br.,
     Docket No. 343, at 20–22.

11   This inquiry has been divided into three parts. See In re K–Dur Antitrust Litig., 686 F.3d 197, 209 (3d Cir.2012). First,
     the plaintiff must show that the challenged conduct has produced anti-competitive effects within the market. Id. (citing
     United States v. Brown Univ., 5 F.3d 658, 668 (3d Cir.1993)). If the plaintiff meets the initial burden, "the burden shifts
     to the defendant to show that the challenged conduct promotes a sufficiently pro-competitive objective." Id. Finally, the
     plaintiff can rebut the defendant's purported pro-competitive justification by showing that the restraint is not reasonably
     necessary to achieve the pro-competitive objective. Id.

---

**End of Document**                          © 2019 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT C

Cable Line, Inc. v. Comcast Cable Communications of..., Not Reported in Fed....

2017 WL 4685359, 2017 Fair Empl.Prac.Cas. (BNA) 373,817

2017 WL 4685359
United States District Court, M.D. Pennsylvania.

CABLE LINE, INC. and McLaughlin
Communications Inc., Plaintiffs,

v.

COMCAST CABLE COMMUNICATIONS OF
PENNSYLVANIA, INC., et al., Defendants.

3:16-CV-1000
|
Filed 10/18/2017

**Attorneys and Law Firms**

Charles D. Mandracchia, Mandrachia & Mcwhirk, LLC,
Jeffrey W. Soderberg, Mandracchia Law, LLC, Skippack,
PA, Leah B. Rotenberg, Mays, Connard & Rotenberg,
Wyomissing, PA, for Plaintiffs.

Steven A. Reed, Zachary M. Johns, R. Brendan Fee,
Morgan Lewis & Bockius LLP, Joe H. Tucker, Leslie
M. Greenspan, Tucker Law Group, LLC, Philadelphia,
PA, Douglas Weiner, Mazzeo Song PC, New York,
NY, Donald M. Lewis, III, Keefer, Wood, Allen &
Rahal, Harrisburg, PA, Joseph A. O'Brien, Oliver Price &
Rhodes, Clarks Summit, PA, for Defendants.

**MEMORANDUM OPINION**

Robert D. Mariani, United States District Judge

**I. INTRODUCTION AND PROCEDURAL HISTORY**

*1 Plaintiffs are cable installation companies that
were former subcontractors of Comcast Cable
Communications of Pennsylvania, Inc. ("Comcast").
They have brought suit against Comcast and two other
cable installation subcontractors for violations of the
Sherman Act and related state antitrust laws, as well as an
employment discrimination claim.

All three defendants moved to dismiss Plaintiff's original
complaint on July 29, 2016 and August 1, 2016. Docs.
31, 33, 36. Plaintiffs filed an Amended Complaint on
September 14, 2016 with additional allegations, though
the claims remained substantively the same. Doc. 41.
Defendants then moved to dismiss all counts of the

Amended Complaint on October 14, 2016. Docs. 48,
50, 52. For reasons stated below, this Court will grant
Defendants' motions to dismiss the claims without
prejudice, but with leave to file a Second Amended
Complaint.

**II. FACTUAL ALLEGATIONS**

Plaintiffs are cable installation companies incorporated
in Pennsylvania. Doc. 41 ¶¶ 1, 2. Comcast is a cable
television company and an internet service provider. *Id.* ¶
10. In order to provide cable and internet services to its
customers, Comcast subcontracts with cable installation
companies, such as plaintiffs, to install and maintain
cable fibers and related devices in customer homes.
*Id.* ¶ 11. Plaintiffs, along with co-defendants Decisive
Communications ("Decisive") and Vitel Communications
("Vitel"), have all competed for Comcast's business
in the past. *Id.* ¶ 15. In 2010, plaintiffs, Vitel, and
Decisive were all selected by Comcast to provide cable
installation service after a competitive process. *Id.* ¶
16. In particular, Plaintiffs were awarded contracts with
Comcast to provide cable installation services in parts of
Pennsylvania, Maryland, Virginia, and West Virginia. *Id.*
¶¶ 16-22. Comcast then advised its selected subcontractors
to "ramp up" operations in order to prepare for incoming
installation work. *Id.* ¶ 24. Plaintiffs understood that
Comcast had solicited cable installation firms to work for
at least three years. *Id.* ¶ 34.

However, two years after it hired plaintiffs, Comcast
initiated a "national subcontractor reduction plan" that
called for a reduction of Comcast's cable installation
subcontractors from 176 firms to 39 firms nation-
wide. *Id.* ¶¶ 27, 28. Plaintiffs were among the firms
that were terminated. *Id.* ¶ 33. They were notified of
the decision by letter in February 2012, though the
termination was not "formalized" until May 2012. *Id.*
In making the decision as to which subcontractors which
would be terminated, Comcast allegedly chose to only
work with the larger subcontractors such as Decisive
and Vitel, who were purportedly underbilling Comcast
by not acknowledging invoices, not billing for service
calls, and falsifying performance metrics. *Id.* ¶¶ 29–
31. Specifically, Plaintiffs allege that "larger companies,
such as Defendants Decisive, could view and change the
information stored in [Comcast's internal system]" and
that Decisive deleted its number of service calls in the

WESTLAW   © 2019 Thomson Reuters. No claim to original U.S. Government Works.

2017 WL 4685359, 2017 Fair Empl.Prac.Cas. (BNA) 373,817

system, i.e. "truck roll" reports. *Id.* ¶¶ 80–82. Thus, larger companies like Decisive and Vitel "gained a competitive advantage" by underreporting "truck rolls," absorbing the immediate expenses, and thereby seeming cheaper to Comcast and giving the impression of better service quality. *Id.* ¶¶ 92, 93. Decisive and Vitel also allegedly encouraged Comcast's customers to call them directly about service issues instead of calling Comcast, therefore making their performance appear better to Comcast. *Id.* ¶¶ 87, 89. Plaintiffs further allege that Comcast "knew" about these practices by Vitel and Decisive, but did not do anything about them because it resulted in Comcast not having to reimburse Vitel and Decisive for service calls. *Id.* ¶ 99. Finally, they allege that when Comcast initiated the subcontractor reduction plan, it made a "preliminary determination" on February 28, 2012 to terminate Vitel and Decisive. *Id.* ¶ 104. However, executives at Comcast "intervened to keep Decisive and Vitel" so that they can "profit[ ] without producing good results." *Id.* ¶ 105.

**\*2** Separately, plaintiffs allege that Comcast "had an extra motive for working with Vitel, despite [its] spotty record," because it was classified as "diverse." *Id.* ¶ 108. Comcast has committed to developing more "diverse" cable content and at least ten minority-owned cable channels by 2019. *Id.* ¶ 110. Comcast is allegedly "struggling" with its efforts to develop content by minority artists, and has thus turned its focus on "boosting minority participation in other segments" such as the hiring of its cable installation subcontractors. *Id.* ¶ 113. Plaintiffs allege that one of the reasons Vitel was kept on by Comcast was that it happened to be "tracked as diverse, [while] plaintiffs were not." because they are Caucasian-owned and operated. *Id.* ¶¶ 118, 119.

After their termination, plaintiffs were forced to lay off their workers and liquidate their inventory. *Id.* ¶ 36. Some of plaintiffs' equipment was sold to Decisive and Vitel for "pennies on the dollar," while their former employees were recruited by Decisive and Vitel. *Id.* ¶¶ 36–45. Plaintiffs allege that Comcast "informed Defendants Vitel and Decisive that Plaintiffs had been terminated before it informed Plaintiffs, in order to give [them] a chance to recruit [plaintiffs'] trained technicians," and they did so "just before Plaintiffs received their termination letter." *Id.* ¶¶ 44, 45. Plaintiffs allege that Comcast did so in order to "eliminate smaller companies and competitors to Vitel and Decisive." *Id.* ¶ 48. Between February 28, 2012 to May 27, 2012, Vitel and Decisive were allegedly able to

work with Comcast to "consolidat[e] the market for cable installation in specific municipalities in Pennsylvania, West Virginia, Virginia, and Maryland." *Id.* ¶ 52. Plaintiffs allege that as a result of the consolidation, there has been a decrease in quality of cable installation service, *id.* ¶ 52, because smaller companies like plaintiffs were more familiar with rural territories and could service such communities better. *Id.* ¶¶ 64–66. Plaintiffs also allege that the reduction plan "flatten[ed] wage rates and employment choices for individual installers," though it is unclear from the Amended Complaint how that effect came to be. Finally, plaintiffs allege that cable services and equipment costs for consumers had increased "nationally" since their termination. *Id.* ¶¶ 57, 58.

## III. STANDARD OF REVIEW

A complaint must be dismissed under Federal Rule of Civil Procedure 12(b)(6) if it does not allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 1974, 167 L.Ed. 2d 929 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949, 173 L.Ed. 2d 868 (2009).

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of a cause of action's elements will not do." *Twombly*, 550 U.S. at 555 (internal citations and alterations omitted). "[T]he presumption of truth attaches only to those allegations for which there is sufficient 'factual matter' to render them 'plausible on [their] face' ... Conclusory assertions of fact and legal conclusions are not entitled to the same presumption." *Schuchardt v. President of the United States*, 839 F.3d 336, 347 (3d Cir. 2016) (citing *Iqbal*, 556 U.S. at 679, 129 S.Ct. 1937).

"Although the plausibility standard 'does not impose a probability requirement,' it does require a pleading to show 'more than a sheer possibility that a defendant has acted unlawfully.' " *Connelly v. Lane Const. Corp.*, 809 F.3d 780, 786 (3d Cir. 2016) (citing *Twombly*, 550 U.S.

*Cable Line, Inc. v. Comcast Cable Communications of..., Not Reported in Fed....*
2017 WL 4685359, 2017 Fair Empl.Prac.Cas. (BNA) 373,817

at 556, 127 S.Ct. 1955 and *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937). "The plausibility determination is 'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.' " *Id.* at 786–87 (citing *Iqbal*, 556 U.S. 679, 129 S.Ct. 1937).

## IV. ANALYSIS

### A. Plaintiffs Have Failed to Adequately Plead Antitrust Standing

**\*3** Plaintiffs assert an antitrust claim under Section 1 of the Sherman Act. The text of Section 1 of the Sherman Act is broad in scope, prohibiting "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States." 15 U.S.C. § 1. However, the Supreme Court has instructed that Section 1 prohibits only "unreasonable" restraints of trade. *Standard Oil Co. v. United States*, 221 U.S. 1, 58, 31 S.Ct. 502, 55 L.Ed. 619 (1911). *See also United States v. Brown Univ.*, 5 F.3d 658, 668 (3d Cir. 1993). To establish a violation under Section 1, a plaintiff must prove: (1) concerted action by the defendants; (2) that produced anti-competitive effects within the relevant product and geographic markets; (3) that the concerted actions were illegal; and (4) that it was injured as a proximate result of the concerted action." *Gordon v. Lewistown Hosp.*, 423 F.3d 184, 207 (3d Cir. 2005).

Before delving into the elements of Section 1 of the Sherman Act however, plaintiffs must establish that they have "antitrust standing." *City of Pittsburgh v. West Penn Power Co.*, 147 F.3d 256, 264 (3d Cir. 1998). The term "antitrust standing" should not be confused with the constitutional requirement of Article III standing. *See In re Wellbutrin XL Antitrust Litig. Indirect Purchaser Class*, 868 F.3d 132, 163–64 (3d Cir. 2017). In antitrust law, the standing requirement "goes beyond the Constitutional standing requirement of 'injury in fact' and is not satisfied by the mere allegation of a causal connection between an alleged antitrust violation and harm to the plaintiff." *Caldon, Inc. v. Advanced Measurement & Analysis Grp., Inc.*, 515 F. Supp. 2d 565, 575 (W.D. Pa. 2007) (internal citations omitted). Instead, causation in an antitrust suit "requires a showing that the defendants' antitrust violation was both a 'but for' cause of the injury, and that it was the proximate cause." *Id.* (citing *Holmes v. Securities*

*Investor Protection Corp.*, 503 U.S. 258, 268, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992)).

The Third Circuit has set forth a multifactor test in analyzing antitrust standing:

> "(1) the causal connection between the antitrust violation and the harm to the plaintiff and the intent by the defendant to cause that harm, with neither factor alone conferring standing; (2) whether the plaintiffs alleged injury is of the type for which the antitrust laws were intended to provide redress; (3) the directness of the injury, which addresses the concerns that liberal application of standing principles might produce speculative claims; (4) the existence of more direct victims of the alleged antitrust violations; and (5) the potential for duplicative recovery or complex apportionment of damages."

*Ethypharm S.A. France v. Abbott Labs.*, 707 F.3d 223, 232–33 (3d Cir. 2013) (citing *In re Lower Lake Erie Iron Ore Antitrust Litig.*, 998 F.2d 1144, 1165–66 (3d Cir. 1993)). Of these, the second factor, antitrust injury, "is a necessary but insufficient condition of antitrust standing. If it is lacking, [the Court] need not address the remaining [ ] factors." *Id.* (internal citations omitted).

"[T]he existence of antitrust injury is not typically resolved through motions to dismiss," although courts can and do decide these issues at the 12(b)(6) stage." *In re Suboxone Antitrust Litig.*, 64 F. Supp. 3d 665, 684 (E.D. Pa. 2014) (citing *Schuylkill Energy Res., Inc. v. Pa. Power & Light Co.*, 113 F.3d 405, 416–19 (3d Cir. 1997)). "At the motion-to-dismiss stage, a plaintiff must allege more than that it has suffered an injury causally linked to a violation of the antitrust laws," but rather an "antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful.' " *King Drug Co. of Florence v. Smithkline Beecham Corp.*, 791 F.3d 388, 393 n. 3 (3d Cir. 2015), *cert. denied*, 137 S. Ct. 446, 196 L.Ed. 2d 328 (2016) (citing *Pace Elecs., Inc. v. Canon Computer Sys., Inc.*, 213 F.3d 118, 120 (3d Cir. 2000)). This requirement derives from the oft-cited principle that the antitrust laws were "enacted for the protection of competition, not competitors." *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 488, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977). Thus, an antitrust claim may be defeated on a motion to dismiss if the allegations do not support the inference that plaintiff suffered an

injury proximately caused by conduct intended to harm competition.

**\*4** In this case, Plaintiffs have not alleged that there are any market-wide anticompetitive effects beyond their own injury. The Third Circuit has "consistently held an individual plaintiff personally aggrieved by an alleged anti-competitive agreement has not suffered an antitrust injury unless the activity has a wider impact on the competitive market." *Eichorn v. AT & T Corp.*, 248 F.3d 131, 140 (3d Cir. 2001). "Business practices-however unseemly, hurtful, or even otherwise unlawful—do not constitute antitrust violations unless they harm, or at least endanger, competition." *In re Mushroom Direct Purchaser Antitrust Litig.*, 514 F. Supp. 2d 683, 695–96 (E.D. Pa. 2007). An antitrust injury must "result from a lessening of competition," even if "there may be an agreement which is harming others in the marketplace." *City of Pittsburgh v. West Penn Power Co.*, 147 F.3d 256, 266 (3d Cir. 1998).

According to the Amended Complaint, plaintiffs and co-defendants Vitel and Decisive were all competing for Comcast's business. In fact, plaintiffs successfully participated in a competitive process in 2010 and were selected as Comcast's subcontractors alongside Vitel and Decisive. Doc. 41 ¶ 16. Plaintiffs then worked with Comcast for two years until 2012, when Comcast "launched a national subcontractor reduction plan," reducing "the number of regional cable installation firms working with Comcast from 176 in 2009 to 39 in 2012." *Id.* ¶¶ 27, 28. Plaintiffs however, do not allege that the plan decreased Comcast's *overall* demand for cable installation services, though Comcast did decrease its demand *with respect to Plaintiffs*, who were passed over in favor of Vitel and Decisive.

The case law in this circuit is replete with examples where plaintiffs failed to establish an antitrust claim when they have only alleged injury to their own welfare. In *Irish v. Ferguson*, the court held allegations that defendants conspired to put plaintiffs out of business or to "eliminate [them] from the local real estate market" only showed an injury to plaintiffs themselves, which did not amount to "specific facts showing that the challenged action has had an actual adverse effect on competition as a whole in the relevant market." 970 F.Supp.2d 317, 366 (M.D. Pa. 2013) (internal citations omitted). Rather, plaintiffs needed to allege that after losing business from a certain consumer, they had no alternatives in the market because

that consumer was "the only option available to them ... or that Plaintiffs had sought employment at other real estate businesses but were turned away." *Id.* In *Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*, the Third Circuit held that plaintiff, a tire supplier, suffered no antitrust injury when "it has had the clear opportunity to compete and did compete, sometimes successfully, for the exclusive tire contracts" with defendant, an organization that promoted motorsports races. 614 F.3d 57, 83 (3d Cir. 2010). In *Hughes v. Halbach & Braun Indus., Ltd.*, the court held that plaintiff's allegations that his employer and others conspired to terminate and "blacklist" him from the industry were insufficient to establish an antitrust injury. 10 F. Supp. 2d 491 (W.D. Pa. 1998). "While Hughes insists that he has demonstrated the effect on *his* welfare," the court noted, "it is the absence of an effect upon the marketplace which mandates the dismissal of this claim." *Id.* at 499. Similarly, in *CAE Inc. v. Gulfstream Aerospace Corp.*, the court held that an alleged exclusive agreement between plaintiff's competitor and an aircraft manufacturer (which solicited business from both plaintiff and its competitor) did not cause an antitrust injury, in part because the agreement "resulted from what seems to have been a competitive process that was open to Plaintiff." 203 F. Supp. 3d 447, 455 (D. Del. 2016). Finally, the court in *Philadelphia Taxi Ass'n, Inc. v. Uber Techs., Inc.* held that a taxicab group failed to allege antitrust injury against Uber because "[w]hile plaintiffs themselves have undoubtedly suffered injury since Uber began operating in [their market], competition has not." 218 F. Supp. 3d 389, 393 (E.D. Pa. 2016).

**\*5** Beyond allegations of plaintiffs' own injuries, the Amended Complaint merely alleges—in a Conclusory manner—that that the number of installation companies and overall quality of their services were reduced. Doc. 41 ¶ 52. Even assuming that the Conclusory statements to be true, "allegations of conspiracy are deficient if there are 'obvious alternative explanation[s]' for the facts alleged." *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 322–23 (3d Cir. 2010) (citing *Twombly*, 550 U.S. at 567, 127 S.Ct. 1955). A much more plausible explanation for plaintiffs' termination, which is apparently also endorsed by the Amended Complaint, is that Comcast wanted to streamline its dealings with cable installation subcontractors and chose to work with only larger cable installation companies who could provide cheaper services instead. Doc. 41 ¶¶ 28, 29. *See LifeWatch Servs., Inc. v. Highmark, Inc.*, 248 F. Supp. 3d 641, 649 (E.D. Pa. 2017)

Case 2:19-cv-07532-ES-MAH Document 18-5 Filed 05/22/19 Page 46 of 300 PageID: 354

Cable Line, Inc. v. Comcast Cable Communications of..., Not Reported in Fed....

2017 WL 4685359, 2017 Fair Empl.Prac.Cas. (BNA) 373,817

(finding an alternative explanation to plaintiffs alleged injury when the telemetry devices plaintiff sold were about "three times as costly" as other options and it was more plausible that "the [defendants] Blue Plans have simply decided—whether in a concerted fashion or not—that the benefits of telemetry devices do not (yet) outweigh their costs.")

The Amended Complaint alludes to the fact that these larger "[s]ubcontractors were chosen, in part, for their willingness to work for Comcast for free by not acknowledging or billing for service calls ... [and] their willingness to falsify Comcast performance metrics to give the illusion of improving customer service." Doc. 41 ¶¶ 30, 31. Such alleged dishonest practices, unseemly as they may be, are not necessarily *antitrust* violations.

Plaintiffs have not alleged, for example, whether these alleged dishonest practices by Decisive and Vitel led to the creation of monopolies or potential price increases in the cable installation market. *Cf. Synthes, Inc. v. Emerge Med., Inc.*, 2012 WL 4473228, at *16 (E.D. Pa. Sept. 28, 2012) (finding the injury allegations "just skirt past *Twombly/Iqbal* standards" when plaintiff alleged that "[t]here is a dangerous probability that Synthes, by driving Emerge and its other competitors out of business ... will achieve a monopoly" and that, "[i]f Synthes is not compelled to cease the above Predatory Anti–Competitive conduct it will achieve a monopoly, and once the monopoly is achieved Synthes will be free to raise its prices back to the high levels that were charged prior to the entry of competition.") Though plaintiffs allege that Vitel and Decisive were able to retain Comcast's business, they have not alleged if there are barriers to entry in the cable installation market such that Vitel and Decisive will be able to monopolize and subsequently raise their prices or otherwise reduce quality. The Amended Complaint repeatedly refers to the fact that Vitel and Decisive are just two out of 176 firms that were hired by Comcast in 2010, and there were at least 39 firms that were kept on as Comcast's subcontractors in 2012. Doc. 41 ¶¶ 28, 61, 115, 122. It is unclear how Vitel and Decisive would have price influence over the 176 firms who competed for Comcast's business, let alone have influence over the entire cable installation market. *Cf. Caldon, Inc. v. Advanced Measurement & Analysis Grp., Inc.*, 515 F. Supp. 2d 565, 576 (W.D. Pa. 2007) (holding that there may be antitrust injury when plaintiff was "Defendants' *only* competitor in the relevant market, and it was alleged that Defendants'

conduct is intended to destroy this competition," thus the "inference [ ] may be drawn from these averments [ ] that Defendants' conduct is attempting to destroy *all* competition in the market") (emphasis in original).

Plaintiffs' theory—that Comcast actively conspired with two of its suppliers in order to push out other suppliers—is far less plausible. Comcast, as the end-consumer in the cable installation market, has every motive to select the suppliers it views as the cheapest or easiest to work with. Furthermore, on the face of the Amended Complaint, it is unclear whether plaintiffs have been foreclosed from the cable installation services market, only that they have lost a single—albeit lucrative—client. For example, the Amended Complaint has not pled if plaintiffs sought to obtain business from any other cable service providers after they were terminated by Comcast, whether plaintiffs were forced to leave the market, whether any of the other firms that lost Comcast's business alongside plaintiffs had left the market, or whether the prices of cable installation services had increased due to defendants' behavior. In fact, an inference may be drawn that plaintiffs *were* able to obtain business from elsewhere, as they are still operational at this time, more than 5 years after their contractual relationship with Comcast ended.

*6 The alternative explanation in this case is that Vitel and Decisive, as larger subcontractors, were able to retain Comcast's business during a time when Comcast decided to drastically reduce its number of cable installation subcontractors. The fact that Comcast let go of some of its subcontractors does not proximately cause a reduction of the number of companies in the *overall* cable installation market. Nor does Comcast's decision plausibly cause a reduction of the overall quality of installers' services; especially where, as here, plaintiffs allege that their personnel and inventory were "absorb[ed]" by Vitel and Decisive. Doc. 41 ¶ 69. If Vitel and Decisive were able to continue to employ plaintiffs' equipment and personnel, it is hard to imagine how a reduction of quality has occurred among Comcast's subcontractors, much less among the entire cable installation market. *Philadelphia Taxi Ass'n, 218 F. Supp. 3d at 393* (the fact that "a portion of Plaintiffs' employees have stopped working for them and now work for Uber" is not reflective of a negative impact in the marketplace).

Without allegations beyond the injuries to plaintiffs' own welfare, the Court cannot say that plaintiffs' injury is

Cable Line, Inc. v. Comcast Cable Communications of..., Not Reported in Fed....
2017 WL 4685359, 2017 Fair Empl.Prac.Cas. (BNA) 373,817

"of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful.' " *Pace Elecs*, 213 F.3d at 120. Plaintiffs failed to establish that they have antitrust standing to pursue the Sherman Act claim.

### B. Plaintiffs Have Failed to Adequately Plead A Conspiracy Among Defendants.

Notwithstanding the lack of antitrust standing, plaintiffs have also failed to plead the "essence of a Section 1 claim," that is, "the existence of an agreement." *Gordon v. Lewistown Hosp.*, 423 F.3d 184, 207 (3d Cir. 2005) (internal citations omitted). "Evidence of conduct that is as consistent with permissible competition as with illegal conspiracy, without more, will not support an inference of conspiracy." *Id.* In Sherman Act lawsuits, "a claim of conspiracy predicated on parallel conduct should be dismissed if common economic experience, or the facts alleged in the complaint itself, show that independent self-interest is an obvious alternative explanation for defendants' common behavior." *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 326 (3d Cir. 2010) (internal quotation marks omitted).

The gravamen of plaintiffs' claim is that Comcast has reduced its number of cable installation subcontractors, and in doing so, terminated plaintiffs in favor of co-defendants Vitel and Decisive. Plaintiffs allege that the decision is the result of an insidious agreement between Comcast and co-defendants to "consolidate[e] the market for cable installation in specific municipalities" and otherwise reduce the number of cable installation companies and the quality of their services. Doc. 41 ¶ 52. However, this Conclusory allegation is not supported by the substantive allegations elsewhere in the Amended Complaint, which state that "*Comcast* launched a national subcontractor plan," that "*Comcast* had no intention of working with Plaintiffs for the long haul," that "*Comcast* planned to replace smaller installation companies with larger installation companies that offered less compensation to [workers]" and that Vitel and Decisive were merely "aware of Comcast's strategy" and were "informed" of Comcast's decision. Doc. 41 ¶¶ 27, 29, 44, 68, 69. These allegations, on their face, indicate that Comcast made the decision to terminate plaintiffs by itself, without influence from or collaboration with Vitel or Decisive.

The Amended Complaint attempts to equate Comcast's decision to share the news of plaintiffs' termination with a full-fledged conspiracy. But it is not an antitrust violation for Comcast to "inform[ ] Defendants Vitel and Decisive that Plaintiffs had been terminated before it informed Plaintiffs." Doc. 41 ¶ 44. A company informing one of its subcontractors of its decision to terminate a relationship with another subcontractor does not constitute an antitrust conspiracy. It is not even an antitrust violation if Comcast had done so in order to give Vitel and Decisive a chance to "recruit trained technicians" from plaintiffs. *Id.* Vitel and Decisive's decision to recruit plaintiffs' workers —after Comcast made the decision on its own to terminate its contract with plaintiffs—is a rational decision reflective of a competitive market. That plaintiffs lost technicians to competitors and sold their inventory "for pennies on the dollar" to them is typical of the harm that could befall on any competitor in a healthy market.

**\*7** Furthermore, the Amended Complaint itself alludes to a legitimate reason why Vitel and Decisive may have wanted to employ plaintiffs' personnel and buy up their equipment. It alleges that one weakness in larger cable installation companies is that they do not have rural installation expertise that some of the smaller companies like plaintiffs have. Doc. 41 ¶¶ 63, 64. An obvious alternative explanation here is that after they were informed of plaintiffs' termination, Vitel and Decisive independently sought to acquire plaintiffs' personnel and inventory, Doc. 41 ¶¶ 40–44, presumably to acquire the rural expertise that plaintiffs had. Such "poaching" techniques, even if unethical, do not lead to the inference that Comcast, Vitel, and Decisive made an a *priori* agreement to reduce competition.

Finally, the timeline of events does not support an inference of collusion. The Amended Complaint alleges that Vitel and Decisive were "among the companies slated for termination" according to Comcast's "preliminary determination" made on February 28, 2017, but executives at Comcast "intervened to keep Decisive and Vitel." Doc. 41 ¶¶ 104, 105. Plaintiffs, however, were not saved from the preliminary determination, and were terminated in February 2012 as part of the reduction plan. Doc. 41 ¶ 33. These allegations contradicts the idea that Vitel and Decisive participated in the decision to terminate plaintiffs. Rather, the Amended Complaint clearly paints a picture where Comcast made a unilateral, preliminary decision on February 28, 2012 to eliminate

Cable Line, Inc. v. Comcast Cable Communications of..., Not Reported in Fed....

2017 WL 4685359, 2017 Fair Empl.Prac.Cas. (BNA) 373,817

certain subcontractors, and while Vitel and Decisive were eventually "rescued" by Comcast's executives, plaintiffs were not.

This is of course unfortunate and unfair from the plaintiffs' perspective. But the fact remains that Comcast is the consumer selecting subcontractors from the market. Plaintiffs essentially complain that Comcast made the "wrong" choice in picking Vitel and Decisive, because they allegedly engage in fraudulent and corrupt billing practices. They allege, for example, that Vitel and Decisive were willing "to work for Comcast for free by not acknowledging or billing for service calls," and that Decisive "simply eras[ed] evidence of a significant number of service calls" in Comcast's internal system, thereby making its performance data seem more efficient. Doc. 41 ¶¶ 30, 80–83. Notably absent in the Amended Complaint is any allegation that Comcast made a prearrangement with Vitel and Decisive that they should fraudulently bill Comcast—or even an allegation that Vitel and Decisive conspired with each other to fraudulently bill Comcast. Instead, plaintiffs conclusorily allege that Comcast "knew that companies like Decisive ... was [*sic*] actively inflating the quality of their metrics" and Comcast's "regional executives were aware of the corruption of the metrics." *Id.* ¶¶ 94, 97. These Conclusory statements, without alleging when Comcast knew about these practices, and whether Comcast had an active role in formulating a conspiracy (as opposed to *post hoc* knowledge of such), are insufficient. As it stands, the factual allegations only suggest that Vitel and Decisive falsified their performance metrics and underbilled Comcast. But these allegations, if true, only evince fraudulent practices on the part of each individual defendant. It does not follow from the allegations that they are manifestations of an illicit agreement among Comcast, Vitel and Decisive.

In short, the Complaint fails to allege a conspiracy among defendants with the purpose of pushing other cable installation companies out of the market. The direct and proximate cause of plaintiffs injury is Comcast's unilateral decision to reduce the number of suppliers it worked with, which led to Comcast terminating many of its subcontractors, including plaintiffs. [1]

### C. The Allegations of Anticompetitive Effects Are Insufficient Under the Rule of Reason Analysis

**\*8** Putting aside antitrust standing and lack of a conspiracy issues, plaintiffs have also failed to allege anticompetitive effects as required by the "rule of reason" analysis. Under the rule of reason analysis, the plaintiff "bears the initial burden of showing that the alleged [agreement] produced an adverse, anticompetitive effect within the relevant geographic market." *In re Ins. Brokerage*, 618 F.3d at 315 (citing *Gordon v. Lewistown Hosp.*, 423 F.3d 184, 210 (3d Cir. 2005)). "Satisfying this burden typically includes a demonstration of defendants' market power." *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 222 (3d Cir. 2011) (internal citations omitted).

Plaintiffs argue that the Court should conduct a "quick look" analysis instead. Doc. 56 at 12. However, the "quick look" analysis should be applied "only when an observer with even a rudimentary understanding of economics could conclude that the arrangement in question would have an anticompetitive effect on customers and markets." *Gordon v. Lewistown Hosp.*, 423 F.3d 184, 210 (3d Cir. 2005). In contrast, a full "rule of reason" analysis must be conducted when the alleged restraint is "a non-price vertical restraint." *Id.* The allegations in this case at most suggest a vertical agreement between a buyer (Comcast) and service providers (Vitel and Decisive), with the primary purpose of pushing the service providers like plaintiffs out of business, thereby consolidating the market. The allegations do not reflect a price-based restraint, nor is the alleged agreement a horizontal agreement made solely among competitors. In keeping with the Third Circuit's instruction that "virtually all vertical agreements now receive a traditional rule-of-reason analysis," the Court will apply a rule of reason analysis in examining the allegations. *In re Ins. Brokerage*, 618 F.3d at 318.

The relevant market in this case is undeniably the cable installation market, in which plaintiffs and co-defendants Vitel and Decisive compete for the business of cable provider companies, such as Comcast. Yet, in an effort to allege anticompetitive effects beyond their own injuries, Plaintiffs mistakenly conflate two distinct markets. The Amended Complaint alleges that Comcast has "substantial market power as the largest cable company and Internet Service Provider in the United States." Doc. 41 ¶ 129. That may well be true in the cable and internet service provider industry, where Comcast is a *seller* of cable content and services. But the present case concerns Comcast's role as a *buyer* in the cable

Case 2:19-cv-07532-ES-MAH Document 18-5 Filed 05/22/19 Page 49 of 300 PageID: 357

Cable Line, Inc. v. Comcast Cable Communications of..., Not Reported in Fed....
2017 WL 4685359, 2017 Fair Empl.Prac.Cas. (BNA) 373,817

installation market. It does not matter how much market power Comcast has in the cable-provider industry, rather, it matters how much market power Comcast has in the cable installation industry.

Plaintiffs allege that defendants conspired to "consolidat[e] the market for cable installation in specific municipalities in Pennsylvania, West Virginia, Virginia, and Maryland." Doc. 41 ¶ 52. Assuming this allegation properly defined the relevant market, there are no allegations that Comcast enjoys substantial market power as a *buyer* in this space. Even if plaintiffs had properly alleged buy-side market power—which they did not—such allegations would only support the idea that Comcast is a "monopsony" firm. "Monopsony power is market power on the buy side of the market." *Weyerhaeuser Co. v. Ross–Simmons Hardwood Lumber Co.*, 549 U.S. 312, 320, 127 S.Ct. 1069, 166 L.Ed.2d 911 (2007) (citing Roger D. Blair & Jeffrey L. Harrison, Antitrust Policy and Monopsony, 76 Cornell L. Rev. 297 (1991)). The Third Circuit has said that without proper allegations of a conspiracy, "[a] firm that has substantial power on the buy side of the market (i.e., monopsony power) is generally free to bargain aggressively when negotiating the prices it will pay for goods and services." *West Penn*, 627 F.3d at 103. *See also LifeWatch Servs., Inc. v. Highmark, Inc.*, 248 F. Supp. 3d 641, 650 (E.D. Pa. 2017) (holding that "Defendants' refusal—whether concerted or not—to purchase any telemetry device ... is not an antitrust violation, but rather a legal exercise of Defendants' monopsony power.")

**\*9** *West Penn* is instructive on antitrust claims in the monopsony context. In that case, the Third Circuit held that plaintiffs there adequately pled an antitrust injury when the complaint alleged "that [Defendant] Highmark has a 60%–80% share of the Allegheny County market for health insurance, that there are significant entry barriers for insurers wishing to break into the market ... that medical providers have very few alternative purchasers for their services ... [that co-Defendant] *UPMC insulated Highmark from competition in return for Highmark's taking steps to hobble West Penn* ... and that Highmark did not pass the savings on to consumers [but] instead, that Highmark pocketed the savings." *Id.* at 103–04 (emphasis added). Plaintiffs in this case, by contrast, have not made such detailed allegations.

In particular, *West Penn* included allegations of an explicit *quid pro quo* agreement, the primary purpose of which was to reduce competition for the benefit of each defendant: it was alleged that an insurer, Highmark, and one of its service providers, UPMC, arrived at a "truce" where "each entity would use its market power to protect the other from competition." *Id.* at 93. When plaintiffs sought financing assistance from Highmark, "it declined to do so out of fear that UPMC would retaliate against it for violating their agreement—an agreement that Highmark candidly admitted was 'probably illegal.' " *Id.* When plaintiffs sought to renegotiate reimbursement rates with Highmark, Highmark "acknowledged that the rates were too low and initially agreed to raise them," but later declined to do so "citing its agreement with UPMC, under which it was not to do anything to benefit West Penn financially." *Id.* at 103. In analyzing these allegations, the Third Circuit noted that "had Highmark been acting alone, West Penn would have little basis for challenging the reimbursement rates." *Id.* As "[a] firm that has substantial power on the buy side of the market," Highmark was "generally free to bargain aggressively when negotiating the prices it will pay for goods and services." *Id.* Thus, save allegations of an illicit agreement to reduce competition, a buyer is free to negotiate, bargain, or terminate the services it pays for.

The Amended Complaint further alleges that Comcast's cable service customers have suffered a price increase "nationally." Doc. 41 ¶¶ 57, 58. Again, Plaintiffs conflate two different markets—while Comcast is a *buyer* in the cable installation market, it is a *seller* in the cable provider market—the fact that there are increased costs in the latter is not a proximate result of fewer installation firms in the former. If anything, the alleged underbilling and falsified invoices by Vitel and Decisive in order to retain Comcast's business would have led to lower costs for Comcast. Without more allegations connecting the alleged effects in these two distinct markets, the Court cannot say that the one proximately caused the other. *See Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 922 F. Supp. 1055, 1063 (E.D. Pa. 1996) (holding that Plaintiffs' antitrust claim failed as a matter of law because "[t]here are no allegations in the amended complaint relating to higher prices or restricted choice at the consumer level") *aff'd*, 124 F.3d 430 (3d Cir. 1997).

Finally, the Court notes that a plain reading of the Amended Complaint would indicate that Plaintiffs are

*Cable Line, Inc. v. Comcast Cable Communications of..., Not Reported in Fed....*
2017 WL 4685359, 2017 Fair Empl.Prac.Cas. (BNA) 373,817

complaining of a breach of contract—plaintiffs entered into a three-year contract with Comcast, and relying on the contract, "ramped up" their inventory and personnel for the incoming service requests, but Comcast then terminated the contract after only two years. Doc. 41 ¶¶ 24, 33, 34. And if the allegations of Vitel and Decisive's dishonest billing practices are indeed true, they may form the basis for consumer fraud, unjust enrichment, or misrepresentation claims. However, violations of common law or state law do not give rise to antitrust injury. *See Philadelphia Taxi Ass'n, Inc. v. Uber Techs., Inc.*, 218 F. Supp. 3d 389, 394 (E.D. Pa. 2016) ("If Plaintiffs seek to prevent Uber from operating in the Philadelphia market, it may seek refuge in PPA regulations, not antitrust law").

**\*10** The Amended Complaint failed to plausibly plead antitrust standing, conspiracy, or anticompetitive effects within the relevant market. Count I will be dismissed with leave to amend so that plaintiffs may attempt to allege sufficient facts to show that they have an actionable Sherman Act claim.

### D. The Statute of Limitations Defense Cannot Be Resolved on Defendants' Motions to Dismiss

Alternatively, all three of the Defendants raise a statute of limitations defense, based on the allegation that plaintiffs were notified by letter in February 2012 "that their long-term relationships ... would be terminated on May 27, 2012." Doc. 41 ¶ 33. Plaintiffs argue that because the termination was not "formalized" until May 27, 2012, their suit has come right under the wire, as it was filed on May 26, 2016.

A suit to recover damages for a violation of the Sherman Act must be "commenced within four years after the cause of action accrued." 15 U.S.C. § 15b. "[A]n antitrust cause of action generally "accrues and the statute [of limitations] begins to run when a defendant commits an act that injures a plaintiffs business." *West Penn*, 627 F.3d at 106 (citing *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 91 S.Ct. 795, 28 L.Ed.2d 77 (1971)). "However, [i]n the context of a continuing conspiracy to violate the antitrust laws, ... each time a plaintiff is injured by an act of the defendants a cause of action accrues to [it] to recover the damages caused by that act." *Id.*

Comcast argues that the May 2012 formalization of the termination was a mere "reaffirmation" of the February

notice, and is thus insufficient to invoke the continuing conspiracy exception to the statute of limitations. Doc. 58 at 14. However, the Third Circuit has conclusively held that suits may be "timely even though the acts that occurred within the limitations period were reaffirmations of decisions originally made outside the limitations period." *West Penn*, 627 F.3d at 106.

In any case, the Court cannot determine at this stage whether the May 2012 "formalization" is an overt act of reaffirmation or an "unabated inertial consequence" of a previous act. *Meijer, Inc. v. 3M*, 2005 WL 1660188, at *3 (E.D. Pa. July 13, 2005). The Amended Complaint does not quote the relevant language in the February 2012 letter, or attach a copy of the letter itself. None of the parties attached the February 2012 letter to their motion papers, or explained what the May 2012 "formalization" meant. Without more, the Court cannot determine if the February 2012 letter is a conclusive termination of the contractual relationship, or if it contains any conditional phrasing that may undermine the finality of termination. And without an explanation from any of the parties what the May 2012 "formalization" process consisted of, the Court cannot say that it is a separate, overt act or otherwise. The statute of limitations issue may not be resolved on the motions to dismiss.

### E. The Amended Complaint Does Not Plausibly Allege An Employment Discrimination Claim

Plaintiffs append an employment discrimination claim to their antitrust claims, alleging that they were passed over in favor of Vitel because Comcast wished to "bolster its paltry efforts at increasing diversity in the cable industry," and Vitel happened to be "tracked as diverse, [while] plaintiffs were not. Doc. 41 ¶¶ 112, 118. Plaintiffs essentially attempt to plead a "reverse discrimination" claim, because they allegedly lost Comcast's business due to the fact they are "owned and operated by Caucasian people" and thus "not 'diverse.' " *Id.* ¶ 119.

**\*11** The Third Circuit has adopted a modified *McDonnell Douglas* standard in reverse discrimination cases, *Iadimarco v. Runyon*, 190 F.3d 151, 163 (3d Cir. 1999). To establish a *prima face* case of reverse discrimination, the plaintiff must present "sufficient evidence to allow a reasonable fact finder to conclude (given the totality of the circumstances) that the defendant treated plaintiff less favorably than others because of [his] race, color, religion, sex, or national origin." *Id.*

Cable Line, Inc. v. Comcast Cable Communications of..., Not Reported in Fed....
2017 WL 4685359, 2017 Fair Empl.Prac.Cas. (BNA) 373,817

(internal quotations and citations omitted). At the motion to dismiss stage, Plaintiffs need not *prove* the elements of a *prima facie* case, but they "must still state a plausible claim." *Byrd v. Elwyn*, 2016 WL 5661713, at \*9 (E.D. Pa. Sept. 30, 2016).

First, the court notes that there is nothing unlawful—and in fact some may argue that it is laudable—for a private company such as Comcast to engage in efforts to increase the diversity of its products or its subcontractors. Second, and of legal significance, Plaintiffs have only alleged that Comcast is facing concerns about its "ability to develop and deliver television content relevant to a diverse society" and has committed to developing "ten minority-owned cable channels." These allegations, while factually substantive, are about programming content Comcast produces for its own customers. Again, plaintiffs are cable installation companies. They are neither buyers of Comcast's cable content nor competitors with Comcast in producing cable content. Comcast's commitment to develop more diverse cable programming has nothing to do with how it selects its cable installation subcontractors. As with the antitrust claim, plaintiffs improperly conflate their own market with the cable provider market.

In the actual market in which plaintiffs operate, the cable installation market, plaintiffs have failed to muster any substantive, factual allegations supporting a discrimination claim. Plaintiffs do not allege, for example, how many of the original 176 cable installation companies hired by Comcast were minority or Caucasian owned, if there are any "diverse" cable installation companies that are comparable to plaintiffs in size, regions served, or types of services provided, and if there are, whether those comparable "diverse" companies were retained by Comcast. *See Byrd*, 2016 WL 5661713, at \*9 (dismissing plaintiffs reverse gender discrimination claim because he failed to allege a reverse gender discrimination claim, since he "[did] not allege that the promoted women were elevated to positions that would have been a promotion from his own position, nor d[id] he allege how many of the six women were promoted and how many were hired.") Furthermore, it cannot be said that Vitel is a comparable firm to plaintiffs, as the Amended Complaint repeatedly allege that Vitel is a "larger" firm that enjoys the concomitant advantages in gaining Comcast's business. *Id.* ¶ 29, 80, 87. Thus, plaintiffs have not plausibly alleged that they were passed over in favor of Vitel *because of* their race. In fact, the Amended Complaint undermines itself in

this regard because it accuses Vitel of inducing Comcast into retaining its business because it falsifies invoices and underbills Comcast. Save for the Conclusory allegations that Plaintiffs are "owned and operated by Caucasian people" and that "Vitel was tracked as diverse," Doc. 41 ¶¶ 118, 119, plaintiffs have failed to plead that they were treated unfavorably because their owners are Caucasian.

Count V is dismissed with leave to amend so that plaintiffs may attempt to allege sufficient facts to show that they were treated less favorably than other subcontractors because of their owners' race.

### F. The Court Declines to Exercise Jurisdiction Over the Pendent Claims

**\*12** Having determined that Plaintiffs' federal antitrust claims must be dismissed, the Court will dismiss plaintiffs' pendent state law claims. Doc. 41, Counts II, III, and IV. The decision whether to exercise supplemental jurisdiction under 28 U.S.C. § 1367(a) is subject to the district court's discretion. 28 U.S.C. § 1367(c)(3) ("The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if ... the district court has dismissed all claims over which it has original jurisdiction.") "[W]here the claim over which the district court has original jurisdiction is dismissed before trial, the district court must decline to decide the pendent state claims unless considerations of judicial economy, convenience, and fairness to the parties provide an affirmative justification for doing so." *Borough of W. Mifflin v. Lancaster*, 45 F.3d 780, 788 (3d Cir. 1995) (internal citations omitted). In light of the dismissal of the federal claims, the Court declines to exercise supplemental jurisdiction over Counts II, III, and IV and will dismiss those claims without prejudice.

### V. CONCLUSION

For the reasons outlined above, Defendants' motion to dismiss the Amended Complaint (Doc. 41) will be granted. The Amended Complaint will be dismissed without prejudice with leave to file a Second Amended Complaint. A separate Order shall issue.

### All Citations

Not Reported in Fed. Supp., 2017 WL 4685359, 2017 Fair Empl.Prac.Cas. (BNA) 373,817

**Cable Line, Inc. v. Comcast Cable Communications of..., Not Reported in Fed....**
2017 WL 4685359, 2017 Fair Empl.Prac.Cas. (BNA) 373,817

Footnotes

1    Plaintiffs refer the Court to *Clear Connection*, a case from the Central District of California that concerned a California
     state law antitrust claim against Comcast. The Court first notes that a case from a district court from another circuit,
     analyzing a California state law claim, enjoys only persuasive authority in this Court. Second, the plaintiff in *Clear
     Connection* alleged that Comcast effectively constrained trade by dictating that only one contractor would service a
     certain territory. *Clear Connection Corp. v. Comcast Cable Commc'ns Mgmt., LLC*, 149 F. Supp. 3d 1188, 1197 (E.D.
     Cal. 2015). The *Clear Connection* plaintiff alleged, for example, that it "had a preferred vendor agreement with Comcast
     to install cable in the Fresno, California, area, but in 2009, Comcast announced a realignment plan that required the
     installer to serve only Fresno and halt its work elsewhere. Clear Connection said it tried to follow the plan, but Comcast
     then ended their contract while helping another installer, O.C. Communications, create a monopoly on Comcast cable
     installation in Sacramento and Fresno." *Id.* at 1198. Unlike the Amended Complaint in this case, the plaintiff in *Clear
     Connection* had explicitly alleged that Comcast helped O.C. Communications build a monopoly in two cities. Such
     allegations are missing here; plaintiffs do not allege that Vitel and Decisive enjoy monopoly power in a specific market,
     or that they were able to raise prices in the cable installation market as a direct result of a conspiracy with Comcast.

---

**End of Document**                                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2019 Thomson Reuters. No claim to original U.S. Government Works.   11

# EXHIBIT D

Case 2:19-cv-07532-ES-MAH   Document 18-5   Filed 05/22/19   Page 54 of 300 PageID: 362

United Food and Commercial Workers Unions and..., Not Reported in Fed....

2017 WL 2837002, 2017-1 Trade Cases P 80,046

2017 WL 2837002
United States District Court, D. Massachusetts.

UNITED FOOD AND COMMERCIAL WORKERS
UNIONS AND EMPLOYERS MIDWEST HEALTH
BENEFITS FUND and Laborers Health and Welfare
Trust Fund for Northern California, on behalf of
themselves and others similarly situated, Plaintiffs,
v.

NOVARTIS PHARMACEUTICALS CORP., Novartis
AG, and Novartis Corporation, Defendants.
Louisiana Health Service and Indemnity
Company d/b/a Blue Cross and Blue Shield
of Louisiana, on behalf of themselves
and others similarly situated, Plaintiff,
v.

Novartis Pharmaceuticals Corp., Novartis
AG, and Novartis Corporation, Defendants.
AFSCME Health and Welfare Fund, on behalf of
themselves and others similarly situated, Plaintiff,
v.

Novartis Pharmaceuticals Corp., Novartis
AG, and Novartis Corporation, Defendants.
Minnesota Laborers Health and Welfare
Fund, on behalf of themselves and
others similarly situated, Plaintiff,
v.

Novartis Pharmaceuticals Corp., Novartis
AG, and Novartis Corporation, Defendants.
Pennsylvania Employees Benefit Trust
Fund, on behalf of themselves and
others similarly situated, Plaintiff,
v.

Novartis Pharmaceuticals Corp., Novartis
AG, and Novartis Corporation, Defendants.

Civil Action No. 15-cv-12732, Civil Action No. 15-
cv-13461, Civil Action No. 15-cv-13724, Civil Action
No. 15-cv-13725, Civil Action No. 15-cv-13726
|
Signed 06/30/2017

**Attorneys and Law Firms**

Hannah Schwarzschild, Thomas M. Sobol, Kristen
A. Johnson, Hagans Berman Sobol Shapiro LLP,

Cambridge, MA, J. Gerard Stranch, IV, Michael Gilman
Stewart, Michael J. Wall, Joe P. Leniski, Branstetter,
Stranch & Jennings, PLLC, Nashville, TN, John D.
Radice, Kenneth Pickle, Radice Law Firm, PC, Long
Beach, NJ, Jonathan D. Karmel, Karmel Law Firm,
Justin N. Boley, Kenneth A. Wexler, Bethany R. Turke,
Wexler Wallace LLP, Chicago, IL, Diana J. Zinser,
Jeffrey L. Kodroff, John A. Macoretta, Spector Roseman
& Kodroff, P.C., Philadelphia, PA, Adam M. Stewart,
Shapiro Haber & Urmy LLP, Boston, MA, Devona
L. Wells, Karen H. Riebel, Heidi M. Silton, Lockridge
Grindal Nauen P.L.L.P., Minneapolis, MN, David Scott
Scalia, The Dugan Law Firm, New Orleans, MA, for
Plaintiffs.

Alice C.C. Huling, David Barr, Katherine O'Brien, Mark
D. Godler, Saul P. Morgenstern, Arnold & Porter Kay
Scholer LLP, Grant J. Esposito, Jessica L. Kaufman,
Morrison & Foerster LLP, New York, NY, Laura Scott
Shores, Matthew Gibbs, Kaye Scholer LLP, Washington,
DC, William A. Zucker, Wyley S. Proctor, McCarter &
English, LLP, Boston, MA, for Defendants.

## MEMORANDUM AND ORDER
## GRANTING MOTION TO DISMISS

ALLISON D. BURROUGHS, U.S. DISTRICT JUDGE

### I. INTRODUCTION

**\*1** In this putative class action, Laborers Health
and Welfare Trust Fund for Northern California and
Louisiana Health Service and Indemnity Company
d/b/a Blue Cross and Blue Shield of Louisiana
("Plaintiffs") bring state-law claims against Defendants
Novartis Pharmaceuticals Corporation, Novartis AG,
and Novartis Corporation (collectively, "Novartis"), on
behalf of themselves and all others similarly situated,
for engaging in an alleged "monopolistic scheme" in
connection with Gleevec®, a brand-name prescription
drug used to treat certain types of chronic myeloid
leukemia and acute lymphoblastic leukemia. Specifically,
Plaintiffs allege that Novartis, which held the patent rights
to Gleevec, engaged in illegal, anticompetitive conduct
designed to delay the entry of generic forms of the
drug into the U.S. market. Presently before the Court is
Novartis' Motion to Dismiss pursuant to Federal Rules of
Civil Procedure 12(b)(6) and 12(b)(1) [ECF No. 111] and
End Payer Plaintiffs' Motion for a Rule 26(f) Conference
[ECF No. 135]. For the reasons set forth below, the

Case 2:19-cv-07532-ES-MAH   Document 18-5   Filed 05/22/19   Page 55 of 300 PageID: 363
United Food and Commercial Workers Unions and..., Not Reported in Fed....
2017 WL 2837002, 2017-1 Trade Cases P 80,046

motion to dismiss is <u>GRANTED</u>, and the motion for a conference is <u>DENIED</u>.

## II. PROCEDURAL HISTORY
Plaintiffs filed their original Class Action Complaint on June 22, 2015, seeking only declaratory and injunctive relief under federal antitrust law. [ECF No. 1]. In July and August 2015, Novartis filed motions to dismiss. [ECF Nos. 53, 60]. On February 1, 2016, while the motions were pending, a generic form of Gleevec was introduced into the market, thus mooting the request for injunctive relief. On March 24, 2016, the Court denied the motions to dismiss as moot and gave Plaintiffs leave to amend their complaint. [ECF No. 104]. In addition, the Court consolidated the action for pretrial purposes with four other cases involving similar claims against Novartis. On April 8, 2016, Plaintiffs filed the operative Consolidated Amended Class Action Complaint ("CAC"). [ECF No. 105]. The parties stipulated that the CAC would supersede all other complaints filed by any plaintiff in any of the consolidated actions. In contrast to the original complaint, the CAC does not contain any claims arising out of federal antitrust law; instead, it asserts only state-law antitrust and unfair trade practices claims, under the laws of 23 states and the District of Columbia. This Court appears to have diversity jurisdiction pursuant to 28 U.S.C. § 1332.

On May 10, 2016, Novartis filed a motion to dismiss for failure to state a claim and lack of jurisdiction [ECF Nos. 111, 112] and a supporting declaration [ECF No. 113]. Plaintiffs opposed the motion [ECF No. 120] and Novartis filed a reply [ECF No. 121]. On August 1, 2016, the Court held a hearing on the motion. [ECF No. 126].

## III. ALLEGATIONS IN THE CONSOLIDATED CLASS ACTION COMPLAINT
The CAC alleges a single claim for relief on behalf of the putative class—that Novartis' conduct amounted to "monopolization and [a] monopolistic scheme" in violation of the laws of 23 states and the District of Columbia. Specifically, Plaintiffs allege that Novartis "engaged in an exclusionary, anticompetitive scheme designed to create and maintain a monopoly for Gleevec and its generic substitutes," and that "as part of this scheme, Novartis: (1) [w]ith intent to mislead or deceive, failed to disclose to the PTO [U.S. Patent and Trademark Office] material information known to it and made

material misrepresentations to the PTO, but for which the '051 patent would not have issued; (2) [i]mproperly listed the '051, '799, and RE'923 patents in the Orange Book; and (3) [p]rosecuted sham patent litigation lawsuits against generic manufacturers." Plaintiffs further allege that at all relevant times, Novartis intended to, and did, maintain and extend its monopoly power, which allowed it to continue charging supra-competitive prices for Gleevec without a substantial loss in sales, and that as a direct and proximate result of this conduct, Plaintiffs and other members of the putative class were injured, in that they paid more for the drug than they would have if a generic had been allowed onto the market.

**\*2** The following facts are derived from the CAC unless otherwise noted.

### A. Prosecution of the Polymorph Patents
Defendant Novartis Pharmaceuticals Corporation (a subsidiary of Defendant Novartis AG), with FDA approval, markets and distributes Gleevec in the United States. Defendant Novartis Corporation is the assignee of U.S. Patent No. 5,521,184 ("the '184 Patent"), which is the basic compound patent claiming Gleevec's active ingredient, commonly known as "imatinib." In addition to claiming the imatinib compound in its "free base" form, the '184 Patent also claims certain "salts" of the imatinib compound and their use as tumor-inhibiting agents. [1] The '184 Patent issued on May 28, 1996, and expired on July 4, 2015.

Prior to the expiration of the '184 Patent, Novartis obtained two follow-on patents that claim particular crystalline ("polymorphic") "non-needle" forms of the mesylate salt of imatinib: [2] (1) U.S. Patent No. 6,894,051 ("the '051 Patent") issued on May 17, 2005, and (2) U.S. Patent No. 7,554,799 ("the '799 Patent") issued on June 9, 2009, which was subsequently surrendered and reissued as RE43'932 ("the RE'932 Patent") [3] (collectively, the "Polymorph Patents"). The CAC alleges that the Polymorph Patents are invalid, although Plaintiffs do not contest the validity of the original '184 Patent.

The application for the '051 Patent, filed in January 2000, purported to disclose and claim the methanesulfonate salt of imatinib, along with a particular polymorphism —namely, the non-needle form, which Novartis referred to as the "#-crystalline" form. [4] In September 2000, the

United Food and Commercial Workers Unions and..., Not Reported in Fed....

2017 WL 2837002, 2017-1 Trade Cases P 80,046

patent examiner issued a non-final rejection of Novartis' claims, concluding that the claims were both anticipated and rendered obvious by the '184 Patent. Specifically, the examiner rejected the claims as anticipated by the '184 Patent's disclosure of the "free form" of imatinib and a "list of intended salts, including the methanesulfonate [mesylate] salt." She also held that the burden was on the applicant to show that the claimed #-crystalline form would not be inherently produced using routine procedures described in the '184 Patent. Although Novartis responded to the examiner's rejections, the examiner nonetheless issued a final office action on July 5, 2001 in which she found that Novartis' patent claims were anticipated and rendered obvious by the '184 Patent.

**\*3** Novartis appealed this rejection to the Patent Board. On November 24, 2003, the Patent Board reversed the examiner's decision. The Patent Board's decision assumed, without deciding, that the original '184 Patent described the mesylate salt of imatinib. The Patent Board nevertheless held that the '184 Patent "contains insufficient disclosure to support a finding of anticipation of the appealed claims which recite a non-hygroscopic or #-crystalline form of the methanesulfonic acid addition [mesylate] salt of imatinib." See Declaration of Wyley S. Proctor [ECF No. 113] ("Proctor Decl."), Ex. D.[5] Further, the Patent Board held that the examiner had erred in shifting the burden of persuasion to Novartis "to establish that the #-crystalline form recited in their claims 'cannot be made following routine conditions.' " Id. This, the Patent Board explained, was reversible error, because "before an applicant can be put to this burdensome task, the examiner must provide some evidence or scientific reasoning to establish the reasonableness of the examiner's belief that the functional limitation is an inherent characteristic of the prior art." Id. (internal quotations and citation omitted). Because no such evidence or reasoning appeared in the record, the Patent Board reversed the examiner's rejections based on anticipation.

Similarly, the Patent Board reversed the examiner's rejections based on obviousness. Again, the Patent Board assumed, *arguendo*, that the '184 Patent described the mesylate salt of imatinib. Id. The Patent Board, however, disagreed with the examiner that this disclosure would render obvious the claims in the '051 Patent. The Board found that the examiner had not adequately explained how a person having ordinary skill in the art "would have been led from 'here to there,' *i.e.*, from the

methanesulfonic acid addition [mesylate] salt of imatinib to the ... #-crystalline form of that compound recited in the appealed claims." Id.; see also CAC ¶ 244.

On December 31, 2003, six weeks after the Patent Board reversed the examiner's rejections and without conducting any further proceedings, the examiner issued a notice of allowance.[6] Plaintiffs allege that the file wrapper reflects no further developments to the record following the Board's decision, except a notice that the patent term would be extended by 311 days due to the pendency of the appeal to the Board. In Plaintiffs' view, the Board's decision was based on an incomplete prior art record and that the examiner's subsequent decision allowing the patent to issue was not on the merits.

The CAC alleges that Novartis specifically withheld five prior art references—publications by its own scientists—that disclosed the earlier use of the mesylate salt form of imatinib to inhibit the growth of tumor cells.

(1) A 1996 article published in *Cancer Research* by Novartis scientists Buchdunger, Zimmerman, Lydon, Druker, and others entitled "Inhibition of the Ab1 Protein-Tyrosine Kinase in vitro and in vivo by a 2-Phenylaminopyrimidine Derivative." The article allegedly disclosed that the scientists had made a series of compounds that inhibited tyrosine kinases, and described a single compound (imatinib) that showed potent inhibition of the Abl kinase associated with chronic myeloid leukemia. The article explained that the scientists had also synthesized a methanesulfonate salt form of the compound, and that they did so well before the article was submitted on July 31, 1995. The Court will refer to this article as the "**1996 Buchdunger Article**." See CAC ¶¶ 159–64.

(2) A 1997 article published in *Bioorganic & Medicinal Chemistry Letters* by Zimmerman, Buchdunger, and others from Novartis' Oncology Research Department, entitled "Potent and Selective Inhibitors of the Abl-Kinase: Phenylamino-Pyrimidine (PAP) Derivatives." The article, which was submitted for publication on August 21, 1996, described development and optimization of a new class of phenylamino-pyramidine derivatives that yielded highly potent and selective Bcr-Abl kinase inhibitors. The article advised that in one particular series of the PAP derivatives, "improvement of the aqueous solubility can be accomplished by

Case 2:19-cv-07532-ES-MAH   Document 18-5   Filed 05/22/19   Page 57 of 300 PageID: 365

United Food and Commercial Workers Unions and..., Not Reported in Fed....

2017 WL 2837002, 2017-1 Trade Cases P 80,046

attachment of a salt forming group on the indole side chain." Thus, the article suggested that the compound might be a development candidate for use in treatment of certain leukemias. The Court will refer to this article as the "**1997 Zimmerman Article.**" See id. ¶¶ 178–80.

**\*4** (3) A 1996 Article published in *Nature Medicine* by Druker, Buchdunger, Zimmerman, Lydon, and others entitled "Effects of a Selective Inhibitor of the Abl Tyrosine Kinase on the Growth of Bcr-Ab1 Positive Cells." The article allegedly detailed the design of imatinib and its effect of selectively inhibiting proliferation of Bcr-Abl expressing cells in vitro and in vivo. The Court will refer to this article as the "**1996 Druker Article**." See id. ¶ 172.

(4) A 1995 presentation that Druker gave at the American Society of Hematology's annual meeting in Seattle, entitled "Preclinical evaluation of a selective inhibitor of the Abl tyrosine kinase as a therapeutical agent for chronic myelogenous leukemia." The presentation abstract allegedly disclosed the imatinib compound as a potent and specific inhibitor of the ABL protein tyrosine kinase, and concluded that the compound may be useful in the treatment of certain leukemias. The Court will refer to this as the "**1995 Druker Presentation**." See id. ¶¶ 157–58.

(5) A 1996 Article published in *Bioorganic & Medicinal Chemistry Letters* by Zimmerman, Buchdunger, Lydon, and others entitled "Phenylamino-Pyrimidine (PAP)—Derivatives: A New Class of Potent and Highly Selective PDGF-Receptor Autophosphorylation Inhibitors." In that article, Zimmerman noted that the phenylamino-pyramidine compounds at issue "show poor solubility in water ... but are soluble under acidic conditions." In a footnote, the authors described a "typical synthesis" of the compounds, which involved filtration, evaporation, and crystallization. The Court will refer to this as the "**1996 Zimmerman Article**." See id. ¶¶ 165–67.

On March 26, 2004, Novartis submitted a Continued Prosecution Application Request and a supplemental Information Disclosure Statement ("IDS") that disclosed, for the first time, two of these prior art references (the 1996 Buchdunger Article and 1997 Zimmerman Article). See id. ¶ 252. Other prior art—the 1995 Druker Presentation,

1996 Zimmerman Article, and 1996 Druker Article—was allegedly never disclosed. Id. ¶¶ 252, 271, 272. Along with the IDS, Novartis filed "remarks," in which it argued that because the Patent Board had presumed that the mesylate salt of imatinib was described in the prior art, yet still reversed the examiner's rejections, principles of *res judicata* required that the patent claims be allowed, even assuming that the prior art disclosed the mesylate salt. Id. ¶ 253; Proctor Decl. Ex. G.

Plaintiffs further allege that during the prosecution of the '051 Patent before the PTO, Novartis made intentional false statements and material omissions, including

(i) misrepresenting that the mesylate salt of imatinib was not actually prepared in Zimmermann [the '184 Patent], (ii) misrepresenting that obviousness and anticipation depend on whether the salt form compound was actually made in Zimmermann [the '184 Patent] (when the relevant question is whether its preparation is within the knowledge of those of ordinary skill in light of Zimmermann [the '184 Patent] ), (iii) failing to disclose that the specific salt, imatinib mesylate, had been publicly disclosed in publications authored by Novartis's own scientists, (iv) withholding relevant prior art until after the PTO sent a notice of allowability, thereby failing to disclose information material to patentability during the prosecution of the patent, (v) misrepresenting, when it did finally disclose some material prior art, that the Board had already decided that prior art disclosing the mesylate salt form would not invalidate the patent (when the Board did *not* consider whether other prior art disclosed the mesylate salt, in part because Novartis had not provided the relevant prior art).

**\*5** CAC ¶ 265.

Plaintiffs additionally claim that Novartis misrepresented in its patent application that the non-needle, #-crystalline form of imatinib mesylate was a recent and "surprising" discovery when, in fact, Novartis scientists had been using the #-crystalline form since August 1993 and anyone skilled in the art would have been both motivated and easily able to formulate a non-needle, crystalline form using routine laboratory procedures.

The PTO ultimately issued the '051 Patent on May 17, 2005. In 2006, Novartis filed and obtained the second follow-on patent, the '799 Patent, which purportedly disclosed the methanesulfonate salt of imatinib and its #-crystalline form. According to Plaintiffs, parts of the '799 Patent application were identical to the '051 Patent application. Novartis again stated that it was "surprised" to find the #-crystalline form in the methanesulfonate salt of the compound, even though the form had been known to have advantageous properties since July 31, 1995 and was the basis of the '051 Patent. Plaintiffs allege that the '799 Patent was broader than the '051 Patent, which claimed the #-crystalline form, because the '799 Patent ultimately also claimed the non-needle crystal of imatinib mesylate. The '799 Patent eventually issued on June 9, 2009. Plaintiffs argue that it is invalid for the same reasons that the '051 Patent is invalid. The '799 Patent was eventually reissued as the RE'932 Patent.

### B. The Orange Book Listing

The Orange Book lists FDA-approved drug products along with the corresponding patents that cover the drugs. One objective of the Orange Book is to provide would-be generic manufacturers with notice of any patent rights that are implicated by a brand-name drug. The information published in the Orange Book, however, is based on drug manufacturers' submissions and representations to the FDA. The FDA does not independently determine whether a particular drug product actually reads on a particular patent claim, and it does not examine the asserted patents to ensure their validity.[7]

**\*6** Novartis submitted all three patents—the original '184 Patent, the '051 Patent, and the '799 Patent—to the FDA to be listed in the Orange Book as covering Gleevec. CAC ¶ 295. Plaintiffs allege that Novartis did so knowing that the Polymorph Patents had "no realistic likelihood"

of ever being able to stand up in court as valid patents, and that those patents would pose an impediment to the launch of generic imatinib mesylate. Id.

### C. Litigation and Settlement Between Sun Pharma and Novartis

On June 16, 2006, Sun Pharma ("Sun") filed an abbreviated new drug application ("ANDA"), pursuant to the Hatch-Waxman amendments to the Federal Food, Drug, and Cosmetic Act, with the FDA, seeking approval to market 100mg and 400mg generic imatinib mesylate tablets, with Gleevec as the brand-name reference.[8] In its ANDA, Sun told the FDA that it would wait until the '184 Patent expired in July 2015 before marketing its drug, but that the follow-on '051 Patent was invalid and would not be infringed. Accordingly, Sun sought FDA approval to market its generic no later than July 5, 2015.

Novartis did not file a Hatch-Waxman infringement suit with respect to the '051 Patent within the period set forth in the statute. Accordingly, no 30-month stay of FDA approval ever went into effect for the Sun ANDA, and on November 13, 2009, the FDA granted tentative approval to Sun's ANDA for a generic version of Gleevec.

On June 7, 2013, while Sun was preparing for the timely entry of its generic into the marketplace, Sun filed an action against Novartis in the United States District Court for the District of New Jersey, seeking a declaratory judgment that Sun would not be infringing the '051 Patent and/or that the '051 Patent was invalid or unenforceable. Novartis counterclaimed, alleging infringement of the '051 Patent and seeking a declaration that the '051 Patent was valid and enforceable.[9] Plaintiffs allege that at the time Novartis filed its counterclaims, Novartis knew that the '051 Patent was invalid for obviousness or anticipation and that "Novartis also knew that it had very likely committed inequitable conduct before the PTO during the prosecution of the '051 Patent." CAC ¶ 306.

**\*7** Sun and Novartis settled the case on May 15, 2014, less than one year after the litigation was filed and before the court issued any substantive rulings in the action. Shortly after the settlement, both parties announced that under their settlement agreement, Sun would be permitted to launch its generic version of Gleevec on February 1, 2016.

2017 WL 2837002, 2017-1 Trade Cases P 80,046

**D. Litigation And Settlement With Other Generic Manufacturers**

In or around 2014, several other generic manufacturers filed ANDAs for generic Gleevec, which included Paragraph IV Certifications as to some or all of the Orange Book-listed patents for Gleevec. In contrast to its approach in the Sun litigation, Novartis immediately filed Hatch-Waxman infringement suits against each of these generics, resulting in 30-month stays of FDA approval as to those ANDAs.

Two of those cases, one involving Dr. Reddy's Laboratories and the other involving Ranbaxy, have already resulted in settlements, the terms of which are not disclosed in the CAC. Plaintiffs represent that Novartis is still actively pursuing litigation as to six other ANDA filers, including Breckenridge, Roxane/ Boehringer Ingelheim, Natco, Amneal, Shilpa Medicare Ltd., and Wockhardt Bio AG. These suits are currently pending in the District Courts for the District of Delaware and the Southern District of New York, with 30-month stays that expire between December 2017 and June 2018.

**IV. LEGAL STANDARD**

Under the Federal Rules of Civil Procedure, a complaint "must provide 'a short and plain statement of the claim showing that the pleader is entitled to relief.' " Cardigan Mountain Sch. v. N.H. Ins. Co., 787 F.3d 82, 84 (1st Cir. 2015) (quoting Fed. R. Civ. P. 8(a)(2)). This pleading standard requires "more than labels and conclusions," Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007), and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice," Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). Rather, a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " Id. at 678 (quoting Twombly, 550 U.S. at 570).

When evaluating the sufficiency of a complaint, the Court "first must 'distinguish the complaint's factual allegations (which must be accepted as true) from its conclusory legal allegations (which need not be credited).' " Cardigan Mountain Sch., 787 F.3d at 84 (quoting García-Catalán v. United States, 734 F.3d 100, 103 (1st Cir. 2013)) (further internal quotations and citation omitted). "Second, the court must determine whether the factual allegations are sufficient to support the reasonable inference that the

defendant is liable for the misconduct alleged." García-Catalán, 734 F.3d at 103 (internal quotations and citation omitted). In conducting this analysis, the Court must accept all well-pleaded facts as true and analyze those facts in the light most favorable to the plaintiff's theory, drawing all reasonable inferences in favor of the plaintiff. U.S. ex rel. Hutcheson v. Blackstone Med., Inc., 647 F.3d 377, 383 (1st Cir. 2011).

"When considering a motion to dismiss under subsection 12(b)(1) of the Federal Rules of Civil Procedure, the Court should apply a standard of review 'similar to that accorded a dismissal for failure to state a claim' under subsection 12(b)(6)." Menge v. N. Am. Specialty Ins. Co., 905 F. Supp. 2d 414, 416 (D.R.I. 2012) (quoting Murphy v. United States, 45 F.3d 520, 522 (1st Cir. 1995)).

> **\*8** When faced with motions to dismiss under both 12(b)(1) and 12(b)(6), a district court, absent good reason to do otherwise, should ordinarily decide the 12(b) (1) motion first.... It is not simply formalistic to decide the jurisdictional issue when the case would be dismissed in any event for failure to state a claim. Different consequences flow from dismissals under 12(b)(1) and 12(b)(6): for example, dismissal under the former, not being on the merits, is without res judicata effect.

Ne. Erectors Ass'n of the BTEA v. Sec'y of Labor, Occupational Safety & Health Admin., 62 F.3d 37, 39 (1st Cir. 1995).

**V. DISCUSSION**

Although Plaintiffs' monopolization claims are based solely on state law, Plaintiffs and Novartis have both raised legal arguments that rely heavily on doctrines developed in federal antitrust cases—specifically, the Noerr-Pennington doctrine, as set forth in E. R. R. Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127 (1961) and United Mine Workers of Am. v. Pennington, 381 U.S. 657 (1965)—and on the related

grounds for antitrust liability—a "Walker Process" theory, as described in Walker Process Equip., Inc. v. Food Mach. & Chem. Corp., 382 U.S. 172 (1965), and a sham litigation theory.

The Noerr-Pennington doctrine, which arose in antitrust cases under the Sherman Act, holds that a party petitioning the government for redress is generally immune from antitrust liability based on that conduct. See Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc., 508 U.S. 49, 56 (1993) (hereinafter, "PRE"). Although it appears that the doctrine developed, at least in part, out of First Amendment concerns, see PRE, 508 U.S. at 56 (citing Noerr, 365 U.S. at 138); In re Solodyn (Minocycline Hydrochloride) Antitrust Litig., No. 14-md-02503-DJC, 2015 WL 5458570, at *11 (D. Mass. Sept. 16, 2015); Hamilton v. Accu-tek, 935 F. Supp. 1307, 1316 (E.D.N.Y. 1996), the Supreme Court has confirmed that Noerr-Pennington immunity extends to "petitioning" activities before the courts (i.e., litigation), see Cal. Motor Transp. Co. v. Trucking Unlimited, 404 U.S. 508, 510 (1972).

There are exceptions to Noerr-Pennington immunity, however, including when a defendant engages in sham litigation or Walker Process fraud on the PTO, both of which Plaintiffs allege here. The Federal Circuit has held that the sham litigation and Walker Process exceptions "provide alternative legal grounds on which a patentee may be stripped of its immunity from the antitrust laws," and that "either or both may be applicable to a particular party's conduct in obtaining and enforcing a patent." Nobelpharma AB v. Implant Innovations, Inc., 141 F.3d 1059, 1071 (Fed. Cir. 1998); see also Handgards, Inc. v. Ethicon, Inc., 601 F.2d 986, 994 (9th Cir. 1979) (distinguishing sham litigation from Walker Process).

In this case, Plaintiffs' state-law monopolization claims, which closely track the sham litigation and Walker Process exceptions, are based on allegations that Novartis (1) made misrepresentations and omissions when prosecuting the '051 Patent before the PTO; (2) wrongfully submitted the Polymorph Patents for publication in the Orange Book; and (3) initiated alleged sham litigation against Sun and other generic manufacturers. Novartis has moved to dismiss, asserting that Plaintiffs fail to allege facts supporting either a sham litigation or Walker-Process-type claim. Plaintiffs' opposition brief argues the contrary. Thus, it appears that both parties have presumed that

(1) Noerr-Pennington shields parties from liability under all of the state antitrust and unfair competition laws cited in the CAC; and that (2) in order to plead viable claims under these state laws, the Plaintiffs must plausibly allege sham litigation and/or Walker-Process theories of antitrust liability.

*9 The First Circuit has not decided whether the Noerr-Pennington doctrine is applicable to state law claims as a matter of federal law. See Davric Me. Corp. v. Rancourt, 216 F.3d 143, 148 n.7 (1st Cir. 2000). The majority of circuits, however, have recognized that Noerr-Pennington emanated, at least in part, from First Amendment concerns and therefore can apply to certain state law claims as well as federal claims. See, e.g., Coll v. First Am. Title Ins. Co., 642 F.3d 876, 895 (10th Cir. 2011) ("[T]he Noerr-Pennington doctrine is based upon the First Amendment, which applies to [the states] through the Fourteenth Amendment...."); see also VIBO Corp. v. Conway, 669 F.3d 675, 683–84 (6th Cir. 2012) ("Where private actors petition the government for action that would violate antitrust law, the Petition Clause [of the First Amendment] immunizes the actors from litigation in connection with their petitioning."); Kottle v. Nw. Kidney Centers, 146 F.3d 1056, 1059 (9th Cir. 1998) (noting that the Noerr-Pennington doctrine "sweeps broadly and is implicated by both state and federal antitrust claims that allege anticompetitive activity in the form of lobbying or advocacy before any branch of either federal or state government"); John J. Miles, Health Care and Antitrust Law, § 7:8 n.7 (2017) (collecting cases). Further, many states have actually adopted the Noerr-Pennington doctrine and applied it to certain state-law claims. See Coll, 642 F.3d at 895 (noting that "many other states have adopted and apply the Noerr–Pennington doctrine to state antitrust claims, as well as other state-law claims," collecting cases, and anticipating that the Noerr-Pennington doctrine would be applied to the New Mexico Antitrust Act); Apple, Inc. v. Motorola Mobility, Inc., 886 F. Supp. 2d 1061, 1077 (W.D. Wis. 2012) (applying Noerr-Pennington immunity to bar state-law unfair competition claim); Bayou Fleet, Inc. v. Alexander, 26 F. Supp. 2d 894, 897 (E.D. La. 1998) (dismissing claim under Louisiana Unfair Trade Practices Act as barred by Noerr-Pennington). Accordingly, as both parties have already done, albeit without explicitly addressing the issue, the Court applies the Noerr-Pennington doctrine to Plaintiffs' state-law claims in this case.

Case 2:19-cv-07532-ES-MAH   Document 18-5   Filed 05/22/19   Page 61 of 300 PageID: 369
United Food and Commercial Workers Unions and..., Not Reported in Fed....
2017 WL 2837002, 2017-1 Trade Cases P 80,046

In addition to arguing that Plaintiffs fail to allege plausible sham litigation or Walker Process claims, Novartis argues that Plaintiffs lack standing to assert these claims and that their Walker Process claims are preempted by federal patent law.

**A. Standing**

Novartis argues, first, that Plaintiffs lack standing to challenge the validity of the patents and can therefore not pursue sham litigation claims based on invalidity, and second, that Plaintiffs do not have standing to bring Walker Process claims because they are indirect purchasers. Plaintiffs argue that they have standing to pursue both state-law antitrust claims that involve issues of patent invalidity and Walker Process fraud despite the fact that they are indirect purchasers.

Article III of the U.S. Constitution requires that three conditions be satisfied in order for a plaintiff to have standing. U.S. Const. art. III, § 2, cl. 1. "First and foremost, there must be alleged (and ultimately proved) an 'injury in fact.' " Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 103 (1998) (quoting Whitmore v. Arkansas, 495 U.S. 149, 155 (1990)). This injury "must be concrete in both a qualitative and temporal sense," "distinct and palpable" as opposed to "abstract," and "actual or imminent" as opposed to "conjectural or hypothetical." Whitmore, 495 U.S. at 155 (internal quotations and citations omitted). Second, standing requires causation, defined as a "fairly traceable connection between the plaintiff's injury and the complained-of conduct of the defendant." Steel Co., 523 U.S. at 103. Finally, standing requires "redressability—a likelihood that the requested relief will redress the alleged injury." Id.

In addition to the Article III standing requirements, plaintiffs pleading federal antitrust claims must meet two other requirements: "the plaintiff must also allege antitrust injury and must demonstrate, through a series of related factors, that its injuries are more than speculative and that it is well-situated to serve as an 'efficient enforcer' of the antitrust laws." William B. Rubenstein, Newberg on Class Actions § 20:3 (5th ed. 2017); see also Associated Gen. Contractors of Cal. v. Cal. State Council of Carpenters, 459 U.S. 519, 535–38 (1983) (establishing factors to consider in assessing antitrust standing). Antitrust standing is generally justified on prudential, rather than on constitutional, grounds. Sullivan v. Tagliabue, 25 F.3d 43, 45 n.5 (1st Cir. 1994) ("It is

unquestioned that the requirements of antitrust standing exceed those of standing in a constitutional sense."); see also In re Modafinil Antitrust Litig., 837 F.3d 238, 264 n.30 (3d Cir. 2016), as amended (Sept. 29, 2016) ("Antitrust standing, unlike Article III standing, is not a jurisdictional requirement."); Ethypharm S.A. Fr. v. Abbott Labs., 707 F.3d 223, 232 (3d Cir. 2013).

**\*10** Although the arguments are somewhat unclear, Novartis seems to challenge Plaintiffs' standing based on antitrust and patent prudential considerations, which relate to Plaintiffs' ability to meet non-Article III standing requirements, rather than challenging their constitutional standing. In any event, the Court finds the Article III standing requirements met here. [10]

**B. Sham Litigation Claims**

**i. Relevant Legal Standard**

In order to bring a sham litigation claim, a plaintiff must plausibly plead that the litigation was:

(1) 'objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits'; and (2) subjectively motivated by a desire to 'interfere *directly* with the business relationships of a competitor', through the use of the governmental *process*—as opposed to the *outcome* of that process—as an anticompetitive weapon.

Solodyn, 2015 WL 5458570, at * 11 (quoting PRE, 508 U.S. at 60–61). "The existence of probable cause to institute legal proceedings precludes a finding that an antitrust defendant has engaged in sham litigation." PRE, 508 U.S. at 62. The Court addresses the two PRE prongs sequentially because "[o]nly if challenged litigation is objectively meritless may a court examine the litigant's subjective motivation." Id. at 60.

**ii. "Objectively Baseless" Prong**

Novartis argues that Plaintiffs have not plausibly alleged that the Sun infringement litigation was "objectively baseless," as required to satisfy the first prong of the PRE test. Novartis asserts that in order to plead a plausible case for "objective baselessness," Plaintiffs need to allege

United Food and Commercial Workers Unions and..., Not Reported in Fed....

2017 WL 2837002, 2017-1 Trade Cases P 80,046

that the patent was either (1) declared invalid by some other court; or (2) that its validity was "tarnished" by an adverse Markman ruling or some other judicial ruling that calls its validity into question. Plaintiffs aver that a prior invalidity finding is not a pre-condition to a sham litigation claim, and that by alleging the patent's invalidity here, they have sufficiently pleaded sham litigation. The Court declines to adopt a bright-line rule requiring that a patent be invalidated or tarnished before a plaintiff can allege a sham litigation claim, but notes that it is difficult to conceive of a scenario in which a sham litigation claim would go forward without the patent having been invalidated or otherwise tarnished.

**\*11** In support of the "objectively baseless" prong, Plaintiffs argue that the '051 Patent is invalid because it would have been obvious to an ordinary person skilled in the art or inherently anticipated in the prior art and thus not patentable. Specifically, Plaintiffs aver that the prior art—the '184 Patent and at least two articles—disclosed that Novartis had made mesylate salt of imatinib, that an ordinary person with the requisite skill would have been motivated to create a usable crystal form, and that the #-crystal form would have been an obvious choice. Further, Plaintiffs assert that the fact that Novartis failed to sue Sun within the requisite time period to obtain a mandatory 30-month stay, and then agreed to a settlement very favorable to Sun, allowing Sun to share in $7.5 billion in potential Gleevec sales that it otherwise would not have been entitled to unless it succeeded in litigation, all shows that Novartis did not believe that it could win on the merits.

Here, Plaintiffs have not alleged a plausible sham litigation claim. The possible invalidity of a patent does not, in and of itself, establish that the litigation asserting it was objectively baseless. "A firm that has received a patent from the patent office (and not by fraud ...), and thus enjoys the presumption of validity that attaches to an issued patent, 35 U.S.C. § 282, is entitled to defend the patent's validity in court, to sue alleged infringers, and to settle with them, whatever its private doubts, unless a neutral observer would reasonably think either that the patent was almost certain to be declared invalid, or the defendants were almost certain to be found not to have infringed it, if the suit went to judgment." Asahi Glass Co. v. Pentech Pharm., Inc., 289 F. Supp. 2d 986, 992–93 (N.D. Ill. 2003). Absent meeting the PRE criteria, "[n]either the bringing of an unsuccessful suit to enforce

patent rights, nor the effort to enforce a patent that falls to invalidity, subjects the suitor to antitrust liability." C.R. Bard, Inc. v. M3 Sys., Inc., 157 F.3d 1340, 1369 (Fed. Cir. 1998). In other words, even if a patent is ultimately found to be invalid, that does not necessarily prove that the relevant claims, without a prior invalidity finding, were "so baseless that no reasonable litigant could realistically expect to secure favorable relief." PRE, 508 U.S. at 62. Thus, a merely plausible patent invalidity claim is not enough to support a plausible sham litigation claim.

"[T]he determination of whether such a suit is a sham depends not on what the patentee believes but 'on the nature of and the underlying merits of the patentee's case.' " Asahi Glass Co., 289 F. Supp. 2d at 995 (quoting FilmTec Corp. v. Hydranautics, 67 F.3d 931, 936 (Fed. Cir. 1995)). Even on the facts alleged in the CAC, Novartis had a colorable claim that the '051 Patent was valid and enforceable by arguing that it was neither inherently anticipated by nor obvious in the prior art, which is consistent with both the patent examiner's and PTO Board of Appeal's determinations.

To prove invalidity by anticipation, a party must show that "every element and limitation of the claim was previously described in a single prior art reference, either expressly or inherently, so as to place a person of ordinary skill in possession of the invention." Sanofi–Synthelabo v. Apotex, Inc., 550 F.3d 1075, 1082 (Fed. Cir. 2008). The prior art, identified by Plaintiffs as belatedly presented or withheld completely from the patent examiner, neither describes the #-crystalline form of the imatinib mesylate salt nor a method to produce it. The prior art only mentions imatinib mesylate itself, CAC ¶ 140, which has many different crystalline forms, CAC ¶¶ 35–36. "[D]ifferences between the prior art reference and a claimed invention, however slight, invoke the question of obviousness, not anticipation." Net MoneyIN, Inc. v. VeriSign, Inc., 545 F.3d 1359, 1371 (Fed. Cir. 2008). Furthermore, not only did the PTO assume that the prior art disclosed the imatinib mesylate, but the patent examiner also received some of the prior art identified in the CAC, initialed it, and still issued the '051 Patent. Thus, the facts in the CAC show that Novartis had a colorable argument that the '051 Patent was not inherently anticipated by prior art, and Plaintiffs cannot, without more, plausibly allege that the Sun litigation was objectively baseless on that theory of patent invalidity.

United Food and Commercial Workers Unions and..., Not Reported in Fed....

2017 WL 2837002, 2017-1 Trade Cases P 80,046

**\*12** With respect to Plaintiffs' theory of patent invalidity based on obviousness, the CAC also establishes that Novartis had a colorable claim that the '051 Patent was not obvious. Section 103 of the Patent Act provides that subject matter cannot be patented if "the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." 35 U.S.C. § 103. The Supreme Court explained how to apply § 103 as follows:

> the scope and content of the prior art are ... determined; differences between the prior art and the claims at issue are ... ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background, the obviousness or nonobviousness of the subject matter is determined. Such secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented.

Graham v. John Deere Co. of Kan. City, 383 U.S. 1, 17–18 (1966); see also KSR Int'l Co. v. Teleflex Inc., 550 U.S. 398, 406–07 (2007) (explaining that Graham "set out a framework for applying the statutory language of § 103" and controls inquiries of whether claimed subject matter is obvious). Furthermore, "[t]he combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results," KSR Int'l Co., 550 U.S. at 416, however, a patent "is not proved obvious merely by demonstrating that each of its elements was, independently, known in the prior art," id. at 418. "Often, it will be necessary for a court to look to interrelated teachings of multiple patents; the effects of demands known to the design community or present in the marketplace; and the background knowledge possessed by a person having ordinary skill in the art, all in order to determine whether there was an

apparent reason to combine the known elements in the fashion claimed by the patent at issue." Id.

The CAC alleges that any person skilled in the art at the time would have tried to find a crystalline form that was suitable for commercial pharmaceutical production, and thus would have been motivated to find a more stable, less hygroscopic (i.e., one that absorbed less moisture from the air) form. CAC ¶¶ 206–07. It further claims that anyone skilled in the art at the time would have known that the needle-shaped, #-crystalline form of mesylate salt was not suitable for pharmaceutical production and would have tried to find a non-needle form (such as the #-crystalline form). CAC ¶ 208. It also alleges that the two techniques Novartis described in its patent application, which produced the #-crystalline form, were commonly known methods for developing alternate crystalline forms at the time. CAC ¶ 211.

The fact that someone might have been "motivated" to discover a crystalline form of a compound that would be more suitable for pharmaceutical production does not on its own establish that the subject matter was obvious. See In re Armodafinil Patent Litig. Inc., 939 F. Supp. 2d 456, 487 (D. Del. 2013) (explaining that obviousness "requires 'a reasonable expectation of success' " (quoting Medichem, S.A. v. Rolabo, S.L., 437 F.3d 1157, 1165 (Fed. Cir. 2006))). Even following extensive presentation of evidence in trial, analogous arguments involving the obviousness of polymorphic forms have failed to invalidate patents. See id. at 494. Here, the prior art did not disclose the existence or properties of the #-crystalline form or the method by which it could be derived. [11] The CAC largely contains conclusory allegations that deriving the #-crystalline form would have been predictable based on the mere disclosure of the mesylate salt and that the methods used to derive it were routine. Even if this were enough to allege a plausible invalidity claim, it is not enough to show that Novartis' litigation based on the '051 Patent was objectively baseless.

**\*13** Moreover, the patent examiner considered much of the prior art at issue in the CAC before eventually issuing the patent, and it is not clear that the prior undisclosed art would have altered the examiner's obviousness analysis. Further, it is noteworthy that the '051 Patent had never been previously invalidated or tarnished in any way. See Solodyn, 2015 WL 5458570, at \*11.

Case 2:19-cv-07532-ES-MAH   Document 18-5   Filed 05/22/19   Page 64 of 300 PageID: 372

United Food and Commercial Workers Unions and..., Not Reported in Fed....

2017 WL 2837002, 2017-1 Trade Cases P 80,046

Finally, the fact that Novartis indeed settlements involving challenges to the validity of the Polymorph Patents and that these patents have never actually been called into question by a judicial authority, while not dispositive, further undercuts Plaintiffs' ability to allege objective baselessness, particularly where Plaintiffs have not called the settlements themselves into question. See Asahi Glass Co., 289 F. Supp. 2d at 992 ("If, however, there is nothing suspicious about the circumstances of a patent settlement, then to prevent a cloud from being cast over the settlement process a third party should not be permitted to haul the parties to the settlement over the hot coals of antitrust litigation."). Although the '051 Patent could ultimately be invalid, that issue is not directly before this Court. Accordingly, Plaintiffs have failed to allege a plausible claim that litigation based on the '051 Patent, and therefore the other Polymorph Patent, was "objectively baseless."

**C. Walker Process Fraud Claims**

**i. Relevant Legal Standard**

In Walker Process, the Supreme Court held that if a party obtains a patent "by knowingly and willfully misrepresenting facts to the Patent Office," this is "sufficient to strip [the party] of its exemption from the antitrust laws." 382 U.S. at 177. To adequately allege Walker Process fraud, Plaintiffs must claim "(1) a false representation or deliberate omission of a fact material to patentability, (2) made with the intent to deceive the patent examiner, (3) on which the examiner justifiably relied in granting the patent, and (4) but for which misrepresentation or deliberate omission the patent would not have been granted." [12] C.R. Bard, 157 F.3d at 1364; see also Nobelpharma, 141 F.3d at 1070–71. The fraud must be "knowing and willful." C.R. Bard, 157 F.3d at 1364 (quoting Walker Process, 382 U.S. at 177). Where the fraud is based on omission, "there must be evidence of intent separable from the simple fact of omission." Dippin' Dots, Inc. v. Mosey, 476 F.3d 1337, 1347 (Fed. Cir. 2007).

**\*14** In addition, a plaintiff must plausibly allege all other required elements of an antitrust claim—causation, antitrust injury, and market power. See Spectrum Sports, Inc. v. McQuillan, 506 U.S. 447, 459 (1993); see also Ritz Camera & Image, LLC, v. SanDisk Corp., 700 F.3d 503, 506 (Fed. Cir. 2012) (explaining that Walker Process

fraud claim requires showing "all the otherwise necessary to establish a Sherman Act monopolization charge"); C.R. Bard, 157 F.3d at 1368 ("Unless the patent had been obtained by fraud such that the market position had been gained illegally, the patent right to exclude does not constitute monopoly power prohibited by the Sherman Act."). Finally, plaintiffs alleging Walker Process fraud must comply with the heightened pleading requirements of Rule 9(b) as applied by the Federal Circuit. Medimmune, Inc. v. Genentech, Inc., 427 F.3d 958, 967 (Fed. Cir. 2005), rev'd and remanded on other grounds, 549 U.S. 118 (2007); see also Exergen Corp. v. Wal-Mart Stores, Inc., 575 F.3d 1312, 1326–28 (Fed. Cir. 2009) (explaining that Rule 9(b) particularity requirement entails alleging the specific "who, what, when, where, and how").

**ii. Misrepresentation/Omission and Materiality**

Plaintiffs base their state-law Walker Process fraud claims on the following: (1) the withholding of prior art publications by Novartis' own scientists "that explicitly disclosed the mesylate salt form imatinib that had the desired qualities of kinase inhibition;" (2) that "Novartis misrepresented that the non-needle form of the compound was a recent, 'surprising' discovery, despite the fact that Ciba-Geigy scientists had been using it for years," that "anyone skilled in the art would have been both motivated and easily able to formulate a non-needle crystal form using routine laboratory procedures," and that Novartis' scientists did in fact do that; and (3) that Novartis improperly argued to the patent examiner that the PTO Board of Appeals decision had *res judicata* effect. CAC ¶¶ 5–7.

Novartis argues that three of the five prior art references at issue were not withheld from the PTO and that the remaining two references were cumulative or immaterial. The two prior art references that were ultimately disclosed to the PTO in an IDS and which the examiner herself initialed, see Proctor Decl., Exs. G–H, indicating that she considered them, cannot form the basis of a plausible Walker Process fraud claim, where they were disclosed prior to issuance. See Fiskars, Inc. v. Hunt Mfg. Co., 221 F.3d 1318, 1327 (Fed. Cir. 2000) ("An applicant cannot be guilty of inequitable conduct if the reference was cited to the examiner, whether or not it was a ground of rejection by the examiner."). Further, Plaintiffs failed to show how

United Food and Commercial Workers Unions and..., Not Reported in Fed....

2017 WL 2837002, 2017-1 Trade Cases P 80,046

a third prior art reference (the 1996 Druker Article) that was actually cited in the '051 Patent's specification, see Proctor Decl., Ex. A, can support a fraud allegation. See Oracle Corp. v. Drug Logic, Inc., No. 11-00910, 2011 WL 5576267, at *11 (N.D. Cal. Nov. 16, 2011) (holding that, where prior art references were disclosed in patent's specifications, allegations did not support inference that applicant deliberately withheld material information).

Novartis' res judicata argument to the patent examiner regarding the prior art that was disclosed post-appeal also cannot support a Walker Process fraud claim because it does not qualify as a material misrepresentation and the patent examiner was not bound by it. See Rothman v. Target Corp., 556 F.3d 1310, 1328–29 (Fed. Cir. 2009) ("While the law prohibits genuine misrepresentations of material fact, a prosecuting attorney is free to present argument in favor of patentability without fear of committing inequitable conduct."); Environ Prods., Inc. v. Total Containment, Inc., 951 F. Supp. 57, 61 (E.D. Pa. 1996) ("[T]here is no policy reason which would support the unprecedented expansion of the interpretation of 'material information' to include legal arguments."). Plaintiffs make no argument to the contrary in their opposition brief.

 *15 Furthermore, the two prior art references that Novartis admits were withheld—the 1995 Druker Presentation and the 1996 Zimmerman Article—also do not support a Walker Process fraud claim in this case. Plaintiffs' allegations of materiality with respect to the undisclosed prior art do not reach the plausibility threshold. In their brief, they explain that the prior art is relevant as to "whether the mesylate salt had been made or disclosed earlier," but the PTO, on appeal, specifically assumed the mesylate salt of imatinib had been disclosed and, moreover, Novartis did ultimately provide prior art that disclosed mesylate salt to the patent examiner. Plaintiffs also argue that the prior art is relevant as to "whether the #-crystal form could be made following routine conditions." Yet Plaintiffs fail to allege how either the 1995 Druker Presentation or the 1996 Zimmerman Article are material in that respect and, as required by Rule 9(b), how they are material to any particular claim in the '051 Patent. See Exergen Corp., 575 F.3d at 1329 ("[T]he pleading fails to identify which claims, and which limitations in those claims, the withheld references are relevant to, and where in those references the material information is found—i.e., the 'what' and 'where' of the

material omissions."). Moreover, the Court cannot infer that they plausibly are material where they neither discuss the #-crystalline form of the mesylate salt specifically nor mention methods for creating it.

Finally, Novartis' statement that the discovery of the #-crystalline form was "surprising" does not support a plausible fraud claim. Firstly, it is unclear whether such a statement qualifies as a misrepresentation, particularly where the examiner was free to reach her own opinion about whether such a discovery was in fact "surprising" based on the prior art that was available to her before the patent issued. Cf. LifeScan, Inc. v. Home Diagnostics, Inc., 103 F. Supp. 2d 379, 386 (D. Del. 2000) ("As the Federal Circuit has recognized, the mere fact that a patent applicant attempts to distinguish its patent from the prior art does not constitute a material omission or misrepresentation where the patent examiner has the prior art before him or her, and therefore, is free to make his or her own conclusions regarding the claimed invention."). Further, Plaintiffs have not sufficiently alleged that if Novartis had avoided using the word "surprising," the patent would not have issued in light of the relevant prior art.

Accordingly, Plaintiffs have failed to sufficiently allege that the claimed misrepresentations or omissions were material to the patent examiner's determination.

### iii. Fraudulent Intent

"Although 'knowledge' and 'intent' may be averred generally, ... the pleadings [must] allege sufficient underlying facts from which a court may reasonably infer that a party acted with the requisite state of mind." Exergen Corp., 575 F.3d at 1327 (citing Fed. R. Civ. P. 9(b)). The facts alleged, even construed generously, do not support a plausible inference of fraudulent intent. In their opposition brief, Plaintiffs point to no specific factual allegations in the CAC that would permit such an inference, and argue only that "no other inference ... can be drawn from the facts alleged in the complaint." [ECF No. 120 at 29]. "[T]he simple fact of omission" is insufficient. Dippin' Dots v. Mosey, 476 F.3d 1337, 1347 (Fed. Cir. 2007). Further, Plaintiffs' belated disclosure of certain prior art does not permit this Court, without more, to plausibly infer that Novartis acted with fraudulent intent. At best, the allegation that the prior art was

disclosed after an initial notice of allowance cuts equally in favor of and against Plaintiffs, in that it suggests that Novartis did not intend to hide information as evidenced by the fact that it did, in fact, disclose it. Where the prior art at issue was largely disclosed and the remaining undisclosed prior art is not clearly material in light of the disclosed prior art, the fact that Novartis' scientists authored the prior art does not demonstrate deceptive intent. Lastly, based on all of the above, there are insufficient factual allegations that would allow the Court to infer that the characterization of the #-crystal as "surprising" was intended to deceive the PTO.

Accordingly, the Court concludes that Plaintiffs have failed to adequately plead a state-law Walker Process fraud claim. [13] Moreover, where Plaintiffs have failed to state a claim based on sham litigation or Walker-Process fraud, Plaintiffs' Orange Book listing allegations cannot form a separate basis for liability and therefore fail as well. See Daiichi Sankyo, Inc. v. Apotex, Inc., No. CIVA.030937(SDW-MCA), 2009 WL 1437815, at *9

(D.N.J. May 19, 2009) (noting that "the Orange Book listing was only wrongful if the patent was obtained through fraud or was 'objectively baseless' "); see also Solodyn, 2015 WL 5458570, at *12. Because Plaintiffs have failed to adequately allege claims sufficient to avoid the bar of Noerr-Pennington immunity, their state-law claims must be dismissed.

## VI. CONCLUSION

*16  Accordingly, Novartis' motion to dismiss [ECF No. 111] is GRANTED. In light of this ruling, there is no need for a Rule 26(f) conference and that motion [ECF No. 135] is DENIED as moot.

## SO ORDERED.

## All Citations

Not Reported in Fed. Supp., 2017 WL 2837002, 2017-1 Trade Cases P 80,046

## Footnotes

1   Because the "free base" forms of many pharmaceutical compounds often do not exhibit the range of physical properties that are suitable for drug development, chemists sometimes modify the characteristics of the compound by adding an acid to form an "acid addition salt." One common acid addition salt is a salt of methanesulfonic acid, also known as "mesylate." Novartis sells Gleevec with imatinib mesylate in a tablet form.

2   Once a salt is selected, a drug manufacturer can also select a polymorphic form of the salt. Salts crystallize in a variety of different shapes, depending on conditions like temperature, solvent, and degree of supersaturation. When a salt is to be used in pharmaceutical drugs, some crystalline forms are preferable to others, as the form of the salt can affect drug qualities such as stability, dissolution, and bioavailability. In addition, certain crystalline forms may not be ideal for mass-scale production, in light of the form's flow properties, compressibility, bulk density, and particle sizes. Plaintiffs allege that "[n]eedle-shaped crystals, which are long and very thin ... are very difficult to handle both in the laboratory and in commercial production." Id. ¶ 41. Accordingly, it is preferable to use a non-needle crystalline form when developing a salt for use in prescription drugs. Id. ¶ 42.

3   The '051 Patent is alleged to expire November 23, 2019. CAC ¶ 262. The CAC alleges that the '799 Patent, due to the terminal disclaimer, would expire the same day, id. ¶ 293, but Novartis represents that the RE'932 Patent expires on July 16, 2019 [ECF No. 112 at 4 n.6].

4   The Court understands the term "methanesulfonate salt" to be identical to "mesylate salt" in this case, and thus uses them interchangeably.

5   Although the Patent Board's decision is not attached to the CAC, it is cited at length therein. Moreover, because documents in the patent's prosecution history are public records, the Court may take judicial notice of their contents. See Beddall v. State St. Bank & Trust Co., 137 F.3d 12, 16–17 (1st Cir. 1998).

6   "If, on examination, it appears that the applicant is entitled to a patent under the law, a notice of allowance will be sent to the applicant...." 37 C.F.R. § 1.311(a).

7   Under the Federal Food, Drug, and Cosmetic Act ("FDCA"), a drug manufacturer must obtain FDA approval to market a drug product by filing a New Drug Application ("NDA"). The FDA will approve the NDA if the drug applicant is able to demonstrate that the drug is safe and effective to treat a particular condition. Within thirty days after the FDA approves an NDA, the drug applicant must submit a "Form 3542" to the FDA, in which the sponsor discloses all patents that it believes are implicated by its new drug. Specifically, FDA regulations require the applicant to disclose

each patent that claims the drug or a method of using the drug that is the subject of the [new drug application] ... and with respect to which a claim of patent infringement could reasonably be asserted if a person not licensed by the owner of the patent engaged in the manufacture, use, or sale of the drug product.

21 C.F.R. § 314.53(b)(1). If, however, there are no relevant patents that could reasonably be asserted, the applicant is also required to disclose this information. The regulation provides that

[i]f the applicant believes that there are no relevant patents that claim the drug substance ... drug product ... or the method(s) of use for which the applicant has received approval, and with respect to which a claim of patent infringement could reasonably be asserted if a person not licensed by the owner of the patent engaged in the manufacture, use, or sale of the drug product, the applicant will verify this information in the appropriate forms.

Id. § 314.53(c)(3). The FDA publishes the patent information provided by the drug applicant in a compendium called *Approved Drug Products with Therapeutic Equivalence Evaluations* (the Orange Book).

**8**     The CAC explains the Hatch-Waxman amendments as follows. See CAC ¶¶ 58–64. In 1984, Congress passed the "Hatch-Waxman" amendments to the FDCA, which were designed to speed the introduction of low-cost generic drugs into the market by permitting generic manufactures to file abbreviated new drug applications. The FDA will approve an ANDA as long as the applicant can show that the proposed generic is therapeutically equivalent to an existing brand-name drug on the market. The Hatch-Waxman amendments also created a mechanism to resolve potential patent disputes between would-be generic manufacturers and brand-name manufacturers before the launch of a generic product. When filing an ANDA, the generic manufacturer must certify, in one of four ways, that its proposed drug will not infringe any patents listed in the Orange Book for the brand-name drug. See 21 U.S.C. § 355(j)(2)(A)(vii). If the generic drug sponsor files a "Paragraph IV Certification," a brand-name manufacturer can sue the ANDA applicant for patent infringement (notwithstanding the fact that the applicant is not yet infringing). The resulting lawsuit, which is commonly known as "Hatch-Waxman Litigation," has the effect of staying the FDA's final approval of the ANDA until the earlier of (1) the passage of 30 months or (2) a court entering final judgment finding that the patent is invalid or not infringed by the generic. Until one of those conditions occurs, the FDA cannot authorize the generic manufacturer to go to market with its product. In addition, the Hatch-Waxman amendments provide that the first ANDA drug applicant to challenge a patent through a Paragraph IV Certification is eligible for six months of marketing exclusivity after it brings its drug to market.

**9**     Novartis did not assert the '799 Patent or the RE'932 Patent against Sun.

**10**    Although the Court need not reach the antitrust standing issue because the claims are dismissed on other grounds, it notes that whether Plaintiffs, as indirect purchasers, have antitrust standing to recover under state antitrust statutes in federal court is a question of state law, see Salveson v. JP Morgan Chase & Co., 166 F. Supp. 3d 242, 256 (E.D.N.Y.), aff'd, 663 Fed.Appx. 71 (2d Cir. 2016), cert. denied 137 S.Ct. 1826, (Apr. 24, 2017); see also In re Lithium Ion Batteries Antitrust Litig., No. 13-MD-2420 YGR, 2014 WL 4955377, at *7 (N.D. Cal. Oct. 2, 2014) ("[A]ntitrust standing under state law is just that, a matter of state law."); D.R. Ward Constr. Co. v. Rohm & Haas Co., 470 F. Supp. 2d 485, 494 (E.D. Pa. 2006), that the parties failed to adequately brief. Furthermore, the Court does not understand Novartis' challenge to Plaintiffs' standing to assert claims in states where they do not reside and have not been injured to raise an Article III standing issue that must be addressed now. See Newberg on Class Actions § 2:3; In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions, 148 F.3d 283, 307 (3d Cir. 1998) ("The absentee class members are not required to make a similar [Article III] showing, because once the named parties have demonstrated they are properly before the court, 'the issue [becomes] one of compliance with the provisions of Rule 23, not one of Article III standing.' " (quoting Goodman v. Lukens Steel Co., 777 F.2d 113, 122 (3d Cir. 1985), aff'd, 482 U.S. 656 (1987))).

**11**    Plaintiffs alleged that the Buchdunger and Druker articles disclosed that scientists used the #-crystalline form of the mesylate salt. CAC ¶ 183. The actual description of these articles calls that allegation into question. The 1996 Buchdunger Article apparently discussed "crystalline derivatives" without describing any specific crystalline form. See CAC ¶¶ 165–67. The 1996 Druker Article only seems to discuss mesylate salt generally, not its crystalline forms. See CAC ¶¶ 159–64. In any event, both were disclosed prior to the issuance of the '051 Patent.

**12**    The Federal Circuit has described Walker Process fraud as distinct from inequitable conduct because "[t]he heightened standard of materiality in a *Walker Process* case requires that the patent would not have issued but for the patent examiner's justifiable reliance on the patentee's misrepresentation or omission." Dippin' Dots, Inc. v. Mosey, 476 F.3d 1337, 1346–47 (Fed. Cir. 2007); see also C.R. Bard, 157 F.3d at 1365 (explaining that "an equitable defense ... may be satisfied when material information is withheld with the intent to deceive the examiner, whether or not the examiner is shown to have relied thereon"); SanDisk Corp. v. STMicroelectronics, Inc., No. C 04-4379 JF (RS), 2008 WL 4615605, at *5 n.5 (N.D. Cal. Oct. 17, 2008) ("Walker Process fraud essentially is a more egregious version of inequitable conduct."). In Metris U.S.A., Inc. v. Faro Techs., Inc., the court observed that, following a Federal Circuit decision in 2011 that

United Food and Commercial Workers Unions and..., Not Reported in Fed....

2017 WL 2837002, 2017-1 Trade Cases P 80,046

heightened the standard for inequitable conduct, "it appears that Walker Process fraud is now largely coextensive with the new inequitable conduct doctrine." 882 F. Supp. 2d 160, 174 (D. Mass. 2011). Thus, although the Federal Circuit has not clarified how coextensive Walker Process fraud is with inequitable conduct, it seems to remain the case that a plaintiff that fails to allege inequitable conduct, necessarily fails to allege Walker Process fraud. Dippin' Dots, 476 F.3d at 1346–47.

**13**  Novartis also argues that the state-law Walker Process fraud claims should be dismissed because they are preempted by federal patent law. When determining whether state-law claims are preempted by federal patent law, Federal Circuit law controls. Dominant Semiconductors Sdn. Bhd. v. OSRAM GmbH, 524 F.3d 1254, 1260 (Fed. Cir. 2008). In Hunter Douglas, Inc. v. Harmonic Design, Inc., the Federal Circuit considered whether federal patent law preempted state law claims for, *inter alia*, state unfair competition law that prohibited tortious activities in the marketplace. 153 F.3d 1318 (Fed. Cir. 1998), overruled on other grounds, Midwest Industries, Inc. v. Karavan Trailers, Inc., 175 F.3d 1356, 1358–59 (Fed. Cir. 1999). It held that there was no field preemption of state unfair competition law by federal patent law. Hunter Douglas, 153 F.3d at 1334–35. With respect to conflict preemption, Hunter Douglas held that state-law claims were preempted by federal patent law only "[i]f a plaintiff bases its tort action on conduct that is protected or governed by federal patent law." Id. at 1335. Because Novartis' preemption argument does not implicate this Court's jurisdiction, the Court need not address it here. This Court also need not address Defendants' state law-specific arguments for dismissal.

---

**End of Document**                                      © 2019 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT E

Case 2:19-cv-07532-ES-MAH   Document 18-5   Filed 05/22/19   Page 70 of 300 PageID: 378

Toyo Tire & Rubber Co., Ltd. v. Atturo Tire Corp., Not Reported in Fed. Supp. (2017)

2017 WL 1178224

2017 WL 1178224
Only the Westlaw citation is currently available.
United States District Court,
N.D. Illinois, Eastern Division.

TOYO TIRE & RUBBER CO., LTD.

and Toyo Tire U.S.A. Corp., Plaintiffs,

v.

ATTURO TIRE CORP. and Svizz-
One Corporation, Ltd., Defendants.

Case No. 14 C 0206
|
Signed 03/30/2017

**Attorneys and Law Firms**

Gary Edward Hood, John A. Leja, Polsinelli Shughart PC, Mark Thomas Deming, Polsinelli PC, Chicago, IL, Graham L.W. Day, Polsinelli PC, St. Louis, MO, Jean-Paul Ciardullo, Justin M. Sobaje, William J. Robinson, Foley & Lardner LLP, Los Angeles, CA, for Plaintiffs.

Brian Christopher Bianco, James Ian Zirkle, Julia Renee Lissner, Stacy Ann Baim, Michael Douglas Switzer, Akerman LLP, Chicago, IL, Reece W. Nienstadt, Mei & Mark LLP, Washington, DC, for Defendants.

**MEMORANDUM OPINION AND ORDER**

JOHN Z. LEE, United States District Judge

*1 Plaintiffs Toyo Tire & Rubber Co., Ltd. and Toyo Tire U.S.A. Corp. ("Toyo"), brought this action against Defendants Atturo Tire Corporation ("Atturo") and Svizz-One Corporation, Ltd., alleging patent infringement, trade dress infringement, trade dress dilution, and other state law claims concerning certain vehicle tires. Atturo filed seven counterclaims arising under state common law and state and federal statutes. Toyo has moved for summary judgment as to all of Atturo's counterclaims based upon the *Noerr-Pennington* doctrine, arguing that the counterclaims arise out of Toyo's actions before the United States International Trade Commission (ITC) and are, therefore, protected from suit. For the reasons that follow, Toyo's motion for summary judgment [331] is denied.

**Background**

In 2013, prior to commencing its action before this Court, Toyo filed a complaint with the ITC, requesting that it investigate various manufacturers and distributors of foreign tires (the "ITC respondents" or "respondents"). Pl.'s LR 56.1(a)(3) Stmt. ¶¶ 5, 7, ECF No. 331-2. Toyo alleged that these respondents were importing and selling tires that it believed infringed various Toyo design patents. *Id.* ¶¶ 6, 8. Atturo was not among the named respondents, nor were any Atturo tires listed among the allegedly infringing tires in Toyo's complaint. Def.'s LR 56.1(b)(3)(C) Stmt. ¶¶ 43, 45, ECF No. 340-3.

At Toyo's request, the ITC agreed to institute an investigation. Pl.'s LR 56.1(a)(3) Stmt. ¶ 11. The investigation, however, was never carried out. Instead, each of the respondents identified in Toyo's complaint (which, again, did not include Atturo) either defaulted, stipulated to consent orders, or entered into settlement agreements with Toyo, following which the ITC terminated its investigation as to each individual entity at Toyo's request. *Id.* ¶¶ 13–16.

The terms of the relevant settlement agreements and the manner in which the ITC terminated its investigation are central to the issues raised in the present motion. The settlement agreements, which were identical in all material respects, provided that the named respondent would refrain from importing and selling any "Accused Tires"—*i.e.*, the tires listed in the ITC complaint—as well as additional tires that Toyo believed infringed upon its intellectual property rights. *Id.* ¶ 26. One of these additional tires was the "Atturo Trail Blade M/T," a tire produced by Atturo. *Id.* ¶¶ 26, 28. Thus, notwithstanding the fact that neither Atturo nor the Atturo Trail Blade M/T was identified in Toyo's complaint, the named respondents agreed in their settlement agreements with Toyo not to sell the Atturo Trail Blade M/T. *Id.* ¶ 29; Def.'s LR 56.1(b)(3)(C) Stmt. ¶ 52.

The agreements were negotiated, finalized, and executed solely between Toyo and the individually named respondents; the ITC took no part in the settlement negotiations. Def.'s LR 56.1 (b)(3)(C) Stmt. ¶¶ 50–51, 53. Moreover, the agreements contained no provision requiring approval by the ITC or any other government agency prior to taking effect. *Id.* ¶¶ 50–51. Rather,

Case 2:19-cv-07532-ES-MAH   Document 18-5   Filed 05/22/19   Page 71 of 300 PageID: 379

Toyo Tire & Rubber Co., Ltd. v. Atturo Tire Corp., Not Reported in Fed. Supp. (2017)

2017 WL 1178224

the agreements were self-executing and became binding even before Toyo requested that the ITC terminate its investigation. *Id.*; *see* Mot. Summ. J. Hr'g Tr. 48:1–2, ECF No. 360 (statement by Toyo's counsel that the agreements were enforceable "as a matter of contract law").

**\*2** Because the ITC was not involved in the settlement negotiations, the execution of the settlement agreements did not automatically terminate the ITC proceedings. And so, with two exceptions, [1] Toyo submitted the settlement agreements to the ITC along with requests that the ITC terminate its investigation of the named respondents. Pl.'s LR 56.1(a)(3) Stmt. ¶¶ 16, 18.

When reviewing a request to terminate a proceeding based upon a settlement agreement between the parties, the ITC regulations provide as follows:

> Regarding terminations by settlement agreement, consent order, or arbitration agreement under § 210.21 (b), (c) or (d), the parties may file statements regarding the impact of the proposed termination on the public interest, and the administrative law judge may hear argument, although no discovery may be compelled with respect to issues relating solely to the public interest. Thereafter, the administrative law judge shall consider and make appropriate findings in the initial determination regarding the effect of the proposed settlement on the public health and welfare, competitive conditions in the U.S. economy, the production of like or directly competitive articles in the United States, and U.S. consumers.

19 C.F.R. § 210.50(b)(2). Nowhere do the regulations require the administrative judge to consider the reasonableness or fairness of the settlement terms or any impact the settlement agreement may have on third parties directly.

On November 20, 2013, Atturo submitted a letter in response to Toyo's requests for termination, noting its concern "that various executed and proposed Settlement Agreements in this investigation represent an abuse of the [ITC] process, and are being used to unfairly restrict competition in the United States market for tires." Pl.'s LR 56.1(a)(3) Stmt., Ex. 26, at 2, ECF No. 331-29. The ITC staff then reviewed Toyo's requests to terminate and provided its view for the administrative law judge's consideration. *See id.* ¶ 21.

In its written response, the staff at the ITC noted that it had no objection to Toyo's requests, stating that "the Staff does not believe that termination of the investigation based on the settlement agreement[s] at issue would be contrary to the public health and welfare, competitive conditions in the U.S. economy, the production of like or directly competitive articles in the United States, or U.S. consumers." *Id.* (citing 19 C.F.R. § 210.50(b)(2)). With respect to Atturo's letter, the staff stated that it "apparently was found not to raise public interest concerns that should prevent the settlements submitted in this investigation." *Id.* Soon thereafter, stating its agreement with the staff's analysis of these public interest factors, the ITC granted Toyo's request that it terminate the investigation. *Id.* ¶ 24. Although the ITC acknowledged that Toyo's request was "based upon" the various settlement agreements, *id.* ¶ 25, the ITC did not review the agreements for their specific impact on Atturo, nor did it mention Atturo in terminating the investigation, *see* Def.'s LR 56.1(b)(3)(C) ¶¶ 50, 58.

**\*3** Toyo filed its suit against Atturo in this Court on January 13, 2014, asserting claims of design patent infringement, trade dress infringement, trade dress dilution, common law unfair competition, common law unjust enrichment, and violation of the Illinois Deceptive Trade Practices Act. Compl. ¶¶ 32–71, ECF No. 1. Atturo answered and asserted seven counterclaims: (1) common law tortious interference with existing contracts; (2) common law tortious interference with prospective business expectancy; (3) common law defamation; (4) common law unfair competition; (5) common law unjust enrichment; (6) violation of the Illinois Deceptive Trade Practices Act; and (7) violation of § 43(a)(1)(b) of the Lanham Act. Am. Answer & Countercls. ¶¶ 100–66, ECF No. 39.

Case 2:19-cv-07532-ES-MAH   Document 18-5   Filed 05/22/19   Page 72 of 300 PageID: 380
Toyo Tire & Rubber Co., Ltd. v. Atturo Tire Corp., Not Reported in Fed. Supp. (2017)
2017 WL 1178224

Atturo's counterclaims arise primarily from the settlement agreements that Toyo negotiated in the ITC action. [2] For example, in its first counterclaim, Atturo states that "Toyo used leverage as a Complainant in the Toyo ITC action to expand the scope of the settlement agreement with [one of the named ITC respondents] beyond the intellectual property at issue in the Toyo ITC Action to include false trade dress infringement allegations against the Atturo Trail Blade M/T Tire." *Id.* ¶ 105. On this basis, Atturo claims that "Toyo unlawfully tortiously interfered with an existing contract between Atturo and [one of the respondents]." *Id.* ¶ 108. On May 20, 2016, Toyo moved for summary judgment as to Atturo's counterclaims, asserting they are barred by the *Noerr-Pennington* doctrine.

### Analysis

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also* Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). In this case, the parties acknowledge that no material facts are in dispute. [3] Pl.'s Mem. Supp. Summ. J. 7–8, ECF No. 331-1; Def.'s Mem. Opp. Summ. J. 15 n.9, ECF No. 340. The sole issue is a legal one: whether the *Noerr-Pennington* doctrine immunizes Toyo from Atturo's counterclaims.

### I. The *Noerr-Pennington* Doctrine

The *Noerr-Pennington* doctrine protects those who petition governmental actors for redress from liability based on their petitioning activity. E.R.R. Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127, 136–38 (1961); *accord* United Mine Workers v. Pennington, 381 U.S. 657, 669 (1965). The doctrine originated in the antitrust context based on two principles.

The first is that the antitrust laws, which generally bar concerted efforts by private actors to restrain trade, should not bar individuals from joining together in efforts to persuade governmental representatives to take action, even if similar concerted efforts to persuade private decisionmakers might be unlawful. Noerr, 365 U.S. at 137. This principle follows in part from basic notions of causation: namely, when the government acts based on petitioning, any purportedly unlawful result is most

proximately caused by government action, not by the private petitioning. *See* F.T.C. v. Superior Court Trial Lawyers Ass'n, 493 U.S. 411, 424–25 (1990); Campbell v. City of Chi., 639 F. Supp. 1501, 1511 (N.D. Ill. 1986), *aff'd*, 823 F.2d 1182 (7th Cir. 1987). Conversely, where private parties take unlawful action merely hoping the government will later ratify it, government action is not an intervening cause, and *Noerr-Pennington* immunity does not arise. Allied Tube & Conduit Corp. v. Indian Head, Inc., 486 U.S. 492, 503–04 (1988); In re Brand Name Prescription Drugs Antitrust Litig., 186 F.3d 781, 789 (7th Cir. 1999); *see also* Superior Court Trial Lawyers Ass'n, 493 U.S. at 424–25.

**\*4** The second principle underlying *Noerr-Pennington* is that prohibitions on petitioning efforts "would raise important constitutional questions" under the First Amendment. Noerr, 365 U.S. at 137–38. Insofar as the antitrust laws would create liability that conflicts with the First Amendment right of petition, the right of petition should prevail. *See id.*

*Noerr-Pennington* has since evolved from these well-defined roots. The Supreme Court has recognized that the principles underlying the doctrine also warrant protection for individuals who "use the channels and procedures of state and federal agencies and courts to advocate their causes and points of view." Cal. Motor Transp. Co. v. Trucking Unlimited, 404 U.S. 508, 510–11 (1972). Thus, in addition to petitioning the legislature, instituting a lawsuit is protected petitioning activity under *Noerr-Pennington. Id.* Additionally, *Noerr-Pennington* immunity has expanded beyond the antitrust context out of the recognition that the doctrine's foundations—particularly those sounding in the First Amendment—have force beyond the antitrust laws. *See* BE & K Constr. Co. v. N.L.R.B., 536 U.S. 516, 526 (2002); In re Innovatio IP Ventures, LLC Patent Litig., 921 F. Supp. 2d 903, 911 (N.D. Ill. 2013) (observing that "the Seventh Circuit has applied the [*Noerr-Pennington*] doctrine broadly," and collecting cases in which the Seventh Circuit and other courts have applied *Noerr-Pennington* to claims arising under federal and state statutes and state common law). [4]

Additionally, *Noerr-Pennington* immunizes not only conduct that constitutes core petitioning activity, but also conduct with anticompetitive consequences "independent of any government action" insofar as the conduct is " 'incidental' to a valid effort to influence government

action." *Allied Tube*, 486 U.S. at 499 (quoting *Noerr*, 365 U.S. at 143). Whether conduct is sufficiently "incidental" to petitioning activity to warrant immunity depends upon the "context and nature" of the conduct and the "source" of anticompetitive consequences. *Id.* at 499–500, 503–04. In making this determination, it is necessary to consider the fundamental nature of the conduct at issue and decide whether it is akin to traditionally unlawful activity, on the one hand, or tantamount to the political activity *Noerr-Pennington* is designed to protect, on the other. *Id.* at 506–07. To guide this analysis, the Supreme Court has held that enough incidental conduct must be protected so as to afford "breathing space" to the right of petition. *BE & K*, 536 U.S. at 531. In other words, some conduct that does not directly implicate First Amendment values should be protected so as not to chill core petitioning activity. *Id.*

On the other hand, an activity that is "mere sham"—*i.e.,* activity that "is actually nothing more than an attempt to interfere directly with the business relationships of a competitor"—is not entitled to protection under *Noerr-Pennington*. *Noerr*, 365 U.S. at 144. In the case of lawsuits, the Supreme Court has developed a two-part test for determining when a lawsuit is a "sham." "First, the lawsuit must be objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits." *Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 60 (1993). Winning lawsuits are *per se* immune, *id.* at 60 n.5, and courts have invariably held that lawsuits terminating in a favorable settlement are also objectively reasonable and are not shams, *New W., L.P. v. City of Joliet*, 491 F.3d 717, 722 (7th Cir. 2007); *see also Theme Promotions, Inc. v. News Am. Mktg. FSI*, 546 F.3d 991, 1008 (9th Cir. 2008). If a court determines a suit is objectively baseless, it continues to the second part of the inquiry: whether the lawsuit "conceals 'an attempt to interfere *directly* with the business relationships of a competitor' " by using the lawsuit as an "anticompetitive weapon." *Prof'l Real Estate Investors*, 508 U.S. at 60–61 (quoting *Noerr*, 365 U.S. at 144; *City of Columbia v. Omni Outdoor Advert., Inc.*, 499 U.S. 365, 380 (1991)).

## II. *Noerr-Pennington* Applied to Toyo's ITC Conduct

**\*5** While *Noerr-Pennington* is understood to protect the act of filing a lawsuit (subject to the sham exception), it is less clear how the doctrine applies to other litigation conduct. There appears to be little dispute that "core

petitioning activity" in the litigation context is limited to direct communications with the court. *See Freeman v. Lasky, Haas & Cohler*, 410 F.3d 1180, 1184 (9th Cir. 2005) ("A complaint, an answer, a counterclaim and other assorted documents and pleadings, in which plaintiffs or defendants make representations and present arguments to support their request that the court do or not do something, can be described as petitions without doing violence to the concept."); *Cardtoons, L.C. v. Major League Baseball Players Ass'n*, 208 F.3d 885, 892 (10th Cir. 2000). But less unanimity exists as to what litigation-based conduct—outside of direct court communications—would qualify as conduct "incidental" to petitioning activity, thereby qualifying for *Noerr-Pennington* immunity.

For example, courts generally agree that the content of presuit demand letters that threaten litigation or seek settlement is immune from suit under *Noerr-Pennington*. *In re Innovatio IP Ventures*, 921 F. Supp. 2d at 912 & n.5 (collecting cases). The question of whether the negotiation and execution of settlement agreements also fall under "incidental" conduct has met diverging views. *Compare Columbia Pictures Indus., Inc. v. Prof'l Real Estate Investors, Inc.*, 944 F.2d 1525, 1528 (9th Cir. 1991) (holding that "[a] decision to accept or reject an offer of settlement is conduct incidental to the prosecution of the suit and not a separate and distinct activity which might form the basis for antitrust liability"), *with In re Nexium (Esomeprazole) Antitrust Litig.*, 968 F. Supp. 2d 367, 395 (D. Mass. 2013) (stating that "[c]ourts are largely uniform in their view that private settlement agreements entered into during the pendency of litigation that are neither presented to nor approved by the judge presiding over the dispute fall outside the ambit of *Noerr-Pennington* immunity," and collecting cases).

Here, Toyo argues that the settlement agreements between it and the respondents in the ITC action are either core petitioning activity or conduct incidental to petitioning activity under *Noerr-Pennington*.[5] In support of its argument that the settlement agreements are core petitioning activity, Toyo points to the fact that it submitted the agreements to the ITC as part of its requests for termination of the ITC proceedings. The Court does not find this argument persuasive for a number of reasons.

It is necessary at the outset to precisely define the "activity" that is in dispute. Toyo would have the

Toyo Tire & Rubber Co., Ltd. v. Atturo Tire Corp., Not Reported in Fed. Supp. (2017)

2017 WL 1178224

Court consider the "activity" to comprise the settlement agreements in their totality. But Atturo's counterclaims arise only from the specific provisions in the settlement agreements that restrict the respondents' ability to purchase and distribute Atturo's tires (the "Atturo provisions"). The other provisions that involve other tires are entirely irrelevant to Atturo's claims. Accordingly, the Atturo provisions in the settlement agreements between Toyo and the ITC respondents constitute the conduct for which Toyo is seeking immunity under the *Noerr-Pennington* doctrine. *See Allied Tube*, 486 U.S. at 499 ("The scope of [*Noerr-Pennington*] protection depends [] on the source, context, and nature of the anticompetitive restraint at issue."). Furthermore, before applying the *Noerr-Pennington* doctrine, the Court has to examine whether Toyo's challenged conduct is in fact related to the prosecution of the suit or "can be more fairly said to be outside of or unrelated to the petitioning activity." *United Tactical Sys., LLC v. Real Action Paintball, Inc.*, Case No. 14-cv-4050-MEJ, 2016 WL 524761, at *6 (N.D. Cal. Feb. 10, 2016).

**\*6** Viewed in this way, it is difficult to see how the submission of the Atturo provisions would constitute core petitioning activity in Toyo's proceedings before the ITC. Recall that Toyo's complaint does not even mention Atturo or Atturo tires, and there is nothing in the record to indicate that the scope of the requested investigation included Atturo or its tires. It only makes sense that the metes and bounds of core petitioning activity in the context of litigation must be determined by reference to the parties and claims to the suit. The jurisdiction of a court (or the agency tribunal in this case) is limited to the parties named in a complaint seeking redress and the scope of the claims alleged. Consider a hypothetical where Toyo and an ITC respondent enter into a settlement agreement without the Atturo provisions and then enter into a separate agreement where the respondent agrees to boycott Atturo tires. As Toyo's counsel conceded at oral argument, the latter agreement would not enjoy *Noerr-Pennington* immunity. Hr'g Tr. at 48:17–49:9. It would be odd to allow Toyo to insulate itself from liability simply by appending the provisions (which are not relevant to the proceedings) to the settlement agreements that it eventually submitted to the ITC. Toyo's efforts to shoehorn whatever claims it may have with respect to the Atturo tires into the ITC proceeding (when it could have, but did not, list them in its ITC complaint) under the guise of motions to terminate "conceals an

attempt to interfere directly with the business relationships of a competitor" by using the ITC proceeding as an "anticompetitive weapon," thereby constituting a "sham" ineligible for *Noerr-Pennington* protection. *Prof'l Real Estate Investors*, 508 U.S. at 60–61 (internal quotations omitted). [6]

This conclusion is buttressed by the fact that the settlement agreements were private agreements that did not require ITC approval to become effective in the first place. Although they were executed after the commencement of the ITC proceedings, the ITC did not mandate them or participate in their negotiation. Def.'s LR 56.1(b)(3)(C) ¶¶ 48, 50. Nor did the ITC require the negotiation of the agreements as a prerequisite to termination of its investigation. *Id.* The agreements delineated what tires the signators would and would not sell in the U.S. market and with whom they would and would not deal, Pl.'s LR 56.1(a)(3) ¶ 26, and were fully enforceable from their signing without regard to the ITC's later decision to terminate its investigation. Def.'s LR 56.1(b)(3)(C) ¶ 50. As the Seventh Circuit has recognized, the *Noerr-Pennington* doctrine "does not authorize anticompetitive *action* in advance of government's [or the ITC's] adopting the industry's anticompetitive proposal. The doctrine applies when such action is the consequence of legislation or other governmental action, not when it is the means for obtaining such action." *In re Brand Name Prescription Drugs*, 186 F.3d at 789 (emphasis in original). Here too the agreement between Toyo and the various ITC respondents with regard to Atturo was an action that was taken by the parties themselves, unrelated to the ITC proceeding.

Holding otherwise would allow actors to shield anticompetitive or tortious conduct that harms third parties simply by appending it to any host of motions in the course of a lawsuit. For example, *A* could sue *B* for breach of contract, agree to settle its suit against *B* with one of the conditions being that *B* breach an existing contract with *C*, file a motion to dismiss the suit against *B* with the settlement agreement attached, and then assert *Noerr-Pennington* immunity when later sued by *C* for tortious interference. The purposes underlying the *Noerr-Pennington* doctrine do not require such a result. Furthermore, allowing *C* to proceed with its claim against *A* would not unreasonably chill *A*'s right to petition the court with respect to its original claims against *B*. *See United Tactical Sys.*, 2016 WL 524761, at *7 (finding

2017 WL 1178224

*Noerr-Pennington* did not apply where "at least some of the terms in the ... settlement agreements and related agreed-on conduct go beyond the [party's] petitioning activities and its claims in [a prior action]"); *Select Portfolio Servicing v. Valentino*, 875 F. Supp. 2d 975, 987 (N.D. Cal. 2012) (finding *Noerr-Pennington* inapplicable because defendant's challenged conduct was based on a settlement agreement term unrelated to the petitioning activity in the underlying lawsuit); *cf. Broadcast Music, Inc. v. Columbia Broadcasting Sys., Inc.*, 441 U.S. 1, 13 (1979) ("Of course, a consent judgment, even one entered at the behest of the Antitrust Division, does not immunize the defendant from liability for actions, including those contemplated by the decree, that violate the rights of nonparties."). For these reasons, the Court finds that Toyo's submission of the Atturo provisions as attachments to its motions to terminate the ITC proceedings did not constitute core petitioning activity.

**\*7** Alternatively, Toyo argues that the settlement agreements fall within the *Noerr-Pennington* doctrine because they are conduct incidental to its petitioning activity. This again requires the Court to look to the context and nature of Toyo's settlement agreements, as well as the source of the alleged resulting harm, with a mind to giving adequate breathing space to the right to petition. *Allied Tube*, 486 U.S. at 499–500, 503–04; *BE & K*, 536 U.S. at 531. In the end, Toyo's alternative argument also fails.

First, as discussed above, the agreements between Toyo and the ITC respondents regarding Atturo are beyond the scope of Toyo's complaint and the ITC investigation. Accordingly, they were not incidental to Toyo's petitioning activity before the ITC. *See United Tactical Systems*, 2016 WL 524761, at \*6 (denying immunity for conduct "outside of or unrelated to the petitioning activity"). Second, the settlement agreements were the product of negotiations between private parties, and the nature of the agreements is much the same: private contracts entered into between private parties. Such private settlement agreements fall outside of *Noerr-Pennington* immunity. *See Andrx Pharm., Inc. v. Biovail Corp. Int'l*, 256 F.3d 799, 818–19 (D.C. Cir. 2001); *In re Nexium*, 968 F. Supp. 2d at 395 (collecting cases). This is true even in those cases where the parties obtain a consent judgment, signed and approved by a judge, that sets forth the terms of their settlement. *In re Nexium*, 968 F. Supp. 2d at 396–97. This is because, in such cases,

the parties dictate the terms of the settlement and their actions are not intended to persuade a judicial officer to obtain a redress of grievances. *Id.*; *accord In re Androgel Antitrust Litig.*, Case No. 1:09-MD-2084-TWT, 2014 WL 1600331, at \*7–8 (N.D. Ga. Apr. 21, 2014) (holding that consent judgments are akin to private agreements and not entitled to *Noerr-Pennington* immunity); *In re Ciprofloxacin Hydrochloride Antitrust Litig.*, 261 F. Supp. 2d 188, 212–13 (E.D.N.Y. 2003) (same); *see also In re Cardizem CD Antitrust Litig.*, 105 F. Supp. 2d 618, 640–42 (E.D. Mich. 2000).

In response, Toyo contends that the settlement agreements in question were presented to and approved by the ITC administrative law judge as part of Toyo's motions to terminate the ITC proceedings. But this argument has several problems. As an initial matter, it ignores the fact that Atturo's counterclaims are also based on a number of settlement agreements that were never presented to the ITC. Am. Answer & Countercls. ¶¶ 112, 115, 121, 130, 132, 139, 141, 148, 150, 158. Furthermore, the settlement agreements that Toyo submitted to the ITC were a *fait accompli*. They did not need the approval of the ITC judge to become effective. Def.'s LR 56.1 (b)(3)(C) Stmt. ¶¶ 50–51; Mot. Summ. J. Hr'g Tr. 48:1–2. Additionally, the Court is not persuaded that the ITC's review of the agreements—which was focused on broad public interest factors, Pl.'s LR 56.1(a)(3) ¶¶ 21, 24—specifically considered, and thus can plausibly be said to have endorsed, the injuries underlying Atturo's counterclaims. Toyo's counsel admitted as much at oral argument. Hr'g Tr. at 14:24–15:8.[7] As a result, the Court finds that the settlement agreements at issue here (or, perhaps, more precisely, the parties' agreement as to Atturo) are similar to the party-negotiated consent judgments discussed above and fall outside of the *Noerr-Pennington* doctrine.

**\*8** The cases upon which Toyo relies are readily distinguishable. For example, *Campbell v. City of Chi.*, 639 F. Supp. 1501, 1511 (N.D. Ill. 1986), aff'd, 823 F.2d 1182 (7th Cir. 1987), involved a settlement agreement between two taxicab companies and the City of Chicago. After reviewing the history of the settlement negotiations, including discussions that resulted in the passing of a favorable ordinance, the court found "the agreement reached here no more atypical than any other lobbying effort made by a powerful lobbyist." *Id.* at 1511. Similarly, *A.D. Bedell Wholesale Co. v. Philip Morris Inc.*, 263 F.3d

Toyo Tire & Rubber Co., Ltd. v. Atturo Tire Corp., Not Reported in Fed. Supp. (2017)

2017 WL 1178224

239 (3d Cir. 2001), involved a settlement agreement that was negotiated between various tobacco manufacturers and numerous states. *Id.* at 253–54. Toyo also cites to *Columbia Pictures Industries, Inc. v. Professional Real Estate Investors, Inc.*, 944 F.2d 1525 (9th Cir. 1991), noting that, in that case, the Ninth Circuit found that even the acceptance and denial of a settlement agreement pre-litigation was entitled to *Noerr-Pennington* immunity. *Id.* at 1528. But the language in *Columbia Pictures* was dicta, and in any event, "[s]ubsequent courts have limited *Columbia Pictures'* holding to its facts, *i.e.*, cases involving the offer or rejection of a settlement." *United Tactical Systems*, 2016 WL 524761, at *6 (collecting cases). [8]

Finally, the Court finds that subjecting private settlement agreements such as Toyo's to liability will leave adequate breathing space for the right to petition courts or agencies for redress. Parties in Toyo's position remain free to file and settle their suits. The First Amendment values that lawsuits and similar agency proceedings implicate—notably, "compensation for violated rights and interests, the psychological benefits of vindication, [and] public airing of disputed facts," *Bill Johnson's Rests., Inc. v. N.L.R.B.*, 461 U.S. 731, 743 (1983) (citations omitted)—will not be undermined by refusing to immunize Toyo's settlement conduct with respect to Atturo in this case.

Parties in Toyo's position have several different options. They can limit settlement agreements to the scope the original complaint and seek express approval of their terms from the judge. Or they can seek to include additional parties like Atturo, whose rights will be impacted by the settlement agreements, to the proceedings. In this way, they can ensure that their conduct would qualify as core petitioning activity or conduct incidental to petitioning activity—precisely the type of activity that the *Noerr-Pennington* doctrine is intended to protect.

### Conclusion

For the foregoing reasons, the Court denies Toyo's motion for summary judgment based upon the *Noerr-Pennington* doctrine [331].

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2017 WL 1178224

---

Footnotes

1   The two exceptions are a draft settlement agreement that Toyo sent to Doublestar Tyre ("Doublestar"), one of the respondents named in the ITC complaint, and a settlement agreement entered into with Vittore Wheel & Tire ("Vittore") and RTM Wheel & Tire ("RTM"), two other respondents named in the complaint. Def.'s LR 56.1(b)(3)(C) ¶¶ 60, 62. Because Doublestar filed consent order stipulations with the ITC and Vittore and RTM defaulted in the ITC action, Toyo did not submit the agreements to the ITC. Pl.'s Reply Supp. Summ. J. 2, ECF No. 344.

2   Atturo's second through seventh counterclaims also rely upon on Toyo's draft settlement agreement with Doublestar and the agreement with Vittore and RTM, but neither of these documents was submitted to the ITC. *E.g.*, *id.* ¶¶ 112, 115, 121, 130, 132, 139, 141, 148, 150, 158.

3   Atturo's memorandum in opposition to Toyo's motion highlights that Toyo's motion does not mention the draft settlement agreement with Doublestar and the agreement with Vittore and RTM that were not submitted to the ITC. Toyo does not dispute this fact. Pl.'s Reply at 2. Atturo also contends that summary judgment is not appropriate because there are genuine issues of material fact as to whether the "sham" exception to *Noerr-Pennington* immunity applies. Def.'s Mem. Opp. Summ. J. at 5, 13. Because the Court holds that Toyo's settlement agreements are not protected activity under *Noerr- Pennington*, there is no need to consider these issues.

4   The parties here do not dispute that *Noerr-Pennington* can apply to each of the different causes of action specified in Atturo's counterclaims, nor do they suggest *Noerr-Pennington* should apply differently to the different causes of action.

5   In framing their arguments, the parties treat Toyo's conduct in this case as the conduct of a party in a lawsuit. Of course, the ITC is an executive agency and not a court, but the parties do not seem to believe this matters for present purposes, and they are likely correct. *See Cal. Motor Transp. Co.*, 404 U.S. at 510–11.

6   To be clear, this is not to say that Toyo's complaint and the resulting ITC proceeding was a sham as a whole. Rather, Toyo's use of the ITC proceedings to immunize anti-competitive conduct against Atturo—a third party who was not mentioned in the ITC complaint—was a sham vis-à-vis Atturo. *See IPtronics Inc. v. Avago Tech. U.S., Inc.*, Case No.

2017 WL 1178224

14-cv-5647-BLF, 2015 WL 5029282, at *6–7 (N.D. Cal. Aug. 25, 2015) (to determine whether ITC proceeding was a sham, court looked only to portion of proceeding related to the party against whom the *Noerr-Pennington* doctrine was being asserted). For this reason, Toyo's reliance on another court's decision concerning Toyo's actions before the ITC, *Toyo Tire & Rubber Co. v. CIA Wheel Grp.*, No. SACV15246JLSDFMX, 2015 WL 4545187 (C.D. Cal. July 8, 2015), is misplaced. In that case, the court considered the *Noerr-Pennington* doctrine solely as applied to Toyo's actions before the ITC as such, not the settlement agreements at issue in this case. *Id.* at *3.

**7**    The ITC staff's reference to a letter submitted by Atturo, which "apparently was found not to raise public interest concerns," Pl.'s LR 56.1(a)(3) ¶ 21, does not persuade the Court otherwise. Toyo fails to specify who considered the letter and the basis for the staff's conclusion. Additionally, the ITC's subsequent termination of the investigation made no mention of Atturo or its letter. Def.'s LR 56.1(b)(3)(C) ¶ 58. Toyo essentially argues that Atturo—like Toyo—had its opportunity to petition the ITC and cannot complain that it lost. This argument has some superficial appeal. But the fact that Atturo submitted a letter to the ITC regarding the propriety of the settlement agreements does not transform Toyo's submission of the settlement agreements into petitioning activity or conduct incidental to petitioning activity. In effect, Atturo was left with two untenable choices. It could ignore Toyo's actions before the ITC (after all, Atturo was not a party to the ITC proceedings or previously involved in them), or it could file its letter. It chose to do the latter. But, in doing so, Atturo was limited by the public welfare standard in § 210.50(b)(2). It had no ability to oppose Toyo's motion or the settlement agreements on the ground that they would injure Atturo directly. The ITC staff's opinion (which was adopted by the administrative law judge) that the settlement agreements did not injure competition in the domestic tire industry as a whole is hardly surprising.

**8**    Toyo's reliance on cases addressing other presuit activities, notably presuit demand letters, is also misplaced. Reply at 6 n.8; *see Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 933–36 (9th Cir. 2006); *In re Innovatio IP Ventures*, 921 F. Supp. 2d at 912 & n.5. There is good reason to distinguish presuit demand letters from settlement agreements like those at issue here. Presuit demand letters are a unilateral action, whereas the settlement agreements at issue here were not only bilateral in nature, but affected the rights of a third party. Additionally, settlement agreements do not implicate the same First Amendment values as presuit demand letters—notably, psychological vindication and the public airing of disputed facts—that courts immunizing presuit demand letters have noted. *Sosa*, 437 F.3d at 936; *see also In re Nexium*, 968 F. Supp. 2d at 396–97 (distinguishing presuit demand letters on the basis that they are aimed at "persuasion of a judicial officer to obtain a redress of grievances").

---

**End of Document**                                        © 2019 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT F

KeyCite Yellow Flag - Negative Treatment

Distinguished by In re DDAVP Indirect Purchaser Antitrust Litigation,
S.D.N.Y., October 17, 2012

2007 WL 5297755
Only the Westlaw citation is currently available.
United States District Court, D. New Jersey.

In re K–DUR ANTITRUST LITIGATION.
This Document Relates To: All Actions.

Civil Action No. 01–1652 (JAG).
|
MDL Docket No. 1419.
|
March 1, 2007.

SPECIAL MASTER'S REPORT AND
RECOMMENDATIONS ON DEFENDANTS'
SCHERING–PLOUGH CORPORATION, KEY
PHARMACEUTICALS, INC., UPSHER–SMITH
LABORATORIES, INC., WYETH AND ESI
LEDERLE APPLICATIONS TO THE SPECIAL
MASTER TO DISMISS CERTAIN CLAIMS
IN INDIRECT PURCHASERS' AMENDED
CONSOLIDATED CLASS ACTION COMPLAINT

ORLOFSKY, Special Master.

## INTRODUCTION

*1 This consolidated antitrust action has been
transferred to the District of New Jersey by the Judicial
Panel on Multidistrict Litigation pursuant to 28 U.S.C. §
1407. Pursuant to Rule 53 of the Federal Rules of Civil
Procedure [1] and by consent of all parties in the above-
captioned action, I have been appointed by order of this
Court, dated April 12, 2006, to preside as a Special Master
to review and decide all currently pending and future
motions directed to Judge Joseph A. Greenaway, Jr. and
Magistrate Judge Madeline Cox Arleo including, but
not limited to discovery disputes, class certification and
summary judgment (the "Appointment Order") (Docket
No. 316). The Appointment Order provides that the
decision of the Special Master on any matter before the
Special Master will conclusively resolve that matter unless
an appropriate objection is filed pursuant to Fed.R.Civ.P.
53(g).

This Report and Recommendation will decide
Defendants' Schering–Plough Corporation, Key
Pharmaceuticals, Inc., Upsher–Smith Laboratories, Inc.,
Wyeth and ESI Lederle Applications to the Special Master
to Dismiss Certain Claims in the Indirect Purchasers'
Amended Consolidated Class Action Complaint (the
"Partial Motion to Dismiss"). This Report and
Recommendations is based upon the parties' written
submissions in support of and in opposition to the Partial
Motion to Dismiss and the oral argument presented by the
parties at a January 24, 2007 hearing before me.

## BACKGROUND

The factual background of this consolidated action
and the underlying motions have been set forth
in detail in Judge Greenaway's decision in this
case, see In re K–Dur Antitrust Litig. ., 338
F.Supp.2d 517 (D.N.J.2004), and my Report and
Recommendation on; (1) Defendants Schering–Plough
Corporation, Key Pharmaceuticals, Inc. and Upsher–
Smith Laboratories, Inc.'s Motion for Sanctions against
Plaintiff Commonwealth of Pennsylvania; (2) Plaintiff
Commonwealth of Pennsylvania's Cross–Motion to
Dismiss; and (3) Motion of James Morgan to Intervene
as Class Representative (Docket No, 328). Familiarity
with that factual background is presumed and will not
be repeated in this Report and Recommendation except
where necessary to resolve this motion.

## DEFENDANTS' APPLICATION TO DISMISS
CERTAIN CLAIMS IN THE INDIRECT
PURCHASER PLAINTIFFS' AMENDED
CONSOLIDATED CLASS ACTION COMPLAINT

Pending before me are the Applications of
Defendants, Schering–Plough Corporation ("Schering"),
Key Pharmaceuticals, Inc. ("Key"), Upsher–Smith
Laboratories, Inc. ("Upsher"), Wyeth and ESI Lederle
("ESI") (collectively, "Defendants"), to dismiss certain
claims in the Indirect Purchasers' Amended Consolidated
Class Action Complaint (the "Partial Motion to
Dismiss"). The relief sought from the Court is a
determination that, inter alia, the Indirect Purchaser
Plaintiffs' (the "IP Plaintiffs") lack standing to bring the
Walker Process and "sham litigation" claims contained

their Amended Consolidated Class Action Complaint (the "Amended Complaint") and, therefore, those claims should be dismissed. Alternatively, Defendants seek a determination that the IP Plaintiffs' *Walker Process* and "sham litigation" claims are preempted by Federal law and, therefore, cannot be considered by this Court.

**\*2** At an earlier stage of this litigation, when the IP Plaintiffs moved to amend the original Complaint, the parties stipulated that the Defendants had reserved the right to raise the defense of "futility" with respect to any claims raised in the IP Plaintiffs' Amended Consolidated Class Action Complaint. *See* Transcript of Oral Argument of January 24, 2007, at 4. For purposes of this Report and Recommendations (the "Report"), I shall treat Defendants' respective Applications as the Defendants' exercise of the reserved "futility" defense with respect to those claims in the Indirect Purchasers' Amended Consolidated Class Action Complaint to which the respective Applications to Dismiss specifically apply.

## I. *LEGAL STANDARD GOVERNING MOTIONS TO DISMISS ANTITRUST CLAIMS*

When considering a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a court is "required to accept as true all allegations in the complaint and all reasonable inferences that can be drawn from them after construing them in a light most favorable to the non-movant." *Jordan v. Fox, Rothschild, O'Brien & Frankel,* 20 F.3d 1250, 1261 (3d Cir.1994) (citation omitted). However, a court need not accept a plaintiffs "bald assertions or legal conclusions." *Morse v. Lower Merion School Dist.,* 132 F.3d 902, 906 (3d Cir.1997). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *In re Burlington Coat Factory Securities Litig.,* 114 F.3d 1410, 1420 (3d Cir.1997) (citation omitted). Thus, "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the Plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).

However, summary procedures should be used sparingly in complex antitrust litigation where motive and intent play leading roles, the proof is largely in the hands of the alleged conspirators, and hostile witnesses thicken

the plot." *Lum v. Bank of Am.,* 361 F.3d 217, 228 (3d Cir.2004) (citing *Poller v. Columbia Broad. Sys.,* 368 U.S. 464, 473, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962)); *see also Brotech Corp. v. White Eagle Int'l Tech. Group,* 2004 WL 1427136, at \*3 (E.D.Pa. June 21, 2004) (citation omitted) ("The dismissal standard is higher in antitrust cases than generally"). Moreover, the Third Circuit Court of Appeals has directed that "[courts] should be extremely liberal in construing antitrust complaints." *See Lum,* at 228 (quoting *Knuth v. Erie–Crawford Dairy Co-op. Ass'n,* 395 F.2d 420, 423 (3d Cir.1968), *cert. denied,* 410 U.S. 913, 93 S.Ct. 966, 35 L.Ed.2d 278 (1973)).

## II. *DISCUSSION*

### A. *Schering and Key's Application to Dismiss Certain Claims in the Amended Complaint*

On September 8, 2006, Schering–Plough Corporation and Key Pharmaceuticals, Inc. (collectively "Schering") submitted an application to the Special Master to dismiss certain claims in the Indirect Purchasers' Amended Consolidated Class Action Complaint (the "Schering Motion"). In support of the Schering Motion, Schering simultaneously filed a memorandum in support of the Schering Motion (the "Schering Opening Brief").

**\*3** In its opening brief, Schering notes that the Indirect Purchaser Plaintiffs' ("IP Plaintiffs" or "Plaintiffs") [2] original complaint challenged the legitimacy of the Schering–Upsher and Schering–ESI Lederle settlement agreements, but did not claim that the Schering patent was invalid. By comparison, Schering argues that the Amended Complaint contains "an entirely new cause of action" ("Count III") that does not depend on the legality of the settlement agreements, rather it states a *Walker Process* monopolization claim exclusively against Schering, Schering contends that Count III alleges that the Schering patent was obtained by fraud on the Patent and Trademark Office ("PTO") or inequitable conduct, and maintained through sham litigation. (Schering Op, Br. at 1.) [3] Finally, Schering notes that this claim does not rely upon the settlement agreements, but seeks damages from a time period long before the settlements were entered into. Thus, Schering argues that the Plaintiffs essentially seek the right to bring a *Walker Process* claim and litigate the validity of Schering's patent notwithstanding the lawfulness of the settlement agreements. Schering

In re K-Dur Antitrust Litigation, Not Reported in F.Supp.2d (2007)

2007 WL 5297755

argues that such relief is not permitted under existing law. (*Id.* at 2.)

First, Schering argues that Plaintiffs' *Walker Process* claims should be dismissed because Plaintiffs lack standing to bring them, Instead, Schering argues that only competitors have standing to bring such claims. (Schering Op. Br. at 2.) In particular, Schering contends that it is "settled patent law" that only parties who have been threatened with a patent infringement suit have standing to bring an action pursuant to *Walker Process Equip. v. Food Machinery & Chemical Corp.,* 382 U.S. 172, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965) ("*Walker Process*"). (*Id.* at 6.) Moreover, Schering asserts that two cases from the District Court for the District of New Jersey have confirmed this principle of law, *see, In re Remeron Antitrust Litig.,* 335 F.Supp.2d 522 (D.N.J.2004) ("*Remeron*") and *Carrot Components Corp. v. Thomas & Betts Corp.,* 229 U.S.P.Q. 61 (D.N.J.1986) ("*Carrot Components*"). (*Id.*) In addition, Schering cites to a number of additional cases in support of its argument that only competitors have standing to bring *Walker Process* claims. Further, Schering argues that the limitations placed on standing are based on "sound policy considerations" and notes that even the *Walker Process* court "expressed concern about subjecting patent holders to a proliferation of suits challenging the validity of their patents." (*Id.* at 7.) Schering adds that if parties such as the Indirect Purchasers are given standing, it would essentially precipitate a situation where consumers would have standing to challenge the validity of the patents. Schering argues that such a situation would "undermine settled principles of patent law" which provide that a patent holder may only be subject to *Walker Process* suits by those against whom the patent holder takes action. Finally, Schering argues that it is "particularly inappropriate" to permit the Indirect Purchasers to relitigate the patent validity issues that were settled in the underlying action. (*Id.* at 8,)

**\*4** Second, Schering argues that the Plaintiffs' monopolization claims, although brought under state law, are preempted by federal patent law, (Schering Op. Br. at 2.) Specifically, Schering argues that because Plaintiffs' *Walker Process* claims are based on, *inter alia,* Schering's conduct before the PTO, the claims are preempted by federal patent law. (Schering Op. Br, at 9.) Schering relies, in particular, on *Semiconductor Energy Lab, Co., Ltd. v. Samsung Electronics. Co., Ltd.,* 204

F.3d 1368 (Fed.Cir.2000) ("*Semiconductor Energy*") in support of its preemption argument. Schering argues that the *Semiconductor Energy* court rejected that plaintiffs argument that it had avoided preemption by alleging a claim that required proof of elements "beyond bad faith misconduct before the PTO." (*Id.* at 10.) Schering argues that the *Semiconductor Energy* court ultimately dismissed that plaintiff's state law claim precisely because it had failed to allege more than the elements found in the patent law cause of action for inequitable conduct. Based on this precedent, Schering contends that in *In re Ciprofloxacin Hydrochloride Antitrust Litig. .,* 363 F.Supp.2d 514 (E.D.N.Y.2005) ("*Cipro*"), the Court had similarly dismissed inequitable conduct and sham litigation claims brought under state antitrust and consumer protection law. (*Id.* at 10.) Schering argues that in *Cipro,* the court dismissed indirect purchaser's *Walker Process* and "sham litigation" claims because the success of those claims was dependent on proving that the patent holder had withheld or misrepresented information before the PTO and, therefore, the court determined that the claims rested entirely on patent law and, thus, were preempted. (*Id.* at 10–11.) Schering urges that the IP Plaintiffs' sham litigation claims fail for the same reasons. Schering contends that these claims in this case are wholly dependent on proof of Schering's enforcement of a patent that was allegedly procured by fraud on the PTO and, therefore, are simply an extension of Plaintiffs' *Walker Process* claims. (*Id.* at 11.) Schering notes that in *Cipro,* the court held that the indirect purchaser's sham litigation claims were preempted because federal patent law controls conduct before the PTO, conduct upon which the instant claims are similarly based. According to Schering, the fact that the IP Plaintiffs claim that Schering's patent suits were "objectively" baseless does not change this result. (Schering Op. Br. at 12.) Finally, Schering asserts that the IP Plaintiffs admit that their sham litigation claims are based on the merits of Schering's patent and contend that this fact further supports the conclusion that these claims are preempted under federal patent law. (*Id.*)

As a consequence, Schering argues that Count III of the Amended Complaint, and any claims in Counts I, II and IV that purport to state *Walker Process* or sham litigation claims should be dismissed. [4]

**B. *Wyeth and ESI Lederld's Application to Dismiss Certain Claims in the Amended Complaint***

2007 WL 5297755

**\*5** Contemporaneous with Schering's submission of the Schering Motion, Wyeth and ESI Lederle (collectively "ESI") submitted an application to the Special Master to dismiss portions of the Amended Consolidated Class Action Complaint filed by the Indirect Purchaser Plaintiffs (the "ESI Motion"). In the memorandum accompanying ESI's motion, ESI similarly contends that the IP Plaintiffs assert a *Walker Process* monopolization claim in Count III of the Amended Complaint based on Schering's alleged fraud upon the PTO. (ESI Op. Br. at 1.)[5] However, ESI further argues that the IP Plaintiffs also incorporate *Walker Process* claims into Count II of the Amended Complaint which seeks restitution, disgorgement, constructive trust, and unjust enrichment under state law and Count IV which seeks damages for restraint of trade under state law. (*Id.*) As a result, ESI moves for dismissal of the IP Plaintiffs' *Walker Process* claims in Count III of the Amended Complaint and to the extent they appear in other counts of the Amended Complaint. (ESI Op, Br. at 1.)

First, ESI argues that Count III and all other *Walker Process* claims should be dismissed for lack of standing. ESI contends that federal court decisions from the District of New Jersey and other federal courts provide that *Walker Process* claims are reserved to parties who are competitors of a patent holder, or parties against whom a patent holder has tried to enforce its patent. By comparison, ESI notes that the IP Plaintiffs are simply purchasers of K–Dur and, further, do not allege that Schering enforced or threatened to enforce its patent against them. Therefore, ESI argues that the IP Plaintiffs lack standing to bring *Walker Process* claims. (*Id.* at 2.) Like Schering, ESI cites *Remeron* and *Carrot Components* as decisions from the District of New Jersey which support the argument that a party lacks standing to bring a *Walker Process* claim unless that patent holder has enforced or threatened to enforce their patent against that party. (*Id.* at 8.) ESI also cites a number of cases, including *Remeron* and *Cipro,* for the premise that standing to allege a *Walker Process* claim can only be exercised by a patent holder's competitors. (*Id.* at 9.) In addition, ESI argues that the IP Plaintiffs' *Walker Process* claims should be dismissed because the IP Plaintiffs have not alleged and cannot allege that they were competitors of Schering and, further, that they do not allege that Schering enforced or threatened to enforce the patent for K–Dur against them. (*Id.* at 13.) Accordingly, ESI contends that the claims in this case suffer from the same defects as those

claims brought in the *Remeron* case. Further, ESI adds that the IP Plaintiffs' "more remote status" as indirect purchasers of K–Dur weakens any argument that they have standing to bring a *Walker Process* claim. (*Id.*) ESI also challenges the decision of the District Court of the District of Columbia in *Molecular Diagnostics Labs. v. Hoffman LaRoche, Inc.,* 402 F.Supp.2d 276 (D.D.C.2005) (*"Molecular Diagnostics"* ) claiming that the court's conclusion that *direct* purchasers have standing to bring *Walker Process* claims is an "anomaly" among courts that have considered the issue and argues that, in any event, the decision does not provide support for the IP Purchasers' assertion of their claims. (ESI Op. Br. at 14.) Finally, ESI contends that the *Walker Process* claims asserted against ESI are particularly problematic because the Amended Complaint fails to allege that ESI did anything to help obtain the Schering patent and notes that ESI was, in fact, a defendant in a patent infringement action brought by Schering against ESI. ESI argues that the IP Plaintiffs' *Walker Process* claim "turns standing on its head" because not only do the IP Plaintiffs lack standing to bring such a claim, but they purport to bring this action against one of the few entities that might actually have standing to bring such a claim. Therefore, ESI reiterates that the IP Plaintiffs' *Walker Process* claim should be dismissed for lack of standing. (*Id.* at 15.)

**\*6** Second, ESI argues that, even if the IP Plaintiffs have standing, their *Walker Process* and "sham litigation" claims should be dismissed because they are based on alleged misconduct before the PTO and, therefore, are preempted by federal patent law. (*Id.*) In support of its preemption argument, ESI relies upon several cases, including *Cipro, Semiconductor Energy* and *Abbott Labs. v. Brennan,* 952 F.2d 1346 (Fed.Cir.1991), in each of which, ESI notes, the courts dismissed state law causes of action that were based on misconduct before the PTO. (*Id.* at 16.) Similarly, ESI argues that because the IP Plaintiffs' state law *Walker Process* and "sham litigation" claims are based "exclusively" on Schering's alleged fraudulent activity before the PTO, they are preempted by federal patent law and should be dismissed. (*Id.* at 17–18.) ESI further argues that to allow these claims to go forward would constitute "an inappropriate collateral intrusion on the regulatory procedures of the PTO" and a usurpation of Congressional authority that was reserved to federal patent law. (Wyeth Op. Br. at 18.)

2007 WL 5297755

Therefore, ESI argues that the IP Plaintiffs' *Walker Process* and "sham litigation" claims should be dismissed. [6]

## C. *Upsher's Application to Dismiss Certain Claims in the Amended Complaint*

Like Schering and ESI, Upsher has also made an application to dismiss certain claims in the IP Plaintiffs' Amended Complaint (the "Upsher Motion"). In support of the Upsher Motion, Upsher asserts that under Count III the Amended Complaint, the IP Plaintiffs assert a wholly new cause of action alleging *Walker Process* and "sham litigation" claims, but argues that these claims are alleged against Schering only. (Upsher Op. Br. at 1.) [7] Upsher further argues that because the IP Plaintiffs have failed to allege facts reflecting that Upsher is liable for Schering's conduct, as alleged in Count III, Upsher cannot be held liable for any damages arising from that count of the Amended Complaint. (*Id.* at 1–2.) Accordingly, Upsher moves to dismiss Count III of the Amended Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. (*Id.* at 2.)

## D. *Indirect Purchaser Plaintiffs' Response in Opposition to the Applications*

On October 23, 2006, the Indirect Purchaser Plaintiffs ("IP Plaintiffs" or "Plaintiffs") [8] filed a memorandum of law in opposition to the respective Defendants' [9] motions to dismiss (the "IP Plaintiffs Answering Brief"). The IP Plaintiffs argue, *inter alia,* that they have standing to assert their monopolization claims (*see* IP Plfs. Ans. Br. at 2) [10] and that those claims are not preempted by patent law. (*Id.* at 6.)

First, Plaintiffs contend that Defendants' standing argument is focused exclusively on the *Walker Process* component of their monopolization claim, and not the *Orange Book* and "sham litigation" allegations. (*Id.* at 1–2.) With respect to *Walker Process,* the Plaintiffs argue that the "gist" of the case was that "proof that the patent holder obtained the patent through knowing and willful misrepresentation of facts to the PTO 'would be sufficient to strip [the holder] of its exemption from the antitrust laws.' " (*Id.* at 3 (citing *Walker Process,* 382 U .S. at 176).) Plaintiffs argue that in this case, their goal is to strip Defendants of *Noerr–Pennington* antitrust immunity, rather than to "annul" the patent in question. (*Id.*)

Plaintiffs claim that, consistent with *Walker Process,* they have standing to bring an antitrust action notwithstanding the fact that the underlying facts in support of the claim include fraudulent procurement of a patent. (*Id.* at 4.) Plaintiffs add that the rationale articulated by the court in *Molecular Diagnostics* reflects why the Defendants' standing arguments are incorrect. Plaintiffs further note that Defendants' reliance on *Remeron* in support of their standing argument is misplaced. Plaintiffs argue that the court's rationale for the decision in *Remeron* decision is "sparse" and note further that the decision was even criticized by the court in *Molecular Diagnostics.* (*Id.* at 4–5.) Therefore, Plaintiffs argue that if their fraud on the PTO or sham litigation claims are proven, then the Defendants antitrust immunity will be "stripped away" and the Indirect Purchasers will be able to pursue their antitrust claims of monopolization. (*Id.* at 6.)

*7 Second, Plaintiffs argue that their claims are not preempted by federal patent law. Plaintiffs assert that when monopolization claims are "properly viewed," they do not conflict with federal patent law, and are not preempted. (IP Plfs. Ans. Br. at 6.) Plaintiffs argue, based on Supreme Court precedent that state antitrust law "is a uniquely inappropriate context in which to find preemption by federal law." (*Id.*) Instead, Plaintiffs argue that their monopolization claims would only be preempted if they posed an obstacle to execution of federal patent law. (*Id.*) Further, Plaintiffs argue that the case of *Dow Chem. Co. v. Exxon Corp.,* 139 F.3d 1470 (Fed.Cir.1998) ("Dow") stands for the principle that "even if a court is required to adjudicate a question of federal patent law in connection with resolving a state law claim, the patent laws will not preempt the state-law claim if the plaintiff must also prove additional elements not found in a federal patent law cause of action." (*Id.* at 7–8.) Plaintiffs argue that unlike the cases cited by the Defendants, their claims are actually state law antitrust claims, not patent claims masquerading in "state law garb." Plaintiffs note that while their claims do require consideration of conduct before the PTO, they also require proof of elements specific to antitrust claims, which, in effect, take these claims out of the realm of claims that would otherwise be preempted by federal patent law. (*Id.* at 8.) In addition, Plaintiffs contend that Defendants' preemption argument rests solely on the decision in *Cipro.* However, Plaintiffs argue that the *Cipro* decision is unpersuasive for the reasons articulated by the Federal Circuit Court of Appeals in *Zenith Elect. Corp. v.*

Case 2:19-cv-07532-ES-MAH   Document 18-5   Filed 05/22/19   Page 85 of 300 PageID: 393
In re WL Dru Antitrust Litigation, Not Reported in F.Supp.2d (2007)
2007 WL 5297755

*Exzec, Inc.,* 182 F.3d 1340, 1355 (Fed.Cir.1999) (*"Exzec"* ), in which the court stated that " 'asserting [a] patent in the marketplace allegedly having known that the patent was unenforceable due to inequitable conduct' is a sufficient species of 'bad faith marketplace conduct' to defeat a preemption defense." (*Id.* at 9.) Thus, Plaintiffs argue that the *Cipro* Court's attempt to distinguish *Dow* on the basis that the patent holder threatened plaintiff's customers, fails because that activity was "no more wrongful" than the prosecution of the sham litigation that occurred in this case. (IP Plfs. Ans. Br. at 10.) Furthermore, Plaintiffs argue that *Walker Process* provides that the mere maintenance of a fraudulently procured patent would be sufficient "marketplace conduct" to give rise to antitrust liability and, therefore, their antitrust claims, as pled, would not be preempted by federal patent law. (*Id.* at 10–11.)

Finally, Plaintiffs argue that state law consistently recognizes monopolization claims similar to those asserted in this case. In particular, Plaintiffs observe that state antitrust laws, which are patterned after federal antitrust laws, allow monopolization claims, a fact which Defendants do not dispute. (*Id.* at 11–12.) Thus, Plaintiffs contend that there is no reason to treat these monopolization claims differently because they rely upon *Walker Process* allegations, since such state law claims have no more deleterious public policy impact than similarly situated federal claims.

**\*8** In light of the foregoing, the IP Plaintiffs argue that the Defendants' respective motions to dismiss should be denied.[11] (*Id.* at 29.)

### E. *Direct Purchaser Plaintiffs' Response in Opposition to the Applications*
Contemporaneous with the submission of the IP Plaintiffs' Reply Brief, the Direct Purchaser Plaintiffs (the "DP Plaintiffs") similarly filed a memorandum opposing the motions to dismiss Count III of the IP Plaintiffs Amended Complaint (the "DP Plaintiffs' Answering Brief"). The DP Plaintiffs challenge the Defendants' collective reasoning and their reliance upon *Remeron* as a basis to dismiss the IP Plaintiffs' claims. (DP Plfs. Ans. Br. at 2.)[12] Specifically, the DP Plaintiffs argued that the *Remeron* decision had been criticized for having failed to provide sufficient justification for its result. By comparison, the DP Plaintiffs argued that other decisions had "affirm[ed]

an overcharged purchaser's standing to assert such claims" and cited two cases in support of this argument. (*Id.* at 3.) As a consequence, the DP Plaintiffs argued that the respective applications to dismiss should be denied. (*Id.* at 4.)

### F. *Schering's Reply in Support of the Application to Dismiss*
In further support of its application to dismiss certain claims in the IP Plaintiffs' Amended Complaint, Schering reasserts the arguments made in its Opening Brief.

First, Schering contends that the IP Plaintiffs concede that under federal *patent* law "they lack standing to force a patent holder to litigate the validity of his patent." Further, Schering argues that under federal *antitrust* law, the IP Plaintiffs also lack standing to sue an "alleged monopolist" for damages. (Schering Reply Br. at 1.)[13] Schering contends that notwithstanding the IP Plaintiffs' claim that under state law they have standing to assert a *Walker Process* monopolization claim, prevailing case law contradicts this argument and cites *Remeron, Cipro* and *In re DDAVP Direct Purchaser Antitrust Litig.,* No. 05–CV–2237 (S.D.N.Y.) (*"DDAVP"* ) in support of the argument that purchasers of a patented product simply do not have standing to bring a *Walker Process* monopolization claim. (*Id.* at 2.) In addition, Schering argues that *Molecular Diagnostics,* a case heavily relied upon by the Plaintiffs, cannot overcome this contrary precedent. Schering argues that not only does *Molecular Diagnostics* represent a minority view on the issue, but that it arguably draws a distinction between direct and indirect purchasers and "strongly impl[ies]" that indirect purchasers of a patented product would lack standing. (Schering Reply Br. at 3.) Furthermore, Schering argues that a significant number of cases limit "competitor standing" under *Walker Process* to entities that have actually been sued for patent infringement or "face a *serious threat of suit* for infringement" and counsel that *Walker Process* standing should be "narrowly construed." (*Id* .) Finally, Schering argues that the IP Plaintiffs' standing argument, if adopted, would "radically rewrite well-established patent law." (*Id.* at 4.) Schering urges that, under the Plaintiffs' theory, any patent could be the target of numerous challenges by consumers and, further, any actual or potential competitor of a patent holder, who otherwise was not under threat of suit, could

In re K-Dur Antitrust Litigation, Not Reported in F.Supp.2d (2007)

2007 WL 5297755

buy the patented product and bring a consumer *Walker Process* claim.

 **\*9** Second, Schering emphasizes that state law causes of action that are based on fraud or inequitable conduct before the PTO are preempted by federal patent law. (*Id.*) Based on this precedent, Schering again argues that the IP Plaintiffs' monopolization claim is preempted because the only wrongful conduct alleged is conduct before the PTO. Furthermore, with respect to the IP Plaintiffs' contention that their claims are not preempted because they require elements of proof beyond those required to substantiate patent invalidity, Schering argues that all of the Federal Circuit's preemption cases involve state law claims which contain elements beyond those necessary to invalidate a patent. Citing *Semiconductor Energy,* Schering notes that the Federal Circuit held that the plaintiff's RICO claim was preempted because the wrongful conduct alleged in that matter related to the patent holders' efforts to obtain the patent and targeting the plaintiff for a patent infringement suit. (*Id.* at 6.) Thus, Schering argues that the issue of preemption hinges on the nature of the wrongful conduct alleged, noting that if the conduct alleged is conduct before the PTO or related to the initiation of litigation against an alleged infringer, the claim will be preempted, whereas if the claim is also predicated on marketplace conduct, then the claim might not be preempted. (Schering Reply Br. at 6.) Schering's position is that the resolution of this motion is governed by *Semiconductor Energy* because here, as in *Semiconductor Energy,* the only conduct alleged by the IP Plaintiffs in the Amended Complaint is conduct before the PTO and the filing of infringement suits, not "marketplace conduct." Thus, Schering argues that because the IP Plaintiffs have failed to allege any "bad faith misconduct in the marketplace." Plaintiffs' claims challenging Schering's conduct before the PTO and Schering's alleged filing of "sham litigation" are preempted and should be dismissed. (*Id.* at 7.) Finally, Schering argues that, in order to preserve the "careful balance" in patent law between the rights of patent holders and the rights of challengers, the group of prospective challengers has been intentionally restricted to direct competitors. Schering argues that to open the door to competitors would markedly change patent law and patent policy, a result that existing case law counsels against. (*Id.* at 7–8.) Thus, Schering requests that the Court grant its motion to dismiss. [14]

**G. *ESI's Reply in Support of the Application to Dismiss***

ESI has also submitted a reply brief in support of its application to dismiss portions of the Amended Complaint. ESI reiterates that the Amended Complaint still does not allege that ESI was involved, in any way, in obtaining the Schering patent. (ESI's Reply Br, at 1.) [15] Having reviewed the IP Plaintiffs' Answering Brief, ESI argues that the IP Plaintiffs have conceded that ESI and Upsher are not defendants in Count III of the Amended Complaint. ESI notes that Upsher's Opening Brief asserts that Count III asserts *Walker Process* and "sham litigation" claims against Schering *only* and that the IP Plaintiffs made no effort to oppose or even respond to Upsher's motion in this regard. Thus, ESI argues that the IP Plaintiffs have apparently conceded that Count III of the Amended Complaint raises claims against Schering alone and, as such, the IP Plaintiffs are barred from seeking recovery from ESI under Count III of the Amended Complaint. (ESI's Reply Br. at 1.)

 **\*10** Next, ESI argues that the *Walker Process* claim contained in Count III of the Amended Complaint and any other allegations of the Amended Complaint that purport to independently allege or incorporate a *Walker Process* claim should be dismissed for lack of standing. To this end, ESI reiterates that federal courts in New Jersey and elsewhere have held that unless a patent holder has enforced or threatened to enforce its patent against a party, that party does not have standing to pursue a *Walker Process* claim, ESI cites *Remeron* and *Carrot Components* in support of its argument on this point. Further, ESI notes that Plaintiffs' primary argument in response to this case law is simply that these cases have been wrongly decided. In response, ESI cites to a recent decision in the *DDAVP* case and argues that the *DDAVP* decision strongly contradicts Plaintiffs' assertion that these other cases were wrongly decided. ESI also challenges the IP Plaintiffs' assertion that Defendants have tried to mischaracterize Plaintiffs' claims as "arcane patent law claims." (*Id.* at 3–4.) Rather, ESI concedes that the IP Plaintiffs' claims arc, in fact, antitrust claims, but argues that indirect purchasers simply do not have standing to pursue antitrust claims based on *Walker Process.* In addition, ESI argues that Plaintiffs are wrong in asserting that courts that have denied standing in *Walker Process* cases have applied some unique standing rule. Rather, ESI contends that these courts have simply applied "general antitrust standing principles" in determining that only

parties against whom a patent has been enforced have standing to bring *Walker Process* claims, (ESI's Reply Br. at 4.) ESI also notes that the IP Plaintiffs "misleadingly argue" that "purchasers" have standing to pursue *Walker Process* claims, but argue that the IP Plaintiffs do not cite a single case which reflects that indirect purchasers have standing to pursue *Walker Process* claims. (*Id.* at 5.) Further, ESI notes that the one case upon which Plaintiffs base their standing claims—*Molecular Diagnostics*—only ruled that direct purchasers had standing to bring a *Walker Process* claim, but did not articulate a general rule applicable to "purchasers." (*Id.*) Thus, Plaintiffs argue that Count III of the Amended Complaint should be dismissed for lack of standing. (*Id.* at 7.)

Finally, ESI argues that the *Walker Process* claim in Count III and the related allegations in Counts II and IV should be dismissed because they are preempted by federal patent law, ESI contends, however, that the IP Plaintiffs misrepresent ESI's position with respect to preemption. Instead, ESI argues that, pursuant to a *Walker Process* claim, the only theory upon which damages could be recoverable for a period dating back to 1989 is based upon misconduct before the PTO, Under these circumstances, ESI argues that Plaintiffs' *Walker Process* claims are preempted. In addition, ESI notes that it is not seeking dismissal of all of the IP Plaintiffs' claims that implicate issues of patent law, rather it is seeking dismissal of those claims dating back to the 1989 time period, claims which ESI contends necessarily rely upon Schering's conduct before the PTO. Therefore, ESI requests that the Court dismiss all *Walker Process* claims asserted by the IP Plaintiffs against ESI.[16]

## H. *Upsher's Reply in Support of the Application to Dismiss*

**\*11** In response to the Plaintiffs' support for Count III of the IP Plaintiffs' Amended Complaint, Upsher reiterated certain points made in its Opening Brief, In addition, Upsher noted that neither the IP Plaintiffs, nor the DP Plaintiffs have raised any opposition to the Upsher Motion, and that neither set of plaintiffs have asserted that Upsher could be held liable for any *Walker Process* or "sham litigation" claims lodged against Schering. (Upsher Reply Br. at 2 .)[17] Thus, Upsher argued that it is appropriate to dismiss Count III of the Amended Complaint to the extent that it relates to, or is intended to relate to Upsher. (*Id.*)

## I. *Analysis*

The Defendants[18] have moved to dismiss certain claims contained in the IP Plaintiffs' Amended Complaint, Motions to dismiss are governed by Rule 12(b)(6) of the Federal Rules of Civil Procedure. Although neither the Defendants, nor the IP Plaintiffs or the Direct Purchaser Plaintiffs (the "DP Plaintiffs") (collectively "Plaintiffs") have specifically articulated a standard of review on a Rule 12(b)(6) motion, it is well settled that the standard of review articulated on page 4 of this Report and Recommendation governs these motions to dismiss,

The Defendants and the Plaintiffs agree that this matter is fundamentally governed by the decision of the United States Supreme Court in *Walker Process Equip., Inc. v. Food Machinery and Chem. Corp.,* 382 U.S. 172, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965). However, the parties disagree as to how *Walker Process* is to be construed and applied to the claims that are the subject of the Motions to Dismiss. Therefore, an analysis of the prevailing case law for each of the "futility" defenses raised by the Defendants in the respective Motions to Dismiss is in order,

### i. *Standing*

Defendants claim that under *Walker Process* and other prevailing case law, the IP Plaintiffs lack standing to bring the *Walker Process* and "sham litigation" claims raised in Count III of the Amended Complaint. (*See* Schering Op. Br. at 5–8; ESI Op. Br, at 8–12; Upsher Op. Br. at 1–2.) In contrast, the Plaintiffs argue that, as consumers of K–Dur, the Indirect Purchaser Plaintiffs have been unduly affected by Schering's fraudulent and/or "inequitable conduct" before the PTO, Schering's "sham litigation" actions against Upsher and ESI, and the resulting settlement agreements entered into by the Defendants and, as such, have standing to bring these claims against the Defendants. (*See* IP Plfs. Ans. Br. at 1–6; DP Plfs. Ans. Br. at 1–4.)

#### a. *Walker Process*

In *Walker Process,* respondent brought a patent infringement action claiming that defendant had infringed respondent's patent for a process used in aeration equipment for sewage treatment systems. 382 U.S, at 173, In turn, petitioner counterclaimed for a declaratory judgment on the ground that the patent was procured

by fraud on the Patent and Trademark Office ("PTO") and was, therefore, invalid. *Id.* at 174, Further, petitioner argued that if respondent's patent was procured by fraud on the PTO and then was consciously used to exclude petitioner from the marketplace, it would constitute a *prima facie* violation of Section 2 of the Sherman Act, 15 U.S.C. § 2. *Id.* at 175.

**\*12** The Supreme Court found, initially, that "a person sued for infringement may challenge the validity of [a] patent on various grounds, including fraudulent procurement." *Id.* at 176. The Court went on to note that a party need not actually be sued in the first instance, rather the validity of a patent may be challenged under the Declaratory Judgment Act. *Id.* In addition, the Court added that, "we have recognized that an *injured party* may attack the misuse of patent rights." *Id.* (emphasis added). Finally, the Court concluded that actual proof that respondent "knowingly and willfully misrepresented" facts to the PTO would be sufficient to remove respondent's exemption from the antitrust laws, *see id.* at 177, and subject respondent to a claim under Section 2 of the Sherman Act.

Ultimately, *Walker Process* stands, in relevant part, for the principle that a party other than the United States may sue "to cancel or annul a patent." *Id.* at 175, While *Walker Process* does not define the precise scope of the class of "injured part[ies]" who "may attack the misuse of patent rights," the facts of the case certainly reflect that direct competitors—*i.e.,* parties against whom "threats of suit" for infringement may be raised and/or an action for patent infringement may be brought—are legally cognizable claimants.

### b. *District of New Jersey decisions*

#### i. *Carrot Components*
Since *Walker Process* was decided, numerous courts have examined the issue of which "injured parties" have standing to bring a *Walker Process* claim. However, there are few directly applicable cases that have been decided in the District of New Jersey. In 1986, the District Court for the District of New Jersey decided *Carrot Components Corp. v. Thomas & Betts Corp.,* 229 U.S . P.Q, 61 (D.N.J.1986) ("*Carrot Components*" ). In *Carrot Components,* plaintiff sought a declaration of invalidity on two patents held by the defendant or a declaration of non-infringement and for damages

related to defendant's monopolistic business practices. Defendant, in turn, moved to dismiss the complaint.

During the course of the litigation the parties agreed that in order to seek declaratory relief in the context of a patent related antitrust action, a plaintiff must demonstrate both "a reasonable apprehension that it will face an infringement suit if it commences or continues the activity in question" and that it has "actually produced the accused device or [is] actually prepared to produce such a device." *Carrot Components,* 229 U.S.P.Q. at 63. The court determined that plaintiff could not support its claims for relief. First, with respect to the declaratory judgment claim, the court found, *inter alia,* that as a *distributor* of the allegedly infringing product, plaintiff "[had] not demonstrated the imminence of conflict with the defendant," *see id.* at 64, and, thus, could not meet the jurisdictional prerequisites for a declaratory judgment action. Second, with respect to plaintiff's monopolization claim, the court found, *inter alia,* that the complaint was deficient in that plaintiff had failed to demonstrate that defendant "[had] wielded exclusionary power through the use of his patent in a relevant market, *to the detriment of the plaintiff .*" *Id.* (emphasis in original). Ultimately, the court found that plaintiff lacked standing to sue based on the conclusion that "plaintiff must at least be able to allege facts that indicate that the defendant has enforced, or has sought to enforce, or has threatened to enforce its fraudulently obtained patent against the plaintiff itself." *Carrot Components,* at 64 (citing *Indium Corp. of Am. v. Semi–Alloys, Inc.,* 556 F.Supp. 1344, 1352–53 (N.D.N.Y.1983)).

**\*13** Thus, *Carrot Components*' basic contribution to the issue of *Walker Process* standing is the conclusion that, with respect to declaratory judgment claims, only parties that have been directly threatened with suit or who can demonstrate that they reasonably anticipate a patent infringement suit or some effort by the patent holder to enforce the subject patent against them will have standing to bring such a claim for relief.

#### ii. *Remeron*
Eighteen years later, the District Court revisited the issue of *Walker Process* standing in the context of a patent litigation in *In re Remeron Antitrust Litig..,* 335 F.Supp.2d 522 (D.N.J.2004) ("Remeron"). In *Remeron,* a multi-district litigation, the plaintiffs, each a direct purchaser of the drug mirtazapine, filed separate actions against the

In re K-Dur Antitrust Litigation, Not Reported in F.Supp.2d (2007)
2007 WL 5297755

defendants alleging " 'an overall scheme' to monopolize the relevant market" for the drug, *Remeron,* at 526. Among other things, plaintiffs alleged that defendant Organon had obtained the subject patent through fraud on the PTO and brought *Walker Process* claims pursuant to Section 2 of the Sherman Act, Defendants moved to dismiss. The *Remeron* court acknowledged that fraudulent procurement of a patent or enforcement of a patent obtained by fraud could form the basis of a claim under Section 2 of the Sherman Act if the other elements of the claim were present. However, the court concluded that the plaintiffs, as direct purchasers of mirtazapine, did not have standing to bring a *Walker Process* claim. In support of this conclusion, the court noted that; (1) plaintiffs had never had the patent enforced against them; (2) were not threatened with enforcement; and (3) were not in a position to manufacture a competing version of the drug. Remeron, at 529

The *Remeron* court reached this conclusion based, in part, on its acceptance of the legal principles emanating from *Carrot Components,* In fact, the court found that "[a] plaintiff does not have standing to assert a *Walker Process* claim unless '[the] defendant had sought to enforce the patent against the plaintiff, or that plaintiff had some reasonable basis for fearing such attempted enforcement.' " *Remeron,* 335 F.Supp.2d at 529. The court went on to observe that *"Walker Process* and its progeny involve antitrust counterclaimants who where potential or actual competitors in patent infringement suits." *Id.* Relying on this precedent, the court concluded that because plaintiffs, as direct purchasers of mirtazapine, did not produce the drug nor were prepared to do so, and were not party to the initial patent infringement suits, they lacked standing to bring a *Walker Process* fraud claim. [19] *Id.*

Like *Carrot Components, Remeron* stands for the proposition that only a party that has had a patent enforced against it, or has been threatened with suit, has standing to bring a *Walker Process* or "sham litigation" claim. Moreover, the *Carrot Components* and *Remeron* decisions certainly suggest that parties who are not actually or prepared to be direct competitors of parties holding a patented product lack standing to bring such claims. Thus, the conclusion to be drawn from *Carrot Components* and *Remeron* is that direct and indirect purchasers of a patented product simply lack standing to bring *Walker Process* and "sham litigation" claims.

### c. *Other federal decisions*

**\*14**  A number of federal cases outside the District of New Jersey have analyzed *Walker Process* and its progeny in an attempt to ascertain and/or define the parameters of standing for prospective *Walker Process* claimants. The results of these cases, while mixed, favor limiting the number of potential *Walker Process* claimants. I now turn to an examination of those cases.

### i. *DDAVP*

The issue of *Walker Process* standing was most recently addressed in *In re DDAVP, Direct Purchaser Antitrust Litig.,* No. 05–Civ.–2237 (CLB) (S.D.N.Y.) (*"DDAVP"* ). In *DDAVP,* the plaintiffs, direct and indirect purchasers of the drug desmopressin acetate ("DDAVP"), filed separate class actions alleging violations of federal and state antitrust law and charging that defendants had unlawfully maintained a monopoly over the market for desmopressin acetate by, *inter alia,* allegedly procuring the applicable patent by fraud or inequitable conduct before the PTO and "instituting and prosecuting" a "sham litigation" action against certain prospective competitors. *In re DDAVP Direct Purchaser Antitrust Litig.,* No, 05–Civ.–2237 (CLB), slip op. at 2–3 (S.D.N.Y. Nov. 2, 2006). Defendants moved to dismiss the complaints on the grounds that, *inter alia,* plaintiffs lacked standing to bring the antitrust claims and that the state law antitrust claims were preempted by federal law. Specifically, Defendants argued that plaintiffs lacked standing because "they are purchasers and not competitors or would be competitors of [the defendants], and because neither [defendant] ha[d] ever threatened to enforce the patents against [the] [p]laintiffs...." *Id.* at 5.

While the *DDAVP* court concluded that the plaintiffs' respective complaints could be dismissed based solely on their failure to plead fraud with particularity, the court went on to consider whether plaintiffs were "proper" antitrust plaintiffs and, as such, whether they had standing to bring a *Walker Process* claim. Following a review of applicable case law respecting *Walker Process* standing, the court noted that:

> Plaintiffs have not alleged and cannot, that they did compete or would have competed with Defendants, nor that they have

been sued or threatened with an infringement lawsuit by Defendants. Rather, they allege that they have paid higher prices for desmopressin acetate by virtue of Defendant's misconduct before the PTO and subsequent actions, which prevented the lower prices, which would have ensued from generic competition.

*Id.* at 9.

Noting that there was no binding precedent from the Southern District of New York with respect to this issue, the court examined other cases that had addressed this issue. Citing *Remeron* and *Cipro,* the court noted that those courts had found, respectively, that absent a threat of suit or the reasonable anticipation of suit, a party does not have standing to bring a *Walker Process* claim and that non-infringing consumers of patented products similarly lacked standing. The court contrasted *Remeron* and *Cipro,* with the decision of the District Court for the District of Columbia in *Molecular Diagnostics,* in which the court found that customers, who are direct purchasers of a patented product, have standing to bring a *Walker Process* claim, *DDAVP,* at 10–11. Having reviewed these cases, the *DDAVP* court concluded that the better argument was articulated in the *Remeron* and *Cipro* cases. As a consequence, the court held that, as consumers, plaintiffs simply lacked standing to bring a *Walker Process* claim against the defendants, and that this defect was a sufficient alternative basis for dismissing the complaints.

**\*15** Although certainly not binding precedent in the District of New Jersey, *DDAVP* adds further support to the existing body of case law holding that *consumers* of patented products lack standing to bring *Walker Process* claims.

### ii. *Molecular Diagnostics*

In support of their argument that the IP Plaintiffs, as indirect purchasers of K–DUR, have standing to bring a *Walker Process* claim, Plaintiffs rely primarily on the decision in *Molecular Diagnostics Labs. v. Hoffman–LaRoche, Inc.,* 402 F.Supp.2d 276 (D.D.C.2005) ("*Molecular Diagnostics*"). *Molecular Diagnostics* is emblematic of the dispute among federal courts regarding which parties have standing to bring a *Walker Process* claim. In *Molecular Diagnostics,* plaintiff, Molecular Diagnostics Laboratories ("MDL"), a direct purchaser of the subject patented product, *Thermus aquaticus* DNA polymerase (*"Taq"* ), brought suit under Section 1 of the Sherman Act charging that they had been forced to pay artificially inflated prices for *Taq* as a result of defendants' enforcement of the patent, which plaintiffs allege was obtained by fraud on the PTO. *Molecular Diagnostics,* 402 F.Supp.2d 278. Defendants moved to dismiss the complaint on a number of grounds, including but not limited to lack of standing.

In defense of the complaint, MDL argued it had standing to bring a *Walker Process* claims due to its status as a *direct consumer* of *Taq.* In response, defendants argued that only competitors or entities against whom a fraudulently obtained patent had been or could be enforced would have standing to bring a *Walker Process* claim. *Id.* at 279. Defendants specifically relied on *Carrot Components* and *Remeron* in support of their position.

As a result, the *Molecular Diagnostics* court undertook a review and analysis of these key decisions. First, the court found *Carrot Components* factually distinguishable from the facts at issue in *Molecular Diagnostics.* The court noted that the plaintiff in *Carrot Components* was a *competitor,* not a customer of the defendant in the case. Further, the court found that the ruling in *Carrot Components* was limited to the facts of that particular case and concluded that the case "did not purport to establish a rule of general applicability." *Id.* at 280. Second, with respect to *Remeron,* the court found that although the plaintiff in that case was a customer of the defendants, the *Remeron* court had offered "little justification" for its holding. *Id.* The court concluded that, in the absence of any compelling justification for the *Remeron* decision, the court need not follow the *Remeron* precedent, Moreover, the court surmised that the *Remeron* court may have confused the harm to be addressed through a *Walker Process* claim, In the opinion of the *Molecular Diagnostics* court, "[a] *Walker Process* claim is not a fraud claim, as the [*Remeron* ] court intonates, but an antitrust violation. The harm is not the invalid patent, but the use of the invalid patent to establish a monopoly." *Molecular Diagnostics,* at 280. Thus, the court concluded that "there is little reason to think that standing requirements for *Walker Process* claims differ from standing requirements in more conventional antitrust actions." *Id.* at 281.

In re K-Dur Antitrust Litigation, Not Reported in F.Supp.2d (2007)

2007 WL 5297755

Accepting plaintiffs' argument that direct purchasers generally have standing to prosecute antitrust claims, the court concluded that there was "no reason to limit [*Walker Process* ] standing to competitors." *Id.* Thus, the court found that "direct purchasers have standing to pursue *Walker Process* claims." *Id.* at 282.

**\*16** In contrast to *Carrot Components* and *Remeron,* cases which *Molecular Diagnostics* criticizes, *Molecular Diagnostics* stands for the principle that, like competitors, direct purchasers are equally well-suited to pursue *Walker Process* claims against both patent holders, whose patents are obtained through fraud or "inequitable conduct" on the PTO and those who collude with them. However, *Molecular Diagnostics* cannot reasonably be construed to have held that consumers, regardless of their station, have standing to pursue *Walker Process* claims.

### iii. *Asahi Glass*

A predecessor to both *Remeron* and *DDAVP, Asahi Glass Co., Ltd. v. Pentech Pharma., Inc.,* 289 F.Supp.2d 986 (N.D.Ill.2003) ("*Asahi Glass"* ), is also representative of that line of cases holding that only competitors have standing to prosecute *Walker Process* claims.

In *Asahi Glass,* plaintiff, Asahi, who was a supplier of the active ingredient [20] in a generic version of the drug Paxil, sued the defendant, Glaxo, the patent holder, in an effort to have the patent for Paxil declared invalid. Through the suit, plaintiff sought to prevent defendant from interfering with Asahi's sales of its amorphous paroxetine hydrochloride product to other potential manufacturers of generic Paxil. Plaintiff also sought to challenge a settlement agreement between Glaxo and Pentech, a former customer of Asahi, which Asahi believed violated antitrust law by restraining trade in the antidepressant market. In particular, Asahi believed that potential customers were not purchasing its paroxetine product because they feared being sued by Glaxo. *Id.* at 989. Defendants moved to dismiss.

The court noted several problems in plaintiff's case, not the least of which was the fact that it was highly unlikely that Glaxo, as the patent holder, would have reason to sue a party in the plaintiff's position; *i.e.,* a supplier of amorphous paroxetine. The court observed that if plaintiff's potential customers (*i.e.,* generic competitors of Glaxo) were deterred by Glaxo's threat of suit, then

those customers had a cause of action against Glaxo, but Asahi had no right to bring an action on that basis. In addition, the court noted that "not being under a serious, palpable, foreseeable, imminent threat of being sued, Asahi cannot obtain a judicial declaration that the patent is invalid or if valid not infringed ... by the sale of the amorphous product." *Asahi Glass,* at 990. The court went on to note that since Asahi did not sell an antidepressant drug, it was not in the "market" for that drug, and therefore, lacked standing to sue. "The general rule is that suppliers do not have 'standing'... to complain about a violation of the antitrust laws at the customer level." *Id.* Further, the court noted that "[i]f suppliers of targets of antitrust violators ... were allowed to sue, potential plaintiffs would be stumbling over each other and the targets themselves, though their claim to relief is primary, might find themselves unable to obtain any relief." *Id.* at 991.

**\*17** Thus, like *Remeron* and *DDAVP, Asahi Glass* provides support for the principle that a party who is not a direct competitor, *e.g.,* a supplier, or is not the target of a suit by a patent holder, simply does not have standing to bring a *Walker Process*—styled antitrust claim.

### d. *The IP Plaintiffs' lack standing to sue*

Although other cases were cited and relied upon by the parties in support of and in opposition to the IP Plaintiffs' claim of standing to bring *Walker Process* claims, the cases discussed above form the basic foundation for the arguments upon which the respective parties have relied. Having thoroughly reviewed the above-referenced cases, as well as a number of the other cases that have been cited by the parties, I conclude, as the did the court in *DDAVP,* that the Courts in *Cipro* and *Remeron* have the better side of the argument on the issue of *Walker Process* standing.

First, although none of the cases cited above, or that I have otherwise reviewed for purposes of deciding the respective motions are binding on this Court (excepting, of course, *Walker Process* ), the majority of decisions which have considered the issue, have reached the conclusion that, unlike competitors, *customers* (e.g., indirect purchasers) do not, generally speaking, suffer exposure to the type of harm that *Walker Process* claims are specifically designed to remedy. In analyzing the *Walker Process* fraud claim, the *Remeron* court undertook a review of the extant *Walker Process* jurisprudence and distilled that body of case law to a conclusion that these cases "involve

2007 WL 5297755

antitrust counterclaimants who were potential or actual competitors in patent infringement suits." *Remeron,* 335 F.Supp .2d at 529. In so concluding, the court simply accepted the narrow holding of *Walker Process* itself, and similar cases which have followed *Walker Process. See Walker Process,* 382 U.S. at 174 ("We have concluded that the *enforcement* of a patent procured by fraud on the Patent Office may be violative of § 2 of the Sherman Act provided that the other elements necessary to a § 2 case are present") (emphasis added); *see also Bourns v. Raychem Corp.,* 331 F.3d 704, 711 (9th Cir.2003) ("Only an actual competitor or one ready to be a competitor can suffer antitrust injury"); *Indium Corp.,* 566 F.Supp. at 1352–53 ("[I]n order to establish *antitrust* standing to assert a *Walker Process* claim, the plaintiff must at least be able to allege facts that indicate that the defendant has enforced, or has sought to enforce, or has threatened to enforce its fraudulently obtained patent against the plaintiff itself") (emphasis added),

Since *Walker Process* was decided, federal courts have fairly consistently measured a party's standing to assert such claims by their status as a competitor in the marketplace. This view has prevailed in cases where courts have been confronted with plaintiffs who were suppliers of such allegedly infringing products, *see Asahi Glass* [21] and *Carrot Components, supra,* or were consumers of such products. *See In re Ciprofloxacin Hydrochloride Antitrust Litig.,* 363 F.Supp.2d 514 (E.D.N.Y.2005) (recognizing a "serious question [as to] whether indirect plaintiffs have standing to assert a *Walker Process* claim"), *Remeron, supra* and *DDAVP, supra.* Furthermore, if anything, the Supreme Court's decision in *Associated Gen. Contractors of California, Inc. v. California State Council,* 459 U.S. 519, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983) ("AGC"), stands for the proposition that not every party connected with a violation of federal antitrust laws has standing to bring an antitrust claim. Indeed, as the Court noted in *AGC,* "[t]he existence of an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement diminishes the justification for allowing a more remote party." *Id.* at 542.

**\*18** Against the backdrop of this case law, I conclude that *Molecular Diagnostics* is an isolated anomaly. The fact that the *Molecular Diagnostics* court found an exception to the general rule of antitrust standing in that case certainly does not mean that the "rule" has lost sway in cases where antitrust claims are based on *Walker*

*Process*-type allegations. *See Molecular Diagnostics,* 402 F.Supp.2d at 279 n. 4 (admitting that with the exception of *Nobelpharma AB v. Implant Innovations, Inc.,* 141 F.3d 1059 (Fed.Cir.1998) and *Argus Chem. Corp. v. Fibre Glass–Evercoat Co.,* 812 F.2d 1381 (Fed.Cir.1987), "neither the parties nor the court have been able to identify an instance in which a *customer* litigated a *Walker Process* claim").

This is, by no means, an exceptional case. In this case, Upsher and Wyeth represent the "identifiable class of 'persons' whose self-interest would normally motivate them to vindicate the public interest." The fact that, at the end of the day, they chose settlement over litigating the underlying patent dispute to a conclusion does not change their role in this dynamic. Nor does it alter the status of the Indirect Purchasers. In the context of this case, the Indirect Purchasers are the "more remote party" whose interest in "antitrust enforcement" is diminished by the presence of both competitors.

Second, I am persuaded by Defendants' argument that antitrust policy, generally speaking, does not support a legal theory which would allow parties having the most tenuous relationship with a particular patent holder's or licensee's attempt to enforce a fraudulently procured patent against its competitors to assert claims that parties who may have suffered more direct injury have settled, or simply chosen not to pursue. Clearly, the boundaries of standing, even in the context of antitrust claims of monopolization based upon *Walker Process*-type allegations, simply cannot be stretched as far as the Plaintiffs would have this Court extend them, If this Court were to conclude that *indirect* purchasers had standing to bring *Walker Process* claims, it would turn antitrust policy on its head, and extend antitrust standing to an extraordinary level, Furthermore, I am sensitive to the Defendants' concerns that expanded standing may open the door to additional rounds of litigation on matters that have conclusively and *lawfully* been resolved, I do not believe that antitrust policy or patent law contemplates a scenario in which parties only tangentially affected by a patent holder's suit to enforce a patent against its competitors, regardless of whether the patent was fraudulently procured, which is ultimately settled by the original litigants, may be relitigated by consumers or indirect purchasers. Not only would such a result likely discourage settlement and inject a significant level of uncertainty into the process of adjudicating patent

disputes, it would become exponentially more costly for all parties involved.

**\*19** Moreover, although Plaintiffs rely heavily on *Molecular Diagnostics* for their conclusion that the IP Plaintiffs have standing to bring *Walker Process* claims, *Molecular Diagnostics* is not as helpful to Plaintiffs' position as they suggest. Importantly, even the *Molecular Diagnostics* court was aware that "[c]onferring standing upon every individual tangentially affected by an alleged antitrust violation presents the risk of duplicative recovery, and may subject defendants to an onslaught of litigation." *Molecular Diagnostics,* 402 F.Supp.2d at 281. Thus, the *Molecular Diagnostics* court counseled that courts should "examine other factors in addition to antitrust injury, such as the potential for duplicative recovery, the complexity of apportioning damages, and the existence of other parties that have been more directly harmed, to determine whether a party is a proper plaintiff...." *Id.* Surely, the IP Plaintiffs can take little comfort from this statement. As the Court noted, indirect purchasers do not have "frequent interactions" with patent holders and do not have a "strong incentive to discover and litigate [an] offense." In addition, there is considerable "difficulty in determining damages" for indirect purchasers. Moreover, because indirect purchasers are two steps removed from the underlying injury (*i.e.,* to competitors), ascertaining their damages is a far more speculative endeavor. Finally, as compared to competitors and direct purchasers, indirect purchasers have certainly been *less* "directly harmed" than their counterparts.

For these reasons, I conclude that the IP Plaintiffs lack standing to bring *Walker Process* claims in Count III of the Amended Complaint and in the other Counts of the Amended Complaint whether explicitly asserted, or incorporated by reference.

### ii. *Preemption*

In addition to arguing that the IP Plaintiffs' *Walker Process* claims fail for lack of standing, Defendants also contend that the *Walker Process* and "sham litigation" claims fail because they are preempted by federal law. In response, Plaintiffs argue that prevailing case law provides that the IP Plaintiffs' claims are not, in fact, preempted by federal law. As a result, an analysis of the key cases cited by the parties is in order.

#### a. *Federal Circuit cases*

##### i. *Semiconductor Energy*

In support of their argument that the IP Plaintiffs claims are preempted by federal law, Defendants have relied, in part, on a decision from the Federal Circuit Court of Appeals (the "Federal Circuit") in *Semiconductor Energy Lab. Co., Ltd. v. Samsung Elect. Co., Ltd.,* 204 F.3d 1368 (Fed.Cir.2000) (*"Semiconductor Energy"* ). In *Semiconductor Energy,* plaintiff, Semiconductor Energy Laboratory ("SEL") sued defendants, several Samsung entities ("Samsung"), alleging that Samsung's production and sale of competing technology infringed a patent held by SEL. Initially, the district court granted SEL's motion for summary judgment and dismissed Samsung's federal and state law based Racketeer Influenced and Corrupt Organizations ("RICO") counterclaims. Following a bench trial, the court found SEL's patent unenforceable due to inequitable conduct before the PTO, The parties appealed the respective judgments.

**\*20** On appeal to the Federal Circuit, the court had to determine whether the district court had, in any way, abused its discretion in its dismissal of Samsung's state law RICO claims. After analyzing Samsung's New Jersey RICO counterclaims, the court concluded that they were preempted by federal patent law. In particular, the court noted that the counterclaims were more closely analogous to a state law-based abuse of process counterclaim that had been found preempted in *Abbott Labs. v. Brennan,* 952 F.2d 1346 (Fed.Cir.1991), than to the intentional interference with contractual relationship claims that had been addressed in *Dow Chem. Co. v. Exxon Corp.,* 139 F.3d 1470 (Fed.Cir.1998). The court also noted that "the wrong alleged and for which state tort damages [are] sought [is] no more than bad faith misconduct before the PTO," and found that the counterclaims, as pled by Samsung, "occup[ied] a field identical in scope with the inequitable conduct defense." *Semiconductor Energy,* 204 F.3d at 1382. Therefore, the court concluded that there was no distinction between the required elements of proof for a state law RICO claim and the defense of inequitable conduct under federal law. Accordingly, the court ultimately found that, "[a] ... state cause of action predicated so squarely on the acts of inequitable conduct would be 'contrary to Congress' preemptive regulation in the area of patent law.' "

2007 WL 5297755

Thus, *Semiconductor Energy* stands for the proposition that, in the context of an antitrust action, where there is no fundamental difference between the required elements of proof in a state law-based claim and claims or defenses arising under federal patent law, the state law-based claims will be found to be preempted by federal law.

### ii. *Dow*

In defense of their position that the IP Plaintiffs have standing to pursue *Walker Process* and "sham litigation" claims against the Defendants, Plaintiffs rely, in part, on a decision from the Federal Circuit in *Dow Chem. Co. v. Exxon Corp.,* 139 F.3d 1470 (Fed.Cir.1998) ("Dow"). In *Dow,* plaintiff-appellant, the Dow Chemical Company ("Dow Chemical"), appealed from the judgment of a district court which, *inter alia,* dismissed Dow Chemical's state law unfair competition claim against defendant, Exxon Corporation ("Exxon"), the holder of a patent for wire and cable devices manufactured with a particular insulating polymer. *Dow,* 139 F.3d at 1471. In the underlying action, Dow Chemical had filed a two-count complaint against Exxon seeking a declaratory judgment of non-infringement or, alternatively, invalidity and unenforceability (Count I) and for unfair competition, under state law, based on Exxon's alleged threats to customers of Dow Chemical for alleged infringement of Exxon's patent (Count II). *Id.* at 1472. As a result of certain developments in the case, the district court ultimately dismissed both Counts I and II of the complaint. Dow Chemical appealed, alleging that the district court should have decided its state law unfair competition claim and that the court erred in dismissing the claim because it implicated the issue of inequitable conduct. Exxon cross-appealed.

**\*21** Upon review, the Federal Circuit framed the issue this way: "whether state courts, or federal courts adjudicating state law claims, may hear a state law tort claim for intentional interference with ... contractual relations that implicates the patent law issue of inequitable conduct or, alternatively, whether such a claim is preempted by federal patent law." *Id.* at 1473. Having framed the issue, the court found that, "provided the state law cause of action includes additional elements not found in the federal patent law cause of action and is not an impermissible attempt to offer patent-like protection to [a] subject matter addressed by federal law," such a claim would not be preempted. *Id.* The court's finding was based, in part, on its analysis of Supreme Court

precedent and its conclusion that the state cause of action at issue did not "present an 'obstacle' to the execution and accomplishment of the patent laws." *Id.* at 1475. In addition, the court concluded that the intent of the particular cause of action was to address an issue that was "traditionally [in] the domain of state law" (*i.e.,* ensuring the integrity of commercial contracts) and that the cause did not seek "to offer patent-like protection to intellectual property...." *Dow,* at 1475. Moreover, the court added that, "a tort claim for intentional interference with contractual relations requires elements *entirely different* from those required for inequitable conduct before the PTO." *Id.* at 1477 (emphasis added). Thus, based on its review of the facts and law, the court was convinced that a state law tort claim of intentional interference with contractual relations was a different animal than a state law claim relying upon proof of inequitable conduct and, therefore, concluded that the lower court's judgment should be reversed. "[B]ecause it requires entirely different elements to establish a prima facie state tort action for intentional interference with contractual relations, it plainly is not a preempted alternative or additional state law remedy for inequitable conduct," *see Dow,* at 1477, therefore, "we must reverse the judgment of the district court." *Id.* at 1479.

Thus, in contrast to *Semiconductor Energy, Dow* holds that a state law claim that implicates issues of patent law, is not preempted where the elements of proof underlying the claim do not rely, in their entirety, on issues of patent law.

### iii. *Exzec*

Plaintiffs also rely on the Federal Circuit's decision in *Zenith Elect. Corp. v. Exzec, Inc.,* 182 F.3d 1340 (Fed.Cir.1999) ("Exzec" ) to support their argument that the IP Plaintiffs "monopolization claims are not patent claims, do not conflict with patent law, and are not preempted." (IP Plfs. Ans. Br. at 6.)

In *Exzec,* plaintiff-appellants, Zenith Electronics Corp. ("Zenith"), the assignee of a patent for touch panel systems for computers, and Elo Touch, the licensee of Zenith's patent, sued Exzec, alleging that Exzec's competing touch panel system infringed Zenith's patent. *Exzec,* 182 F.3d at 1343. Exzec, in turn, filed two counterclaims, both for unfair competition, one arising under federal law [22] and the other arising under Illinois

common law. In support of these claims, Exzec alleged that Elo Touch knew that Exzec's touch panels utilized a different technology than the patented touch panels and, therefore, did not infringe Zenith's patent. Exzec further alleged that, despite this knowledge, Elo Touch "falsely stated" to Exzec's customers that Exzec had infringed the Zenith patent and was incapable of producing a non-infringing touch panel. *Id.* Elo Touch moved to dismiss Exzec's counterclaims. The district court found that Exzec had pleaded viable claims in both cases, and denied the motion to dismiss. In particular, with respect to the state law claim, the district court found that dismissal was inappropriate because defendant had "sufficiently alleged" that Elo Touch had "acted in bad faith" and, as such, the defense of "privilege" was not available to Elo Touch. *Id.* at 1344. Elo Touch subsequently filed a motion for reconsideration, which was denied. Elo Touch then petitioned for permission to appeal and the Federal Circuit granted the petition.

**\*22** On appeal, the Federal Circuit undertook an analysis of the substance of Exzec's state law-based unfair competition claims in light of certain recent Federal Circuit precedent, Citing *Dow,* the court noted that it had previously held that tortious interference with contractual relations claims were not preempted by federal patent law "because the claims involved allegations of bad faith marketplace conduct by the patentee." *Id.* at 1355. The court added that, although the claim in *Dow* involved inequitable conduct, where a patent holder "knowingly makes baseless infringement assertions against a competitor's customers" the patent holder may be subject to liability, *Exzec,* 182 at 1355. Further, citing *Hunter Douglas v. Harmonic Design, Inc.,* 153 F.3d 1318 (Fed.Cir.1998) ("*Hunter Douglas*" ), the court noted that it had concluded that state tort claims that were based on publicizing a patent, were not preempted by federal patent law "if the claimant can show that the patent holder acted in bad faith in its publication of a patent." *Id.* Thus, the court distilled *Hunter Douglas* to mean that "to avoid patent law preemption of ... state tort law claims, bad faith must be alleged and ultimately proven, even if bad faith is not otherwise an element of the tort claim." *Id.* Based on its understanding of this case law, the court found that "bad faith [was] a prerequisite to Exzec's state-law tortious interference claim [and, that] without it, the claim was preempted by patent law."

Thus, *Exzec* construed *Dow* and like cases to permit exceptions to automatic patent preemption where a party brings state law-based claims which rely upon facts implicating issues of patent law, provided that acts of "bad faith" conduct in the marketplace are alleged and, ultimately, proven,

### b. *Other decisions*

#### i. *Cipro*

*In re Ciprofloxacin Hydrochloride Antitrust Litig.,* 363 F.Supp.2d 514 (E.D.N.Y.2005) ("*Cipro*" ), was a multi-district litigation in which plaintiffs, direct and indirect purchasers of the drug ciprofloxacin hydrochloride, brought an action against the brand-name manufacturer of the drug and prospective generic manufacturers, alleging that defendants had illegally agreed to restrain trade in the relevant market in violation of Section 1 of the Sherman Act. Initially, plaintiffs moved to have certain agreements between the defendants declared *per se* unlawful under Section 1 of the Sherman Act. These motions were denied by the court, Following that denial, the indirect plaintiffs amended their complaint to add a new count (Count V) alleging *Walker Process* and "sham litigation" claims. The substance of these claims was that Defendant Bayer had made certain misrepresentations to the PTO in order to obtain its patent for ciprofloxacin hydrochloride and then, knowing that the patent was invalid, enforced the patent against its competitors, *Cipro,* at 542–43, Bayer subsequently moved to dismiss Count V on two bases: (1) that the indirect plaintiffs' state law-based *Walker Process* claims were preempted by federal law; and (2) that they were barred by the applicable statute of limitations. *Id.* at 543.

**\*23** In analyzing Bayer's motion to dismiss, the court noted that "[o]rdinarily, antitrust claims premised on the enforcement of a fraudulently procured patent are brought by an accused infringer as a counterclaim to the original charge of infringement." *Id.* at 543. The court found the indirect purchasers' *Walker Process* and "sham litigation" claims to be "unusual" because "they [were] brought by indirect purchasers of the patented item and because they [were] asserted under state law." *Id.* at 543. Upon review of the indirect plaintiffs' *Walker Process* and "sham litigation" claims, the court concluded that the claims, although allegedly based on state law, actually rested entirely upon federal patent law because if the plaintiffs were unable to demonstrate

that Bayer intentionally withheld information from or misrepresented material aspects of the product to the PTO, their *Walker Process* and "sham litigation" claims could not survive. "There is simply no theory for proving a *Walker Process* antitrust violation in this case that would not require a showing of misconduct before the PTO." *Id.* Based on its factual finding that the indirect plaintiffs' claims were dependent on a showing of misconduct before the PTO, the court ultimately concluded, *inter alia,* that the indirect plaintiffs' state antitrust claims were preempted by federal law. *Id.* at 544. As a result, the court also concluded that those claims should be dismissed, "Whatever the reasons for indirect plaintiffs bringing *Walker Process* and sham litigation claims under state law, those claims are preempted by federal patent law and must, therefore, be dismissed." *Id.* at 543.

Therefore, *Cipro* holds that in circumstances where a party brings *Walker Process* or "sham litigation" claims based on state antitrust law, but those claims are ultimately dependent upon proof of a violation of federal patent law, those claims are automatically preempted by federal law and, as a result, are subject to dismissal.

#### c. *IP Plaintiffs' claims are preempted*
As discussed in detail above, I have concluded that the IP Plaintiffs lacked standing to bring *Walker Process* claims against the Defendants and those claims should be dismissed. However, assuming, as did the court in *Asahi Glass,* that my analysis of that issue is incorrect, *see Asahi Glass,* 289 F.Supp .2d at 991, I further conclude that Plaintiffs' *Walker Process* and "sham litigation" claims are subject to dismissal because they are preempted by federal patent law.

I reach this conclusion based on the determination that, as with my resolution of the issue of standing, the Defendants also have the more persuasive argument on the question of preemption. Having given due consideration to *Semiconductor Energy, Dow, Exzec,* and *Cipro,* I conclude, in light of the circumstances of this case, that the "better" and more persuasive reasoning may be found in *Semiconductor Energy* and *Cipro.*

**\*24** In *Semiconductor Energy,* the Federal Circuit found Samsung's New Jersey RICO counterclaims were preempted because "the wrong alleged and for which state tort damages [were] sought [was] no more than bad faith misconduct before the PTO." *Semiconductor Energy,* 204 F.3d at 1382. In so finding, the *Semiconductor Energy* court specifically distinguished *Dow* on the grounds that, in *Dow,* not only did the state cause of action contain elements of proof that were not elements of the defense of "inequitable conduct," but that "the state tort *as applied* was not an impermissible attempt to offer patent-like protection." *Id.* (emphasis added). In this case, the IP Plaintiffs purport to bring claims pursuant to twenty-four states' respective antitrust and/or consumer protection laws. Although these respective statutes do not contain identical language or identical elements of proof, they all suffer from the same defect; *i.e.,* they fundamentally rely upon evidence of fraud or "inequitable conduct" before the PTO, or evidence derivative of those actions to satisfy their respective elements of proof.[23] Stated another way, these state statutes, as the IP Plaintiffs would have this Court *apply* them, would, in fact, constitute an "impermissible attempt to offer patent-like protection."[24]

In this regard, I take note of Count III of the Amended Complaint and, in particular, the IP Plaintiffs' allegation that "Schering's #743 Patent was obtained through material, intentional misrepresentations and material, intentional omissions in Schering's communications with the PTO...." *See* Amd. Complt. ¶ 215. In making this claim, the IP Plaintiffs draw upon allegations made earlier in the Amended Complaint that specifically relate to Schering's alleged unlawful conduct in obtaining the #743 patent through fraud on the PTO. *See* Amd. Complt. ¶¶ 62–122. Thus, in this case, just as in *Semiconductor Energy,* it is apparent that "the wrong[s] alleged and for which and for which state law ... damages [are] sought [is] no more than bad faith misconduct before the PTO." This conclusion is ultimately fatal to Count III, because, as presently pled, Count III ends up "occupy[ing] a field identical in scope" to issues already reserved to and adequately addressed by federal patent law. Therefore, on this basis alone, the *Walker Process* and "sham litigation" claims contained in Count III and other Counts of the Amended Complaint are preempted by federal law. *See Semiconductor Energy,* 204 F.3d at 1382 ("[a] ... state cause of action predicated so squarely on the acts of inequitable conduct would be 'contrary to Congress' preemptive regulation in the area of patent law' ") (citing *Abbott Labs. v. Brennan,* 952 F.2d 1346, 1357 (Fed.Cir.1991)).

Even if reasonable people could disagree about the extent to which IP Plaintiffs' state law antitrust claims rely

upon conduct before the PTO, evidence of marketplace conduct, as Defendants have argued (*see* Hrg. Tr. at 24–25), is sorely lacking. As the parties are already aware, evidence of marketplace conduct can revive a claim otherwise subject to preemption under federal patent law. *See e.g., Semiconductor Energy,* at 1382. As construed by the Federal Circuit in *Dow* and reaffirmed in *Semiconductor Energy,* "marketplace conduct" is intentional conduct having a direct impact upon non-competitors (i.e., customers). *See Dow,* 139 F.3d at 1477; *Semiconductor Energy,* at 1382. *See also Exzec,* 182 F.3d at 1340 ("While the tortious interference claims in *Dow Chemical* involved inequitable conduct, we also noted that a holder of a valid and enforceable patent who knowingly makes baseless infringement assertions against a competitor's customers may also be subject to ... liability"); *Hunter Douglas,* 153 F.3d at 1334 (Fed.Cir.1998) ("The state law remedies in *Dow Chemical* were directed to allegedly tortious conduct in the marketplace"); *Cipro,* 363 F.Supp.2d at 544–45 ("The marketplace conduct in *Dow* was Exxon's threats to *Dow's* customers, not activity that occurred before the PTO or in the context of a litigation").

**\*25** Thus, what plainly distinguishes the claims in this case from those in *Dow,* and like cases, is the absence of any legally cognizable allegations of "marketplace conduct." *See Exzec,* 182 F.3d at 1355 (affirming lower court denial of motion to dismiss counterclaims where patent licensee was alleged to have acted in "bad faith" by making false representations to competitor's customers); *Dow,* 139 F.3d at 1477 (reversing lower court judgment dismissing state law unfair competition claim where complaint alleged threats made by patent holder to sue competitor's customers for patent infringement). By comparison, in cases where claims have been found preempted, allegations (or evidence) of "marketplace conduct" have been noticeably absent. *See Semiconductor Energy,* 204 F.3d at 1382 ("[T]he wrong alleged and for which and for which state law tort damages [are] sought [is] no more than bad faith misconduct before the PTO"); *Cipro,* 363 F.Supp.2d at 545 ("Indirect plaintiffs' Count V does not allege any malfeasance in the marketplace such as threats to Barr or its customers, but instead rests entirely upon actions that occurred before the PTO"); *Cardio Vention, Inc. v. Medtronic, Inc.,* 430 F.Supp.2d 933, 941 (D.Minn.2006) ("Accordingly, federal patent law preempts [plaintiff's] Count III claim, because the claim does not allege any actionable conduct except conduct

before the PTO. As the allegations are coextensive with patent law, they are preempted by patent law"). In light of the allegations contained in the Amended Complaint, the IP Plaintiffs' *Walker Process* and "sham litigation" claims clearly belong with this latter group of cases.

Therefore, even assuming, *arguendo,* that the IP Plaintiffs had standing to bring their *Walker Process* claims, I find that these same *Walker Process* and "sham litigation" claims, as asserted in Count III and, either explicitly or by reference, in other Counts of the Amended Complaint, are preempted by federal patent law because they rely, either directly or derivatively, upon allegedly fraudulent or inequitable conduct before the PTO to substantiate those claims.

#### d. *Direct Purchaser Plaintiffs' opposition to the Defendants' Motions to Dismiss*

Although the pending motions to dismiss do not address the DP Plaintiffs' claims, the DP Plaintiffs have raised several arguments in opposition to the pending motions which must be considered.

On October 23, 2006, Mr. Pearlman filed the Direct Purchaser Plaintiffs' Memorandum In Opposition to Defendants Schering–Plough, Wyeth, and ESI Lederle's Applications to Special Master to Dismiss Portions of the Indirect Purchaser Plaintiffs' Amended Consolidated Class Action Complaint (the "DP Plaintiffs' Answering Brief"). In that Answering Brief, the DP Plaintiffs essentially took the position that "overcharged purchasers" have standing to assert *Walker Process* claims. At the oral argument at the January 24, 2007 hearing before me, Mr. Sorenson (incorrectly identified in the transcript as Mr. Lieverman), speaking on behalf of the DP Plaintiffs, presented oral argument on the Motions to Dismiss, limiting himself to two minutes, *See* Transcript of January 24, 2007 Oral Argument at 78– 79. Thereafter, on January 26, 2007, I received a letter from Mr. Refsin, submitted on behalf of the DP Plaintiffs. Mr. Refsin's January 26, 2007 letter indicated that he was writing because my ruling on the pending Motions to Dismiss "could affect the DP Plaintiffs' pending challenge to the exclusionary payments made by Schering even though we do not have *Walker Process* claims and were not afforded an opportunity to participate fully in Wednesday's argument." (Refsin Letter, at 1.)

**\*26** Although Mr. Refsin was present at the oral argument on January 24, 2007, he did not at that time request an opportunity to be heard. While I was somewhat surprised by Mr. Refsin's letter stating that the DP Plaintiffs "were not afforded an opportunity to participate fully in Wednesday's argument," particularly in light of Mr. Pearlman's Answering Brief filed on October 23, 2006, and Mr. Sorenson's presentation at the oral argument on January 24, 2007, I overruled the Defendants' objections to the submission of Mr. Refsin's letter and agreed to consider it. I also gave the Defendants an opportunity to reply to Mr. Refsin's letter of January 26, 2007, which they did in a February 1, 2007 letter from Mr. Nields, addressed to me. I have now considered Mr. Pearlman's Answering Brief, filed October 23, 2006, Mr. Refsin's letter of January 26, 2007, and Mr. Nields' letter of February 1, 2007 in response.

In Mr. Refsin's letter of January 26, 2007, the DP Plaintiffs contend that if this Court were to adopt Defendants' argument that patent policy dictates that purchasers not be afforded standing to assert antitrust claims involving a challenge to the validity of a patent, "a glaring gap" would be created in the protections provided by the antitrust laws. (Refsin Letter, at 1.)

Mr. Refsin also noted in his letter that "... in ruling on Defendants' motion to dismiss the Indirect Plaintiffs' Walker Process claims, we ask the Court to consider the effect that its ruling may have on the pending challenges to the exclusionary payments that Schering made to settle the underlying patent litigation." (*Id.* at 3.)

In his letter of February 1, 2007 in response to Mr. Refsin's letter, Mr. Nields pointed out: "Schering does not contest a purchaser's standing to bring a claim challenging the lawfulness of settlements based on an allegation of improper payments." Mr. Nields goes on to note:

> What we contest is a purchaser's standing to bring a *Walker Process* and sham litigation claims based solely on patent issues. The cases hold that purchasers lack standing to bring such claims. And a contrary rule would lead to the absurd result that purchasers could re-litigate patent issues that

were compromised in a perfectly lawful settlement.

(Nields Letter, at 1.)

The record is clear that the pending motions filed by Defendants to dismiss portions of the Indirect Purchaser Plaintiffs' Amended Consolidated Class Action Complaint relate solely to the question of whether the IP Plaintiffs have standing to assert *Walker Process* and sham litigation claims. Given the narrow issue that I must decide, I express no view on the DP Plaintiffs' "pending challenges to the exclusionary payments that Schering made to settle the underlying patent litigation" and expressly limit my holding to the precise issues raised by Defendants' motions to dismiss portions of the Indirect Purchaser Plaintiffs' Amended Consolidated Class Action Complaint. I express no view as to the merits of the claims asserted by the DP Plaintiffs, or the defenses which Defendants may advance to defeat those claims.

## III. *CONCLUSION*

**\*27** For the reasons set forth above, I conclude that the respective Applications of Defendants Schering–Plough Corporation, Key Pharmaceuticals, Inc., Upsher–Smith Laboratories, Inc., Wyeth and ESI Lederle to dismiss certain claims contained in the Indirect Purchaser Plaintiffs' Amended Consolidated Class Action Complaint should be granted. Accordingly, Count III of the Indirect Purchaser Plaintiffs' Amended Consolidated Class Action Complaint is dismissed with prejudice. To the extent that other Counts of the Indirect Purchaser Plaintiffs' Amended Consolidated Class Action Complaint incorporate and/or allege, either explicitly or by reference, the claims contained in Count III, those claims are also dismissed with prejudice.

**As provided in the Order entered by Magistrate Judge Arleo in this matter, the Special Master's decision on any motion can be appealed to Judge Greenaway in the manner, and subject to the standards of review set forth in Rule 53 of the Federal Rules of Civil Procedure and applicable Local Rules.**

In re Dur Antitrust Litigation, Not Reported in F.Supp.2d (2007)

2007 WL 5297755

### ORDER

The Special Master having considered the Applications of Defendants Schering–Plough Corporation, Key Pharmaceuticals, Inc., Upsher–Smith Laboratories, Inc., Wyeth and ESI Lederle to Dismiss Certain Claims Contained in the Indirect Purchaser Plaintiffs' Amended Consolidated Class Action Complaint, the briefs filed by all parties in support of and in opposition to the Applications, as well as the oral argument of counsel, for the reasons set forth in the foregoing Report and Recommendations;

**IT IS HEREBY ORDERED,** this 1st day of March, 2007, that:

(1) the Defendants' respective Applications are **GRANTED;** and,

(2) Pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, Count III of the Indirect Purchaser Plaintiffs' Amended Consolidated Class Action Complaint, and any other portion of the Amended Complaint which purports to state a *Walker Process* or sham litigation claim that is not dependent on the legality of the settlement agreements challenged in the initial Complaint, are **DISMISSED** with prejudice.

**All Citations**

Not Reported in F.Supp.2d, 2007 WL 5297755

Footnotes

1   **(a) Appointment.**
    **(1)** Unless a statute provides otherwise, a court may appoint a master only to:
    **(A)** perform duties consented to by the parties;
    * * *
    **(C)** address pretrial and post-trial matters that cannot be addressed effectively and timely by an available district judge or magistrate judge of the district.

2   This reference to the Indirect Purchaser Plaintiffs as "Plaintiffs" is limited to the discussion contained in this section of the Report. Subsequent references to "Plaintiffs," that is, as contained in the "Analysis" section of this Report, is intended to refer to the Indirect Purchaser Plaintiffs and the Direct Purchaser Plaintiffs collectively.

3   References to Schering's Memorandum in Support of its Application to the Special Master to Dismiss Certain Claims in the Indirect Purchasers' Amended Consolidated Class Action Complaint shall be cited as "Schering Op. Br. at ___."

4   Schering has also objected to Count III of the Indirect Purchasers Plaintiffs' Amended Complaint on the basis that no states recognize *Walker Process* claims under state law, that the instant *Walker Process* claims are barred by the applicable statutes of limitation and that the IP Plaintiffs do not allege injury prior to the date that generic entry occurred. I have given due consideration to these additional arguments. However, as discussed in more detail below, because I have resolved the instant motions to dismiss based on the litigants' respective standing and preemption arguments, I find that it is unnecessary to address the substance of these remaining arguments for purposes of this Report and Recommendations.

5   References to Wyeth and ESI Lederle's Memorandum in Support of their Application to Special Master to Dismiss Portions of the Amended Consolidated Class Action Complaint on behalf of Indirect Purchaser Plaintiffs shall be cited as "ESI Op. Br. at ___."

6   ESI also argues that the IP Plaintiffs' claims for damages beginning in 1989 should be dismissed and that the claims should be limited to a period beginning in March 2002. ESI also incorporated certain sections of Schering and Upsher's respective memoranda in support of their motions to dismiss. I have given due consideration to these additional arguments. However, as discussed in more detail below, because I have resolved the instant motions to dismiss based on the litigants' respective standing and preemption arguments, I find that it is unnecessary to address the substance of these arguments for purposes of this Report and Recommendations.

7   References to the opening brief in support of Upsher–Smith's Application to the Special Master to Dismiss Certain Claims in the Indirect Purchasers' Amended Consolidated Class Action Complaint shall be cited as "Upsher Op. Br. at ___."

8   This instant reference to the Indirect Purchaser Plaintiffs as "Plaintiffs" is limited to the discussion contained in this section of the Report. Subsequent references to "Plaintiffs," that is, as contained in the "Analysis" section of this Report, is intended to refer to the Indirect Purchaser Plaintiffs and the Direct Purchaser Plaintiffs collectively.

9   The term "Defendants" as used here is consistent with the IP Plaintiffs' use of that terra in their Reply Brief, which is understood to apply to all of the defendants in this action (i.e., Schering, Key, Upsher, Wyeth and ESI Lederle),

In re K-Dur Antitrust Litigation, Not Reported in F.Supp.2d (2007)

2007 WL 5297755

10    References to the Indirect Purchasers' Memorandum in Opposition to Defendants' Motion to Dismiss shall be cited as "IP Plfs. Ans. Br. at ___."

11    Like Schering and ESI, the Indirect Purchasers have made additional arguments in opposition to the motions to dismiss. In particular, they have argued that the subject claims are not time barred, that the length of the damages period has no bearing on the motions to dismiss and that ESI's argument that it cannot be liable for pre-joinder injuries is incorrect. I have given due consideration to these additional arguments. However, as discussed in more detail below, because I have resolved the instant motions to dismiss based on the litigants' respective standing and preemption arguments, I find that it is unnecessary to address the substance of these remaining arguments for purposes of this Report and Recommendations.

12    References to the Direct Purchaser Plaintiffs' Memorandum in Opposition to Defendant Schering–Plough, Wyeth and ESI Lederle's Applications to Special Master to Dismiss Portions of the Indirect Purchaser Plaintiffs' Amended Consolidated Class Action Complaint shall be cited as "DP Plfs. Ans. Br. at ___."

13    References to Schering's Reply Memorandum in Support of its Application to the Special Master to Dismiss Certain Claims in the Indirect Purchasers' Amended Consolidated Class Action Complaint shall be cited as "Schering Reply Br. at ___."

14    As noted above, Schering has sought dismissal of these claims on grounds not discussed in the above summary, However, because I have resolved the pending motions to dismiss based on the litigants' respective standing and preemption arguments, I find that it is unnecessary to address the substance of these remaining arguments for purposes of this Report and Recommendations.

15    References to Wyeth's and ESI Lederle's Reply Brief in Support of their Application to the Special Master to Dismiss Portions of the Amended Consolidated Class Action Complaint on behalf of Indirect Purchaser Plaintiffs shall be cited as "Schering Reply Br. at ___."

16    Like Schering, ESI has also sought dismissal of these claims on grounds not discussed in the above summary. However, because I have resolved the instant motions to dismiss based on the litigants' respective standing and preemption arguments, I find that it is unnecessary to address the substance of these remaining arguments for purposes of this Report and Recommendations.

17    References to Upsher–Smith's Reply in Support of its Application to the Special Master to Dismiss Certain Claims in the Indirect Purchasers' Amended Consolidated Class Action Complaint shall be cited as "Upsher Op. Br. at ___."

18    The use of the term "Defendants" in this section of this Report refers to all of the named defendants in this action (i.e., Schering–Plough Corporation, Key Pharmaceuticals, Inc., Upsher–Smith Laboratories, Inc., Wyeth and ESI Lederle).

19    The *Remeron* court also dismissed, without significant comment, plaintiffs' "sham litigation" claim.

20    That active ingredient was amorphous paroxetine hydrochloride.

21    *See Asahi,* 289 F.Supp. at 990 (noting that because supplier of active ingredient contained in an allegedly infringing product was not "under a serious, palpable, foreseeable, imminent threat of being sued" by the patent holder, they lacked standing to obtain a judicial declaration of invalidity); *see also Aventis Enviro, Science U.S.A. v. Scotts Co.,* 383 F.Supp.2d 488, 496 (S.D.N.Y.2005) ("It is equally well-established that mere suppliers of products to the targets of antitrust violations do not have standing to assert antitrust claims").

22    That particular claim was brought under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

23    For example, in order to state a claim under the New Jersey Consumer Fraud Act, a party must prove the following three elements: "1) unlawful conduct by the defendants; 2) an ascertainable loss on the part of the plaintiff; 3) a casual relationship between the defendants' unlawful conduct and the plaintiff's ascertainable loss." *N.J. Citizen Action v. Schering–Plough Corp.,* 2002 WL 32344594, at *2 (N.J.Super.L. May 12, 2002). Further, in order to state a monopolization claim under the New Jersey Antitrust Act, a party must prove the following four elements: "1) relevant geographic and product market; 2) high probability of success of monopolization, 3) specific intent, and 4) conduct to further an attempt to monopolize." *D'Arrigo v. South Jersey Hosp.,* 2006 WL 2795337, at *11 (N.J.Super.L. Aug, 25, 2006). By comparison, "[i]n order to state a claim for abuse of process, the moving party must show: (1) an ulterior motive and (2) some further act after an issuance of process representing the perversion of the legitimate use of the process." *Falzo v. County of Essex,* 2005 WL 2129927, at *4 (D.N.J. Aug.31, 2005) (citation omitted), Although the elements of these respective claims are different, the means of proof is effectively the same because the "issue[s] at bar relate [ ] directly to administrative proceedings before the PTO ...," *see Abbott Labs. v. Brennan,* 952 F.2d 1346, 1356 (Fed.Cir., 1991) or are derivative of administrative proceedings before the PTO. Similarly, because the state law claims posed by the IP Plaintiffs in this matter relate directly to or are derivative of Schering's alleged fraudulent activities or "inequitable conduct" before the PTO, there is essentially no difference between the instant claims for relief and the claims brought in *Abbott Labs,* or *Semiconductor Energy,* as each set of claims ultimately challenges conduct before the PTO.

In re K-Dur Antitrust Litigation, Not Reported in F.Supp.2d (2007)

2007 WL 5297755

24   The "as applied" test is the proper test for evaluating state law claims. *See Hunter Douglas, Inc. v. Harmonic Design, Inc.,* 153 F.3d 1318, 1335 (Fed.Cir.1998) ("If a plaintiff bases its tort action on conduct that is protected or governed by federal patent law, then the plaintiff may not invoke the state law remedy, which must be preempted for conflict with federal patent law.... This approach, which considers whether a state tort, 'as-applied,' conflicts with federal patent law, is consistent with that employed by the Supreme Court in cases involving preemption of state unfair competition law").

---

**End of Document**                              © 2019 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT G

2017 WL 2868999, 2017-1 Trade Cases P 80,047

2017 WL 2868999
United States District Court,
N.D. Illinois, Eastern Division.

Tarek FARAG and Soona Farag, Plaintiffs,
v.
HEALTH CARE SERVICE CORPORATION, d/b/
a Blue Cross Blue Shield of Illinois and Novartis
Pharmaceuticals Corporation, Defendants.

Case No. 17 C 2547
|
Signed 07/05/2017

**Attorneys and Law Firms**

Tarek Farag, St. Charles, IL, pro se.

Soona Farag, St. Charles, IL, pro se.

Michael H. McColl, Foran, Glennon, Palandech Ponzi &
Rudloff PC, Jeffrey Mark Wagner, Kaye Scholer, Emily
Newhouse Dillingham, Arnold & Porter Kaye Scholer
LLP, Chicago, IL, Saul P. Morgenstern, Mark Godler,
Arnold & Porter Kaye Scholer LLP, New York, NY, for
Defendants.

**MEMORANDUM OPINION AND ORDER**

Harry D. Leinenweber, Judge

*\*1* Before the Court are Motions to Dismiss filed
by Defendant Novartis Pharmaceuticals Corporation
("Novartis") [ECF No. 16] and Defendant Health
Care Service Corporation d/b/a Blue Cross Blue
Shield of Illinois ("BCBSIL") [ECF No. 15]. For the
reasons to follow, the Court dismisses Plaintiffs' claims
against Novartis with prejudice under Rule 12(b)(1) or,
alternatively, under Rule 12(b)(6). Absent those federal
question claims, the Court declines to hear Plaintiffs' state
law claims against BCBSIL or rule on the latter's Motion.
Instead, the Court remands the balance of the case to
Kane County Circuit Court.

**I. BACKGROUND**

Plaintiffs Tarek and Soona Farag (referred to collectively
as "Plaintiffs" and individually as "Tarek" or "Soona")
have employer-sponsored health insurance coverage
through Defendant BCBSIL. (ECF No. 1 at Ex. 1
("Compl.") ¶ 1.) Tarek has high blood pressure, and
his doctors have tried many medications to treat his
condition. (Id. ¶ 4.) All have caused side effects with the
exception of the brand-name drug Diovan, manufactured
by Defendant Novartis, which Tarek's doctors "settled on
and prescribed for him long before January 2011." (Ibid.)
For a brief period "[a]round the beginning of 2013," Tarek
tried taking the generic form of Diovan (valsartan), but it
"caused him serious side effects." (Id. ¶ 5.) Unsurprisingly,
valsartan had a cheaper copay than Diovan, for which
Tarek paid $30.00 until around June 2013 (when BCBSIL
increased the copay for Diovan to $50.00). Plaintiffs allege
that the overall price of a one-month supply of Diovan was
about $207 during 2013, $270 during 2014, $310 during
2015, and about "$400 during 2017." (Id. ¶ 25.)

On April 11, 2015, Tarek's doctor prescribed him twice
his usual dose of Diovan. (Compl. ¶ 7.) At some point
thereafter, Tarek took medication for numbness in his
hands, which caused his blood pressure and heart rate
to collapse, leading his doctor to advise that Tarek stop
taking Diovan and only add it back into his medication
regimen as he recovered. (Id. ¶ 8.) On September 19,
2015, Tarek sought to refill his Diovan prescription and
expected to pay his usual $50 copay. However, BCBSIL
refused to cover it on the same terms it had previously
and instead requested "preauthorization" from Tarek's
doctor. (Id. ¶ 9.) Tarek's doctor completed the required
forms, but BCBSIL denied coverage because Tarek had
not taken Diovan "for more than 90 days." (Id. ¶ 10.)
As a result, BCBSIL required that Tarek pay $173.11
instead of $50.00. (Id. ¶ 11.) Despite placing several calls
to BCBSIL, Tarek was unable to get the company to
remedy the situation. (Id. ¶¶ 12-13, 15-17.) On these calls,
BCBSIL agents typically justified the denial of coverage
on the grounds that Diovan is considered "a Step Therapy
medication," requires preauthorization, is dispensed in
prescriptions that are valid only for one year, must be
taken "for the past 90 days to qualify for the copay of
$50," and must be precipitated by an attempt to take the
generic. (Id. ¶ 27.) Tarek continued taking Diovan and
paying the higher rate "with accumulated difference of
about $700." (Id. ¶ 14.)

2017 WL 2868999, 2017-1 Trade Cases P 80,047

**\*2** Proceeding *pro se*, Plaintiffs filed suit against BCBSIL on May 19, 2016 in Kane County Circuit Court. On May 24, 2016, Tarek "was in a very stressful situation due to the ongoing court case and the denial of his proper coverage, which caused his blood pressure to go high and fluctuate in a dangerous way that caused him symptoms of a stroke." (Compl. ¶ 19.) He was rushed to the hospital and, roughly $16,000 later, restored to good health. (*Ibid.*) The Kane County court dismissed the claims in Plaintiffs' original complaint without prejudice, and Plaintiffs then filed an Amended Complaint against BCBSIL on October 5, 2016. BCSBIL moved to dismiss the Amended Complaint, and the court obliged—dismissing two claims with prejudice and two claims without prejudice. On March 1, 2017, Plaintiffs amended again, this time adding Novartis as a defendant. This is the operative Complaint.

On the basis of federal question jurisdiction over patent and antitrust claims that Plaintiffs brought against Novartis, Defendants removed the Complaint to this Court on April 4, 2017. (ECF No. 1 ¶¶ 3-6.) Both Defendants now move to dismiss all counts.

## II. LEGAL STANDARD

When considering a motion to dismiss a complaint, the Court accepts the facts stated in the complaint as true and draws reasonable inferences in favor of the plaintiff. *Newell Operating Co. v. Int'l Union of United Auto., Aerospace, and Agr. Implement Workers of Am.,* 532 F.3d 583, 587 (7th Cir. 2008). A document filed *pro se* is to be liberally construed, and a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers. *Erickson v. Pardus,* 551 U.S. 89, 94 (2007).

Although the Federal Rules of Civil Procedure do not require a complaint to include "detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007) (internal citations omitted). To survive a Rule 12(b)(6) motion, "the complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Independent Trust Corp. v. Stewart Info. Servs. Corp.,* 665 F.3d 930, 934 (7th Cir. 2012) (internal quotation marks omitted).

The plausibility standard, while not akin to a probability requirement, "asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (citation omitted). Where a complaint pleads facts that are merely consistent with liability, it "stops short of the line between possibility and plausibility." *Id.* (internal quotation marks omitted).

Standing is an essential component of Article III's case-or-controversy requirement. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560 (1992). Rule 12(b)(1) allows a party to raise by motion a federal court's lack of subject-matter jurisdiction, including a lack of standing. *See, Ret. Police Ass'n v. City of Chicago,* 76 F.3d 856, 862 (7th Cir. 1996). The plaintiff then bears the burden of establishing jurisdiction with competent proof of jurisdictional facts. *Scanlan v. Eisenberg,* 669 F.3d 838, 841-42 (7th Cir. 2012).

## III. ANALYSIS

### A. Novartis

Against Novartis, Plaintiffs seek a judgment for at least $18,000, compensatory damages, punitive damages, costs and attorneys' fees. They do not seek injunctive relief. According to Plaintiffs, the inventors listed on Novartis' U.S. Patent No. 6,294,197 ("the '197 patent"), which covers a tablet form of valsartan "mixed with additives by compression," are not the same inventors that Novartis lauded for inventing Diovan, meaning that Novartis committed fraud on the United States Patent and Trademark Office ("the PTO") by listing the wrong inventors on the face of the '197 patent. (Compl. ¶ 30.) Plaintiffs further allege that, because the "generic drug for Diovan" caused Tarek "serious side effects" whereas Diovan did not, Novartis defrauded the PTO by seeking protection for a patent that (it knew) flunked the enablement requirement of 35 U.S.C. § 112(a). (*Id.* ¶¶ 5, 31.) Plaintiffs claim that—ostensibly through these actions and by emerging from the 1996 merger of "two giants Ciba-Geigy and Sandoz"—Novartis has wrongfully "kept others away from manufacturing or selling Diovan or its generic Valsartan" and "unlawfully monopolize[d] the market for Diovan," allowing it to charge higher prices for Diovan than generic drug manufacturers charge for valsartan. (*Id.* ¶¶ 30, 33.)

Farag v. Health Care Service Corporation, Not Reported in Fed. Supp. (2017)

2017 WL 2868999, 2017-1 Trade Cases P 80,047

**\*3** Without citing any provision of law authorizing their claims, Plaintiffs bring three counts against Novartis: "fraudulently claiming that Novartis' team is the inventors of Diovan," "fraudulently claiming that it has patent protection for Diovan and monopolizing it," and "violating the antitrust laws and abusing of [*sic*] monopoly power." (Compl. ¶¶ 30-32.) The Court finds these counts best characterized as a *Walker Process* claim based on fraudulent procurement of the '197 patent and its subsequent unlawful monopolization under Section 2 of the Sherman Act, 15 U.S.C. § 2, plus a claim under Section 7 of the Clayton Act, 15 U.S.C. § 18, challenging the merger that spawned Novartis as "obvious[ly] ... against the antitrust laws." (Compl. ¶ 33.) (To the extent Plaintiffs might be seeking relief under the Illinois Antitrust Act, 740 Ill. Comp. Stat. 10/3, it is preempted inasmuch as it relates to the *Walker Process* claim. Because there is "simply no theory for proving a *Walker Process* antitrust violation in this case that would not require a showing of misconduct before the PTO," "federal patent law preempts any state antitrust cause of action premised on [such] conduct before the PTO." *In re Ciprofloxacin Hydrochloride Antitrust Litig.,* 363 F.Supp.2d 514, 543 (E.D.N.Y. 2005); *see also, Semiconductor Energy Lab. Co., Ltd. v. Samsung Elec. Co., Ltd.,* 204 F.3d 1368, 1382 (Fed. Cir. 2000) (finding preemption where "the wrong alleged and for which state tort damages [were] sought [was] no more than bad faith misconduct before the PTO"); *accord, In re K-Dur Antitrust Litig.,* No. 01-1652, 2007 WL 5297755, at \*24-25 (D.N.J. Mar. 2, 2007).)

Novartis moves to dismiss Plaintiffs' counts against it both on Rule 12(b)(1) subject-matter jurisdiction and Rule 12(b)(6) plausibility grounds. Novartis maintains that the Court does not have jurisdiction to grant Plaintiffs their requested relief because neither Plaintiff has standing to challenge the validity or enforceability of the '197 patent—or any patent Novartis holds on Diovan. In the same vein, Novartis asserts that Plaintiffs lack antitrust standing and that their complaint fails to allege a plausible monopolization violation under federal or state antitrust law. Finally, Novartis contends that Plaintiffs' claim for damages is time-barred.

### 1. Declaratory Judgment of Invalidity or Unenforceability

Article III of the Constitution requires an actual "case" or "controversy" between litigating parties before a court may adjudicate a dispute. A party may bring an action under the Declaratory Judgment Act only if an "actual controversy" exists, "which is the same as an Article III case or controversy." *Arris Group, Inc. v. British Telecomms. PLC,* 639 F.3d 1368, 1373 (Fed. Cir. 2011) (citations omitted). The party seeking a declaratory judgment must show an Article III case or controversy at the time it filed for declaratory relief. *Id.* at 1373 (citing *King Pharm., Inc. v. Eon Labs., Inc.,* 616 F.3d 1267, 1282 (Fed. Cir. 2010)). When the underlying merits of the declaratory judgment action involve issues of conduct before the PTO, Federal Circuit law controls whether an actual controversy exists. *3M Co. v. Norton Co.,* 929 F.2d 670, 672 (Fed. Cir. 1991).

This Court must ask whether "the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *MedImmune, Inc. v. Genentech, Inc.,* 549 U.S. 118, 132 n.11 (2007). A proper dispute must "admit of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts." *Id.* at 127 (internal quotation marks omitted). "A mere adverse *economic* interest is insufficient to create declaratory judgment jurisdiction." *Arris,* 639 F.3d at 1374-75 (emphasis original).

**\*4** Plaintiffs' interest in having the '197 patent declared invalid or unenforceable is adverse to Novartis' interest only in a pure economic sense, and is thus far too attenuated to support jurisdiction under the Declaratory Judgment Act. At best, securing such a judgment would merely inhibit Novartis from excluding competitors, thus leading indirectly to a decrease in the price of Diovan for Tarek. Indeed, Federal Circuit law suggests that purchasers of goods covered by a patent who do not compete with the patentee and otherwise face no threat of an action for infringement "cannot challenge [the] patent's validity or enforceability through a declaratory judgment action." *Ritz Camera & Image, LLC v. SanDisk Corp.,* 700 F.3d 503, 506 (Fed. Cir. 2012).

The Court therefore dismisses Plaintiffs' claims to the extent they can be construed as a plea for a declaratory judgment that the '197 patent is invalid or unenforceable as a result of fraud on the PTO.

Farag v. Health Care Service Corporation, Not Reported in Fed. Supp. (2017)

2017 WL 2868999, 2017-1 Trade Cases P 80,047

### 2. Walker Process Antitrust Action

As the Court lacks subject-matter jurisdiction to issue a declaratory judgment, Plaintiffs' claims relying on Novartis' alleged misconduct before the PTO resemble antitrust claims under *Walker Process Equip., Inc. v. Food Machinery & Chemical Corp.,* 382 U.S. 172, 174 (1965) ("[T]he enforcement of a patent procured by fraud on the Patent Office may be violative of § 2 of the Sherman Act provided the other elements necessary to a § 2 case are present."). *Walker Process* allows a plaintiff to strip a patent holder of its exemption from the antitrust laws if its patent was procured by fraud. *Id.* at 177. (That a claimant may otherwise lack entitlement to a declaratory judgment remedy does not preclude *Walker Process* relief. *See, Ritz Camera,* 700 F.3d at 506.)

### a. Standing

The Court must first determine whether Plaintiffs have standing to bring a *Walker Process* claim, as each of their counts invokes Novartis' alleged fraudulent conduct in procuring the '197 patent. As a question ancillary to patent matters, antitrust standing turns on regional circuit law. *See, Shuffle Tech Int'l, LLC v. Scientific Games Corp.,* No. 15 C 3702, 2015 WL 5934834 at *9 (N.D. Ill. Oct. 12, 2015). The Seventh Circuit has not determined whether end users of patented products who did not purchase them from the patentee have standing to assert a *Walker Process* claim. Courts in the Second, Third, and Ninth Circuits have engaged the issue at some length and, even viewed in the light most favorable to Plaintiffs, they lack standing under those cases to pursue a *Walker Process* claim.

First, Novartis' patent is not "already tarnished" by a finding of inequitable conduct. *In re DDAVP Direct Purchaser Antitrust Litig.,* 585 F.3d 677, 691-92 (2d Cir. 2009) (conferring antitrust standing on purchaser plaintiffs to pursue *Walker Process* claim because the patents at issue were "already unenforceable due to inequitable conduct"). Rather, Plaintiffs are seeking to litigate the inequitable conduct issues in tandem with their *Walker Process* antitrust claim. Thus, Plaintiffs do not fall within *DDAVP*'s conferral of standing on *Walker Process* claimants suing on patents found previously to have been procured by fraud.

Nor are Plaintiffs direct purchasers of Diovan from Novartis. *See, e.g., Ritz Camera & Image, LLC v. SanDisk Corp.,* 772 F.Supp.2d 1100 (N.D. Cal. 2011) (finding that direct purchasers had standing to bring Sherman Act monopolization claim alleging that manufacturers of flash memory devices enforced fraudulently obtained patents), *aff'd, Ritz Camera,* 700 F.3d 503 (Fed. Cir. 2012); *Molecular Diag. Labs. v. Hoffman-LaRoche, Inc.,* 402 F.Supp.2d 276, 282 (D.D.C. 2005) ("[D]irect purchasers have standing to pursue *Walker Process* claims."). Rather, pharmaceutical companies like Novartis typically provide their manufactured drugs to wholesalers or distributors, who then furnish them to pharmacies, who in turn dispense them to patients like Tarek.

**\*5** Accordingly, Plaintiffs are *indirect* purchasers with respect to Novartis, and courts confronted with such situations decline to find *Walker Process* standing. *See, e.g., In re K-Dur Antitrust Litig.,* 2007 WL 5297755, at *18 ("If this Court were to conclude that *indirect* purchasers had standing to bring *Walker Process* claims, it would turn antitrust policy on its head, and extend antitrust standing to an extraordinary level[.]"); *In re Ciprofloxacin,* 363 F.Supp.2d at 542 (holding that non-infringing consumers of patented products complaining of supracompetitive prices have no cause of action to invalidate the patent). Nonetheless, the Federal Circuit in *Ritz Camera* made clear that *Walker Process* standing should be interpreted in light of regional circuit law on antitrust standing. *See, Ritz Camera,* 700 F.3d at 506-07. As such, the Court examines the question more closely in view of Seventh Circuit law that a private plaintiff, to have antitrust standing, must plausibly allege (1) that it suffered an antitrust injury and (2) that it is an acceptable plaintiff to pursue the alleged antitrust actions. *See, Gatt Commc'ns, Inc. v. PMC Asscs., LLC,* 711 F.3d 68, 76 (7th Cir. 2013).

### 1. Antitrust injury

Plaintiffs fail to allege a cognizable antitrust injury. First, the Complaint clearly states that at least one form of generic valsartan is available on the market. As such, to the extent Novartis has market power, it is not maintaining it by erecting (insurmountable) barriers to generic entry. Second, the gravamen of the Complaint is that Novartis has injured Plaintiffs by charging higher prices (to direct purchasers, indirectly leading to higher

2017 WL 2868999, 2017-1 Trade Cases P 80,047

copays) than generic manufacturers charge for generic valsartan. Standing alone, this is hardly revelatory and fails to clear the *Twombly* hurdle: A brand-name drug's higher prices are equally consistent (if not more so) with unilateral exercise of individual market power, which does not violate the antitrust laws. *See, Schor v. Abbott Labs.,* 457 F.3d 608, 610 (7th Cir. 2006) ("The price of Norvir cannot violate the Sherman Act: a patent holder is entitled to charge whatever the traffic will bear."); *accord, In re Brand Name Prescription Drugs Antitrust Litig.,* 186 F.3d 781, 786-87 (7th Cir. 1999).

Thus, Seventh Circuit law suggests that the harm Plaintiffs complain of is not a cognizable antitrust injury.

### 2. Acceptable plaintiff

The Court finds further that Plaintiffs are not a proper antitrust plaintiff to bring a *Walker Process* claim against Novartis. Although federal courts have devised a panoply of tests to determine whether an injured party is a proper antitrust plaintiff, two bear particular relevance for the analysis here.

First, *Illinois Brick Co. v. Illinois,* 431 U.S. 720 (1977), limits damages actions under Section 4 of the Clayton Act to direct purchasers. *Id.* at 735. As indirect purchasers (who purchased Diovan at pharmacies or through intermediary health plans), Plaintiffs have no cognizable Clayton Act damages claim based on charges that direct purchasers of Diovan may have passed on to them. (*See,* Section III.A.3.a.1, *infra.*)

Second, and more specific to Sherman Act claims, is the balancing test in *Associated Gen. Contractors of Calif., Inc. v. Calif. State Council of Carpenters,* 459 U.S. 519, 536-45 (1983). There, the Supreme Court crafted a multi-factor "direct injury" barometer of whether the plaintiff is a proper party to bring a private antitrust action. These factors are (1) the causal connection between the violation and the harm; (2) the presence of improper motive; (3) the type of injury and whether it was one Congress sought to redress; (4) the directness of the injury; (5) the speculative nature of damages; and (6) the risk of duplicate recovery and complex damage apportionment. *Loeb Indus., Inc. v. Sumitomo Corp.,* 306 F.3d 469, 484 (7th Cir. 2002) (citing *Associated Gen.,* 459 U.S. at 537-45).

**\*6** As applied to Plaintiffs' Complaint, too many of these factors are left wanting. Plaintiffs do allege in the barest terms possible an improper motive on the part of Novartis with respect to conduct before the PTO, but their allegation of its improper motive ("greed") in charging higher prices for Diovan than generic manufacturers charge for valsartan is of dubious sufficiency—particularly because greed is not an unlawful motive. *See, Schor,* 457 F.3d at 610. As mentioned previously, the causal connection is loose, the directness of the injury oblique. Further, the damages are speculative; Plaintiffs cannot with a straight face claim that brand-name drugs should cost the same as generics, meaning that "to obtain damages the plaintiffs would have to separate the price effects of [unlawful monopoly activity] from the price effects of the defendant['s] lawful market power." *Brand Name Prescription Drugs,* 186 F.3d at 786 (citing *Blue Cross & Blue Shield United of Wisc. v. Marshfield Clinic,* 152 F.3d 588, 593-94 (7th Cir. 1998)). There also seems a risk of duplicate recovery and complex damages apportionment, because more direct purchasers as well as insurance carriers pay a significant portion of any unlawfully supracompetitive prices that Novartis might be found to charge.

Working within this "direct injury" framework, recent Seventh Circuit cases have found that indirect purchasers lack antitrust standing. For example, where consumers of aluminum-containing products brought an antitrust action against aluminum manufacturers, the court held that such indirect purchasers were not participants in the aluminum market merely "by creating a demand for aluminum." *In re Aluminum Warehousing Antitrust Litig.,* 833 F.3d 151, 161-62 (7th Cir. 2016). Their injuries similarly were not a "necessary step" in carrying out the alleged anti-competitive conspiracy, but instead "down the distribution chain" and "purely incidental," as the alleged scheme would have been just as effective from the defendants' point of view if direct purchasers paid supracompetitive prices without passing that cost on to consumers. *Id.* at 162. The same is true in this case. Plaintiffs cannot claim to be participants in the Diovan market merely because Tarek, by having high blood pressure (and experiencing side effects from valsartan), creates demand for Diovan. Novartis did not need to injure indirect purchasers like Tarek for the alleged monopolization to work; all it requires is for Novartis' *direct* purchasers—namely, drug wholesalers or distributors—to pay monopoly prices, irrespective of

Farag v. Health Care Service Corporation, Not Reported in Fed. Supp. (2017)

2017 WL 2868999, 2017-1 Trade Cases P 80,047

whether they would pass that cost on to pharmacies, or pharmacies to ultimate consumers.

Even if they suffered a cognizable antitrust injury, Plaintiffs are unlikely under Seventh Circuit precedent to qualify as proper antitrust plaintiffs, as they have only an indirect nexus to the alleged monopoly.

\* \* \*

Although it appears to be a matter of first impression in this Circuit, the Court holds that *Walker Process* does not confer standing on a party whose only connection to the patentee is as an indirect purchaser of products covered by the patent. Novartis' Rule 12(b)(1) Motion is granted in relevant part.

### b. Fraud on the PTO

Even if Plaintiffs do have standing to bring their *Walker Process* count, their Complaint fails to state a claim on which relief can be granted. Showing fraud on the PTO under *Walker Process* requires evidence that: (1) the patent at issue was procured by knowing or willful fraud on the PTO; (2) the defendant was aware of the fraud when enforcing the patent; (3) the defendant clearly intended to deceive the examiner; (4) the patent would not have issued but for the misrepresentation or omission. *See, Nobelpharma AB v. Implant Innovations, Inc., 141 F.3d 1059, 1068-71 (Fed. Cir. 1998); accord, C.R. Bard, Inc. v. M3 Sys., Inc., 157 F.3d 1340, 1364 (Fed. Cir. 1998)*. To state a plausible claim under *Walker Process* that Novartis committed fraud on the PTO, Plaintiffs must therefore adequately allege these elements under Federal Circuit law. *See, Dippin' Dots, Inc. v. Mosey, 476 F.3d 1337, 1346 (Fed. Cir. 2007)* (citation omitted). In addition, because *Walker Process* claims are fraud claims, Plaintiffs must meet the heightened pleading requirements of Rule 9(b). *Medimmune, Inc. v. Genentech, Inc., 427 F.3d 958, 967 (Fed. Cir. 2005)* ("Like all fraud-based claims, *Walker Process* allegations are subject to the pleading requirements of Fed. R. Civ. P. 9(b)."), *rev'd and remanded on other grounds, 549 U.S. 118 (2007).*

**\*7** However, Plaintiffs utterly fail to identify any references or statements made to or withheld from the PTO that could plausibly meet the *Walker Process* elements—let alone Rule 9(b)'s required specificity. First,

Plaintiffs claim that the inventors of the '197 patent were incorrectly named based on an August 24, 2000 Novartis press release naming different individuals as the "inventor of Diovan(R) (valsartan) and his research team." (Compl. at Ex. A2.) Novartis maintains, however, that the much earlier U.S. Patent No. 5,399,578 ("the '578 patent") covers the valsartan *compound* and lists the same inventors referenced in the Novartis press release. Even Plaintiffs admit that the '197 patent does not cover the "invention" of valsartan or Diovan but, on the other hand, is directed to "solid oral dosage [of valsartan] formed by compression methods" (Compl. ¶ 32). Indeed, the '197 patent expressly discloses that "[t]he preparation of valsartan is described in U.S. patent specification No. 5,399,578." ('197 patent at 2:53-55.) (In ruling on a motion to dismiss for failure to state a claim, the Court may consider documents, like the '197 patent, that are referred to in the Complaint, as well as facts readily ascertainable from sources not subject to reasonable dispute, such as the '578 patent. *See, Williamson v. Curran, 714 F.3d 432, 436 (7th Cir. 2013); Ennenga v. Starns, 677 F.3d 766, 773 (7th Cir. 2012)*.) That the individuals identified in the Novartis press release as the inventors of Diovan/valsartan are not listed as inventors of the '197 patent gives rise to no reasonable inference in Plaintiffs' favor.

Second, Plaintiffs nod toward a patent issued to Hoffman-LaRoche, Inc., U.S. Patent No. 5,696,116 ("the '116 patent"), claiming that Novartis knew its press release was false because the '116 patent was the first to disclose valsartan as a compound to treat high blood pressure. The '116 patent application was filed on July 12, 1994, claimed a foreign priority date of July 15, 1993, and issued on December 9, 1997. (Compl. ¶ 20.) However, the '578 patent application disclosing the preparation of a valsartan compound was filed December 29, 1992, claimed a foreign priority date of February 19, 1990, and was issued March 21, 1995. To the extent the '116 patent is relevant to Plaintiffs' *Walker Process* fraud allegations at all, it offers no support for the allegation that Novartis knew its scientists were not the true inventors of Diovan and somehow committed fraud on the PTO in applying for the '197 patent.

Finally, based on side effects Tarek experienced while taking valsartan that he does not experience while taking Diovan, Plaintiffs allege that Novartis "knew that the patent protection for Diovan was invalid" for failure to meet the enablement requirement. Every patent

2017 WL 2868999, 2017-1 Trade Cases P 80,047

specification must "contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same." 35 U.S.C. § 112(a). Yet an individual's experiencing side effects when taking a generic drug but not the associated brand-name drug, standing alone, lends no plausibility to an enablement invalidity argument.

Even assuming that the valsartan Tarek took was manufactured precisely according to the '197 patent's disclosures—something Plaintiffs do not allege—there are far too many independent factors that could explain Tarek's side effects and are exceedingly more plausible than impugning the '197 patent's written description. For example, "the branded version may be produced under better quality control (the rationale for trademarks)" than the generic. Brand Name Prescription Drugs, 186 F.3d at 787. For another, varying absorption rates between the generic and the brand-name drug may account for differing side effects. See, e.g., IMS Health, Inc. v. Sorrell, 630 F.3d 263, 267-68 (2d Cir. 2010) ("Bioequivalent generic drugs are not necessarily identical to the brand name version, but are required to demonstrate an absorption rate between 80 and 125 percent of the brand-name drug. Variations in absorption rates among branded or generic drugs may cause different reactions, such as side effects."), aff'd, 564 U.S. 552 (2011). Regardless of whether valsartan side effects bear on the sufficiency of the '197 patent's written description, the first salient question for Walker Process purposes would be some knowledge on the part of Novartis concerning the '197 patent's shortcomings during its prosecution— something Plaintiffs do not even allege generally. Thus, the Complaint lacks plausible allegations that the '197 patent fails to meet the enablement requirement or that Novartis did anything unlawful at all in that respect.

*8 Plaintiffs fail to allege any of the required substantive elements of fraud on the PTO—to say nothing of Rule 9(b)'s requirement that these allegations be pled with specificity. Absent any other basis for their claim that Novartis made fraudulent statements to the PTO regarding the '197 patent, the Complaint does not implicate any of the required Walker Process elements. Plaintiffs' fraud counts against Novartis thus flunk the plausibility standard, and the Court grants Novartis's Rule 12(b)(6) Motion in relevant part.

### c. Time-Barred Recovery

As a final basis for dismissal, the Court finds that Plaintiffs' Walker Process claim is barred by the statute of limitations. Generally, a federal antitrust claim that accrues more than four years prior to a plaintiff's suit is time-barred. Zenith Radio Corp. v. Hazeltine Research, Inc., 401 U.S. 321, 338 (1971). While the four-year statute of limitations generally begins running when the allegedly fraudulently procured patent issued, see, Brunswick Corp. v. Riegel Textile Corp., 752 F.2d 261, 268 (7th Cir. 1984), the situation may well be different where a purchaser plaintiff who is not a business competitor of the defendant merely claims to have paid supracompetitive prices for a product covered by the patent. See, e.g., In re: Evanston Northwestern Healthcare Corp. Antitrust Litig., No. 07 C 4446, 2016 WL 4720014, at *8-9 (N.D. Ill. Sept. 9, 2016) (citing Berkey Photo, Inc. v. Eastman Kodak Co., 603 F.2d 263, 295 (2d Cir. 1979)). In such cases, a cause of action for illegal monopolization under Section 2 of the Sherman Act may accrue once a purchaser plaintiff actually pays the supracompetitive price. Berkey, 603 F.2d at 295.

Under the general rule, Plaintiffs' Walker Process claim is unquestionably time-barred. Plaintiffs readily admit that the patent issued on September 25, 2001 (Compl. ¶ 22), meaning that the statute of limitations on their Walker Process claim expired on September 25, 2005. They did not file their claims against Novartis until March 1, 2017— nearly a dozen years late. However, even the more lenient Berkey accommodation for purchaser plaintiffs is of no avail here. The Complaint alleges that Tarek's doctor began prescribing Diovan "for him long before January 2011," which he took without interruption until "[a]round the beginning of 2013," when he first tried generic valsartan. (Compl. ¶¶ 4-5.) The only prices Tarek was paying for Diovan (in the form of a copay or, potentially, higher health benefit plan premiums associated with his Diovan prescriptions) he was paying well before March 1, 2013—and thus his cause of action accrued before then, barring on statute-of-limitations grounds Plaintiffs' March 1, 2017 Walker Process claim against Novartis.

Ostensibly to invoke the discovery rule or fraudulent concealment to toll the statute of limitations, see, In re Copper Antitrust Litig., 436 F.3d 782, 789 (7th Cir. 2006), Plaintiffs nakedly assert that they "could not find

2017 WL 2868999, 2017-1 Trade Cases P 80,047

out how Novartis monopolized Diovan until July 12, 2014." (Compl. ¶ 24.) No detail is provided about what Plaintiffs learned on this date and why they could not reasonably have earlier discovered whatever it was. In fact, many of the allegations in the complaint undercut the notion that there was any concealed or undetectable injury resulting from Novartis' alleged wrongful exclusion of others from the market or extraction from Tarek of "an extremely high price" for Diovan. (Compl. ¶ 30.) For example, the '197 patent application and the August 24, 2000 Novartis press release, both of which form the basis for Plaintiffs' *Walker Process* claim, were matters of public record. Further, Tarek was aware by "the beginning of 2013" of facts undercutting any claim that Novartis had monopolized the relevant market, as he was taking generic valsartan.

**\*9** Striding further down the rabbit hole, the Court notes that the *Walker Process* claim would be time-barred even if the discovery rule *did* apply to toll the statute of limitations until Plaintiffs knew or reasonably should have known that the prices paid for Diovan were supracompetitive. Plaintiffs have explicitly defined their injury as their Diovan copays that exceeded those charged for generic valsartan. Yet Plaintiffs allege that "around the beginning of 2013," Tarek tried to use generic valsartan and "[a]t that time" his "copay for Diovan was $30 and BCBS was paying $176.61, while he paid $12.6 for the generic and BCBS paid $0.0." (Compl. ¶ 5.) He thus became aware of the complained-of disparity in price more than four years prior to March 1, 2017 (although BCBSIL later increased his Diovan copay to $50. (It is not reasonable to infer that "the beginning of 2013" encompasses a date after March 1, 2013, and any uncertainty concerning the exact time at which Tarek discovered the disparity in copays flows from Plaintiffs' own imprecise allegations. *See, e.g., Morrison v. Int'l Union Sec., Police, and Fire Professionals of Am.,* No. 13 C 1146, 2013 WL 5274280, at \*4 (D. Md. Sept. 16, 2013) (granting motion to dismiss with prejudice because the plaintiff's "imprecise allegations" that harassment "occurred [continuously] throughout or during 2012" did "not satisfy the Court that any breach occurred within" the six-month statute of limitations); *Farbstein v. Hicksville Pub. Library,* 323 F.Supp.2d 414, 421 (E.D.N.Y. 2004) ("Plaintiff refers generally to events that occurred in the four year period prior to initiation of this lawsuit.... Thus, these imprecise allegations are

ineffective, as framed, to rescue Plaintiff's ... claims from the [three-year] statute of limitations.").)

For the sake of completeness, the Court notes that the continuing violation exception to the statute of limitations in antitrust actions is of no avail here either. *See, Zenith Radio Corp.,* 401 U.S. at 338. That exception allows an antitrust defendant's "overt act" to restart the statute of limitations, which act " 'must be a new and independent act that is not merely a reaffirmation of a previous act' " and " 'must inflict new and accumulating injury on the plaintiff.' " *Xechem, Inc. v. Bristol-Myers Squibb Co.,* 274 F.Supp.2d 937, 944-45 (N.D. Ill. 2003) (quoting *Grand Rapids Plastics, Inc. v. Lakian,* 188 F.3d 401, 406 (6th Cir. 1999)). Plainly, this case does not involve such an overt act. Continuing to charge direct purchasers prices in excess of those charged for generic valsartan is merely reaffirming prior pricing acts, much like the filing of repeated infringement lawsuits that "did nothing more than reaffirm" prior efforts to block the same competitor from the market. *Xechem,* 274 F.Supp.2d at 945. More specifically, price increases are generally not considered overt acts, see, e.g., *Z Techs. Corp. v. Lubrizol Corp.,* 753 F.3d 594, 600-601 (6th Cir. 2014), as opposed to, for example, "a series of ongoing meetings to correct a cartel and adjust its prices." Areeda & Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application,* ¶ 320 (3d ed. 2007) ("If the mere charging of a monopoly price constitutes a 'continuing violation' tolling the statute, then we have indefinitely lengthened the statute of limitation on claims of successful monopolization.") (internal quotation marks and citation omitted). And even if bare price increases were overt acts, Plaintiffs' only specific allegation of a price increase that affected them is BCBSIL's increase of Tarek's copay to $50 "[a]round June 2013" (Compl. ¶ 6), passing on more of the cost of Diovan to consumers. This is not an overt act of Novartis.

**\*10** For the foregoing reasons, Novartis' Rule 12(b)(6) Motion is granted in relevant part.

### 3. Antitrust Violation of Section 7 of the Clayton Act

In their third count, Plaintiffs allege that the "December 1996" merger of "two giants Ciba-Geigy and Sandoz," which spawned Novartis, "resulted in a very harmful monopoly and price increase, which is against the

2017 WL 2868999, 2017-1 Trade Cases P 80,047

antitrust laws." (Compl. ¶¶ 21, 33.) The Court charitably construes this as a claim brought under Section 4 for a violation of Section 7 of the Clayton Act, which is the principal federal antitrust statute concerning mergers and acquisitions, stock purchases, and joint ventures. It prohibits acquisitions, both direct and indirect, the effect of which "may be substantially to lessen competition, or to tend to create a monopoly." 15 U.S.C. § 18. As with Sherman Act claims, if a party seeks to sue a putative section 7 violator, it must commence its enforcement action "within four years after the cause of action accrued," or the enforcement action "shall be forever barred." 15 U.S.C. § 15b. However, for many of the reasons already explored, these allegations fail to state a plausible claim.

### a. Antitrust Standing

#### 1. Proper antitrust plaintiff

With respect to antitrust standing under the Clayton Act, Plaintiffs are indirect purchasers of Diovan, and direct purchasers—such as drug wholesalers or distributors—are better situated under *Illinois Brick* to bring a Clayton Act lawsuit. *See, Illinois Brick,* 431 U.S. at 737-42 (holding that only overcharged direct purchaser, and not others in chain of manufacture or distribution, is party "injured in his business or property" within meaning of Clayton Act). Although the Illinois Antitrust Act appears to permit indirect purchasers to sue for antitrust violations, 740 Ill. Comp. Stat. 10/7(2) ("No provision of this act shall deny any person who is an indirect purchaser the right to sue for damages.")—potentially making Plaintiffs' proper parties to challenge the Ciba-Geigy/Sandoz merger under state law—the federal pleading standards and statute of limitations otherwise mirror those governing claims under the Illinois Antitrust Act. *See, e.g.,* 740 Ill. Comp. Stat. 10/7 ("Any action for damages under this subsection is forever barred unless commenced within 4 years after the cause of action accrued."); *id.* at 10/11 ("When the wording of this act is identical or similar to that of a federal antitrust law, the courts of this State shall use the construction of the federal law by the federal courts as a guide in construing this Act."); *Hackman v. Dickerson Realtors, Inc.,* 520 F.Supp.2d 954, 968 (N.D. Ill. 2007) ("[T]he pleading requirements of the Sherman Act inform the pleading requirements under the Illinois Antitrust Act.") (citations omitted); *Laughlin v. Evanston Hosp.,* 550

N.E.2d 986, 990 (Ill. 1990) (holding that courts interpret the Illinois Antitrust Act in light of federal antitrust law upon which it is modeled). Thus, all the other deficiencies explored herein leave Plaintiffs high and dry on any cognizable state-law challenge to the merger as well.

#### 2. Antitrust injury

**\*11** With respect to the antitrust injury necessary for standing, Plaintiffs fail to state a plausible claim that Novartis used its patent monopoly (presumed valid for the Clayton Act claim) unlawfully in the relevant market. Not only does the Complaint admit the existence of at least one generic valsartan manufacturer—and this during times that preceded expiration of the '197 patent by several years—but the mere allegation that Diovan has steadily increased in price is just as consistent (if not more so) with the rights Novartis enjoys by virtue of its immunized patent monopoly. (*See,* Section III.A.2.a.1, *supra.*)

### b. Time-barred Recovery

Moreover, although Clayton Act claims for violation of Section 7 may accrue later, the four-year statute of limitations generally begins to run as soon as the acquisition takes place. *See, United States v. E.I. du Pont de Nemours & Co.,* 353 U.S. 586, 598 (1957). As the merger Plaintiffs appear to challenge occurred over twenty years ago, quite clearly the statute of limitations has run under the default rule. For a merger that produced anticompetitive effects only *post-*merger, the statute of limitations begins to run not when the merger transpired, but when the injury occurred. *E.I. du Pont,* 353 U.S. at 597-98. In the words of the Seventh Circuit, "old activity (as in *du Pont,* a stock acquisition preceding the suit by 30 years) is not immunized, if the potential for a reduction in output is created or realized more recently as market conditions change." *U.S. Gypsum Co. v. Ind. Gas Co.,* 350 F.3d 623, 628 (7th Cir. 2003). Yet Plaintiffs' claims are time-barred regardless of the theory invoked to delay accrual.

The Clayton Act's prohibition on anticompetitive acquisitions regulates injuries arising out of "holding as well as obtaining assets," *U.S. v. ITT Cont'l Banking Co.,* 420 U.S. 223, 240, 242 (1975), leading many courts to christen the theory for delaying the accrual date for

2017 WL 2868999, 2017-1 Trade Cases P 80,047

such injuries the "hold-and-use doctrine." *In re: Evanston, 2016 WL 4720014 at *12* (citations omitted). As such, subsequent anticompetitive acts committed by the merger enterprise may be dated "from the time these events actually transpired and not only from the date of the mergers which made these actions possible." *Julius Nasso Concrete Corp. v. Dic Concrete Corp.,* 467 F.Supp. 1016, 1023 (S.D.N.Y. 1979). However, for the hold-and-use doctrine to apply, a plaintiff must show—and thus must at least plead facts supporting a plausible inference—that the conduct was made possible by the acquisition. *See, e.g., In re: Evanston,* 2016 WL 4720014 at *13; *Julius Nasso,* 467 F.Supp. at 1023. There are no such allegations here, and Ciba-Geigy or Sandoz on their own could have done precisely what Novartis allegedly did—patent a drug and unilaterally institute a steady price increase during the term of the patent monopoly. As distinguished from the situation in, for example, *In re: Evanston*—where health care providers in a certain geographic area merged and then later instituted an alleged supracompetitive pricing policy for services—unilaterally increasing the price of a brand-name drug is within the ambit of a lawful patent monopoly. *See, e.g., Schor,* 457 F.3d at 610; *Brand Name Prescription Drugs,* 186 F.3d at 786-87.

**\*12** Even if the hold-and-use doctrine applied, Plaintiffs' cause of action would have accrued at the time Novartis instituted its supracompetitive pricing policy. *See, In re: Evanston,* 2016 WL 4720014, at *13. Although Plaintiffs provide data about price increases from 2013 through 2107—that is, within the window of the four-year statute of limitations—they do not allege that Novartis kept the price of Diovan constant (or only increased it in proportion to, say, the consumer price index) prior to 2013. It is not reasonable to infer that Novartis, after securing its '197 patent monopoly in 2001, waited until 2013 to increase Diovan prices under an allegedly supracompetitive pricing policy enabled by the 1996 merger. As such, even applying the hold-and-use doctrine to Plaintiffs' allegations does not bring their challenge to the merger within the four-year statute of limitations.

Next, Plaintiffs have no recourse here to the continuing violation doctrine, which does not apply to alleged violations of section 7 of the Clayton Act. *See, e.g., Z Techs. Corp. v. Lubrizol Corp.,* 753 F.3d 594, 599, 604-05 (6th Cir. 2014); *Midwestern Machinery Co., Inc. v. Northwest Airlines, Inc.,* 392 F.3d 265, 270-71 (8th Cir. 2004); *accord, Shuffle Tech,* 2015 WL 5934834, at *13-14.

And even if it did, in the absence of an overt act (*see,* Section III.A.2.c, *supra*), "the doctrine would only at best allow [plaintiffs] to reach back to when [they were] first injured by the anticompetitive effects of the merger—that is, when [plaintiffs] paid [defendant's] supracompetitive prices." *In re: Evanston, 2016 WL 4720014, at *14.* Thus, this doctrine cannot do for Plaintiffs' challenge to the Novartis merger what it cannot do for Plaintiffs' *Walker Process* claim.

Similarly, and for the same reasons discussed in Section III.A.2.c, Tarek's taking (and presumably paying a copay) for Diovan "long before January 2011" anesthetizes *Berkey,* which suspends running of the statute of limitations until a purchaser plaintiff pays the supracompetitive price. That clearly happened well before March 1, 2013. And, finally, even in the best case for Plaintiffs, where the discovery rule somehow applies to toll the four-year statute of limitations on their challenge to the merger until they discovered that they were paying a supracompetitive price (which Plaintiffs define with respect to the disparity in copays between Diovan and generic valsartan), their imprecise allegations about the timing of their discovery do not permit an inference that it occurred after March 1, 2013. (*See,* Section III.A.2.c.)

As such, there is no basis on which to find that Plaintiffs timely brought a federal or state antitrust claim challenging the merger.

\* \* \*

Therefore, Novartis' Motion to Dismiss under Rule 12(b)(6) is granted to the extent Plaintiffs' claims invoke a Section 7 violation of the Clayton Act or a comparable theory under the Illinois Antitrust Act.

### B. BCBSIL

Against BCBSIL, Plaintiffs bring counts for "violating the contract," "committing fraud to deny the proper coverage," "committing fraud to provide low quality medications," and "committing fraud to increase the incomes of its managements." (Compl. ¶¶ 26-29.) As best the Court can tell, these claims sound in breach of contract and common-law fraud. Plaintiffs seek compensatory damages, punitive damages, costs, and attorneys' fees.

2017 WL 2868999, 2017-1 Trade Cases P 80,047

This case was removed from state court on the basis of Novartis' federal question claims. (*See,* ECF No. 1 ¶ 4 ("This Court has original jurisdiction in this case under 28 U.S.C. § 1331."), ¶ 6 ("All Defendants consent to the removal of this matter pursuant to 28 U.S.C. § 1446(b)(2)(A).").) Because the Court has dismissed the federal question claims against Novartis that grounded removal, it now searches for independent subject-matter jurisdiction to hear Plaintiffs' state law claims against BCBSIL. Subject-matter jurisdiction is a threshold matter that must be established before resolving issues on the merits. *Steel Co. v. Citizens for a Better Environment, 523 U.S. 83, 94-95 (1998).* The Court has an independent obligation to ensure that jurisdiction exists. *DeBartolo v. HealthSouth Corp.,* 569 F.3d 736, 740 (7th Cir. 2009). Because Plaintiffs' claims for fraud and breach of contract do not arise under federal law, subject-matter jurisdiction to hear them can only be grounded in diversity jurisdiction under 28 U.S.C. § 1332, which requires that plaintiffs and defendants are citizens of different states and that the amount in controversy exceeds $75,000.

**\*13** Plaintiffs do not allege their own citizenship in their Complaint. As individuals, Plaintiffs are citizens of the state in which they are "domiciled," that is, "the state in which a person intends to live over the long run." *See, Heinen v. Northrop Grumman Corp., 671 F.3d 669, 670 (7th Cir. 2012).* In their Complaint, Plaintiffs list their address as 33W135 Bonnie Street, Saint Charles, Illinois 60174. They further claim to have health insurance coverage through BCBSIL by virtue of Soona's longtime employment with "School Dist. 33" (Compl. ¶ 1), evidencing an intent to remain in Illinois. *See, e.g., Newell v. O&K Steel Corp.,* 42 Fed.Appx. 830, 833 (7th Cir. 2002) (naming as factors relevant to domicile "current residence," "place of employment," and "location of property");*24 Hour Fitness USA, Inc. v. Bally Total Fitness Holding Corp.,* No. 08 C 3853, 2008 WL 4671748, at \*3 (N.D. Ill. Oct. 21, 2008) (also noting the importance of the "presence of family members"). In view of the mute pleadings, Plaintiffs appear to be domiciled in and citizens of Illinois for purposes of diversity jurisdiction.

In the same vein, Plaintiffs' Complaint does not allege the citizenship of BCBSIL. The Court has little reason to doubt that BCBSIL is an Illinois citizen for purposes of diversity. *See, e.g., Raines v. Health Care Service Corp.,* No. 86 C 5352, 1988 WL 58591, at \*1 (N.D. Ill. May 31, 1988) ("Defendant Health Care Service

Corporation, a mutual legal reserve company d/b/a Blue Cross Blue Shield of Illinois ('Blue Cross') is a corporation with its principal place of business in Chicago, Illinois.");*Health Care Service Corp. v. Califano, 466 F.Supp. 1190, 1192 n.8 (N.D. Ill. 1979)* ("In 1975, HCSC was incorporated by the State of Illinois as a non-profit health care service corporation thus merging the Illinois Blue Cross and Blue Shield plans.") (citation omitted). Similarly, "Blue Cross and Blue Shield Association" is registered as an active Illinois corporation. *See,* Office of the Illinois Secretary of State, *https://www.ilsos.gov/corporatellc/CorporateLlcController* visited (June 27, 2017). (Such filings are matters of public record and are properly subject to judicial notice.) *See, e.g., GE Capital Corp. v. Lease Resolution Corp.,* 128 F.3d 1074, 1080-81 (7th Cir. 1997) (stating that a district court is permitted to take judicial notice of matters of public record); *City of Waukegan v. Bond Safeguard Ins. Co.,* No. 15 C 3007, 2015 WL 68770106, at \*2 (N.D. Ill. Nov. 6, 2015) ("With respect to [the defendant's] state of incorporation, the Court takes judicial notice of filings with the Secretary of State...."); *Patten v. Northern Trust Co.,* 703 F.Supp.2d 799, 803 n.2 (N.D. Ill. 2010) (finding it proper to take judicial notice of "matters of public record, such as [regulatory] filings".) Similarly, according to its website, BCBSIL's headquarters are located at 300 East Randolph Street, Chicago, Illinois 60601. *See,* BlueCross BlueShield of Illinois, Contact Us, *https://www.bcbsil.com/employer/contact_us.htm* (visited June 27, 2017). Thus, BCBSIL appears to be a citizen of Illinois.

Absent diversity, the Court does not appear to have independent subject-matter jurisdiction over Plaintiffs' state-law claims against BCBSIL. As a result, the Court remands the balance of the case to Kane County Circuit Court. *See,* 28 U.S.C. § 1447(c) ("If at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded."); *see, generally, Adkins v. Illinois Cent. R. Co.,* 326 F.3d 828 (7th Cir. 2003). Alternatively, to the extent the Court may enjoy residual authority to hear the claims based on supplemental jurisdiction— notwithstanding that the federal question anchor is now aweigh—the Court exercises its discretion to remand them. *See,* 28 U.S.C. § 1367(c) (permitting a district court to decline to exercise supplemental jurisdiction over a claim if it "has dismissed all claims over which the district court has original jurisdiction"); *see, generally, Carnegie-*

Farag v. Health Care Service Corporation, Not Reported in Fed. Supp. (2017)

2017 WL 2868999, 2017-1 Trade Cases P 80,047

*Mellon Univ. v. Cohill,* 484 U.S. 343 (1988); *Groce v. Eli Lilly & Co.,* 193 F.3d 496 (7th Cir. 1999).

federal question claims against Novartis that formed the basis for removal, the Court remands the balance of the case to Kane County Circuit Court.

## IV. CONCLUSION

**IT IS SO ORDERED.**

**\*14** For the reasons stated herein, Defendant Novartis' Motion to Dismiss [ECF No. 16] is granted. The claims against Novartis are dismissed with prejudice under Rule 12(b)(1) and, alternatively, Rule 12(b)(6). Absent the

**All Citations**

Not Reported in Fed. Supp., 2017 WL 2868999, 2017-1 Trade Cases P 80,047

---

**End of Document**                                          © 2019 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT H

2018 WL 7197233
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

SERGEANTS BENEVOLENT ASSOCIATION
HEALTH & WELFARE FUND,
Individually and on Behalf of Itself and
All Others Similarly Situated, Plaintiff,
v.
ACTAVIS, PLC, and Forest Laboratories, LLC,
Merz Pharma GmbH & Co. KGaA, Merz GmbH &
Co. KGaA, Merz Pharmaceuticals GmbH, Amneal
Pharmaceuticals, LLC, Teva Pharmaceutical
Industries, Ltd., Barr Pharmaceuticals, Inc.,
Cobalt Laboratories, Inc., Upsher-Smith
Laboratories, Inc., Wockhardt Limited, Wockhardt
USA LLC, Sun Pharmaceuticals Industries,
Ltd., Dr. Reddy's Laboratories Ltd., and
Dr. Reddy's Laboratories Inc., Defendants.

15 Civ. 6549 (CM)
|
Signed 12/26/2018

**Attorneys and Law Firms**

Elizabeth S. Metcalf, Peter George Safirstein, Safirstein Metcalf LLP, New York, NY, Lori Ann Fanning, Pro Hac Vice, Marvin Alan Miller, Miller Law LLC, Chicago, IL, for Plaintiff.

Heather McDevitt, Kristen O'Shaughnessy, Martin Michael Toto, Jack Pace, William Harold Bave, III, Peter J. Carney, White & Case LLP, New York, NY, John Mark Gidley, White & Case LLP, Washington, DC, Kevin Charles Adam, White & Case LLP, Boston, MA, for Defendants Actavis, PLC, Forest Laboratories, LLC.

Martin Michael Toto, White & Case LLP, New York, NY, for Defendant Merz Pharmaceuticals GmbH & Co. KGaA.

Jay Philip Lefkowitz, Alexandra Corbett Strang, Devora Whitman Allon, Kyla A. Jackson, Pro Hac Vice, Steven James Menashi, Kirkland & Ellis LLP, New York, NY, for Defendants Amneal Pharmaceuticals, LLC, Upsher-Smith Laboratories, Inc.

Christopher T. Holding, Pro Hac Vice, Sarah K. Frederick, Goodwin Procter, LLP, Boston, MA, for Defendants Teva Pharmaceuticals USA, Inc., Barr Pharmaceuticals, Inc., Teva Pharmaceutical Industries Ltd.

Christopher T. Holding, Pro Hac Vice, Sarah K. Frederick, Pro Hac Vice, Goodwin Procter, LLP, Boston, MA, Jack Pace, Kristen O'Shaughnessy, Martin Michael Toto, Peter J. Carney, White & Case LLP, New York, NY, John Mark Gidley, White & Case LLP, Washington, DC, for Defendant Cobalt Laboratories, Inc.

Damon William Suden, William Alfred Escobar, Kelley Drye & Warren, LLP, New York, NY, for Defendants Wockhardt Limited, Wockhardt USA LLC.

Jay Philip Lefkowitz, Steven James Menashi, Kirkland & Ellis LLP, New York, NY, for Defendant Sun India Pharmaceuticals Industries, Ltd.

Eric Peter Stephens, Jones Day, New York, NY, Jonathan Bruce Berman, Pro Hac Vice, Jones Day, Washington, DC, for Defendants Dr. Reddy's Laboratories Ltd., Dr. Reddy's Laboratories, Inc.

Jay Philip Lefkowitz, Alexandra Corbett Strang, Devora Whitman Allon, Steven James Menashi, Kirkland & Ellis LLP, New York, NY, for Defendant Sun Pharmaceuticals Industries Ltd.

Heather McDevitt, Kristen O'Shaughnessy, Martin Michael Toto, William Harold Bave, III, White & Case LLP, New York, NY, Kevin Charles Adam, White & Case LLP, Boston, MA, for Defendants Merz GmbH & Co. KGaA., Merz Pharmaceuticals GmbH, Merz Pharma GmbH & Co. KGaA.

Devora Whitman Allon, Kyla A. Jackson, Pro Hac Vice, Kirkland & Ellis LLP, New York, NY, for Defendant Sun Pharmaceuticals Industries, Ltd.

**ORDER**

Colleen McMahon, Chief Judge

**\*1** The Complaint in this action, which was filed following an earlier civil enforcement action by the New York Attorney General, alleges a two-part scheme to prolong the monopoly of Defendant Forest Laboratories,

LLC ("Forest"), over the blockbuster Alzheimer's drug memantine hydrochloride, or Namenda®. According to the Complaint, Forest and its patent licensor Merz [1] first entered into agreements with generic manufacturers to stay out of the market until the exclusivity period for Forest's existing, twice-a-day Namenda IR formulation had nearly expired ("pay for delay"). With this maneuver, Forest bought itself time to gain regulatory approval for a new, once-a-day Namenda XR formulation and to pull from the market the old, twice-a-day Namenda IR formulation (the "product hop" or "hard switch"). Although a preliminary injunction prevented Forest from withdrawing the old formulation, a successful switch would have effectively forestalled generic competition until the year 2029.

Under the United States Supreme Court's decision in *Illinois Brick Co. v. Illinois,* 431 U.S. 720, 745–46 (1977), indirect purchasers of products sold at supra-competitive prices lack standing to sue under federal antitrust statutes. However, under its later decision in *California v. ARC Am. Corp.*, 490 U.S. 93, 105–06 (1989), indirect purchasers may still bring suit under state antitrust laws, if a state permits such claims. Therefore, it is common in private antitrust litigation for two groups of purchasers, direct and indirect, to file separate cases arising out of the same nucleus of operative fact, but to allege different causes of action—direct purchasers under federal law and indirect purchasers under state laws.

That is precisely what happened here. In a parallel "direct purchaser" case, drug wholesaler plaintiffs, which bought Namenda directly from Forest, brought a suit alleging five counts under the federal antitrust laws against Forest, Merz, and Forest's parent company Actavis, plc ("Actavis"). That case, captioned *In re Namenda Direct Purchaser Antitrust Litigation,* No. 15-cv-7488 (S.D.N.Y.), is currently pending before this Court. I refer to the drug wholesaler plaintiffs in that case as the Direct Purchaser Plaintiffs, or "DPPs," and I refer to that case as the "DP Action."

In the instant case, employee health plan Sergeants Benevolent Association Health & Welfare Fund, which purchased Namenda indirectly, separately brought a suit alleging 123 claims under state antitrust, consumer protection, and restitution laws. [2] This case, captioned *Sergeants Benevolent Association Health & Welfare Fund v. Actavis, plc,* No. 15-cv-6549 (S.D.N.Y.), names Actavis,

Forest, Merz, and eight generic drug manufacturers [3] (the "Generic Defendants"), which were not named in the DP Action. I refer to the Plaintiff here, Sergeants Benevolent Association Health & Welfare Fund, as the Indirect Purchaser Plaintiff, or "IPP," and I refer to this case as the "IP Action."

**\*2** The complaints in the DP and IP Actions were filed around the same time. The parties, with the exception of Merz, sought consolidated briefing on motions to dismiss, (Dkt. No. 63), which was granted, (Dkt. No. 64). Merz eventually joined the consolidated briefing. (*See, e.g.*, Dkt. No. 85.)

Ruling on the motions to dismiss both the DPPs' and IPP's complaints, this Court held that most of the federal antitrust counts in the DPPs' complaint survived. *Sergeants Benevolent Association Health & Welfare Fund v. Actavis, plc,* Nos. 15-cv-6549, 15-cv-7488, 2016 WL 4992690, at \*16–\*17 (S.D.N.Y. Sept. 13, 2016). In the interest of efficiently resolving common factual and legal issues, it then denied without prejudice the motions to dismiss the IPP complaint, and placed all 123 state law claims on its suspense calendar while the federal antitrust claims in the DP Action were pending. *Id.* at \*17.

The DP Action proceeded through class certification and denial of Defendants' motion for summary judgment before the parties expressed interest in mediation. (*See* Dkt. No. 122.) [4] However, it was determined that mediation would be successful only if the IP Action came off of the suspense calendar and the IPP came back into the proceedings. (*Id.*)

As a result, the IPP's 123 state law claims are presently before the Court on separate motions to dismiss by (1) Actavis, Forest, and Merz and (2) the Generic Defendants. The parties have also recently submitted supplemental briefing. (*See* Dkt. Nos. 129–33, 146, 149–56.)

For the reasons below, the motions to dismiss the IP Action are **GRANTED IN PART** and **DENIED IN PART.**

### Table of Contents

I. Overview of Claims and Jurisdiction...——

Case 2:19-cv-07532-ES-MAH   Document 18-5   Filed 05/22/19   Page 120 of 300 PageID: 428
Sergeants Benevolent Association Health & Welfare Fund v. Actavis, plc, Slip Copy (2018)

2018 WL 7197233

II. Factual Background...——
A. The Parties...——

B. The Regulatory Scheme...——

C. Drug Substitution Laws and Product Hopping...——

D. The Namenda Settlement Agreements...——

E. The "Hard Switch"...——

III. Procedural History...——

IV. Standard of Review...——

V. Count One: Monopolization Under the Laws of 27 States Against Actavis, Forest, and Merz...——
A. The IPP's Underlying Factual Allegations State a Claim for Monopolization...——

1. The IPP Has Stated a Claim for Monopolization Based on the Hard Switch from Namenda IR to Namenda XR...——

2. The IPP States a Claim for Monopolization Based on the Settlement Agreements...——

3. The Court's Earlier Ruling Regarding the DPPs' Overarching Scheme Claim Does Not Support Dismissing Count One...——

4. The Statute of Limitations Argument Is Inadequately Briefed With Respect to the IP Action...——

B. The IPP States a Claim for Monopolization Under the Laws of Some States But Not Others...——

1. The IPP Has Article III Standing To Bring State Law Monopolization Claims on Behalf of Class Members Who Made Purchases in Those States...——

2. The IPP Fails to State a Claim for Monopolization in Three States That Follow Illinois Brick (Florida, Massachusetts, and Utah)...——

3. The IPP's Failure To Satisfy Pre-Suit Notification Requirements Does Not Warrant Dismissal of the Claims in Three States (Hawaii, Arizona, and Nevada)...——

4. The IPP Fails To State a Claim for Monopolization Under the Law of Kansas...——

C. In Conclusion, the IPP Has Stated A Claim for Monopolization Under Count One With Respect to the Laws of 23 States...——

*3 VI. Count Two: Conspiracy To Monopolize Under the Laws of 27 States Against Actavis, Forest, Merz, and the Generic Defendants...——
A. The IPP States a Claim for Conspiracy To Monopolize...——

B. Illinois...——

C. Oregon...——

D. In Conclusion, the IPP Has Stated a Claim for Conspiracy to Monopolize Under Count Two With Respect to the Laws of 25 States...——

VII. Count Three: Consumer Protection and Unfair and Deceptive Trade Practices Under the Laws of 25 States Against Actavis, Forest, Merz, and the Generic Defendants...——
A. The IPP Adequately Pleads Its State Law Claims Under Twombly and Iqbal...——

B. The IPP Is Not Required to Plead Its Complaint in Accordance With Federal Rule of Civil Procedure 9(b)...——

C. Illinois Brick Does Not Bar the IPP's Consumer Protection Claims...——

D. The IPP States a Claim Under the Consumer Protection Laws of Some States But Not Others...——

1. Alabama...——

2. Arizona...——

3. California...——

4. District of Columbia...——

5. Florida...——

6. Hawaii...——

Case 2:19-cv-07532-ES-MAH  Document 18-5  Filed 05/22/19  Page 121 of 300 PageID: 429
Sergeants Benevolent Association Health & Welfare Fund v. Actavis, plc, Slip Copy (2018)
2018 WL 7197233

7. Idaho...——

8. Illinois...——

9. Kansas...——

10. Maine...——

11. Massachusetts...——

12. Michigan...——

13. Missouri...——

14. Montana...——

15. Nebraska...——

16. Nevada...——

17. New Hampshire...——

18. New Mexico...——

19. New York...——

20. North Carolina...——

21. Rhode Island...——

22. Tennessee...——

23. Utah...——

24. Vermont...——

25. West Virginia...——

E. In Conclusion, the IPP Has Stated a Claim for Violation of State Consumer Protection Laws Under Count Three Under the Laws of 14 States...——

VIII. Count Four: Unjust Enrichment Under the Laws of 44 States Against Actavis, Forest, Merz, and the Generic Defendants...——
A. Count Four Does Not State a Claim With Respect to the Generic Defendants Under the Laws of Any State...——

B. The Unjust Enrichment Claims Under the Laws of Ten States Are Barred By *Illinois Brick* (Alaska, Colorado, Connecticut, Delaware, Montana, New Jersey, Oklahoma, South Carolina, Virginia, and Washington)...——

C. Autonomous Unjust Enrichment Claims in States That Do Not Follow *Illinois Brick* Survive (Arkansas and Wyoming)...——

D. The IPP States a Claim for Unjust Enrichment Under the Laws of Some States But Not Others...——

1. Alabama...——

2. Arizona...——

3. California...——

4. District of Columbia...——

5. Florida...——

6. Idaho...——

7. Illinois...——

8. Kansas...——

9. Maine...——

10. Massachusetts...——

11. Michigan...——

12. Mississippi...——

13. New York...——

14. North Carolina...——

15. North Dakota...——

16. Rhode Island...——

17. Tennessee...——

18. Utah...——

19. Washington...——

20. West Virginia and Wisconsin...——

21. Wyoming...——

E. In Conclusion, the IPP Has Stated a Claim for Unjust Enrichment Under Count Four With Respect to Actavis, Forest, and Merz Under the Laws of 31 States...——

IX. Conclusion...——

## BACKGROUND

### I. Overview of Claims and Jurisdiction

This case, *Sergeants Benevolent Association Health & Welfare Fund v. Actavis,* No. 15-cv-6549 (S.D.N.Y.) (the "IP Action"), proceeds in parallel with the factually similar case, *In re Namenda Direct Purchaser Antitrust Litigation,* No. 15-cv-7488 (S.D.N.Y.) (the "DP Action").

Although this Court accepted these two cases on its docket as related cases pursuant to Local Rule 13, (*see* 15-cv-7488, entry of Oct. 6, 2015), and although this Court granted certain Defendants' motion for consolidated briefing on the motions to dismiss pursuant to its individual rules, (15-cv-6549, Dkt. No. 64), it never consolidated the cases under Federal Rule of Civil Procedure 42(a), nor joined the claims and parties under Federal Rules of Civil Procedure 18 and 19, respectively.

**\*4** As a result, the IP Action proceeds as an entirely separate action composed solely of state law claims. The complaint in the IP Action alleges a total of 123 state law claims, under the law of 44 states, aggregated as four "counts": (1) monopolization (27 state law claims); (2) conspiracy to monopolize (27 state law claims); (3) violation of consumer protection and unfair and deceptive trade practices statutes (25 state law claims); and (4) unjust enrichment (44 state law claims).

Since not a single federal interest is implicated in the IP Action, the Court exercises jurisdiction over these 123 state law claims pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d) ("CAFA"). CAFA's prerequisites are met. The IPP's Consolidated Amended Complaint ("CAC") alleges that the aggregate amount in controversy exceeds $5,000,000.00. (CAC ¶ 31.) In addition, the IPP, a New York trust, is diverse from several of the Defendants, including Actavis, Merz, and the majority of the Generic Defendants. (CAC ¶¶ 15–29.)

### II. Factual Background

The factual nucleus from which the IP Action arises has been described exhaustively in several published opinions, including those of Judge Sweet and the Second Circuit in the earlier civil enforcement action by the New York

Attorney General, and those of this Court in the parallel DP Action.

The relevant opinions are: (i) *New York v. Actavis, plc,* No. 14-cv-7473, 2014 WL 7015198 (S.D.N.Y. Dec. 11, 2014) (*Namenda I*), in which the district court (Sweet, J.) preliminarily enjoined Actavis and Forest from withdrawing Namenda IR, the twice-a-day or "immediate release" formulation, from the market; (ii) *Schneiderman ex rel. New York v. Actavis plc,* 787 F.3d 638 (2d Cir. 2015) (*Namenda II*), in which the Second Circuit upheld the preliminary injunction granted in *Namenda I*; and (iii) three opinions from the private, follow-on litigation before this Court.

The first opinion, on which the Court granted consolidated briefing, denied Actavis, Forest, and Merz's motion to dismiss the DP Action; denied all Defendants' motions to dismiss the IP Action without prejudice; and placed the 123 state law claims in the IP Action on the Court's suspense calendar. *Sergeants Benevolent Association Health & Welfare Fund v. Actavis, PLC,* Nos. 15-cv-7488, 15-cv-6549, 2016 WL 4992690 (S.D.N.Y. Sept. 13, 2016) (*Namenda III*).

The second opinion of this Court granted in part and denied in part the DPPs' motion for collateral estoppel and partial summary judgment against Actavis and Forest, on the basis of facts established about the product hop in *Namenda I* and *Namenda II. In re Namenda Direct Purchaser Antitrust Litig.,* No. 15-cv-7488, 2017 WL 4358244 (S.D.N.Y. May 23, 2017) (*Namenda IV*).

The third opinion denied Actavis's and Forest's post-discovery motion for summary judgment and granted the DPPs' motion for class certification. *In re Namenda Direct Purchaser Antitrust Litig.,* 331 F. Supp. 3d 152 (S. DN.Y. 2018) (*Namenda V*).

In light of the detailed factual history discussed in these opinions, the Court provides only an abridged summary of the relevant facts here.

#### A. The Parties

Defendant Forest Laboratories, LLC ("Forest") is a limited liability company incorporated in Delaware with offices in New York and New Jersey. *Namenda III,* 2016 WL 4992690, at \*2. It is wholly owned by Defendant

Sergeants Benevolent Association Health & Welfare Fund v. Actavis, plc, Slip Copy (2018)

2018 WL 7197233

Actavis, plc ("Actavis"). [5] *Id.*; (CAC ¶ 16.) The IPP also describes Actavis as Forest's successor-in-interest. (*See* CAC ¶ 192.)

**\*5** In 2000, Forest entered into a patent licensing and cooperation agreement with Merz GmbH & Co. KGaA, Merz Pharma GmbH & Co. KGaA, and Merz Pharmaceuticals GmbH (collectively, "Merz") [6] to develop a memantine hydrochloride-based drug for the treatment of moderate-to-severe forms of Alzheimer's disease. *Namenda III,* 2016 WL 4992690, at \*2; *Namenda IV,* 2017 WL 4358244, at \*2.

The resulting drug was launched in 2004 as a twice-daily immediate release formula ("Namenda IR"), generating $1.5 billion in annual sales for Forest in 2012 and 2013. *Namenda II,* 787 F.3d at 646–47.

Defendants Barr Pharmaceuticals, Inc. ("Barr"); Teva Pharmaceuticals Industries, Ltd. and Teva Pharmaceuticals USA, Inc. (jointly, "Teva"); Cobalt Laboratories, Inc. ("Cobalt"); Upsher-Smith Laboratories, Inc. ("Upsher-Smith"); Amneal Pharmaceuticals, LLC ("Amneal"); Wockhardt Limited and Wockhardt USA LLC (jointly, "Wockhardt"); Sun India Pharmaceuticals Industries, Ltd. ("Sun"); and Dr. Reddy's Laboratories Ltd. and/or Dr. Reddy's Laboratories, Inc. (jointly, "Dr. Reddy's") (collectively, the "Generic Defendants," and together with Actavis, Forest, and Merz, the "Defendants") each developed generic formulations of Namenda IR and sought approval from the FDA to take these generic formulations to market. *Namenda III,* 2016 WL 4992690, at \*2.

Plaintiff Sergeants Benevolent Association Health & Welfare Fund (the "IPP," or, where appropriate, the "Named Plaintiff") is a New York trust that provides prescription drug benefits for active and retired New York City Police Department sergeants and their dependents through its participant plans. *Id.*; (CAC ¶ 15.) As a third-party payor of pharmaceutical claims for members of its plans, the IPP alleges that it was an indirect purchaser of branded Namenda IR during the relevant period. (CAC ¶ 15.) The IPP alleges that, beginning in April 14, 2010 and continuing through the present day (the "Class Period"), it indirectly purchased branded Namenda IR in 11 states [7] at prices higher than it would have otherwise paid absent

Defendants' unlawful anticompetitive conduct. (*Id.* ¶¶ 15, 146)

The IPP also alleges that it purchased (*i.e.* paid for) branded Namenda XR indirectly during the Class Period, when it would otherwise have purchased low-cost, generic Namenda IR absent Defendants' unlawful competitive conduct. (*Id.* ¶ 202.)

**B. The Regulatory Scheme**

The Federal Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C. § 301 *et seq.*, governs the manufacture, sale, and marketing of prescription pharmaceuticals in the United States. *Namenda III,* 2016 WL 4992690, at \*2. The FDCA requires a pharmaceutical company to submit a New Drug Application ("NDA") to the FDA before it can bring a new drug to market. *Id.*

The Drug Price Competition and Patent Term Restoration Act (the "Hatch-Waxman Act"), Pub. L. No. 98-417, 98 Stat. 1585, was enacted to serve the "dual purposes of incentivizing innovation," by rewarding brand-name drug manufacturers for bringing new therapies to market, and "lowering drug prices for consumers," by rewarding generic drug manufacturers who attempt to compete with costly branded drugs. *Id.* at \*3.

**\*6** Rewards under the Hatch-Waxman Act take the form of granting an exclusive share of the prescription pharmaceutical market through one of two legal regimes: patents and exclusivities. *See Frequently Asked Questions on Patents and Exclusivity,* FDA (last updated May 2, 2018), https://www.fda.gov/drugs/developmentapprovalprocess/ucm079031.htm ("FAQs"). Patents are property interests granted by the U.S. Patent and Trademark Office ("PTO"), while exclusivities are statutory protections granted by the Food and Drug Administration ("FDA"). *See Namenda IV,* 2017 WL 4358244, at \*3; *see also* FAQs at 1.

*Patents.* Manufacturers may claim patents for new drug compounds, drug products, and methods of use. *See In re Actos End-Payor Antitrust Litig.,* 848 F.3d 89, 94 (2d Cir. 2017) (*Actos II*). Patents vary in duration but typically last for twenty years. *See* FAQs at 2. During the lifetime of the patent, brand manufacturers are provided a legal monopoly on their invention, which can enable favorable price-setting. *Id.* at 1.

Sergeants Benevolent Association Health & Welfare Fund v. Actavis, plc, Slip Copy (2018)

2018 WL 7197233

Patent protection is so valuable to pharmaceutical companies that entering the period following patent expiration is known as going off the "patent cliff." *Namenda III,* 2016 WL 4992690, at *3. In 2012, patent cliffs collectively caused the entire U.S. pharmaceutical market to shrink by 1%. Eric Sagonowsky, *Big Pharma faces $26.5B in losses this year as next big patent cliff looms, analyst says,* FiercePharma, Apr. 21, 2017, https://ww.fiercepharma.com/pharma/big-pharma-faces-26-5b-patent-loss-threats-year-analyst-says.

The Hatch-Waxman Act allows a brand-name drug manufacturer to extend any patent submitted as part of an NDA for an additional five years, to compensate for the time elapsed during the FDA's approval process. 35 U.S.C. § 156; *Namenda III,* 2016 WL 4992690, at *3.

*Exclusivity.* Both the FFDCA and the Hatch-Waxman Act also provide for statutory periods of "marketing exclusivity" in connection with the approval of certain NDAs. *Otsuka Pharm. Co., Ltd. v. Price,* 869 F.3d 987, 988 (D.C. Cir. 2017); *see also* FAQs at 3. "When a drug earns a period of exclusivity, the Food and Drug Administration must withhold approval of certain competing drugs," including generics, "if various conditions are satisfied." *Otsuka Pharm.,* 869 F.3d at 988.

Not all NDAs will qualify for statutory exclusivities. For example, the FDA may grant exclusivities for, among other things, a new chemical entity (five years), 21 C.F.R. § 314.108; or an "orphan" drug intended to treat rare diseases (seven years), 21 C.F.R. § 316.31. *See* FAQs at 3. The FDA may also grant additional exclusivities later in the life of a drug, well after submission of the initial NDA. For instance, the FDA may grant a six-month period of exclusivity for studying the drug's efficacy in children ("pediatric exclusivity"). 21 U.S.C. § 355a; *Namenda II,* 787 F.3d at 644.

*Interaction.* To a degree, exclusivity interacts with patent protection. *See* FAQs at 4. For example, when a brand manufacturer submits an NDA to the FDA, it must list any patents that claim drugs, drug products, or methods of use that are the subject of that NDA. *See In re Actos End Payor Antitrust Litig.,* No. 13-cv-9244, 2015 WL 5610752, at *1 (S.D.N.Y. 2015) (*Actos I*). The FDA lists all existing patents and exclusivities in the "Orange Book." *Id.*; FAQs at 5.

Patent protection also interacts with exclusivity when a generic manufacturer seeks FDA approval to market a generic version of a branded drug that is still "on patent." Specifically, the Hatch-Waxman Act provides for a 180-day period of "patent challenge" exclusivity for the first generic manufacturer to file a certification with the FDA that contests the validity of the brand manufacturer's patent. *Namenda III,* 2016 WL 4992690, at *3; *see also* FAQs at 3. This period of exclusivity is valid against other generic manufacturers, although multiple filers may share the exclusivity period if they file on the same day. *See FTC v. Actavis, Inc.,* 570 U.S. 136, 174–75 (2013) (Roberts, J., dissenting) (citing 21 U.S.C. § 355(j)(5)(B)(iv)(II)(bb); FDA, Guidance for Industry: 180-Day Exclusivity When Multiple ANDAs Are Submitted on the Same Day 4 (July 2003) ). Patent challenge exclusivity is highly valuable, "possibly worth several hundred million dollars." *Actavis,* 570 U.S. at 144 (citing C. Scott. Hemphill, *Paying for Delay: Pharmaceutical Patent Settlement as a Regulatory Design Problem,* 81 N.Y.U.L. Rev. 1553, 1579 (2006) ).

*7 To win the 180-day period of patent challenge exclusivity, a generic manufacturer must file an Abbreviated New Drug Application ("ANDA") with the FDA, which relies on the NDA submitted by the brand manufacturer to show the drug is safe and effective. *Actavis,* 570 U.S. at 142. As part of this process, a generic manufacturer must certify that the generic drug "has the same active ingredients as, and is biologically equivalent" to the brand drug. *Id.* (internal citations omitted). In addition, and critical to gaining the 180-day exclusivity period, the first-filer generic manufacturer must also certify that the brand name drug is patented, but that the patent is invalid or the generic will not infringe it, a so-called "Paragraph IV" certification. *Id.* at 143.

The Hatch-Waxman Act allows a brand manufacturer to treat the filing of a Paragraph IV certification as an infringing action and to sue the generic filer for patent infringement. *Id.* The filing of a patent infringement action triggers an automatic, 30-month stay on the FDA's approval of the generic manufacturer's ANDA. *Id.* During this time, however, the FDA may tentatively approve the ANDA, such that the generic drug is set for final approval and launch after the 30-month stay expires. *Namenda IV,* 2017 WL 4358244, at *4.

At this point, a generic manufacturer defending a patent infringement action based on its Paragraph IV certification has several options. First, it may defend the patent infringement action by arguing that the underlying patent is invalid or that its generic drug does not otherwise infringe the patent. If successful, a judgment in the infringement action results not only in the invalidation of the underlying patent or a finding of non-infringement but also entitles the generic manufacturer to the coveted 180-day exclusivity period. *See* Shashank Upadhye, *Generic Pharmaceutical Patent and FDA Law* §§ 28:9.50, 29:5 (2018–19 ed.).

Second, a generic manufacturer may launch its generic product "at risk," once it has gained FDA approval and the 30-month stay has expired, but while the litigation is ongoing. *Id.* § 32.

Third, the brand manufacturer and generic manufacturer may enter into a settlement agreement to resolve the litigation, which allows the generic manufacturer to extract certain concessions from the brand manufacturer ("reverse payments"). *See* Hemphill, *supra,* at 1568; *see also Actavis,* 570 U.S. at 140–41. Settlement agreements containing reverse payments may raise antitrust scrutiny if the payments flowing from the brand manufacturer to the generic manufacturer are "large and unjustified." *Actavis,* 570 U.S. at 158. Brand manufacturers are particularly incentivized to settle with first-filer generics because, under the Hatch-Waxman Act, no later-filing generic is eligible for the 180-day period of patent challenge exclusivity, thereby minimizing such "Paragraph IV" challenges.

### C. Drug Substitution Laws and Product Hopping
Apart from the federal Hatch-Waxman Act, state law regimes also facilitate generic competition and the provision of cheaper prescription drugs to consumers by allowing, or in some cases requiring, pharmacists to fill a prescription for a branded drug with a "therapeutically equivalent" generic drug. *Namenda IV,* 2017 WL 4358244, at *4. States define therapeutic equivalence differently, but most use the comparatively strict definition adopted by the FDA. *Id.* at *4–*5. This definition only allows a pharmacist to substitute a generic drug if the FDA designates the generic as "AB-rated" in the Orange Book. *Namenda III,* 2016 WL 4992690, at *3.

As this Court has previously observed, "The requirement that substituted drugs meet therapeutic equivalence standards, although intended to protect patients, allows brand-name drug manufacturers to 'game the system' through a practice known as 'product hopping.' " *Namenda IV,* 2017 WL 4358244, at *5.

**\*8** In a product hop, a brand manufacturer re-patents a slightly different formulation of the drug shortly before any generic competitors are legally allowed to enter the market. *Namenda II,* 787 F.3d at 643 & n.2 (citing Alan Devlin, *Exclusionary Strategies in the Hatch-Waxman Context,* 2007 Mich. St. L. Rev. 631, 658 (2007) ). At its core, product hopping is regulatory arbitrage—taking advantage of the comparatively forgiving "improvement" standard under the federal patent laws and the relatively strict "therapeutically equivalent" standard under state drug substitution laws. *See* Devlin, *supra,* at 657 n.139. Examples of product hops have included embedding the drug's active ingredient in a different inactive substrate, *In re Asacol Antitrust Litig.,* 323 F.R.D. 451, 462 (D. Mass. 2017) (*Asacol II*); introducing a tablet in place of a capsule, *Mylan Pharm. Inc. v. Warner Chilcott Pub. Ltd.,* 838 F.3d 421, 429 (3d Cir. 2016); or re-apportioning the "scoring" lines on a tablet that allow patients to break the pill into smaller dosages, *id.* at 429–30.

Once the re-formulated product is re-patented, but before generic versions of the old formulation can legally enter the market and gain a foothold through state drug substitution laws, a brand manufacturer may try to persuade physicians to prescribe their patients the new formulation (a "soft switch"). *Namenda II,* 787 F.3d at 648. In the alternative, a brand manufacturer might withdraw the old formulation from the market altogether or severely restrict access, forcing physicians to adopt the new formulation in order to avoid interruptions to their patients' medication regimens ("hard switch"). *Id.*

A product hop raises antitrust scrutiny when it "coerces consumers and impedes competition." *Id.* at 652.

### D. The Namenda Settlement Agreements
After entering into the June 2000 patent licensing and cooperation agreement with Merz, in December 2002 Forest submitted an NDA to the FDA for 5 mg and 10 mg memantine hydrochloride tablets for the treatment of Alzheimer's disease. (CAC ¶ 63.) The drug was based on Patent No. 5,061,703 (the "'703 patent"), which was

2018 WL 7197233

obtained in 1991 and was set to expire on April 11, 2010. (*Id.* ¶¶ 4, 64.)

In October 2003, the FDA approved Forest's NDA for Namenda IR tablets and listed the '703 patent in the Orange Book. (*Id.* ¶¶ 64–65.)

On October 16, 2007, at least fourteen generic manufacturers filed ANDAs with Paragraph IV certifications for AB-rated generic formulations of Namenda IR. (*Id.* ¶ 69.) Beginning in January 2008, Forest and Merz filed patent infringement lawsuits against these generic manufacturers, including the Generic Defendants, in the U.S. District Court for the District of Delaware. (*Id.* ¶¶ 70–71.) This triggered 30-month stays on these first-to-file ANDAs, which the IPP alleges would have begun to expire in April 2010. (*Id.* ¶ 72.)

Forest and Merz then obtained a patent extension on the '703 patent under the Hatch-Waxman Act. In March 2009, the '703 patent was extended for five years based on the duration of the FDA's approval process for the NDA. (*Id.* ¶ 67.) [8] This extended the '703 patent's expiration date from April 11, 2010 to April 11, 2015. (*Id.*)

Between July 2009 and December 2009, while the 30-month ANDA stays were in effect, Forest and Merz entered into settlement agreements with the Generic Defendants. (*Id.* ¶ 75.) Pursuant to these settlement agreements, the Generic Defendants agreed to delay market entry until as late as July 11, 2015. (*Id.* ¶ 76.)

All of the Generic Defendants received tentative approval of their ANDAs from the FDA between January 2010 and April 2010, and all had received final approval of their ANDAs by October 2011. (*Id.* ¶ 82–83.)

  **\*9**  In 2014, Forest was granted an additional six months of pediatric exclusivity for Namenda IR based on studies of the drug's efficacy in children with autism. (*Id.* ¶ 68.) This tacked an additional six months of statutory market exclusivity for Namenda IR onto the end of the '703 patent protection period. (*Id.*)

### E. The "Hard Switch"
On August 21, 2009, "less than a month after it had announced the first wave of settlements with generics challenging the Namenda IR patent," Forest submitted

an NDA for a once-a-day, extended release formulation of memantine hydrochloride, Namenda XR. (*Id.* ¶ 98.) The IPP alleges that the NDA did not demonstrate that Namenda XR was more efficacious than Namenda IR. (*Id.*)

The FDA approved the NDA for Namenda XR on June 21, 2010, but Forest did not launch the drug until June 2013. (*Id.* ¶¶ 99, 102.)

After the launch of Namenda XR, Forest used aggressive marketing to begin encouraging patients and physicians to switch from Namenda IR to Namenda XR. (*Id.* ¶ 105.) The IPP alleges that, when that "soft switch" strategy failed, Forest began implementing a strategy in February 2014 that involved discontinuing and/or severely limiting the distribution of Namenda IR. (*Id.* ¶¶ 95, 127–28.) This "hard switch" strategy included: (i) seeking to have the Centers for Medicare and Medicaid Services ("CMS") remove Namenda IR from its reference list; (ii) signing an exclusive distribution agreement with a mail-order only pharmacy; and (iii) requiring physicians to certify that it was medically necessary for patients to take Namenda IR rather than Namenda XR. (*Id.* ¶ 95.) Forest planned to discontinue retail sales of Namenda IR in January 2015. (*Id.*)

In September 2014, New York State filed a complaint against Actavis and Forest alleging violations of the federal Sherman Antitrust Act and New York's Donnelly Act on the basis of the hard switch, and seeking to preliminarily enjoin the defendants from withdrawing Namenda IR from the market. *Namenda II,* 787 F.3d at 649.

In December of 2014, the U.S. District Court for the Southern District of New York (Sweet, J.) entered an order preliminarily enjoining Actavis and Forest from withdrawing Namenda IR from retail shelves. *Namenda I,* 2014 WL 7015198, at \*46. The Second Circuit upheld the injunction. *Namenda II,* 787 F.3d at 663.

The enforcement action was followed by several private, follow-on suits seeking treble damages under federal and state antitrust laws, which are described below.

### III. Procedural History
The IP Action was filed in August of 2015 as a putative class action on behalf of:

Case 2:19-cv-07532-ES-MAH   Document 18-5   Filed 05/22/19   Page 127 of 300 PageID: 435
Sergeants Benevolent Association Health & Welfare Fund v. Actavis, plc, Slip Copy (2018)
2018 WL 7197233

All persons or entities in the United States and its territories who indirectly purchased, paid and/or provided reimbursement for some or all of the purchase price for branded Namenda IR 5 or 10 mg tablets, or Namenda XR capsules, for consumption by themselves, their families, or their members, employees, insureds, participants, or beneficiaries, other than for resale, at any time during the period from April 14, 2010 and continuing until the anticompetitive effects of Defendants' unlawful conduct ceases (the "Class Period").

(CAC ¶ 146.)

The DP Action was filed the following month.[9] Both the IP Action and the DP Action were placed on this Court's docket as related actions shortly thereafter. (*See* 15-cv-7488, entry of Oct. 6, 2015.)

**\*10** Like the enforcement action, the private plaintiffs sought damages on the basis of the "hard switch," but they also alleged damages stemming from the settlement agreements entered into with generic manufacturers. (*See, e.g.*, CAC ¶ 84–86.)

Early in the litigation, this Court granted the parties' request for consolidated briefing on the motions to dismiss both the DP and IP Actions. (Dkt. No. 64.)[10] Thereafter, Actavis, Forest, and Merz submitted a single memorandum of law in support of their motion to dismiss the DP and IP Actions. (Dkt. No. 85 or "Forest Br.".) The Generic Defendants, who had not been named in the DP Action, submitted a separate memorandum of law in support of their motion to dismiss the IP Action. (Dkt. No. 81 or "Gen. Defs. Br.".)

Roughly speaking, Actavis, Forest, and Merz's briefing challenged the sufficiency of the facts alleged in the DPPS' and IPP's Complaints as a whole, while the Generic Defendants' briefing challenged the IPP's ability to bring individual claims as a matter of state law. Each group of Defendants expressly adopted the arguments of the other group, to the extent applicable, in full.

In the IP Action, the IPP filed two separate memoranda of law in opposition to (i) Actavis, Forest, and Merz's motion and (ii) the Generic Defendants' motion. (Dkt. No. 87 or "IPP Resp. to Forest Br."; Dkt. No. 88 or "IPP Resp. to Gen. Defs. Br.".) Actavis, Forest, and Merz filed one reply, and the Generic Defendants filed another. (Dkt. No. 90 or "Forest Reply"; Dkt. No. 89 or "Gen. Defs. Reply.")

On September 13, 2016, this Court issued an order (i) denying in part and granting in part Actavis, Forest, and Merz's motion to dismiss the DP Action; (ii) denying without prejudice Actavis, Forest, and Merz's and the Generic Defendants' motions to dismiss the IP Action; and (iii) placing the 123 state law claims from the IP Action on the Court's suspense calendar pending resolution of the federal antitrust claims in the DP Action.[11] *Namenda III,* 2016 WL 4992690, at *16–*17.

The DP Action proceeded through discovery, summary judgment, and class certification. *See Namenda IV,* 2017 WL 4358244; *Namenda V,* 2018 WL 3970674. Defendants in the DP Action recently sought and were denied leave to appeal this Court's grant of class certification. (15-cv-7488, Dkt. No. 600.)

On September 10, 2018, after the parties to the DP Action expressed interest in mediation, this Court lifted its stay of the IP Action and referred the parties to Magistrate Judge Lehrburger for supervision of "such non-duplicative discovery as is necessary to get the parties to the IPP case up to speed[.]" (Dkt. No. 122 at 2.) The order of September 10, 2018 acknowledged that the 123 state law claims in the IP Action were the subject of a pending motion to dismiss and had yet to be addressed. (*Id.*)

**\*11** Subsequently, Actavis, Forest, Merz, and the Generic Defendants filed renewed motions to dismiss the IP Action, along with supplemental briefing. (Dkt. No. 131-1 or "Gen. Defs. Suppl. Br."; Dkt. No. 133 or "Forest Suppl. Br."; Dkt. No. 152 or "IPP Resp. to Forest Suppl. Br."; Dkt. No. 158 or "IPP Resp. to Gen. Defs. Suppl. Br."; Dkt. No. 159 or "Forest Suppl. Reply"; and Dkt. No. 160 or "Gen. Defs. Suppl. Reply.") Defendants again divided the briefing, with Actavis, Forest, and

2018 WL 7197233

Merz focusing on the sufficiency of the factual allegations regarding the underlying anticompetitive conduct, and the Generic Defendants briefing the requirements of each state's laws in detail.

Presently before the Court are the motions of (1) Actavis, Forest, and Merz and (2) the Generic Defendants to dismiss all 123 state law claims in the IP Action.

## DISCUSSION

### IV. Standard of Review

In deciding a motion to dismiss pursuant to Rule 12(b)(6), the Court must liberally construe all claims, accept all factual allegations in the complaint as true, and draw all reasonable inferences in favor of the plaintiff. *See Cargo Partner AG v. Albatrans, Inc.*, 352 F.3d 41, 44 (2d Cir. 2003); *see also Roth v. Jennings*, 489 F.3d 499, 510 (2d Cir. 2007).

To survive a motion to dismiss, "a complaint must contain sufficient factual matter ... to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007) ). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 556 U.S. at 678 (citing *Twombly,* 550 U.S. at 556).

Finally, a motion to dismiss must be supported by "information contained in the 'four corners' of the complaint." *Hayden v. Cty. of Nassau,* 180 F.3d 42, 54 (2d Cir. 1999). This principally includes facts alleged in the complaint and materials attached to or incorporated by reference into the complaint. *Kramer v. Time Warner Inc.,* 937 F.2d 767, 773 (2d Cir. 1991). It also includes information of which the court takes judicial notice. *Id.*

### V. Count One: Monopolization Under the Laws of 27 States Against Actavis, Forest and Merz

The IPP first brings 27 separate state law claims grouped under the heading "Count One: Monopolization Under State Law." (CAC at 46.) These 27 state laws are all state antitrust or fair competition laws. (CAC ¶ 201.) The IPP asserts these claims against Actavis, Forest, and Merz, but not against the Generic Defendants. (CAC ¶ 201.)

Count One alleges unlawful monopolization based on two separate, anticompetitive acts: (i) the "hard switch" from Namenda IR to Namenda XR and (ii) the "pay to delay" settlement agreements with generic competitors. (CAC ¶¶ 193–96.)

The IPP alleges that both of these acts were part of an "overall scheme," (CAC ¶ 195), perpetuated to "maintain and extend [Forest's] monopoly power in the memantine hydrochloride market," (CAC ¶ 197). In turn, "Forest's unlawful anticompetitive scheme to prevent, delay, and or minimize the success of the introduction into the United States marketplace of any generic versions of Namenda IR enabled Forest to continue charging supra-competitive prices for memantine hydrochloride without a substantial loss of sales." (*Id.*)

The bulk of the parties' briefing is directed to this Count and to Count Two, for conspiracy to monopolize.

Actavis, Forest, and Merz bring a full arsenal of arguments to dismiss Count One, *viz.*:

- Judge Sweet's preliminary injunction in the earlier enforcement action prevented any "hard switch" from Namenda IR to Namenda XR from occurring, and in any case the IPP will be unable to offer any evidence that its plan participants or any member of the Class switched to Namenda XR as a result of the withdrawal announcement, (Forest Br. at 15–34);

- **\*12** • The IPP has expressly disclaimed that it is relying on a theory of unlawful "reverse payments" under *Actavis,* 570 U.S. at 158, to show anticompetitive conduct with respect to the settlement agreements, and, even if the IPP were to rely on such a theory, it cannot plausibly allege that any of the reverse payments made pursuant to the agreements were improper, (Forest Br. at 34–60);

- The IPP's "injuries" caused by the settlement agreements are purely speculative, (Gen. Defs. Br. at 26);

- Because this Court previously dismissed the DPPs' claim for an "overarching scheme," and because the IPP has failed to plead any independently anticompetitive conduct with respect to either the

hard switch or the settlement agreements, this Count must be dismissed, (Forest Br. at 60–62); and

• The antitrust laws of 26 states have limitations periods of five years or fewer making it "likely" that all of the state law claims asserted under Count One are time-barred, (*id.* at 65 n.42).

Actavis, Forest, Merz, and the Generic Defendants also argue for the dismissal of particular state law claims that are part of Count One, *viz.*:

• The IPP lacks Article III standing to assert claim in states where it has not made purchases and thereby suffered injury-in-fact, which are all but nine states, (Forest Br. at 65–66);

• *Illinois Brick* bars the IPP's claims in five states [12] that have not enacted so-called "*Illinois Brick* repealer statutes," (Gen. Defs. Suppl. Br. at 10–11);

• The IPP has failed to satisfy statutory requirements in four states that any plaintiff first notify the state's attorney general before filing a private damages suit, (Gen Defs. Suppl. Br. at 11–13); and

• Claims for unilateral monopolization are inactionable under the laws of three states, (Forest Br. at 82).

### A. The IPP's Underlying Factual Allegations State a Claim for Monopolization

### 1. The IPP Has Stated a Claim for Monopolization Based on the Hard Switch from Namenda IR to Namenda XR

"Well-established case law makes clear that product redesign is anticompetitive when it coerces consumers and impedes competition." *Namenda II,* 787 F.3d at 652. While withdrawing an old product and substituting a new product does not constitute anticompetitive conduct *per se,* "when a monopolist combines product withdrawal with some other conduct, the overall effect of which is to coerce consumers rather than persuade them on the merits, and to impede competition, its actions are anticompetitive[.]" *Id.* at 654 (internal citations omitted).

As part of Count One, the IPP alleges that the IPP "unlawfully switched the conversion of the memantine hydrochloride market from Namenda IR to Namenda

XR" through a variety of anticompetitive measures, including "(i) publicizing to doctors, caregivers and the general public that the discontinuation of Namenda IR was imminent; (ii) significantly limiting or attempting to limit the distribution of Namenda IR; and (iii) requesting that CMS remove Namenda IR tablets from the 2015 Formulary Reference File," all while knowing that Namenda XR was neither safer nor more effective than Namenda IR. (CAC ¶ 195.)

**\*13** In its original, consolidated briefing, Actavis, Forest, and Merz argued that both the DPPs and the IPP had failed to state claims for the hard switch because Judge Sweet's preliminary injunction in the earlier enforcement action, *Namenda I,* had prevented the withdrawal of Namenda IR and therefore any alleged exclusionary conduct from occurring. (Forest Br. at 15.) Defendants also argued that both the DPPs and the IPP had failed to allege injury in fact and to adequately plead antitrust injury resulting from the announcement that Forest was discontinuing Namenda IR. (*Id.* at 30.) Defendants have renewed these arguments in supplemental briefing. (Forest Suppl. Br. at 10.)

### a) Actavis and Forest Are Collaterally Estopped From Arguing That the Anticompetitive Hard Switch Took Place

"Collateral estoppel, or issue preclusion, prevents the relitigation of an issue that was raised, litigated, and actually decided by a judgment in a prior proceeding." *Jim Beam Brands Co. v. Beamish & Crawford Ltd.,* 937 F.2d 729, 734 (2d Cir. 1991). In order to establish that an issue was determined in a former adjudication, a party asserting collateral estoppel must establish four things: (1) the issues in the prior proceeding and the current proceeding are identical; (2) the issue raised in the current action was in fact actually decided in the prior proceeding; (3) there was full and fair opportunity to litigate the issue in the prior proceeding; and (4) the issue previously litigated and decided was necessary to support a valid and final judgment on the merits. *In re PCH Assocs.,* 949 F.2d 585, 593 (2d Cir. 1991).

After discovery in the parallel DP Action had closed, the DPPs sought partial summary judgment on the first count of their Complaint, which alleged that the Defendants' February 2014 announcement of the

2018 WL 7197233

upcoming withdrawal of Namenda IR from the market constituted unlawful monopolization in violation of Section 2 of the Sherman Act. *Namenda IV,* 2017 WL 4358244, at *9.

In *Namenda IV,* this Court ruled, as against Actavis and Forest, that they were collaterally estopped from "relitigating the questions of (1) whether [Forest] possessed monopoly power over the U.S. memantine market up until the entry of generic competition; (2) whether its February 2014 announcement of the upcoming discontinuation of Namenda IR was coercive and anticompetitive; and (3) whether Forest had any non-pretextual procompetitive justification for its illegal conduct." 2017 WL 4358244, at *9–*16. However, this Court denied the DPPs' motion for collateral estoppel with respect to the issue of whether plaintiffs had suffered an antitrust injury, *i.e.,* been forced to switch from Namenda IR to Namenda XR as a result of Forest's withdrawal announcement. *Id.* at *16. [13]

The IPP sought the same relief in connection with the IP Action, (Dkt. Nos. 112, 113), which the Court stayed, (Dkt. No. 120 at 1).

The stay has now been lifted, and the motion is ripe for decision.

The Court grants the motion. For the reasons discussed in *Namenda IV,* 2017 WL 4358244, at *9–*16, Actavis and Forest are collaterally estopped from relitigating the issues of "(1) whether [Forest] possessed monopoly power over the U.S. memantine market up until the entry of generic competition; (2) whether its February 2014 announcement of the upcoming discontinuation of Namenda IR was coercive and anticompetitive; and (3) whether Forest had any non-pretextual procompetitive justification for its illegal conduct." *Id.* at *16. The same findings with respect to *Namenda I* and *II* that created estoppel in that case apply equally here.

**\*14** By the same token, Actavis and Forest are not estopped from making arguments related to the IPP's injury. Their injury argument is addressed in subpart c), *infra.*

*b) Even Though Merz Is Not Collaterally Estopped From Arguing That the Hard Switch*

*Took Place, the IPP Nonetheless States a Claim That the Hard Switch Occurred*

Merz, the only other party named in Count One, is not collaterally estopped from arguing that the IPP fails to state a claim against it because the product hop did not occur. (*See* Dkt. No. 116 at 1.) [14] Merz was not a party to the action in *Namenda I* or *Namenda II,* and the IPP did not move for collateral estoppel with respect to Merz in this action. (*See* Dkt. No. 113.)

Nonetheless, for the same reasons discussed in *Namenda III,* I find that the IPP has stated a plausible claim that the product hop occurred.

In *Namenda III,* I found it persuasive for purposes of the DPPs' federal claims that both the *Namenda I* and *Namenda II* courts had identified exclusionary conduct that occurred prior to the entry of the preliminary injunction. *See Namenda III,* 2016 WL 4992690, at * 10 —*11. As a result, I held that the DPPs had alleged an injury on the basis that "they were forced to pay for certain patients' memantine treatment at brand-name prices because these patients switched to Namenda XR *prior* to the entry of the injunction." *Namenda III,* 2016 WL 4992690, at *12 (emphasis in original). Plaintiffs' injury, the Court found, was that they were forced to pay for Namenda XR *after generic entry—* when absent Defendants' anticompetitive conduct, their patients' prescriptions would have been filled by a far cheaper generic." *Id.* (emphasis in original). In other words, the DPPs had adequately pled that Forest's announcement discontinuing Namenda IR, as well as the tactics that accompanied the announcement, was sufficiently coercive.

The very same reasoning applies to the IPP Complaint. The IPP alleges it was injured because it was deprived of the opportunity to buy lower-priced generic Namenda IR and forced to buy more expensive branded Namenda XR. (CAC ¶ 202.) Further, like the DPP Complaint, the IPP Complaint alleges that once patients switched their prescriptions as a result of the "hard switch" tactics, "reverse commuting" back to Namenda IR was highly unlikely. (*Id.* ¶ 126.) These allegations are substantively identical to those in the DPP Complaint, and they therefore survive a motion to dismiss for the same reasons articulated by this Court in *Namenda III.*

Sergeants Benevolent Association Health & Welfare Fund v. Actavis, plc, Slip Copy (2018)

2018 WL 7197233

### c) The IPP Sufficiently Pleads That It
### Was Injured as a Result of the Hard Switch

According to Actavis, Forest, and Merz, the IPP has failed to allege a cognizable antitrust injury based on Forest's announcement that it was discontinuing the Namenda IR formulation, because the IPP will not be able to establish "antitrust injury," *i.e.*, that these tactics actually *caused* consumers to switch from Namenda IR to Namenda XR. (Forest Suppl. Br. at 10.)

**\*15**  "Antitrust injury" is a component of antitrust standing under federal law. "Unlike the United States government, which is authorized to sue anyone violating the antitrust laws, a private antitrust plaintiff must show 'standing' to sue" in a federal antitrust case. Phillip E. Areeda & Herbert Hovenkamp, *Fundamentals of Antitrust Law,* § 3.01[A] (4th ed. 2018 suppl.). Among other standing requirements, a plaintiff must show that it has suffered "antitrust injury," which is "defined as the kind of injury that the antitrust laws were intended to prevent and 'flows from that which makes defendants' acts unlawful.' " *Id.* (citing *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977) ).

Previously, with respect to the DP Action, this Court held that the DPPs would be required to show at the summary judgment stage that "patients switched to Namenda XR because of the announced withdrawal of Namenda IR ... prior to the injunction." *Namenda III,* 2016 WL 4992690, at *12. However, that holding related to the *wholesaler plaintiffs*' claims *under federal law,* which unquestionably requires that a private plaintiff demonstrate antitrust standing before he can proceed with his claim.

Here, however, the IPP alleges no claims under federal law. So that argument fails as a matter of law. To the extent Actavis, Forest, and Merz raise the federal requirement of "antitrust injury" as grounds for dismissal of the 27 state law claims in Count One, this argument is irrelevant.

Actavis, Forest, and Merz have not briefed whether each of the 27 *state laws* under which the IPP brings monopolization claims each contains a similar "antitrust injury" or "antitrust standing" requirement. (*See* Forest Suppl. Br. at 10–11.) *McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215 (2d Cir. 2008), cited by Actavis, Forest, and

Merz, is inapposite, not the least because it is a RICO case —with federal mail and wire fraud as the predicate acts— and not an indirect purchaser case based on state antitrust laws. *Id.* at 222. Therefore, I conclude that they have no basis to argue that the IPP has not sufficiently alleged injury under any of the 27 state law monopolization theories.

In supplemental briefing, Actavis, Forest, and Merz argue for the first time that the IPP Complaint does not plausibly allege any antitrust injury because the plaintiffs' expert in the DP Action "disclaimed any need to assess why patients switched to Namenda XR." (Forest Suppl. Br. at 10.) They highlight the fact that one of the DPPs' experts in that Action, Dr. Russell Lamb, calculated "aggregate overcharge damages" rather than "individualized analysis" for purposes of class certification. *Namenda V,* 2018 WL 3970674, at *10. In the DP Action, the Court found that this was sufficient to defeat Defendants' motion for summary judgment, because direct purchasers would have been indifferent to individual consumers' choices and instead would have paid attention to the market as a whole. *Id.* at *30.

The methodology used by the DPPs' expert—namely, evidence on a motion for summary judgment in the DP Action—is of no relevance in deciding whether the IPP has pleaded (not proven) a state antitrust violation. This argument is a red herring and entirely unpersuasive on a motion addressed to the pleadings.

### 2. The IPP States a Claim for Monopolization
### Based on the Settlement Agreements

As discussed, when a patent holder provides favorable terms to an alleged infringer as part of a settlement agreement, this is called a "reverse payment." *Actavis,* 570 U.S. at 141. The Supreme Court has held that "a reverse payment, where large and unjustified, can bring with it the risk of significant anticompetitive effects." *Id.* at 158. Reverse payments comprised of cash, nominally conferred as compensation for avoided litigation costs, are most suspect, but reverse payments may also provide value in the form of early entry licenses, a period of exclusivity, or cash for avoided litigation costs. *King Drug Co. of Florence, Inc. v. Smithkline Beecham Corp.*, 791 F.3d 388, 403 (3d Cir. 2015) ("We do not believe *Actavis's* holding can be limited to reverse payments of cash."); *accord In re*

*Loestrin 24 Fe Antitrust Litig.*, 814 F.3d 538, 552 (1st Cir. 2016).

**\*16**  As mentioned above, Count One for monopolization under the laws of 27 states alleges that, in addition to engaging in an anticompetitive hard switch, Actavis, Forest, and Merz "entered into unlawful agreements" with generic manufacturers "to settle patent infringement suits as part of an overall anticompetitive scheme." (CAC ¶¶ 193.)

Actavis, Forest, and Merz have moved to dismiss Count One on the ground that the IPP has failed to state a claim that the settlement agreements were, in and of themselves, unlawful. (Gen. Defs' Suppl. Br. at 3; Forest Suppl. Br, at 4.)

### a) The IPP Brings a Reverse Payments Case Under **Actavis**

Defendants first argue that the IPP actually disclaims reliance on a reverse payment theory under *Actavis,* 570 U.S. 136. (Gen. Defs. Suppl. Br. at 3; Forest Suppl. Br. at 4.) They support this argument with several quotations from the IPP's brief in opposition to their original motions to dismiss. (Gen. Defs. Suppl. Br. at 4; Forest Suppl. Br. at 4.) These include the following statements made by the IPP, among others: "Forest desperately tries to convert the [IPP]'s theory of its case into a reverse payment settlement case, which it is not." (IPP Resp. to Forest Br. at 25.) "The [IPP] has not pled any reverse payment agreement claims." (*Id.*)

However, despite this language, the IPP argues, in this very same brief, "Even under an Actavis analysis, the [IPP]'s Complaint survives. *See* Directs' Brief, which the [IPP] adopts and incorporates by reference." (*Id.* at 27.) Over several pages, the IPP then fleshes out a claim under *Actavis,* including that the early entry dates should trigger scrutiny because the negotiated entry dates fell after expiration of the '703 patent and only three months before expiration of the pediatric exclusivity period, (*id.* at 27) and that the acceleration clauses in the settlement agreements, like most favored nation clauses, constitute reverse payments under *Actavis, (id.* at 29). In supplemental briefing, moreover, the IPP argued that the payments in the settlement agreements were unlawful

because they exceeded expected litigation costs. (IPP Resp. to Forest Suppl. Br. at 10.)

So the pertinent question is: does the CAC allege facts that adequately plead a claim under *Actavis,* even if the IPP identified the proper legal theory only in the alternative?

### b) The IPP States a Claim for Unlawful Reverse Payments in the Form of Early Entry Licenses, Cash Payments, and Unspecified Benefits

Defendants argue—as they did in their original motion to dismiss—that early entry licenses are *per se* pro-competitive and do not constitute reverse payments in violation of the rule laid out in *Actavis.* (Forest Suppl. Br. at 6.) In particular, Defendants point out that the early entry licenses permitted the Generic Defendants to enter three months before the pediatric exclusivity period expired. (Gen. Defs. Suppl. Br. at 5.)

Defendants also argue that any monetary payments the Generic Defendants received as part of the settlement agreements constituted avoided litigation costs, as lawfully permitted by *Actavis.* (Forest Suppl. Br. at 6–7; Gen. Defs. Suppl. Br. at 5–7.)

Finally, they state that the IPP's allegations with respect to the reverse payments are bare and conclusory, and they therefore must be dismissed under *Twombly,* 550 U.S. at 557. (Forest Suppl. Br, at 6; Gen. Defs. Suppl. Br. at 6–7.)

**\*17**  In *Namenda III,* this Court held that the DPPs had stated a claim against Actavis, Forest, and Merz based on the reverse settlement agreements with generic manufacturers. 2016 WL 4992690, at \*15. As part of that decision, the Court said it could not determine as a matter of law that the settlement agreements were *not* anticompetitive simply because they allowed for entry prior to the end of exclusivity. *Id.* The Court distinguished *Actos I,* 2015 WL 5610752, at \*13, which had found that certain early entry licenses did not constitute anticompetitive reverse payments, because the plaintiffs in that case had not alleged a two-step anticompetitive scheme involving a post-settlement product hop. *Id.*

This same reasoning is applicable to the instant motion. Defendants have not cited any new, controlling case law which holds that, as a matter of law, early entry licenses

2018 WL 7197233

are immune from antitrust scrutiny. And as discussed above, the opinions in *King Drug,* 791 F.3d at 403, and *Loestrin 24 Fe,* 814 F.3d at 552, suggest that no item of value that was transferred from plaintiff to defendant is immune from antitrust scrutiny as a matter of law. Rather, all benefits conferred as part of a settlement agreement are subject to antitrust review under the Rule of Reason. *See also* 2 William C. Holmes, *Intellectual Property and Antitrust Law* § 38:3 (Sept. 2018 update) (recent decisions on reverse payments "appear to favor a burden-shifting analysis keyed into the size of the reverse payment, proof of demonstrated anticompetitive effects, and the presence or absence of plausible justifications for the payment, with the trier balancing anticompetitive effects against procompetitive justifications").

Regarding the alleged cash payments for avoided litigation costs, the Court held in *Namenda III* that *Actavis* required courts to compare a given payment to estimated future litigation costs and to "consider whether a payment 'reflects traditional settlement considerations, such as avoided litigation costs or fair value for services' to determine if it was justified. 2016 WL 4992690, at *14 (internal quotation omitted). "These intrinsically fact-based determinations," the Court found, "cannot be made on a pre-answer motion to dismiss." *Id.* The Court also rejected Defendants' argument that the FTC had created a universal safe harbor for litigation costs up to $7 million. *Id.* at 29.

Actavis, Forest, and Merz now argue for the first time in supplemental briefing that "the FTC has subsequently extended the safe harbor to additional reverse payment consent orders." (Forest Suppl. Br. at 7.) The Court has read these consent orders. They do exclude "compensation for saved future litigation expenses of up to $7 million." *See, e.g.*, Stip. Order at 3–4, *FTC v. Altergan*, No. 17-cv-312 (N.D. Cal. Jan. 23, 2017), ECF No. 4. But they do not announce a shift in FTC policy that would automatically immunize all payments under $7 million in all lawsuits and contexts from allegations of anticompetitive conduct under *Actavis.*

Finally, the Court disagrees with the Defendants that the IPP has not met its burden under *Twombly* with respect to the reverse payments simply because the Complaint does not estimate the value of the payments or anticipated litigation costs. (Gen. Defs. Suppl. Br. at 6.) The Complaint alleges that the Generic Defendants

"very likely received something of value in exchange for the agreement to delay entry," (CAC ¶ 76) and no more is required at the motion to dismiss stage. Courts do not "require that the plaintiffs provide precise figures and calculations at the pleading stage" because "very precise and particularized estimates of fair value and anticipated litigation costs may require evidence in the exclusive possession of the defendants, as well as expert analysis." *Loestrin,* 814 F.3d at 552; *see also In re Opana ER Antitrust Litigation,* 162 F. Supp. 3d 704, 718 (N.D. Ill. 2016) ("precise valuation may require discovery").

### c) The IPP Sufficiently Alleges That It Was Injured as a Result of the Settlement Agreements.

**\*18**  Finally, Defendants argue that the IPP fails to adequately plead that the settlement agreements caused it antitrust injury. (Gen. Defs. Br. at 26.) The IPP's injuries are too speculative, they argue, because "Plaintiffs sole theory of harm ... is that consumers would have been able to purchase lower-price generic products earlier" had the litigation not settled. (*Id.*) Obviously, this would have lowered the amount the IPP would have to reimburse individual consumers who were beneficiaries under its plans.

The IPP alleges that, absent the unlawful settlement agreements, one of three events would have occurred that would have allowed for earlier entry of generic Namenda: (i) the generics would have prevailed in the patent litigation against Forest and Merz; (ii) the Generic Defendants would have launched "at risk" prior to the resolution of the patent litigation; or (iii) Forest and Merz would have settled the litigation legally with an earlier generic entry date. (CAC ¶ 81.)

The IPP's theory is similar to that of the DPPs, and in *Namenda III* this Court found that the DPPs had adequately alleged antitrust injury as a result of the settlement agreements. *Namenda III,* 2016 WL 4992690, at *15.

Specifically, with respect to the first early entry scenario, this Court held that, while the DPPs had alleged no facts to suggest that Forest's and Merz's patent was invalid or that the Generic Defendants would have prevailed in litigation, this could be left to the summary judgment stage. *Id.* ("To survive a motion for summary judgment,

[the DPPs] will have to substantiate these allegations with evidence suggesting that the settlement agreements did, in fact, delay generic entry and that the delay had the effect of allowing Forest to complete the hard switch."). There is no reason this Court should now find otherwise with respect to the CAC in the IP Action.

With respect to the second possible early entry scenario, an "at risk" launch, the IPP has alleged that the FDA tentatively approved the ANDAs of several of the generic companies in early 2010, (CAC ¶ 82, 83), and that an unusually large number of generic manufacturers (14) submitted ANDAs with Paragraph IV certifications for Namenda IR, as compared to other branded drugs, (id. ¶ 69). Defendants argue that this is insufficient to show that an "at risk" launch was anything more than speculative, particularly given the expense of "at risk" launches and the fact that the Delaware court had issued claim construction opinions in the patent litigation that were unfavorable to the generic manufacturers. (Forest Br. at 41–42.) Again, however, this Court heard these very same arguments in *Namenda III* and found that they were more appropriately determined after discovery at the summary judgment stage. 2016 WL 4992690, at *15.

Finally, with respect to the third, "alternative settlement" theory, the IPP alleges that, in the absence of unlawful settlement agreements that caused the Generic Defendants to act against their self-interest when settling, earlier entry would have been possible. (CAC ¶ 84.) Defendants argue that this impermissibly second guesses an otherwise pro-competitive settlement. (Forest Br. at 44 ("Plaintiffs [*sic*] cannot premise an antitrust theory on the claim that they [*sic*] could imagine a different agreement that might have been *even more* procompetitive.") (emphasis in original).) Once again, however, the Court rejected this argument in *Namenda III*, 2016 WL 4992690, at *15; and other courts have expressly recognized the viability of the "alternative settlement" theory in this type of litigation, *In re Androgel Antitrust Litig. (No. II)*, No. 09-md-2084, 2018 WL 2984873, at *16 (N.D. Ga. June 14, 2018) (collecting cases).

**\*19** This Court thus concludes that the IPP has stated a claim for monopolization on the basis of the settlement agreements.

### 3. The Court's Earlier Ruling Regarding the DPPs' Overarching Scheme Claim Does Not Support Dismissing Count One

Defendants next argue that the IPP fails to state a claim for an "anticompetitive scheme" under Count One. (Forest Suppl. Br. at 9.) Defendants argue that, because the IPP fails to state a claim for either an anticompetitive hard switch or for anticompetitive settlement agreements, it cannot use an "overarching scheme" claim to tie this conduct together. But since this Court has already found that the IPP does state a claim on the basis of both the hard switch and the settlement agreements, this argument fails.

In addition, any ruling regarding the duplicative nature of the overarching scheme claim was confined to the DP Action. The DPPs had brought five claims, the first three of which alleged violations of Section 2 of the Sherman Act. (15-cv-7488, Dkt. No. 29 ¶¶ 237–65.) In the DPP Complaint, Count I was based on the hard switch, and Count III was based on the settlement agreements. (*Id.*) Count II alleged an "overarching scheme" based on the hard switch and settlement agreements. (*Id.*) Counts I through III were all asserted against Actavis, Forest, and Merz. (*Id.*) In *Namenda III*, this Court held that the "overarching scheme" claim was duplicative of the claims related to the product hop and the settlement agreements. 2016 WL 4992690, at *16.

The IPP Complaint is structured differently. It contains four Counts, the first two of which allege antitrust offenses under the laws of 27 states. (CAC ¶¶ 191–210.) As discussed earlier in this opinion, Count One alleges monopolization against Actavis, Forest, and Merz based on both the hard switch and the settlement agreements. (*Id.*) Count Two alleges a conspiracy to monopolize against all Defendants—Actavis, Forest, Merz, and the Generic Defendants—and bases these allegations on the settlement agreements but not on the hard switch. (*Id.*) Plainly, Counts One and Two are not duplicative because (i) they are asserted against different groups of defendants, and (ii) they are grounded in different conduct (conspiracy to monopolize being a separate theory from actual monopolization).

The Court therefore denies Actavis, Forest, and Merz's motion to dismiss Count One.

#### 4. The Statute of Limitations Argument Is Inadequately Briefed With Respect to the IP Action

In their original brief in support of their motion to dismiss both the DP and IP Actions, Actavis, Forest, and Merz argued that the DPPs' claims were time-barred. (Forest Br. at 62–65.)

In *Namenda III*, this Court rejected Defendants' argument that the DPPs' claims based on the settlement agreements were time-barred because the DPP Complaint was filed more than five years after the last settlement agreement was executed. 2016 WL 4992690, at *16. Relying on *Berkey Photo Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 295–96 (2d Cir. 1979), it held that "a purchaser suing a monopolist for overcharges paid within the previous four years may satisfy the conduct prerequisite to recovery by pointing to anticompetitive actions taken before the limitations periods"—but confined the damages period to four years before the filing of the DP Action based on the four-year statute of limitations in the Sherman Act. *Id.*

**\*20** The original brief's discussion of the statute of limitations and the IPP Complaint was limited to two footnotes. The first footnote urged the Court to limit the IPP's damages "to four years prior to the filing of the Complaint—August 19, 2011, as opposed to the damages period asserted by IPPs [*sic*] as of April 14, 2010." (*Id.* at 62 n.41.)

This I cannot do. As Defendants themselves have acknowledged, the limitations period for each state's antitrust law is not uniformly four years. (*See* App'x 2.) Moreover, the parties have not briefed whether *Berkey Photo*, 603 F.2d at 267–68, which considered the question of ongoing injury with respect to the Sherman Act, is applicable to antitrust claims brought under state law.

In their second footnote, Defendants argue: "[T]he antitrust laws of 26 states alleged by IPPs [*sic*], the consumer protection laws of 21 states alleged by IPPs [*sic*], and the unjust enrichment claims of 28 states alleged by the IPP have limitations periods of five years or less (*see* Appendices 2–4), making it likely that these claims are also time-barred." (*Id.* at 65 n.42.)[15]

"Likely" is not a standard that results in dismissal. This Court cannot make a sweeping inference about

statutes of limitation for state antitrust laws on the basis of federal cases interpreting the Sherman Act. Nor will it independently undertake a review each state's requirements, armed with only a number in the cell of a table and without the movants' having briefed the issues. If the issue is important enough to movants, they can call relevant cases under relevant laws to the court's attention. I will not do Defendants' work for them.

As a result, Actavis, Forest, and Merz's motion to dismiss—or, in the alternative, shorten—the Count One claims on statute of limitations grounds is denied without prejudice. However, as I will not immediately entertain a new motion, they will have to wait until discovery is over to make any renewed motion.

### B. The IPP States a Claim for Monopolization Under the Laws of Some States But Not Others

I now turn to Defendants' arguments regarding the individual state law claims alleged under Count One.

#### 1. The IPP Has Article III Standing To Bring State Law Monopolization Claims on Behalf of Class Members Who Made Purchases in Those States

Defendants argue that the IPP may bring class claims only under the laws of eleven states—Delaware, Florida, Georgia,[16] Kansas, Nevada, New Jersey, New York, Pennsylvania,[17] South Carolina, and Virginia—because, as the Named Plaintiff, the IPP "lack[s] standing to assert claims under the laws of the states in which they [*sic*] do not reside or in which they [*sic*] suffered no injury." (Forest Br. at 65–66; Gen. Defs. Br. at 32–33.)

In supplemental briefing, however, Defendants concede that, pursuant to the Second Circuit's recent ruling in *Langan v. Johnson & Johnson Consumer Cos.*, 897 F.3d 88, 96 (2d Cir. 2018), this is a "question of predominance under Rule 23(b)(3), not a question of standing under Article III." (Gen. Defs. Suppl. Br. at 9 (quoting *Langan*, 897 F.3d at 96.) )

**\*21** In *Langan*, which came before the Second Circuit on review of a grant of class certification, the Second Circuit denied Defendants' motion to de-certify the class and dismiss the case because the named plaintiff had not

2018 WL 7197233

suffered injury-in-fact in each state where she asserted claims:

> [W]e write to make explicit what we previously assumed in *In re Foodservice Inc. Pricing Litigation*, 729 F.3d 108 (2d Cir. 2013): as long as the named plaintiffs have standing to sue the named defendants, any concern about whether it is proper for a class to include out-of-state, nonparty class members with claims subject to different state laws is a question of predominance under Rule 23(b)(3), *id.* at 126–27, not a question of 'adjudicatory competence' under Article III[.]

897 F.3d 88, 93 (2d Cir. 2018). Since *Langan*, a number of district court opinions have followed its reasoning to deny motions to dismiss state law claims on Article III standing grounds because the named plaintiff did not make in-state purchases and thereby suffer injury-in-fact in those states. *See, e.g., Daniel v. Tootsie Roll Indus., LLC*, No. 17-cv-7541, 2018 WL 3650015, at *5 (S.D.N.Y. Aug. 1, 2018) (applying *Langan* to hold that named plaintiffs had Article III standing to assert claims on behalf of "nonparty class members with claims subject to different state laws"); *Donnenfeld v. Petro, Inc.*, No. 17-cv-2310, 2018 WL 4356727, at *12 (E.D.N.Y. Sept. 12, 2018) (denying defendant's motion to dismiss state consumer protection claims in states in which the plaintiff did not reside); *Holve v. McCormick & Co., Inc.*, No. 16-cv-6702, 2018 WL 3861406, at *10 (W.D.N.Y. Aug. 14, 2018) (holding that named plaintiff had Article III standing to bring class claims under Maryland state law). Thus, the Court will not presently grant Defendants' motion to dismiss a broad swath of the IPP's state law claims for lack of Article III standing.

I write briefly to note that *Langan* gives rise to certain prudential concerns for CAFA class actions. It seems clear enough that Sergeants Benevolent cannot state a claim under the laws of at least some states whose laws are pleaded in its Complaint. Put otherwise, if there were no CAFA and the IPP brought a monopolization claim under

the law of, say, Utah, that action would be dismissed on motion because the IPP could not state a claim under the relevant law. No state court would allow it to continue as a plaintiff on the theory that the proper time to deal with this question was at class certification. An entity that has no claim fails to state a claim—not as a matter of Article III standing (the issue addressed in *Langan*) but under Rule 12(b)(6) or its state court equivalent. Yet a number of courts, purporting to follow *Langan*, have concluded that, because a class plaintiff who fails to state a claim under a particular state's law (*i.e.*, it cannot recover for the alleged violation of law for its own account) nonetheless has Article III standing, the issue of whether the plaintiff fails to state a claim should abide a decision on a motion for class certification.

This court does not read *Langan* any more broadly than it purports to reach. Nothing in *Langan*, as I read it, precludes a defendant from moving to dismiss a CAFA plaintiff's claims under a particular statute pursuant to Rule 12(b)(6), on the grounds that the plaintiff fails to state a claim for its own account—a question entirely different from whether it has constitutional standing. CAFA—which confers no substantive rights on any litigant, but simply permits certain cases that do not otherwise belong in a federal court to be brought here—cannot be read to enable plaintiffs to state claims when the laws of the several states specifically provide to the contrary. It is imperative that too much not be read into *Langan* since neither CAFA nor state consumer protection laws require counsel to compete with other advocates for the positions of class counsel and lead plaintiff, both of which create healthy incentives to find the best class representative(s) possible.

**\*22** For those courts that read *Langan* more broadly than I do, it is enough that a district court can conclude that a class plaintiff is not an appropriate class representative because he/it fails to state a claim at the class certification stage. But that comes at cost. A district court's inability to address these arguments at the motion to dismiss stage increases a plaintiff's leverage with respect to settlement negotiations, without any additional effort on its part.

So while I accept that *Langan* forecloses any argument that a CAFA plaintiff's claims should be dismissed on motion for lack of Article III standing, I decline to read it as foreclosing consideration of a properly made Rule 12(b)

2018 WL 7197233

(6) motion at the motion to dismiss stage—a subject that the Court of Appeals nowhere addressed.

### 2. The IPP Fails to State a Claim for Monopolization in Three States That Follow *Illinois Brick* (Florida, Massachusetts, and Utah)

Defendants next argue that the IPP fails to state a claim under Rule 12(b)(6) under the antitrust laws of Florida, Massachusetts, Puerto Rico, Rhode Island, and Utah, because these states follow the rule of *Illinois Brick* and prohibit indirect purchaser actions. (Forest Br. at 66; Gen. Defs. Br. 35–36; Gen. Defs. Suppl. Br. at 10 n.4.) [18] They are correct about three of these states.

#### a) Florida

Count One of the IPP Complaint alleges a claim for monopolization under Fla. Stat. §§ 501.201, *et seq.* (CAC ¶ 201(d).) Actavis, Forest, and Merz argue that because the Florida Antitrust Act applies *Illinois Brick*, the IPP cannot recover as an indirect purchaser. (Forest Suppl. Br. at 10 n.4.)

I first note that the IPP incorrectly cites to the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), Fla. Stat. §§ 501.201, *et seq.*, rather than the Florida Antitrust Act, *id.* §§ 542.15, *et seq.* I construe this as a typographical error but hold that Defendants are correct that the Florida Antitrust Act does not permit indirect purchaser recovery. "Florida adheres to the 'direct purchaser' rule enunciated in *Illinois Brick*." *Mack v. Bristol-Myers Squibb Co.*, 673 So.2d 100, 102 (Fla. Dist. Ct. App. 1996).

The Court therefore **DISMISSES** the IPP's Florida Antitrust Act claim under Count One.

#### b) Massachusetts

Count One of the IPP Complaint alleges a claims for monopolization under Mass. Gen. Laws, ch. 93A. (CAC ¶ 201(i).) Defendants move to dismiss the Massachusetts law claim under Count One on the basis that Massachusetts follows *Illinois Brick*. (Gen. Defs.

Suppl. Br. at 10 n.4 (citing *Ciardi v. Hoffman-La Roche, Ltd.*, 762 N.E.3d 303, 308 (Mass. 2002) ).)

Again, I note that the IPP has incorrectly cited to chapter 93A, Massachusetts' consumer protection statute, rather than chapter 93, its antitrust statute. I again treat this as a typographical error, particularly since the IPP's conspiracy to monopolize claim is brought under chapter 93. I dismiss the claim anyway because *Ciardi* is squarely on point. Chapter 93 A (consumer protection) allows indirect purchaser claims; chapter 93 (antitrust) does not. "Because the Antitrust Act is to be construed in harmony with judicial interpretations of comparable Federal antitrust statutes, the rule of law established in *Illinois Brick Co. v. Illinois* ... would apply with equal force to preclude claims brought under G.L. c. 93 by indirect purchasers in Massachusetts." *Ciardi*, 762 N.E.2d at 308; *see also In re EpiPen ( Epinephrine Injection, USP) Mktg., Sales Practices & Antitrust Litig.*, No. 17-md-2785, 2018 WL 3973153, at *32 n.20 (D. Kan. Aug. 20, 2018).

**\*23** The Court therefore **DISMISSES** the IPP's Massachusetts law claim under Count One.

#### c) Puerto Rico

Count One of the IPP Complaint alleges a claim for monopolization under the Puerto Rico Antitrust Act ("PRAA"), 10 P.R. Laws §§ 263, *et seq.* (CAC ¶ 201(aa).) Defendants move to dismiss because, while Puerto Rico does not expressly prohibit suits by indirect purchasers, the PRAA is modeled after the Clayton Act, under which indirect purchasers lack standing pursuant to the Supreme Court's decision in *Illinois Brick*. (Forest Suppl. Br. at 10 n.4.) The IPP counters that the PRAA does not limit standing to direct purchasers. (IPP Resp. to Gen. Defs. Br. at 11–12 (citing *Rivera-Muniz v. Horizon Lines Inc.*, 737 F. Supp. 2d 57, 61 (D.P.R. 2010) ).)

Again, the correct citation for the PRAA is 10 L.P.R.A. §§ 257, *et seq.*, as section 263 covers price discrimination, specifically. The monopolization offense is found at 10 L.P.R.A. § 260. I once again construe this as a typographical error.

The Court recognizes that many district courts in the continental United States have dismissed indirect purchaser claims under the PRAA for lack of standing,

based on the idea that the PRAA is modeled on federal statutes that do not extend standing to indirect purchasers. *See, e.g., Opana ER*, 162 F.Supp.3d at 723 (collecting cases); *In re Digital Music Antitrust Litig.*, 812 F. Supp. 2d 390, 413 (S.D.N.Y. 2011).

Nonetheless, this Court finds that the U.S. District Court for the District of Puerto Rico has more faithfully interpreted the standing requirements of the PRAA, in light of how the Supreme Court of Puerto Rico reads that statute. *Rivera-Muniz*, 737 F. Supp. 2d at 61 (citing *Pressure Vessels P.R. v. Empire Gas P.R.*, 137 D.P.R. 497, 520 (P.R. 1994) ).

In *Pressure Vessels*, the Supreme Court of Puerto Rico interpreted the private damages section of the PRAA to hold that private remedies were available to any plaintiff who met the following conditions: (1) the person was harmed in his business or property (2) by reason of (3) actions prohibited by law. 137 D.P.R. at 518. The Supreme Court of Puerto Rico reasoned that, in order to satisfy this second prong, a plaintiff need only allege that "as a consequence of the legal violation, he has been injured." *Id.* at 520. Based on this interpretation of the PRAA in *Pressure Vessels*, the Court in *Rivera-Muniz* held, "Because Puerto Rico liberally construes its standing requirements in private antitrust cases, it is immaterial whether Plaintiffs are direct or indirect purchasers." *Rivera-Muniz*, 737 F. Supp. 2d at 61 (internal citation omitted).

Defendants' motion to dismiss this claim is, therefore, **DENIED**.

### d) Rhode Island

Count One of the IPP Complaint alleges a claim for monopolization under R.I. Gen. Laws §§ 6-36-1, *et seq.* (CAC ¶ 201(t).) Defendants move to dismiss this claim on the grounds that Rhode Island's *Illinois Brick* repealer statute went into effect on July 15, 2013. (Forest Suppl. Br, at 10 n.4.) Several federal district courts have held that the statute does not have retroactive application. *See, e.g., In re Effexor Antitrust Litig.*, No. 11-cv-5661, 2018 WL 4466050, at *16 (D.N.J. Sept. 18, 2018) (also analyzing general presumption against retroactive application in Rhode Island law); *In re Niaspan Antitrust Litig.*, 42 F. Supp. 3d 735, 759 (E.D. Pa. 2014) (same).

*24 The Court agrees with Defendants and with the weight of federal case law and finds that the IPP cannot bring claims under Rhode Island's antitrust law for conduct occurring before July 15, 2013. As a result, the Court **DISMISSES IN PART** the Rhode Island law claim under Count One, to the extent it seeks damages prior to that date. *See Niaspan*, 42 F. Supp. 3d at 759 (restricting end payor plaintiffs from "recover[ing] for any overcharges incurred before the ... Rhode Island repealer statute took effect").

### e) Utah

Count One of the IPP Complaint alleges a claim for monopolization under Utah Code §§ 76-10-1301, *et seq.* [*sic*].[19] (CAC ¶ 201(w).) Defendants move to dismiss this claim on *Illinois Brick* grounds, arguing, "Indirect purchasers may only bring claims under the Utah Antitrust Act if they are citizens or residents of Utah." (Gen. Defs. Br. at 35–36 n.15 (citing Utah Code § 76-10-3109).)

Despite Defendants' characterization, this is not in fact an *Illinois Brick* argument but instead an argument about the ability of the Named Plaintiff to state a claim under the Utah Antitrust Act pursuant to Federal Rule of Civil Procedure 12(b)(6). The statute reads, in relevant part: "A person who is a citizen of this state or a resident of this state and who is injured or is threatened with injury in his business or property by a violation of the Utah Antitrust Act may bring an action for injunctive relief and damages, regardless of whether the person dealt directly or indirectly with the defendant." Utah Code § 76-10-3109.

"The majority of courts that have been presented with this statute require at least one Utah citizen or resident be a named plaintiff." *Effexor*, 2018 WL 6003893, at *17 (collecting cases); *see also GEICO Corp. v. Autoliv, Inc.*, No. 16-13189, 2018 WL 5077767, at *27 (E.D. Mich. Aug. 30, 2018) (dismissing Utah antitrust claim with prejudice.)

Sergeants Benevolent, the sole Named Plaintiff in this case, has not alleged anywhere in the Complaint that it is a citizen or resident of Utah. Therefore, it fails to plead an element required to state a claim under the Utah Antitrust Act. The possibility that some beneficiary of the IPP may have retired to Utah is not enough,

Case 2:19-cv-07532-ES-MAH   Document 18-5   Filed 05/22/19   Page 139 of 300 PageID: 447
Sergeants Benevolent Association Health & Welfare Fund v. Actavis, plc, Slip Copy (2018)

2018 WL 7197233

because none of the IPP's beneficiaries is a *named* plaintiff. Defendants' motion to dismiss the Utah monopolization claim under Count One pursuant to Rule 12(b)(6) is, therefore, **GRANTED**.

### 3. The IPP's Failure To Satisfy Pre-Suit Notification Requirements Does Not Warrant Dismissal of the Claims in Three States (Hawaii, Arizona, and Nevada)

In supplemental briefing, Defendants argue for the first time that the IPP's state antitrust claims under the laws of Arizona, Hawaii, and Nevada fail because the IPP has not alleged that it has complied with state law notice requirements. (Forest Suppl. Br. at 12; Gen. Defs. Suppl. Br. at 12–13.)

### *a) Hawaii*[20]

Count One of the IPP Complaint alleges an antitrust under Haw. Rev. Stat §§ 480, *et seq.* (CAC ¶ 201(e).) The Hawaii Antitrust Act reads, in relevant part: "A class action for claims for a violation of this chapter other than claims for unfair or deceptive acts or practices may be filed, and may be prosecuted on behalf of indirect purchasers by a person other than the attorney general as follows: (1) A filed copy of the complaint and all relevant supporting and exculpatory materials in possession of the proposed class representative or its counsel shall be served on the attorney general not later than seven days after filing of the complaint." Haw. Rev. Stat. § 480-13.3(a).

**\*25** Generic Defendants argue that notice of suit must be provided to the state's attorney general and that failure to do so requires dismissal. (Gen. Defs. Suppl. Br. at 12 (citing Haw. Rev. Stat. § 480-13.3).) The IPP responds that at least two courts have allowed plaintiffs to proceed under the Hawaii Antitrust Act, despite their failure to comply with pre-suit notice requirements. (IPP Resp. to Gen. Defs. Suppl. Br. at 16 (citing *In re Aggrenox Antitrust Litig.*, 94 F. Supp. 3d 224, 253–54 (D. Conn. 2015) (*Aggrenox I*); *In re Aftermarket Filters Antitrust Litig.*, No. 08-md-4883, 2009 WL 3754041, at *6 (N.D. Ill. Nov. 5, 2009) ).)

The Court finds the cases cited by the IPP to be persuasive on the question of whether failure to comply with the statutory requirement is fatal to a claim under the Hawaii

Antitrust Act. In *Aftermarket Filters*, 2009 WL 3754041, at *6, the court held that the statutory scheme did not imply that dismissal was the proper remedy for failing to comply with the notification requirement. Moreover, defendants could not use the notification requirement "as a shield to avoid answering for alleged anti-competitive behavior." *Id.* The court in *Aggrenox I*, 94 F. Supp. 3d at 253–54, adopted this reasoning.

The case cited by Defendants, *In re Asacol Antitrust Litig.*, No. 15-cv-12370, 2016 WL 4083333, at *14 n.14 (D. Mass. July 20, 2016) (*Asacol I*), is not persuasive. There, the court admitted that "[c]ourts are divided on whether Hawaii's statute necessitates dismissal" but dismissed the claim without looking specifically to Hawaii law. *Id.*

However, even if I were to find that the Hawaii statute required dismissal of the IPP's claim in Hawaii state court, I would find that Federal Rule of Civil Procedure 23 is comprehensive with respect to pre-filing requirements in federal court, as held by the United States Supreme Court in *Shady Grove Orthopedic Associates v. Allstate Insurance Co.*, 559 U.S. 393 (2010). "The Second Circuit has not taken up the problem of the effect of *Shady Grove's* split opinions." *In re Aggrenox Antitrust Litig.*, No. 14-md-2516, 2016 WL 4204478, at *5 (D. Conn. Aug. 9, 2016) (*Aggrenox II*). According to Justice Scalia's plurality opinion, "the only test of a Rule's validity under the Rules Enabling Act is 'whether it regulates procedure,'" which the Court "found that Rule 23 did." *In re Trileginant Corp.*, 11 F. Supp. 3d 82, 116 (D. Conn. 2014). According to Justice Stevens' concurrence, if the state rule conflicts with Rule 23, the state rule will yield only if it is not "so bound up with the state-created right or remedy that it defines the scope of that substantive right or remedy." *Shady Grove*, 559 U.S. at 419–20 (Stevens, J., concurring).

I find that Hawaii's limitation on class actions is "a state law that restricts the types of claims eligible for class treatment beyond the limits established by Rule 23." *In re Restasis Antitrust Litig*, No. 18-md-2819, 2018 WL 5928143, at *6 (E.D.N.Y. Nov. 13, 2018). It thus conflicts with the federal rule. *Id.* Under the plurality approach, therefore, the Hawaii Antitrust Act's notice provision would yield to Rule 23.

Moreover, a majority of federal courts have held that, pursuant to Justice Stevens' approach, the pre-suit notice requirement is not substantive. *See, e.g.*, *Restasis*, 2018

WL 5928143, at *6. *Aggrenox I*, 94 F. Supp. 3d at 254, is particularly persuasive. There, the court reasoned that the plain language of the Hawaii statute itself "does not appear ... to create a substantive right to recovery that only 'vests' after some action or inaction of the state attorney general. Rather, it creates a right to 'bring an action based on unfair methods of competition' in section 480–2, without any reference to notice, and delineates procedural prerequisites for class actions under the chapter in section 480–13.3." *Id.* The court there also observed that defendants had not drawn the court's attention to any arguments, *e.g.*, from the legislative history, that would counsel a different reading. *Id.*

 **\*26**  This Court agrees with the weight of federal case law, which holds the pre-suit notice provision in the Hawaii Antitrust Act would, first of all, not require dismissal of the suit in state court and that, even if it did, would not override Rule 23 to bar a claim in federal district court.

The Court therefore **DENIES** Defendants' motion to dismiss the Hawaii law claim under Count One.

### b) Arizona

Count One of the IPP Complaint alleges an antitrust claim under Ariz. Rev. Stat. §§ 44-1403, *et seq.* (CAC ¶ 201(a).) The Arizona Antitrust Act provides, in relevant part: "A person filing a complaint, counterclaim or answer for any violation of the provisions of this article shall simultaneously with the filing of the pleading in the superior court or, in the case of pendent state law claims in the federal court, serve a copy of the complaint, counterclaim or answer on the attorney general." Ariz. Rev. Stat. § 44-1415(a).

In supplemental briefing, Defendants argue that notice of suit must be provided to the state's attorney general when the complaint is filed, and that failure to comply with the notice provision is grounds for dismissal. (Gen. Defs. Suppl. Br. at 12 (citing *Effexor*, 2018 WL 4466050, at *10–*11; *Asacol I*, 2016 WL 4083333, at *14–*15).) In response, the IPP cites *In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d 772, 817 (N.D. Ill. 2017), where the district court allowed claims under Arizona's Antitrust Act to proceed, despite the plaintiffs' failure to comply with the statutory notice requirements. (IPP Resp. to Gen. Defs. Suppl. Br. at 16.)

This Court does not see a meaningful distinction between the pre-suit notification requirement under the Hawaii Antitrust Act and that under the Arizona Antitrust Act, even if other courts have found to the contrary. Moreover, in addition to requiring those filing complaints to notify the attorney general, the statute by its terms also obliges those *answering* complaints to notify the attorney general. It is hard to imagine that failure to comply with this requirement would necessitate dismissal.

The Court is not persuaded by the reasoning in *Effexor*, 2018 WL 4466050, at *10–*11, or in *Asacol I*, 2016 WL 4083333, at *14–*15, which found that there was no conflict between Rule 23 and the Arizona pre-filing requirement. Instead, this Court agrees with the court in *Restasis*, 2018 WL 5928143, at *6, which found that the United States Supreme Court had held in *Shady Grove* that Rule 23 is "not silent on the question of whether a particular claim is eligible for class treatment." *Restasis*, 2018 WL 5928143, at *6. Rule 23 contains its own limitations on those claims eligible for class treatment; "[t]herefore, a state law that restricts the types of claims eligible for class treatment beyond the limits established by Rule 23 conflicts with the federal rule." *Id.* Like Hawaii's statute, therefore, this Court could only find that this requirement was grounds for dismissal if it also found the requirement to be substantive.

For the reasons already discussed, however, because this Court finds that, Arizona's pre-suit notice requirement is purely procedural, Defendants' motion to dismiss the Arizona antitrust claim under Count One is **DENIED**.

### c) Nevada

Count One of the IPP Complaint alleges an antitrust claim under Nev. Rev. Stat. §§ 598A.060, *et seq.* (CAC ¶ 201(n).) The Generic Defendants argue that notice of suit must be provided to the state's attorney general or the claim cannot proceed. (Gen. Defs. Suppl. Br. at 12 (citing Nev. Rev. Stat. § 598A.210(3) ).) The statute states, in relevant part: "Any person commencing an action for any violation of the provisions of this chapter shall, simultaneously with the filing of the complaint with the court, mail a copy of the complaint to the Attorney General." Nev. Rev. Stat. § 598A.210(3).

**\*27** Defendants argue that failure to notify the attorney general requires dismissal. (Gen. Defs. Suppl. Br. at 12 (citing *Effexor*, 2018 WL 4466050, at \*10–\*11; *Asacol I*, 2016 WL 4083333, at \*14–\*15).) In response, the IPP does not cite any cases that discuss Nevada law particularly, but instead argues generally that "pre-suit notice requirements are procedural and, therefore, superseded by federal law." (IPP Resp. to Gen. Defs. Suppl. Br. at 16 (citing *Mace v. Van Ru Credit Corp.*, 109 F.3d 338, 346 (7th Cir. 1997) ).)

Only scant federal case law interprets the Nevada Antitrust Act's statutory notice requirement in light of *Shady Grove*, and the Court is not aware of any Nevada cases that discuss whether the requirement is substantive or procedural in nature.

Again, however, the Court sees no meaningful difference between the text of Nevada's statute and that of Hawaii's. The Court remains unpersuaded by the reasoning of the two cases cited by Defendants, for the reasons discussed above.

As a result, Defendants' motion to dismiss the Nevada law claim under Count One is **DENIED**.

### 4. The IPP Fails To State a Claim for Monopolization Under the Law of Kansas

Defendants argue that the IPP may not maintain a claim for monopolization (as opposed to conspiracy to monopolize) under the laws of Kansas, New York, and Tennessee because those statutes do not permit recovery for unilateral anticompetitive conduct. (Forest Br. at 67.) [21] For example, commentators have observed that "Section 50-132 [of the Kansas Restraint of Trade Act] would not appear to extend to cases of unilateral monopolization." 6 Julian von Kalinowski, Peter Sullivan, & Maureen McGuirl, *Antitrust Laws and Trade Regulation* § 116.03 (2d ed. 2018); *see also Commonwealth Electrical Inspection Servs. v. Town of Clarence*, 6 A.D.3d 1185, 1186 (N.Y. App, Div. 2004) (New York's Donnelly Act does not create a cause of action for unilateral anticompetitive conduct); *In re Ditropan XL Antitrust Litig.*, 529 F. Supp. 2d 1098, 1109 (N.D. Cal. 2007) (the Tennessee Trade Practices Act does not create a cause of action for unilateral monopolization).

But the IPP Complaint does not allege monopolization via unilateral action. It pleads "plead some sort of concerted action" in support of its non-conspiracy monopolization claims. (*See* Forest Br. at 67.) The most obvious example is the IPP's allegation, in support of Count One, that Forest and Merz "entered into unlawful agreements with the Generic[] Defendants." (CAC ¶ 193). That is by definition *not* unilateral action. The IPP Complaint also plausibly alleges that Forest's hard switch was executed with the participation of other parties; those parties may not have been named as defendants but they did not have to be. For example, Forest signed "an exclusive distribution contract in November, 2014 for Namenda IR with Foundation Care, a mail-order-only pharmacy." (CAC ¶ 95). Forest also "agreed to pay rebates to health plans to make sure they put Namenda XR on the same tier as Namenda IR so that members would not have an incentive to choose Namenda IR and patients did not have to pay higher co-payments for Namenda XR." (CAC ¶ 110). There is nothing unilateral about any of this. Unilateral conduct might include, in the pharmaceutical context: launching a false advertising campaign against a competitor; filing a sham petition with the FDA; filing a sham patent with the PTO; or initiating sham litigation against a competitor. None of that is alleged here.

**\*28** However, Actavis, Forest, and Merz also argue that, under the law of these three states, monopolization, absent conspiracy, is not a cognizable cause of action. Since Count Two alleges conspiracy to monopolize, in effect what Defendants argue is that Counts One and Two are necessarily duplicative insofar as they are raised under the law of these three states.

#### a) Kansas

Defendants cite *In re Relafen Antitrust Litigation*, 221 F.R.D. 260, 283 (D. Mass. 2004), for the proposition that Kansas "prohibits combinations and conspiracies only" and move to dismiss on that basis. (Forest Br. at 67.) The IPP argues that it has pled concerted action in the form of the settlement agreements as the foundation for its Kansas law claim under Count One. (IPP Resp. to Gen. Defs. Br. at 14.)

The Kansas Restraint of Trade Act ("KRTA") provides, in relevant part, "No person, servant, agent or employee

2018 WL 7197233

of any person doing business within the state of Kansas shall conspire or combine with any other persons, within or without the state for the purpose of monopolizing any line of business[.]" Kan. Stat. § 50-132; *see also Good v. Dickinson*, 278 P. 730, 732 (Kan. 1929) (sale of business, although bilateral conduct, did not constitute trust or combination as required to allege monopolization). The Kansas Supreme Court has observed (albeit in dicta) that, when bringing a claim for monopolization, conspiracy is "legal requirement under Kansas antitrust law." *Bergstrom v. Noah*, 974 P.2d 520, 528 (Kan. 1999); *but see Bellinder v. Microsoft Corp.*, Nos. 00-c-0855, 00-C-00092, 99-cv-17089, 2001 WL 1397995, at *1 (Kan. Dist. Ct. Sept. 7, 2001) (certifying class action under Kan. Stat. § 50-132 where plaintiffs alleged that Microsoft "abused its monopoly power" but did not allege conspiracy). The weight of published, appellate case law in Kansas holds that the IPP may not proceed on a theory of monopolization unless accompanied by allegations of conspiracy.

Other federal district courts have agreed that monopolization, absent conspiracy, does not state a claim under the KRTA. *Relafen*, 221 F.R.D. at 283; *EpiPen*, 2018 WL 3973153, at *33.

Obviously, the IP's claim for conspiracy to monopolize is in Count Two, not Count One, and this court will dismiss duplicative counts, Defendants' motion to dismiss the Kansas claim under Count One is, therefore, **GRANTED**.

### b) New York

The Donnelly Act prohibits "[e]very contract, agreement, arrangement or combination" that establishes a monopoly or restrains competition. N.Y. Gen. Bus. Law § 340(1). As the New York Court of Appeals has held, the term "arrangement" "must be interpreted as contemplating a reciprocal relationship of commitment between two or more legal or economic entities similar to but not embraced within the more exacting terms, 'contract', 'combination' or 'conspiracy'." *State v. Mobil Oil Corp.*, 344 N.E.2d 357, 359 (N.Y. 1976); *see also Glob. Reins. Corp. U.S. Branch v. Equitas Ltd.*, 969 N.E.2d 187, 192 (N.Y. 2012) ("An antitrust claim under the Donnelly Act ... must allege both concerted action by two or more entities and a consequent restraint of trade within an identified relevant product market.")

In other words, a plaintiff must allege concerted action to bring a claim under the Donnelly Act, which the IPP does here. (*See supra.*) However, unlike the Kansas statute, there is no requirement that a plaintiff use the word "conspiracy" in order to state a claim.

**\*29** At least one other federal district court has refused to dismiss a Donnelly Act claim that alleged concerted action but not conspiracy. *In re K-Dur Antitrust Litig.*, No. 01-cv-1652, 2008 WL 2660782, at *3 n.15 (D.N.J. Mar. 10, 2008).

Defendants' motion to dismiss the New York claim under Count One is, therefore, **DENIED**.

### c) Tennessee

Similar to the Donnelly Act, the Tennessee Trade Practices Act ("TTPA") declares unlawful "[a]ll arrangements, contracts, agreements, trusts, or combinations between persons or corporations made with a view to lessen, or which tend to lessen, full and free competition," as well as those "designed, or which tend to" control prices. Tenn. Code. § 47-25-101. The Supreme Court of Tennessee interprets the TTPA broadly. "Its broad and comprehensive provisions cover every conceivable case of an agreement or contract made to lessen or destroy competition and control prices." *Standard Oil Co. v. State*, 100 S.W. 705, 716 (Tenn. 1907). *See also Freeman Indus., LLC v. Eastman Chem. Co.*, 172 S.W.3d 512, 522 (Tenn. 2005) (observing that "the language of Tennessee's antitrust statutes have not changed significantly since *Standard Oil*" and finding that the TTPA prohibits "agreements" and "arrangements" that affect competition).

Defendants cite no relevant law in support of the proposition that the TTPA requires a plaintiff to allege conspiracy.

Accordingly, Defendants' motion to dismiss the Tennessee claim under Count One is, therefore, **DENIED**.

### C. In Conclusion, the IPP Has Stated A Claim for Monopolization Under Count One With Respect to the Laws of 23 States

2018 WL 7197233

In sum, the Court finds that the IPP has adequately pled facts supporting its allegations of monopolization based upon both the hard switch and the settlement agreements.

The Court also finds that, as a matter of law, the IPP may pursue its Count One claims for monopolization under the laws of all states **except** Florida, Kansas, Massachusetts, and Utah. Those claims are hereby **DISMISSED**. The IPP's claim for monopolization under Rhode Island law is hereby **DISMISSED IN PART** to the extent it seeks damages for injuries occurring before July 15, 2013.

### VI. Count Two: Conspiracy To Monopolize Under the Laws of 27 States Against Actavis, Forest, Merz, and the Generic Defendants

Second, the IPP brings an additional 27 state law claims grouped under the heading "Count Two: Conspiracy to Monopolize Under State Law." (CAC at 52.) The claims under Count Two are, for the most part, identical to the 27 claims under Count One. (*Id.* ¶ 207.)

Count Two differs from Count One in three significant respects.

First, Count Two alleges conspiracy to monopolize rather than actual monopolization. "Defendants have intentionally and unlawfully conspired in order to allow Forest monopolize [*sic*] the market for memantine hydrochloride in violation" of state laws. (*Id.*)

Second, the IPP asserts claims for conspiracy to monopolize under Count Two against Actavis, Forest, Merz, *and the Generic Defendants*, who are not named in Count One. (*Id.* at 52.)

Third, whereas Count One alleges injuries to indirect purchasers stemming from both the hard switch and the settlement agreements, Count Two alleges injuries to indirect purchasers stemming from the settlement agreements only. (*Id.* ¶ 205.)

**\*30**  Beyond that, there are extremely minor, and likely inadvertent, differences between the state law causes of action underlying Counts One and Two. For example, Count One alleges monopolization under the laws of Florida and New Hampshire but does not allege monopolization under the laws of Illinois or Oregon. (*Compare id.* ¶¶ 201, 207.) Count Two, by contrast, alleges conspiracy to monopolize under the laws of Illinois and

Oregon but does not allege conspiracy to monopolize the laws of Florida and New Hampshire. (*Id.*) There are also several differences—again, probably typographical errors —in the citations to the state codes. (*See, e.g., id.* ¶¶ 201(i), 207(i).)

Defendants move to dismiss Count Two in all or large part for many of the same reasons as they did for Count One, including:

- The IPP has expressly disclaimed reliance on *Actavis, 570 U.S. at 158*, and, in any event, cannot prove that the agreements contained unlawful "reverse payments, (Forest Br. at 34–60);

- Any injuries the IPP alleges it suffered due to the settlement agreements is purely speculative, (*id.* at 40–46);

- The claims are "likely" time-barred by the applicable state statutes of limitations, (*id.* at 65 n.42).

- The IPP lacks Article III standing to assert claims in states where it has not made purchases and thereby suffered injury in fact, which are all but nine states, (*id.* at 65–66);

- *Illinois Brick* bars the IPP's claims in six states, (Gen. Defs. Suppl. Br. at 10–11); and

- The IPP has failed to satisfy pre-suit notice requirements in four states, (Gen. Defs. Suppl. Br. at 11–13).

For the reasons discussed in the preceding sections of this opinions, none of these arguments has merit, with the exception of the arguments that (i) Massachusetts bars indirect purchasers from recovering under its antitrust act; (ii) Utah bars indirect purchasers from recovering under its antitrust act unless they are citizens or residents of Utah; and (iii) Rhode Island barred indirect purchasers from recovering under its antitrust act until the amendments of July 15, 2013. Therefore, the Massachusetts and Utah claims under Count Two are hereby **DISMISSED**, and the Rhode Island claim under Count Two is hereby **DISMISSED IN PART**, to the extent it seeks damages for injuries occurring before July 15, 2013.

Defendants also raise a handful of arguments specific to Count Two, *viz.*:

- The IPP does not adequately allege a conspiracy because it pleads only parallel conduct without the necessary "plus factors" that would be indicative of agreement; (Gen. Defs. Br. at 20; Forest Br. at 60);

- The Illinois Antitrust Act grants a right to bring a class action to the Illinois attorney general only (Gen. Defs. Br. at 35 n.15); and

- Oregon adheres to the law of *Illinois Brick* and therefore precludes recovery for indirect purchasers, (Gen. Defs. Br. at 35).

As with Count One, the Court first analyzes the argument of general applicability, and then turns to the Illinois and Oregon arguments.

### A. The IPP States a Claim for Conspiracy To Monopolize

Defendants argue in their original briefing [22] that the IPP fails to allege a conspiracy, thereby necessitating dismissal of Count Two, because it has not pled sufficient "plus factors" to support an inference of conspiracy. (Forest Br. at 60; Gen. Defs. Br. at 20.)

**\*31** This is, of course, an argument with respect to the elements of an antitrust conspiracy under *federal* law. Neither party has briefed the elements of conspiracy— let alone what is adequate at the motion to dismiss stage —under each state's law. However, both parties have apparently used federal antitrust law as a guidepost, and this Court does the same. The Court reminds the IPP that it will be required to show at the class certification stage that common legal issues with respect to the conspiracy elements of each state's law predominate over any individual issues.

Under the guideposts laid out by federal law, the IPP has pled sufficient circumstantial evidence to support a conspiracy to monopolize.

"[C]ourts have not given much attention to conspiracy to monopolize as a distinct antitrust offense," 2-16 Earl W. Kintner et al., *Federal Antitrust Law* § 16.39 (2017). Nonetheless, "in deciding whether there is concerted action, courts routinely apply the same analysis under both Sections 1 and 2" of the Sherman Act. 2 von Kalinowski, Sullivan, & McGuirl, *supra*, § 26.02; *see also*

Areeda & Hovenkamp, *supra*, § 41.01 [A]. "In order to establish a conspiracy in violation of § 1, whether horizontal, vertical, or both, proof of joint or concerted action is required; proof of unilateral action does not suffice." *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 183 (2d Cir. 2012). Put another way, "Since mere parallel behavior can be consistent with independent conduct, courts have held that a plaintiff must show the existence of additional circumstances, often referred to as 'plus' factors, which, when viewed in conjunction with the parallel acts, can serve to allow a fact-finder to infer a conspiracy." *Apex Oil Co. v. DiMauro*, 822 F.2d 246, 253 (2d Cir. 1987).

Defendants argue principally that parallel contingent launch provisions, on their own, are insufficient to establish a conspiracy. (Gen. Defs. Suppl. Br. at 8 (citing *In re Nexium (Esomeprazole) Antitrust Litig.*, 842 F.3d 34, 55 (1st Cir. 2016) ) ). Indeed, some courts in this district have found that pleading only contingent launch provisions does not survive a motion to dismiss. *See Actos I*, 2015 WL 5610752, at *23. Moreover, it is true that when plaintiffs build their conspiracy cases on contingent launch clauses alone, they often fail at the summary judgment stage. *See, e.g., King Drug Co. of Florence, Inc. v. Cephalon, Inc.*, Nos. 06-cv-1797, 06-cv-1833, 06-cv-2768, 2014 WL 2813312, at *14 (E.D. Pa. June 23, 2014). Finally, the *Nexium* court found that, at trial, the absence of evidence other than contingent launch provisions entitled the defendants to judgment as a matter of law on the conspiracy claim. *Nexium*, 842 F.3d at 55.

However, this Court disagrees that more is presently required because, "to present a plausible claim at the pleading stage, the plaintiff need not show that its allegations suggesting an agreement are more likely than not true or that they rule out the possibility of independent action, as would be required at later litigation stages such as a defense motion for summary judgment ... or a trial." *Anderson News*, 680 F.3d at 184 (internal citations omitted).

First, the IPP has met its burden to show parallel conduct, as it has alleged that the Generic Defendants entered into settlement agreements around the same time with Forest and Merz that contained the same pertinent provisions. (*See* IPP Resp. to Forest Br. at 36–37; *see also* CAC ¶ 76.) For example, Plaintiff alleges that the Generic Defendants entered into the settlement agreements in July,

2018 WL 7197233

September, October, and December of 2009. (CAC ¶ 75.) Plaintiff also alleges that each of these agreements contained acceleration clauses, which led to agreement not to launch any competing generic formulations until July 11, 2015. (CAC ¶¶ 76, 79.) Even at the summary judgment stage, for example, the *Nexium* court found it significant for inferring the existence of a conspiracy that each generic competitor "agreed to delay its market entry on the express condition that every other Generic Defendant do the same." *Nexium*, 842 F. Supp. 3d at 254. The Court will not ignore this potent allegation merely because other courts have found that, after discovery, additional support is required.

**\*32** Second, the IPP adequately alleges "plus factors" that support an inference of conspiracy at the motion to dismiss stage. The IPP Complaint directly alleges that the settlements were "negotiated collectively" or in such a manner that each Generic Defendant was informed of the pertinent terms of the other agreements. (CAC ¶¶ 75, 77.) Such collective negotiations, if true, would certainly constitute circumstantial evidence of a conspiracy.

The IPP Complaint also adequately alleges behavior against interest, which, combined with allegations of parallel conduct, can be indicative of concerted rather than independent action. *See, e.g., Toys "R" Us, Inc. v. F.T.C.*, 221 F.3d 928, 935 (7th Cir. 2000); *Apex Oil*, 822 F.2d at 254. Forest, Merz, and the Generic Defendants entered into the settlement agreements between July and December of 2009, which allowed for generic entry no earlier than July 11, 2015. (CAC ¶ 19–29.) The FDA's automatic, 30-month stays allegedly began to expire in April 2010. (CAC ¶ 72.) The FDA tentatively approved the generics' ANDAs in January and April of 2010. (CAC ¶ 82.) This translates to a delay of roughly five years in exchange for only three months' competition within the exclusivity period, which certainly states a claim against interest that is plausible on its face.

Finally, the presence of contingent launch clauses, which are analogous to "most favored nation" provisions, raises antitrust scrutiny, even if they may have certain procompetitive effects. *See*, e.g., *U.S. v. Apple, Inc.*, 952 F. Supp. 2d 638, 701 (S.D.N.Y. 2013).

The Court finds that the IPP states a claim for conspiracy to monopolize.

**B. Illinois**

Count Two (but not Count One) of the IPP Complaint alleges claims under the Illinois Antitrust Act ("IAA"), 740 Ill. Comp. Stat. 10/3, *et seq.* (CAC ¶ 207(e).) Defendants move to dismiss this claim because the statute states, in relevant part, "no person shall be authorized to maintain a class action in any court of this State for indirect purchasers asserting claims under this Act, with the sole exception of this State's Attorney General." 740 Ill. Comp. Stat. 10/7(2); (Forest Suppl. Br. at 10 n.4). *See also Gaebler v. KM. Potash Corp.*, 676 N.E.2d 228, 230 (Ill. App. Ct. 1996); *Bobrowicz v. City of Chicago*, 522 N.E.2d 663, 669 (Ill. App. Ct. 1988).

The IPP responds that the restriction "does nothing more than dictate the manner in which the procedural device of a class action can proceed" and does not apply in federal court pursuant to the Supreme Court's holding in *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393 (2010). (IPP Resp. to Gen. Defs. Br. at 8–10.)

Courts in this circuit have split as to whether the indirect purchaser class action bar in the IAA is procedural or substantive, under Justice Stevens' concurrence in *Shady Grove.* Compare Dig. Music, 812 F. Supp. 2d at 416, with *Aggrenox II*, 2016 WL 4204478, at *6. However, the Court agrees with those cases in this circuit that have treated the IAA as stating a procedural rule applicable in Illinois state courts, rather than a substantive rule applicable to federal courts sitting in diversity jurisdiction in New York.

First, the same paragraph of the statute begins by stating that "[n]o provision of this Act shall deny any person who is an indirect purchaser the right to sue for damages." 740 Ill. Comp. Stat. 10/7(2). The statute therefore does not limit the substantive rights of an injured party in an individual action. *See Aggrenox II*, 2016 WL 4204478, at *6 ("[A]ny indirect purchaser procedurally blocked from participation in a class action would still have the same remedy in an individual action.")

**\*33** Moreover, were the IAA to prohibit class actions altogether, the statute would read no differently than the New York class actions bar at issue in *Shady Grove*—a fact observed by at least one other court in this circuit. *Aggrenox II*, 2016 WL 4204478, at *6 ("I cannot square Shady Grove's allowance of a Rule 23 class action despite New York's class-action bar with the dis allowance of a

2018 WL 7197233

Rule 23 class action in the case of Illinois's class-action bar simply on the basis that Illinois's bar is narrower.").

Defendants' motion to dismiss the Illinois claim for conspiracy to monopolize under Count Two is **DENIED.**

### C. Oregon

Defendants argue that "the laws of Oregon bar recovery for at least part of the period for which Plaintiff seeks damages." (Gen. Defs. Br. at 35 (citing *Niaspan,* 42 F. Supp. 3d at 759).) The IPP responds that "[t]his is a non-issue" given that the class period begins after the enactment of Oregon's *Illinois Brick* repealer. (IPP Resp. to Gen. Defs. Br. at 13.)

Oregon's *Illinois Brick* repealer statute became effective on January 1, 2010. *See* Or. Rev. Stat. § 646.780; Laws 2009, c.304, § 1, eff. Jan. 1, 2010. The IPP has proposed a Class Period beginning April 14, 2010. (CAC ¶ 146.) There is therefore no *Illinois Brick* problem for purposes of this case.

Defendants' motion to dismiss the Oregon claim for conspiracy to monopolize under Count Two is **DENIED.**

### D. In Conclusion, the IPP Has Stated a Claim for Conspiracy to Monopolize Under Count Two With Respect to the Laws of 25 States

In sum, the Court finds that the IPP has adequately pled facts supporting its allegations of conspiracy to monopolize.

The Court also finds that, as a matter of law, the IPP may pursue its Count Two claims for conspiracy to monopolize under the laws of all states **except** Massachusetts and Utah. Those claims are hereby **DISMISSED.** Moreover, the IPP's claim for conspiracy to monopolize under Rhode Island law is hereby **DISMISSED IN PART** to the extent that it seeks to recover for injuries incurred prior to July 15, 2013.

### VII. Count Three: Consumer Protection and Unfair and Deceptive Trade Practices Under the Laws of 25 States Against Actavis, Forest, Merz, and the Generic Defendants

The IPP Complaint next alleges an additional 25 state law claims grouped under the heading "Count Three:

Consumer Protection and Unfair and Deceptive Trade Practices." (CAC at 56.) The IPP asserts this cause of action against all Defendants: Actavis, Forest, Merz, and the Generic Defendants. (*Id.*)

This cause of action alleges that "Defendants engaged in unfair competition or unfair acts or unconscionable [*sic*] acts or practices in violation of state consumer protection statutes." (CAC ¶¶ 212.) Specifically, "There was a gross disparity between the price that [the IPP] and [Class] members paid for the brand product and the value received, given that a less expensive substitute generic product should have been available." (*Id.* ¶ 213.) Count Three also alleges that the IPP and the Class "were deprived of the opportunity to purchase a generic version of Namenda IR 5 or 10 mg tablets and forced to pay higher prices for Namenda XR." (*Id.* ¶ 214.) Together, these allegations form the factual nucleus on which the 25 state law consumer protection claims are based.

As they have done with respect to Counts One and Two of the IPP Complaint, Defendants first advance several broad-based arguments aimed at dismissing Count Three of the IPP Complaint as a whole or in large part, *viz.*:

> **\*34** • The claims are "likely" time-barred under the applicable statute of limitations (Forest Br. at 65 n.42);

> • The IPP lacks Article III standing to bring claims in states where it has not made purchases and thereby suffered injury-in-fact, (Gen. Defs. Br. at 31);

> • The IPP must satisfy the pleading requirements of Fed. R. Civ P. 9(b) since state consumer protection claims are grounded in fraud, (Gen. Defs. Br. at 38);

> • In the alternative, IPP has failed to satisfy the Fed. R. Civ P. 8 pleading standard under *Twombly* and *Iqbal*, (*id.* at 37).

For the reasons already discussed, this Court denies the motion to dismiss the claims as "likely" time-barred. In addition, the Court has held that it will not dismiss a broad swath of claims for lack of Article III standing, on the basis that the IPP did not suffer injury-in-fact in states where it did not make purchases. However, the Court must consider the other Rule 9(b) and Rule 8 arguments.

2018 WL 7197233

Defendants next make several separate state-specific arguments, *viz.*:

- The IPP may not bring state consumer protection claims where the state follows *Illinois Brick, (id.)*;

- The IPP has failed to satisfy the pre-filing requirements under certain states' statutes, (Gen. Defs. Br. at 40; Gen. Defs. Suppl. Br. at 13);

- Certain states require a showing of consumer deception, which the IPP does not and cannot allege, (Forest Br. at 67 n.47);

- Some states require that the claim be based on a consumer transaction or conduct that is consumer-oriented, which the IPP does not plead, (Forest Br. at 67–68 n.48);

- A subset of consumer protection statutes do not cover antitrust conduct, (Forest Br. at 68 n,49; Gen. Defs. Br. at 40);

- Recovery is possible under certain consumer protection statutes only when the conduct complained of is primarily intrastate, (Forest Br. at 68 n.50; Gen. Defs. Br. at 40, 41–42);

- Certain state statutes confer a right of action only on consumers who are natural persons with regard to transactions made primarily for personal or household purposes, (Forest Br. at 68 n.51), or on consumers who are elderly or disabled, (Forest Br. at 68 n.52; Gen. Defs. Br. at 40); and

- Some states' consumer protection laws prohibit nationwide class actions or prohibit class actions altogether, (Forest Br. at 68 n.53; Gen. Defs. Br. at 39, 41–42).

Defendants raise one or several of these arguments as a defense to each state law claim under Count Three. The table in Appendix 3 of Actavis, Forest, and Merz's original brief provides a mostly accurate overview of which arguments correspond to which claims. (*See* Forest Br. App'x 3.)

As this Court has done with the other Counts of the IPP Complaint, it first addresses Defendants' arguments of general applicability and then addresses each state law claim.

**A. The IPP Adequately Pleads Its State Law Claims Under *Twombly* and *Iqbal***

Defendants argue that the IPP does not properly plead its claim for violation of state consumer protection laws under Count Three because (i) it does not cite to specific provisions of the consumer protection statutes and (ii) it does not plead the elements of each state's law. (Gen. Defs. Br. at 37, 42.) Merely listing citations to the state codes, they argue, does not satisfy *Iqbal,* 556 U.S. at 678 (2009) or *Twombly,* 550 U.S. at 570.

**\*35**  The Court disagrees.

First, the IPP is not required to identify the particular sections of the code under which the claims are brought, as long as defendants are on notice of the theory plaintiffs are pursuing. *See, e.g., In re Propranolol Antitrust Litig.,* 249 F. Supp. 3d 712, 729 (S.D.N.Y. 2017) (denying defendants' motion to dismiss even though indirect purchasers did not specify the state code sections under which the claims were brought).

Moreover, the factual allegations that support the IPP's claims are well-pleaded throughout the Complaint, and it is not necessary that the IPP reiterate each of them when listing its causes of action in the final section of the Complaint. *See In re Domestic Drywall Antitrust Litig.* No. 13-cv-2437, 2016 WL 3769680, at \*11 (E.D. Pa. July 13, 2016) ("To the extent Defendants' one-paragraph *[Twombly]* argument is an invitation for the Court to comb through all of Plaintiffs' consumer protection claims and determine whether the elements have been adequately pleaded, the Court respectfully declines the invitation."); *see also In re Petrobras Sec. Litig.,* 152 F. Supp. 3d 186, 197 (S.D.N.Y. 2016) (in securities fraud case, complaint "as a whole" adequately pleaded specific statements made or authorized by specific defendants, actual reliance, and failure to comply with statutory requirements).

Finally, although state laws may vary to some degree in the elements that they require, the IPP has made an effort to limit its claims to state laws that share substantive foundational features—such as a right of action for "unfair," as opposed to "deceptive," trade practices. *See, e.g. Propranolol,* 249 F. Supp. 3d at 729 (finding that a high level of detail was "not necessary at the pleading stage because the 'elements of unjust enrichment are similar in every state.' ") (citing *In re Credit Default Swaps*

*Antitrust Litig.*, No. 13-md-2476, 2014 WL 4379112, at *18 (S.D.N.Y. Sept. 4, 2014) ).

### B. The IPP Is Not Required to Plead Its Complaint in Accordance With Federal Rule of Civil Procedure 9(b)

Defendants next argue that because "allegations of deceptive trade practices ... amount to allegations of fraud," the IPP must satisfy the heightened pleading standard of Rule 9(b)." (Gen. Defs. Br. at 38 (citing *NCC Sunday Inserts, Inc. v. World Color Press, Inc.*, 692 F. Supp. 327, 330 (S.D.N.Y. 1988) ); Gen. Defs. Reply at 24.)

The IPP responds that it "has carefully limited its consumer fraud claims to the 'unfair methods' and 'unfair trade practices' prongs of the statutes." (IPP Resp. to Gen. Defs. Br. at 17.) (*See also* CAC ¶ 214 (alleging injury "as a direct and proximate result of Defendants' unfair competition, unfair or unconscionable acts and practices").) The IPP also responds that *NCC Sunday Inserts,* 692 F. Supp. at 330, was binding only with respect to the Connecticut Unfair Trade Practices Act, under which the IPP does not bring a claim. (*Id.* at 17.)

Courts regularly distinguish between state consumer protection claims that proceed under a theory of "deceptive practices" and those that proceed under a theory of "unfair practices." *See, e.g., In re Packaged Seafood Prods. Antitrust Litig.*, 242 F. Supp. 3d 1033, 1074 (S.D. Cal. 2017); *In re Auto. Parts Antitrust Litig. (Instrument Panel Clusters),* No. 12-md-2311, 2014 WL 2993753, at *19 (E.D. Mich. July 3, 2014). This is consistent with the federal FTC Act, which allows recovery for "unfair" as well as "deceptive" acts or practices, 15 U.S.C. §§ 45(a)(1), 45(n), and on which "virtually every" state consumer protection law is based, *Toward Greater Equality in Business Transactions: A Proposal to Extend the Little FTC Acts to Small Businesses,* 96 Harv. L. Rev. 1621, 1622 (1983).

**\*36** As for *NCC Sunday Inserts,* that decision—which addresses a statute not at issue in this case, the Connecticut Unfair Trade Practices Act—does not hold that the heightened pleading standards of Rule 9(b) apply to allegations under state consumer protection laws. That case held only that, "To the extent that fraud is being alleged under the rubric 'deceptive trade practices,' Rule 9(b) governs the pleading procedures." *NCC Sunday Inserts,* 692 F. Supp. at 330.

The IPP does not allege anything under the rubric of "deceptive trade practices"—deliberately so. In the absence of any "developed argument or legal authority" for Defendants' argument that I must treat the CAC as alleging deception rather than unfair acts, the claims may proceed. *Dig Music,* 812 F. Supp. 2d at 408 n.10.

Defendants' motion to dismiss all Count Three claims on these grounds is, therefore, **DENIED.**

### C. *Illinois Brick* Does Not Bar the IPP's Consumer Protection Claims

Defendants argue—but do not cite any persuasive authority—that consumer protection claims brought by indirect purchasers are barred in all states that follow *Illinois Brick.* (Gen. Defs. Br. at 31–34.) Instead, the cases they cite focus overwhelmingly on unjust enrichment claims brought by indirect purchasers. (*Id.*)

The Generic Defendants cite only one case in which a court dismissed a consumer protection act claim that was duplicative of a state antitrust claim; in that instance, however, the district court based its finding on a case from the Supreme Court of Illinois that specifically barred plaintiffs from invoking the Consumer Fraud Act to recover for conduct not covered by the Illinois Antitrust Act. *In re Wellbutrin XL Antitrust Litig.*, 260 F.R.D. 143, 162 (E.D. Pa. 2009).

The Court **DENIES** without prejudice the Defendants' motion to dismiss the majority of claims under Count Three in one fell swoop. I will consider the *Illinois Brick* arguments to the extent that the Defendants have briefed them with respect to each state's law.

### D. The IPP States a Claim Under the Consumer Protection Laws of Some States But Not Others

I now turn to the arguments aimed at individual state law claims.

At this particular stage, the Court notes that it has been tasked with determining the intricacies of 25 states' consumer protection laws, in many cases with the benefit of very little briefing. For certain claims, Defendants' arguments for dismissal consists of little more than a footnote in its brief, which in many cases is a citation to either a single federal district court opinion in a similar, nationwide class of indirect purchasers, or a particular

Sergeants Benevolent Association Health & Welfare Fund v. Actavis, plc, Slip Copy (2018)

2018 WL 7197233

statutory provision, with little or no explanation of how state courts have interpreted this particular provision.

As is its duty, the Court has taken these arguments seriously. Nonetheless, the Court cautions that, to the extent this very limited briefing invites the Court to *sua sponte* "comb through all of Plaintiffs' consumer protection claims and determine whether the elements have been adequately pleaded, the Court respectfully declines the invitation." *Domestic Drywall*, 2016 WL 3769680, at *11. In other words, this Court responds to the arguments that are affirmatively raised in Defendants' briefing but does not undertake an independent assessment of arguments that are not pointed out by the Defendants—who are represented by able counsel.

Because of Defendants challenge each state's law on multiple grounds, this opinion proceeds state by state.

### 1. Alabama

 *37 Generic Defendants move to dismiss the Alabama claim under Count Three because the IPP cites to Alabama's antitrust statute, Ala. Code § 8-10-3, rather than to its consumer protection statute, Ala. Code § 8-10-5. (Gen. Defs. Br. at 37 n.17.) As this Court has done throughout this opinion for the benefit of both the IPP and the Defendants, it takes the IPP at its word that this is a typographical error. (*See* IPP Resp. to Gen. Defs. Br. at 18 n.8.)

For the first time in supplemental briefing, Defendants argue that the IPP fails to satisfy the pre-filing notice requirement under Alabama's consumer protection statute. (Gen. Defs. Suppl. Br. at 13 (citing Ala. Code § 8-19-10(e) ).) That provision states, in relevant part: "At least 15 days prior to the filing of any action under this section, a written demand for relief. shall be communicated to any prospective respondent by placing in the United States mail or otherwise." Ala. Code § 8-19-10(e).

It also states: "The demand requirements of this subsection shall not apply if the prospective respondent does not maintain a place of business or does not keep assets within the state, but such respondent may otherwise employ the provisions of this section by making a written offer of relief and paying the rejected tender into court

as soon as practicable after receiving notice of an action commenced under this section." *Id.*

Defendants have not argued that they maintain a place of business or keep assets within the state, and nothing in the CAC alleges that they do so. (*See* CAC ¶¶ 16–30.) Even if this Court were to determine that Defendants maintain a place of business or keep assets in the state, nothing in the statute suggests that notifying defendants is a prerequisite to suit or that an action that failed to comply with this provision would require dismissal in state court. Indeed, the relatively flexible notice provisions for out-of-state defendants suggests otherwise. Moreover, the tenor of the provision as a whole suggests that it operates much like a Rule 68 offer of judgment and is aimed at encouraging settlement.

*Effexor,* 2018 WL 4466050, cited by Defendants, did not analyze the language of the various notice provisions at issue or opine on their purpose. That case also did not examine whether, under the laws of each state, the proper remedy for non-compliance with the notice remedy would be dismissal. Beyond *Effexor,* Defendants cite no case for the proposition that defendant notification requirements under these statutes would require dismissing the claim here.

Defendants' motion to dismiss the Alabama law claim under Count Three is **DENIED.**

### 2. Arizona

The IPP has withdrawn this claim. (IPP Resp. to Gen. Defs. Br. at 17 n.7.)

### 3. California

Defendants first argue that the California Unfair Competition Law ("CUCL") requires a showing of consumer deception. (Forest Br. at 67 n.47.) The IPP responds that it has limited its state consumer protection claims to the "unfair methods" and "unfair trade practices" prongs of state statutes. (IPP. Resp. to Gen. Defs. Br. at 17).

Here, the IPP has the better of the arguments. For purposes of CUCL, unfair practices include, among other

things, "any unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200. Moreover, California's Supreme Court has held "that because the prohibitions on 'unlawful,' 'unfair' or 'fraudulent' practices are written in the disjunctive, each of those 'prongs' gives rise to a separate and distinct theory of liability." 1-16 Cheryl Lee Johnson (ed.), *California Antitrust and Unfair Competition Law* § 16.04 (revised ed. 2018) (citing *Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 973 P.2d 527, 540 (Cal. 1999) ); *see also Podolsk v. First Healthcare Corp.*, 58 Cal. Rptr. 2d 89, 102 (Cal. Ct. App. 1996) (nursing home's practice of requiring relatives of patients on Medicare/Medicaid to sign guarantees could fall under "unlawful" prong of the CUCL, even if not deceptive). Therefore, the IPP is correct that it need not allege deceptive behavior to survive a motion to dismiss.

**\*38** Defendants next argue that the IPP must plead primarily intrastate conduct in order to allege a claim under the CUCL. (Forest Br, at 68 n.50). The IPP responds that the Complaint alleges intrastate effects and that, as a matter of law, a nationwide antitrust class action satisfies "intrastate" pleading requirements. (IPP Resp. to Gen. Defs. Br. at 32.)

The Court agrees that the IPP has pleaded intrastate effects in its Complaint, insofar as the IPP alleges both that it indirectly purchased Namenda in California, (CAC ¶ 15), and that hundreds of thousands of consumers nationwide, including, presumably, California residents, were affected, (*id.* ¶ 48).

The only case cited by Defendants is inapposite, as it discusses wholly extraterritorial application of the statute and says nothing about whether the conduct must occur "primarily" within the state. *Meridian Project Sys., Inc. v. Hardin Const. Co., LLC*, 404 F. Supp. 2d 1214, 1225 (E.D. Cal. 2005). In other cases, California courts have allowed class members who were either California residents or for whom the relevant transaction had occurred in state to bring claims under the CUCL. *Norwest Mortg., Inc. v. Superior Court*, 72 Cal. App. 4th 214, 222 (Cal. Ct. App. 1999) (class members who were either California residents or for whom the defendant had purchased insurance within California could bring claims).

Finally, Defendants argue that the IPP has not satisfied California's pre-filing notice requirement. (Gen. Defs. Br.

at 41 (citing Cal. Bus & Prof. Code § 17209).) That provision reads: "If a violation of this chapter is alleged or the application or construction of this chapter is in issue in any proceeding *in the Supreme Court of California, a state court of appeal, or the appellate division of a superior court*, each person filing any brief or petition with the court in that proceeding shall serve, within three days of filing with the court, a copy of that brief or petition on the Attorney General ... and on the district attorney of the county in which the lower court action or proceeding was originally filed." *Id.* (emphasis added). That provision, by its terms, applies only to appellate proceedings in state court. Since this is a diversity case in a federal district court, the statute does not apply.

As a result, the Court **DENIES** the Defendants' motion to dismiss the California claim under Count Three.

### 4. District of Columbia

Defendants argue that the IPP fails to state a claim under the D.C. Consumer Protection and Procedures Act ("DCCPPA") because it is not a "consumer" within the meaning of that statute. (Forest Br. at 67–68 n.48 (citing D.C. Code § 28-3905(k) ).)

The relevant provision of the DCCPPA states: "A consumer may bring an action seeking relief from the use of a trade practice in violation of a law of the District." D.C. Code § 28-3905(k)(1)(A). "When used as a noun," a "consumer" means "a person who, other than for purposes of resale, does or would purchase, lease (as lessee), or receive consumer goods or services, including as a co-obligor or surety, or does or would otherwise provide the economic demand for a trade practice." *Id.* § 28-3901(a)(2)(A). A "trade practice" means "any act ... [involving] ... a sale, lease or transfer, of consumer goods or services." *Id.* § 28-3901(a)(6). When used as an adjective, "consumer" relates to things "receive[d] and normally use[d] for personal, household or family purposes." *Id.* § 28-3901(a)(2)(B)(i).

**\*39** Sergeants Benevolent, the only Named Plaintiff in this Action, does not fit the definition of "consumer" under the plain language of the statute. Additionally, the D.C. Court of Appeals has clarified that "the CPPA was designed to police trade practices arising only out of consumer-merchant relationships, and does not apply

2018 WL 7197233

to commercial dealings outside the consumer sphere." *Ford v. Chartone, Inc.*, 908 A.2d 72, 81 (D.C. 2006) (internal quotations omitted). "[T]he CPPA does not protect merchants in their commercial dealings with suppliers or other merchants." *Id.* at 83. For example, D.C. courts have held that a taxi driver's claims for coerced purchases of gasoline and other supplies against his taxi-owners association do not state a claim under the DCCPPA. *Mazanderan v. Indep. Taxi Owners' Ass'n, Inc.*, 700 F. Supp. 588, 591 (D.D.C. 1988). The relevant question is whether the plaintiff's activity is akin to that of a merchant. *Ford*, 908 A. 3d at 83.

In addition, "Courts overseeing multidistrict litigation as well as state courts in the District of Columbia have ... held that transactions along the distribution chain that do not involve the ultimate retail customer are not 'consumer transactions' that the [DCCPPA] seeks to reach. Rather, it is the ultimate retail transaction between the final distributor and the individual member of the consuming public that the [DCCPPA] covers." *In re Cast Iron Soil Pipe & Fittings Antitrust Litig.*, No. 14-m-2508, 2015 WL 5166014, at *30 (E.D. Tenn. 2015).

Sergeants Benevolent is not an "individual member of the consuming public." *Id.* Moreover, it is immaterial that Sergeants Benevolent pays for pharmaceuticals prescribed to its members, who do use them for "personal, family, or household purposes." D.C. Code § 28-3901(a)(2)(B)(i). As other courts have held, "when an insurance plan makes a purchase, it does so, not for personal purposes, but for the plan's business purposes, *i.e.*, to fulfill its side of a contractual relationship with its members, who pay premiums for its coverage." *Restasis*, 2018 WL 5928143, at *7 (collecting cases).

Because the IPP fails to state a claim under the DCCPPA under Rule 12(b)(6), the Court **GRANTS** Defendants' motion to dismiss. [23]

### 5. Florida

Defendants move to dismiss the claim under the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") on the grounds that the IPP does not sufficiently allege intrastate conduct. (Forest Br. at 68 n.50; Gen. Defs. Br. at 40–41 n.20.) Relatedly, Defendants argue that a plaintiff

may not use the FDUTPA to bring claims on behalf of a nationwide class. (Gen. Defs. Br. at 39 n.18).

The cases cited by Defendants, however, say nothing about an intrastate conduct requirement and instead stand for the proposition that the FDUTPA covers only those individuals who live or make purchases in Florida. It is intrastate *injury*, not conduct, which implicates the FDUTPA.

For example, in *Oce Printing Sys. USA, Inc. v. Mailers Data Servs., Inc.*, 760 So.2d 1037, 1040 (Fla. Dist. Ct. App. 2000), the court held that plaintiffs, a class of users, brokers, and servicers of Siemens/Oce ultra-high speed printers, possessed viable causes of action under FDUTPA only if they were also Florida consumers, and that they would not be entitled to recovery merely on the basis that Siemens/Oce had entered into certain anticompetitive agreements or otherwise engaged in unlawful conduct within the state of Florida. *Id.*

**\*40** Likewise, the court in *Montgomery v. New Piper Aircraft*, 209 F.R.D. 221, 228 (S.D. Fla. 2002), held that a nationwide class of aircraft owners could not recover under the FDUTPA merely because the defendant's unlawful conduct had taken place within the state. *Id.* Instead, only Florida consumers could take advantage of the FDUTPA. *Id.*

Finally, *Coastal Physician Servs. of Broward Cty., Inc. v. Ortiz*, 764 So.2d 7, 8 (Fla. Dist. Ct. App. 1999), held that the FDUTPA was "for the protection of in-state consumers for either in-state or out-of-state debt collectors." *Id.*

The IPP alleges that it "indirectly purchased, paid and/or provided reimbursement for Namenda in ... Florida." (CAC ¶ 15.) Moreover, although the IPP brings the IP Action on behalf of a nationwide Class, it does not purport to enable all members of the Class to recover under the FDUTPA. For these reasons, Defendants' motion to dismiss the Florida claim under Count Three is **DENIED**.

### 6. Hawaii

Defendants argue that the Hawaii Unfair and Deceptive Acts or Trade Practices statute ("HUDAP") only

"allow[s] suits by consumers who are natural persons with regard to transactions made primarily for personal or household purposes." (Forest Br. at 68 n.51). The statute reads, in relevant part: "No person other than a consumer, the attorney general or the director of the office of consumer protection may bring an action based upon unfair or deceptive acts or practices declared unlawful by this section." Haw. Rev. Stat. § 480-2(d). The preceding section of the statute defines "consumer" as "a natural person who, primarily for personal, family, or household purposes, purchases, attempts to purchase, or is solicited to purchase goods or services or who commits money, property, or services in a personal investment." Haw. Rev. Stat. § 480-1.

Sergeants Benevolent Association Health & Welfare Fund is not a natural person. It is a trust, incorporated in New York, which reimburses either pharmacies or its members for purchases of Namenda. Additionally, Sergeants Benevolent also does not pay for Namenda "primarily for personal, family, or household purposes," regardless of how its member insureds use Namenda. *See Restasis*, 2018 WL 5928143, at *7. Therefore, it fails to state a claim under Rule 12(b)(6) with respect to the HUDAP.

Defendants' motion to dismiss the Hawaii law claim under Count Three is **GRANTED**.

### 7. Idaho

Defendants first argue that plaintiff has failed to plead deceptive conduct, as required by the Idaho Consumer Protection Act ("ICPA"). (Forest Br. at 67 n.47.) The IPP responds that the ICPA confers a right of action based on "unfair" conduct. (IPP Resp. to Gen. Defs. Br. at 17.) Defendants also argue that the ICPA makes unlawful only specific types of conduct, including misrepresentations, and does not include antitrust conduct. (Gen. Defs. Br. at 40 n.19 (citing Ida. Code § 48-603).) These arguments are treated together.

Like many state consumer protection laws, most of the conducted enumerated in the ICPA focuses on deceptive, fraudulent, or misleading practices. Idaho Code § 48-603. Nonetheless, there is no firm requirement that a plaintiff show deception since, for example, "engaging in any unconscionable method, act, or practice in the conduct of

trade or commerce" is expressly contemplated by the Act. Ida. Code § 48-603(18); *id.* § 48-603C. Other courts have found that plaintiffs may state a claim for anticompetitive conduct, even if that conduct is not deceptive, under this prong of the ICPA. *In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, 350 F. Supp. 2d 160, 184 (D. Me. 2004).

**\*41** Moreover, the ICPA contains a harmonization provision with the federal FTC Act. Idaho Code § 48-604(1). And, the Supreme Court of Idaho has held that the ICPA must be "liberally construed to effect the legislative intent to deter deceptive *or unfair trade practices* and to provide relief for consumers exposed to proscribed practices." *In re W. Acceptance Corp., Inc.*, 788 P.2d 214, 216 (Ida. 1990) (emphasis added) (internal quotation omitted). The Court therefore denies Defendants' motion to dismiss the ICPA claim.

Defendants next argue that the ICPA requires that the underlying conduct involve a consumer transaction or conduct that is consumer-oriented. (Forest Br. at 67–68 n.48 (citing *Sheet Metal Workers Local 441 Health & Welfare Plan v. GlaxoSmithKline, plc*, 737 F. Supp. 2d 380, 409 (E.D. Pa. 2010) ).)

In *Sheet Metal Workers*, the court referenced a state court decision, *State ex rel. Wasden v. Daicel Chem. Indus., Ltd.*, 106 P.3d 428, 435 (Ida. 2005), which examined the unconscionability provisions of the ICPA and found that they were "designed to prohibit unconscionable 'sales conduct' that is *directed at the consumer.*" *Id.* (emphasis added). *Wasden*, however, hinged on two factors: whether the alleged price-fixing of sorbates, an antimicrobial food and animal feed additive, was "sales conduct" for purposes of the ICPA and whether the defendants had ever sold sorbates to consumers in Idaho. *Id.* at 430, 435.

Here, by contrast, the Defendants are alleged to have marketed and sold Namenda to consumers at inflated, anticompetitive prices by, among other things, restricting consumer access to generic versions of Namenda and announcing the withdrawal of the Namenda IR formulation directly to consumers. Thus, construing the allegations in the light most favorable to the Plaintiff, I find that the IPP has adequately alleged "consumer conduct" within the meaning of the statute. *See also New Motor Vehicles*, 350 F. Supp. 2d at 185 (upholding claim for antitrust conduct under ICPA).

Defendants' motion to dismiss is **DENIED**.

### 8. Illinois

Defendants first argue that plaintiffs must allege deception in order to state a claim under the Illinois Consumer Fraud Act ("ICFA"). (Forest Br. at 67 n.47.) *See also Sullivan's Wholesale Drug Co., Inc. v. Faryl's Pharmacy, Inc.*, 573 N.E.2d 1370, 1376 (Ill. App. Ct. 1991) (plaintiff's "cause of action must stand or fall on whether defendants' conduct was deceptive") (citing *Laughlin v. Evanston Hosp.*, 550 N.E.2d 986, 993 (Ill. 1990) ). The IPP argues that it can plead its claim under the "unfairness" prong of the ICFA, which is separate from the "deception" prong. (IPP Resp. to Gen. Defs. Br. at 17.)

At bottom, it is unclear whether *Laughlin's* statement that the ICFA's "reach was to be limited to conduct that defrauds or deceives consumers or others" was intended to bar all future claims brought under its "unfairness" prong, or whether its holding was, instead, restricted to the price discrimination claims alleged in that particular case. 550 N.E.2d at 993. Subsequent cases in Illinois imply that "unfairness" has survived *Laughlin*: "[a] plaintiff may allege that conduct is unfair under the [I]CFA without alleging that the conduct is deceptive." *Hill v. PS Illinois Tr.*, 856 N.E.2d 560, 568 (Ill. Ct. App. 2006). "A deceptive practices claim must meet Rule 9(b)'s heightened pleading standard, while an unfair practices claim need not because it is not based on fraud." *Wheeler v. Assurant Specialty Prop.*, 125 F. Supp. 3d 834, 842 (N.D. Ill. 2015). I will follow the lead of those Illinois courts and decline to dismiss the IPP's claim as a matter of law on these grounds.

 **\*42** Second, Defendants argue that the ICFA is inapplicable to antitrust conduct. (Forest Br. at 68 n.49 (citing 815 Ill. Comp. Stat. 505/2; *Laughlin*, 550 N.E.2d at 993); Gen. Defs. Br. at 40 n.19.) The IPP responds that the ICFA "should be interpreted in the same manner and to the same extent as Section 5 of the FTC Act," which unquestionably includes conduct that violates the antitrust laws. (IPP Resp. to Gen. Defs. Br. at 26 (citing 815 Ill. Comp. Stat. 505/2).)

Again, this Court is not persuaded that *Laughlin* bars the current claims. *Laughlin* held that price discrimination,

which was not actionable under the IAA, was similarly not actionable under the ICFA. 550 N.E.2d at 993 ("There is no indication that the legislature intended that the Consumer Fraud Act be an additional antitrust enforcement mechanism."); *accord Butler v. Jimmy John's Franchise, LLC*, No. 18-cv-0133, 2018 WL 3631577, at \*8 (S.D. Ill. My 31, 2018) ("the Illinois Supreme Court has instructed that plaintiffs cannot use the [ICFA] to get around the fact that their theory does not fly under the [IAA].."). As a result, *Laughlin* stands for the proposition that the ICFA is not a safety net that serves to catch residual anticompetitive behavior, although it does not speak to whether the ICFA countenances claims that are also actionable under the IAA.

A subsequent case, *Gaebler v. KM. Potash Corp.*, 676 N.E.2d 228, 230 (Ill. App. Ct. 1996), relied on *Laughlin* to bar claims for anticompetitive conduct that were brought pursuant to the ICFA *only*—presumably because plaintiffs had tried to skirt the IAA's prohibition on indirect purchaser class actions. *Id.* ("[C]lassic antitrust allegations dressed in Consumer Fraud Act clothing" did not state a claim). However, federal courts in Illinois and the Seventh Circuit have questioned whether *Gaebler*, which interprets *Laughlin* as preventing the ICFA from ever being a remedy for anticompetitive conduct, states the law too broadly. *Siegel v. Shell Oil Co.*, 480 F. Supp. 2d 1034, 1049 n.12 (N.D. Ill. 2007) (noting that no other Illinois appellate courts have interpreted *Laughlin* in this manner). And, consistent with both *Laughlin* and *Gaebler*, other federal courts have held that "[i]t remains possible ... that an unfair practice might be covered by both the antitrust law and the Consumer Fraud Act," *Batson v. Live Nation Entm't, Inc.*, 746 F.3d 827, 831 (7th Cir. 2014). The Court finds these recent cases, as well as the lack of subsequent appellate case law in Illinois, persuasive on the question of whether *Gaebler* bars recovery for anticompetitive conduct under the ICFA.

Third, Defendants argue that the ICFA bars class actions. (Gen. Defs. Br. at 39, n.18; Forest Br. at 68, n.53). However, they fail to cite to any provision of the ICFA that does so. Instead, they cite to the IAA, which does not purport to apply to other statutes. 740 Ill. Comp. Stat. § 10/7(2) ("no person shall be authorized to maintain a class action ... for indirect purchasers asserting claims under *this Act*") (emphasis added). In the absence of any arguments, case law, or citations to the consumer fraud statute, the

2018 WL 7197233

Court finds that this argument does not provide sufficient grounds for dismissing the ICFA claim.

Finally, Defendants argue that the ICFA requires plaintiffs to allege a consumer transaction or conduct that is consumer-oriented. (Forest Br. at 67–68, n.48 (citing Ill. Comp. Stat. 505/10a(a) ).) But that section reads, in relevant part, "Proof of a public injury, a pattern, or an effect on consumers and the public interest generally shall be required in order to state a cause of action under this Section *against a party defendant who is a new vehicle dealer or used vehicle dealer within the meaning of Chapter 5 of the Illinois Vehicle Code or who is the holder of a retail installment contract within the meaning of Section 2.12 of the Motor Vehicle Retail Installment Sales Act.*" Ill. Comp. Stat 505/10a(a) (emphasis added). By its terms, the statute is inapplicable to the case at bar.

 **\*43** Defendants' motion to dismiss the Illinois claim under Count Three is **DENIED**.

### 9. Kansas

Defendants argue that the IPP has failed to allege consumer deception in satisfaction of the elements of the Kansas Consumer Protection Act ("KCPA"). (Forest Br. at 67 n.47.) The IPP responds generally that it brings its claims pursuant to the "unconscionable" prong of the state consumer protection laws. (IPP Resp. to Gen. Defs. Br. at 17.)

The Court agrees with Defendants' interpretation of the statute. The KCPA is intended to "protect consumers from suppliers who commit deceptive and unconscionable practices." Kan. Stat. § 50-623; *see also id.* §§ 50-626, 50-627. As with other state laws, the enumerated offenses under the statute focus overwhelmingly on deceptive or fraudulent acts. Unlike other states, however, Kansas courts have spoken more uniformly to the issue of whether the "unconscionability" prong of the statute also requires a showing of deception: "In order to render the contract between the parties unconscionable, there must be some element of deceptive bargaining conduct present as well as unequal bargaining power." *Cornelison v. Denison State Bank*, 315 P.3d 278 (Kan. Ct. App. 2014) (citing *Willman v. Ewen*, 230 Kan. 262, 266, 634 P.2d 1061 (1981) ); *see also State ex rel. Stovall v. ConfiMed.com, L.L.C.*, 272 Kan. 1313, 1321, 38 P.3d 707, 713 (2002) (same). And,

unlike courts in, for example, Illinois, courts in Kansas have not affirmatively excused a plaintiff proceeding with a claim for unconscionability from satisfying the heightened pleading requirements for claims grounded in fraud. *Compare Wheeler, 125 F. Supp. 3d at 842, supra.*

Because the IPP cites no cases in support of its arguments, and cites one in support of Defendants', the KCPA claim is **DISMISSED**. [24]

### 10. Maine

Defendants argue that the Maine Unfair Trade Practices Act ("MUTPA") provides a cause of action only for persons who purchase goods "primarily for personal, family, or household purposes." (Forest Br. at 68 n.51.) The statute provides a remedy to, in relevant part "[a]ny person who purchases or leases goods, services or property, real or personal, primarily for personal, family or household purposes and thereby suffers any loss of money or property, real or personal." Me. Rev. Stat. tit. 5, § 213(1).

For the reasons discussed above, the Court finds that Sergeants Benevolent, an insurer, has not purchased or paid for Namenda "primarily for personal, family, or household purposes." *See Restasis*, 2018 WL 5928143, at *7. It has paid for the drug because it is an insurer and has a contractual duty to reimburse its members for their purchases. Therefore, it fails to state a claim under Rule 12(b)(6).

 **\*44** Defendants' motion to dismiss is **GRANTED**. [25]

### 11. Massachusetts

In order to bring a claim under Massachusetts' state consumer protection law, Defendants argue that the IPP must allege primarily intrastate conduct. (Forest Br. at 68 n.50; Gen. Defs. Br. at 41 n.20.) Defendants do not cite any case law for this proposition, although they do cite Mass. Laws ch. 93A, § 1, which defines "trade" and "commerce" to include "trade or commerce directly or indirectly affecting the people of this commonwealth." *Id.* The IPP responds that the Complaint alleges intrastate effects and that, as a matter of law, a nationwide antitrust

2018 WL 7197233

class action satisfies "intrastate" pleading requirements. (IPP Resp. to Gen. Defs. Br. at 32.)

On its own, the "affecting people of this commonwealth" language does not persuade the Court that this claim should be dismissed, particularly as the IPP has alleged sales of Namenda IR and Namenda XR affecting consumers and third party payors across the country, including in Massachusetts.

It is true that an earlier version of the Massachusetts statute contained an exemption for defendants "of whose gross revenue at least twenty per cent is derived from transactions in interstate commerce," as well as for defendants who met certain other criteria. *See Dodd v. Commercial Union Ins. Co.*, 365 N.E.2d 802, 808 (Mass. 1977). However, the statute no longer carves out such defendants. Rather, the current version of that provision now states, in relevant part, "For the purpose of this section, the burden of proving exemptions from the provisions of this chapter shall be upon the person claiming the exemptions." Mass. Laws ch. 93A, § 3.

Next, Defendants argue that G.L. c. 93A does not allow for class actions or indirect purchaser actions. *Ciardi*, 762 N.E.2d at 314, is squarely on point: it holds that both class actions and indirect purchaser actions are permitted under Massachusetts' consumer protection law. *Id.*

Finally, Defendants argue in their supplemental briefing that the IPP has not satisfied the pre-filing notice requirement under chapter 93A. (Gen. Defs. Suppl. Br. at 13 (citing Mass. Gen. Laws ch. 93A, § 9(3) ).) Like Alabama's consumer protection statute, the pre-suit notice provisions of chapter 93A do not apply if "the prospective respondent does not maintain a place of business or does not keep assets within the commonwealth." *Id.* Defendants do not argue, and nothing in the CAC alleges, that they maintain a place of business or keep assets in Massachusetts. (*See* CAC ¶¶ 16–30.) Moreover, nothing in § 9(3) suggests that a Massachusetts court would dismiss an action under Chapter 93A if a plaintiff failed to comply with this provision. Like the Alabama statute, the provision appears to operate like a Rule 68 offer of judgment, capping damages for defendants who make settlement offers in good faith.

**\*45** Defendants' motion to dismiss the Massachusetts law claim under Count Three is **DENIED**.

## 12. Michigan

Defendants first argue that the IPP is required to allege consumer deception to plead a claim under the Michigan Consumer Protection Act ("MCPA"). (Forest Br. at 67 n.47.) The IPP argues that it can base its claim on "unfair" practices. (IPP Resp. to Gen. Defs. Br. at 17.)

The IPP is correct. "The MCPA is broader than common law torts of fraud inasmuch as it prohibits 'not only 'deceptive' business practices but also those which are 'unfair' and 'unconscionable.' ' " *Game On Ventures, Inc. v. Gen. RV Ctr., Inc.*, 587 F. Supp. 2d 831, 839 (E.D. Mich. 2008) (citing *Mayhall v. A.H. Pond Co.*, 341 N.W.2d 268, 270 (Mich. Ct. App. 1983) ). The Court finds that the IPP has adequately alleged conduct falling under § 445.903(z) —"Charging the consumer a price that is grossly in excess of the price at which similar property or services are sold." (*Compare* CAC ¶ 213). Therefore, Defendants' first argument fails.

Defendant next argues that the IPP fails to plead a consumer transaction or conduct that is consumer-oriented. (Forest Br. at 67–68, n.48 (citing *Sheet Metal Workers,* 737 F. Supp. 2d at 412).) *Sheet Metal Workers,* however, dismissed the plaintiffs' MCPA claim in a sham patent litigation case because plaintiffs had not "alleged that [defendant] had an intent to deceive consumers and because their actions [did] not fall within any of the enumerated prohibited practices listed in section 445.901 [*sic*]." *Id.* The facts of *Sheet Metal Workers* are readily distinguishable, particularly as the IPP has adequately alleged "unfair" conduct under an enumerated provision of the statute.

Third, Defendants argue that the MCPA is inapplicable to antitrust conduct because it only applies to "specific types of conduct," such as misrepresentations. (Gen. Defs. Br. at 40 n.19 (citing Mich. Comp. Laws § 445.903); Forest Br. at 68 n.49.) The IPP opposes this argument on the basis that the MCPA is "modeled after the FTC Act and extend[s] to prohibit unfair methods of competition including monopolistic conduct." (IPP Resp. to Gen. Defs. Br. at 26.)

2018 WL 7197233

The IPP is correct. The MCPA does contain harmonization language: it enables injured persons to bring a class action caused by "a method, act, or practice in trade or commerce declared by a circuit court of appeals or the supreme court of the United States to be an unfair or deceptive act or practice within the meaning of section 5(a)(1) of the Federal Trade Commission Act." Mich. Compiled Laws § 445.911(3)(c). Moreover, federal courts have sustained causes of action under the MCPA for antitrust conduct. *FTC v. Mylan Labs., Inc.*, 62 F. Supp. 2d 25, 48 (D.D.C. 1999).

Defendants' motion to dismiss is **DENIED.**

### 13. Missouri

Defendants argue that the IPP fails to adequately plead a consumer transaction or conduct that is consumer-oriented under the Missouri Merchandising Practices Act ("MMPA"). (Forest Br. at 67–68, n.48 (citing Mo. Rev. Stat. § 407.020(1) ).)

The Court is not convinced that the provision of the MMPA cited by Defendants contains such a requirement. "The act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce ... in or from the state of Missouri, is declared to be an unlawful practice." Mo. Rev. Stat. § 407.020(1). "Trade or commerce," in turn, is defined as "the advertising, offering for sale, sale, or distribution, or any combination thereof, of any services and any property, tangible or intangible, real, personal, or mixed, and any other article, commodity, or thing of value wherever situated." *Id.* § 407.010(7).

**\*46** Because Defendants have cited no authority commensurate with the proposition that Missouri restricts recovery under the MMPA to consumer-oriented conduct not covered by the IPP Complaint, their motion to dismiss the Missouri claim under Count Three is **DENIED.**

### 14. Montana

Defendants argue that the Montana Unfair Trade Practices and Consumer Protection Act ("MUTPCPA") only "allow[s] suits by consumers who are natural persons with regards [*sic*] to transactions made primarily for personal or household purposes." (Forest Br. at 68, n.51 (citing Mont. Stat. § 30-14-102).)

The MUTPCPA enables a "consumer" to bring an action for damages, Mont. Stat. § 30-14-133(1), and defines "consumer" as "a person who purchases or leases goods, services, real property, or information primarily for personal, family, or household purposes," *id.* § 30-14-102(1).

As I have held with respect to other state laws containing this requirement, I find that Sergeants Benevolent has failed to state a claim under the MUTPCPA because it did not purchase Namenda "primarily for personal, family, or household purposes." *See Restasis,* 2018 WL 5928143, at *7.

Defendants' motion to dismiss is, therefore, **GRANTED.** [26]

### 15. Nebraska

Defendants argue that the IPP fails to adequately plead a consumer transaction or conduct that is consumer-oriented under the Nebraska Consumer Protection Act ("NCPA"). (Forest Br. at 67–68 n.48 (citing Neb. Rev. Stat. § 59-1601).) As with their claim under Missouri law, Defendants have cited no authority commensurate with the proposition that the NCPA restricts recovery to "consumer-oriented" conduct or that such conduct not covered by the IPP Complaint. Section 59-1601 of the NCPA is broad, with no indications that recovery is restricted to certain types of conduct: "person" is defined to include trusts," *id.* § 59-1601(1), and "trade and commerce" is defined to mean, in relevant part, "any commerce directly or indirectly affecting the people of the State of Nebraska," *id.* § 59-1601(2).

As a result, Defendants' motion to dismiss the Nebraska claim under Count Three is **DENIED.**

### 16. Nevada

2018 WL 7197233

Defendants argue that the Nevada Deceptive Trade Practices Act ("NDTPA") requires the IPP to allege deceptive conduct. (Forest Br. at 67 n.47.) The IPP argues that it has limited its claims to the "unfair methods" and "unfair trade practices" prongs of the statute. (IPP Resp. to Gen. Defs. Br. at 17.)

The NDTPA enumerates deceptive trade practices at sections 598.015 through 598.025 of the statute. Section 598.0923 of the statute makes it a violation to "knowingly ... violate a state or federal statute or regulation relating to the sale or lease of goods or services." Nev. Rev. Stat. § 598.0923(3). This Court adopts the reasoning in *Effexor*, 2018 WL 4466050, at *20, which found that a plaintiff could state a claim under this section of the NDTPA where the claims were "predicated on allegations of anticompetitive conduct, which are considered prohibited acts under Nev. Rev. Stat. § 598A.060." *Id.*

**\*47** Defendants next argue that the Nevada Deceptive Trade Practices Act ("NDTPA") confers a right of action only to elderly or disabled persons. (Gen. Defs. Br. at 40 (citing Nev. Rev. Stat. § 598.0977); *see also* Forest Br. at 68 n. 52.) Because the IPP, "a New York trust, is not an elderly or disabled person located in Nevada," it cannot bring a claim. (Gen. Defs. Br. at 40.)

I agree with the IPP that private relief in the statute is not so limited. As the IPP persuasively argues, Nev. Rev. Stat. § 41.600 operates to provide a right of action to "any person who is a victim of consumer fraud." (IPP Resp. to Gen. Defs. Br. at 31 (citing Nev. Rev. Stat. § 41.600; *Southern Serv. Corp. v. Excel Bldg. Servs., Inc.*, 617 F. Supp. 2d 1097, 1099 (D. Nev. 2007) ).) The statute defines "consumer fraud" to encompass acts that violate the NDTPA. *See* Nev. Rev. Stat. § 41.600(2)(e) (" 'consumer fraud' means ... a deceptive trade practice as defined in NRS 598.0915 to 598.0925, inclusive"). In *Southern Serv. Corp.*, 617 F. Supp. 2d at 1100, moreover, the U.S. District Court for the District of Nevada found that "person," as used in Nev. Rev. Stat. § 41.600, could include a corporate competitor, which indicates that private relief under the statute is not restricted to elderly or disabled persons. The fact that the law makes special provision for the elderly and disabled does not mean that others are not covered elsewhere in the statute.

Other federal district courts to examine this issue are in accord and have not restricted NDTPA claims to elderly or disabled plaintiffs. *DDAVP*, 903 F. Supp. 2d at 227; *Domestic Drywall*, 2016 WL 3769680, at *10.

Defendants' motion to dismiss the Nevada law claim under Count Three is DENIED.

### 17. New Hampshire

Defendants argue that the New Hampshire Consumer Protection Act ("NHCPA") only applies when the underlying conduct is primarily intrastate. (Forest Br. at 68 n.50; Gen. Defs. Br. at 40–41 n.20). Defendants cite to the provision of the statute that deems unlawful "any unfair method of competition ... in the conduct of any trade or commerce within this state." N.H. Rev. Stat. § 358-A:2. The IPP alleges it has met this requirement, both with respect to its Complaint and as a matter of nationwide class action law. (IPP Resp. to Gen. Defs. Br. at 32.)

Without more, the Court is not persuaded that the "within this state" language in the statute requires dismissal of the claim. "[C]ourts interpreting New Hampshire's consumer protection law disagree as to whether a nationwide scheme in which the plaintiffs pay a higher price in the state is sufficient to satisfy the statute's requirement." *In re Ductile Iron Pipe Fittings (DIPF) Indirect Purchaser Antitrust Litig.*, No. 12-cv-169, 2013 WL 5503308, at *22 (D.N.J. Oct. 2, 2013) (collecting cases). However, based on the language of the statute, this Court agrees with those cases that have held that sales of the offending goods into New Hampshire alleges sufficient intrastate conduct to satisfy the NHCPA. *DDAVP*, 903 F. Supp. 2d at 231.

Defendants' motion to dismiss the New Hampshire claim is, therefore, **DENIED**.

### 18. New Mexico

Defendants first argue that the New Mexico Unfair Practices Act ("NMUPA") requires plaintiffs to allege deceptive conduct. (Forest Br. at 67, n.47). The IPP says that the NMUPA also covers unfair or unconscionable conduct. (IPP Resp. to Gen. Defs. Br. at 17.)

**\*48** The IPP has the better reading of the NMUPA. In addition to deceptive conduct, the NMUPA also makes unlawful "unconscionable trade practices," which include those that "result[ ] in a gross disparity between the value received by a person and the price paid." N.M. Stat. § 57-12-2(E)(2); (*compare* CAC ¶ 213). Federal courts have permitted price-fixing claims, which typically do not require alleging deception, to proceed under this provision. *In re Lipitor Antitrust Litig.*, No. 12-cv-2389, 2018 WL 4006752, at *20 (D.N.J. Aug. 21, 2018); *Domestic Drywall*, 2016 WL 3769680, at *8. Although this is not a price-fixing case, the Court is persuaded by these cases that hold that a plaintiff need not allege consumer deception. In addition, and for the same reasons, the Court also rejects Defendants' argument that the NMUPA does not provide a remedy for antitrust conduct. (Forest Br. at 68, n.49; Gen. Defs. Br. at 40 n.19.)

Defendants next argue that the IPP fails to adequately plead a consumer transaction or conduct that is consumer-oriented under the NMUPA. (Forest Br. at 67–68 n.48 (citing N.M. Stat. §§ 57-12-2–3).)

As with their claim under Missouri and Nebraska law, however, Defendants have cited no authority commensurate with the proposition that the NCPA restricts recovery to "consumer-oriented" conduct or that such conduct not covered by the IPP Complaint. Section 57-12-3 of the NMUPA states: "Unfair or deceptive trade practices and unconscionable trade practices in the conduct of any trade or commerce are unlawful." Section 57-12-2, in turn, defines "trade or commerce" very broadly, including "the advertising, offering for sale or distribution of any services and any property and any other article, commodity or thing of value, including any trade or commerce directly or indirectly affecting the people of this state." N.M. Stat. § 57-12-2(C).

Defendants' motion to dismiss is **DENIED**.

### 19. New York

Defendants move to dismiss the IPP's claim under section 349 of New York's General Business Law ("NYGBL") for failure to plead deceptive conduct. (Forest Br. at 67 n.47.) The IPP argues that it is not required to plead deceptive conduct to recover under the statute and that allegations

of "unfair" conduct suffice. (IPP Resp. to Gen. Defs. Br. at 17.)

The Court agrees with Defendants. Section 349 of the NYGBL does not contain an "unfair" or "unconscionable" practices prong, and therefore a plaintiff must plead consumer fraud or deception in order to bring a claim. In addition, while antitrust conduct is actionable under section 349, plaintiffs still must allege deception to state a claim. *See Dig. Music*, 812 F. Supp. 2d at 410 (analyzing New York cases); *see also* 7 von Kalinowski, Sullivan, & McGuirl, *supra*, § 132.07. Even cases cited by the IPP hold that any plaintiff who brings a claim under section 349 must allege deceptive conduct in its Complaint. *See, e.g., In re Processed Egg Prods. Antitrust Litig.*, 851 F. Supp. 2d 867, 907 (E.D. Pa. 2012) (dismissing claim for failure to allege deception as the basis for injury) (citing *Stutman v. Chem. Bank*, 731 N.E.2d 608, 611–12 (N.Y. 2000) ).

As a result, Defendants' motion to dismiss the New York claim is **GRANTED**. [27]

### 20. North Carolina

Defendants ask this Court to dismiss the IPP's claim under the North Carolina Unfair and Deceptive Trade Practices Act ("NCUDTPA") because it has failed to allege conduct that is primarily intrastate. (Forest Br. at 68 n.50; Gen. Defs. Br. at 41 n.20 (both citing N.C. Gen. Stat. § 75-1.1).) However, nothing in the section of the statute cited by Defendants indicates that a claim may be brought pursuant to the NCUDTPA only if the conduct is "primarily intrastate." *See* N.C. Gen. Stat. § 75-1.1.

**\*49** Second, Defendants argue that the NCUDTPA only permits actions by natural persons with regard to transactions made primarily for personal or household purposes. (Forest Br. at 68 n.51 (citing N.C. Gen. Stat. 75.1-1).) Again, nothing in the cited section indicates that a claim would be restricted to natural persons or to transactions made primarily for personal or household purposes. In fact, "commerce" is expressly defined to "include[ ] all business activities, however denominated," and exempts only "professional services rendered by a member of a learned profession." N.C. Gen. Stat. § 75-1.1(b).

Sergeants Benevolent Association Health & Welfare Fund v. Actavis, plc, Slip Copy (2018)

2018 WL 7197233

Defendants' motion to dismiss is **DENIED**.

### 21. Rhode Island

Defendants argue that the Rhode Island Deceptive Trade Practices Act ("RIDTPA") limits relief to "[a]ny person who purchases or leases goods or services primarily for personal, family, or household purposes." R.I. Gen. Laws § 6-13.1-5.2(a); (*see also* Forest Br. at 68 n.51).

As discussed in previous sections, Sergeants Benevolent fails to state a claim under the RIDTPA because it did not purchase Namenda "primarily for personal, family, or household purposes." *See Restasis,* 2018 WL 5928143, at *7.

Defendants' motion to dismiss is, therefore, **GRANTED**. [28]

### 22. Tennessee

Defendants argue that the TCPA is inapplicable to antitrust conduct. (Forest Br. at 68 n.49; Gen Defs. Br. at 40 n.19 (citing Tenn. Code § 47-18-104(b) ).) There appears to be a split among Tennessee's intermediate courts with respect to this question. Some courts have held expressly that "the TCPA does not apply to anti-competitive conduct." *Bennett v. Visa U.S.A. Inc.,* 198 S.W.3d 747, 755 (Tenn. Ct. App. 2006). Others have concluded that anticompetitive conduct is an "unfair" practice covered by the TCPA. *Blake v. Abbott Labs.*, No. 03A01-9509-cv-00307, 1996 WL 134947, at *5–*7 (Tenn. Ct. App. Mar. 27, 1996).

More recent decisions in Tennessee, including *Bennett,* have reasoned that, by not incorporating the "unfair methods of competition" language from the federal FTC Act into Tennessee's "little FTC" Act, the Tennessee legislature intended to prohibit recovery for anticompetitive conduct under the TCPA. *Bennett,* 198 S.W.3d at 754–55; *see also Sherwood v. Microsoft Corp.*, No. M2000-1850-COA-R9-CV, 2003 WL 21780975, at *31–*33 (Tenn. Ct. App. July 31, 2003); *Duke v. Browning-Ferris Indus. of Tenn., Inc.*, No. W2005-146-COA-R3-CV, 2006 WL 1491547, at *8 (Tenn. Ct. App. May 31, 2006). Instead, the legislature intended that consumers injured by such conduct would have an exclusive remedy

under the state antitrust statute, the Tennessee Trade Practices Act. *Sherwood,* 2003 WL 21780975, at *33. *Blake,* by comparison, did not analyze the legislative history of the TCPA or its incongruities with the federal FTC Act, instead relying on the statutory mandate that it be "liberally construed." 1996 WL 134947, at *6–*7.

Like other federal courts to review this issue, I find that the more recent opinions of the Tennessee Court of Appeals, such as *Bennett* and *Sherwood,* both persuasive in their own right, as well as indicative of how the Tennessee Supreme Court would likely rule on this question. *See Relafen,* 221 F.R.D. at 284; *In re Photochromic Lens Antitrust Litig.*, No, 10-md-2173, 2011 WL 4914997, at *4 & n.14 (Oct. 14, 2011).

**\*50** Therefore, Defendants' motion to dismiss the Tennessee claim under Count Three is **GRANTED**. [29]

### 23. Utah

Defendants first argue that the Utah Consumer Sales Practices Act ("UCSPA") requires the IPP to plead deceptive conduct. (Forest Br. at 67 n.47.) The IPP argues that a plaintiff may state a claim under the UCSPA for "unfair" acts or practices that are not inherently deceptive. (IPP Resp. to Gen. Defs. Br. at 17.)

The Court agrees with the IPP. The UCSPA expressly allows a plaintiff to plead "unconscionable" conduct as the basis of its claim, and that this does not require a showing of fraud or deception. *See* Utah Code § 13-11-5; *see also New Motor Vehicles,* 350 F. Supp. 2d at 205; *Gallegos v. LVNV Funding LLC,* 169 F. Supp. 3d 1235, 1245 (D. Utah 2016) (considering separately claims for deceptive and unconscionable acts).

Defendants next argue that the UCSPA is inapplicable to antitrust conduct because anticompetitive conduct is not enumerated within the statute's list of "deceptive practices." (Forest Br. at 68 n.49; Gen. Defs. Br. at 40 n.19 (citing Utah Code § 13-11-4).) The IPP responds that the UCSPA contains a harmonization provision with the FTC Act, giving it a broad reach. (IPP Resp. to Gen. Defs. Br. at 26.)

First, the list of deceptive practices in the statute is not exclusive, by its own terms. Utah Code § 13-11-4(2).

Sergeants Benevolent Association Health & Welfare Fund v. Actavis, plc, Slip Copy (2018)

2018 WL 7197233

Second, Defendants cite to the "deceptive act or practice" provision of the UCSPA, whereas the IPP has stated that it brings all claims under Count Three pursuant to the "unfair" or "unconscionable" practices prongs of the relevant statutes. Here, the relevant provision is not section 13-11-4 but instead section 13-11-5. Finally, other federal district courts have found that allegations of anticompetitive conduct, when brought pursuant to the "unconscionability" provision of the UCSPA, can survive a motion to dismiss. *New Motor Vehicles,* 350 F. Supp. 2d at 205; *Aftermarket. Filters,* 2009 WL 3754041, at *9. Therefore, the Court declines to dismiss the UCSPA claim on this ground.

Defendants next move to dismiss the UCSPA claim because it applies only to natural persons making purchases for personal or household purposes. (Forest Br. at 68 n.51 (citing Utah Code §§ 13-11-3(2)(a), 13-11-19).)

The Court disagrees that the UCSPA clearly restricts recovery in this manner. Utah Code § 13-11-5 states, "An unconscionable act or practice by a supplier *in connection with a consumer transaction* violates this act, whether it occurs before, during, or after the transaction." *Id.* § 13-11-5 (emphasis added). Utah Code § 13-11-19, which provides a private cause of action, permits a "*consumer* who suffers loss as a result of a violation of this chapter" to recover actual damages. *Id.* § 13-11-19(2) (emphasis added). The statute defines "consumer transaction" in Section 13-11-3(2) but does not anywhere define "consumer," That subsection reads, in relevant part: " 'Consumer transaction' means a sale ... or other ... transfer or disposition of goods ..., to, *or apparently to,* a person for ... primarily personal, family, or household purposes." Utah Code § 13-11-3(2)(a) (emphasis added). "Person," moreover, expressly includes a "corporation, ... trust, partnership, association, ... or any other legal entity." *Id.* § 13-11-3(5) (emphasis added).

**\*51** On its face, the definition of "consumer transaction" appears to contemplate sales of goods to—among other entities—corporations and trusts for their "personal," "family," or "household" purposes. This, of course, is possible only through an entity's members, employees or customers, which is consistent with the IPP's allegations in its Complaint.

The Court is not aware of any case law that would prohibit recovery by the IPP for failure to state a claim on the

basis of these statutory provisions. The Court is aware of only one case, from the District of Utah, that purports to interpret "consumer" for purposes of subsection 13-11-19. *Icon Health & Fitness, Inc. v. ConsumerAffairs.com,* No. 16-cv-168, 2018 WL 1183372, at *5 (D. Utah Mar. 6, 2018), *motion to certify appeal denied,* 2018 WL 2122855 (D. Utah May 8, 2018). The court in that case reasoned that the plaintiff, whose products were reviewed on Defendant's website, did not have a cause of action under the UCSPA because the plaintiff did "not allege or argue that it is a consumer harmed by Defendants' conduct." *Id.* The facts of the IP Action are clearly distinguishable, however, because Sergeants Benevolent alleges that, through its own reimbursements or payments for branded Namenda, it grossly overpaid for the product relative to its value. (CAC ¶ 213.) In addition, at least one federal court has allowed a corporation, which that a competitor engaged in false consumer advertising in the course of consumer transactions, to recover under the UCSPA. *See Derma Pen, LLC v. 4EverYoung Ltd.,* No. 13-cv-00729, 2017 WL 2258362, at *15 (D. Utah May 22, 2017), *aff'd,* 736 F. App'x 741 (10th Cir. 2018).

In addition, unlike other consumer protection statutes reviewed by this Court, the UCSPA contemplates sales made both "to" and "apparently to" a person for personal, family, or household purposes. Utah Code § 13-11-3(2)(a). The Court is not aware of any Utah case that interprets this language, and the distinction is not clear from the legislative history. The "apparently to" language was inserted as part of S.B. 75, which expanded the definition of "consumer transaction" related to identity fraud. 2000 Utah Las Ch. 57 (West) (S.B. 75) (" 'Consumer transaction' ... includ[es] the use or misuse of personal identifying information of any person in relation to a consumer transaction to, or apparently to, a person for primarily personal, family, or household purposes."). Later, the identity fraud language was stripped from the definition, but the phrase "apparently to" was retained. 2004 Utah Laws Ch. 55 (H.B. 195). Construing the allegations in the Complaint in the light most favorable to the IPP, however, the Court finds that sales of Namenda were made either to or "apparently to" consumers primarily for their personal, family, or household purposes. Therefore, the Complaint states a claim.

Finally, Defendants argue that class actions are not permissible under the UCSPA. (Forest Br. at 68 n.53; Gen.

2018 WL 7197233

Defs. Br. at 39 n.18 (citing Utah Code § 13-11-19(2) ).) The UCSPA states, in relevant part: "A consumer who suffers loss as a result of a violation of this chapter may recover, but not in a class action, actual damages[.]" Utah Code § 13-11-19(2).

However, another paragraph of the same section permits a consumer to bring a class action for actual damages provided certain preconditions are satisfied. Utah Code § 13-11-19(4)(a); see also Miller v. Basic Research, LLC, 285 F.R.D. 647, 654–55 (D. Utah 2010). Specifically, class plaintiffs proceeding under the UCSPA must allege that the specific action was declared unlawful pursuant to an administrative rule, a court order, or (in limited cases) a consent judgment before the consumer transactions on which the action was based occurred. Id.

 *52  Courts that have examined the class action damages bar under the UCSPA have tended to defer the question of whether an action meets the statutory prerequisites until later stages of the case. See, e.g., In re General Motors LLC Ignition Switch Litig., Nos. 14-md-2543, 14-mc-2543, 2018 WL 4351892, at *46 n.63 (S.D.N.Y. Sept. 12, 2018) ("The Court defers to another day whether the provision" that limits damages under the UCSPA "applies here."); In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liability Litig., MDL No. 2672, 2018 WL 4777134, at *28–*29 (N.D. Cal. Oct. 3, 2018) ("The Court will not make these determinations at this stage.").

The Court agrees that this issue is more appropriately handled following discovery, when the parties can address (i) if the statutory prerequisites have been met with respect to the conduct and particular transactions alleged and, (ii) in the alternative, whether the need to make this individualized determination in Utah would defeat predominance.

Defendants' motion to dismiss the UCSPA claim is DENIED.

### 24. Vermont

Defendants move to dismiss the Vermont Consumer Protection Act ("VCPA") because it permits only claims brought by natural persons making purchases for personal or household purposes, (Forest Br. at 68 n.51 (citing Vt. Stat. tit 9 § 2461(b) ).)

This cited provision restricts recovery to a "consumer." Vt. Stat. tit. 9 § 2461(b). "Consumer," in turn, is defined as "any person who purchases, leases, contracts for, or otherwise agrees to pay consideration for goods or services *not for resale in the ordinary course of his or her trade or business* but for his or her use or benefit or the use or benefit of a member of his or her household, or in connection with the operation of his or her household ..., or a person who purchases, leases, contracts for, or otherwise agrees to pay consideration for goods or services *not for resale in the ordinary course of his or her trade or business* but for the use or benefit of his or her business or in connection with the operation of his or her business." Vt. Stat. tit. 9, § 2451a(a) (emphasis added).

As discussed in preceding sections, Sergeants Benevolent cannot state a claim under this statute by alleging that it reimbursed for Namenda on behalf of its insured members. See Restasis, 2018 WL 5928143, at *7. The language of the statute clearly restricts the term "consumer" to end users of the product.

Therefore, Defendants' motion to dismiss the VCPA claim is GRANTED.

### 25. West Virginia

Defendants argue for the first time in their supplemental briefing that the IPP's claim under the West Virginia Consumer Credit and Protection Act ("WVCCPA") must be dismissed because the IPP has not satisfied the statutory pre-filing notice requirement. (Gen. Defs. Suppl. Br. at 13 (citing W. Va. Code § 46A-6-106(c) ).) That provision reads, in relevant part: "[N]o action, counterclaim, cross-claim or third-party claim may be brought pursuant to the provisions of this section until the person has informed the seller or lessor in writing and by certified mail, return receipt requested, of the alleged violation and provided the seller or lessor twenty days from receipt of the notice of violation but ten days in the case a cause of action has already been filed to make a cure offer." W. Va. Code § 46A-6-106(c).

Unlike the similar pre-suit notice requirement under the Hawaii Antitrust Act, the state court remedy for noncompliance with the WVCCPA's pre-filing notice requirement appears to be dismissal of the claim. *Harrison*

Sergeants Benevolent Association Health & Welfare Fund v. Actavis, plc, Slip Copy (2018)

2018 WL 7197233

*v. Porsche Cars North Am., Inc.*, No. 15-0381, 2016 WL 1455864, at *3 (W. Va. Apr. 12, 2016) (unpublished opinion) (dismissing claim for failure to comply with pre-suit notice provisions).

**\*53** Because the notification requirement is an express precondition to filing suit, federal district courts sitting in diversity have also granted defendants' motions to dismiss when the plaintiffs have not complied with this provision. *Waters v. Electrolux Home Prods., Inc.*, 154 F. Supp. 3d 340, 354 (N.D. W. Va. 2015) (consumer class action); *Muffins v. Ethicon, Inc.*, No. 12-cv-2952, 2017 WL 319804, at *3 (S.D. W. Va. Jan. 20, 2017) (consumer class action); *McCoy v. Southern Energy Homes, Inc.*, No. 09-cv-1271, 2012 WL 1409533, at *13 (S.D. W. Va. Apr. 23, 2012); *Stanley v. Huntington Nat. Bank,* No. 11-cv-54, 2012 WL 254135, at *7 (N.D. W. Va. Jan. 27, 2012) (individual action). Other courts have dismissed the claim without prejudice. *Processed Egg Prods.*, 851 F. Supp. 2d at 911.

To this Court's knowledge, no federal district court has examined the cure offer requirement in light of the Supreme Court's holding in *Shady Grove.* Certainly, the pre-suit cure offer requirement is "a state law that restricts the types of claims eligible for class treatment beyond the limits established by Rule 23," because it requires certain prerequisites to filing suit that Rule 23 does not. *Restasis,* 2018 WL 5928143, at *6. It therefore conflicts with the federal rule.

The question is therefore whether the cure offer requirement is "so bound up with the state-created right or remedy that it define the scope of that substantive right or remedy." *Id.* (citing *Shady Grove,* 559 U.S. at 419–20 (Stevens, J., concurring) ).

This Court finds that it is. Under the statute, the cure offer, where accepted, tolls the applicable statute of limitations "for the period the effectuation of the cure offer is being performed." W. Va. Code § 46A-6-106(e). Moreover, where the accepted cure offer is performed, it constitutes a complete defense to the action. *Id.* § 46A-6-106(h). And, if a defendant accepts and performs a cure offer, and a plaintiff brings suit anyway, the defendant is entitled to attorneys' fees and costs for defending the action. *Id.* In other words, the cure offer creates substantive defenses and additional remedies under state law.

For this reason, the Court **GRANTS** Defendants' motion to dismiss the West Virginia claim under Count Three. [30]

### E. In Conclusion, the IPP Has Stated a Claim for Violation of State Consumer Protection Laws Under Count Three Under the Laws of 14 States

In sum, the Court finds that the IPP Complaint adequately pleads facts supporting its allegations of unfair trade practices against all Defendants. The Court also finds that, as a matter of law, the IPP may pursue its Count Three claims for consumer protection law violations under the laws of all states **except** Arizona (which claim was withdrawn by the IPP), the District of Columbia, Hawaii, Kansas, Maine, Montana, New York, Rhode Island, Tennessee, Vermont, and West Virginia. Those claim are hereby **DISMISSED**.

### VIII. Count Four: Unjust Enrichment Under the Laws of 44 States Against Actavis, Forest, Merz, and the Generic Defendants

**\*54** Finally, the IPP Complaint alleges 44 state law claims grouped under the heading "Count Four: Unjust Enrichment." (CAC at 56.) The IPP asserts this cause of action against all Defendants: Forest, Actavis, Merz, and the Generic Defendants. (*Id.*)

This cause of action alleges that "Defendants have benefited from the overcharges" on Namenda IR and XR; that these benefits were "made possible by the unlawful and inequitable acts alleged" in the Complaint; that "Defendants' financial benefits are traceable to Plaintiff and End-Payor Class members' overpayments"; and that "Plaintiff and End-Payor Class members have conferred an economic benefit upon the Defendants in the nature of profits resulting from unlawful overcharges." (CAC ¶¶ 219–21.) Together, these allegations form the factual nucleus on which the 44 state unjust enrichment claims are based.

At the outset, the IPP notes that, "[t]o the extent required, this claim is pled in the alternative to other claims in this Complaint." (CAC ¶ 218.) The IPP maintains that "unjust enrichment is a separate cause of action" from both state antitrust and consumer protection laws, "which plaintiffs are allowed to plead in the alternative under Federal Rule of Civil Procedure 8—regardless of consistency and whether based on legal of [*sic*] equitable grounds." (IPP

Resp. to Gen. Defs. Br. at 41). The IPP also alleges that it has no adequately remedy at law. (CAC ¶ 230.)

As they have done with respect to Counts One, Two, and Three of the IPP Complaint, Defendants first make several broad-based arguments aimed at dismissing Count Four of the Complaint as a whole, including:

- The claims are "likely" time-barred under the applicable statute of limitations, (Forest Br. at 65 n.42);

- The IPP has failed to satisfy the Fed. R. Civ. P. 8 pleading standard under *Twombly* and *Iqbal*, (Gen. Defs. Br. at 42);

- The IPP lacks Article III standing to bring claims in states where it has not made purchases and thereby suffered injury-in-fact, (Forest Br. at App'x 4);

- The IPP has not plausibly alleged that it conferred any benefit on the Generic Defendants, (Gen. Defs. Br. at 46);

- The IPP may not skirt the strictures *of Illinois Brick* by bringing indirect purchaser claims as equitable actions for unjust enrichment, (Gen. Defs. Br. at 34–36 nn. 12, 14; Forest Br. at App'x 4); and

- Equitable claims cannot be used as a backstop where the injuries suffered by plaintiffs are not cognizable under either the antitrust or consumer protection laws (Gen Defs. Br. at 43).

This Court has already addressed the first three of these arguments. For the same reasons discussed in preceding sections, the Court therefore denies Defendants' motions to dismiss on those grounds.

The Court addresses the remaining three arguments— related to conferral of a benefit, *Illinois Brick*, and equitable claims—in its discussion below.

As with Count Three, Defendants also make several separate, state-specific arguments aimed at dismissing the individual state law claims under Count Four, *viz.*:

- Certain states have no independent cause of action for unjust enrichment, (Gen. Defs. Br. at 44; Forest Br. at 70 n.55);

- Some states require the plaintiff to allege that the defendant received a direct benefit from it, (Gen. Defs. Br. at 44–45; Forest Br. at 77 n.57); and

- **\*55** • A subset of states require the plaintiff to allege privity with the defendant, (Gen. Defs. Br. at 47–48), or "something approaching privity," (Forest Br. at 70).

Defendants raise one or several of these arguments as a defense to each state law claim under Count Four. The table in Appendix 4 of Actavis, Forest, and Merz's original brief provides a mostly accurate overview of which arguments correspond to which claims. (*See* Forest Br. App'x 4.)

Again, as this Court has done with the other Counts of the IPP Complaint, it first addresses Defendants' arguments of general applicability and then proceeds through each state claim, determining whether the relevant arguments raised warrant dismissal.

### A. Count Four Does Not State a Claim With Respect to the Generic Defendants Under the Laws of Any State

Federal district courts generally recognize that "[t]he elements of unjust enrichment are similar in every state." *Lazarek v. Ambit Energy Holdings, LLC*, No. 15-cv-6361, 2017 WL 4344557, at \*6 (W.D.N.Y. Sept. 29, 2017) (citing *Credit Default Swaps*, 2014 WL 4379112, at \*18). Both *Lazarek* and *Credit Default Swaps* base their reasoning in large part on a law review article, which compared the elements of unjust enrichment in each state and, finding them to be similar, proposed that these state laws could be applied to antitrust claims. Daniel R. Karon, *Undoing the Otherwise Perfect Crime—Applying Unjust Enrichment to Consumer Price-Fixing Claims*, 108 W. Va. L. Rev. 395, 409–10 & n.79 (2005).

That article summarized the elements of unjust enrichment as follows: "(1) [plaintiff] conferred a benefit upon the defendant, who had knowledge of the benefit; (2) [t]he defendant accepted and retained the conferred benefit; and (3) [u]nder the circumstances, it would be inequitable for the defendant to retain the benefit without paying for it." *Id.* at 409.

Notably, the IPP adopts this same formulation in its brief. (IPP Resp. to Gen. Defs. Br. at 38.)

Sergeants Benevolent Association Health & Welfare Fund v. Actavis, plc, Slip Copy (2018)

2018 WL 7197233

The Generic Defendants move to dismiss all of Count Four with respect to themselves — but not with respect to Actavis, Forest, and Merz—because "Plaintiff's Complaint does not plausibly allege that Plaintiff conferred even an indirect economic benefit ... on the Generic Defendants." (Gen. Defs. Br. at 46; Gen. Defs. Suppl. Br. at 17–18.) The IPP responds that the Generic Defendants received a benefit "in the nature of profits resulting from unlawful overcharges." (IPP Resp. to Gen. Defs. Br. at 39.)

Even by the IPP's own logic, however, the unlawful overcharges did not unjustly enrich the Generic Defendants, If the benefit alleged is indeed "profits resulting from unlawful overcharges"—profits which could have come only from sales of branded Namenda IR and Namenda XR—then the CAC alleges no facts consistent with the claim that any benefit flowed from the IPP or the Class to the Generic Defendants.

In other words, nowhere has the IPP alleged that it or other members of the Class paid increased prices for *generic* versions of Namenda IR. Rather, the gravamen of the IPP Complaint is that it and other Class members paid increased prices for *branded* Namenda IR while generic Namenda IR was kept off of the market. All of these overcharge benefits flowed to Forest. [31]

**\*56**  Indeed, according to the CAC, the only benefits conferred upon the Generic Defendants came from Forest and Merz—not from the IPP or class members—and came in the form of: (i) cash payments for avoided litigation costs; (ii) early entry licenses; and (iii) an acceleration clause that guaranteed entry no later than other generic manufacturers. The IPP has wholly failed to allege a connection between these benefits, which again are the only benefits to Generic Defendants mentioned in the CAC, and the loss suffered by the IPP and other Class members. (*See* CAC ¶ 221 ("Plaintiff and [IPP] Class members have conferred an economic benefit upon the Defendants in the nature of profits resulting from unlawful overcharges, *to the economic detriment of Plaintiff and the End-Payor Class members.*").) [32]

The Court therefore DISMISSES all 44 state law claims under Count Four with respect to the Generic Defendants.

**B. The Unjust Enrichment Claims Under the Laws of Ten States Are Barred By *Illinois Brick* (Alaska, Colorado, Connecticut, Delaware, Montana, New Jersey, Oklahoma, South Carolina, Virginia, and Washington)**

The remaining Defendants next move to dismiss the claims for unjust enrichment under the laws of 20 states because allowing the IPP to pursue such claims would constitute an impermissible "end run" around the *Illinois Brick* prohibition on indirect purchaser actions. (Gen. Defs. Br. at 34–36 nn.12, 14; Forest Br. App'x 4.) [33]

As an initial matter, these 20 states include Puerto Rico and Utah. As this Court has already determined when addressing the arguments brought against Count One, Puerto Rico and Utah allow indirect purchaser claims. Accordingly, the Court **DENIES** Defendants' motion to dismiss the Puerto Rico and Utah unjust enrichment claims.

Whether the remaining 18 state claims can be dismissed based on *Illinois Brick* depends on whether the claims stand on their own or simply reflect an alternative election of equitable remedies by the IPP. Courts in this circuit have observed that "unjust enrichment takes at least two forms:" autonomous and parasitic. *In re Dig. Music Antitrust Litig.*, 812 F. Supp. 2d 390, 411 (S.D.N.Y. 2011). "Parasitic claims are where the unjust enrichment is based upon a predicate wrong, such as a tort, breach of contract or other wrongful conduct such as an antitrust violation." *Id.* (internal quotation omitted). "Conversely, unjust enrichment may provide an independent ground for restitution, and this is known as autonomous restitution." *Id.* (internal quotation omitted).

Logically, "Autonomous claims in an area regulated by an independent body of law are more problematic than parasitic claims because the premise for such a claim must be that, even if the defendants' conduct is blameless under the substantive requirements of federal and state antitrust statutes and state consumer protection statutes, the plaintiffs nevertheless can still obtain restitution." *Id.* at 411–12. This becomes even trickier when the state legislature has expressed a policy preference restricting certain groups of plaintiffs from recovering.

**\*57**  The majority of courts in this circuit have followed the rule that indirect purchasers may not allege

2018 WL 7197233

autonomous unjust enrichment claims if that state follows *Illinois Brick.* "It is beyond peradventure that indirect purchasers may not employ unjust enrichment to skirt the limitation on recovery imposed by *Illinois Brick.*" *Dig. Music,* 812 F. Supp. 2d at 412; *accord DDAVP,* 903 F. Supp. 2d at 232; *Yong Ki Hong v. KBS Am., Inc.,* 951 F. Supp. 2d 402, 425 (E.D.N.Y. 2013) ("Certainly, if such plaintiffs were permitted to repackage their antitrust claims as unjust enrichment actions, the entire thrust and purpose of the antitrust standing doctrine would disintegrate.").

This Court agrees with the logic of those decisions, which is respectful of states' own policy determinations about who may recover for anticompetitive conduct. It therefore **DISMISSES** the following ten autonomous unjust enrichment claims brought in states that follow the rule of *Illinois Brick*: Alaska, Colorado, Connecticut, Delaware, Montana, New Jersey, Oklahoma, South Carolina, Virginia, and Washington.

Defendants seek dismissal of claims in an additional eight states that follow *Illinois Brick* but for which the Complaint pleads a viable antitrust or consumer protection claim: Alabama, Idaho, Massachusetts, Minnesota, Missouri, New York, Rhode Island, and South Dakota. (Gen. Defs. Br. at 34–36.) By definition, these are parasitic claims rather than autonomous claims.

"As to parasitic claims premised on a violation of state law, these claims boil down to an election of remedies." *Dig. Music,* 812 F. Supp. 2d at 413. This turns on a case-by-case examination of whether each state's antitrust or consumer protection statute has "override[n]" or "limit[ed] ... the scope of restitutionary relief" that would normally be available to a plaintiff at equity. *Id.*

No party has briefed the extent to which each of these eight states' antitrust and consumer protection laws limits a plaintiff's ability to recover in equity. Absent such argument or briefing, this Court will not undertake an independent assessment of whether and to what extent these each of these statutes restricts equitable recovery.

Therefore, Defendants' motion to dismiss these eight parasitic unjust enrichment claims is **DENIED**, without prejudice to consideration of the issue at a later date on proper briefing.

**C. Autonomous Unjust Enrichment Claims in States That Do Not Follow *Illinois Brick* Survive (Arkansas and Wyoming)**

Defendants also argue that, in an antitrust case, claims for unjust enrichment cannot lie where the injuries suffered by plaintiffs are not cognizable under either the antitrust or consumer protection laws. (Gen Defs. Br. at 43.) This is true regardless of whether those states follow *Illinois Brick.* On these grounds, they move to dismiss any autonomous unjust enrichment claims remaining, which would be those under the laws of Arkansas and Wyoming.

The IPP responds that recovery under a theory of autonomous enrichment is not contingent on statutory claims. (IPP Resp. to Gen. Defs. Br. at 39–40.)

The Court is aware of some cases that support Defendants' argument. For example, in *Sheet Metal Workers Local 441 Health & Welfare Plan v. GlaxoSmithKline, plc,* 737 F. Supp. 2d 380, 426 (E.D. Pa. 2010), the court applied the respect-for-state-policies rationale undergirding *Digital Music* and held that it would dismiss all autonomous unjust enrichment claims "unless plaintiffs have presented convincing caselaw establishing that a state recognizes unjust enrichment as an autonomous cause of action." *Id.* at 426; *accord Niaspan,* 42 F. Supp. 3d at 763.

**\*58** This Court finds, however, that such a determination inappropriately shifts the burden at the motion to dismiss stage to the nonmoving party—particularly in light of the fact that unjust enrichment claims can morph from parasitic to autonomous once a court determines that the predicate statutory claims do not survive. Rather than asking the plaintiff to shoulder the burden of these contingencies, the Court finds it is more appropriate at this stage that the parties moving to dismiss bear the burden of arguing that the state does not recognize an autonomous cause of action for unjust enrichment, as Defendants do here with respect to California, Illinois, and Mississippi, (*See* Forest Br. App'x 4.)

In the alternative, the party moving to dismiss may argue that the policy reasons barring recovery under the predicate statues are strong enough to require dismissing any autonomous unjust enrichment claim in that state. For example, at least one district court has held that it would "decline to allow autonomous restitution where recovery under state antitrust and consumer protection statutes is specifically prohibited." *In re Flonase Antitrust*

*Litig.*, 692 F. Supp. 2d 524, 542 n.13 (E.D. Pa. 2010). The Court agrees that such an approach accords respect to states' own substantive policy determinations.

Here, however, the Court has not had occasion to determine whether recovery is "strictly prohibited" under the antitrust and consumer protection laws of Arkansas and Wyoming. This is because (i) the IPP did not allege antitrust or consumer protection claims in those states, and (ii) Defendants did not independently raise reasons why the IPP would be prohibited from recovering under the antitrust laws of Arkansas and Wyoming, beyond the fact that the IPP simply did not allege those claims in the first place. Cf. *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 599 F. Supp. 2d 1179, 1191 (N.D. Cal. 2009) (defendants briefed policy reasons why plaintiffs could not recover under the antitrust laws and, therefore, by extension, the unjust enrichment laws, of Arkansas, Virginia, Montana, and Puerto Rico).

In sum, this Court agrees with the reasoning of *In re Cardizem CD Antitrust Litig., 105 F. Supp. 2d 618, 669* (E.D. Mich. 2000). That case reasoned that a federal policy requiring dismissal of all autonomous unjust enrichment claims in an antitrust case would both "fail[ ] to read Plaintiffs' complaint in the light most favorable to Plaintiffs and confuse[ ] Plaintiffs' right to recover an equitable remedy under a common law claim based upon principles of unjust enrichment with its right to recover a remedy at law for an alleged violation of a state's antitrust laws."

Therefore, the Court **DENIES** Defendants' motion to dismiss the claims under Arkansas and Wyoming law, without prejudice to consideration of the issue at a later date on proper briefing.

### D. The IPP States a Claim for Unjust Enrichment Under the Laws of Some States But Not Others

The Court now turns to Defendants' state-specific arguments for dismissing the IPP's unjust enrichment claims under Count Four. (Gen. Defs. Br. at 44–50.)

### 1. Alabama

Defendants argue that the IPP cannot allege a claim for unjust enrichment in Alabama because to do so it

must allege that it conferred a direct benefit on the Defendants. (Forest Br. at 70 n.57 (citing *Danny Lynn Elec. & Plumbing, LLC v. Veolia ES Solid Waste Se., Inc.*, No. 09-cv-192, 2011 WL 2893629, at *6 (M.D. Ala. July 19, 2011) ); Gen. Defs. Br. at 45 n.24 (same).)

The IPP responds that unjust enrichment does not require a direct benefit because it does not require privity. (IPP Resp. to Gen. Defs. Br. at 43.) The IPP also cites several federal district court cases that denied motions to dismiss based on the "direct benefit" requirement, none of which discuss that requirement in the context of Alabama law. (*Id.*)

**\*59** "The essence of the theories of unjust enrichment or money had and received is that a plaintiff can prove facts showing that defendant *holds* money which, in equity and good conscience, belongs to plaintiff or *holds* money which was improperly paid to defendant because of mistake or fraud." *Hancock-Hazlett Gen. Const. Co. v. Trane Co.*, 499 So. 2d 1385, 1387 (Ala. 1986) (emphasis in original). The IPP Complaint plainly alleges that Defendants "hold" money, in the form of overcharges on Namenda IR and Namenda XR that "belongs to" the IPP or to other members of the Class. It is a foundational principle of antitrust law that overcharges are passed along the distribution chain to consumers.

The case cited by Defendants is distinguishable. In *Danny Lynn Electric & Plumbing*, 2011 WL 2893629, at *6, plaintiffs' payments of inflated fees to a company did not directly benefit individual employees of the company, whose annual bonuses were tied to that company's profits. *Id.* It could not be said, in other words, that the individuals "held" money, through their bonuses, that belonged to the fee payers. *Id.*

Defendants' motion to dismiss this claim is **DENIED.**

### 2. Arizona

Defendants argue that the claim for unjust enrichment under Arizona law should be dismissed because the IPP does not allege that it "directly" benefitted the Defendants. (Gen. Defs. Br. at 45 n.24 (citing *In re Refrigerant Compressors Antitrust Litig.*, No. 09-MD-02042, 2013 WL 1431756, at *26 (E.D. Mich. Apr. 9, 2013) ).)

Arizona law, however, does not appear to require that
the plaintiff confer any benefit directly on the defendant.
*See Murdoch-Bryant Const., Inc. v. Pearson*, 703 P.2d
1197, 1202–03 (Ariz. 1985). In that case, the court found
that the excavation and site preparation subcontractor
had conferred a benefit on a joint venture partner, even
though that partner had signed the TV agreement with the
prime contractor after the excavation and site preparation
subcontractor's work had already been performed. *Id.*

Other federal district courts have also rejected the so-
called "direct benefit" argument to hold that indirect
purchasers may state a claim for unjust enrichment under
Arizona law. *See In re Lidoderm Antitrust Litig.*, 103 F.
Supp. 3d 1155, 1175–76 (N.D. Cal. 2015). Those courts
reasoned, in part, that unjust enrichment in Arizona is a
"flexible, equitable remedy," and "[a] benefit may be any
type of advantage, including that which saves the recipient
from any loss or expense." *Id.* The *Lidoderm* court found,
accordingly, that indirect purchasers still stated a claim
even though they had dealt directly with intermediaries in
the chain of distribution, rather than defendants. *Id.*; *see
also Flonase*, 692 F. Supp. 2d at 543.

Defendants' motion to dismiss this claim is **DENIED**.

### 3. California

Defendants argue that California has no independent
cause of action for unjust enrichment. (Gen. Defs. Br. at
44.)

While some California courts have held that there is no
independent recovery in unjust enrichment, others have
simply restyled a claim for unjust enrichment as a claim
sounding in quasi-contract, and still other courts have
treated these claims in the ordinary course, enumerating
its elements. 55 *Cal. Jur. 3d Restitution* § 2 (noting
inconsistent treatment of unjust enrichment claims and
collecting cases). For example, the Ninth Circuit recently
held, in the same opinion, that "in California, there is
not a standalone cause of action for 'unjust enrichment,'
which is synonymous with 'restitution,' " but later held
that "[w]hen a plaintiff alleges unjust enrichment, a court
may construe the cause of action as a quasi-contract claim
seeking restitution.' " *Astiana v. Hain Celestial Grp.*, 783
F.3d 753, 762 (9th Cir. 2015).

**\*60** Because this Court apparently may construe the
claim as one for quasi-contract, the Court **DENIES**
Defendants' motion to dismiss.

### 4. District of Columbia

Defendants argue that the claim for unjust enrichment
under the District of Columbia's law should be dismissed
for the IPP's failure to allege that it conferred a direct
benefit on the Defendants. (Gen. Defs. Br. at 45 n.24
(citing *Refrigerant Compressors*, 2013 WL 1431756, at
*26).)

The Court disagrees. *Refrigerant Compressors* relied on
cases that did not analyze D.C. law. *See also Lidoderm*,
103 F. Supp. 3d at 1176 (finding Defendants' citation
to *Refrigerant Compressors* "not helpful"). Defendants
have cited no other case law requiring D.C. law to be so
construed, and the Court is aware of none. *See id.* ("I find
that in absence of cases arising under District of Columbia
law that support defendants' proposed narrow definition
of direct benefit, the claims under District of Columbia
law can proceed.").

Defendants' motion to dismiss this claim is **DENIED**.

### 5. Florida

Defendants also that the claim for unjust enrichment
under Florida law should be dismissed because the IPP
must allege that it conferred a direct benefit on the
Defendants. (Gen. Defs. Br. at 45, n.24 (citing *Century
Senior Servs. v. Consumer Health Ben. Ass'n, Inc.*, 770 F.
Supp. 2d 1261, 1267 (S.D. Fla. 2011) ).)

The Court agrees with the district court's thoughtful
analysis in *In re Processed Egg Prods. Antitrust Litig.*,
851 F. Supp. 2d 867, 928–29 (E.D. Pa. 2012), which
upheld a claim for unjust enrichment under Florida law
against the same challenge. That case surveyed several
Florida cases and determined that while some Florida
courts had not allowed plaintiffs to rely on the doctrine
of unjust enrichment absent a direct benefit, other courts
had allowed these claims to proceed. *Id.* For example, on
a motion to dismiss, an appellate court overturned a trial
court's dismissal of a medical services provider's unjust

2018 WL 7197233

enrichment claim, which was based on uncompensated treatment of defendant HMO's members. *Merkle v. Health Options, Inc.*, 940 So. 2d 1190, 1199 (Fla. Dist. Ct. App. 2006). Florida courts have also confirmed that recovery under quasi-contract is available "even where the parties had no dealings at all with each other." *Commerce P'ship 8098 L.P. v. Equity Contracting Co., Inc.*, 695 So. 2d 383, 386 (Fla. Dist. Ct. App. 1997).

Therefore, at this stage, the Court **DENIES** Defendants' motion to dismiss.

### 6. Idaho

Defendants move to dismiss the claim for unjust enrichment under Idaho law because the IPP fails to allege privity (or "something approaching privity") and that the IPP conferred a direct benefit on Defendants. (Forest Br. at 70 nn.56–57; Gen. Defs. Br. at 45 n.24.) Defendants cite *Beco Const. Co., Inc. v. Bannock Paving Co., Inc.*, 797 P.2d 863, 867 (Ida. 1990).

The Court agrees and dismisses this claim as to all Defendants. First, the *Beco Construction* court rejected the plaintiff's contention that "the equitable principle of unjust enrichment does not require the plaintiff and the defendant to have any other relationship beyond the nexus that one party may not unjustly enrich itself at the expense of the other." *Id.*

**\*61** Second, other Idaho courts have similarly restricted recovery in the absence of a direct relationship. *See, e.g., Stevenson v. Windermere Real Estate/Capital Grp., Inc.*, 275 P.3d 839, 842–44 (Ida. 2012) ("The Stevensons' argument, reduced to its essence, is that because they conferred a benefit upon Jefferson, and Jefferson conferred a benefit upon Windermere, they can cut out the middleman and directly recover from Windermere for unjust enrichment.... We are unwilling to expand the doctrine of unjust enrichment to the extent advocated by the Stevensons."); *Med. Recovery Servs., LLC v. Bonneville Billing & Collections, Inc.*, 336 P.3d 802, 806 (Ida. 2014) (summarizing cases).

Defendants' motion is **GRANTED.**

### 7. Illinois

Defendants argue that Illinois has no independent cause of action for unjust enrichment and that, in the alternative, the IPP has failed to allege privity with Defendants or conferral of a direct benefit on Defendants. (Gen. Defs. Br, at 44, 45 nn.22, 24.) Defendants also argue that the IPP has failed to allege a duty owed to it by Defendants, which is required under Illinois law for recovery in unjust enrichment. (Gen. Defs. Br. at 48 n.26.)

First, Illinois appears to recognize an independent cause of action for unjust enrichment. "To state a cause of action based on a theory of unjust enrichment, a plaintiff must allege that the defendant has unjustly retained a benefit to the plaintiff's detriment, and that defendant's retention of the benefit violates the fundamental principles of justice, equity, and good conscience." *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*, 545 N.E.2d 672, 679 (Ill. 1989). However, it is also true that, recently, intermediate appellate courts have called this into question. *See Cleary v. Philip Morris Inc.*, 656 F.3d 511, 517 (7th Cir. 2011) (noting apparent disagreement in Illinois law). This Court follows the controlling view of the Illinois Supreme Court and declines to dismiss the IPP's unjust enrichment claim under Illinois law.

A plaintiff in Illinois is likewise not required to allege privity or allege a direct benefit. *See Freeman Indus., LLC v. Eastman Chem. Co.*, 172 S.W.3d 512, 525 (Tenn. 2005) (listing *HPI Health Care* as a case that "concluded that the benefit received by a defendant need not be direct to establish an unjust enrichment claim").

Defendants cite *Cleary*, 656 F.3d at 517, to support their contention that defendants must receive a benefit from plaintiff in a "direct way." (Gen. Defs. Br. at 45.) However, *Cleary* was decided on the basis that the plaintiffs had not alleged *any* detriment that would make the defendants' retention of profits from cigarette sales unjust, since plaintiffs had not proven that they would have refrained from purchasing defendants' cigarettes even defendants had disclosed their true nature and risk. 656 F.3d at 519. Because the IPP has alleged a detriment here, in the form of overcharges, *Cleary* is inapposite.

Finally, Defendants cite *Martis v. Grinnell Mut. Reins. Co.*, 905 N.E.2d 920, 928 (Ill. App. Ct. 2009), for the

proposition that the IPP must allege a duty owed to it by Defendants in order to state a claim for unjust enrichment. (Gen. Defs. Br. at 48 n.26.) Contrary to Defendants' argument, however, *Martis* dismissed plaintiff's claim because plaintiff's claim under the Illinois Consumer Fraud Act ("ICFA") had been dismissed; therefore, there was no underlying fraud count upon which the plaintiff could establish a duty in unjust enrichment. 905 N.E.2d at 928. Here, by contrast, the Court has found that the IPP has stated a claim under the ICFA.

**\*62** Therefore, Defendants' motion to dismiss the IPP's claim for unjust enrichment under Illinois law is **DENIED.**

### 8. Kansas

Defendants argue that the IPP fails to state a claim for unjust enrichment under Kansas law because it does not allege either (i) that the IPP and the Defendants are in privity or (ii) that the IPP conferred a direct benefit on Defendants. (Gen. Defs. Br. at 44, 45 nn.22, 24.)

Kansas does not require privity. "Our past cases establish that recovery under quasi-contract or unjust enrichment is not prohibited simply because the subcontractor and the owner of the property are not in privity. This conclusion is consistent with the theory of quasi-contract and unjust enrichment, which does not depend on privity." *Haz-Mat Response, Inc. v. Certified Waste Servs. Ltd.*, 910 P.2d 839, 847 (Kan. 1996).

Other district courts have been similarly unable to find any authority for the proposition that plaintiffs in Kansas are required to allege a "direct benefit." *See Processed Egg Prods.*, 851 F. Supp. 2d at 930 (E.D. Pa. 2012); *Packaged Seafood Prods.*, 242 F. Supp. 3d 1033, 1090 (S.D. Cal. 2017); *Lidoderm*, 103 F. Supp. 3d at 1177–78; *Auto. Parts Antitrust Litig. (Instrument Panel Clusters)*, 2014 WL 2993753, at \*30. In particular, this Court adopts the thoughtful analysis in *Processed Egg Prods.*, 851 F. Supp. 2d at 929–30, which summarized several Kansas cases that permitted plaintiffs to maintain unjust enrichment claims absent "direct" benefits.

Accordingly, Defendants' motion to dismiss this claim is **DENIED.**

### 9. Maine

Defendants argue that to plead a claim for unjust enrichment under Maine law, the IPP must allege that it conferred a benefit directly on the Defendants. (Gen, Defs. Br. at 45 n.24.)

The Defendants again cite *Refrigerant Compressors*, 2013 WL 1431756, at \*25, which dismissed a similar claim for unjust enrichment, albeit without any analysis of Maine's laws.

Beyond *Refrigerant Compressors*, the Court is aware of one trial-level case from Maine purporting to condition recovery on a direct benefit. *Rivers v. Amato*, No. CIV. A. CV-00-131, 2001 WL 1736498, at \*4 (Me. Super. Ct. June 22, 2001). In that case, however, a prospective buyer claimed unjust enrichment against the owner of a piece of property, on the theory that the buyer's negotiations with a third-party developer had led to the owner's repudiating their original contract and entering into a higher-priced land sale contract with that developer. *Id.* The court there found that the prospective buyer had failed to allege that *any* cognizable benefit was conferred. *Id.*

At present, and in the absence of any additional briefing by Defendants on this issue, neither *Refrigerant Compressors* nor *Rivers* convinces the Court that Maine's unjust enrichment law requires a plaintiff to allege a direct benefit in order for its claim to survive a motion to dismiss. *See also TFT-LCD (Flat Panel)*, 2011 WL 4501223, at \*11 (denying motion to dismiss claim under Maine's unjust enrichment law for failure to allege direct benefit).

Defendants' motion is **DENIED.**

### 10. Massachusetts

Defendants argue that Massachusetts law similarly requires that the IPP confer a direct benefit on Defendants in order to state a claim for unjust enrichment. (Gen. Defs. Br. at 45 n.24.) Defendants again cite *Refrigerant Compressors*, which does not contain any analysis of Massachusetts law and does not cite to any cases containing analysis of Massachusetts law. 2013 WL 1431756, at \*25.

Sergeants Benevolent Association Health & Welfare Fund v. Actavis, plc, Slip Copy (2018)

2018 WL 7197233

**\*63** Moreover, Massachusetts law does not appear to include such a requirement. *See, e.g., Meshna v. Scrivanos*, No. CIV.A. 2011 01849 BLS 1, 2012 WL 414476, at \*4 (Mass. Super. Ct. Dec. 21, 2011) (plaintiff employees successfully pleaded unjust enrichment claim against restaurant owner on the basis that owner was unjustly enriched by tips that customers left for employees). *See also Packaged Seafood Prods.*, 242 F. Supp. 3d 1033, 1091 (S.D. Cal. 2017) (noting absence of direct benefit rule in Massachusetts cases).

Defendants' motion to dismiss is **DENIED.**

### 11. Michigan

Defendants argue that Michigan law also requires the IPP to allege that it conferred a direct benefit on Defendants, again citing *Refrigerant Compressors*. (Gen. Defs. Br. at 45 n.24 (citing 2013 WL 1431756, at \*25).) The IPP responds that other courts have sustained claims for unjust enrichment under Michigan law by indirect purchaser classes. (IPP Resp. to Gen. Defs. Br. at 43 (citing *In re Suboxone (Buprenorphine Hydrochloride and Naloxone) Antitrust Litig.*, 64 F. Supp. 3d 665, 706 (E.D. Pa. 2014) ).)

This Court is persuaded that, under Michigan law— which strictly grounds a claim for unjust enrichment in quasi-contract—the relationship between the IPP and the Defendants is too attenuated to support a claim of unjust enrichment. *See A & M Supply Co. v. Microsoft Corp.* ("*A & M II*"), No. 274164, 2008 WL 540883, at \*2 (Mich. Ct. App. Feb. 28, 2008) (requiring direct benefit). In *A & M I*, the Court of Appeals vacated and remanded the trial court's certification of a class of "individuals who purchased, leased, or licensed a copy of Windows 95 or Windows 98 from an entity other than Microsoft." *A & M Supply Co. v. Microsoft Corp.* ("*A & M I*"), 654 N.W.2d 572, 575 (Mich. Ct. App. 2002). In a later proceeding, *A & M II*, the Court of Appeals dismissed the unjust enrichment claims by indirect purchasers against Microsoft because there was no "direct contact" between the parties, nor any showing that "Microsoft received any direct payment or other benefit from those purchasers." 2008 WL 540883, at \*2.

Although there may be limited exceptions to the "direct benefit" requirement where the plaintiff and defendant

are directly in contact, *see Rammer Asphalt Paving Co. v. E. China Twp. Sch.*, 504 N.W.2d 635, 641 (Mich. 1993), the IPP has not alleged that either it or any Class members had direct contact with Actavis, Forest, or Merz. *See also Hollowell v. Career Decisions, Inc.*, 298 N.W.2d 915, 920 (Mich. Ct. App. 1980) ("The process of imposing a 'contract-in-law' to prevent unjust enrichment is an activity which courts should approach with some caution.").

Therefore, Defendant's motion to dismiss this claim is **GRANTED.**

### 12. Mississippi

Defendants cite *Cole v. Chevron USA, Inc.*, 554 F. Supp. 2d 655, 671 (S.D. Miss. 2007), for the proposition that unjust enrichment is not a separate cause of action in Mississippi.

After reading *Cole* and the case on which it relies, *Coleman v. Conseco, Inc.*, 238 F. Supp. 2d 804, 813 (S.D. Miss. 2002), the Court is not convinced that Mississippi courts have barred unjust enrichment as a separate cause of action. Although Mississippi courts discuss unjust enrichment as a "theory of recovery," this is not incompatible with its being considered a cause of action. *See Estate of Johnson v. Adkins*, 513 So. 2d 922, 926 (Miss. 1987) ("The doctrine of unjust enrichment or recovery in quasi-contract applies to situations where there is no legal contract but where the person sought to be charged is in possession of money or property which in good conscience and justice he should not retain but should deliver to another[.]") (citing *Hans v. Hans*, 482 So.2d 1117, 1122 (Miss. 1986) ).

**\*64** Other federal courts have agreed. "Contrary to *Coleman* and its federal progeny ... there is a substantial body of Mississippi case law that treats unjust enrichment as a separate cause of action." *In re Light Cigarettes Mktg. Sales Practices Litig.*, 751 F. Supp. 2d 183, 193 (D. Me. 2010).

Defendants' motion to dismiss this claim is **DENIED.**

### 13. New York

2018 WL 7197233

Defendants argue that New York requires both privity and conferral of a direct benefit in order allege a claim for unjust enrichment. (Gen. Defs. Br. at 45 n.24; *id.* at 48; Forest Br. at 70 nn.56–57.) The privity argument is a non-starter. "[A] plaintiff need not be in privity with the defendant to state a claim for unjust enrichment[.]" *Sperry v. Crompton Corp.*, 8 N.Y.3d 204 215, 863 N.E.2d 1012, 1018 (2007).

The New York Court of Appeals has announced a rule that the relationship between the parties may not be "too attenuated" in a claim for unjust enrichment. *Sperry v. Crompton Corp.*, 8 N.Y.3d 204, 216, 863 N.E.2d 1012, 1018 (2007). In *Sperry*, for example, the Court of Appeals dismissed a claim by end purchasers of rubber products against manufacturers of processing chemicals that had allegedly been sold to the rubber product manufacturers at a markup. *Sperry v. Crompton Corp.*, 8 N.Y.3d 204, 209, 863 N.E.2d 1012, 1013–14 (2007).

Later, the New York Court of Appeals dismissed on the same grounds a claim for unjust enrichment brought by a real estate broker, which had conducted due diligence on certain properties, against a rival brokerage firm, which had purchased those due diligence reports from the developer and eventually won the commission to sell the properties in the original broker's stead. *Georgia Malone & Co. v. Rieder*, 19 N.Y.3d 511, 519, 973 N.E.2d 743, 748 (2012). Over a dissent, the Court of Appeals held that "regardless of whether [the defendant rival firm] was a good-faith purchaser of the due diligence materials, the complaint fails to present a sufficient connection between [plaintiff and defendant] to form the basis of an unjust enrichment claim." *Id.*

However, wrongdoing can create the requisite relationship between benefactor and beneficiary. The First Department has synthesized the rule as follows: "a plaintiff must plead some relationship between the parties that could have caused reliance or inducement and ... the relationship cannot be too attenuated." *Philips Int'l Invs., LLC v. Pektor*, 117 A.D.3d 1, 4, 982 N.Y.S.2d 98, 100–01 (2014); *see also Mandarin Trading Ltd. v. Wildenstein*, 944 N.E.2d 1104, 1111 (N.Y. 2011).

In *Philips International Investments*, for example, the First Department denied a motion to dismiss an unjust enrichment claim against a group of limited partnerships that had swooped in to purchase viable properties in a real estate transaction—cutting plaintiff, who had done much of the development work, out of the deal—because they "knew of the alleged wrong being done to plaintiff and of their essential role in the allegedly wrongful scheme." *Philips Int'l Investments, LLC v. Pektor*, 117 A.D.3d 1, 8, 982 N.Y.S.2d 98, 103 (2014).

At this time, the Court cannot hold that the relationship between the IPP and the Defendants is too attenuated as matter of law, since the IPP has plausibly pled that Defendants derived an economic benefit from charging monopolistic and artificially inflated prices for Namenda, a direct and proximate result of Defendants' unlawful practices. *Cf. Duran v. Bautista*, 2015 N.Y. Slip Op. 50507(U), 19, 2015 WL 1567020, at *18 (N.Y. Sup. 2015) ("It is against equity and good conscience to permit [the defendant] to retain the proceeds ... if the Class is able to prove the alleged fraudulent scheme.")

**\*65** Other district courts examining this requirement with respect to indirect purchaser class actions are in accord. *See Processed Egg Prods.*, 851 F. Supp. 2d at 930; *DDAVP*, 903 F.Supp.2d at 234; *Suboxone, 64* F. Supp. 3d at 709–10.

The Court therefore **DENIES** Defendants' motion to dismiss the claim for unjust enrichment under New York law, without prejudice to renewal at a later date.

### 14. North Carolina

Defendants cite *Effler v. Pyles*, 380 S.E.2d 149, 152 (N.C. Ct. App. 1989), for the proposition that a plaintiff must allege that it conferred a direct benefit on a defendant. (Forest Br. at 70 n.57; Gen. Defs. Br. at 45 n.24.) The *Effler* court affirmed the trial court's entry of summary judgment in favor of defendant because the record did "not satisfy plaintiffs burden of showing that she conferred a benefit *directly* on defendant." *Effler*, 380 S.E.2d at 152 (emphasis added).

The North Carolina Supreme Court has defined the elements of the claim more broadly, without reference to a "direct" benefit: "In order to establish a claim for unjust enrichment, a party must have conferred a benefit on the other party. The benefit must not have been conferred officiously, that is it must not be conferred by an interference in the affairs of the other party in a manner

2018 WL 7197233

that is not justified in the circumstances. The benefit must not be gratuitous and it must be measurable." *Booe v. Shadrick*, 369 S.E.2d 554, 556 (N.C. 1988).

Moreover, "cases decided after *Effler* have held that an indirect benefit can support an unjust enrichment claim." *Lau v. Constable*, No. 16 CVS 4393, 2017 WL 536361, at *5 (N.C. Super. Feb. 7, 2017) (collecting cases); *see also Bandy v. Gibson*, No. 16 CVS 456, 2017 WL 3207068, at *5 (N.C. Super. July 26, 2017) (same).

Generally, federal district courts that have recognized this split in North Carolina authority have not dismissed unjust enrichment claims on pre-answer motions. *Lidoderm*, 103 F. Supp. 3d at 1178 (citing other federal cases). In particular, the court in *Processed Egg Prods.*, 851 F. Supp. 2d at 931–32, found that the more expansive language of *Booe*, from the North Carolina Supreme Court, was more persuasive than the language of *Effler*, from the intermediate appellate court. *Id.* This Court agrees that, given both the divide in authority and the clear language of *Booe*, a case from the North Carolina Supreme Court, it cannot dismiss the claim on these grounds.

Therefore, the Court **DENIES** Defendants' motion to dismiss the North Carolina claim for unjust enrichment.

### 15. North Dakota

Defendants argue that unjust enrichment under North Dakota law requires the plaintiff to have conferred a direct benefit on the defendant, citing *Ritter, Laber & Assocs., Inc. v. Koch Oil, Inc.*, 680 N.W.2d 634, 642 (N.D. 2004) and *Relafen*, 225 F.R.D. at 28. (Forest Br. at 70 n.57; Gen. Defs. Br. at 45 n.24.)

In *Ritter*, defendant and plaintiffs worked on the same construction project; the defendant argued that the plaintiffs, which had not chosen to contract with it directly at the outset of the project, could not later sue it for unjust enrichment. 680 N.W.2d at 642 (citing *Apache Corp. v. MDU Res. Grp, Inc.*, 603 N.W.2d 891 (N.D. 1999) ).

**\*66** *Apache*, however, does not stand for the proposition that, in North Dakota, unjust enrichment claims universally require a direct benefit. Rather, that case holds that, when parties involved in a single project do not

all contract with one another, "[t]he separate contracts convey clearly the limited kinds of liability and exposure each party has in mind. .... Respect for that contract arrangement requires the courts to refuse restitution between the parties who did not contract with each other." *Apache*, 603 N.W.2d at 895 (citing Dan B. Dobbs, *Law of Remedies*, § 4.1(2), p. 372 (2d ed. 1993) ). *Accord In re Auto. Parts (Fuel Senders) Antitrust Litig*, 29 F. Supp. 3d 982, 1025 (E.D. Mich. 2014) (declining to dismiss indirect purchasers' unjust enrichment claim under North Dakota law on the basis of *Apache*); *In re Auto. Parts (Bearings) Antitrust Litig.*, 50 F. Supp. 3d 836, 864–65 (E.D. Mich. 2014).

Moreover, North Dakota courts have upheld unjust enrichment claims even where no direct benefit was alleged. *See, e.g., Opp v. Matzke*, 559 N.W.2d 837, 840 (N.D. 1997) (well driller had stated claim for unjust enrichment against landowner even though she had not asked him to drill the well and did not reside on the property; since defendant "provide[d] her family a place to live on the property," she benefitted from the well).

Defendants' motion to dismiss the North Dakota claim is **DENIED.**

### 16. Rhode Island

Defendants argue that Rhode Island law requires the IPP to allege that it conferred a direct benefit on Defendants. (Gen. Defs. Br. at 45 n.24.) Defendants again cite *Refrigerant Compressors*, which dismissed the Rhode Island unjust enrichment claim without any analysis of Rhode Island law. 2013 WL 1431756, at *25.

In Rhode Island, there are three elements of unjust enrichment. *R & B Elec. Co. v. Amco Const. Co.*, 471 A.2d 1351, 1355 (R.I. 1984). "First, a benefit must be conferred upon the defendant by the plaintiff. Second, there must be an appreciation by the defendant of such benefit. Finally, there must be an acceptance of such benefit under such circumstances that it would be inequitable for him to retain the benefit without paying the value thereof." *Id.* at 1356. None of these elements requires conferral of a direct benefit.

Moreover, "[t]he most significant requirement for a recovery on quasi contract is that the enrichment to

the defendant be unjust," *Id.* Because the Rhode Island courts have not stated clearly that an action for unjust enrichment requires that the plaintiff have conferred a benefit on the defendant directly, and because Defendants have cited no case that so holds, the Court denies Defendants' motion to dismiss this claim on such grounds.

However, because the conduct underlying this claim is based on antitrust violations, and because Rhode Island did not recognize a cause of action for indirect purchasers under its antitrust statute until July 15, 2013, the Court **DISMISSES IN PART** this claim to the extent the IPP seeks to recover for injuries incurred before that date.

### 17. Tennessee

Defendants argue that a plaintiff in Tennessee must demonstrate either (i) that it "has exhausted all remedies against the person with whom the plaintiff enjoyed privity of contract" or (ii) that any attempt to exhaust these remedies would be futile, before it may recover in unjust enrichment. *Freeman Indus., LLC v. Eastman Chem. Co.*, 172 S.W.3d 512, 525–26 (Tenn. 2005); (*see also* Gen. Defs. Br. at 46–47). Defendants further contend that the IPP's assertions at paragraphs 222–23 of its Complaint demonstrate that that the IPP intends to rely on a futility theory, but that, under Tennessee law, "a bare allegation of futility is not enough." (Gen. Defs. Br. at 46–47).

**\*67** *Freeman Indus.*, 172 S.W.3d at 526, held that, at the summary judgment stage, an affidavit from plaintiff's counsel averring that he was "unaware of any viable claims" against the party with which the plaintiff had been in privity, without any further factual basis, was insufficient to show that he was entitled to recover in unjust enrichment. *Id.*

The IP Action, however, is at the motion to dismiss stage, where plaintiff has adequately alleged that any claim against the pharmacies or distributors would be futile. (CAC ¶¶ 222–23.) It is thus easily distinguishable from *Freeman Industries*, and the IPP must be given the opportunity to prove up its futility argument after discovery is complete.

Defendants' motion to dismiss the Tennessee claim is **DENIED.**

### 18. Utah

Defendants argue that, under Utah law, a plaintiff must allege that it conferred a benefit directly on a defendant. (Gen. Defs. Br. at 45 n.24 (citing *Concrete Prods. Co. v. Salt Late Cty.*, 734 P.2d 910, 911–12 (Utah 1987) ).)

In *Concrete Prods.*, 734 P.2d at 911, a concrete supplier delivered materials to a subcontractor hired for a public works project. *Id.* The supplier, which was never paid, unsuccessfully sued the subcontractor, and then turned around and attempted to sue the county government on the theory that the county had not required the general contractor to post a bond. *Id.* The court found that the subcontractor could not recover in unjust enrichment against the county because there was no benefit to the county whatsoever—"[i]nstead, [the county] will incur the expenses of cleaning and maintaining curbs and gutters with no resale value or intrinsic economic worth." *Id.* at 912. Although the *Concrete Products* court distinguished an earlier case, *Breitling Bros. Const. v. Utah Golden Spikers, Inc.*, 597 P.2d 869 (Utah 1979), by stating that "[n]o *direct* benefit, such as that demonstrated by the plaintiff in *Breitling*, is present here," *Concrete Prods.*, 734 P.2d at 911–12 (emphasis added), the use of the word "direct" in that case's dicta does not convince the Court that a plaintiff must allege a direct benefit as part of its *prima facie* case.

Other district courts have also found that Utah law does not require a direct benefit. *Processed Egg Prods.*, 851 F. Supp. 2d at 932–34; *Auto. Parts (Bearings)*, 50 F. Supp. 3d at 864–65; *Packaged Seafood Prods.*, 242 F. Supp. 3d at 1092–93.

Defendants' motion to dismiss the Utah unjust enrichment claim is, therefore, **DENIED.**

### 19. Washington

Defendants claim that Washington unjust enrichment law requires plaintiffs to allege a direct benefit. (Gen Defs. Br. at 45 n.24 (citing *Keil v. Scholten*, No. 48051-1-I, 2002 WL 988562, at \*5 (Wash. Ct. App. Feb. 4, 2002) ) (unpublished opinion).)

2018 WL 7197233

In *Keil*, a group that had formed a joint venture to purchase a commercial real estate property sued a real estate broker for unjust enrichment, seeking recovery of two hundred thousand dollars he had earned as a commission from the sale proceeds. *Id.* at *4. But for the broker's fraud and misrepresentations concerning the sale, the group argued, it never would have paid the four hundred thousand dollars cash at closing from which the broker earned his fee. *Id.* at *5. The court found that the group could not recover the broker's commission on a theory of unjust enrichment because, pursuant to the sale documents, it was the property owner's obligation to pay the brokerage fee, not the group's. *Id.*

**\*68** Similarly, in *State v. Am. Tobacco Co.*, No. 96-2-15056-SEA, 1996 WL 931316, at *8–9 (Superior Ct. Wash. Apr. 9, 1999)*, the court found that the State of Washington had not stated a claim for unjust enrichment against tobacco producers, because the benefit that the state alleged to have conferred, in the form of medical payments, was too attenuated. *Id.*

However, in *Chem. Bank v. Wash Pub. Power Supply Sys.*, 691 P.2d 254, 544 (Wash. 1984), the Supreme Court of Washington held that a group of bondholders, which had funded a nuclear power plant construction project that later went bankrupt, had provided a "benefit" to the projects' participants—municipal entities that had bargained for a share of the plants' power output—such that restitution was appropriate. *Id.* at 558. The court reasoned that "the Restatement's definition of benefit is quite broad;" that the bond revenues—although flowing through a third party—had been raised on the request of the participants; and that, "[f]inally, it was for the participants' benefit that the plants were being built in the first place." *Id.*

This Court is not aware of any federal district court cases discussing the "direct benefit" requirement under Washington unjust enrichment law in the antitrust context. However, this Court concludes that it must follow the reasoning of the Washington Supreme Court in *Chemical Bank.* The IPP has alleged that unlawful overcharges for branded Namenda IR and Namenda XR flowed ultimately to Defendants, even though there were intermediaries in the chain of distribution. This is analogous to the bondholder financing that flowed to the participants in *Chemical Bank.* Moreover, it was on

Defendants' account that higher prices for Namenda were passed through to the consumer.

Therefore, the Court **DENIES** Defendants' motion to dismiss

### 20. West Virginia and Wisconsin

Defendants argue that a plaintiff must allege conferral of a direct benefit on a defendant in order to bring a claim for unjust enrichment in West Virginia and Wisconsin. (Gen. Defs. Br. at 45 n.24 (citing *Refrigerant Compressors*, 2013 WL 1431756, at 25–26) ). *Refrigerant Compressors*, however, neither analyzes the law under either of these jurisdictions nor cites any case that does.

As a result, and in the absence of any additional briefing, Defendants' motion to dismiss these claims is **DENIED.**

### 21. Wyoming

Lastly, Defendants argue that the IPP has failed to allege that it conferred a direct benefit on Defendants, as required under Wyoming law. (Forest Br. at 70 n.57 (citing *Boyce v. Freeman*, 39 P.3d 1062, 1065–66 (Wyo. 2002)* ).) In *Boyce*, 39 P.3d at 1063, the plaintiff gave a pickup truck to an employee of the defendant because the employee told the plaintiff that the defendant would pay for the truck. *Id.* Plaintiff was never paid for the truck and brought an unjust enrichment claim against the defendant, alleging that the employee had used the truck on the job and, therefore, that the defendant-employer was unjustly enriched. *Id.* The Supreme Court of Wyoming found that because nothing in the record showed that the employer knew it was expected to pay for the truck, or that the employer induced the plaintiff to give the truck to its employee, "[w]e see no evidence leading us to conclude that ... good conscience requires [the defendant] to pay[.]" *Id.* at 1066. The opinion concluded, in part, that the employer had "received no *direct* benefit from this action." *Id.*

**\*69** In *Boyce*, the Supreme Court of Wyoming also described the elements of unjust enrichment as follows: "(1) Valuable services were rendered, or materials furnished, (2) *to the party to be charged*, (3) which services or materials were accepted, used and enjoyed by the

2018 WL 7197233

party, and, (4) under such circumstances which reasonably notified the party to be charged that the plaintiff, in rendering such services or furnishing such materials, expected to be paid by the party to be charged. Without such payment, the party would be unjustly enriched." *Id.* at 1065 (citing *Coones v. F.D.I.C.*, 894 P.2d 613, 617 (Wyo. 1995) (emphasis added).)

The Court finds that the *Boyce* opinion as a whole establishes that a plaintiff seeking to recover under a theory of unjust enrichment under Wyoming law must allege a direct benefit.

Other federal district courts sitting in diversity are in accord. *See, e.g.*, *Aftermarket. Filters*, 2010 WL 1416259, at *2–3.

Therefore, Defendants' motion to dismiss the Wyoming claim is **GRANTED**.

### E. In Conclusion, the IPP Has Stated a Claim for Unjust Enrichment Under Count Four With Respect to Actavis, Forest, and Merz Under the Laws of 31 States

In sum, the Court finds that the IPP Complaint has adequately pled facts supporting a claim for unjust enrichment against Actavis, Forest, and Merz only, The Court thus dismisses all claims under Count Four with respect to the Generic Defendants.

The Court also finds that, as a matter of law, the IPP may pursue its Count Four claims for unjust enrichment under the laws of all states **except** Alaska, Colorado, Connecticut, Delaware, Idaho, Michigan, Montana, New Jersey, Oklahoma, South Carolina, Virginia, Washington, and Wyoming. Those claim are hereby **DISMISSED.**

The Court also **DISMISSES IN PART** the IPP's claim under Rhode Island law, to the extent the IPP seeks recovery for injuries occurring prior to July 15, 2013.

### IX. Conclusion

In conclusion, the Court holds as follows:

Footnotes

With respect to Count One for monopolization, the claims under the laws of Florida, Kansas, Massachusetts, and Utah are **DISMISSED** in their entirety. The claim under the law of Rhode Island is **DISMISSED IN PART**, to the extent that the IPP seeks to recover on the basis of injuries occurring before July 15, 2013.

With respect to Count Two for conspiracy to monopolize, the claims under the laws of Illinois, Massachusetts, and Utah are **DISMISSED** in their entirety. The claim under the law of Rhode Island is **DISMISSED IN PART**, to the extent that the IPP seeks to recover on the basis of injuries occurring before July 15, 2013.

With respect to Count Three for consumer protection and unfair and deceptive trade practices, the claims under the laws of Arizona, the District of Columbia, Hawaii, Kansas, Maine, Montana, New York, Rhode Island, Tennessee, Vermont, and West Virginia are **DISMISSED** in their entirety.

With respect to Count Four, unjust enrichment, all claims are **DISMISSED ONLY WITH RESPECT TO** the Generic Defendants. For the remaining Defendants, Actavis, Forest, and Merz, the claims under the laws of Alaska, Colorado, Connecticut, Delaware, Idaho, Michigan, Montana, New Jersey, Oklahoma, South Carolina, Virginia, Washington, and Wyoming are **DISMISSED** in their entirety. The claim under the law of Rhode Island is **DISMISSED IN PART**, to the extent that the IPP seeks to recover on the basis of injuries occurring before July 15, 2013.

The Clerk of Court is respectfully requested to remove Docket Number 133 from the Court's list of pending motions.

**\*70** Pursuant to this Court's memorandum endorsement at Docket Number 165, the Clerk of Court is also respectfully requested to remove Docket Number 150 from the Court's list of pending motions.

All Citations

Slip Copy, 2018 WL 7197233

*Sergeants Benevolent Association Health & Welfare Fund v. Actavis, plc, Slip Copy (2018)*

2018 WL 7197233

1    "Merz" refers to three entities, all named as Defendants in the Complaint: Merz GmbH & Co. KGaA, Merz Pharma GmbH & Co. KGaA, and Merz Pharmaceuticals GmbH.

2    The IPP's Complaint includes four counts, with dozens of state law claims under each count. I recognize that plaintiffs will sometimes style their complaints this way. Frankly, however, each of these state law claims should be its own cause of action, such that the IPP Complaint would properly contain 123 separate counts.

3    These are: Barr Pharmaceuticals, Inc. ("Barr"); Teva Pharmaceuticals Industries, Ltd. and Teva Pharmaceuticals USA, Inc. (jointly, "Teva"); Cobalt Laboratories, Inc. ("Cobalt"); Upsher-Smith Laboratories, Inc. ("Upsher-Smith"); Amneal Pharmaceuticals, LLC ("Amneal"); Wockhardt Limited and Wockhardt USA LLC (jointly, "Wockhardt"); Sun India Pharmaceuticals Industries, Ltd. ("Sun"); and Dr. Reddy's Laboratories Ltd. and/or Dr. Reddy's Laboratories, Inc. (jointly, "Dr. Reddy's").

4    Unless otherwise noted, all references herein are to the docket in *Sergeants Benevolent Association Health & Welfare Fund v. Actavis, plc,* No. 15-CV-6549 (S.D.N.Y.).

5    Allergan plc was formerly known as Actavis, plc. (*See In re Namenda Direct Purchaser Antitrust Litig.*, No 18-2421 (2d Cir.), Dkt. No. 1 at 2 (corporate disclosure statement).) This opinion uses "Actavis" throughout to reflect the fact that the IPP has not moved for a substitution of parties in the IP Action.

6    The DPPs subsequently dismissed all three Merz entities from the DP Action on April 20, 2017. (15-cv-7488, Dkt. No. 207.) They remain parties to the IP Action, however.

7    The IPP does not, however, bring claims under the laws of all 11 states. (*Compare* CAC ¶ 15 *with* CAC ¶¶ 201, 207, 215, 226.)

8    It is not clear from the face of the IPP Complaint how Forest was able to obtain a five-year patent extension, the maximum permitted, when the FDA approval process for the Namenda IR NDA allegedly took only one year.

9    Plaintiff Rochester Drug Co-Operative, Inc., also filed a complaint on behalf of direct purchasers that did not name the Generic Defendants. (15-CV-10083, Dkt. No. 1.) On January 26, 2016, Plaintiffs JM Smith Corporation and Rochester Drug Co-Operative, Inc. stipulated to consolidating the cases. (15-cv-7488, Dkt. No. 65.)

10    As discussed, Merz did not join the motion for consolidated briefing, (Dkt. No. 63 at 2 n. 1), but later joined Actavis and Forest's brief, (Dkt. No. 85).

11    This Court had previously ordered that "the Indirect Purchaser Plaintiff's claims are *severed* and placed on the Court's suspense calendar." *Namenda III,* 2016 WL 49992690, at *17 (emphasis added). The use of the word "sever," however, did not connote that the cases had been consolidated under Rule 42(a) or joined for purposes of Rules 18 and 19.

12    Generic Defendants also argue that *Illinois Brick* bars the IPP's claims under two additional states—Illinois and Oregon—under Count One. (Gen. Defs. Suppl. Br. at 10–11.) However, the IPP Complaint does not allege Illinois and Oregon claims under Count One; instead, it alleges them only under Count Two. (*See* CAC ¶ 201.) This Court therefore addresses the Illinois and Oregon arguments in the portion of the opinion that discusses Count Two.

13    Later, in *Namenda V,* this Court ultimately found that the DPPs, which were drug wholesalers, could rely on classwide economic models at trial to show that they had suffered antitrust injury. *Namenda V,* 331 F. Supp. 3d at 177. In addition, although the DPPs had originally moved for collateral estoppel on Count One against Actavis, Forest, and Merz, (15-cv-7488, Dkt. No. 134), the parties subsequently stipulated to the dismissal of Merz from the action, (15-cv-7488, Dkt. No. 207). In an accident of timing, therefore, Merz was dismissed after the parties had submitted briefing on the collateral estoppel motion but before this Court had ruled on that motion.

14    Merz would also not be collaterally estopped from arguing that, under the facts alleged in the IPP Complaint, it had absolutely nothing to do with the hard switch. However, likely because Merz chose to be represented by the same counsel as Actavis and Forest, and likely because these parties chose to submit a consolidated brief in support of their motions to dismiss both the DPP and IPP Complaints, Merz never raised this argument separate and apart from Actavis and Forest. (*See* Forest Br. at 15–33.) The Court therefore does not address it.

15    The Generic Defendants adopt this argument in Actavis, Forest, and Merz's brief with their own footnote: "For the reasons set forth in Forest's motion to dismiss, Plaintiffs claims are also barred by the statute of limitations." (Gen. Defs. Br. at 50 n.27.) My holding above applies equally to the Generic Defendants.

16    The IPP Complaint does not allege any claim under Georgia law, under any of Counts One through Four, (CAC ¶¶ 191–231.)

17    The IPP Complaint does not allege any claim under Pennsylvania law, under any of Counts One through Four. (CAC ¶¶ 191–231.)

Sergeants Benevolent Association Health & Welfare Fund v. Actavis, plc, Slip Copy (2018)
2018 WL 7197233

18   Defendants also argue that any states that have not expressly adopted or rejected *Illinois Brick* should be treated as barring indirect purchaser claims. (Gen. Defs. Br. at 36 n.16 (citing *In re Digital Music Antitrust Litig.*, 812 F. Supp. 2d 390, 413 (S.D.N.Y. 2011) ).) However, Defendants have not indicated which states these would be.

19   Since this provision governs prostitution offenses, and since Count Two cites the Utah Antitrust Act at Utah Code §§ 76-10-3101, *et seq.*, (CAC ¶ 207(x) ), the Court once again assumes this is a typographical error.

20   Although this Court would ordinarily proceed through the state law claims in alphabetical order, there exists much more fulsome case law regarding the pre-suit notice requirement under the Hawaii Antitrust Act than there does for any of the other states.

21   Although Actavis, Forest, and Merz purport to seek dismissal of the IPP's monopolization claims at CAC ¶¶ 207(g), 207(p) and 207(w), those paragraph numbers actually correspond to Count Two of the IPP Complaint—conspiracy to monopolize —which is not unilateral conduct by definition. As it has several times throughout this opinion, the Court assumes that this is a typographical error, and it treats the pleadings as if Actavis, Forest, and Merz instead move to dismiss the equivalent state law claims under Count One of the IPP Complaint.

22   By way of background, I note briefly that the Court did not previously have occasion to consider the conspiracy issue in the DP Action. The DP Action did not expressly assert conspiracy as a cause of action, (15-cv-7488, Dkt. No. 29 ¶¶ 237– 65), and the DPPs later informed the Court that they had abandoned any "inter-generic conspiracy claim" raised under Count IV of their Complaint, *Namenda V*, 2018 WL 3970674, at \*25.

23   Defendants also argue that the DCCPPA requires plaintiffs to allege deceptive conduct, (Forest Br. at 67 n.47), and is inapplicable to antitrust conduct, (Forest Br. at 68 n.49; Gen. Defs. Br. at 40 n.19). However, because the Court dismisses the DCCPPA claim under Count Three for failure to state a claim based on a retail purchase for personal, family, or household purposes, it does not reach these arguments.

24   Defendants also argue that the KCPA bars class actions (Gen. Defs. Br. at 39 n.18; Forest Br. at 68 n.53); that the statute requires plaintiffs to allege a consumer transaction or conduct that is consumer-oriented (Forest Br. at 67–68 n.48); that the statute is inapplicable to antitrust conduct (Gen. Defs. Br. at 40; Forest Br. at 68 n.49); and that the statute only allows suits by consumers who are natural persons with regard to transactions made primarily for personal or household purposes (Forest Br. at 68 n.51). However, because the Court dismisses the KCPA claim on the grounds that it is inapplicable to antitrust conduct, it does not reach these arguments.

25   Defendants also argue that the MUTPA requires a showing of consumer deception. (Forest Br. at 67 n.47.) However, because the Court dismisses the MUPTA claim on the grounds that Sergeants Benevolent has failed to state a claim based on purchases made "primarily for personal, family, or household purposes," it does not reach these arguments.

26   Defendants also argue that the MUTPCPA does not permit class actions. (Forest Br. at 68 n.53.) However, because the Court dismisses the MUTPCPA claim on the grounds that Sergeants Benevolent has failed to state a claim based on purchases made "primarily for personal, family, or household purposes," it does not reach these arguments.

27   Defendants also argue that NYGBL § 349 requires a plaintiff to allege a consumer transaction or conduct that is consumer-oriented, (Forest Br. at 67-68 n.48), and that the statute covers only conduct that is primarily intrastate, (Forest Br. at 68 n.50; Gen. Defs. Br. at 40–41 n.20). However, because the Court dismisses the NYGBL § 349 claim for failure to plead deceptive or fraudulent conduct, it does not reach these arguments.

28   Defendants also argue that the RIDTPA requires a showing of consumer deception, (Forest Br, at 67 n.47), and is inapplicable to antitrust conduct, (Forest Br. at 68 n.49). However, because the Court dismisses the RIDTPA claim on the grounds that Sergeants Benevolent has failed to state a claim based on purchases made "primarily for personal, family, or household purposes," it does not reach these arguments.

29   Defendants also argue that the TCPA requires a showing of consumer deception (Forest Br. at 67 n.47) and that the statute does not permit class actions (Forest Br. at 68 n.53; Gen. Defs. Br. 39 n.18.) However, because the Court dismisses the TCPA claim as inapplicable to antitrust conduct, it does not reach these arguments.

30   Defendants also argue that the WVCCPA requires plaintiffs to allege deceptive conduct, (Forest Br. at 67 n.47); requires plaintiffs to plead a consumer transaction or conduct that is consumer-oriented, (Forest Br. at 67–68 n.48); and is inapplicable to antitrust conduct, (Forest Br. at 68 n.49; Gen. Defs. Br. at 40 n.19). However, because the Court dismisses the WVCCPA claim for failure to serve a cure offer on the Defendants prior to initiating the lawsuit, it does not reach these arguments.

31   Again, most likely due to their decision to retain the same counsel and to submit a brief jointly with Forest, Actavis and Merz have not challenged the unjust enrichment claims under Count Four on the basis that no benefit from the overcharges on Namenda flowed to them, so the Court will not raise and address this argument *sua sponte*.

2018 WL 7197233

32    The *Restatement (Third) of Restitution and Unjust Enrichment* states, "While the paradigm case of unjust enrichment is one in which the benefit on one side of the transaction corresponds to an observable loss on the other, the consecrated formula 'at the expense of another' can also mean 'in violation of the other's legally protected rights,' without the need to show that the claimant has suffered a loss." *Restatement (Third) of Restitution and Unjust Enrichment* § 1 (2011). The IPP presumably could have chosen to rely upon this theory to prosecute its claims of unjust enrichment. However, the IPP has also stated expressly in its Complaint and in briefing that it conferred a benefit on Generic Defendants in the form of overcharges, so the Court does not reach this question.

33    Because Actavis, Forest, and Merz adopt the Generic Defendants' briefing in whole, this Court continues to refer to Generic Defendants' briefs, even though these defendants were dismissed from Count Four.

---

**End of Document**                              © 2019 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT I

H-Quotient, Inc. v. Knight Trading Group, Inc., Not Reported in F.Supp.2d (2005)

2005 WL 323750, 2005-1 Trade Cases P 74,722

KeyCite Yellow Flag - Negative Treatment

Distinguished by In re Automotive Parts Antitrust Litigation, E.D.Mich., July 3, 2014

2005 WL 323750

United States District Court,

S.D. New York.

H-QUOTIENT, INC., Plaintiff,

v.

KNIGHT TRADING GROUP, INC. and

Knight Securities, L.P., Defendants.

No. 03 Civ. 5889(DAB).

|

Feb. 9, 2005.

*MEMORANDUM AND ORDER*

BATTS, J.

**\*1** Before the Court is a Motion to Remand to the Supreme Court of the State of New York, County of New York by Plaintiff H-Quotient, Inc. ("H-Quotient"). Plaintiff also seeks to recover the costs incurred as a result of the removal.

For the reasons stated herein, Plaintiff's Motion to Remand is DENIED and Plaintiff's Request for the Recovery of Costs is DENIED.

# I. BACKGROUND

Plaintiff H-Quotient, a Virginia corporation, is a developer and publisher of software producers for the hospital and health care industry. (Compl.¶¶ 1-2.) Plaintiff's common stock is publicly traded and quoted on the Over the Counter Bulletin Board ("OTCBB"), an electronic trading service used by many small companies, that transmits real-time information of over-the-counter securities. OTCBB is operated and regulated by the National Association of Securities Dealers ("NASD"), a not-for-profit, self-regulatory organization of the securities industry authorized to do business in New York. (Id.¶¶ 9-10.)

Defendants Knight Trading Group, Inc. and Knight Securities, L.P. (collectively "Defendants"), Delaware organizations authorized to do business in New York and with their principal places of business in New Jersey and New York, acted as a broker and dealer for securities of companies quoted on the OTCBB. (Id.¶ 3, 4, 11.) Defendants served as market makers for the stock of Plaintiff, [1] which involved "act[ing] on behalf of other brokerage houses by contracting with other stock brokerages to buy and sell Plaintiff's stock on behalf of such other stock brokerage's clients." (Id.¶ 15.) Simply put, Defendants held a certain number of shares of Plaintiff's stock in order to facilitate trading of the stock.

Plaintiff commenced this action in New York State Supreme Court, County of New York on July 29, 2003. [2] The Complaint alleges that Defendants took part in "the improper and illegal 'naked short' sale of Plaintiff's stock and the 'front-running' of Plaintiff's stock, *i.e.,* executing orders for their own account before filling orders received by customers, all to the detriment of Plaintiff, Plaintiff's stockholders and to the market for Plaintiff's stock in general." (Id.¶ 18.)

The Complaint raises three causes of action that sound in New York common law of torts, namely breach of duty to deal honestly with Plaintiff, attempt to damage the business of Plaintiff, and attempt to injure the character and business reputation of Plaintiff. Plaintiff also alleges a violation of New York General Business Law § 340, a New York antitrust statute known as the Donnelly Act.

On August 6, 2003, Defendants timely filed a Notice of Removal to the United States District Court for the Southern District of New York. Defendants assert that there is federal jurisdiction over this matter because the above-mentioned claims actually arise under federal securities and antitrust laws. Plaintiff filed the present Motion to Remand on September 16, 2003, pursuant to 28 U.S.C. § 1447. Plaintiff also seeks to recover the costs incurred as a result of the removal. Defendants filed their Memorandum in Opposition to the Motion to Remand on January 27, 2004.

# II. DISCUSSION

## A. Legal Standards

2005 WL 323750, 2005-1 Trade Cases P 74,722

**\*2**  "[A]ny civil action brought in a State court of which the districts courts of the United States have original jurisdiction, may be removed by the defendant or the defendants, to the ... district and division embracing the place where such action is pending." 28 U.S.C. § 1441(a). "Absent diversity of citizenship, federal-question jurisdiction is required." *Caterpillar Inc. v. Williams,* 482 U.S. 386, 392 (1987); *see also* 28 U.S.C. § 1441(b); *Beneficial Nat'l Bank v. Anderson,* 539 U.S. 1, 6 (2003). Any doubts as to whether federal jurisdiction exists are to be resolved against removability. *Lupo v. Human Affairs Int'l,* 28 F .3d 269, 274 (2d Cir.1994) (quoting *Solmlyo v. J. Lu-Rob Enters., Inc.,* 932 F.2d 1043, 1045-46 (2d Cir.1991)). Furthermore, the party seeking removal bears the burden of establishing federal jurisdiction. *See United Food & Commercial Workers Union v. CenterMark Properties Meriden Square, Inc.,* 30 F.3d 298, 301 (2d Cir.1994).

Federal jurisdiction exists when a "case falls within the original 'federal question' jurisdiction of the United States district courts." *Franchise Tax Bd. v. Constr. Laborers Vacation Trust,* 463 U.S. 1, 8 (1983); *Perpetual Sec., Inc. v. Tang,* 290 F.3d 132, 136 (2d Cir.2002). Federal district courts "have jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331; *see also Beneficial Nat'l Bank,* 539 U.S. at 6.

The presence of federal question jurisdiction is governed by the well-pleaded complaint rule. *See Metro. Life Ins. Co. v. Taylor,* 481 U.S. at 58, 63 (1987). "[W]hether a case is one arising under the Constitution or a law or treaty of the United States, ... must be determined from what necessarily appears in the plaintiff's statement of his own claim ... unaided by anything alleged in anticipation or avoidance of defenses which it is thought the defendant may interpose." *Taylor v. Anderson,* 234 U.S. 74, 75-76 (1914); *see also Caterpillar Inc.,* 482 U.S. at 392 (1987). If a complaint only "alleges ... state law based causes of action, it cannot be removed from state court to federal court even if there is a federal defense." *Hernandez v. Conriv Realty Associates,* 116 F.3d 35, 38 (2d Cir.1997) (citing *Caterpillar Inc.,* 482 U.S. at 392-93); *see Franchise Tax Bd.,* 463 U.S. at 14 ("since 1887 it has been settled law that a case may not be removed to federal court on the basis of a federal defense, including the defense of preemption, even if the defense is anticipated in the plaintiff's complaint, and even if both parties admit that the defense is the only question truly at issue in

the case."). The well-pleaded complaint rule "makes the plaintiff the master of the claim; he or she may avoid federal jurisdiction by exclusive reliance on state law." *Caterpillar,* 482 U.S. at 392.

Two exceptions exist to the well-pleaded complaint rule: the complete preemption [3] and artful pleading doctrines. [4]

**\*3**  In certain instances, courts have found that Congress "so completely preempt[ed] a particular area that any civil complaint raising this select group of claims is necessarily federal in character." *Metro. Life,* 481 U.S. at 63-64. Therefore, in such cases, removal is proper under 28 U.S.C. § 1441(b), which authorizes any claim that "arises under" federal law to be removed to federal court. *See Beneficial Nat'l Bank,* 539 U.S. at 8; *Caterpillar,* 482 U.S. at 392-93. The Supreme Court has found complete preemption in only three categories of cases: (1) certain claims under the Labor Management Relations Act, *see Beneficial Nat'l Bank,* 539 U.S. at 8; (2) suits brought by a beneficiary under Employment Retirement Income Security Act of 1974, *see id.;* and (3) Indian land grant rights, *see Oneida Indian Nation v. County of Oneida,* 414 U.S. 661, 666-67 (1974). Recently, the Second Circuit also found complete preemption for cases arising under the Securities Litigation Uniform Standards Act. *See Spielman v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 332 F.3d 116, 124 n. 5 (2d Cir.2003). The Court of Appeals noted, however, that "the complete preemption doctrine must be applied sparingly and with great restraint." *Id.*

Another "exception" to the well-pleaded complaint rule is the artful pleading doctrine. Under this doctrine, a plaintiff may not avoid removal "by framing in terms of state law a complaint the real nature of [which] is federal, ... or by omitting to plead necessary federal questions in a complaint." *Fax Telecomunicaciones Inc. v. AT & T,* 138 F.3d 479, 486-87 (2d Cir.1998) (quoting *Derrico v. Sheehan Emergency Hosp.,* 844 F.2d 22, 27 (2d Cir.1988)); *see also Marcus,* 138 F.3d at 55-56. Thus, removal is proper if "the elements of the [state law] claim [a]re virtually identical to those of a claim expressly grounded on federal law." *Travelers Indem. Co. v. Sarkisian,* 794 F.2d 754, 760 (2d Cir.1986); *see also In re NASDAQ Market Makers Antitrust Litigation,* 929 F.Supp. 174, 178 (S.D.N.Y.1996) (interpreting *Sarkisian* ).

H-Quotient, Inc. v. Knight Trading Group, Inc., Not Reported in F.Supp.2d (2005)

2005 WL 323750, 2005-1 Trade Cases P 74,722

Where there is a proper basis for removal, a federal district court has jurisdiction over the civil action as well as supplemental jurisdiction over "all other claims that are so related to the claims in the action within such original jurisdiction that they form part of the same case or controversy." 28 U.S.C. § 1367(a). The district court, however, may decline to exercise supplemental jurisdiction over a claim if (1) the claim raises novel or complex issues of state law, (2) the state law claim "substantially dominates" over the federal claim, (3) the district court has dismissed all federal claims, or (4) there are other compelling reasons to decline jurisdiction. 28 U.S.C. § 1367(c)(1)-(4).

**B. Analysis**

In the present case, Plaintiff argues that this Court lacks subject matter jurisdiction and therefore must remand the action back to state court. Defendants bear the burden of demonstrating that this case is properly in federal court.

 **\*4** Although the Parties in this case are diverse, removal is not proper based on diversity jurisdiction because Defendant Knight Trading Group, Inc. is a citizen of New York. *See* 28 U.S.C. § 1441(b) ("Any other such action shall be removable only if none of the parties in interest properly joined and served as defendants is a citizen of the State in which such action is brought."). Therefore, Defendants must show that this Court has federal question jurisdiction over the subject matter of this action.

Defendants argue that federal question jurisdiction exists for the following reasons: (1) Plaintiff's claims based on naked short-selling arise under federal securities law, (2) Congress has completely preempted Plaintiff's claims with federal securities laws, and (3) Plaintiff has artfully pleaded an alleged federal antitrust violation as a claim under New York's Donnelly Act.

 1. The Donnelly Act and Federal Antitrust Violation
Defendants argue that Plaintiff artfully pleaded its state antitrust claim under the Donnelly Act to prevent a federal claim under the Sherman Act, 15 U.S.C. § 7 *et seq.* According to Defendants, interstate commerce dominates the allegations in Plaintiff's complaint and Plaintiff makes no contentions that intrastate conduct, namely New York's local interests, were at all affected by Defendants' conduct. In Defendants' views, the resolution of this claim

will turn upon a determination of whether it violated federal law by conducting an interstate conspiracy to restrain trade in an over-the-counter securities exchange market.

According to the Donnelly Act, contracts, or agreements for monopoly or in restraint of trade are illegal and void for those monopolies "in the conduct of any business, trade or commerce or in the furnishing of any service in this state." N.Y. General Business Law § 340(1).

The New York Court of Appeals has not clearly laid out in what circumstances the Donnelly Act is preempted by the federal antitrust trust, the Sherman Act. However, New York courts have determined that "Where the conduct complained of principally affects interstate commerce, with little or no impact on local or intrastate commerce, it is clear that federal antitrust laws operate to preempt the field and oust state courts of jurisdiction." *Two Queens, Inc. v. Scoza,* 745 N.Y.S.2d 517, 519 (1 st Dep't.2002); *see also In re Wiring Device Antitrust Litigation,* 498 F.Supp. 79, 82 (E.D.N.Y.1980) (stating that where interstate commerce is involved, federal antitrust laws preempt the Donnelly Act) (citing *Beltone Electronics Corp. v. Selbst,* 1977-2 Trade Cases CCH PP 61,586, 72,387 (Sup.Ct.N.Y.Co.1977), *aff'd mem.,* 403 N.Y.S.2d 1019 (1 st Dep't.1978)); *Flood v. Kuhn,* 443 F.2d 264, 268 (2d Cir.1971), *aff'd,* 407 U.S. 258 (1972) (court held that because burden on interstate commerce outweighs states' interests in regulating baseball's reserve system, Commerce Clause precludes application of state antitrust law).

 **\*5** In this case, the participants of any alleged Donnelly Act violation are Defendants, Delaware organizations and a New Jersey market maker with their principal places of business in New York and New Jersey, and another New York based company. [5] Further, the conspiracy is directed at an electronic, over-the-counter securities exchange, operated by the NASD, a foreign corporation authorized to do business in New York. The stock at issue is that of Plaintiff's, a Virginia corporation with its principal place of business in Virginia. Plaintiff has not put forth any specific allegations in its pleadings of impact on intrastate commerce.

It appears to the Court that any of the activities alleged to have been committed by Defendants primarily affected

F-Quotient, Inc. v. Knight Trading Group, Inc., Not Reported in F.Supp.2d (2005)

2005 WL 323750, 2005-1 Trade Cases P 74,722

interstate commerce. Defendants were dealing with the sale of stocks in a Virginia company, and did not limit its business to any particular state. Defendants are "unquestionably engaged in interstate commerce, [so] those who are damaged from an alleged restraint of trade find a remedy in the federal, not the state antitrust laws." *In re Wiring Device,* 498 F.Supp. at 82.

The Court finds that Plaintiff's fourth cause of action, alleging a Donnelly Act violation, actually arises under the federal antitrust statute, the Sherman Act.

Because federal question jurisdiction exists based on the Sherman Act, the Court will not address the remaining arguments against remand set forth by Defendants.

Plaintiff's remaining claims arise out of the Defendants' alleged "scheme" to drive down the price of its securities through naked short-selling. Hence, they all "derive from a common nucleus of operative fact ... such that [a plaintiff] would ordinarily be expected to try them all in one proceeding." *United Mine Workers v. Gibbs,* 383 U.S. 715, 725 (1966). Because there is federal jurisdiction under the Sherman Act, this Court may retain supplemental jurisdiction over the state law claims. These claims are standard common law claims. None are novel or complex in any way, nor do the state law claims predominate over the federal claims.

### III. CONCLUSION

Based on the foregoing reasons, this Court hereby DENIES Plaintiff's Motion to Remand to state court and DENIES Plaintiff's Request for the Recovery of Costs.

Defendants shall answer the Complaint within 30 days of the date of this Order.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2005 WL 323750, 2005-1 Trade Cases P 74,722

---

Footnotes

1    T.D. Waterhouse Investor Services, Inc. and T.D. Waterhouse Capital Markets, Inc. also acted as a market maker for Plaintiff's stock. Claims against them were dismissed by Order of Dismissal, dated Dec. 3, 2003.

2    On or about that same day, Plaintiff made an application by Order To Show Cause to Justice Karla Moskowitz, seeking a preliminary injunction to refrain Defendants from engaging in certain securities practices. Justice Moskowtiz signed the Order on July 31, 2003.

3    Courts often comment that the complete preemption doctrine is not really an exception to the well-pleaded complaint rule, but rather a corollary, because whenever the doctrine applies, the well-pleaded complaint rule is satisfied. *Caterpillar,* 482 U.S. at 393; *Marcus v. AT & T Corp.,* 138 F.3d 46, 53 (2d Cir.1998).

4    The artful pleading doctrine is also more properly styled a "corollary" rather than an exception.

5    As stated above, Plaintiff voluntarily dismissed its claims against the alleged co-conspirators, T.D. Waterhouse.

---

**End of Document**                                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT J

In re Magnesium Oxide Antitrust Litigation, Not Reported in F.Supp.2d (2011)

2011 WL 5008090, 2012-1 Trade Cases P 77,878

KeyCite Yellow Flag - Negative Treatment

Declined to Follow by Le v. Kohls Department Stores, Inc., E.D.Wis., February 8, 2016

2011 WL 5008090
NOT FOR PUBLICATION
United States District Court, D. New Jersey.

In re MAGNESIUM OXIDE
ANTITRUST LITIGATION.

Civ. No. 10−5943 (DRD).
|
Oct. 20, 2011.

**Attorneys and Law Firms**

Trujillo, Rodriguez & Richards, LLC, by: Lisa J. Rodriguez, Esq., Haddonfield, NJ, Gold Bennett Cera & Sidener LLP, by: Solomon B. Cera, Esq., C. Andrew Dirksen, Esq., San Francisco, CA, Goldman Scarlato & Karon, P.C., by: Daniel R. Karon, Esq., Cleveland, OH, for Direct Purchaser Plaintiffs.

Lite Depalma Greenberg, LLC, by: Allyn Z. Lite, Esq., Joseph J. DePalma, Esq., Newark, NJ, Hagens Berman Sobol Shapiro LLP, by: Steve W. Berman, Esq., Anthony D. Shapiro, Esq., Elizabeth A. Fegan, Esq., Jason A. Zweig, Esq., New York, NY, Hudson Mallaney & Shindler, by: J. Barton Goplerud, Esq., West Des Moines, IA, Girardi Keese, by: Stephen G. Larson, Esq., Los Angeles, CA, for Indirect Purchaser Plaintiffs.

Loweinstein Sanler PC, by: Douglas S. Eakley, Esq., Michael J. Hahn, Esq., Roseland, NJ, Paul, Weiss, Rifkind, Wharton & Garrison LLP, by: Aidan Synnott, Esq., Daniel A. Crane, Esq., New York, NY, Cozen O'Connor, P.C., by: John P. Johnson, Esq., Francis P. Newell, Esq., Peter M. Ryan, Esq., Philadelphia, PA, Finklestein Thompson LLP, by: Rosalee B. Connell, Esq., Douglas G. Thompson, Esq., Michael G. McLellan, Esq., Washington, DC, for Defendants.

**OPINION**

DEBEVOISE, Senior District Judge.

**\*1** This matter arises out of the consolidation of five separate actions in this Court[1] alleging a conspiracy to fix prices in and allocate shares of the domestic Magnesium Oxide market from January 2002 to the present ("the Class Period"). On November 15, 2010, Direct Purchaser Plaintiffs ("DP Plaintiffs") Orangeburg Milling Company, Inc., Bar Ale, Inc., and Air Krete, Inc. filed a Class Action Complaint ("CAC") against Defendants Premier Chemicals, LLC ("Premier"), Sumitomo Corporation of America ("Sumitomo"), and YAS, Inc. ("YAS") pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26, alleging violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and seeking class certification under Federal Rule of Civil Procedure 23(b)(2) and (3), declaratory judgment, treble damages, costs and attorneys' fees, and an injunction. On December 30, 2010, DP Plaintiffs filed an Amended CAC to add additional factual allegations in support of their claims.

On October 7, 2010, Indirect Purchaser Plaintiffs ("IP Plaintiffs") Ronald Hayek, Daniel, Walker, Sue Walker, and John Bidart filed a CAC against Defendants under Section 16 of the Clayton Act, alleging violations of Section 1 of the Sherman Act, and under various state antitrust and consumer protection laws. IP Plaintiffs seek similar relief as DP Plaintiffs. [2] On December 31, 2010, IP Plaintiffs filed an Amended CAC to add similar factual allegations as those added by DP Plaintiffs in their Amended CAC.

On March 1, 2011, Defendants filed a Motion to Dismiss [3] all of Plaintiffs' claims pursuant to Federal Rule of Civil Procedure 12(b)(6). For the reasons set forth below, Defendants' motion is granted. No Defendant is entitled to dismissal of Plaintiffs' federal and state antitrust claims on the merits because Plaintiffs sufficiently allege a meeting of the minds among all Defendants to fix prices in and allocate shares of the domestic Magnesium Oxide market. However, Defendants are entitled to dismissal of IP Plaintiffs' federal and state antitrust claims and the majority of their consumer protection claims for lack of standing. In addition, those consumer protection claims under which IP Plaintiffs have standing are dismissed to the extent they are based on allegations of fraud because those allegations do not comply with the requirements of Federal Rule of Civil Procedure 9(b). Finally, Plaintiffs' federal and state antitrust claims are dismissed because they are time-barred by their respective statutes of limitations.

2011 WL 5008090, 2012-1 Trade Cases P 77,878

# I. BACKGROUND

Magnesium Oxide ("MgO") is a solid, white, naturally occurring mineral that is used in producing a wide variety of products, including refractory products, animal feeds, fertilizers, electrical insulation, and pharmaceuticals. It is formed by an ionic bond between one magnesium atom and one oxygen atom. MgO can be mined from magnesite or processed from seawater or subterranean brines containing magnesium chloride. This case concerns the two most common forms of MgO: Caustic-calcined magnesia ("CCM") and dead-burned magnesia ("DBM"). DBM and CCM are produced differently and have different commercial applications. [4]

 **\*2**  In 2000, according to the CACs, domestic consumption of DBM and CCM came from two sources: the United States and China. Roughly 50% of CCM "and a lesser amount of" DBM consumed in the United States were produced domestically, while the rest was imported from China. (Direct Purchasers' Consolidated Amended Class Action Complaint ("Direct CAC") ¶ 27; (Indirect Purchasers' Consolidated Amended Class Action Complaint ("Indirect CAC") ¶ 33.) At that time, Premier allegedly maintained control over the majority of DBM and CCM consumed in the United States by (1) purchasing imported CCM and DBM for resale to its customers in the United States, and (2) sourcing magnesite from China for production into DBM to be sold domestically.

"Sumitomo similarly purchased Chinese MgO but only [DBM] for resale to its U.S. customers" and "sourced magnesite from China for manufacture into [DBM] for sale in the U.S." (Direct CAC ¶ 27; Indirect CAC ¶ 34.) To do so, it enlisted the help of YAS to (1) "facilitate[ ] [its] purchases of Chinese magnesite" (Direct CAC ¶ 27; Indirect CAC ¶ 35), and (2) purchase Chinese DBM for resale in the United States.

This arrangement proved successful because Hideo Sumikawa, the current president of YAS, previously worked for Sumitomo and has since maintained relationships with certain Chinese magnesite mines. "In particular, Sumitomo, through Coy Akiyama—head of Sumitomo's inorganic chemicals unit—purchases [DBM] from Chinese mines that Sumikawa (YAS) has facilitated, thereby allowing Sumitomo and YAS to participate together in the U.S. MgO market." (Direct CAC ¶ 33; Indirect CAC ¶ 41.)

According to Plaintiffs, sometime before the Class Period, Premier "saw its share of MgO markets shrink due to increased Chinese competition." (Direct CAC ¶ 28; Indirect CAC ¶ 36.) Specifically, "cheaper imports, mainly from China ha [d] replaced some of the U.S. domestic production, notably affecting Premier." (Direct CAC ¶ 29; Indirect CAC ¶ 37.) Thus, during the Class Period, Premier and Sumitomo allegedly bought nearly all of the Chinese DBM available for purchase and resold it to their customers in the United States.

In addition, Plaintiffs allege that, "[d]uring the Class Period, with some limited exceptions, the MgO markets were considered to be fairly saturated, with limited potential for growth." (Direct CAC ¶ 30; Indirect CAC ¶ 38.) However, "[i]nstead of competing, representatives from Premier, Sumitomo, and YAS began meeting regularly to discuss fixing U.S. MgO prices and allocating MgO markets." (Direct CAC ¶ 31; Indirect CAC ¶ 39.) Specifically, Plaintiffs allege a conspiracy among Premier, Sumitomo, and YAS to (1) fix prices in and allocate shares of the domestic DBM market and (2) allocate the domestic CCM market to Premier so that it could fix prices in that market, which resulted in Plaintiffs' purchasing DBM and CCM at artificially high prices.

### i. The DBM and CCM Agreements
 **\*3**  Plaintiffs allege that, during the Class Period, Cary W. Ahl, Sr. Premier's then-president, "regularly called" Mr. Sumikawa of YAS "to discuss fixing Premier's and Sumitomo's [DBM] prices and allocating their respective MgO accounts in the U.S." (Direct CAC ¶ 34; Indirect CAC ¶ 42.) These market allocation and price-fixing schemes were allegedly implemented by Mr. Ahl and his successors at Premier and Terry Wakisama at Sumitomo.

In the summer of 2004, Coy Akiyama of Sumitomo, Mr. Sumikawa of YAS, Gary Vannorsdel, an animal nutrition broker, and Mr. Vannorsdel's son, met at a Holiday Inn, in Tulsa, Oklahoma, to discuss plans for Sumitomo to enter the CCM market without upsetting Premier. Sumitomo had been shipping DBM to the United States on "partially empty barges and wanted to maximize efficiencies by filling those barges with [CCM] for sale to the western U.S." (Direct CAC ¶ 39; Indirect CAC ¶ 48.) Indeed, DBM shipments filled only half of Sumitomo's New

In re Magnesium Oxide Antitrust Litigation, Not Reported in F.Supp.2d (2011)

2011 WL 5008090, 2012-1 Trade Cases P 77,878

Orleans barge capacity. Apparently, "Tulsa was the only port that could accommodate this barge, and Sumitomo had access to a very large storage facility in Tulsa." (Direct CAC ¶ 36; Indirect CAC ¶ 44.)

At the Tulsa meeting, "[i]n the course of discussing a strategy for Sumitomo to enter the U.S. [CCM] market, Akiyama (Sumitomo) recounted to Sumikawa (YAS) multiple discussions between him and Ahl where Ahl had called Akiyama to set [DBM] prices; to allocate [DBM] markets; and to ensure that Sumitomo was maintaining its agreement with Premier to fix [DBM] prices and allocate [DBM] markets." (Direct CAC ¶ 40; Indirect CAC ¶ 49.) At one point, Mr. Vannorsdel "expressed concern about compromising his relationship with Premier by helping facilitate Sumitomo and YAS's involvement" in the CCM market, to which Mr. Akiyama responded, " 'Don't be concerned because we [Sumitomo] talk with Premier on a daily basis to set prices and to discuss what accounts they can have.' " (Direct CAC ¶ 41; Indirect CAC ¶ 50.)

Shortly after the Tulsa meeting, Mr. Ahl discovered Sumitomo's plan to enter the CCM market and retaliated by dropping DBM prices. [5] As a result, Sumitomo did not follow through with its plans to enter the CCM market. "Following the [CCM]-related message that Premier sent to Sumitomo and YAS via Premier's pre-market-entry retaliation, Sumitomo and YAS illegally agreed with Premier to remain out of the [CCM] market—a market Sumitomo, as a rational profit-seeking entity, was motivated to enter—thus allowing Premier to maintain its control over [CCM] pricing." (Direct CAC ¶ 43; Indirect CAC ¶ 52.)

### ii. Fraudulent Concealment

Plaintiffs allege that the MgO conspiracy was "inherently self-concealing" and that Defendants took affirmative measures to conceal it. (Direct CAC ¶ 48–49; Indirect CAC ¶ 55–56.) Specifically, Plaintiffs allege that "[D]efendants met secretly and among themselves for the express purpose of fixing prices and allocating markets of domestically sold MgO." (Direct CAC ¶ 50; Indirect CAC ¶ 57.) In addition, Defendants allegedly explained increases in the price of MgO "by references to tight supply, thinning margins, and increased energy and freight costs." (Direct CAC ¶ 51; Indirect CAC ¶ 58.) As a result, Plaintiffs allege that "neither [P]laintiffs nor the class members had knowledge of any of the foregoing

violations, and neither [P]laintiffs nor the class members, until recently, could have discovered through reasonable diligence that [D]efendants and their co-conspirators had engaged in the foregoing violations." (Direct CAC ¶ 49; Indirect CAC ¶ 56.)

### iii. The Complaints

**\*4**  On November 15, 2010, DP Plaintiffs—i.e. those who purchased either DBM or CCM directly from one or more Defendants, their predecessors, subsidiaries, or co-conspirators during the Class Period—filed a CAC against Defendants under Sections 4 and 16 of the Clayton Act alleging violations of Section 1 of the Sherman Act, and seeking class certification under Federal Rule of Civil Procedure 23(b)(2) and (3), declaratory judgment, treble damages, costs and attorneys' fees, and an injunction. On December 30, 2010, DP Plaintiffs filed an Amended CAC to add additional factual allegations in support of their claims.

On October 7, 2010, IP Plaintiffs—i.e. those who purchased products containing DBM or CCM that was manufactured, distributed or sold by one or more Defendants, their predecessors, subsidiaries, or co-conspirators during the Class Period—filed a CAC against Defendants under Section 16 of the Clayton Act, alleging violations of Section 1 of the Sherman Act, and under various state antitrust and consumer protection laws, and seeking similar relief as the DP Plaintiffs. On December 31, 2010, IP Plaintiffs filed an Amended CAC to add similar factual allegations as those added by DP Plaintiffs in their Amended CAC.

## II. DISCUSSION

Defendants now move to dismiss both Amended CACs pursuant to Federal Rule of Civil Procedure 12(b)(6). In doing so, Defendants argue that Plaintiffs (1) lack standing to assert their federal and state antitrust claims; (2) fail to allege a plausible antitrust conspiracy to fix DBM prices, allocate portions of the domestic DBM market, and allocate the domestic CCM market to Premier; and (3) fail to plead fraudulent concealment with particularity to equitably toll the applicable federal and state antitrust statutes of limitations. Defendants further argue that IP Plaintiffs' lack standing to assert their

In re Magnesium Oxide Antitrust Litigation, Not Reported in F.Supp.2d (2011)

2011 WL 5008090, 2012-1 Trade Cases P 77,878

consumer protection and unfair competition claims, and that those claims are improperly pled.

**A. Standard of Review**

In assessing the parties' arguments, the Court must apply the standard of review applicable to requests for dismissal pursuant to Federal Rule of Civil Procedure 12(b)(6). That rule permits a court to dismiss a complaint for failure to state a claim upon which relief can be granted. When considering a Rule 12(b)(6) motion, the Court must accept the factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *Morse v. Lower Merion Sch. Dist.,* 132 F.3d 902, 906 (3d Cir.1997). The Court's inquiry, however, "is not whether plaintiffs will ultimately prevail in a trial on the merits, but whether they should be afforded an opportunity to offer evidence in support of their claims." *In re Rockefeller Ctr. Prop., Inc.,* 311 F.3d 198, 215 (3d Cir.2002).

The Supreme Court recently clarified the Rule 12(b)(6) standard in two cases: *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009), and *Bell Atlantic Corporation v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). The decisions in those cases abrogated the rule established in *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim, which would entitle him to relief." In contrast, *Bell Atlantic,* 550 U.S. at 545, held that "[f]actual allegations must be enough to raise a right to relief above the speculative level." Thus, the assertions in the complaint must be enough to "state a claim to relief that is plausible on its face," *id.* at 570, meaning that the facts alleged "allow [ ] the court to draw the reasonable inference that the defendant is liable for the conduct alleged." *Iqbal,* 129 S.Ct. at 1949; *see also, Phillips v. County of Allegheny,* 515 F.3d 224, 234–35 (3d Cir.2008) (In order to survive a motion to dismiss, the factual allegations in a complaint must "raise a reasonable expectation that discovery will reveal evidence of the necessary element," thereby justifying the advancement of "the case beyond the pleadings to the next stage of litigation.").

**\*5** When assessing the sufficiency of a complaint, the Court must distinguish factual contentions—which allege behavior on the part of the defendant that, if true, would satisfy one or more elements of the claim asserted—from

"[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Iqbal,* 129 S.Ct. at 1949. Although for the purposes of a motion to dismiss the Court must assume the veracity of the facts asserted in the complaint, it is "not bound to accept as true a legal conclusion couched as a factual allegation." *Id.* at 1950. Thus, "a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Id.*

When a claim is dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6), leave to amend and reassert that claim is ordinarily granted. *In re Burlington Coat Factory Litig.,* 114 F.3d 1410, 1434 (3d Cir.1997). A claim may be dismissed with prejudice, however, if amending the complaint would be futile. *Id .* "Futile," as used in this context, means that the complaint could not be amended to state a legally-cognizable claim. *Id.* (citing *Glassman v. Computervision Corp.,* 90 F.3d 617, 623 (1st Cir.1996)).

**B. Plaintiffs' Standing to Bring Antitrust Claims**

Standing is a jurisdictional prerequisite under Article III of the United States Constitution. "Under Article III, the Federal Judiciary is vested with the 'Power' to resolve not questions and issues but 'Cases' or 'Controversies.' " *Arizona Christian Sch. Tuition Org. v. Winn,* ——U.S. ——, ——, 131 S.Ct. 1436, 1441, 179 L.Ed.2d 523 (2011). "To state a case or controversy under Article III, a plaintiff must establish standing." *Id.* at 1442 (citing *Allen v. Wright,* 468 U.S. 737, 751, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984)). The Supreme Court explained the elements of standing in *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992):

"First, the plaintiff must have suffered an 'injury in fact'—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) 'actual or imminent, not "conjectural" or "hypothetical." ' Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be 'fairly ... trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the court .' Third, it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.' "

WESTLAW  © 2019 Thomson Reuters. No claim to original U.S. Government Works.

Defendants argue that Plaintiffs lack antitrust standing because they do not identify whether they purchased DBM or CCM. Specifically, Defendants contend that the alleged agreements regarding DBM and CCM, respectively, amount to "two conspiracies [that] are allegedly directed at different purchasers and encompass different time frames[,] and [n]othing indicates that anticompetitive activity in one market would have an effect on prices in the other market." (YAS Br., 9.) "Under these circumstances," according to Defendants, "a purchaser of [DBM] would suffer no redressable injury from anticompetitive conduct in the [CCM] market, and would accordingly lack standing to maintain claims based on such conduct (and vice versa)." (*Id.*).

**\*6** This argument is unavailing because, as discussed fully below, Plaintiffs allege a single conspiracy in the domestic MgO market comprised of two agreements: one to fix prices in and allocate shares of the domestic DBM market, and one to allocate the domestic CCM market to Premier. These agreements are interdependent in that Defendants entered into the CCM agreement in order to maintain the DBM agreement. As a result, price-fixing in the DBM market has an effect on prices in the CCM market, and vice versa, because the absence of one agreement would eliminate the consideration for the other.

As a general matter, DP Plaintiffs' allegation that they were "injured by having paid more for MgO[6] than they otherwise would have paid absent [D]efendants' unlawful conduct" (Direct CAC ¶ 56) is sufficient to establish antitrust standing. Standing to sue under Section 4 of the Clayton Act is determined by a five-factor test:[7] "(1) the causal connection between the antitrust violation and the harm to the plaintiff; (2) whether the plaintiff's alleged injury is of the type that the antitrust laws were intended to redress; i.e., did the plaintiff suffer antitrust injuries; (3) the directness of the injury; (4) the existence of more direct victims of the violation; and (5) the potential for duplicative recovery or complex apportionment of damages." *In re Warfarin Sodium Antitrust Litig.,* 214 F.3d 395, 399 (3d Cir.2000) (citing *Associated General Contractors of California, Inc. v. California State Council of Carpenters,* 495 U.S. 519, 538 (1983). Here, there is little doubt that those who purchased DBM and/or CCM directly from Defendants at supracompetitive prices have standing to sue for damages under Section 4 and for injunctive relief under Section 16. *See id.* at 401 ("It is

difficult to imagine a more formidable demonstration of antitrust injury" than supra-competitive pricing.); *In re Mercedez Benz Anti–Trust Litig.,* 157 F.Supp.2d 355, 364 (D.N.J.2001) ("Where, as here, it is alleged that consumers paid a price higher than the price that would have been offered had the dealers been competing, the purpose of the antitrust laws is obviously thwarted."). Thus, DP Plaintiffs have standing to pursue their antitrust claims.

IP Plaintiffs, however, do not. While they seek solely injunctive relief under Section 16 of the Clayton Act —and therefore are not subject to the aforementioned five-factor test, *see* Note 7—they must still allege "(1) [a] threatened loss or injury cognizable in equity; (2) proximately resulting from the alleged antitrust injury." *In re Warfin,* 214 F.3d at 400. In analyzing whether an antitrust injury proximately caused an alleged loss to an indirect purchaser, this Circuit has been guided by the Supreme Court's decision in *Shield of Virginia v. McCready,* 457 U.S. 465, 102 S.Ct. 2540, 73 L.Ed.2d 149 (1982).[8] *McCready* explained that "an antitrust violation may be expected to cause ripples of harm to flow through the Nation's economy; but ... [i]t is reasonable to assume that Congress did not intend to allow every person tangentially affected by an antitrust violation to maintain an action." 457 U.S. at 476. Thus, in determining whether an injury was proximately caused by an antitrust violation for Article III standing purposes, courts should "look (1) to the physical and economic nexus between the alleged violation and the harm to the plaintiff, and (2) more particularly, to the relationship of the injury alleged with those forms of injury about which Congress was likely to have been concerned in making defendant's conduct unlawful and in providing a private remedy." *Id.* at 478. In doing so, they should consider whether the plaintiff's injury is "inextricably intertwined with the injury that the conspirators sought to inflict," *In re Warfin,* 214 F.3d at 400–01 (purchasers of prescription drug whose active ingredient was the subject of a price-fixing conspiracy maintained standing to sue as indirect purchasers because "the excess amount paid" for the drug was "inextricably intertwined with the injury [Defendant] aimed to inflict"), or, put another way, "whether the injury alleged is so integral an aspect of the conspiracy alleged, there can be no question but that the loss was precisely the type of loss that the claimed violations ... would be likely to cause." *McCready,* 457 U.S. at 479 (quotations and citations omitted) (alleged conspiracy among psychiatrists and Blue Shield to take patients

2011 WL 5008090, 2012-1 Trade Cases P 77,878

away from psychologists by refusing to reimburse Blue Shield subscribers for psychotherapeutic services resulted in "clearly foreseeable" harm to Blue Shield subscribers and "was a necessary step in effecting the ends of the alleged illegal conspiracy.").

**\*7** Here, IP Plaintiffs allege that "as a direct and proximate result of Defendants' and their co-conspirators' unlawful contract, combination and conspiracy, Plaintiffs and the Class members were injured and financially damaged in their business and property by having paid more for MgO Products than they would have absent Defendants' and their coconspirators' unlawful conduct." (Indirect CAC ¶ 54.) However, they fail to specify which MgO products—i.e. products containing DBM or CCM—they purchased. The mere fact that a product contains DBM or CCM does not necessarily mean that an increase in the price of that product is "inextricably intertwined" with, or an "a necessary step in achieving the ends" of, the alleged conspiracy to fix prices in and allocate shares of the domestic DBM and CCM markets. Indeed, the price of DBM and CCM would have a minimal foreseeable effect on the price of products containing trace amounts of them, but a significant foreseeable effect on the price of products in which they are major ingredients. Thus, without knowing which specific products IP Plaintiffs purchased, it is impossible to determine whether an increase in their price is the type of injury that furthers the object of the alleged conspiracy to fix prices in and allocate shares of the domestic DBM and CCM markets. Accordingly, IP Plaintiffs' federal antitrust claims are dismissed for lack of standing.[9] However, IP Plaintiffs are granted leave to amend in order to allege (1) the specific purchased products containing DBM or CCM and (2) the nexus between an increase in the price of those products and the alleged conspiracy to fix prices in and allocate shares of the domestic DBM and CCM markets.

Defendants further argue that IP Plaintiffs lack standing to assert their state law antitrust claims, with the exception of Iowa and California, because they only allege purchasing MgO products in Iowa and California. Specifically, Defendants contend that IP Plaintiffs "have no standing to bring claims based on violations of states in which they neither reside nor purchased any MgO products." (Sumitomo Br. (IP Pl.), 4.) IP Plaintiffs counter that "Defendants improperly confuse 'standing' with class certification issues," which, at this point, are premature.

(IP Pl's Br., 30.) Specifically, IP Plaintiffs maintain that they "are not bringing claims in their own name in other states; rather they are seeking to *represent* similarly situated persons in other states," and that "[t]his issue, improperly raised by Defendants on a motion to dismiss will be addressed at class certification under Rule 23." (*Id.* at 31) (emphasis in original).

It is well-settled that a named plaintiff in a class action lawsuit is required to establish Article III standing. *See Lewis v. Casey,* 518 U.S. 343, 357, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996) ("That a suit may be a class action ... adds nothing to the question of standing, for even named plaintiffs who represent a class must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent." (quotations and citations omitted)); *Warth v. Seldin,* 422 U.S. 490, 501, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975) ("[T]he plaintiff still must allege a distinct and palpable injury to himself, even if it is an injury shared by a large class of other possible litigants."); *O'Shea v. Littleton,* 414 U.S. 488, 494, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974) ("[I]f none of the named plaintiffs purporting to represent a class establishes the requisite of a case or controversy with the defendants, none may seek relief on behalf of himself or any other member of the class." (citations omitted)); *Winer Family Trust v. Queen,* 503 F.3d, 319, 326 (3d Cir.2007) ("The initial inquiry in either case is whether the lead plaintiff individually has standing.").

**\*8** Less well-settled is whether, pre-class certification, named plaintiffs are required to establish standing for each and every claim set forth in a class action complaint, or whether it is sufficient to establish standing for a single claim because a court will determine if the named plaintiffs have standing to represent the unnamed class members seeking redress under the balance of asserted claims during the class certification process pursuant to Federal Rule of Civil Procedure 23. This issue typically arises in cases, such as this one, where named plaintiffs assert analogous causes of action under the laws of many states but cannot specifically tie their injuries to each state. Indeed, here, IP Plaintiffs, who allege that they purchased MgO products in Iowa and California, assert violations of twenty-five states' antitrust laws.[10]

2011 WL 5008090, 2012-1 Trade Cases P 77,878

Courts, including this one, have held that "the fact that the named Plaintiffs may not have individual standing to allege violations of ... laws in states other than those in which they purchased Defendants' [product] is immaterial [because] [t]he issue ... is one of predominance—whether questions of law or fact common to all class members predominate over any questions affecting only individual members." *Ramirez v. STI Prepaid LLC,* 644 F.Supp.2d 496, 505 (D.N.J.2009) (quotations and citations omitted); *see also In re Grand Theft Auto Video Game Consumer Litig. ( No. II),* No. 06–MD–1739, 2006 WL 3039993, at *3 (S.D.N.Y. Oct. 25, 2006)* ("The relevant question ... is not whether the Named Plaintiffs have standing to sue Defendants—they most certainly do—but whether their injuries are sufficiently similar to those of the purported Class to justify the prosecution of a nationwide class action. This question is, at least in the first instance, appropriately answered through the class certification process."); *In re Buspirone Patent Litig.,* 185 F.Supp.2d 363, 377 (S.D.N.Y.2002) ("[T]hese alleged problems with standing will not arise unless class certification is granted. If certification is granted, the proposed class would contain plaintiffs who have personal standing to raise claims under the laws governing purchases in all of the [ ] states, and the only relevant question about the named plaintiffs' standing to represent them will be whether the named plaintiffs meet the ordinary criteria for class standing ...").

Other courts find that they must initially "review[ ] the standing of actual, not proposed plaintiffs" to assert the claims in a class action complaint because "[t]he alternative ... would allow named plaintiffs in a proposed class action, with no injuries in relation to the laws of certain states referenced in their complaint, to embark on lengthy class discovery with respect to injuries in potentially every state in the Union." *In re Wellbutrin XL Antitrust Litig.,* 260 F.R.D. 143, 154–56 (E.D.Pa.2009); *see also In re Potash Antitrust Litig.,* 667 F.Supp.2d 907, 924 (N.D.Ill.2009) (named plaintiffs are required to establish standing for each claim under which they purport to represent class members because "[t]o have standing as a class representative, the plaintiff must be part of the class, that is, he must possess the same interest and suffer the same injury shared by all members of the class he represents." (quotations and citations omitted)), *rev'd on other grounds by, Minn–Chem Inco. v. Agrium Inco.,* —— F.3d ——, No. 10–1712, 2011 WL 4424789 (7th Cir. Sept.23, 2011); *In re Packaged Ice Antitrust Litig.,* 08–

md–01952, 2011 WL 891160, at *11 (E.D.Mich. Mar. 11, 2011)* ("[N]amed plaintiffs lack standing to assert claims under the laws of the states in which they do not reside or in which they suffered no injury.").

**\*9** Two Supreme Court decisions, *Amchem Prods. Inc. v. Windsor,* 521 U.S. 591, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997) and *Ortiz v. Fibreboard Corp.,* 527 U.S. 815, 119 S.Ct. 2295, 144 L.Ed.2d 715 (1999), are at the heart of this issue. In *Amchem,* the Supreme Court reviewed a challenge to certification of a global settlement class involving persons who were exposed to asbestos. *See* 521 U .S. at 591–92. In doing so, it analyzed the role of settlement in determining class certification under Rule 23, as well as arguments set forth by objectors that certain members of the settlement class lacked standing to sue because they had not sustained a cognizable injury or because their injury was not redressable. *Id.* at 612. The Court declined to reach the standing arguments because it found the class certification issues under Rule 23 to be dispositive. *Id.* Consequently, the Court held that because resolution of the class certification issues "here is logically antecedent to the existence of Article III issues, it is appropriate to reach them first." *Id.* (citation omitted).

The Court further explained that it was "follow[ing] the path taken by the [Third Circuit] Court of Appeals" in "declin[ing] to reach these issues because they 'would not exist but for the [class-action] certification.' " *Id.* (quoting *Georgine v. Amchem Prods., Inc.,* 83 F.3d 610, 623 (3d Cir.1996)). To be sure, in *Georgine,* the Court of Appeals, when faced with class certification and Article III issues simultaneously, decided the class certification issues first because they were dispositive. 83 F.3d at 623. In doing so, the Court found "it prudent not to decide issues unnecessary to the disposition of the case, especially when many of these issues implicate constitutional questions." *Id.* (citing *Spector Motor Serv., Inc. v. McLaughlin,* 323 U.S. 101, 105, 65 S.Ct. 152, 89 L.Ed. 101 (1944) (expressing the rule that courts will avoid constitutional questions when possible)). Thus, these rulings echo the "fundamental and longstanding principle of judicial restraint [ ] requir[ing] that courts avoid reaching constitutional questions in advance of the necessity of deciding them." *Lyng v. Northwest Indian Cemetery Protective Ass'n,* 485 U.S. 439, 445, 108 S.Ct. 1319, 99 L.Ed.2d 534 (1988).

2011 WL 5008090, 2012-1 Trade Cases P 77,878

The *Ortiz* court also dealt with certification issues regarding a global settlement class for asbestos related injuries and arguments regarding the Article III standing of certain class members who petitioners alleged did not suffer an injury-in-fact. 527 U.S. at 821, 831. As in *Amchem,* the Court decided to address the class certification issues before the Article III questions. *Id.* at 831. In doing so, it explained:

> Ordinarily, of course, this or any other Article III court must be sure of its own jurisdiction before getting to the merits. *Steel Co. v. Citizens for a Better Environment,* 523 U.S. 83, 88–89, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998). But the class certification issues are, as they were in *Amchem,* "logically antecedent" to Article III concerns, 521 U.S., at 612, 117 S.Ct. 2231, 138 L.Ed.2d 689, and themselves pertain to statutory standing, which may properly be treated before Article III standing, *see Steel Co., supra,* at 92, 523 U.S. 83, 118 S.Ct. 1003, 140 L.Ed.2d 210. Thus the issue about Rule 23 certification should be treated first, "mindful that [the Rule's] requirements must be interpreted in keeping with Article III constraints...." *Amchem, supra,* at 612–613, 521 U.S. 591, 117 S.Ct. 2231, 138 L.Ed.2d 689.

**\*10** *Id.*

Thus, *Amchem* and *Ortiz* stand for the proposition that, in cases where a court is presented with class certification and Article III standing issues simultaneously, and the class certification issues are dispositive in that they pertain to statutory standing—i.e. whether a statute authorizes a given party to sue in the first place, the certification issues are "logically antecedent" to the standing issues and the court may therefore elect to address the certification issues first in the interest of judicial restraint. Under these circumstances, if a court finds that "certification of [a] proposed class [is] improper, the issue of certain class members' standing would [be] moot." *In re Welbutrin XL,* 260 F.R.D. at 153.

Here, however, the Court is presented solely with the issue of whether the named IP Plaintiffs have standing to assert the causes of action in the Indirect CAC, a threshold issue that the Court must address. *See Lewis* 518 U.S. at 357. Contrary to *Ramirez* and *In re Grand Theft Auto,* the "[Supreme] Court's standing cases confirm that a plaintiff must demonstrate standing for each claim he seeks to press." *DaimlerChrysler Corp. v. Cuno,* 547 U.S. 332, 335, 126 S.Ct. 1854, 164 L.Ed.2d 589 (2006); *see*

*also Allen v. Wright,* 468 U.S. 737, 752, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984) ("[T]he standing inquiry requires careful judicial examination of a complaint's allegations to ascertain whether the particular plaintiff is entitled to an adjudication of the particular claims asserted."); *Blum v. Yaretsky,* 457 U.S. 991, 999, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982) ("It is not enough that the conduct of which the plaintiff complains will injure *someone.* The complaining party must also show that he is within the class of persons who will be concretely affected. Nor does a plaintiff who has been subject to injurious conduct of one kind possess by virtue of that injury the necessary stake in litigating conduct of another kind, although similar, to which he has not been subject."). Otherwise, a plaintiff would be able to bring a class action complaint under the laws of nearly every state in the Union without having to allege concrete, particularized injuries relating to those states, thereby dragging defendants into expensive nationwide class discovery, potentially without a good-faith basis. In other words, the plaintiff would have to do "no more than name the preserve on which he intends to hunt." *Johnson v. Ga. Highway Express, Inc.,* 417 F.2d 1122, (5th Cir.1969), overruled on other grounds by *Griffin v. Dugger,* 823 F.2d 1476 (11th Cir.1987). Accordingly, because the named IP Plaintiff lack standing to assert antitrust violations under the laws of Arizona, the District of Columbia, Hawaii, Illinois, Maine, Minnesota, Nebraska, Nevada, New Mexico, New York, North Carolina, North Dakota, Oregon, South Dakota, Tennessee, Utah, and West Virginia, *see* Note 10, IP Plaintiffs' claims under those laws are dismissed.

## C. The Alleged MgO Conspiracy

### i. One Conspiracy or Two

**\*11** As an initial matter, Defendants maintain that Plaintiffs allegations are confusing to the point where it is impossible to determine whether the alleged conspiracy relates to DBM, CCM, or MgO in general. As a result, Defendants contend that Plaintiffs fail to allege a plausible antitrust conspiracy. This contention is unfounded. While Plaintiffs at times refer to anticompetitive conduct regarding MgO generally, it is clear from the surrounding allegations whether such conduct concerns DBM or CCM. [11] Indeed, as evidenced by their next contention, Defendants have no problem categorizing Plaintiffs' individual allegations as relevant to DBM or CCM.

WESTLAW   © 2019 Thomson Reuters. No claim to original U.S. Government Works.

In re Magnesium Oxide Antitrust Litigation, Not Reported in F.Supp.2d (2011)

2011 WL 5008090, 2012-1 Trade Cases P 77,878

On that note, Defendants contend that, to the extent that the Court finds that Plaintiffs allege distinct conspiracies regarding DBM and CCM, respectively, the Court should analyze the allegations relating to each conspiracy separately and require that those allegations independently meet the pleading requirements of *Twombly* and *Iqbal.* Plaintiffs counter that they allege a single MgO conspiracy comprised of intertwined and interdependent anticompetitive agreements.

As Plaintiffs point out, it is well-settled that "[t]he character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole." *Continental Ore Co. v. Union Carbide & Carbon Corp.,* 370 U.S. 690, 699, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962); *see also In re Fine Paper Antitrust Litig.,* 685 F.2d 810, 822 (3d Cir.1982) ("a seriatim examination of [ ] claims against each [ ] conspiracy defendant[ ] as if they were separate lawsuits ... overlook[s] the conspiracy itself."). Defendants contend that the Supreme Court's ruling in *Continental Ore* is inapposite because that case concerned a monopolistic exclusion conspiracy, as opposed to a price-fixing conspiracy. This contention is remarkably unpersuasive. The very case that *Continental Ore* cites for the proposition that a court must look to an alleged conspiracy as a whole, *United States v. Patten,* 226 U.S. 525, 33 S.Ct. 141, 57 L.Ed. 333 (1913), concerned a conspiracy to artificially inflate the price of cotton. Furthermore, there is no indication that *Continental Ore* limited its ruling to conspiracies based on monopolistic exclusion. *See* 370 U.S. at 699 ("we do not believe that ... liability under the antitrust laws can be measured by any rigid or mechanical formula ..."). Finally, Defendants fail to present, nor does the Court see, a single reason why it would be any less logical or equitable to assess an alleged price-fixing or market allocation conspiracy as a whole than a monopolistic exclusion conspiracy.

Defendants' contention that the Court should analyze Plaintiffs' allegations separately with respect to DBM and CCM because Plaintiffs allege "two different courses of conduct as to the two different products at two different times" (Sumitomo Reply Br., 3) is also unavailing. While it is true that Defendants initially "agreed to fix prices and allocate markets for DBM," ("the DBM Agreement") and subsequently agreed to allocate the domestic CCM market to Premier ("the CCM Agreement"), (*id.*), those agreements are not mutually exclusive. To the

contrary, the CCM Agreement is dependent on the DBM Agreement, and vice versa. *See In re Vitamins Antitrust Litig.,* 320 F.Supp.2d 1, 16 (D.D.C.2004) (recognizing the potential "interdependency between various branches of a common conspiracy."). Specifically, Defendants entered into the CCM Agreement in order to restore and maintain the DBM Agreement after Premier broke that agreement due to Sumitomo and YAS's attempt to enter the domestic CCM market. Consequently, the absence of one eliminates the consideration for the other. Moreover, "[h]orizontal antitrust conspiracies commonly include sellers in more than one relevant market." *In re Vitamins Antitrust Litig.,* No. MISC 99–197, 2000 WL 1475705, at *10 (D.D.C. May 9, 2000). Accordingly, the Court will treat Plaintiffs CACs as alleging a single conspiracy not to compete in the sale of two forms of MgO.

### ii. The Necessity of Allegations Regarding the MgO Market

**\*12** Defendants argue that Plaintiffs fail to allege an unlawful price-fixing and market allocation conspiracy because they do not set forth relevant market conditions and Sumitomo's, YAS's, and Premier's relative market power indicating that they plausibly could have fixed the price of DBM and allocated the domestic DBM and CCM markets. Plaintiffs argue that they are alleging per se violations of Section 1 of the Sherman Act and therefore "Defendants' arguments concerning market power and relevant markets are legally irrelevant." (DP Pl's. Br., 12.)

"Section 1 of the Sherman Act provides: Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." *In re Ins. Brokerage Antitrust Litig.,* 618 F.3d 300, 314 (3d Cir.2010) (quoting 15 U.S.C. § 1). "[T]his statutory language imposes two essential requirements on an antitrust plaintiff." *Id.* "First, the plaintiff must show that the defendant was a party to a contract, combination ... or conspiracy." *Id.* at 315 (quotation and citation omitted). This requires the plaintiff to demonstrate "some form of concerted action" indicating a "unity of purpose or a common design and understanding or a meeting of the minds or a conscious commitment to a common scheme." *Id.* (quotations and citations omitted).

Second, "the plaintiff must show that the conspiracy to which the defendant was a party imposed an unreasonable

2011 WL 5008090, 2012-1 Trade Cases P 77,878

restraint on trade ." *Id.* (quotation and citation omitted). "[T]he usual standard applied to determine whether a challenged practice unreasonably restrains trade is the so-called rule of reason." *Id.* (quotation and citation omitted). "[U]nder a rule-of-reason analysis, the plaintiff bears the initial burden of showing that the alleged [agreement] produced an adverse, anticompetitive effect within the relevant geographic market." *Id.* (quotation and citation omitted). "[S]uccessful attempts to meet this burden typically include a demonstration of defendants' market power, as a judgment about market power is [a] means by which the effects of the [challenged] conduct on the market place can be assessed." *Id.* at 315–16 (quotation and citations omitted).

"If the plaintiff carries this burden, the court will need to decide whether the anticompetitive effects of the practice are justified by any countervailing pro-competitive benefits." *Id.* However, "Judicial experience has shown that some classes of restraints" almost never have "redeeming competitive benefits," and therefore a court need not apply the rule of reason analysis. *Id.* Instead, they are "subject to a 'per se' standard." *Id.* "Paradigmatic examples are horizontal agreements among competitors to fix prices or to divide markets." *Id.* (quotation and citation omitted). If a plaintiff's allegations "fall into one of the recognized classes," an unreasonable restraint on trade is "conclusively presumed" and therefore "plaintiffs are relieved of the obligation to define a market and prove market power." *Id.* (citations omitted).

**\*13** As discussed below, Plaintiffs sufficiently allege that Defendants entered into (1) a horizontal agreement to fix prices in and allocate shares of the domestic DBM market and (2) a horizontal agreement to allocate the domestic CCM market to Premier. Accordingly, Plaintiffs assert per se antitrust violations that do not require allegations regarding the nature of the domestic DBM and CCM markets or Defendants' power within those markets. [12]

### iii. The DBM Agreement

Defendants argue that Plaintiffs' allegations of an agreement to fix prices in and allocate shares of the domestic DBM market are facially insufficient because (1) they fail to provide the substance of the agreement, (2) they fail to rule out potentially alternative, lawful explanations for such an agreement, and (3) their "factual

narrative is inherently implausible." (Sumitomo (DP Pl's.) Br., 15 .) Plaintiffs argue that their allegations of a price-fixing and market allocation agreement are sufficient because (1) they "explicitly state who was conferring with whom about MgO pricing, markets and customers" (DP Pl's. Br., 15.), and (2) Defendants' arguments regarding the inherent plausibility of the alleged conspiracy implicate factual questions that are not properly resolved on a motion to dismiss.

Defendants' contention that Plaintiffs' allegations are inadequate because they "fail to disclose the actual substance of the alleged conversations or agreements" (Sumitomo (DP Pl's.) Br., 14) is unavailing. *Twombly* does not require detailed allegations regarding the specific nature of a price-fixing or market allocation agreement; rather, "stating such a claim requires a complaint with enough factual matter (taken as true) to suggest that an agreement was made." 550 U.S. at 556. Put another way, a complaint "simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of an illegal agreement." *Id.* Requiring Plaintiffs to set forth the full details of an antitrust conspiracy at this stage of the litigation would present an onerous burden because "in antitrust cases, [ ] the proof is largely in the hands of the alleged conspirators." *In re Neurontin Antitrust Litig.,* No. 02–1390, 2009 WL 2751029, at \*7 (D.N.J. Aug.28, 2009) (quoting *Hosp. Building Co. Trustees of Rex Hosp.,* 425 U.S. 738, 96 S.Ct. 1848, 48 L.Ed.2d 338 (1976)).

Here, Plaintiffs allege that (1) a significant portion of DBM consumed in the United States comes from China; (2) during the Class Period, Premier and Sumitomo bought nearly all Chinese DBM available for purchase and resold it to their customers in the United States; (3) Mr. Ahl of Premier "regularly called" Mr. Sumikawa of YAS "to discuss fixing Premier's and Sumitomo's [DBM] prices and allocating their respective MgO accounts in the U.S" (Direct CAC ¶ 34; Indirect CAC ¶ 42); (4) these market allocation and price-fixing schemes were implemented by Mr. Ahl and his successors at Premier and Mr. Wakisama of Sumitomo; (5) at the 2004 Tulsa meeting, Mr. Akiyama recounted to Mr. Sumikawa "multiple discussions" between him and Mr. Ahl to set DBM prices and allocate DBM markets "and ensure that Sumitomo was maintaining its agreement with Premier to fix [DBM] prices and allocate [DBM] markets," (Direct CAC ¶ 40; Indirect CAC ¶ 49); and (5)

2011 WL 5008090, 2012-1 Trade Cases P 77,878

when Mr. Vannorsdel allegedly "expressed concern about compromising his relationship with Premier by helping facilitate Sumitomo and YAS's involvement" in the CCM market, Mr. Akiyama responded, " 'Don't be concerned because we [Sumitomo] talk with Premier on a daily basis to set prices and to discuss what accounts they can have.' " (Direct CAC ¶ 41; Indirect CAC ¶ 50.)

**\*14** These allegations plausibly suggest that Defendants entered into an agreement to fix prices in and allocate shares of the domestic DBM market, the specifics of which can be reasonably expected to be revealed in discovery. Plaintiffs state (1) the subject of the alleged agreement, (2) the parties to the agreement and the specific individuals that discussed and implemented the agreement, and (3) the context in which the agreement arose. This is sufficient to withstand a motion to dismiss.

Defendants' contention that Plaintiffs fail to assert a plausible antitrust conspiracy because their allegations could, in fact, refer to a lawful vertical agreement between Sumitomo and Premier to fix prices for DBM whereby Sumitomo purchases DBM from Premier as a reseller, is irrelevant. At the pleading stage, Plaintiffs need only set forth allegations that create an inference of an unlawful agreement, *Twombly, 550 U.S. at 556,* which, as previously discussed, they have done; they need not set forth allegations tending to rule out potential alternative explanations. [13]

Finally, Defendants' contention that the alleged DBM Agreement is "inherently implausible" in that, on the one hand, Sumitomo was allegedly worried about retaliatory action by Premier for attempting to enter the CCM market and, on the other hand, "could give credible assurances to the Vannorsdels that it could shield them from Premier['s] retaliation because of [Sumitomo's] 'daily' contact with Premier," (Sumitomo (DP Pl.'s) Br., 15) is similarly irrelevant because it asks the Court to improperly assess the merits of Plaintiffs' allegations. [14] *See Aktieselskabet AF 21. November 2001 v. Fame Jeans Inc., 525 F.3d 8, 17 (D.C.Cir.2008)* (*"Twombly* was concerned with the plausibility of an inference of conspiracy, not with the plausibility of a claim. A court deciding a motion to dismiss must not make any judgment about the probability of the plaintiff's success ... the court must assume that all the allegations in the complaint are true (even if doubtful in fact)" (quotations and citations omitted)). Thus, Plaintiffs have sufficiently alleged an unlawful agreement among Defendants to fix prices in and allocate shares of the domestic DBM market.

### iv. The CCM Agreement

Defendants contend that Plaintiffs fail to allege the existence of an unlawful agreement to allocate the domestic CCM market to Premier because (1) they merely allege parallel conduct that does not indicate concerted action, (2) there are obvious alternative explanations for Sumitomo's and YAS's decision not to enter the CCM market, and (3) they fail to establish that Defendants were competitors in the CCM market. Plaintiffs counter that they are not relying on parallel conduct but rather direct admissions of an agreement among Defendants to allocate the domestic CCM market to Premier, and therefore Defendants' proffered alternative explanations are irrelevant.

As previously discussed, Section 1 of the Sherman Act "does not prohibit [all] unreasonable restraints of trade ... but only restraints effected by a contract, combination, or conspiracy." *Twombly, 550 U.S. at 553* (quotation and citation omitted). This is because seemingly anticompetitive conduct may be just as "consistent with conspiracy ... [as] with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market." *Id. at 554* (citation omitted). Accordingly, "[t]he crucial question is whether the challenged anticompetitive conduct stem[s] from independent decision or from an agreement, tacit or express." *Id. at 553* (quotation and citation omitted). "Hence, when allegations of parallel conduct are set out in order to make a § 1 claim, they must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action." *Id. at 557.*

**\*15** This is usually accomplished by pleading one or more "plus factors" that "indicate the existence of an actionable agreement." *In re Ins. Brokerage, 618 F.3d at 321.* While "[t]here is no finite set of such criteria," the Court of Appeals has identified "at least three such plus factors: (1) evidence that the defendant had a motive to enter into a[ ] conspiracy; (2) evidence that the defendant acted contrary to its interests; and (3) evidence implying a traditional conspiracy." *Id. at 321–22* (quotations and citation omitted).

2011 WL 5008090, 2012-1 Trade Cases P 77,878

Here, Plaintiffs' allegations suggest an agreement among Defendants to allocate the CCM market to Premier. Plaintiffs allege that (1) representatives from Sumitomo and YAS met with others at a Tulsa hotel, in the summer of 2004, to discuss entering the domestic CCM market in order to fill Sumitomo's barge capacity; (2) Premier discovered their plan to enter the domestic CCM market and retaliated by lowering DBM prices; and (3) as a result, Sumitomo and YAS agreed with Premier to remain out of the CCM market.

To be sure, contrary to Plaintiffs' contentions, these allegations do not amount to a direct admission of an unlawful agreement to allocate the CCM market to Premier; taken in isolation, they merely amount to parallel conduct plus a conclusory allegation of an agreement. Placing these allegations in the context of the CACs as a whole, however, Plaintiffs successfully demonstrate the first plus factor—that Sumitomo and YAS had a motive to enter into an unlawful agreement with Premier to stay out of the domestic CCM market—and provide a plausible context for that agreement. As previously discussed, Sumitomo and YAS maintained an agreement with Premier to fix prices in and allocate shares of the domestic DBM market. As a result, as the CACs indicate, Sumitomo and YAS wanted to enter the CCM market undetected so that they could continue to maintain their agreement with Premier in the DBM market. When Premier discovered their plans and, in response, cut prices in the DBM market, Sumitomo and YAS agreed with Premier to stay out of the CCM market with the motive of restoring and maintaining their agreement in the DBM market.

In this context, Defendants' alternative explanations that a profit-maximizing entity could independently decide not to enter a market in which (1) it remained unfamiliar with the product and its customers and (2) the dominant player recently cut prices are by no means "obvious" or "more plausible" (Sumitomo (DP Pl's.) Br., 18) than an illegal agreement to stay out of the CCM market and therefore do not provide a basis for dismissal. At the pleading stage, "a claim of conspiracy predicated on parallel conduct should be dismissed if common economic experience, or the facts alleged in the complaint itself, show that independent self-interest is an obvious alternative explanation for defendants' common behavior." *In re Ins. Brokerage,* 618 F.3d at 326. Plaintiffs' allegations need not rule out all potential alternative explanations. *See Starr*

*v. Sony BMG Music Entertainment,* 592 F.3d 314, 352 (2d Cir.2010) ("Although the *Twombly* court acknowledged that for purposes of summary judgment a plaintiff must present evidence that tends to exclude the possibility of independent action, it specifically held that, to survive a motion to dismiss, plaintiffs need only enough factual matter (taken as true) to suggest that an agreement was made" (quotations and citations omitted)).

**\*16** Finally, Sumitomo's argument that Plaintiffs fail to allege a plausible agreement to allocate the CCM market to Premier because there is no indication that Defendants were actual or potential competitors in the CCM market is unavailing. Sumitomo specifically contends that Plaintiffs must establish that it had the intent and capability of entering the CCM market as a competitor in order to allege a plausible agreement among Defendants to allocate the CCM market to Premier. However, the authority cited by Sumitomo provides little support for this contention. *See Palmer v. BRG of Georgia, Inc.,* 498 U.S. 46, 49–50, 111 S.Ct. 401, 112 L.Ed.2d 349 (1990) (parties need not have competed in the same territorial market to unlawfully allocate that market); *Andrx Pharm, Inc. v. Bioval Corp., Int'l,* 256 F.3d 799, 806–07 (D.C.Cir.2001) (potential competitor must show background and experience in new market, financial capability to enter market, and affirmative steps toward entry in order to establish injury-in-fact for standing to sue under Section 4 of the Clayton Act); *Engine Specialities, Inc. v. Bombardier Ltd.,* 605 F.2d 1, 9 (1st Cir.1979) (to sustain jury finding of unlawful horizontal market allocation agreement among potential competitors, there must have been sufficient support in the record to establish that potential competitors had the "necessary desire, intent, and capability to enter the market").

To be sure, the Court of Appeals has generally recognized that the existence of an unlawful horizontal agreement to allocate a given market must occur among competitors or potential competitors in that market:

> An agreement among persons who are not actual or potential competitors in a relevant market is for Sherman Act purposes *brutum fulmen* ... To some extent, of course, a horizontal agreement tends to define the relevant market, for it

In re Magnesium Oxide Antitrust Litigation, Not Reported in F.Supp.2d (2011)

2011 WL 5008090, 2012-1 Trade Cases P 77,878

tends to show that the parties to it are at least potential competitors. If they were not, there would be no point to such an agreement. Thus its very existence supports an inference that it would have an effect in a relevant market. Where, ... however, the disputed issue is the existence or scope of the alleged horizontal agreement that is to be inferred from circumstantial evidence, the first inquiry must be whether or not each firm alleged to have been a party to it was an actual or potential competitor in that market.

*United States v. Sargent Elec. Co.,* 785 F.2d 1123, 1127 (3d Cir.1986) (reversing dismissal of indictment on double jeopardy grounds). However, Sumitomo fails to present, nor is the Court aware of, any authority requiring a purchaser plaintiff to specifically establish, at the pleading stage, that the parties to a horizontal agreement to allocate a given market were competitors or potential competitors in that market. To require Plaintiffs, pre-discovery, to establish Sumitomo's background and experience in the CCM market, its financial capability to enter that market, and the specific steps taken by Sumitomo to enter it, would be overly onerous, as much of this information is likely to be exclusively in the hands of Sumitomo. [15] Thus, Plaintiffs have sufficiently alleged an unlawful agreement among Defendants to allocate the domestic CCM market to Premier.

### *v. YAS' Involvement in the Alleged Conspiracy*

**\*17** YAS separately argues that Plaintiffs fail to establish its participation in the alleged conspiracy because they fail to show that it came to a meeting of the minds with Sumitomo and Premier to (1) fix prices in and allocate shares of the domestic DBM market and (2) allocate the domestic CCM market to Premier. [16] Plaintiffs counter that (1) they have set forth direct allegations indicating YAS's knowledge and participation in the alleged conspiracy, and (2) YAS need not have played the same role in the conspiracy, maintain the same motives as Sumitomo or Premier for participating in it, or sell MgO to be held liable.

As previously discussed, to hold YAS or any other Defendant liable, Plaintiffs must set forth allegations suggesting that YAS maintained "unity of purpose or a common design and understanding or a meeting of minds or a conscious commitment to a common scheme" with Sumitomo and Premier to (1) fix prices in and allocate shares of the domestic DBM market, and (2) allocate the CCM market to Premier. *In re Ins. Brokerage,* 618 F.3d at 315 (quotations and citation omitted). This does not require a showing that YAS knew of or participated in every transaction in furtherance of or related to the alleged conspiracy. *See TV Signal Co. of Aberdeen v. American Tel. & Tel. Co.,* 462 F.2d 1256, 1259 (8th Cir.1972) ("Although knowledge is implicit in the requirement of unity of purpose, no case of which we are aware requires that each party to a conspiracy knows of each transaction encompassed by the conspiracy in order to be held accountable therefore."); *In re Vitamins Antitrust Litig.,* 320 F.Supp.2d 1, 15 (D.D.C.2004) ("Although Plaintiffs must show that each Defendant had knowledge of an agreement as to the overall conspiracy, they need not show (1) evidence of a formal agreement, or (2) knowledge, on behalf of the Defendant, of every detail of the alleged conspiracy."); *In re Mercedez–Benz,* 157 F.Supp.2d at 375 ("That a particular defendant may or may not have joined in a specific overt act in furtherance of the conspiracy ... does not affect its status as a conspirator."). On the other hand, "knowledge alone [of the conspiracy] is not sufficient" to hold it liable. *In re Vitamins,* 320 F.Supp.2d at 16. Plaintiffs must therefore set forth allegations suggesting that YAS (1) had knowledge of the conspiracy to fix prices in and allocate shares of the domestic DBM market, and allocate the CCM market to Premier, and (2) intended to join that conspiracy. *Id.* "[A] party progresses form mere knowledge of an endeavor to intent to join it when there is 'informed and interested cooperation, stimulation, instigation. And there is also a stake in the venture which, even if it may not be essential, is not irrelevant to the question of conspiracy.' " *Id.* (quoting *Direct Sales Co. v. United States,* 319 U.S. 703, 713, 63 S.Ct. 1265, 87 L.Ed. 1674 (1943)).

### 1. *The DBM Agreement*

Plaintiffs allege that Mr. Sumikawa of YAS (1) facilitates Sumitomo's purchases of Chinese DBM for resale in the domestic DBM market, (2) received regular phone calls from Mr. Ahl of Premier "to discuss fixing Premier's and Sumitomo's [DBM] prices and allocating their respective

[DBM] accounts in the U.S.," (Direct CAC ¶ 34; Indirect CAC ¶ 42), and (3) attended the 2004 Tulsa meeting where (i) Mr. Akiyama of Sumitomo recounted to him "multiple discussions" between him and Mr. Ahl to set DBM prices and allocate DBM markets "and ensure that Sumitomo was maintaining its agreement with Premier to fix [DBM] prices and allocate [DBM] markets," (Direct CAC ¶ 40; Indirect CAC ¶ ) and (ii) it was revealed that Sumitomo communicates with Premier on a daily basis fix prices and allocate accounts. These allegations create a plausible inference that YAS had knowledge of an agreement to fix prices in and allocate shares of the domestic DBM market and the intent to join it. Accepting Plaintiff's allegations as true and making all reasonable inferences in their favor, YAS' facilitation of Sumitomo's DBM purchasing indicates a plausible stake in the DBM Agreement, while its receipt of phone calls to discuss the Agreement and attendance at a meeting at which it was revealed indicates that YAS had knowledge of the DBM Agreement and that it engaged in informed and interested cooperation.

**\*18** Citing to *In re Elevator Antitrust Litig.,* 502 F.3d 47, 50 (2d Cir.2007) and *Hinds County, Mississippi v. Wachovia Bank N.A.,* 620 F.Supp.2d 499, 518 (S.D.N.Y.2009), YAS argues that these allegations should be "discounted" because they amount to mere "averments of agreements made at some unidentified place and time." (YAS Br., 4.) *In re Elevator Antitrust Litig.* concerned a list of "basically every type of conspiratorial activity that one could imagine ... in entirely general terms without any specification of any particular activities by any particular defendant." 502 F.3d at 50. Similarly, *Hinds County* dealt with conclusory allegations in support of "'per se illegal horizontal communications' in support of [an] alleged conspiracy." 620 F.Supp.2d at 518. Here, in contrast, Plaintiffs allege (1) the way in which YAS participates with Sumitomo—a member of the conspiracy—in the domestic DBM market, (2) phone calls from Premier—another party to the conspiracy—to YAS to discuss fixing prices in and allocating shares of the domestic DBM market, and (3) YAS's attendance at a meeting where Sumitomo—its partner in the domestic DBM market—recounted to YAS discussions in which it set prices in and allocated shares of the domestic DBM market with Premier. These allegations, do not amount to a mere "list of theoretical possibilities," *In re Elevator Antitrust Litig.,* 502 F.3d at 50, or "require the Court to assume the existence of the

conspiracy." *Hinds County,* 620 F.Supp.2d at 518. Rather, they make the alleged conspiracy more plausible.

YAS further argues that "it is wholly implausible that [it] (a minor player that was not itself a manufacturer, importer or seller [17] ) would have discussed fixing Premier's and Sumitomo's [DBM] prices," particularly since Plaintiffs fail to "allege that YAS had any ability to influence (let alone dictate Sumitomo's [DBM] prices, nor which customers Sumitomo dealt with." (YAS Br., 5.) As previously discussed, this line of argument is not only improper at the pleading stage—where the Court must accept Plaintiffs' allegations as true—it is also unpersuasive. There is nothing "wholly implausible" about YAS participating in discussions to fix prices in and allocate shares of the domestic DBM market. Sumitomo was only able to participate in the domestic DBM market in the first place due to YAS's relationship with Chinese mines from which Sumitomo could purchase DBM and magnesite. Consequently, it is certainly plausible that YAS could participate in discussions with co-conspirators to fix prices and allocate shares of the DBM market.

### 2. *The CCM Agreement*

Plaintiffs' allegations suggesting an agreement among Sumitomo and Premier to allocate the CCM market to Premier apply with equal force to YAS. As previously discussed, Plaintiffs allege that (1) Sumitomo and YAS met with others at a Tulsa hotel, in the summer of 2004, to discuss entering the domestic CCM market in order to fill Sumitomo's barge capacity; (2) Premier discovered their plan to enter the domestic CCM market and retaliated by lowering DBM prices to keep Sumitomo and YAS out of the CCM market; and (3) as a result, Sumitomo and YAS agreed with Premier to remain out of the CCM market.

**\*19** YAS argues that these allegations are conclusory because they "provide [ ] no details whatsoever about YAS's participation in this alleged agreement, including what role it is alleged to have played." (YAS Br., 7.) At the pleading stage, however, Plaintiffs need not allege the specific nature of YAS's or any other Defendant's participation in the agreement to allocate the CCM market to Premier. *See In re Static Random Access Memory (SRAM) Antitrust Litig.,* 580 F.Supp.2d 896, 904 (N.D.Cal.2008) ("Although Plaintiffs will need to provide evidence of each Defendants' participation [at summary judgment] ... they now only need to make

2011 WL 5008090, 2012-1 Trade Cases P 77,878

allegations that plausibly suggest that each Defendant participated in the alleged conspiracy."). As previously discussed, Plaintiffs must set forth allegations suggesting that YAS had knowledge of the agreement and the intent to join it. Plaintiffs' allegations that YAS, as Sumitomo's partner in the domestic MgO market, (1) attended a meeting to arrange for Sumitomo to enter the domestic CCM market and (2) subsequently agreed with Sumitomo and Premier to allocate that market to Premier in order to maintain their agreement to fix prices and allocate shares of the domestic DBM market, do just that.

Finally, like Sumitomo, YAS argues that it cannot be held liable for the alleged agreement to allocate the domestic CCM market to Premier because Plaintiffs fail to establish that YAS was an actual or potential competitor in that market. For the reasons discussed in Point IIC*iv,* at the pleading stage, Plaintiffs, as purchasers, need not establish that YAS was an actual or potential competitor in the CCM market in order to allege its participation in a horizontal conspiracy. Furthermore, YAS's (1) role in facilitating Sumitomo's purchase of Chinese DBM and (2) attendance at the 2004 Tulsa meeting where it, Sumitomo, and the Vannorsdels discussed entering into the CCM market, suggests that YAS intended to participate with Sumitomo in the CCM market in the same way as they had been participating in the DBM market. Thus, Plaintiffs have set forth allegations plausibly suggesting that YAS participated in an agreement to allocate the CCM market to Premier.

### D. Statute of Limitations and Fraudulent Concealment

Actions brought under the Clayton Act are subject to a four-year statute of limitations. 15 U.S.C. § 15b. In an antitrust conspiracy that continues over a period of years, each overt act in furtherance thereof that injures the plaintiff—for example, the selling of a price-fixed product—starts the statute of limitations period running for that particular act. *Klehr v. A.O. Smith Corp.,* 521 U.S. 179, 189, 117 S.Ct. 1984, 138 L.Ed.2d 373 (1997); *see also Zenith Radio Corp. v. Hazeltine Research, Inc.,* 401 U.S. 321, 338, 91 S.Ct. 795, 28 L.Ed.2d 77 ("Generally, a cause of action accrues and the statute begins to run when a defendant commits an act that injures a plaintiff's business" (citations omitted)). However, "the commission of a separate new overt act generally does not permit the plaintiff to recover for the injury caused by old overt acts outside the limitations period." *Klehr,* 521 U.S. at 190 (citations omitted).

**\*20** Defendants argue that Plaintiffs' federal antitrust claims are barred by the applicable four-year statute of limitations. Specifically, Defendants contend that Plaintiffs (1) fail to allege overt acts in furtherance of the alleged conspiracy that occurred after 2004 and (2) fail to plead fraudulent concealment with particularity to otherwise toll the statute of limitations. Plaintiffs do not dispute that they fail to allege overt acts after 2004, but maintain that they plead fraudulent concealment with the requisite particularity to toll the statute of limitations.

The equitable doctrine of fraudulent concealment applies to every federal statute of limitations. *Holmberg v. Armbrecht,* 327 U.S. 392, 397, 66 S.Ct. 582, 90 L.Ed. 743 (1946). To toll a statute of limitations through fraudulent concealment, a plaintiff must show "(1) an affirmative act of concealment; (2) which misleads or relaxes the plaintiff's inquiry, who (3) exercised due diligence in investigating his cause of action ." *In re Lower Lake Erie Iron Ore Antitrust Litig.,* 998 F.2d 1144, 1178–79 (3d Cir.1993) (citation omitted). In addition, allegations of fraudulent concealment must be pled with particularity in accordance with Federal Rule of Civil Procedure 9(b). *In re Mercedes–Benz,* 157 F.Supp.2d at 368.

However, "Rule 9[ (b) ] does not require plaintiffs to plead facts that, by the nature of the alleged fraud, are within the defendants' control." *Id.* (citing *In re Craftmatic Secs. Litig.,* 890 F.2d 628, 645 (3d Cir.1989)). Indeed, "[c]ourts must be sensitive to the fact that [a rigid] application of Rule 9(b) prior to discovery may permit sophisticated defrauders to successfully conceal the details of their fraud." *In re Craftmatic,* 890 F.2d at 645 (quotation and citation omitted). "Thus, courts have relaxed the rule when factual information is peculiarly within the defendant's knowledge or control." *Id.* Accordingly, under the more flexible application of Rule 9(b), Plaintiffs need not allege the specific information that is exclusively within Defendants' knowledge or control. *See id.* at 646. However, Plaintiffs must allege facts suggesting fraudulent concealment and "why additional information lies exclusively within the defendants' control." *Id* .

As discussed fully below, Plaintiffs fail to satisfy each element of fraudulent concealment, thus requiring dismissal of their federal antitrust claims as time-barred. However, the Court will grant Plaintiffs leave to amend

In re Magnesium Oxide Antitrust Litigation, Not Reported in F.Supp.2d (2011)

2011 WL 5008090, 2012-1 Trade Cases P 77,878

their allegations of fraudulent concealment to equitably toll the statute of limitations. [18]

### i. Affirmative Acts of Concealment

Defendants argue that (1) Plaintiffs fail to sufficiently allege affirmative acts of concealment and (2) their allegations that the MgO conspiracy is self-concealing cannot satisfy the first element of fraudulent concealment. [19] Plaintiffs contend that they have alleged (1) a self-concealing conspiracy that satisfies the first element of fraudulent concealment, or, (2) in the alternative, affirmative acts of concealment committed by Defendants.

**\*21** The Court of Appeals has yet to define what constitutes an affirmative act of concealment in antitrust cases. However, courts have generally taken two distinct views. *In re Mercedez–Benz,* 157 F.Supp.2d at 368. The first requires a plaintiff to show one or more affirmative acts to conceal an antitrust conspiracy that are wholly extrinsic to the conspiracy itself. *See, e.g.,* *Colorado v. Western Paving Constr. Co.,* 630 F.Supp. 206, 2010 (D.Colo.1986), *aff'd en banc by an equally divided court,* 841 F.2d 1025 (10th Cir.1988), *cert. denied,* 488 U.S. 870, 109 S.Ct. 179, 102 L.Ed.2d 148 (1988). The second also requires a plaintiff to show one or more affirmative acts of concealment, but those acts may be part and parcel to, or in furtherance of, the conspiracy. *Supermarket of Marlington, Inc. v. Meadow Gold Dairies, Inc.,* 71 F.3d 119, 122 (4th Cir.1995) (citing *Texas v. Allen Constr. Co.,* 851 F.2d 1526, 1532 (5th Cir.1988)). The Court finds the first view to be overly restrictive in this case. In a conspiracy involving price-fixing, "it is virtually impossible to distinguish between acts in furtherance of the conspiracy and acts designed to maintain the conspiracy's secrecy because the conspiracy's success is often contingent upon its ability to avoid detection by regulators and purchasers." *In re Aspartame Antitrust Litig.,* No. 06–1732, 2007 WL 5215231, at \*5 (E.D.Pa. Jan.18, 2007); *See also In re Mercedez–Benz,* 157 F.Supp.2d at 372 ("secrecy is [the] natural lair" of a price-fixing conspiracy).

Several courts, including those in this Circuit, have found that a plaintiff may avoid the affirmative act requirement altogether in cases where an antitrust conspiracy is "inherently self-concealing." *See, e.g., In re Aspartame,* 2007 WL 5215231, at \*5; *In re Nine West Shoes Antitrust Litig.,* 80 F.Supp.2d 181, 192 (S.D.N.Y.2000); *In re Mercedez–Benz,* 157 F.Supp.2d at 371; *Pennsylvania Milk Indus. Mgmt. Corp.,* 812 F.Supp. 500 (E.D.Pa.1992); *Bethlehem Steel Corp. v. Fischbach & Moore, Inc.,* 641 F.Supp. 271, 273–74 (E.D.Pa.1986). However, the definition of a self-concealing antitrust conspiracy, particularly one that involves price-fixing, remains nebulous. The *In re Mercedez–Benz* court held that a self-concealing antitrust conspiracy is one where "concealment is so intertwined with the conspiracy as a whole that the equitable foundations of the fraudulent concealment doctrine require the limitations period to be tolled." 157 F.Supp.2d at 371. Other courts maintain that all properly alleged price-fixing conspiracies are inherently self-concealing. *See, e.g., In re Issuer Plaintiff Initial Public Offering Antitrust Litig.,* No. 00–7804, 2004 WL 487222, at \*4 (S.D.N.Y. Mar.12, 2004); *Nine West,* 80 F.Supp.2d at 192.

The Court agrees that, under certain circumstances, an antitrust conspiracy may depend on its own concealment to the point that any act in furtherance thereof can also be said to conceal it. As the Supreme Court explained long ago, the purpose of the fraudulent-concealment doctrine is to prevent a defendant from "concealing a fraud, or ... committing a fraud in a manner that it concealed itself until such time as the party committing the fraud could plead the statute of limitations to protect it." *Bailey v. Glover,* 88 U.S. (21 Wall.) 342, 349, 22 L.Ed. 636 (1874). However, the Court cannot find that conspiracies involving price-fixing are *per se* self-concealing, as such a finding would render them wholly exempt from the applicable statute of limitations.

**\*22** Although not binding, *In re Publication Paper Antitrust Litig.,* No. 04–1631, 2005 WL 2175139 (D.Conn. Sept.7, 2005) provides a helpful framework under which to determine whether a conspiracy involving price-fixing is self-concealing for the purposes of establishing fraudulent concealment. That case found that a price-fixing conspiracy may be self-concealing, depending on the nature of the industry in which the item is price-fixed:

> In a competitive, well-regulated industry it will often be the case that a price-fixing conspiracy, if not concealed, would immediately fail because of governmental or private

In re Magnesium Oxide Antitrust Litigation, Not Reported in F.Supp.2d (2011)

2011 WL 5008090, 2012-1 Trade Cases P 77,878

legal action. In such circumstances, any announcement of a price increase will carry with it an implicit statement that the price increase is legitimate, i.e., the result of competitive forces, not collusion. Nevertheless, not every price-fixing conspiracy is self-concealing. For example, there may be industries in which the participants are aware of collusion but it is not stopped because of indifference, fear, or because the perpetrators are exempt from, or beyond the reach of, antitrust laws. In such circumstances, the defendants' announcement of a price increase will not carry with it any implied certification of legitimacy, and so, absent additional circumstances, will not be self-concealing.

*In re Publication Paper,* 2005 WL 2175139, at *4. Accordingly, "whether a particular price-fixing conspiracy or, more precisely, whether a particular announcement of a price increase necessarily conceals its true nature depends on the nature of the industry and the circumstances surrounding the announcement." *Id.* In other words, a plaintiff must show circumstances indicating that a price increase "carries with it a pretense of legitimacy" or "that it would necessarily be assumed that [it was] the result of legitimate market forces." *Id.* To do so, a plaintiff may, for example, set forth allegations showing "that price increases are not abnormal, that such increases are typically ascribed to market forces, that an openly collusive price increase would not be tolerated, and that there was nothing suspicious about the circumstances under which each of the pre-limitations period price announcements were made." *Id.*

Here, Plaintiffs fail to allege particular circumstances surrounding the MgO market indicating that the alleged conspiracy was self-concealing. Plaintiffs come close to pleading an affirmative act of concealment in alleging that "price increases for MgO were justified by references to tight supply, thinning margins, and increased energy and freight costs" (Direct CAC ¶ 51; Indirect CAC ¶ 58), however they fail to explain the particular circumstances

surrounding Defendants' price increases and pretextual justifications for those increases—information which is in Plaintiffs' control—in accordance with Rule 9(b). [20] Thus, Plaintiffs have failed to meet the first element of fraudulent concealment to toll the statute of limitations. However, the Court will grant Plaintiffs leave to amend to adequately plead either (1) circumstances surrounding the MgO market during the Class Period indicating that the alleged conspiracy is self-concealing, or (2) particular circumstances surrounding Defendants' price increases and the allegedly pretextual justifications for those price increases. *See In re Burlington Coat Factory Litig.,* 114 F.3d at 1434.

### ii. Reliance

*23 Defendants argue that Plaintiffs fail to meet the second element of fraudulent concealment because they have not alleged that that they relied on Defendants' alleged affirmative acts of concealment. Plaintiffs argue that there is no reliance requirement to establish fraudulent concealment.

While the aforementioned elements of fraudulent concealment do not specifically note a reliance requirement, the language of the second element strongly suggests one. As previously noted, the second element of fraudulent concealment requires a showing that the defendant's concealment misled or relaxed the plaintiff's potential inquiry into what otherwise would have been evidence of its cause of action. *In re Lower Lake Erie,* 998 F.2d at 1179; *see also Forbes v. Eagleson,* 228 F.3d 471, 487 (3d Cir.2000) ("[T]he plaintiff must show that he actually was mis[led] ... into thinking that he d [id] not have a cause of action" (quotation and citation omitted)). Implicit in the notion that a plaintiff's inquiry was misled or relaxed by an act of concealment is that the plaintiff relied on that act of concealment. That is, the plaintiff's inquiry would not have been misled or relaxed if it did not rely on the defendant's act of concealment. Here, Plaintiffs make no allegations that they were misled by Defendants' concealment of the alleged conspiracy and therefore have failed to meet the second element of fraudulent concealment. However, the Court will grant Plaintiffs leave to amend to adequately plead that they relied on the self-concealing nature of Defendants' conspiracy and/or pretextual justifications for Defendants' price increases. *See In re Burlington Coat Factory Litig.,* 114 F.3d at 1434.

In re Magnesium Oxide Antitrust Litigation, Not Reported in F.Supp.2d (2011)
2011 WL 5008090, 2012-1 Trade Cases P 77,878

### iii. Due Diligence

Defendants argue that Plaintiffs fail to satisfy the due diligence element of fraudulent concealment because they do not allege any due diligence performed during the Class Period, particularly that which led to the discovery of the alleged conspiracy. Plaintiffs counter that, under the fraudulent concealment doctrine, they need only plead that they would not have discovered their claim, even in the exercise of reasonable due diligence. Plaintiffs further argue that determinations of due diligence are fact-intensive and therefore not properly addressed on a motion to dismiss.

The parties cite somewhat differently worded standards to support their respective positions on what the due diligence prong requires. Defendants cite *In re Lower Lake Erie,* in which the Court of Appeals held that a plaintiff must show that he "exercised due diligence in investigating his cause of action." 998 F.2d at 1178–79. Plaintiffs, on the other hand cite *Matthews v. Kidder, Peabody & Co., Inc.,* where the Court of Appeals held that a plaintiff must show that his ignorance is not attributable to a lack of "reasonable due diligence in attempting to uncover the relevant facts." 260 F.3d 239, 256 (3d Cir.2001).

While the wording of the due diligence prong has differed slightly among Third Circuit case law, its substance has remained consistent. The due diligence prong is rooted in the notion of inquiry notice: that an injury accrues when a reasonable plaintiff under the circumstances would have discovered it. *See Matthews,* 260 F.3d at 251. As previously discussed, a federal antitrust injury accrues when an overt act is committed that injures the plaintiff, thereby triggering the four-year statute of limitations; however, one or more affirmative acts of concealment "may toll the statute of limitations [ ] if [they] mislead[ ] a plaintiff into thinking that he does not have a cause of action." *Davis v. Grusemeyer,* 996 F.2d 617, 624 (3d Cir.1993), *overruled on other grounds by Rolo v. City Investing Co. Liquidating Trust,* 155 F.3d 644 (3d Cir.1998). Thus, to establish the due diligence prong of fraudulent concealment, a plaintiff must affirmatively show that he was not on inquiry notice of the alleged antitrust conspiracy. *See id.* ("A key aspect of a plaintiff's case alleging fraudulent concealment is [ ] proof that the plaintiff was not previously on notice of the claim he now brings." (citations omitted)).

**\*24** In this Circuit, "inquiry notice [is] analyzed in two steps." [21] *Matthews,* 260 F.3d at 252. "First, the burden is on the defendant [s] to show the existence of 'storm warnings.' " *Id.* In this case, a storm warning would be information or data that would alert a reasonable MgO purchaser of ordinary intelligence to potentially culpable conduct. "Second, if the defendants establish the existence of storm warnings, the burden shifts to the plaintiffs to show that they exercised reasonable due diligence and yet were unable to discovery their injuries." *Id.* This requires Plaintiffs to show that (1) they investigated the storm warnings and (2) in their investigation, they exercised the due diligence expected of a reasonable DBM or CCM purchaser of ordinary intelligence. *See id.*

As Plaintiffs point out, this inquiry is necessarily bound up with the facts of the case because it "implicates factual questions as to when [a] plaintiff discovered or should have discovered the elements of the cause of action," *id.* at 250 (quotations and citation omitted); *see also Mercedez–Benz,* 157 F.Supp.2d at 373 ("At a minimum, this issue will involve assessing the factual circumstances surrounding the accused purchasing transactions and whether those circumstances would have put a reasonably diligent plaintiff on notice of a price-fixing conspiracy"), and, as a result, at the pleading stage, this court has been hesitant to dismiss an otherwise fraudulently concealed antitrust claim for failure to sufficiently allege due diligence. *See In re Electrical Carbon Prods.,* 333 F.Supp.2d at 317–18; *Mercedez–Benz,* 157 F.Supp.2d at 374.

Citing to *In re Publication Paper* and *Hinds County,* Defendants maintain that, at the pleading stage, the due diligence prong nonetheless requires that "Plaintiffs [ ] allege with particularity when the Named Plaintiffs or Class members became aware of the antitrust violations and what inquiries [they] made into the activities alleged in the complaint." (Sumitomo Reply Br., 18) (internal quotations omitted). In *In re Publication Paper,* the plaintiffs alleged that they were aware of certain suspicious activities two years before the end of the limitations period. *See* 2005 WL 2175139, at \*5. Accordingly, the court found that the plaintiffs were therefore required allege they steps they took to investigate those activities. *See id.* Here, however, Plaintiffs do not allege any suspicious activities or storm warnings within the limitations period.

Defendants' citation to *Hinds County* is more persuasive. In that case, the plaintiffs attempted to satisfy the due diligence prong by alleging that they "did not discover, nor could have discovered through reasonable diligence, that [d]efendants and their co-conspirators were violating the antitrust laws until shortly before this litigation was commenced, because [d]efendants and their co-conspirators were using deceptive and secret methods to avoid detection and affirmatively conceal their violations." *Hinds County,* 620 F.Supp.2d at 521–22. The court found that allegation too vague to satisfy Rule 9(b) and further explained that to deem such an allegation sufficient would "allow[ ] the allegations required to satisfy the first prong of fraudulent concealment to also satisfy the third prong." *Id.* at 521–22.

**\*25** The Court finds this logic persuasive. Here, Plaintiffs allege that, due to the secretive nature of the alleged MgO conspiracy, "neither plaintiffs nor the class members had knowledge of any of the foregoing violations, and neither plaintiffs nor the class members, until recently, could have discovered through reasonable diligence that [D]efendants and their co-conspirators had engaged in the foregoing violations." (Direct CAC ¶ 49; Indirect CAC ¶ 56 .) This allegation cannot satisfy the requirements of Rule 9(b), particularly when it fails to encompass when and how Plaintiffs ultimately discovered the alleged MgO conspiracy—information that is certainly with Plaintiffs' control. *See In re Craftmatic,* 890 F.2d at 645. Without some level of specificity regarding Plaintiffs' discovery of the alleged conspiracy, it is impossible to discern whether Plaintiffs could or should have discovered it within the limitations period. Thus, Plaintiffs have failed to meet the due diligence prong of fraudulent concealment. However, Plaintiffs will be granted leave to amend to adequately plead, in accordance with Rule 9(b), (1) when and how they discovered the alleged MgO conspiracy, and (2) that the self-concealing nature of the conspiracy and/or pretextual justifications for Defendants' price increases made it so that they were not alerted to any storm warnings that would otherwise trigger an obligation to perform due diligence. *See In re Burlington Coat Factory Litig.,* 114 F.3d at 1434.

**E. IP Plaintiffs' Claims for Violations of Various States' Consumer Protection Laws**

IP Plaintiffs assert claims under California, Florida, Hawaii, Massachusetts, Montana, Nebraska, New Hampshire, New York, South Carolina, and Vermont consumer protection and unfair competition laws. As with IP Plaintiffs' antitrust claims under state law, Defendants argue that IP Plaintiffs lack standing to assert their consumer protection claims, except that under California law, because they "do not allege purchases in any of the 10 states other than California." (Sumitomo (IP Pl.'s) Br., 5). Defendants further argue that these claims should be dismissed because IP Plaintiffs do not plead them with particularity in accordance with Federal Rule of Civil Procedure 9(b).

*i. Standing*

IP Plaintiffs' standing to sue under a state's consumer protection law is analogous to their standing under a state's antitrust law. As discussed in Point B, IP Plaintiffs' failure to tie their injuries or Defendants' unlawful conduct to a number of states was fatal to their standing to sue because the antitrust laws of those states require a showing that part of Defendants' conduct occurred or had an effect in-state. On the other hand, IP Plaintiffs have standing to sue under the antitrust laws that have no such requirement.

Similarly, many of the consumer protection and unfair competition laws asserted by IP Plaintiffs require that Defendants' unlawful conduct affect trade and commerce in the state under whose law they are suing, *see* MCA 30–14–103, 102 (Montana) ("Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are unlawful.... [T]rade or commerce [must] directly or indirectly affect[ ] the people of this state."); MGLA §93A 1, 2 (Massachusetts) (same); S.C.Code 1976 §§ 39–5–10, 20 (South Carolina) (same); Neb. Rev. St. §§ 59–1602, 1601 (Nebraska) ("Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce shall be unlawful.... Trade and commerce shall mean the sale of assets or services and any commerce directly or indirectly affecting the people of the State of Nebraska."); N.H.Rev.Stat. § 358–A:2 (New Hampshire) ("It shall be unlawful for any person to use any unfair method of competition or any unfair or deceptive act or practice in the conduct of any trade or commerce within this state."); N.Y. Gen. Bus. Law § 349 (New York) ("Deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful."); *Sherman v. Ben & Jerry's Franchising, Inc.,* 08–CV–207, 2009 WL 2462539, at *10 (D.Vt. Aug.10, 2009)* (Out of state plaintiffs alleging out of

2011 WL 5008090, 2012-1 Trade Cases P 77,878

state conduct do not have standing to sue under Vermont Consumer Fraud Protection Act), while others do not, *see* F.S.A. 501.204, 501.211 (Florida); HRS 480–2, 480–13 (Hawaii). [22]

 **\*26** IP Plaintiffs' allegations that "Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes the above states, by affecting, fixing, controlling, and/or maintaining, at artificial and noncompetitive levels, the prices at which MgO and MgO Products were sold, distributed, or obtained in those states;" "MgO price competition was restrained, suppressed, and eliminated throughout the states;" and "MgO prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the states" (Indirect CAC ¶¶ 79, 81) are conclusory and do not tie their injuries to the alleged conspiracy's effect on trade and commerce in those specific states. Therefore, IP Plaintiffs' consumer protection claims under Montana, Massachusetts, Nebraska, New Hampshire, and New York law are dismissed for lack of standing.

### *ii. Pleading Requirements*
The consumer protection laws of Florida and Hawaii —under which IP Plaintiffs currently maintain standing to sue—require that they plead the circumstances of any alleged fraudulent conduct with particularity in accordance with Rule 9(b). *See Jovine v. Abbott Laboratories, Inc.,* 11–CV–80111, 2011 WL 1376029 (S.D.Fla. Apr.12, 2011) (applying Rule 9(b) to allegations of unfair or deceptive acts or practices under the Florida Deceptive and Unfair Trade Practices Act); *Cannon v. U.S. Bank, NA,* Civ. No. 11–00079, 2011 WL 1637415, (D.Hawai'i Apr.29, 2011) (applying Rule 9(b) to allegations of fraudulent business practices under the Hawaii State Unfair and Deceptive Business Practices Act); *Athena Feminine Techs., Inc. v. Wilkes,* No. C 10–4868, 2011 WL 4079927 (N.D.Cal. Sept.13, 2011) ("[A] claim brought under the fraudulent prong of the [Unfair Competition Law] must be pled with particularity under Rule 9(b)").

IP Plaintiffs' allegations that "Defendants deliberately failed to disclose material facts to Plaintiff and the classes concerning Defendants' unlawful activities and artificially inflated prices for MgO and MgO Products," and "misrepresented to all consumers during the Class Period that Defendants' MgO prices were competitive

and fair" (Indirect CAC ¶ 80); *see also* (Indirect CAC ¶ 83) (alleging "affirmative misrepresentations and omissions concerning the price of MgO") are not set forth with any measure of particularity. *See In re Supreme Specialties, Inc. Sec. Litig.,* 438 F.3d 256, 270 (3d Cir.2006) (Under Rule 9(b), a plaintiff must allege fraud with particularity by pleading the following: "(1) a specific false representation [or omission] of material fact; (2) knowledge by the person who made it of its falsity; (3) ignorance of its falsity by the person to whom it was made; (4) the intention that it should be acted upon; and (5) that the plaintiff acted upon it to his [or her] damage." (quotations and citation omitted)). Accordingly, IP Plaintiffs' consumer protection and unfair competition claims under Florida and Hawaii law are dismissed to the extent they are premised on Defendants' fraudulent conduct. However, IP Plaintiffs are granted leave to amend their allegations to comply with the requirements of Rule 9(b). Additionally, at this time, those claims may move forward to the extent they are premised on allegations of Defendants' engaging in unfair competition, as there is no indication that Rule 9(b) applies to such allegations.

### III. CONCLUSION

 **\*27** For the foregoing reasons, Defendants' Motion to Dismiss is GRANTED to the following extent only. The Court rules as follows:

(1) IP Plaintiffs' federal and state antitrust claims are dismissed without prejudice for lack of standing. IP Plaintiffs have thirty (30) days to amend their allegations to set forth (1) the specific products purchased containing DBM or CCM and (2) the nexus between an increase in the price of those products and the alleged conspiracy to fix prices in and allocate shares of the domestic DBM and CCM markets.

(2) IP Plaintiffs' antitrust claims under Arizona, the District of Columbia, Hawaii, Illinois, Maine, Minnesota, Nebraska, Nevada, New Mexico, New York, North Carolina, North Dakota, Oregon, South Dakota, Tennessee, Utah, and West Virginia law are dismissed with prejudice for lack of standing.

(3) Plaintiffs' federal and state antitrust claims are dismissed without prejudice as time-barred under

the applicable statutes of limitations. Plaintiffs have thirty (30) days to amend their allegations of fraudulent concealment to equitably toll those statutes of limitations.

(4) IP Plaintiffs' consumer protection and unfair competition claims under Montana, Massachusetts, Nebraska, New Hampshire, and New York are dismissed with prejudice for lack of standing.

(5) IP Plaintiffs' consumer protection and unfair competition claims under Florida and Hawaii law are dismissed without prejudice to the extent they are premised on allegations of Defendants' fraudulent conduct. IP Plaintiffs have thirty (30) days to amend those allegations to comply with Federal Rule of Civil Procedure 9(b).

The Court will enter an order implementing this opinion.

### All Citations

Not Reported in F.Supp.2d, 2011 WL 5008090, 2012-1 Trade Cases P 77,878

### Footnotes

1   See Docket Nos. 10–cv–5174, 10–cv–5352, 10–cv–6095, and 10–cv–6093, and 10–cv–5943, all of which were consolidated under Docket No. 10–cv–5943.

2   To be sure, IP Plaintiffs seek only injunctive relief for Defendants' alleged violations of federal antitrust laws, as only direct purchasers may bring federal antitrust actions for damages. *Illinois Brick v. Illinois,* 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977).

3   In fact, Sumitomo, Premier, and YAS each filed separate motions to dismiss. However, each joined in the others' arguments. Therefore, for the sake of simplicity and brevity, the Court will treat them as a single motion.

4   CCM "is manufactured at lower temperatures than [DBM] and is used in products like animal feeds and fertilizers." (Direct CAC ¶ 25; Indirect CAC ¶ 31.) DBM, on the other hand, "is most often used in refractory applications." (*Id.*)

5   These prices were later restored.

6   MgO collectively refers to DBM and/or CCM. (Direct CAC ¶ 1.)

7   As discussed further below, standing to assert claims for injunctive relief under Section 16 of the Clayton Act are analyzed under a more relaxed standard. *See In re Warfarin,* 214 F.3d at 399.

8   Although that decision analyzed proximate causation in the context of a Section 4 claim for damages, the Court of Appeals has applied its analysis to Section 16 claims because proximate cause is an element of standing under both. *See In re Warfin Sodium Antitrust Litig.,* 214 F.3d 395, 400–01 (3d Cir.2000).

9   IP Plaintiffs also lack standing to assert their state antitrust claims because those claims are construed in accordance with federal antitrust principles. *See In re Digital Music Antitrust Litig.,* 592 F.Supp.2d 435, 448 n. 21 (S.D.N.Y.2008) (Arizona, California, District of Columbia, Iowa, Kansas, Maine, Michigan, Minnesota, North Carolina, South Dakota, Vermont, West Virginia, Wisconsin), *rev'd on other grounds by, Starr v. Sony BMG Music Entm't.,* 592 F.3d 314 (2d Cir.2010); *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n,* 809 F.2d 626, 635–36 (9th Cir.1987) (Hawaii); *Gutnayer v. Cendant Corp.,* 116 Fed. App'x 758, 761 (7th Cir.2004) (Illinois); *Monsanto Co. v. Swann,* No. 4:00–CV–1481, 2001 WL 34079480, at *3 (E.D.Mo. Sept.19, 2001) (Mississippi); Neb.Rev.Stat. § 59–829 (2010) (Nebraska); Nev.Rev.Stat. § 598A.050 (2011) (Nevada); *Minuteman, LLC v. Microsoft Corp. .,* 147 N.H. 634, 637, 795 A.2d 833 (N.H.2002) (New Hampshire); *Clough v. Rush,* 959 F.2d 182, 187 (10th Cir.1982) (New Mexico); *Fido's Fences v. Canine Fence Co.,* 672 F.Supp.2d 303, 313 (E.D.N.Y.2009) (New York); *Westgo Indus., Inc. v. W.J. King Co.,* Civil No. A3–75–82, 1981 WL 2064, at *6 (D.N.D. Mar.1, 1981) (North Dakota); *Oregon Laborers–Employees Health & Welfare Trust Fund v. Phili Morris, Inc.,* 185 F.3d 957, 963 n. 4 (9th Cir.1999) (Oregon); *In re Refalen Antitrust Litig.,* 221 F.R.D. 260, 278–79 (D.Mass.2004) (Tennessee); *Am. Airlines v. Christensen,* 967 F.2d 410, 414 (10th Cir.1992) (Utah).

10   At this time, IP Plaintiffs lack Article III standing to assert violations of the following state antitrust laws because they fail to allege a causal connection between their injuries and the conduct prohibited by the laws of those states, which require a showing that such conduct occurred, or whose effect was felt, in-state. *See* A.R.S. § 44–1402 (Arizona) ("A contract, combination or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce, any part of which is within this state, is unlawful"); DC ST § 28–4502 (District of Columbia) (same); HRS § 480–4 (Hawaii) (same); 10 M.R.S.A. § 1101 (Maine) (same); SDCL § 37–1–3.1 (South Dakota) (same); K.S.A. § 50–101 (Kansas) ("A trust is a combination of capital, skill, or acts, by two or more persons," among other things, "[t]o fix any standard

or figure, whereby such person's price to the public shall be, in any manner, controlled or established, any article or commodity of merchandise, produce or commerce intended for sale, use or consumption in this state"); M.C.L.A. §§ 445.771, 445.772 (Michigan) ("A contract, combination, or conspiracy between 2 or more persons in restraint of, or to monopolize, trade or commerce in a relevant market is unlawful.... Relevant market means the geographical area of actual or potential competition in a line of trade or commerce, all or any part of which is within this state"); M.S.A. § 325D.54 (Minnesota) (act applies to "(a) any contract, combination, or conspiracy when any part thereof was created, formed, or entered into in this state; and (b) any contract, combination, or conspiracy, wherever created, formed, or entered into; any establishment, maintenance, or use of monopoly power; and any attempt to establish, maintain, or use monopoly power; whenever any of the foregoing affects the trade or commerce of this state."); Neb. Rev. St. § 59–801 (Nebraska) ("Every contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce, within this state, is hereby declared to be illegal."; Nevada is hereby declared to be illegal."); N.R.S. § 598A.060 (Nevada) (same); N.M.S .A. § 1978, 57–1–1 (New Mexico) (same); W.Va.Code § 47–18–3 (West Virginia) (same); NY GBL § 340 (New York) (Every contract, agreement, arrangement or combination whereby ... [c]ompetition or the free exercise of any activity in the conduct of any business, trade or commerce or in the furnishing of any service in this state is or may be restrained ... is hereby declared to be against public policy, illegal and void."); N.C.G.S.A. § 75–1 (North Carolina) ("Every contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce in the State of North Carolina is hereby declared to be illegal."; NDCC, 51–08.1–01, 02 (North Dakota) ("A contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in a relevant market is unlawful.... Relevant market means the geographical area of actual or potential competition in a line of commerce, all or any part of which is within this state."); O.R.S. 646.705 (Oregon) ( "As used in ORS 136.617 and 646.705 to 646.805, 'trade or commerce' means trade or commerce within the state; or between the state and any state, territory, or foreign nation."); (Tennessee) T .C.A. § 47–25–101 ("All arrangements, contracts, agreements, trusts, or combinations between persons or corporations made with a view to lessen, or which tend to lessen, full and free competition in the importation or sale of articles imported into this state, or in the manufacture or sale of articles of domestic growth or of domestic raw material, and all arrangements, contracts, agreements, trusts, or combinations between persons or corporations designed, or which tend, to advance, reduce, or control the price or the cost to the producer or the consumer of any such product or article, are declared to be against public policy, unlawful, and void."). IP Plaintiffs' allegations that "[P]rices for MgO and MgO Products were raised, fixed, maintained, and stabilized at artificially high levels throughout the states," and "Defendants' illegal conduct had a substantial effect on commerce in the above states" (Indirect CAC ¶¶ 72, 73) are conclusory and fail to specifically tie their injuries to the alleged MgO conspiracy occurring or its effects in those states.

IP Plaintiffs lack statutory standing to sue under Utah's antitrust laws because they have a citizenship/residency requirement. *See* U.C.A. §§ 1953 76–10–919 ("A person who is a citizen of this state or a resident of this state and who is injured or is threatened with injury in his business or property by a violation of the Utah Antitrust Act may bring an action for injunctive relief and damages, regardless of whether the person dealt directly or indirectly with the defendant."), and under Illinois's antitrust laws because they do not allow a private right of action. *See* 740 ILCS 10/7 ("This State, counties, municipalities, townships and any political subdivision organized under the authority of this State, and the United States, are considered a person having standing to bring an action under this subsection.").

However, IP Plaintiffs apparently have standing to sue under Mississippi, New Hampshire, Vermont, and Wisconsin antitrust laws, as they provide a private right of action and have no discernible requirement of in-state conduct or effect, or residency. *See* Miss.Code Ann. §§ 75–21–1, 9 (Mississippi); N.H. Rev. Stat § 356:1 (New Hampshire); 9 V.S.A. §§ 2453, 2465 (Vermont); W.S.A. §§ 133.03, 133.18 (Wisconsin).

11   Moreover, the CACs specifically note at the outset that the term MgO can refer to DBM or CCM. *See* (Direct CAC ¶ 1; Indirect CAC ¶ 1 n. 1).

12   This also disposes of Sumitomo's contention that the Court should consider "certain relevant facts" noted in *Animal Science Prods., Inc. v. China Nat'l Metals & Minerals,* 596 F.Supp.2d 842 (D.N.J.2008) regarding the domestic DBM and CCM markets. (Sumitomo (DP Pl.'s) Br., 4.)

13   This is to be distinguished from the requirement to plead plus factors to rule out independent action "when a plaintiffs' claims of conspiracy rest on parallel conduct," *In re Ins. Brokerage,* 618 F.3d at 323, which is discussed below regarding the alleged CCM Agreement. Plaintiffs need not assert plus factors to establish the plausibility of the DBM Agreement because they set forth direct allegations of that agreement. *See In re Ins. Brokerage,* 618 F.3d at 323 ("Allegations of direct evidence of an agreement, if sufficiently detailed, are independently adequate.").

14   Moreover, there is nothing "inherently implausible" about Sumitomo's attempt to assuage the Vannorsdels' concern about Premier's potential retaliation by stating that it speaks with Premier on a daily basis to set DBM prices and allocate shares

2011 WL 5008090, 2012-1 Trade Cases P 77,878

of the DBM market. It is certainly plausible that Sumitomo was aware of the risk of retaliation by Premier but believed it could "enter the [CCM] market discreetly" (Direct CAC ¶ 39; Indirect CAC ¶ 48) because Premier's attention was focused on maintaining their agreement in the DBM market.

15  In any event, Plaintiffs allege Sumitomo's motive for entering the CCM market (filling excess barge capacity), and certain steps taken to enter that market (meeting with the Vannorsdels in Tulsa).

16  Citing to *Toledo Mack Sales & Serv. v. Mack Trucks, Inc.,* 530, F.3d 204 (3d Cir.2008), YAS further argues that Plaintiffs' failure to establish that YAS occupies the same level as Sumitomo and Premier on the MgO supply chain "precludes *per se* treatment of YAS' alleged antitrust violations." (YAS Br., 4 n. 5.) This argument misses the mark. While *Toledo Mack* noted that, "[i]n contrast to horizontal price-fixing agreements between entities at the same level of a product's distribution chain, the legality of a vertical agreement that imposes a restriction on the dealer's ability to sell the manufacturer's product is governed by the rule of reason," and that "[t]he rule of reason analysis applies even when ... the plaintiff alleges that the purpose of the vertical agreement between a manufacturer and its dealers is to support illegal horizontal agreements between multiple dealers," 530 F.3d at 225 (citation omitted), Plaintiffs do not allege YAS' arrangement with Sumitomo to source Chinese magnesite and MgO constitutes an unlawful vertical agreement to support a horizontal conspiracy between Sumitomo and Premier. Rather, Plaintiffs allege that YAS participated directly with Sumitomo and Premier in the alleged horizontal conspiracy to fix prices and allocate shares of the DBM market and allocate the CCM market to Premier. Moreover, "[t]he law is settled that where an upstream supplier participates in a conspiracy involving horizontal competitors, it is proper to analyze the entire restraint as one of horizontal price-fixing." *In re Mercedez–Benz, 157 F.Supp.2d at 362.*

17  Citing to *Howard Hess Dental Laboratories Inc. v. Dentsply Intern., Inc.,* 424 F.3d 363 (3d Cir.2005), YAS also argues that Plaintiffs' failure to allege that it sold DBM or CCM requires its dismissal from this case as a matter of law. While that case notes the well-settled proposition that only direct purchasers may recover damages in federal antitrust suits, it by no means indicates that only a seller of the product in question may be found liable in a Section 1 conspiracy. As previously discussed, YAS need not have participated in a particular act in furtherance of the conspiracy to be held liable.

18  IP Plaintiffs' state antitrust law claims similarly require dismissal for failure to establish fraudulent concealment, as their applicable statutes of limitations range from three to six years. *See* Ariz.Rev.Stat. Ann. § 44–1410(A) (Arizona) (2011) (four years); Cal. Bus. & Prof.Code § 16750.1 (2011) (California) (four years); D.C.Code § 28–4511(b) (2011) (four years); Haw.Rev.Stat. § 480–24(a) (2010) (Hawaii) (four years); Ill. Comp. Stat. ch. 740, § 10/7(2) (2010) (four years); Iowa Code § 553.16 (2011) (Iowa) (four years); *Four B Corp. v. Daicel Chem. Indus., Ltd.,* 253 F.Supp.2d 1147, 1156 (D.Kan.2003) (Kansas) (three years) (citing Kan. Stat. Ann. § 60–512(2) (2010)); *McKinnon v. Honeywell Int'l, Inc.,* 977 A.2d 420, 424 (Me.2009) (Maine) (six years) (citing Me.Rev.Stat. Ann. tit. 14 § 752 (2008)); Mich. Comp. Laws § 445.781 (2010) (Michigan) (four years); *Am. Computer Trust Leasing v. Jack Farrell Implement Co.,* 763 F.Supp. 1473, 1491 n. 21 (D.Minn.1991) (Minnesota) (four years) (citing Minn.Stat. § 325D.64 (subdiv .1) (2010)); Miss.Code Ann. § 15–1–49(1) (2010) (three years); Neb.Rev.Stat. § 25–206 (2010) (Nebraska) (four years); Nev.Rev.Stat. § 598A.220(2)(a) (2010) (four years); N.H.Rev.Stat. § 356:12(II) (1973) (New Hampshire) (four years); N.M. Stat. § 57–1–12(B) (1978) (New Mexico) (four years); N.Y. Gen. Bus. Law § 340(5) (2004) (New York) (four years); N.C. Gen.Stat. § 75–16.2 (2010) (North Carolina) (four years); N.D. Century Code § 51–08.1–10(2) (1987) (four years); Or.Rev. Stat. § 646.800(2) (1975) (Oregone) (four years); S.D. Codified Laws § 37–1–14.4 (1975) (South Dakota) (four years); *State ex rel. Leech v. Levi Strauss & Co.,* No. 79–722–III, 1980 WL 4696, at *3 (Tenn.Ch. Sept.25, 1980) (Tennessee) (three years) (citing Tenn. Stat. § 28–3–105(3) (2011)); Utah Code § 76–10–925(2) (1979) (Utah) (four years); Vt. Stat. Ann. tit. 12, § 511 (2010) (Vermont) (six years); W. Va.Code § 47–18–11 (1978) (West Virginia) (four years); Wis. Stat. § 133.18(2) (2011) (Wisconsin) (six years). However, to the extent that IP Plaintiffs sufficiently amend their allegations to establish fraudulent concealment of their federal antitrust claims, they will also have established fraudulent concealment of their state law antitrust claims. *See* Note 9.

19  Defendants further argue that Sumitomo's alleged admission to the Vannorsdels of the DBM Agreement cuts against their fraudulent concealment allegations. This is unpersuasive because the admission in no way put Plaintiffs on notice of their claims during the limitations period. *See Emerson Elec. Co. v. Le Carbon Lorraine, SA,* 500 F.Supp.2d 437, 448 (D.N.J.2007) ("Where fraudulent concealment of a federal antitrust claim has been shown, the four-year federal statute of limitations begins anew from the time the plaintiff knew or should have known of the existence of the federal claim." (quotations and citations omitted)).

20  Nor can Plaintiffs' conclusory allegation that "defendants met secretly and among themselves for the express purpose of fixing prices and allocating markets of domestically sold MgO" (Direct CAC ¶ 50; Indirect CAC ¶ 57) satisfy the affirmative act requirement.

In re Magnesium Oxide Antitrust Litigation, Not Reported in F.Supp.2d (2011)

2011 WL 5008090, 2012-1 Trade Cases P 77,878

21    While the following inquiry notice analysis is laid out in the context of a RICO case, it has also been applied in antitrust cases involving price-fixing. *See In re Aspartame Antitrust Litig.,* 416 Fed. App'x. 208, 211–12 (3d Cir.2011); *In re Electrical Carbon Prods. Antitrust Litig.,* 333 F.Supp.2d 303, 317 (D.N.J.2004).

22    Thus, contrary to Defendants' contention, the fact that IP Plaintiffs fail to allege that they reside or purchased an MgO product in a given state does not automatically deprive them of standing to sue under the state's consumer protection or unfair competition law. To be sure, the case Defendants cite in support of this contention held that the named plaintiffs in that case lacked standing to assert consumer protection and unfair competition claims under the laws of states in which they neither resided nor suffered an injury. *See In re Potash* 667 F.Supp.2d at 924. However, the Court cannot accept this holding as a bright line rule. Standing issues are intimately bound up with the elements of the particular claim asserted, as a plaintiff must establish that his injury is "fairly traceable to the challenged action of the defendant." *Lujan,* 504 U.S. at 560; *see also Blum,* 457 U.S. at 999 ("The complaining party must also show that he is within the class of persons who will be concretely affected."); *Allen,* 468 U.S. at 752 ("[T]he standing inquiry requires careful judicial examination of a complaint's allegations to ascertain whether the particular plaintiff is entitled to an adjudication of the particular claims asserted.").

---

**End of Document**                                              © 2019 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT K

Case 2:19-cv-07532-ES-MAH Document 18-5 Filed 05/22/19 Page 212 of 300 PageID: 520
In re Aggrenox Antitrust Litigation, Not Reported in Fed. Supp. (2016)

2016 WL 4204478

KeyCite Yellow Flag - Negative Treatment
Disagreed With by In re Lipitor Antitrust Litigation, D.N.J., August 21, 2018

2016 WL 4204478
Only the Westlaw citation is currently available.
United States District Court, D. Connecticut.

IN RE AGGRENOX ANTITRUST LITIGATION.
This Document Relates to:
Indirect-Purchaser Actions.

No. 3:14-md-2516 (SRU)
|
Signed 08/09/2016

MEMORANDUM OF DECISION AND ORDER

Stefan R. Underhill, United States District Judge

*1 On March 23, 2015, I issued a decision on several motions to dismiss in this complex multidistrict litigation ("MDL"). See In re Aggrenox Antitrust Litig., 94 F. Supp. 3d 224 (D. Conn. 2015) (doc. # 229) (hereinafter "March 23 Order"). I later expanded upon and clarified some aspects of that decision in an order granting a motion to certify it for interlocutory appeal under 28 U.S.C. § 1292(b). See In re Aggrenox Antitrust Litig., 2015 WL 4459607 (D. Conn. July 21, 2015) (doc. # 311) (hereinafter "July 21 Order").[1] The March 23 Order included many subsidiary rulings so its holding was somewhat complicated, see 94 F. Supp. 3d at 257–58, but the relevant portion for present purposes is that the motions to dismiss indirect-purchaser actions were granted in part and denied in part.

At that time, the indirect-purchaser actions included two complaints: the putative-class complaint of indirect-purchaser plaintiffs ("IPPs," though they style themselves end-payor plaintiffs or EPPs), and a complaint filed by Humana, a large indirect purchaser and opt-out from the putative class. Humana and the IPPs filed amended complaints, though they only actually amended certain portions while leaving others unmodified, re-pleading them merely "to preserve appellate rights." The defendants filed motions to dismiss the amended complaints (doc. ## 290, 291), and I heard oral argument on them, but I took the motions under advisement in

part because new actions were being added to the MDL that appeared likely to raise common issues that could efficiently be taken up together.

There are now seven operative complaints in this case, which were filed respectively by: (1) direct-purchaser putative-class plaintiffs ("DPPs") (doc. # 105/109); (2) IPPs (doc. # 263); (3) Humana (doc. # 239); (4) Walgreen plaintiffs[2] (doc. # 340); (5) Rite Aid plaintiffs[3] (doc. # 341) (the Walgreens and Rite Aid plaintiffs are generally referred to collectively as the "retailer plaintiffs"); (6) Louisiana Health Service Indemnity Co., d/b/a BlueCross/BlueShield of Louisiana ("Louisiana Health," though they style themselves "BCBSLA"); and (7) CVS Pharmacy, Inc.[4]

After oral argument on a motion to dismiss the retailer plaintiffs' complaints, which pertained principally to the assignment of rights from (direct-purchaser) wholesalers to (indirect-purchaser) retailers, I denied the motion from the bench (doc. # 338).[5] I later held oral argument on a motion to dismiss Louisiana Health's complaint and took the motion under advisement. The motions to dismiss that remain pending are therefore the motion to dismiss the IPPs' amended complaint (doc. # 290), the motion to dismiss Humana's amended complaint (doc. # 291), and the motion to dismiss Louisiana Health's complaint (doc. # 374). Those motions involve many of the same or related issues, and each of them is granted in part and denied in part, as follows.

I. Standard of Review

*2 The Rule 12(b)(6) motions to dismiss for failure to state a claim are of course reviewed by the same familiar standard that I applied and described at greater length in the March 23 Order. I accept the material facts alleged in the complaints as true, draw all reasonable inferences in favor of the plaintiffs, and decide on a claim-by-claim basis whether it is plausible that the plaintiffs have a valid claim for relief. Ashcroft v. Iqbal, 556 U.S. 662, 678–79 (2009); Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555–56 (2007); Leeds v. Meltz, 85 F.3d 51, 53 (2d Cir. 1996). To survive a motion to dismiss, claims must be supported by factual allegations that are "enough to raise a right to relief above the speculative level" and with "enough facts to state a claim to relief that is plausible on its face." Twombly, 550 U.S. at 555, 570; see also Iqbal, 556 U.S. at 679 ("While legal conclusions can provide the

framework of a complaint, they must be supported by factual allegations."). The plausibility standard set forth in *Twombly* and *Iqbal* obligates the plaintiff to "provide the grounds of his entitlement to relief" through more than "labels and conclusions, and a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555 (quotation marks omitted).

## II. Reasserted Dismissed Claims

The IPPs and Humana included without substantive revision in their amended complaints some claims[6] that I dismissed in the March 23 Order. They have reasserted them for the asserted purpose of preserving their rights on appeal and do not challenge the defendants' renewed motions to dismiss them, except by incorporating by reference their arguments opposing the first motions to dismiss. I do not believe repleading claims was necessary to preserve appellate rights and reassert my dismissal of those claims, granting the defendants' motions to dismiss them to the same extent and for the same reasons as described in the March 23 Order.

## III. Injunctive Relief

The IPPs, Humana, and Louisiana Health all plead claims for injunctive relief, and the defendants move to dismiss them on the same basis that they moved to dismiss similar claims pleaded by the retailer plaintiffs. The defendants argue that the claims for injunctive relief are moot, because there is nothing left to enjoin: the challenged agreements were made in 2008, and even if they did unlawfully delay the entry of Aggrenox generics to the market, those generics have now in fact entered (and have been on the market since July 2015). The plaintiffs therefore can seek damages for alleged overcharges already incurred, but they cannot plead ongoing harm or a credible threat of future harm and thus cannot need (or even stand to benefit from) an injunction. The plaintiffs argue somewhat vaguely about the ongoing threat that the generics could be removed from the market (though they plead no plausible factual basis to justify that concern) and assert that even if the generics are not removed, the injunctive claims are not moot because I have the authority (and ought to exercise it) to enjoin bad actors from committing other similar bad acts in the future.

Now that generic entry has occurred, the plaintiffs' arguments for an injunction are thin, and the defendants

have a strong argument to dismiss those claims.[7] In some other circumstances that argument might be still more persuasive. But as I observed from the bench when I denied the motion to dismiss the retailer plaintiffs' complaints, as a practical matter, the stakes of this argument in this case are exceedingly low. This case is not about injunctive relief, which is at best a peripheral issue, and the case will proceed with those claims or without them. If they turn out *not* to be moot (however miniscule the risk), it will be significant to have wrongly dismissed them. But if they are indeed moot, as the defendants plausibly argue, then they will fall by the wayside and will not be pursued at trial, and their ongoing inclusion at this stage will not prejudice any party in any way. I therefore deny the motions to dismiss claims of injunctive relief.

## IV. Louisiana Health

**\*3** As an initial matter, I reassert the reasoning and the holdings of the March 23 Order and the July 21 Order, as applied to Louisiana Health's claims and the motion to dismiss them. To the extent that the defendants renew arguments that I rejected in those orders, I reject them again. Notably, I adhere to my ruling on the significance of *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263 (2d Cir. 1979), which is discussed at length in the March 23 Order, 94 F. Supp. 3d at 237–39, and in the July 21 Order. In short, "a purchaser suing a monopolist for overcharges in injured anew by each overcharge," *id.* at 238, and "[c]laims are therefore not time-barred that stem from alleged overcharges incurred within the relevant statutory period, whatever that period may be for a particular statute, measured backward from the filing of the claims." *Id.* at 248.[8]

I similarly adhere to other rulings from the earlier orders, and make new rulings relating to Louisiana Health's claims, as follows.

### A. Consumer Protection and Unjust Enrichment Claims

Louisiana Health has pleaded—quite like the other indirect purchasers pleaded—essentially undifferentiated claims under the separate consumer-protection laws of fifteen states in its Count Eight. It also pleads generic unjust enrichment as its Count Nine, without even listing the jurisdictions whose law(s) it invokes. It treats all of those laws—which may or may not be materially different

2016 WL 4204478

from each other, and which may or may not protect against the particular harms that antitrust law addresses —as simple surrogates for antitrust law, with very little elaboration. I held in the March 23 Order that:

> The indirect purchasers and Humana have *listed* claims under very many state laws, but they have not truly *pleaded* claims under those laws sufficient to show their entitlement to recovery under them, as required by Rule 8. *See Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937 ("A pleading that offers labels and conclusions or formulaic recitation of the elements of a cause of action will not do."). Rather, they have pleaded federal antitrust claims and the factual foundation for them, viable under [*FTC v.] Actavis*, [133 S. Ct. 2223 (2013),] and they merely allege that those claims are also actionable under general consumer-protection laws and as unjust enrichment.

94 F. Supp. 3d at 255. Louisiana Health's complaint is no better on this score than the other complaints, and I therefore adhere to that ruling. The motion to dismiss is similarly "granted with respect to all such claims, without prejudice to repleading in nonconclusory fashion." *Id.* at 256.

### B. Rhode Island

A basic and complicating feature of all indirect-purchaser antitrust actions is the rule of *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977). In that case, as I wrote in the March 23 Order, "the Supreme Court held that only the overcharged direct purchaser, and no one else in the chain of distribution, can recover damages under federal antitrust law." 94 F. Supp. 3d at 248. The Court gave indirect purchasers an opening, however, in *California v. ARC America Corp.*, 490 U.S. 93 (1989), where it held that *Illinois Brick* "does not prevent indirect purchasers from recovering damages under state antitrust laws where the state laws otherwise allow it (and many states have passed so-called '*Illinois Brick* repealers' in order to do so)." 94 F. Supp. 3d at 248. A recurring issue in this case, therefore, is whether the *Illinois Brick* rule applies to the antitrust law of particular states.

**\*4** I noted in the March 23 Order that "Rhode Island was an *Illinois Brick* state until its legislature enacted a repealer on July 15, 2013." *Id.* at 252. The parties disputed whether that repealer should be applied retroactively,

and I concluded that it should not. I adhere to that ruling with respect to Louisiana Health, and hold that its "claims under the Rhode Island antitrust statute alleging overcharges before July 15, 2013 are dismissed," *id.* at 253, but that the motion to dismiss Rhode Island antitrust claims is denied with respect to alleged overcharges incurred from that date forward.

### C. Louisiana Antitrust and Consumer Protection Claims

Louisiana has not passed an *Illinois Brick* repealer and there appears to be no authoritative statement from Louisiana's courts that the logic of *Illinois Brick* does not apply to the state's own antitrust law. Louisiana Health argues that the logic of requiring a repealer is flawed, because *Illinois Brick* was only concerned with federal antitrust law. Though it is true that the Supreme Court in *Illinois Brick* was interpreting federal law, I adhere to the reasoning of the March 23 Order that "[i]n the absence of a clear decision—by either the legislature or by the jurisdiction's own courts—to allow indirect-purchaser recovery, the antitrust laws of a state (or territory) are interpreted as presumptively consistent with federal law." 94 F. Supp. 3d at 252. Louisiana is of course free to depart from federal antitrust law and allow indirect-purchaser recovery under its own law, but I cannot conclude that it has done so unless and until Louisiana's legislature or courts clearly say that it has done so.

Louisiana Health filed a notice of supplemental authority (doc. # 483), alerting me to a decision from a Louisiana trial judge that appears to allow indirect-purchaser recovery under Louisiana antitrust law,[9] but it does so by means of a one-sentence decision that simply adopts the plaintiff's brief as its reasons. It also appears to conflict with the decision of another Louisiana trial judge,[10] and with the decisions of several federal courts, including the Fifth Circuit Court of Appeals. *See, e.g.*, *Free v. Abbott Laboratories, Inc.*, 176 F.3d 298, 300–01 (5th Cir. 1999); *In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, 350 F. Supp. 2d 160, 170 (D. Me. 2004); *In re Relafen Antitrust Litig.*, 225 F.R.D. 14, 27 (D. Mass. 2004); *FTC v. Mylan Labs., Inc.*, 99 F. Supp. 2d 1, 6–7 (D.D.C. 1999). I agree with Louisiana Health that none of those decisions is authoritative or binding on me, but they follow the same approach I am following and come to the same conclusion.

2016 WL 4204478

The same reasoning applies to claims under the Louisiana Unfair Trade Practices Act. Louisiana Health pleaded that claim as a separate count (Count Six) from the omnibus count of various state consumer-protection claims (Count Eight) discussed above, and it suffers the same infirmity of assuming the non-obvious proposition that a generic consumer-protection statute reaches the same conduct reached by antitrust law and can therefore act as surrogate for it. But more significantly, even if that proposition is correct and any antitrust claim can also be brought under consumer-protection law, that formality of pleading cannot avoid the rule of *Illinois Brick*. If Louisiana's law redundantly allows the same antitrust claim to be brought under multiple laws, the *Illinois Brick* rule will nevertheless apply until an authoritative statement of Louisiana's legislature or courts says otherwise. Indirect-purchaser claims under Louisiana antitrust and consumer-protection law are therefore dismissed.

### D. Kansas

**\*5** The defendants point out that Kansas antitrust law prohibits only combinations and conspiracies to monopolize and not monopolistic behavior by single parties, and they therefore move to dismiss Louisiana Health's claim under Kansas law to the extent it is a simple monopolization claim rather than a conspiracy-to-monopolize claim. It is obvious that the salient allegations in this case (and in any reverse-payment case) are allegations of an unlawful agreement between at least two parties. Kansas antitrust law would appear to reach such conduct (to the extent that any antitrust law reaches it), and the motion to dismiss a claim under that law is therefore denied.

### V. Various State Claims

#### A. Illinois Antitrust and Consumer Protection Claims

The defendants move to dismiss the IPPs' and Louisiana Health's claims under the Illinois Consumer Fraud Act on the dual grounds that statute does not reach antitrust conduct and that the plaintiffs have not sufficiently pleaded a consumer nexus. The defendants also move to dismiss the IPPs' claims under the Illinois Antitrust Act, on the basis that statute does not permit indirect-purchaser class actions unless they are brought by the Illinois Attorney General.

#### 1. *Illinois Antitrust Act and* Shady Grove

The Illinois Antitrust Act provides that "no person shall be authorized to maintain a class action in any court of this State for indirect purchasers asserting claims under this Act, with the sole exception of the State's Attorney General." 740 Ill. Comp. Stat. 10/7(2). It is not obvious that the formulaic expression "in any court of this State" appearing in an Illinois statute applies to a federal court in Connecticut, but if it does, the statute potentially raises a *Shady Grove* problem. In the March 23 Order, I briefly discussed *Shady Grove Orthopedic Associates v. Allstate Ins. Co.*, 559 U.S. 393 (2010), as follows:

> [T]he Supreme Court held that Rule 23 applied in federal court to claims brought under New York law despite New York's general class action bar. It is difficult to isolate a holding in *Shady Grove* that is much broader than that, because the holding was announced by Justice Scalia in an opinion that garnered a majority only in part and a plurality in part. The fifth vote for the judgment was provided by Justice Stevens, who wrote a separate concurrence. When no single rationale garners a majority, the holding of the Court is "that position taken by those Members who concurred in the judgments on the narrowest grounds." *Marks v. United States*, 430 U.S. 188, 193 (1977). The indirect purchasers argue for an expansive application of Justice Scalia's opinion, which would broadly eliminate state class-action restrictions in federal court. The defendants argue that the holding is narrowed by the scope of Justice [Stevens's] concurrence, which would allow state procedural rules to control in federal court when they are "part of a State's framework of substantive rights or remedies." *Shady Grove*, 559 U.S. at 419 (Stevens, J., concurring).

94 F. Supp. 3d at 253–54. I declined to "wade any deeper into the difficult problem of what part of the reasoning in *Shady Grove* is or is not controlling," *id.* at 254, because I was not able to conclude on the basis of the arguments that were before me that the answer would have made a difference for the particular state law then in question. The same issue arises now in the context of Illinois law, and the parties make the same arguments as before.

Case 2:19-cv-07532-ES-MAH   Document 18-5   Filed 05/22/19   Page 216 of 300 PageID: 524
In re Aggrenox Antitrust Litigation, Not Reported in Fed. Supp. (2016)

2016 WL 4204478

The Second Circuit has not taken up the problem of the effect of *Shady Grove*'s split opinions, but the defendants point out that most of the lower courts that have done so—including in this district—have concluded that the Stevens concurrence controls. *See, e.g., In re Triclegiant Corp., Inc.*, 11 F. Supp. 3d 82, 115–18 (D. Conn. 2014) (collecting cases and concluding that the Stevens concurrence controls). *But see 3M Co. v. Boulter*, 842 F. Supp. 2d 85, 95 n.7 (D.D.C. 2012) (rejecting the argument that the Stevens concurrence controls). I have some doubt, however, that those courts are correct. The *Marks* doctrine—that is, the doctrine that in a split decision the controlling rationale is that taken by the Justices who concur in the judgment on the narrowest grounds—works "only when one opinion is a logical subset of other, broader opinions. In essence, the narrowest opinion must represent a common denominator of the Court's reasoning; it must embody a position implicitly approved by at least five Justices who support the judgment." *King v. Palmer*, 950 F.2d 771, 781 (D.C. Cir. 1991). The Stevens concurrence is "narrower" than the position of the other Justices who made up the *Shady Grove* majority only in the sense that it would reject state procedural rules in fewer cases. It is not logically narrower, however, because it is not a logical subset of the opinion of the other Justices in the majority. Those Justices do not implicitly approve of its rationale for sometimes allowing state procedural rules to control—on the contrary, they explicitly reject that rationale—and it therefore does not represent the common denominator of the Court's reasoning.

 **\*6**  The courts that have taken the Stevens concurrence to be controlling have generally not addressed that problem. At least one court took the Stevens approach to form the "narrowest grounds" not because it represents the common denominator of the judgment but because it "was consistent with [the] approach of the four members of the dissent." *In re Wellbutrin XL Antitrust Litig.*, 756 F. Supp. 2d 670, 675 (E.D. Pa. 2010). In other words, even though Stevens joined the majority to hold that Rule 23 trumps New York's class-action bar, he agreed with the dissent that *some* state procedural rules—when sufficiently intertwined with the state's substantive rights and remedies—can control in federal court. The *Wellbutrin* Court infers from that agreement that there were five votes for Stevens's approach. The problem is that no other Justice joined his concurrence, and even if we nevertheless infer agreement, the common denominator of a concurrence and a dissent does not support the

judgment. It is, in effect, *Marks*-doctrine dicta rather than *Marks*-doctrine holding.

It does not follow, of course, that the stricter view represented by the Scalia plurality controls: the portions of Scalia's opinion with which Stevens did not agree did not garner a majority. So it may be that in a case where a state procedural rule is part of the state's framework of substantive rights, there simply is no controlling Supreme Court holding, and that *Marks*-doctrine dicta is the most persuasive guide.

The defendants argue that the indirect-purchaser class-action bar in the Illinois Antitrust Act is just such a procedural rule. A few courts, including the *Wellbutrin* Court, agree—because the bar is part of and applies only to the antitrust law rather than being a separate and generally applicable procedural provision, and because, in the view of those courts, it "appear[s] to reflect a policy judgment about managing the danger of duplicative recoveries." 756 F. Supp. 2d at 677. Those points are well taken, but I respectfully disagree that they are sufficient to alter the scope of a substantive right or remedy, because any indirect purchaser procedurally blocked from participation in a class action would still have the same remedy in an individual action. It may be true that many indirect purchasers will decide not to bother, and that fact could have a profound effect on the defendants' total liability. But that was also true in *Shady Grove*, which "transform[ed] a $500 case into a $5,000,000 award." 559 U.S. 393, 436 (2010) (Ginsburg, J., dissenting).

In sum, I cannot square *Shady Grove's* allowance of a Rule 23 class action despite New York's class-action bar with the *dis* allowance of a Rule 23 class action in the case of Illinois's class-action bar simply on the basis that Illinois's bar is narrower. It is narrower because its application is limited to indirect-purchaser antitrust claims, and that does tie it more specifically to particular substantive rights; but if New York's state-law bar is not a procedural rule that alters the scope of a substantive right or remedy, then the narrower scope of Illinois's state-law bar does not make it one that does. I therefore deny the motion to dismiss claims under the Illinois Antitrust Act. This issue will no doubt surface again later in this litigation. Perhaps by then we will have clearer guidance about the applicability of *Shady Grove*.

Case 2:19-cv-07532-ES-MAH   Document 18-5   Filed 05/22/19   Page 217 of 300 PageID: 525

In re Aggrenox Antitrust Litigation, Not Reported in Fed. Supp. (2016)

2016 WL 4204478

### 2. *Illinois Consumer Protection Claims*

The IPPs and Louisiana Health plead claims under the Illinois Consumer Fraud and Deceptive Business Practices Act, which provides that "[u]nfair methods of competition and unfair or deceptive acts or practices ... in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby." 815 Ill. Comp. Stat. § 505/12. The defendants argue that because indirect purchasers are not consumers—whom that statute protects from fraud and deception—they must plead a sufficient "consumer nexus" in order for their claims under the statute to survive. That may be so, but even if the IPPs and Louisiana Health were able to plead such a nexus, I agree with the *Wellbutrin* Court (which held in an earlier opinion than the one already cited above) that "plaintiffs may not assert what are essentially antitrust claims in the guise of a claim under the Illinois consumer protection statute." *In re Wellbutrin XL Antitrust Litig.*, 260 F.R.D. 143, 162 (E.D. Pa. 2009).

**\*7** The allegations in this case are antitrust allegations, plainly and clearly, and the "allegations of consumer fraud overlap entirely with the allegations of anticompetitive conduct." *Id.* The Supreme Court of Illinois has reasoned that "[t]here is no indication that the legislature intended that the Consumer Fraud Act be an additional antitrust enforcement mechanism. The language of the Act shows that its reach was to be limited to conduct that defrauds or deceives consumers or others. The title of the Act is consistent with its content." *Laughlin v. Evanston Hosp.*, 133 Ill. 2d 374, 390 (1990).

At least one court has distinguished *Laughlin* as preventing the use of the consumer-protection statute to reach antitrust conduct only when the antitrust law provides no remedy (that is, it prevents the use of the consumer-protection law as an end-run around limitations on the antitrust law). *See Siegel v. Shell Oil Co.*, 480 F. Supp. 2d 1034, 1046–48 (N.D. Ill. 2007). That is consistent with the holding in *Laughlin*, but the *Laughlin* Court nevertheless used the broader language doubting whether the consumer-protection statutes were "an additional antitrust enforcement mechanism" at all, not merely in some class of antitrust cases. 133 Ill. 2d at 390. If the antitrust claims in this case were not cognizable under Illinois's antitrust law, then using the

state's consumer-protection law in the absence of non-antitrust allegations would be an end-run around the antitrust law and would squarely violate the rule of *Laughlin*. If the antitrust claims in this case *are* cognizable under Illinois's antitrust law, then pleading claims under the state's consumer-protection law as well is duplicative and merely muddies the water, violating at least the broad dicta of *Laughlin* if not squarely violating its holding.

The plaintiffs' argument for using the consumer-protection law as a surrogate for antitrust law is essentially that the language of the consumer-protection law is so vague and so broad that it reaches any "unfair" business practice, which manifestly includes antitrust violations. By that reasoning, all antitrust claims can be brought under the consumer-protection law, and the antitrust statute is redundant. A state's highest court may authoritatively interpret its laws that way, but *Laughlin* suggests that Illinois's highest court does not. I accordingly grant the motions to dismiss claims under the Illinois Consumer Fraud and Deceptive Business Practices Act.

### B. California Unfair Competition Claims

The defendants move to dismiss the IPPs claims under the California Unfair Competition Law, which creates a cause of action for persons who have "has lost money or property as a result of ... unfair competition," Cal. Bus. & Prof. Code § 17204, which is defined as "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited" by the false advertising law. *Id.* § 17200.

The defendants argue that the statute requires deception and reliance, citing cases about deceptive practices and false advertising. The IPPs argue again that the statute is extremely broad and phrased in the disjunctive, and that the conduct alleged (and presumably any conceivable antitrust violation) constitutes "unfair" business practices. The problem here is the same as the problem with the Illinois claims above. This is an antitrust case, and California has antitrust law. The IPPs offer no authority for the proposition that other provisions of California law besides its antitrust law can act as surrogates for antitrust law. The motion to dismiss the IPPs claims under the California Unfair Competition Law is therefore granted.

Case 2:19-cv-07532-ES-MAH   Document 18-5   Filed 05/22/19   Page 218 of 300 PageID: 526
In re Aggrenox Antitrust Litigation, Not Reported in Fed. Supp. (2016)

2016 WL 4204478

## C. Florida Deceptive and Unfair Trade Practices Claims

**\*8** The IPPs, Humana, and Louisiana Health all plead claims under the Florida Deceptive and Unfair Trade Practices Act. That statute prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.204. The statute does not define the proscribed methods, acts, or practices, and it is not obvious that they would reach any alleged antitrust conduct. Antitrust claims brought under that statute might therefore seem to suffer from the same infirmity discussed in the context of Illinois and California law above. The plaintiffs do, however, point to the authority of at least one Florida appellate court that has held that those proscribed acts include antitrust violations, and therefore that the statute can be used as a surrogate for antitrust law. See Mack v. Bristol-Myers Squibb Co., 673 So. 2d 100, 110 (Fla. Dist. Ct. App. 1996). I recognize the authority of Florida's appellate courts to so interpret Florida's law, and I accordingly deny the motions to dismiss claims under the Florida Deceptive and Unfair Trade Practices Act.

## D. Massachusetts Consumer Protection Claims

The IPPs, Humana, and Louisiana Health plead claims under sections nine and eleven of the Massachusetts Consumer Protection Act. Those sections, however, are mutually exclusive. Section eleven provides standing to any person "who engages in the conduct of any trade or commerce," Mass. Gen. Laws. ch. 93A, § 11, while section nine provides standing to any person "other than a person entitled to bring action under section eleven." Mass. Gen. Laws. ch. 93A, § 9. The precise meaning of "the conduct of any trade or commerce" may be slippery, but those provisions are naturally construed to make section nine exclusively applicable to consumers and section eleven exclusively applicable to business entities. See, e.g., Cont'l Ins. Co. v. Bahman, 216 F.3d 150, 156 (1st Cir. 2000) ("Withal, section 11 affords no relief to consumers and, conversely, section 9 affords no relief to persons engaged in trade or commerce."). Where there is ambiguity, the choice between consumer and business claims under the statute "appears to turn on whether a given party has undertaken the transaction in question for business reasons, or has engaged in it for purely personal reasons (such as the purchase of an item for personal

use)." Frullo v. Landenberger, 814 N.E.2d 1105, 1112 (Mass. App. Ct. 2004).

The difference between claims brought under sections nine and eleven is particularly consequential because of the application of the Illinois Brick rule. The Massachusetts Antitrust Act is "construed in harmony with judicial interpretations of comparable Federal antitrust statutes," and thus "the rule of law established in Illinois Brick" applies. Ciardi v. F. Hoffmann-La Roche, Ltd., 436 Mass. 53, 57–58 (2002). Section eleven of the Massachusetts Consumer Protection Act "includes a specific provision that in any action brought under that section, the court shall be guided in its interpretation of unfair methods of competition by the provisions of the Antitrust Act," id., and section nine does not. Thus, Massachusetts courts hold that Illinois Brick applies to section eleven and not to section nine.

Despite the fact that they are business entities, the IPPs, Humana, and Louisiana Health argue that they are not engaged in the conduct of any trade or commerce, and therefore can bring claims under section nine.[11] They cite In re Pharmaceutical Industry Average Wholesale Price Litigation ("In re AWP"), 491 F. Supp. 2d 20 (D. Mass. 2007), for the proposition that health plans are not engaged in trade or commerce when they are not motivated by a desire to make money but act within their "core mission." The District Court in that case reasoned that the party in question was a nonprofit acting pursuant to its legislative mandate rather than as a business— which the plaintiffs here do not allege of themselves—but even so, that outcome is somewhat counterintuitive, since nonprofits do act in commercial capacities and engage in trade and commerce. The First Circuit Court of Appeals did not take up the question, but affirmed the decision on other grounds and held that any errors in that analysis were harmless. In re Pharm. Indus. Average Wholesale Price Litig., 582 F.3d 156, 194 (1st Cir. 2009).

**\*9** Because the IPPs, Humana, and Louisiana Health are business entities rather than consumers and have not purchased Aggrenox "for purely personal reasons (such as the purchase of an item for personal use)," Frullo, 814 N.E.2d at 1112, I decline to follow In re AWP, and I follow instead In re Lidoderm Antitrust Litigation, 103 F. Supp. 3d 1155, 1163 (N.D. Cal. 2015), and United Food & Commercial Workers Local 1776 & Participating Employers Health & Welfare Fund v. Terikoku Pharm.

In re Aggrenox Antitrust Litigation, Not Reported in Fed. Supp. (2016)

2016 WL 4204478

*USA, Inc.* , 74 F. Supp. 3d 1052, 1084–85 (N.D. Cal. 2014). I hold as those courts did that the indirect purchasers are engaged in the conduct of trade or commerce and therefore cannot make claims under section nine. For the foregoing reasons, the motions to dismiss are granted with respect to all claims under the Massachusetts Consumer Protection Act.

### E. South Carolina Unfair Trade Practices Claims

The defendants move to dismiss the IPPs claim under the South Carolina Unfair Trade Practices Act. They argue that the claim should be dismissed because the statute by its own terms does not permit class actions (it allows that a plaintiff may "bring an action individually, but not in a representative capacity." S.C. Code Ann. § 39-5-140(a)), and because the indirect purchasers should not be permitted to use that statute as an end-run around *Illinois Brick* .

I am not persuaded by the first argument, because my analysis of the effect of *Shady Grove* on the class-action bar in this statute is not materially different than the parallel analysis in the discussion of Illinois law above. But I agree that *Illinois Brick* is decisive. The rule of *Illinois Brick* appears to control in South Carolina, and the IPPs have offered no authority to the contrary. Nor have they offered any authority for the argument that the South Carolina Unfair Trade Practices Act can operate as a surrogate for antitrust law, even if the *Illinois Brick* rule did not apply. The motion to dismiss is granted with respect to the claim brought under the South Carolina Unfair Trade Practices Act.

### F. Vermont Consumer Fraud Claims

The defendants move to dismiss Humana's claim under the Vermont Consumer Fraud Act on the basis that Humana is not a "consumer." Humana argues that it is a consumer under the Act, because it defines that word to include, among other things, "a person who purchases ... or otherwise agrees to pay consideration for goods or services not for resale in the ordinary course of his or her trade or business but for the use or benefit of his or her business or in connection with the operation of his or her business." Vt. Stat. Ann. tit. 9, § 2451a(a).

That definition of "consumer" allows businesses to sue as consumers with respect to the products that they *use* as consumers. The fact that Humana's members are

consumers, and that Humana co-purchases or reimburses for consumer products that its members use, does not make Humana a consumer of those products. Humana may be able to sue under the Vermont Consumer Fraud Act in connection with computers or office equipment of which Humana is a business consumer, but not in connection with drugs of which Humana's members are consumers. Moreover, Humana has not offered authority for the proposition that the Vermont Consumer Fraud Act reaches antitrust conduct. The motion to dismiss claims under that act is therefore granted.

### VI. Conclusion

The defendants' motions to dismiss the IPPs' amended complaint (doc. # 290), Humana's amended complaint (doc. # 291), and Louisiana Health's complaint (doc. # 374) are granted in part and denied in part as follows:

*10 • All claims that have been reasserted without amendment after dismissal merely to preserve appellate rights are dismissed to the same extent and for the same reasons as described in my March 23 Order;

• the motions to dismiss are denied with respect to claims for injunctive relief;

• Louisiana Health's undifferentiated claims under the consumer-protection laws of fifteen states and its generic claim of unjust enrichment are dismissed without prejudice to repleading in nonconclusory fashion within the next thirty days;

• Louisiana Health's claims under the Rhode Island antitrust statute alleging overcharges before July 15, 2013 are dismissed, but the motion to dismiss is denied with respect to alleged overcharges incurred from that date forward;

• Louisiana Health's claims under Louisiana antitrust law and the Louisiana Unfair Trade Practices Act are dismissed;

• the motion to dismiss Louisiana Health's claims under Kansas antitrust law is denied;

• the motions to dismiss claims under Illinois antitrust law are denied;

• claims under the Illinois Consumer Fraud and Deceptive Business Practices Act are dismissed;

Case 2:19-cv-07532-ES-MAH  Document 18-5  Filed 05/22/19  Page 220 of 300 PageID: 528
In re Aggrenox Antitrust Litigation, Not Reported in Fed. Supp. (2016)
2016 WL 4204478

• claims under California Unfair Competition Law are dismissed;

• the motions to dismiss are denied with respect to claims under the Florida Deceptive and Unfair Trade Practices Act;

• claims under the Massachusetts Consumer Protection Act are dismissed;

• claims under the South Carolina Unfair Trade Practices Act are dismissed; and

• claims under the Vermont Consumer Fraud Act are dismissed.

It is not necessary for any party to re-assert dismissed claims in order to preserve appellate rights. The rulings set forth in this order may be raised on appeal from a final judgment.

So ordered.

Dated at Bridgeport, Connecticut, this 9th day of August 2016.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 4204478

Footnotes

1    The Second Circuit declined to hear the interlocutory appeal (doc. # 362).

2    Walgreen Co., The Kroger Co., Safeway Inc., HEB Grocery Company L.P., Albertson's LLC.

3    Rite Aid Corporation, and Rite Aid Hdqtrs. Corp.

4    CVS might naturally be regarded as part of the "retailer plaintiffs" group, but that phrase in earlier filings does not directly refer to it because its case was not yet part of the MDL. It has, however, agreed to be bound by the pertinent earlier rulings (doc. # 465).

5    On the issue of the assignment of claims from wholesalers to retailers, I expressed my general agreement with the opinion that was issued on July 17, 2015 by United States District Judge William H. Orrick. *See United Food & Commercial Workers Local 1776 & Participating Employers Health & Welfare Fund v. Teikoku Pharma USA, Inc.*, 2015 WL 4397396 (N.D. Cal. July 17, 2015). I denied the motion to dismiss for essentially the same reasons described in that opinion.

6    The defendants list those claims reasserted by the IPPs in the defendants' memorandum in support of their motion to dismiss the amended IPP complaint (doc. #290-1 at 24); and they list those claims reasserted by Humana in the defendants' memorandum in support of their motion to dismiss Humana's amended complaint (doc. # 291-1 at 16–17).

7    I also recognize that Judge Orrick agreed with that argument and dismissed essentially similar claims for injunctive relief in *United Food & Commercial Workers*, 2015 WL 4397396, which is the opinion with which I agreed in substantial part (on the separate issue of assignment of claims) when I denied the motion to dismiss the retailer plaintiffs' complaints.

8    There is, however, a caveat that *Berkey Photo* applies *federal* antitrust law, so I apply the same reasoning to state law only "[i]n the absence of any argument that the legislatures or courts of any particular states reject the reasoning in the *Berkey Photo* analysis ... as it would apply to their particular statutes." 94 F. Supp. 3d at 248.

9    *State of Louisiana v. SmithKline Beecham Corp.*, No. 636,032, 19th Judicial District Court for the Parish of East Baton Rouge, State of Louisiana, Sec. 25 (May 17, 2016).

10   *State of Louisiana v. AstraZeneca AB, et al.*, No. 637,960, 19th Judicial District Court for the Parish of East Baton Rouge, State of Louisiana, Sec. 22 (Mar. 18, 2016).

11   Though they pleaded claims under section eleven, none of the plaintiffs appears to oppose the argument that indirect purchasers are barred by *Illinois Brick* from bringing such claims, and Humana indicates in a footnote that it is not pursuing them.

**End of Document**                                      © 2019 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT L

Case 2:19-cv-07532-ES-MAH   Document 18-5   Filed 05/22/19   Page 222 of 300 PageID: 530
In re K-Dur Antitrust Litigation, Not Reported in F.Supp.2d (2008)
2008 WL 2660780

2008 WL 2660780
Only the Westlaw citation is currently available.
United States District Court, D. New Jersey.

In re K–DUR ANTITRUST LITIGATION.
This Document Relates To: All Actions.

Civil Action No. 01–1652 (JAG).
|
MDL Docket No. 1419.
|
Feb. 28, 2008.

*SPECIAL MASTER'S REPORT AND
RECOMMENDATION ON THE MOTION
OF DEFENDANTS, SCHERING–PLOUGH
CORPORATION, KEY PHARMACEUTICALS,
INC., UPSHER–SMITH LABORATORIES, INC.,
WYETH AND ESI LEDERLE FOR SUMMARY
JUDGMENT AGAINST INDIRECT PURCHASER
PLAINTIFF TEAMSTERS HEALTH & WELFARE
FUND OF PHILADELPHIA AND VICINITY*

ORLOFSKY, Special Master.

## I. *INTRODUCTION*

**\*1** This consolidated antitrust action has been
transferred to the District of New Jersey by the Judicial
Panel on Multidistrict Litigation pursuant to 28 U.S.C. §
1407. Pursuant to Rule 53 of the Federal Rules of Civil
Procedure1 [1] and by consent of all parties in the above-
captioned action, I have been appointed by order of this
Court, dated April 12, 2006, to preside as a Special Master
to review and decide all currently pending and future
motions directed to Judge Joseph A. Greenaway, Jr. and
Magistrate Judge Madeline Cox Arleo including, but
not limited to discovery disputes, class certification and
summary judgment (the "Appointment Order") (Docket
No. 316). The Appointment Order provides that the
decision of the Special Master on any matter before the
Special Master will conclusively resolve that matter unless
an appropriate objection is filed pursuant to Fed.R.Civ.P.
53(g).

This Report and Recommendation will decide the
Motion of Defendants, Schering–Plough Corporation,
Key Pharmaceuticals, Inc., Upsher–Smith Laboratories,

Inc., Wyeth and ESI Lederle, for Summary Judgment
Against Indirect Purchaser Plaintiff Teamsters Health &
Welfare Fund of Philadelphia and Vicinity ("THWF").
After consideration of the parties' submissions in support
of, and in opposition to, this Motion, and based upon the
analysis that follows, Defendants' motion for summary
judgment against the THWF is granted. [2]

## II. *BACKGROUND*

The factual background of this consolidated action
and the underlying motions have been set forth
in detail in Judge Greenaway's decision in this
case, *see In re K–Dur Antitrust Litig ., 338
F.Supp.2d 517 (D.N.J.2004),* and my Report and
Recommendation on: (1) Defendants Schering–Plough
Corporation, Key Pharmaceuticals, Inc. and Upsher–
Smith Laboratories, Inc.'s Motion for Sanctions against
Plaintiff Commonwealth of Pennsylvania; (2) Plaintiff
Commonwealth of Pennsylvania's Cross–Motion to
Dismiss; and (3) Motion of James Morgan to Intervene
as Class Representative (Docket No. 328). Familiarity
with that factual background is presumed and will not
be repeated in this Report and Recommendation except
where necessary to resolve this motion.

## III. *LEGAL STANDARD GOVERNING MOTIONS
FOR SUMMARY JUDGMENT*

Motions for summary judgment are governed by Federal
Rule of Civil Procedure 56. [3] "Summary judgment is
appropriate under Fed.R.Civ.P. 56(c) when the moving
party demonstrates that there is no genuine issue of
material fact and the evidence establishes the moving
party's entitlement to judgment as a matter of law." *Med
Alert Ambulance, Inc. v. Atlantic Health Sys., Inc.,* No. 04–
1615(JAG), 2007 WL 2297335, *2 (D.N.J. Aug. 6, 2007)
(citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23
(1986)).

Under Rule 56(c), the moving party "always bears the
initial responsibility of informing the district court of the
basis for its motion, and identifying those portions of 'the
pleadings, depositions, answers to interrogatories, and
admissions on file, together with affidavits, if any,' which
it believes demonstrate the absence of a genuine issue of
material fact." *Celotex,* 477 U.S. at 323 (1986) (quoting
Fed.R.Civ.P. 56). " '[W]ith respect to an issue on which the
nonmoving party bears the burden of proof ... the burden

2008 WL 2660780

on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case.' " [4] *Med Alert,* 2007 WL 2297335 at *3 (quoting *Celotex,* 477 U.S. at 325). *See also Kournelis v. Sherrer,* 2005 WL 2175442, at *4 (D.N.J. Sept. 6, 2005) ("Rule 56(c) imposes a burden on the moving party simply to point out to the district court that there is an absence of evidence to support the non-moving party's case") (citing *Celotex,* 477 U.S. at 325).

**\*2** "Once the moving party has satisfied its initial burden, the party opposing the motion must establish that a genuine issue as to a material fact exists." *Med Alert,* 2007 WL 2297335 at *3 (citing *Jersey Cent. Power & Light Co. v. Lacey Twp.,* 772 F.2d 1103, 1109 (3d Cir.1985)). The party opposing the motion may not rest upon mere allegations or denials of the pleadings, "but must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256 (1986). *See also Ridgewood Bd. of Educ. v. N.E. for M.E.,* 172 F.3d 238, 252 (3d Cir.1999) ( "Speculation and conclusory allegations do not satisfy [the nonmoving party's] duty."). " 'A nonmoving party has created a genuine issue of material fact if it has provided sufficient evidence to allow a jury to find in its favor at trial.' " *Med Alert,* 2007 WL 2297335 at *3 (quoting *Gleason v.. Norwest Mortg., Inc.,* 243 F.3d 130, 138 (3d Cir.2001)). *See also Dasrath v. Continental Airlines, Inc.,* 467 F.Supp.2d 431, 443 (D.N.J.2006) ("A dispute is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the non-moving party.' ") (quoting *Anderson,* 477 U.S. at 248). In addition, "[a] fact is 'material' only if it might affect the outcome of the suit under the applicable rule of law." *Id.*

"In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor .' " *Marino v. Indus. Crating Co.,* 358 F.3d 241, 247 (3d Cir.2004) (quoting *Anderson,* 477 U.S. at 255 (internal quotations omitted)). However, "[t]he mere existence of a scintilla of evidence in support of the plaintiffs position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson,* 477 U.S. at 252. Furthermore, "[d]isputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment." *Dasrath,* 467 F.Supp.2d at 443.

## IV. *DISCUSSION*

The THWF is a trust fund established and maintained under federal law for the purposes of providing health benefits to eligible participants and beneficiaries. *See* IP Plaintiffs' Second Amended Complaint ("Sec.Am.Compl.") at ¶ 23. Although the parties differ somewhat in their characterization of the THWF's role, the uncontroverted evidence in the record reflects that the THWF does not purchase K–Dur or its generic equivalents directly from the Defendants. *See* Def. Stmt. (THWF) at ¶ 3; Pl. Resp. Stmt. (THWF) at ¶ 3. Rather, under the THWF's Plan of Benefits and its contract with its pharmaceutical benefits manager ("PBM"), the THWF is financially responsible for its participants' purchases of drugs from pharmacies through its PBM. *Id. See also* Einhorn Dep. at 39–42 and Einhorn Decl. at ¶ 3 (attached to the Lieverman Decl. as Exhibits 12 and 13, respectively). The PBM provides services to administer the THWF's prescription drug program which, include, *inter alia,* handling payment to the pharmacies on behalf of the THWF. The PBM then bills the THWF, which is ultimately responsible for paying the cost of its participants' prescriptions (less the co-payment paid by the participant). *Id.*

**\*3** Until April 2006, the THWF had its principal place of business in Philadelphia, Pennsylvania. [5] *See* Sec. Am. Compl. at ¶ 23, Def. Stmt. (THWF) at ¶ 2 and Pl. Resp. Stmt. (THWF) at ¶ 2. The THWF has plan members in Pennsylvania, New Jersey and Delaware, and most of the purchases of K–Dur by THWF plan members were made in those three states. [6] *See* Def. Stmt. (THWF) at ¶ 2 and Pl. Resp. Stmt. (THWF) at ¶ 2.

As noted in my previous Reports deciding other of Defendants' Motions for Summary Judgment, the IP Plaintiffs' Second Amended Complaint asserts claims for declaratory and injunctive relief under Section 16 of the Clayton Act, 15 U.S.C. § 26; [7] for compensatory and multiple damages for Defendants' allegedly unlawful agreements in restraint of trade under the antitrust and/or consumer protection statues of certain states; [8] and seeking disgorgement and restitution under state unjust enrichment laws. *See* Sec. Am. Compl. At this juncture, the IP Plaintiffs are not pursuing state law claims for

Case 2:19-cv-07532-ES-MAH Document 18-5 Filed 05/22/19 Page 224 of 300 PageID: 532
In re K-Dur Antitrust Litigation, Not Reported in F.Supp.2d (2008)

2008 WL 2660780

monopolization and unlawful restraint of trade under the laws of Pennsylvania, Delaware or New Jersey. [9] *See* Sec. Am. Compl., Cts. III and IV. Thus, Count II of the Second Amended Complaint, alleging unjust enrichment, is the IP Plaintiffs' only claim for damages under the laws of Pennsylvania, Delaware or New Jersey.

### A. *Choice of Law*

Defendants move for summary judgment against the THWF on the ground that its unjust enrichment claim is not viable under any of the state laws potentially applicable to the THWF's claim. Although the parties have not extensively briefed the choice of law issue, Defendants contend that the claims of a third party payor ("TPP"), such as THWF, are governed by the state in which the TPP is located. *See* Def. Br. (THWF) at 2 n. 3 and Def. Reply at 16–17. The IP Plaintiffs contend that the TPP's claims are governed by the law of the state(s) where the TPP members' purchases were made, which, in the case of the THWF, are Pennsylvania, New Jersey and Delaware. [10] *See* Tr. at 126–127; Pl. Br. at 33 n. 25.

In determining which state's law to apply, federal courts look to the choice of law rules of the forum state. *See, e.g., In re Ford Motor Co. Ignition Switch Prods. Liability Litig.,* 174 F.R.D. 332, 347–48 (D.N.J.1997); *In re Vioxx Prods. Liability Litig.,* 239 F .R.D. 450, 454 (E.D.La.2006).* In cases transferred by the Judicial Panel on Multidistrict Litigation ("MDL"), courts typically apply the law of the state in which the action was initially filed. *See In re Ford Motor Co,* 174 F.R.D at 348; *In re Vioxx, supra.* Here, because the THWF's class action complaint was initially filed in the District of New Jersey, New Jersey choice of law rules apply. *See* THWF Complaint (No. 01–CV–2191 (JAG)) (attached as Exhibit 1 to the O'Shaughnessy Decl.).

New Jersey's choice of law principles require a two-step governmental interest analysis. *Rowe v. Hoffman–La Roche, Inc.,* 917 A.2d 767, 771 (N.J.2007). "Under the governmental interest test a court must *'first* determine whether a conflict exists between the laws of the interested states,' and, *if* the court finds a conflict, then determine 'the state with the greatest interest in governing the particular issue.' " *Heindel v. Pfizer Inc.,* 381 F.Supp.2d 364, 371 (D.N.J.2004) (quoting *Veazey v. Doremus,* 510 A.2d 1187 (N.J.1986) (emphasis added)). The existence of any conflicts must be determined on an issue-by-issue

basis. *Rowe,* 917 A.2d at 771. "If there is no actual conflict, then the choice-of-law question is inconsequential, and the forum state applies its own law to resolve the disputed issue." *Id.* If an actual conflict exists, a court "must 'identify the governmental policies underlying the law of each state and how these policies are affected by each state's contacts to the litigation and the parties.' " *Heindel,* 381 F.Supp.2d at 371 (quoting *Veazey, supra* ). The court must apply the law of "the state with the greatest interest in governing the particular issue." *Rowe,* 917 A.2d at 771.

**\*4** As is set forth below, the laws of New Jersey, Pennsylvania and Delaware are not in conflict on the issue that is dispositive of the THWF's unjust enrichment claim. Accordingly, I need not determine which of the foregoing states has the greatest interest in governing that claim.

### B. *The THWF's Unjust Enrichment Claim*

Defendants assert, *inter alia,* that the THWF's unjust enrichment claims is not cognizable under the laws of Pennsylvania, New Jersey or Delaware because those states either do not recognize a private right of action for antitrust damages or bar indirect purchaser antitrust actions. *See, e.g.,* Def. Br. (THWF) at 2–9 and Def. Reply at 12–15. [11] Based on the following analysis, I find the THWF's unjust enrichment claim is precluded by the applicable states' antitrust laws.

### *Pennsylvania*

Pennsylvania has no general antitrust statute and no statute that creates a private right of action against restraints of trade or monopolization. *See* ABA Section of Antitrust Law, *State Antitrust Practice and Statutes* (3d ed.2004) at §§ 41–1 and 41–16. Plaintiffs have not cited, nor have I located, any case awarding damages under Pennsylvania law for antitrust violations. On the contrary, the courts that have expressly considered this issue have concluded that no private remedy for damages is available under Pennsylvania law. *See XF Enterprises, Inc. v. BASF Corp.,* 2000 WL 33155746, 47 Pa. D. & C. 4th 147, 150 (Pa.Com.Pl. July 30, 2000) ("No court to date has held that a private remedy is available for damages under Pennsylvania's common law on antitrust violations. The federal Sherman Act, a codification of the common law of antitrust, additionally provides for liability for damages. Pennsylvania has no legislation which provides for these

Case 2:19-cv-07532-ES-MAH Document 18-5 Filed 05/22/19 Page 225 of 300 PageID: 533
In re Buy Antitrust Litigation, Not Reported in F.Supp.2d (2008)
2008 WL 2660780

damages"); *Stutzle v. Rhone–Poulenc, S.A.,* No. 002768 Oct. Term 2002, 2003 WL 22250424, at *1 (Pa.Com.Pl. Sept. 26, 2003) (citing *XF Enterprises, supra* ); *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.,* 516 F.Supp.2d 1072, 1100 (N.D.Cal.2007) ("In light of the fact that no Pennsylvania state court has ever affirmatively held that a common law cause of action or antitrust damages may lie, and furthermore in light of the existence of cases based on state law expressly stating that *no* such cause of action may lie, the court declines plaintiffs' invitation to hold that such an action is permissible.") (italics in original); *In re Static Random Access Memory (SRAM) Antitrust Litig.,* MDL No. 1819, 2008 WL 426522 (N.D.Cal. Feb. 14, 2008) (citing *XF Enterprises,* 47 Pa. D. & C. 4th at 150–51).

### New Jersey

As the IP Plaintiffs have acknowledged, the Supreme Court of New Jersey recently held that indirect purchasers cannot bring antitrust claims under either the New Jersey Antitrust Act or the New Jersey Consumer Fraud Act. *See* Pl. Br. at 23 n. 19 (citing *Wilson v. General Motors Corp.,* 190 N.J. 336, 921 A.2d 414 (N.J.2007). *See also Island Mortgages of New Jersey v 3M,* 373 N.J.Super. 172, 860 A.2d 1013, 1018 (N.J.Super. Ct., Law Div.2004) (indirect purchasers alleging conduct that is "traditionally classified under antitrust law" could not bring suit under New Jersey Consumer Fraud Act); *Sickles v. Cabot Corp.,* 379 N.J.Super. 100, 877 A.2d 267, 274–77 (N.J.Super.Ct., App.Div.2005) (indirect purchasers do not have a valid cause of action under New Jersey's Antitrust Act or its Consumer Fraud Act).

### Delaware

**\*5** Finally, although Delaware has enacted an Antitrust Act, Del.Code Ann. tit. 6, § 2101, *et seq.,* the statute does not provide for a private right of action. *See* Del.Code Ann. tit. 6, §§ 2107 and 2108. *See also Maddock v. Greenville Ret. Cmty., L.P.,* No. 12564, 1997 WL 89094, at *6 (Del. Ch. Feb. 26, 1997) and ABA Section of Antitrust Law, *State Antitrust Practice and Statutes* (3d ed. 2004) at 9–1 (As originally proposed, the Delaware Antitrust Act allowed a private right of action, but the legislature removed that provision before passing the Act) (citing

Kirk, *An Overview of the Delaware Antitrust Act,* 8 Del. J. Corp. L. 243, 256 & n. 82 (1983)).

Based on the foregoing, it is clear that the THWF could not pursue an antitrust claim for damages under the law of Pennsylvania, New Jersey or Delaware. Defendants contend that the THWF should not be permitted to use its unjust enrichment claim to circumvent the antitrust law of the foregoing states. *See* Def. Reply at 12–16. In opposing Defendants' Motion, the IP Plaintiffs argue that unjust enrichment claims are distinct and independent from state antitrust claims and are cognizable irrespective of whether the applicable state law recognizes a private antitrust right of action or permits indirect purchasers to pursue such claims. *See* Pl. Br. at 35–42.

I recognize that there is some disagreement among courts regarding whether a plaintiff precluded by state law from seeking damages for alleged antitrust violations may nonetheless pursue an unjust enrichment claim premised on the same conduct. *Compare In re Cardizem CD Antitrust Litig.,* 105 F.Supp.2d 618, 669–70 (E.D.Mich.2000) and *In re Cardizem CD Antitrust Litig.,* MDL 1278, Order No. 70 at 27–33 (E.D.Mich. May 23, 2003) (attached as Exhibit 20 to Lieverman Decl.), *with Stutzle,* 2003 WL 22250424, at *2 (applying Pennsylvania law and rejecting unjust enrichment claim sounding in antitrust); *In re New Motor Vehicles Canadian Export Antitrust Litig.,* 350 F.Supp.2d 160, 211 (D.Me.2004) (concluding that for states which bar indirect purchaser claims, it would "subvert the statutory scheme" to allow indirect purchasers to secure restitutionary relief at common law (or in equity) (citing *Stutzle,* 2003 WL 22250424, at *2); *In re Microsoft Corp. Antitrust Litig.,* 401 F.Supp.2d 461, 464 (D.Md.2005) (unjust enrichment claim not permitted under South Carolina law where indirect purchasers lacked standing); *In re Microsoft Corp. Antitrust Litig.,* 241 F.Supp.2d 563, 565 (D.Md.2003) (same).

However, after considering the various courts' reasoning on this issue, I am persuaded by the cases holding that where the applicable state law bars antitrust actions for damages by indirect purchasers, or simply does not recognize a private cause of action for antitrust violations, a plaintiff cannot circumvent the statutory framework by recasting an antitrust claim as one for unjust enrichment.

Case 2:19-cv-07532-ES-MAH Document 18-5 Filed 05/22/19 Page 226 of 300 PageID: 534
In re K-Dur Antitrust Litigation, Not Reported in F.Supp.2d (2008)
2008 WL 2660780

In this case, it is clear that that the THWF's unjust enrichment claim is fundamentally based on the same facts and alleged wrongdoing that form the basis of the IP Plaintiffs' antitrust claims. The unjust enrichment count of the Second Amended Complaint alleges that Defendants were unjustly enriched by the "overcharges and supra-competitive prices and/or reimbursements" received as result of Defendants' alleged "anticompetitive behavior restricting competition." *See, e.g.,* Sec. Am. Compl. at ¶ 209–210. Thus, "in essence, plaintiffs allege that defendants' illegal conduct amounts to an antitrust violation." *Stutzle,* 2003 WL 22250424, at *1. In view of the fact that the neither the legislatures nor the courts of Pennsylvania, New Jersey and Delaware have authorized indirect purchaser actions for damages sustained as a result of antitrust violations, I conclude that the THWF cannot use its unjust enrichment claim as a means to pursue damages that are not allowable under those states' antitrust laws. *See Stutzle,* 2003 WL 22250424, at *2; *In re New Motor Vehicles.,* 350 F.Supp.2d at 211; *In re Microsoft,* 401 F.Supp.2d at 464; *In re Microsoft Corp.,* 241 F.Supp.2d at 565; *Aikens v. Microsoft Corp.,* 159 Fed. Appx. 471, 477 (4th Cir.2005) ("[T]o the extent that the [indirect purchaser] plaintiffs cannot sue for monetary damages under Louisiana antitrust law, they cannot employ a subsidiary unjust enrichment claim to circumvent this rule."). *See also In re Terazosin Hydrochloride Antitrust Litig.,* 160 F.Supp.2d 1365, 1380 (S.D.Fla.2001) ("State legislatures and courts that adopted the *Illinois Brick* rule against indirect purchaser antitrust suits did not intend to allow 'an end run around the policies allowing only direct purchasers to recover.' ") (quoting *Abbott Labs., Inc. v. Segura,* 907 S.W.2d 503, 506 (Tex.1995)); *Sickles v. Cabot Corp.,* 877 A.2d 267, 277 (N.J.Super.Ct.2005) ("[T]o permit an indirect purchaser ... to recast his antitrust claim as a consumer fraud violation

would undermine the standing requirements of the ATA and would 'essentially permit an end run around the policies allowing only direct purchasers to recover under the Antitrust Act.' ") (quoting *Segura,* 907 S.W.2d at 506); *XF Enterprises,* 47 Pa. D. & C. 4th at 152 (use of civil conspiracy claim as a means to collect damages which are not allowable by Pennsylvania's antitrust law is not a proper use of the claim and can only lead to mischief).

*6 For the foregoing reasons, I find that the THWF's unjust enrichment claim is not cognizable under the law of New Jersey, Pennsylvania or Delaware and, therefore, Defendants are entitled to summary judgment on the THWF's claim.

## V. CONCLUSION

For the reasons set forth above, I conclude that the Motion of Defendants, Schering–Plough Corporation, Key Pharmaceuticals, Inc., Upsher–Smith Laboratories, Inc., Wyeth and ESI Lederle, for Summary Judgment Against Indirect Purchaser Plaintiff Teamsters Health & Welfare Fund of Philadelphia and Vicinity should be granted.

**As provided in the Order entered by Magistrate Judge Arleo in this matter, the Special Master's decision on any motion can be appealed to Judge Greenaway in the manner, and subject to the standards of review set forth in Rule 53 of the Federal Rules of Civil Procedure and applicable Local Rules.**

## All Citations

Not Reported in F.Supp.2d, 2008 WL 2660780

---

Footnotes

1   **(a) Appointment.**
    **(1)** Unless a statute provides otherwise, a court may appoint a master only to:
    **(A)** perform duties consented to by the parties;
    * * *
    **(C)** address pretrial and post-trial matters that cannot be addressed effectively and timely by an available district judge or magistrate judge of the district.

2   The Motion decided in this Report is among seven separate Motions for Summary Judgment filed by Defendants against five individual consumer Indirect Purchaser Plaintiffs ("IP Plaintiffs") and three third-party payor IP Plaintiffs. In the Reports deciding these motions, Defendants' opening and reply memoranda of law in support of each separate motion will be cited, respectively, as "Def. Br. (Plaintiff name) at ___," and "Def. Reply (Plaintiff name) at ___." Defendants' Omnibus Reply Memorandum of Law in Further Support of Their Motion for Summary Judgment Against Indirect Purchaser Plaintiffs will

In re K-Dur Antitrust Litigation, Not Reported in F.Supp.2d (2008)

2008 WL 2660780

be cited as "Def. Reply at ___." Plaintiffs' omnibus Memorandum of Law and Surreply Memorandum of Law in Opposition to Defendants' Motions for Summary Judgment will be cited, respectively, as "Pl. Br. at ___" and "Pl. Surreply at ___."

3        In addition to Fed.R.Civ.P. 56, Defendants' Motions are also subject to Rule 56.1 of the Local Rules of the United States District Court for the District of New Jersey, which requires that "[o]n motions for summary judgment, each side shall furnish a statement which sets forth material facts as to which there exists or does not exist a genuine issue." D.N.J. L. Civ. R. 56.1.

Pursuant to Local Rule 56.1, Defendants submitted separate Statements of Material Facts as to each IP Plaintiff against whom Defendants have moved for summary judgment, and Plaintiffs submitted Responses to each of those Statements of Material Facts. (Defendants' Statements of Material Facts as to the IP Plaintiffs will be cited as "Def. Stmt. (Plaintiff name) at ¶ ___; Plaintiffs' Responses thereto will be cited as "Pl. Resp. Stmt. (Plaintiff name) at ¶ ___"). Defendants also submitted Supplemental Statements of Material Facts as to certain of the IP Plaintiffs. (Defendants' Supplemental Statements of Fact will be cited as "Def. Suppl. Stmt. (Plaintiff name) at ¶ ___). Finally, Plaintiffs submitted an omnibus Statement of Material Facts in Opposition to Defendants' Motions for Summary Judgment, to which Defendants submitted a Response. (Plaintiffs' omnibus Statement of Material Facts will be cited as "Pl. Stmt. at ¶ ___; Defendants' Response will be cited as "Def. Resp. Stmt. at ¶ ___").

4        In their omnibus Surreply Memorandum of Law in Opposition to Defendants' Motions for Summary Judgment, the IP Plaintiffs suggest that Defendants bear the burden of negating the injury element of Plaintiffs' claims. See Pl. Surreply at 3 (stating that "the summary judgment rules put the burden on Defendants to prove the *absence* of injury" and "[t]he burden remains on Defendants to show that there are no disputed facts on summary judgment and that there is no injury....") (italics in original). Such a suggestion overstates a moving party's summary judgment burden with respect to an issue on which the nonmoving party bears the ultimate burden of proof. See Celotex, 477 U.S. at 325 (where the nonmoving party bears the burden of proof on an issue, the moving party's burden on summary judgment "may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case").

5        In April 2006, the THWF moved its offices to Pennsauken, New Jersey. See Pl. Resp. Stmt. (THWF) at ¶ 2 and Einhorn Decl. at ¶ 2.

6        William Einhorn, the THWF's Administrator, testified that on an average basis, the THWF covers approximately 10,300 eligible members and their families, or approximately 27,000 or 28,000 covered lives. See Einhorn Dep. at 19.

7        On February 6, 2008, Defendants submitted a Motion for Summary Judgment with respect to the Indirect Purchaser Plaintiffs' federal antitrust claim for declaratory and injunctive relief under Section 16 of the Clayton Act. See Sec. Am. Compl., Ct. I. On February 11, 2008, counsel for the IP Plaintiffs advised me that, without admission or concession of any factual allegations or legal arguments in Defendants' papers, the IP Plaintiffs do not contest Defendants' Motion or the dismissal of the federal antitrust claim. Accordingly, on February 12, 2008, I entered an order granting Defendants' Motion and dismissing with prejudice the IP Plaintiffs' federal antitrust claim. In their submissions relating to the above-referenced Motion, Defendants and the IP Plaintiffs agree that the dismissal of the IP Plaintiffs' antitrust claims docs not divest the district court of jurisdiction over the IP Plaintiffs' remaining claims. I similarly conclude that pursuant to 28 U.S.C. § 1367, the district court may retain jurisdiction over the IP Plaintiffs' state law claims.

8        In my Report and Recommendation dated March 1, 2007, I recommended dismissal of Count III of the Second Amended Complaint, which alleged unlawful monopolization under certain state antitrust and/or consumer protection statutes (the *"Walker Process* /sham litigation claims"). The IP Plaintiffs' objections to the March 1, 2007 Report have been briefed and argued before the District Court.

9        Counts III and IV of the Second Amended Complaint do not allege claims under the antitrust or consumer protection laws of Pennsylvania or Delaware. Although Counts III and IV of the Second Amended Complaint assert claims under the New Jersey Antitrust Act and the New Jersey Consumer Fraud Act, the IP Plaintiffs have subsequently stated that they are not pursuing claims pursuant to those laws. See Pl. Br. at 23 n. 19 (citing Wilson v. General Motors Corp., 921 A.2d 414 (N.J.2007)).

10       I note that the IP Plaintiffs have not argued that the THWF's claim is governed by the law of any state other than Pennsylvania, New Jersey or Delaware, nor have Plaintiffs identified any other state law that could be applicable.

11       Defendants also contend that the THWF cannot satisfy certain alleged requirements of an unjust enrichment claim under the laws of these three states. For example, Defendants assert that a claim for unjust enrichment under Pennsylvania and Delaware law requires a direct relationship between the plaintiff and the defendant. See Def. Reply (THWF) at 3–4 and 6–7. With respect to New Jersey, Defendants argue that the THWF cannot establish, *inter alia,* a direct relationship between the parties or a mistake on the part of the person conferring the benefit. See Def. Br. (THWF) at 8–9. Because I

2008 WL 2660780

conclude that the THWF's unjust enrichment claim is not cognizable under Pennsylvania, New Jersey or Delaware law, it is not necessary to address the specific elements necessary to establish that claim under each state's law.

---

**End of Document**                        © 2019 Thomson Reuters. No claim to original U.S. Government Works.

---

# EXHIBIT M

Case 2:19-cv-07532-ES-MAH   Document 18-5   Filed 05/22/19   Page 230 of 300 PageID: 538
Sherman v. Ben & Jerry's Franchising, Inc., Not Reported in F.Supp.2d (2009)

2009 WL 2462539

2009 WL 2462539
Only the Westlaw citation is currently available.
United States District Court, D. Vermont.

Shannon SHERMAN and

Simple Man, Inc., Plaintiffs,

v.

BEN & JERRY'S FRANCHISING, INC., and
Ben & Jerry's Homemade, Inc., Defendants.

No. 1:08–CV–207.
|
Aug. 10, 2009.

**Attorneys and Law Firms**

Arthur P. Strickland, Esq., Arthur P. Strickland PC,
Roanoke, VA, Jeffrey M. Goldstein, Esq., Goldstein Law
Group, Leesburg, VA, David J. Meretta, Esq., Eric H.
Karp, Esq., Witmer, Karp, Warner & Ryan LLP, Boston,
MA, Thomas P. Aicher, Esq., Cleary Shahi & Aicher,
P.C., Rutland, VT, for Plaintiffs.

Eric L. Yaffe, Esq., Iris Figueroa Rosario, Esq., Katherine
L. Wallman, Esq., Gray, Plant, Mooty, Mooty & Bennett,
P.A., Washington, DC, John Joseph Dwyer, Esq., DLA
Piper U.S. LLP, Reston, VA, Elizabeth R. Wohl, Esq.,
Downs Rachlin Martin PLLC, Brattleboro, VT, Robert
D. Rachlin, Downs Rachlin Martin PLLC, Burlington,
VT, for Defendants.

*OPINION AND ORDER*

(Papers 38, 64)

J. GARVAN MURTHA, Senior District Judge.

**\*1** Plaintiffs, former owners of a Ben & Jerry's Franchise
in Virginia, filed a twelve count complaint alleging
Defendants committed various civil wrongs related to
the parties' franchise agreement. Before the Court is
Defendants' Motion to Dismiss Plaintiffs' Amended
Complaint under Federal Rule of Civil Procedure 12(b)
(6) for failure to state a claim upon which relief can
be granted. (Paper 64.) For the following reasons,
Defendants' Motion is GRANTED in part and DENIED
in part.

I. *Background*

Facts alleged in the complaint are assumed to be true for
the purposes of a motion to dismiss. Shannon Sherman is
the founder and president of Simple Man, Inc., a Virginia
corporation. On August 2, 2004, Sherman and Simple
Man, Inc. ("Plaintiffs") entered into a Development
Agreement with Defendant Ben & Jerry's Franchising,
Inc. ("Ben & Jerry's") under which the parties agreed
Plaintiffs would open three Ben & Jerry's Scoop Shops in
the Lynchburg–Roanoke–Christianburg, Virginia area.
Plaintiffs entered the Development Agreement based,
in part, upon the 2002 and 2003 earnings information
contained in a Uniform Franchise Offering Circular
("UFOC") Ben & Jerry's provided to prospective
franchisees. Each UFOC included information about the
average and median gross sales and variable costs for
existing Ben & Jerry's franchise Scoop Shops. Ben &
Jerry's also provided earnings information for current
franchise shops on its "extranet," a Ben & Jerry's website
with postings regarding the company.

Sherman pursued opening the scoop shops. Ben &
Jerry's required franchisees to submit prospective store
locations for approval based on published criteria.
Sherman proposed a site in Blacksburg, Virginia which
Ben & Jerry's approved although it did not meet the
published criteria. The parties entered into a Franchise
Agreement for that shop on October 21, 2004. Sherman
later proposed a site in Christianburg, Virginia, which
Ben & Jerry's rejected even though it met the published
criteria. On two occasions, a representative told Sherman
Ben & Jerry's retained the right to sell products through
"White Napkin, White Tablecloth" restaurants in areas
near Sherman's scoop shop. These "finer restaurants"
would, however, be restricted in their advertising and
would not be allowed to sell pre-packaged ice cream to-go.

Sherman began operating a Ben & Jerry's scoop shop in
February 2005. The scoop shop operated at a loss each
year, and she attributes the lagging sales in part to various
misrepresentations allegedly made by Ben & Jerry's.
Sherman claims Ben & Jerry's sold its products through
two local restaurants that did not fit the description
of "White Napkin, White Tablecloth" restaurants, and
that these restaurants openly advertised Ben & Jerry's
products and also packaged them to-go—all in violation
of Ben & Jerry's employees' representations to her. Ben
& Jerry's also implemented advertising promotions paid
for with franchisees' fees that did not sell ice cream, but

instead promoted a political agenda. For example, Ben & Jerry's "Waffle Truth" campaign directed customers to Al Gore's website and encouraged them to buy his book or DVD. Sherman also alleges Ben & Jerry's failed to provide ongoing support and training in violation of the parties' Franchise Agreement. Furthermore, the support Ben & Jerry's did provide Sherman through its "Stores in Trouble" program was, according to her, unprofessional and flawed.

**\*2** According to Sherman, Ben & Jerry's intentionally distorted the earnings information provided in the UFOC and extranet in an effort to induce prospective franchisees to open stores destined to fail. Sherman claims she should not have signed the Franchise Agreement or opened a Ben & Jerry's store if it had presented correct earnings data.

## II. *Motion to Dismiss Standard*
In a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), the Court's function is "not to weigh the evidence that might be presented at trial but merely to determine whether the complaint itself is legally sufficient." *Goldman v. Belden,* 754 F.2d 1059, 1067 (2d Cir.1985). The Court will grant a motion to dismiss only if the Plaintiff cannot show some "plausible entitlement to relief." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570 (2007). The Court accepts the facts alleged in the complaint as true and draws all reasonable inferences in favor of the plaintiff. *Kassner v. 2nd Ave. Delicatessen Inc.,* 496 F.3d 229, 237 (2d Cir.2007). Jurisdiction of this matter is based on diversity, 28 U.S.C. §§ 1332, and the Court applies Vermont law in accord with the choice of law provision in the parties' Franchise Agreement. (Paper 64–19 at 46.)

## III. *Discussion*
The gravamen of Plaintiffs' Amended Complaint is that Defendants fraudulently induced them to enter into a Ben & Jerry's franchise agreement by misrepresenting key information, and then drove the shop to economic failure by refusing to provide ongoing assistance, siphoning customers away by distributing products through local restaurants and alienating customers with politically divisive marketing campaigns. Plaintiffs' Amended Complaint includes twelve counts, each of which is addressed below.

### A. *Fraud, Negligent Misrepresentation and Estoppel Claims*
Plaintiff's Amended Complaint includes four counts alleging Ben & Jerry's fraudulently or negligently misrepresented facts which induced Plaintiffs to enter into and continue in the Franchise Agreement.

### 1. *Fraudulent Inducement (Count I)*
Plaintiffs first claim Ben & Jerry's induced them to purchase the franchise by misrepresenting earnings data in Item 19 of the UFOC. To establish fraudulent inducement under Vermont law, Plaintiffs must ultimately prove the following elements: an intentional misrepresentation of fact affecting the essence of the transaction, false when made and known to be false by the maker, not open to the defrauded party's knowledge, and relied upon by the defrauded party to its damage. *Union Bank v. Jones,* 138 Vt. 115, 121, 411 A.2d 1338, 1342 (1980). The person who relies on the misrepresentation must have done so "justifiably." *Sugarline Assocs. v. Alpen Assocs.,* 155 Vt. 437, 445, 586 A.2d 1115, 1120 (1990). In this case, Plaintiffs' UFOC Item 19 claim fails because reliance on Defendants' alleged misrepresentations was unreasonable as a matter of law.

**\*3** Resolution of this claim requires a factfinder to look outside the four corners of the parties' contract because Plaintiffs agreed the Franchise Agreement constituted the parties' entire agreement, and that no other representations induced them to enter the contract. (Paper 64–19 at 45.) In determining whether to allow claims based on communications outside the contract, courts must strike a balance between the competing values of contractual certainty and protecting innocent parties from fraud. *Turner v. Johnson & Johnson,* 809 F .2d 90 (1st Cir.1986). These competing values are expressed in two lines of precedent in Vermont. On one hand, there is the well-established general rule that extrinsic evidence is not admissible to vary or contradict an unambiguous written contract. *Isbrandtsen v. North Branch Corp.,* 150 Vt. 575, 577, 556 A.2d 81, 83 (1988). On the other hand, boilerplate integration clauses and disclaimers will not, as a rule, preclude a claim of fraudulent inducement based on statements not contained in the contract. *Negyessy v. Strong,* 136 Vt. 193, 194, 388 A.2d 383, 385 (1978) ("When the misrepresentation relates to the inducement to enter a contract ... the misrepresentations cannot be avoided by a parol evidence claim that they are merged

into the terms of the agreement."). With these competing principles in hand, the Court considers the challenges to Plaintiffs' fraudulent inducement claims.

First, Plaintiffs explicitly disclaimed reliance on any representation outside the contract by agreeing "[The Franchise Agreement], the attachments hereto, and the documents referred to herein constitute the entire Agreement between BEN & JERRY'S and OPERATOR concerning the subject matter hereof, and *supercede any prior agreements, no other representations having induced OPERATOR to execute this Agreement.*" (Paper 64–19 at 45 (emphasis added).) The Court's analysis does not end here, because, as stated above, general disclaimers and merger clauses do not necessarily bar fraudulent inducement claims under Vermont law. *See Negyessy,* 136 Vt. at 194. The parties' agreement in this case, however, contained more than just a vague or general merger clause. UFOC Item 19 and the Franchise Agreement also included specific, clearly stated warnings and disclaimers relating to Plaintiffs' expected profits. UFOC Item 19 states:

> The information set forth in this Item 19 aggregates the gross sales and key variable cost percentages of individual Scoop Shops. It should not be considered as the actual or probable sales or costs that may be realized by any franchisee. We do not represent that any franchisee or Scoop Shop can expect to obtain the reported results. Actual results vary from Scoop Shop to Scoop Shop, and we cannot estimate the results of any specific Scoop Shop. A new franchisee's Scoop Shop results are likely to differ from those of established Scoop Shops. We recommend that you make your own independent investigation and evaluation of the potential performance of your Scoop Shop, and consult with your attorney and other advisors before signing any franchise agreement.... Actual results are dependent on a variety of internal and external factors,

none of which either we or a franchisee can estimate, such as competition, taxes, the availability of financing, general economic climate, demographics, weather, changing consumer preferences and the franchisee's own commitment to the business.

**\*4**  (Paper 64–18 at 7.) The Franchise Agreement stated:

> OPERATOR acknowledges that it has conducted an independent investigation of the business of operating a scoop shop, and recognizes that the business venture contemplated by this Agreement involves business risks and that its success will be largely dependent upon the ability of OPERATOR ... as (an) independent businessperson(s). BEN & JERRY'S expressly disclaims the making of, and OPERATOR acknowledges that it has not received, any warranty or guarantee, express or implied, as to the potential volume, profits, or success of the business venture contemplated by this agreement.

(Paper 64–19 at 48.) Where a seller *expressly* disclaims any express or implied warranty concerning *specific* representations, and a buyer *expressly* acknowledges the disclaimer and the need to conduct an independent investigation, that party may not sue on a claim she was defrauded into entering the contract in reliance on those very representations. *C.f. Sugarline Assocs. v. Alpen Assocs.,* 155 Vt. 437, 445–47, 586 A.2d 1115 (1990) (holding plaintiff could not show justifiable reliance on fraudulent nondisclosure claim, even if defendants deliberately withheld information, where defendant disclaimed knowledge and expressly refused to elaborate on withheld information); *see also R.J. Wildner Contracting Co. v. Ohio Turnpike Comm'n,* 913 F.Supp. 1031, 1040 (N.D.Ohio 1996) (applying Ohio

2009 WL 2462539

law, court granted motion to dismiss where reliance on representation was unreasonable as a matter of law because contract contained specific disclaimer and warning); *Mfrs. Hanover Trust Co. v. Yanakas,* 7 F.3d 310, 315 (2d Cir.1993) (holding under New York law, where "contracting party disclaims the existence of or reliance upon specific representations, that party will not be allowed to claim that he was defrauded into entering the contract in reliance on those representations [but] general and vague merger clause would not bar parol evidence to support a fraud claim.") On the facts presented here, the Court finds Plaintiffs have not shown a plausible entitlement to relief under Rule 12(b)(6). Plaintiffs' fraudulent inducement claim based on UFOC Item 19 is dismissed.

Plaintiffs next claim they were induced to enter the Franchise Agreement by alleged assurances that Ben and Jerry's would only allow "White Napkin, White Tablecloth" restaurants to sell Ben & Jerry's products near Plaintiffs' store and that these restaurants would not be allowed to advertise or sell pre-packaged ice cream. Defendants argue this claim is barred because (1) the economic loss rules applies, (2) parol evidence of an oral agreement is not admissible to vary or contradict the terms of a written contract, and (3) Plaintiffs agreed under the Franchise Agreement's integration clause that they were not relying on outside representations. Under Vermont's well-established economic loss rule, "claimants cannot seek, through tort law, to alleviate losses incurred pursuant to a contract." *Springfield Hydroelectric Co. v. Copp,* 172 Vt. 311, 314, 779 A.2d 67 (2001). Defendants cite no Vermont precedent, however, establishing whether the economic loss rule applies to fraud in the inducement claims. The Court's research reveals states have taken different positions on this issue, *See* Ralph C. Anzivino, *The Fraud in the Inducement Exception to the Economic Loss Doctrine,* 90 Marq. L.Rev. 921, 931–34 (2007), and Vermont's position has not yet been decided. [1] Thus, the Court rejects Defendants' motion to dismiss on this basis. As for Defendants' parol evidence argument, as explained above, the parol evidence rule does not necessarily preclude this claim because "proof of fraud in the inducement will defeat the bar of the parol evidence rule." *Big G Corp. v. Henry,* 148 Vt. 589, 594, 536 A.2d 559 (1987). Here, in contrast to Plaintiffs' UFOC Item 19 claim, there is no specific disclaimer stating Plaintiffs did not rely on the alleged statements. The Court may determine whether Plaintiffs qualify for the parol evidence

rule's fraud exception on a motion for summary judgment backed by a developed factual record.

**\*5** Plaintiffs next claim Ben & Jerry's "made false misrepresentations" on a company website "(the extranet) which fraudulently induced Plaintiffs "into continuing in the franchise." (Compl.¶ 79.) Defendants move to dismiss this claim, arguing Plaintiffs failed to comply with the heightened pleading standard under Federal Rule of Civil Procedure 9(b). Rule 9(b) requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed.R.Civ.P. 9(b); *Rombach v. Chang,* 355 F.3d 164, 170 (2d Cir.2004). Rule 9(b)'s particularity requirement provides defendants with fair notice of a plaintiff's claim and safeguards reputations from improvident charges of wrongdoing. *Id .* at 171. Under the Rule, a fraud claim must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Id.* at 170. Plaintiffs' extranet claim fails to specify the most basic "circumstances constituting fraud", such as what information Plaintiffs claim was misleading or how the information lead Plaintiffs to continue in the franchise. Defendants' motion to dismiss this claim is granted.

### 2. Fraudulent Nondisclosure ( Count II )

Plaintiffs next claim Ben & Jerry's fraudulently withheld information from the UFOC Item 19 and extranet, and as a result "realized reduced sales and revenue relative to their expectations, reasonably formed based on data provided by Ben & Jerry's." (Compl .¶ 84.) Recovery requires "the party claiming fraud justifiably relied on the statements or conduct of the other." *Sugarline Assocs.,* 155 Vt. at 445. As discussed above, the justifiable reliance element is missing in Plaintiffs' UFOC Item 19 claim.

In *Sugarline Assocs.,* the Vermont Supreme Court reversed judgment for the purchaser of a hotel who claimed the seller fraudulently failed to disclose information about the property's septic system. The court cited the following facts as central to its holding that the purchaser could not show justifiable reliance, even if defendants withheld information deliberately: (1) defendant expressly disclaimed knowledge of the withheld information; (2) defendant never claimed the information furnished represented full disclosure; (3) defendant never

Case 2:19-cv-07532-ES-MAH Document 18-5 Filed 05/22/19 Page 234 of 300 PageID: 542
Sherman v. Ben & Jerry's Franchising, Inc., Not Reported in F.Supp.2d (2009)
2009 WL 2462539

discouraged independent investigation and (4) defendant may have actually invited further investigation. *Id.* at 445– 47. The court concluded "these were signals that would lead a reasonable buyer *not* to rely on an assumption that all relevant documents or information had been disclosed, but, to the contrary, to investigate further." *Id.* at 445. The court held "a duty to investigate is triggered when, as here, the buyer is put on notice by the seller's declaration of ignorance of the material facts." *Id.* at 447. Here, UFOC Item 19 put Plaintiffs on notice that Ben & Jerry's "did not represent that any franchisee or Scoop Shop can expect to obtain the reported results", "[a]ctual results vary from Scoop Shop to Scoop Shop," "[Ben & Jerry's] cannot estimate the results of any specific Scoop Shop", and "[a] new franchisee's Scoop Shop results are likely to differ from those of established Scoop Shops." (Paper 64–18 at 6.) Ben & Jerry's also explicitly "recommend[ed] that [Plaintiffs] make [their] own independent investigation and evaluation of the potential performance of [their] Scoop Shop." (*Id.*) Indeed, Ben & Jerry's offered "[s]ubstantiation for the information contained in [the] Item 19 ... upon reasonable request" (Paper 64–18 at 6), and provided Plaintiffs with contact information for over 260 franchisees located across the United States. (*Id.* at 8–27.) Likewise, Ben & Jerry's "expressly disclaim[ed] the making of, and [Plaintiff] acknowledg[ed] that it has not received, any warranty or guarantee, express or implied, as to the potential volume, profits, or success of the business venture contemplated by this agreement." (Paper 64–19 at 48.) These disclaimers and warnings clearly triggered a duty to investigate. Plaintiffs' reliance was not justified, and the fraudulent disclosure claim based on Item 19 is dismissed. Plaintiffs' fraudulent nondisclosure claim as to the extranet is also dismissed because this claim was not pled with sufficient particularity under Vermont Rule of Civil Procedure 9(b) as discussed in Section III.A.1.

### 3. *Fraud (Count III), Negligent Misrepresentation (Count IV) and Estoppel (Count V)*

**\*6** Plaintiffs' fraud, negligent misrepresentation and estoppel claims are based on the same sets of facts discussed above. For the reasons enumerated in Section III.A.1 and 2, the Court rejects Defendants' motion to dismiss the fraud, negligent misrepresentation and estoppel claims based on Defendants' alleged "White Napkin, White Tablecloth" statements. The Court grants, however, Defendants' motion to dismiss Plaintiffs' fraud, negligent misrepresentation and estoppel claims as to

UFOC Item 19 and the extranet. The claims related to UFOC Item 19 are dismissed because a party claiming fraud, negligent misrepresentation or estoppel must show justifiable reliance. *Sugarline Assocs.,* 155 Vt. at 445 (must show justifiable reliance to recover for fraud); *Hedges v. Durrance,* 175 Vt. 588, 591, 834 A.2d 1 (2003) (for negligent misrepresentation); *Cmty. Nat'l Bank v. State,* 172 Vt. 616, 619, 782 A.2d 1195 (2001) (under estoppel theory). As discussed in Sections III.A.1 and 2, Plaintiffs cannot, as a matter of law, show justifiable reliance on the UFOC Item 19 disclosures. Plaintiffs' fraud, negligent misrepresentation and estoppel claims with respect to the extranet are dismissed because the claims were not pled with sufficient particularity under Vermont Rule of Civil Procedure 9(b), as set forth in Section III.A.1.

### B. *Breach of Contract (Count VI) and Breach of the Covenant of Good Faith and Fair Dealing (Count VII)*

Plaintiffs claim Defendants breached the Franchise Agreement by (1) failing to enforce the "White Napkin, White Tablecloth" program, (2) misusing advertising money paid by franchisees to fund a political agenda rather than Ben & Jerry's products, (3) failing to approve the Christianburg location although it met Ben & Jerry's published criteria, (4) "general lack of marketing support", and (5) failing to provide training and ongoing support. Plaintiffs also claim Defendants breached the covenant of good faith and fair dealing by selling Ben & Jerry's products at two area restaurants that did not fit Defendants' "White Napkin, White Tablecloth" restaurant description.

Plaintiffs' first claim is that Defendants breached the Franchise Agreement by failing to enforce the "White Napkin, White Tablecloth" program represented by Ben & Jerry's employees. Before proceeding to the merits of the breach of contract claim, the Court notes Plaintiffs' breach of covenant claim is based on precisely the same conduct. Vermont courts will not recognize a separate cause of action for violation of the covenant of good faith and fair dealing where a plaintiff pleads a breach of contract claim based on the same conduct. *See Monahan v. GMAC Mortgage Corp.,* 179 Vt. 167, 187 n. 5, 893 A.2d 298 (2005). Because the Court finds Plaintiffs cannot show any "plausible entitlement to relief" for breach of contract under Rule 12(b)(6), that claim is dismissed. Under Vermont law, "[e]nforcement of any prior oral agreement ... is barred by a merger clause in the written contract" and "[e]ven without the merger

2009 WL 2462539

clause, the parol evidence rule would bar enforcement of a prior or contemporaneous oral agreement that varies or contradicts the terms of the written agreement." *Hoeker v. Dep't of Soc. & Rehab. Servs.,* 171 Vt. 620, 621, 765 A.2d 495, 498 (2000).

**\*7** Ben & Jerry's reserved the right under the Franchise Agreement "[t]o sell or distribute, directly or indirectly, or license others to sell or distribute, under the Proprietary Marks, at any location (notwithstanding its proximity to the Authorized Location) whether within or outside the Territory, (i) *prepackaged* and other Products ... *for sale made at restaurants.*" (Paper 64–19 at 6 (emphasis added).) Thus, Plaintiffs' claim that Ben & Jerry's could not sell pre-packaged products through two area restaurants contradicts, or at least varies, this provision. Moreover, the Franchise Agreement contains a merger clause stating, "[t]his Agreement, the attachments hereto, and the documents referred to herein constitute the entire Agreement between BEN & JERRY's and OPERATOR concerning the subject matter hereof, and supersede any prior agreements...." (Paper 64–19 at 45.) Thus, evidence of Defendants' alleged "White Napkin, White Tablecloth" policy is not admissible to prove the breach of contract claim. Because Ben & Jerry's was not prohibited under the Franchise Agreement from selling pre-packaged products through restaurants, including restaurants not deemed "White Napkin, White Tablecloth," Plaintiffs' breach of contract claim is dismissed. Plaintiffs' breach of covenant claim, however, is preserved.

Plaintiffs next claim Defendants breached the Franchise Agreement by misusing advertising fees paid by franchisees to promote a political agenda rather than advertise products. Defendants argue Plaintiffs cannot show any "plausible entitlement to relief" under Rule 12(b)(6) because the claim contradicts the Franchise Agreement. Under the Franchise Agreement, the parties agreed "Ben & Jerry's shall direct all marketing programs, with *sole discretion* over the concepts, materials, and media used in such programs and the placement and allocation thereof." (Paper 64–19 at 26 (emphasis added).) If the Court accepts as true, as it must, Plaintiffs' contention that these programs did not constitute advertising, the allegations suffice to state a claim. Defendants' motion to dismiss is denied.

Plaintiffs next claim Ben & Jerry's breached the Franchise Agreement by failing to approve the Plaintiffs'

Christianburg location, although it met Ben & Jerry's prerequisites. Defendants argue Plaintiffs cannot show any "plausible entitlement to relief" for this claim under Rule 12(b)(6) because Ben & Jerry's reserved sole discretion to approve or disapprove sites. The Court agrees. The parties' Development Agreement states, "Ben & Jerry's shall have ten (10) business days after receipt of [the site evaluation package] from DEVELOPER to approve or disapprove, *in its sole discretion,* each proposed site for each Scoop Shop." (Paper 64–14 at 7–8 (emphasis added).) Plaintiffs' claim, even if true, does not state a breach of the Development Agreement. In any event, Plaintiffs released this claim by entering into the Mutual Termination and Release Agreement, under which each party released all claims related to the Development Agreement. (Paper 64–15 at 3.) The claim is therefore dismissed. [2]

**\*8** Plaintiffs also allege Ben & Jerry's breached the Franchise Agreement because there was "a general lack of marketing support." Compl. ¶ 102. Plaintiffs attempt to supplement this allegation in their opposition paper, stating "[a]t no time did Defendants purchase, furnish, or distribute advertising to the benefit of Plaintiffs" and Defendants "fail[ed] to advertise at all." (Paper 73 at 20–21.) These supplementary allegations do not appear in the Amended Complaint, and parties may not amend the complaint through supportive memoranda. *Wright & Ernst & Young LLP,* 152 F .3d 169, 178 (2d Cir.1998). The Court nevertheless denies Defendants' motion to dismiss the "general lack of marketing support" claim because there are allegations in the Amended Complaint relevant to marketing and advertising support.

Plaintiffs' final breach of contract claim alleges Defendants failed to provide "ongoing assistance" in violation of Ben & Jerry's duties under Franchise Agreement Paragraphs 3.2, 3.3, 3.6, 3 .7 and 6.2. Defendants argue Plaintiffs cannot show any "plausible entitlement to relief" for this claim under Rule 12(b)(6) because, under the Franchise Agreement, Ben & Jerry's was obligated to provide ongoing support only as it deemed appropriate or necessary. (Document 64–2 at 23.) Defendants also argue the claim should be dismissed because Plaintiffs have not stated a claim, but rather legal conclusions. *See Smith v. Local 819 I.B.T. Pension Plan,* 291 F.3d 236, 240 (2d Cir.2002) ("[C]onclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to

Case 2:19-cv-07532-ES-MAH  Document 18-5  Filed 05/22/19  Page 236 of 300 PageID: 544
*Sherman v. Ben & Jerry's Franchising, Inc.*, Not Reported in F.Supp.2d (2009)
2009 WL 2462539

dismiss.") The Court will not dismiss the claim at this time because there appear to be allegations in the Amended Complaint relevant to business support; however, Plaintiffs' approach of listing contract provisions and summarily stating Defendants breached the provisions will not survive a motion for summary judgment.

### C. *Unjust Enrichment (Count VIII) and Quantum Meruit (Count IX)*

Defendants' motion to dismiss is denied as to Plaintiffs' claims of unjust enrichment and quantum meruit. The claims are properly pled in that Plaintiffs have also pled fraudulent inducement and the Amended Complaint includes allegations that Defendants profited at Plaintiffs' expense.

### D. *Virginia Retail Franchising Act (Count X), Virginia Disclosure Registration Act Violation (Count XI), and Vermont Consumer Fraud Protection Act (Count XII)*

#### 1. *Virginia Retail Franchising Act*

Plaintiffs seek relief under the Virginia Retail Franchising Act ("VRFA") § 13.1–563, which provides in relevant part:

It shall be unlawful for any person, in connection with the sale or offer to sell a franchise in this Commonwealth, directly or indirectly:

1. To employ any device, scheme, or artifice to defraud;

2. To make any untrue statement of a material fact or to omit to state a material fact necessary in order to avoid misleading the offeree;

**\*9** 3. To engage in any transaction, practice, or course of business that operates or would operate as a fraud or deceit upon the franchisee.

Va.Code § 13.1–563. This claim must be dismissed because the VRFA does not grant plaintiffs a direct right of action for violations of § 13.1–563. *Turner v. Subaru of America, Inc.,* 566 F.Supp. 143, 151 (W.D.Va.1983). Rather, "[a]ggrieved persons may void any franchises signed under the circumstances described in § 13.1–563" and "then sue for damages resulting therefrom." *Id.* (citing Va.Code §§ 13.1–565, 13.1–571(a)); *see also Principe v. McDonald's Corp.,* 463 F.Supp. 1149, 1151 (W.D.Va.1979) ( "[P]laintiffs are bound by Va.Code s

13.1–571 (1978 Repl.) prescribing the conditions under which they may seek civil remedies under the VRFA. Plaintiffs must either seek to void their franchise under Va.Code s 13.1–565 (1978 Repl.) or they must show damages pursuant to Va.Code s 13.1–564 (1978 Repl.)"). Under § 13.1–565,

Any franchise may be declared void by the franchisee at his option by sending a written declaration of that fact and the reasons therefor to the franchisor by registered or certified mail if:

1. The franchisor's offer to sell a franchise was unlawful, as provided in § 13.1–560 or § 13.1–563, provided that the franchisee send such written declaration *within 72 hours after discovery thereof but not more than 90 days after execution of the franchise.*

Va.Code § 13.1–565 (emphasis added). Plaintiffs have never declared the franchise void under § 13.1–565, and the time to do so has expired. Plaintiffs' claim under VRFA § 13.1–565 is dismissed.

#### 2. *Virginia Disclosure Registration Act*

Plaintiffs next claim Ben & Jerry's violated § 13.1–564 of the VRFA, a subpart of the VRFA, which provides: "It shall be unlawful for a franchisor to cancel a franchise without reasonable cause or to use undue influence to induce a franchisee to surrender any right given to him by any provision contained in the franchise." Va.Code § 13.1–564. Plaintiffs contend Ben & Jerry's violated the second part of this provision, but do not state what right Plaintiffs were allegedly induced to surrender or how Defendants influenced them to surrender the right. Legal conclusions alone do not state a claim, *Smith,* 291 F.3d at 240; therefore, Defendants' motion to dismiss is granted.

#### 3. *Vermont Consumer Fraud Protection Act*

Plaintiffs claim Ben & Jerry's provided false or misleading sales data in UFOC Item 19 in violation of Vermont Consumer Fraud Act Section 2453, which prohibits "[u]nfair methods of competition in commerce, and unfair or deceptive acts or practices in commerce." 9 V.S.A § 2453. Defendants argue Plaintiffs fail to state a claim under this statute because the statute applies only to Vermont citizens. The Vermont Supreme Court has stated "Vermont's consumer fraud laws ... were passed to protect *[the] state's citizens* from unfair and deceptive business

Sherman v. Ben & Jerry's Franchising, Inc., Not Reported in F.Supp.2d (2009)

2009 WL 2462539

practices and to encourage a commercial environment highlighted by integrity and fairness." *See Gramatan Home Investors Corp. v. Starling,* 143 Vt. 527, 536, 470 A.2d 1157, 1162 (1983) (citing 9 V.S.A. § 2451) (emphasis added); *Turner v. Baxley,* 354 F.Supp. 963, 970 (D.Vt.1972) ( "Proceedings under the Vermont Consumers Fraud Act are designed to protect the people of Vermont from fraudulent practices."). Plaintiffs are citizens of Virginia, not Vermont. Furthermore, Plaintiffs' franchise was established and operated in Virginia. The Court finds based on both of these factors that there is insufficient nexus to Vermont to grant Plaintiffs standing as a Vermont consumer. The Court express no opinion, however, on whether Vermont's Consumer Fraud Act precludes all nonresidents from suing under the Act, regardless of where the commerce occurred. *See Lyon v. Caterpillar, Inc.,* 194 F.R.D. 206, 215 (E.D.Pa.2000) ("State consumer fraud acts are designed to either protect state residents or protect consumers engaged in transactions within the state.").

## IV. *Conclusion*
**\*10** For the reasons stated above, Defendants' Motion to Dismiss (Paper 64) is GRANTED in part and DENIED in part as follows:

A. *Count I—Fraudulent Inducement*
Defendants' motion to dismiss Plaintiffs' fraudulent inducement claim re:

1. UFOC Item 19 is GRANTED; the claim is DISMISSED;

2. "White Napkin, White Tablecloth" statements barred by the economic loss and parol evidence rules is DENIED; and

3. false misrepresentations made on a company website (extranet)is GRANTED; the claim is DISMISSED.

B. *Count II—Fraudulent Nondisclosure*
Defendant's motion to dismiss Plaintiffs' claim for fraudulent nondisclosure (UFOC Item 19 and extranet) is GRANTED. Count II is DISMISSED.

C. *Counts III—Fraud; Count IV—Negligent Misrepresentation; & Count V—Estoppel*

Defendants' motion to dismiss Plaintiffs' fraud (Count III), negligent misrepresentation (Count IV) and estoppel (Count V) claims re:

1. "White Napkin, White Tablecloth" statements is DENIED; and

2. UFOC Item 19 and the extranet is GRANTED; the claims are DISMISSED.

D. *Count VI—Breach of Contract*
Defendant's motion to dismiss Plaintiffs' claim for breach of contract re:

1. failure to enforce "White Napkin, White Tablecloth" program is GRANTED; the claim is DISMISSED;

2. misuse of advertising fees is DENIED;

3. failure to approve Christianburg location is GRANTED; the claim is DISMISSED;

4. lack of marketing support is DENIED; and

5. failure to provide training and ongoing support is DENIED.

E. *Count VII—Breach of the Covenant of Good Faith and Fair Dealing*
Defendant's motion to dismiss Plaintiffs' claim for breach of the covenant of good faith and fair dealing by selling Ben & Jerry's products at restaurants that did not fit Defendants' "White Napkin, White Tablecloth" restaurant description is DENIED.

F. *Count VIII—Unjust Enrichment*
Defendant's motion to dismiss Plaintiffs' claim of unjust enrichment is DENIED.

G. *Count IX—Quantum Meruit*
Defendant's motion to dismiss Plaintiffs' claim of quantum meruit is DENIED.

H. *Count X—Virginia Retail Franchising Act*
Defendant's motion to dismiss Plaintiffs' claim under the Virginia Retail Franchising Act is GRANTED; Count X is DISMISSED.

2009 WL 2462539

### I. *Count XI—Disclosure Registration Act Violation*

Defendant's motion to dismiss Plaintiffs' claim under the Virginia Disclosure Registration Act is GRANTED; Count XI is DISMISSED.

### J. *Count XII—Vermont Consumer Fraud Protection Act*

Defendant's motion to dismiss Plaintiffs' claim under the Vermont Consumer Fraud Protection Act is GRANTED; Count XII is DISMISSED.

Defendants' Motion to Dismiss and Request for Oral Arguemnt (Paper 38) is DENIED as moot. Defendants' Request for Oral Argument (Paper 64) is DENIED.

Discovery was stayed in this case pending issuance of the ruling on the Motion to Dismiss Amended Complaint. (Paper 84.) Accordingly, the stay is hereby lifted and counsel shall submit a proposed Amended Discovery Schedule/Order for the Court's consideration by September 1, 2009.

**\*11** SO ORDERED.

### All Citations

Not Reported in F.Supp.2d, 2009 WL 2462539

---

Footnotes

1   It is clear under Vermont law that a tort claim should be dismissed when it merely restates a breach of contract claim, i.e., when the only fraud alleged is that the defendant was not sincere when it promised to perform under the contract, *see Bevins v. King,* 147 Vt. 203, 204–5, 514 A.2d 1044 (1986), however, that is not the claim presented here.

2   Plaintiffs stated in their opposition paper that this conduct also constitutes a breach of the covenant of good faith and fair dealing. (Paper 73 at 23.) The Amended Complaint states no such claim, and parties may not amend the complaint through supportive memoranda. *Wright,* 152 F.3d at 178. Under Federal Rule of Civil Procedure 8, Plaintiffs must make "a short and plain statement of the *claim* showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2)(emphasis added). Rule 8 "does not require detailed factual pleading, [but] a plaintiff's assertions must still direct the defendant to the factual cause of the plaintiff's alleged injury." *McTigue v. City of Chicago,* 60 F.3d 381, 382 (7th Cir.1995). Likewise, although Federal Rule of Civil Procedure 10 provides for a party to adopt by reference allegations made elsewhere in the pleading, "[a] party must state its claims or defenses in numbered paragraphs, each limited as far as practicable to a single set of circumstances." Fed.R.Civ.P. 10(b).

---

**End of Document**                                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT N

Cole v. NIBCO, Inc., Not Reported in F.Supp.3d (2015)

2015 WL 2414740, 86 UCC Rep.Serv.2d 700

2015 WL 2414740
NOT FOR PUBLICATION
United States District Court, D. New Jersey.

Kimberly COLE, Alan Cole, James Monica, Linda
Boyd, Michael Mcmahon, Ray Sminkey, James
Medders, Judy Medders, Robert Peperno, Sarah
Peperno, and Kelly Mccoy, on behalf of themselves
and all others similarly situated, Plaintiffs,
v.
NIBCO, INC., Defendant.

Civ. No. 3:13–cv–07871 (FLW)(TJB).
|
Signed May 20, 2015.

**Attorneys and Law Firms**

Benjamin F. Johns, Joseph G. Sauder, Matthew D.
Schelkopf, Chimicles & Tikellis, LLP, Haverford, PA,
Bruce Daniel Greenberg, Lite Depalma Greenberg, LLC,
Newark, NJ, Daniel Hogan, Michael J. Hopkins, Law
Offices of Robert A. Stutman, PC, Fort Washington, PA,
for Plaintiffs.

John McGahren, Morgan Lewis & Bockius, LLP,
Princeton, NJ, Robert T. Connor, Kelley Jasons
McGowan Spinelli Hanna & Reber LLP, Stephanie A.
Blair, Morgan, Franco A. Corrado, Lewis & Bockius
LLP, Philadelphia, PA, for Defendant.

OPINION

WOLFSON, District Judge.

*1 Plaintiffs Kimberly Cole, Alan Cole, James
Monica ("Monica"), Linda Boyd ("Boyd"), Michael
McMahon ("McMahon"), Ray Sminkey ("Sminkey"),
James Medders, Judy Medders, Robert Peperno, Sarah
Peperno, and Kelly McCoy ("McCoy") (collectively,
"Plaintiffs"), who are nine homeowners from seven states,
bring this putative class action on behalf of themselves and
a nationwide class, or alternatively, putative New Jersey,
Pennsylvania, Alabama, Georgia, Texas, Oklahoma, and
Tennessee state subclasses. Presently before the Court is
a partial motion to dismiss Plaintiffs' Complaint filed by
Defendant NIBCO, Inc.'s ("NIBCO" or "Defendant"),
for failure to state a claim.

Plaintiffs' claims stem from the alleged failures of various
plumbing system products manufactured by NIBCO and
installed in Plaintiffs' homes. Plaintiffs allege that NIBCO
breached an express warranty (Count I); breached the
implied warranty of merchantability (Count II); breached
the implied warranty of fitness for a particular purpose
(Count III); was negligent in the design, testing, and
manufacture of its products (Count IV); violated the New
Jersey Consumer Fraud Act, N.J. Stat. Ann. § 56:8–1
et seq. ("NJCFA") (Count V); violated the Pennsylvania
Unfair Trade Practices and Consumer Protection Law, 73
Pa. Cons.Stat. Ann § 201–1, et seq. ("UTPCPL") (Count
VI); violated the Texas Deceptive Trade Practices Act,
Tex. Bus. & Com.Code Ann. § 17.41, et seq. ("TDTPA")
(Count VII); violated the Oklahoma Deceptive Trade
Practices Act, Okla. Stat. Ann. tit. 78 § 51–55, et seq.
("ODTPA"); and was unjustly enriched (Count IX). In
Count X, Plaintiffs request declaratory relief and an
injunction.

For the foregoing reasons, Defendant's motion is
GRANTED IN PART and DENIED IN PART. Counts
II, III, and IV are dismissed as asserted by Monica, and
Counts I, II, III, and IV are dismissed as asserted by the
Coles; both sets of plaintiffs are granted leave to file claims
under the NJPLA and the TPLA, respectively. Count
I is dismissed without prejudice as asserted by McCoy.
Counts I and II are dismissed without prejudice as asserted
by McMahon. As asserted by all Plaintiffs, Counts III,
IV, VI, VII, and VIII are dismissed without prejudice, and
Counts V, IX, and X are dismissed. Count II as asserted
by McCoy, however, may proceed.

**I. FACTUAL BACKGROUND**

The following factual allegations are taken from Plaintiffs'
Complaint and are accepted as true for the purposes of
this motion to dismiss. *See* Toys "R" Us, Inc. v. Step Two,
S.A., 318 F.3d 446, 457 (3d Cir.2003); Dayhoff, Inc. v. H.J.
Heinz Co., 86 F.3d 1287, 1302 (3d Cir.1996). The Court
need not recount all facts, and instead recounts only those
relevant to the grounds asserted by Defendant in their
motion.

This case concerns a putative class action by seven
plaintiffs from six states, all of whom plead various
causes of action proximately caused by defective plumbing
system products manufactured by NIBCO, Inc., an
Indiana corporation. FAC ¶¶ 9–13, 104. The three

products at issue (collectively, "the PEX Products") are: (1) cross-linked polyethylene plumbing tubes ("PEX Tubing"), (2) the brass fittings that connect PEX tubes together ("PEX Fittings"), (3) and stainless steel clamps ("PEX Clamps") that join the PEX Tubes with the PEX Fittings. *Id.* ¶¶ 1, 104. Plaintiffs allege that the PEX Products all suffer from design and/or manufacturing defects that allow water to escape their homes' plumbing systems and cause damage to both the PEX Products and the homes in which they are installed. *Id.* ¶¶ 9–12. Specifically, Plaintiffs allege that (1) the PEX Tubing "is prone to premature oxidative failure and creep rupture," (2) the PEX Fittings "are prone to dezincification corrosion," and (3) the PEX Clamps "are prone to failure b chloride-induced stress corrosion cracking." *Id.* 2–4.

**\*2** Plaintiffs allege that "NIBCO manufactures, warrants, advertises, and sells the PEX Products at issue and, further, that NIBCO's sales catalog advertised that, *inter alia,* its PEX tubing was the highest quality PEX tubing available, and that its cross chemical bonding process gave it 'superior characteristics.' " *Id.* ¶¶ 7–8. Plaintiffs further allege that NIBCO warrants that its PEX Tubing will be free from any defects in materials and workmanship ten years from the date of purchase when a licensed professional contractor installs the PEX Tubing. *Id.* ¶ 123. According to Plaintiffs, the warranty period for the PEX Tubing increases to twenty-five years when PEX Fittings and PEX Clamps are used in conjunction with the PEX Tubing. *Id.* at ¶ 121. However, "[c]ontrary to these affirmative statements, the PEX Products suffer from design and/or manufacturing defects." *Id.* ¶ 9. Plaintiffs allege that "NIBCO has systematically breached its warranty by failing to fully or adequately compensate property owners who have been injured as a result of the PEX Product Defects. NIBCO also failed to disclose this material information to Plaintiffs and Class Members." *Id.* ¶ 10. Further, Plaintiffs allege that "[b]efore manufacturing, warranting, advertising and/or selling the PEX Products, NIBCO failed to take appropriate steps to ensure that its products were safe for their intended use. [NIBCO] knew or should have known that the PEX Products were not suitable for use within water-carrying plumbing systems and that the PEX Products suffered from the PEX Product Defects." *Id.* ¶ 11.

Each Plaintiff's alleged injuries are detailed below.

### a. The Coles, Tennessee Plaintiffs

In 2008, a licensed professional contractor installed a residential plumbing system in the new home of Kimberley Cole and Alan Cole (collectively, "the Coles"), Tennessee residents. FAC ¶¶ 14–15, 18. This system utilized all relevant PEX Products. *Id.* at ¶ 17. The Coles claim that failure of PEX Tubing caused several water leaks in their basement between November 2010 and August 2014. *Id.* at ¶ 20–22. Upon discovery of the leaks, the Coles allegedly notified NIBCO of the PEX Tubing's failure, pursuant to the terms of NIBCO's express warranty for the PEX Products. *Id.* at ¶ 24. However, despite notice, Plaintiffs allege that NIBCO failed to honor the warranty by providing replacement products or other compensation. *Id.*

### b. James Monica, New Jersey Plaintiff

In December 2010, a licensed professional contractor installed a residential plumbing system in the new home of James Monica, a New Jersey resident. FAC ¶¶ 28–29, 31. This system utilized all relevant PEX Products. *Id.* at ¶ 30. Monica claims that on three occasions, beginning in November 2012, PEX Fittings used in his home's plumbing system failed, causing "water saturation" on his basement's ceiling and walls and leaks in his first floor plumbing. *Id.* at ¶ 33–38. Upon discovery of the leaks, Monica allegedly notified NIBCO of the failure of the PEX Fittings, pursuant to the terms of NIBCO's express warranty of the PEX Products. *Id.* at ¶ 39. Plaintiffs allege that NIBCO failed to honor this express warranty, because replacement products or other compensation were never provided. *Id.* The FAC alleges that Monica's losses include not only the damaged PEX Fittings, but other "out-of-pocket loss associated with catastrophic plumbing failures and attempted repairs of such within his home." *Id.* at ¶ 42.

### c. Linda Boyd, Alabama Plaintiff

**\*3** In June 2008, a licensed professional contractor installed a residential plumbing system in the new home of Linda Boyd, an Alabama resident. FAC ¶¶ 43–45, 47. This system utilized all relevant PEX Products. *Id.* at ¶ 46. Boyd claims that between March 26, 2013 and October 31, 2013, failure of PEX Tubing used in his home's plumbing system caused several water leaks. *Id.* at ¶ 49–51. Upon discovery of the leaks, Boyd allegedly notified NIBCO of the PEX

Cole v. NIBCO, Inc., Not Reported in F.Supp.3d (2015)
2015 WL 2414740, 86 UCC Rep.Serv.2d 700

Tubing's failure, pursuant to the terms of NIBCO's express warranty for the PEX Products. *Id.* at ¶ 53. As with the other Plaintiffs, Plaintiffs allege that NIBCO provided no relief to Boyd. *Id.*

### d. Michael McMahon, Texas Plaintiff

Michael McMahon ("McMahon"), a Texas resident, moved into a home on January 1, 2013, that was constructed in 2007. FAC at ¶¶ 57–58, 61. When the home was constructed, licensed professional contractors installed a residential plumbing system that used all relevant PEX Products. *Id.* at ¶ 59. Since 2013, McMahon has discovered six leaks in his home, all allegedly resulting from defects in PEX Tubing. *Id.* at ¶¶ 62–63. McMahon claims to have suffered "significant damages due to the PEX Product Defects," including water saturation, flooding, and damage to his walls. *Id.* ¶ 64.

### e. Ray Sminkey, Oklahoma Plaintiff

In spring 2008, a licensed professional contractor installed a residential plumbing system in the new home of Ray Sminkey ("Sminkey"), an Oklahoma resident. FAC 66–68, 70. This system utilized, in relevant part, only PEX Tubing. *Id.* at ¶ 69. Sminkey claims that beginning on November 5, 2013, the PEX Tubing used in his home's plumbing system began to leak and had to be replaced by a plumber. *Id.* at ¶ 72–74. Sminkey claims to have suffered "significant damages on three separate occasions due to PEX Product Defects." *Id.* ¶ 75.

### f. The Medders, Texas Plaintiffs

In 2011, a licensed professional contractor installed a residential plumbing system in the new home of James and Judy Medders (collectively, "the Medders"), Texas residents. FAC ¶¶ 77, 79, 81. This system utilized all relevant PEX Products. *Id.* at ¶ 80. The Medders claim that the failures of various PEX Fittings caused leaks in various locations in their home between December 2013 and June 2014. *Id.* at ¶¶ 84–85. Upon discovery of the leaks, the Medders notified NIBCO of the problem, but allege that NIBCO failed to act under their express warranty and provide replacement PEX Fittings. *Id.* at ¶ 86.

### g. The Pepernos, Pennsylvania Plaintiffs

In 2007, a licensed professional contractor installed a residential plumbing system in the new home of Robert and Sara Peperno (collectively, "the Pepernos"), Pennsylvania residents. FAC 90, 92, 94. This system utilized all relevant PEX Products. *Id.* at ¶ 93. The Pepernos claim that failure of the PEX Tubing caused three leaks in their basement between December 15, 2013 and June 7, 2014. *Id.* at ¶ 96–98. Upon discovery of the leaks, the Pepernos allegedly notified NIBCO of the failure of the PEX Tubing. However, NIBCO failed to act under their express warranty and provide replacement products or other compensation. *Id.* ¶ 100.

### Kelly McCoy, Georgia Plaintiff

**\*4** In 2010, a licensed professional contractor installed a residential plumbing system in the new home of Kelly McCoy ("McCoy"), a Georgia resident. FAC ¶¶ 18:103–104, 19:106. [1] This system utilized all relevant PEX Products. *Id.* at ¶ 18:105. McCoy claims that the PEX Tubing used in his plumbing system failed repeatedly and caused leaks, which necessitated six separate repairs. *Id.* at ¶ 107. As a result of the leaks, the broken PEX Tubing had to be released and a bathroom wall needed to be repaired.

Plaintiffs filed their Complaint in the District Court of New Jersey on December 27, 2013 and filed their First Amended Complaint ("FAC") on October 6, 2014. Thereafter, Defendant filed the instant partial motion to dismiss. Defendant contends that nearly all of the causes of action asserted in the FAC fail to state a claim.

## II. STANDARD OF REVIEW

When reviewing a motion to dismiss on the pleadings, courts "accept all factual allegations as true, construe the FAC in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the FAC, the plaintiff may be entitled to relief." *Phillips v. Cnty. of Allegheny,* 515 F.3d 224, 233 (3d Cir.2008) (citation and quotations omitted). *In Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007), the Supreme Court clarified the Rule 12(b)(6) standard: the factual allegations set forth in a complaint "must be enough to raise a right to relief above the speculative level." *Id.* at 555. As the Third Circuit has stated, "[t]he Supreme Court's *Twombly* formulation of the pleading standard can be summed up thus: 'stating ... [a] claim requires a complaint with enough factual matter (taken as true) to suggest' the required element. This 'does not impose a probability requirement at the pleading stage,' but instead 'simply calls for enough facts to raise a

2015 WL 2414740, 86 UCC Rep.Serv.2d 700

reasonable expectation that discovery will reveal evidence of the necessary element." *Phillips,* 515 F.3d at 234 (quoting *Twombly,* 127 U.S. at 555); *see also Covington v. Int'l Ass'n of Approved Basketball Officials,* 710 F.3d 114, 118 (3d Cir.2013) ("[A] claimant does not have to set out in detail the facts upon which he bases his claim. The pleading standard is not akin to a probability requirement; to survive a motion to dismiss, a complaint merely has to state a plausible claim for relief." (citations omitted)).

In affirming that *Twombly*'s standards apply to all motions to dismiss, the Supreme Court explained several principles. First, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). Second, "only a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* at 679. Therefore, "a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* Ultimately, "a complaint must do more than allege the plaintiffs entitlement to relief. A complaint has to 'show' such an entitlement with its facts." *Fowler v. U PMC Shadyside,* 578 F.3d 203, 211 (3d Cir.2009). However, "a district court ruling on a motion to dismiss may not consider matters extraneous to the pleadings ... [although a] limited exception exists for documents that are integral to or explicitly relied upon in the FAC." *W. Penn Allegheny Health Sys., Inc. v. UPMC,* 627 F.3d 85, 97 n. 6 (3d Cir.2010) *cert. denied,* 132 S.Ct. 98 (2011) (citation and internal quotation marks omitted).

**\*5** The Third Circuit has reiterated that "judging the sufficiency of a pleading is a contextdependent exercise" and "[s]ome claims require more factual explication than others to state a plausible claim for relief." *Id.* at 98. That said, the Rule 8 pleading standard is applied "with the same level of rigor in all civil actions." *Id.* (quoting *Iqbal,* 556 U.S. at 684).

## III. DISCUSSION

At the outset, the Court notes that Plaintiffs indicate under which state's law they have brought suit in only four of their asserted ten Counts: Counts V, VI, VII, and VII, alleging respective violations of the consumer fraud statutes of New Jersey, Pennsylvania, Texas, and Oklahoma. By contrast, Plaintiffs' asserted claims for breach of express warranty (Count I), breach of

implied warranties of fitness for a particular purpose and merchantability (Counts II and III), negligence (Count IV), and unjust enrichment (Count IX) are devoid of reference to any particular state's laws. *See* FAC ¶¶ 144–73, 208–12. However, Defendant suggests, and Plaintiffs do not dispute, that the state law of each Plaintiff's home state should apply to Plaintiffs' claims. Def.'s Br. at 9 n. 5; Pls.' Opp. Br. at 13 n. 7. Therefore, the Court will follow the lead of the parties and will not engage in a choice of law analysis.[2] *See, e.g., UBI Telecom Inc. v. KDDI Am., Inc.,* No. CIV.A. 13–1643 KSH, 2014 WL 2965705, at \*9 (D.N.J. June 30, 2014) ("When the parties agree upon which state's law applies ... the Court need not conduct [a] choice-of-law inquiry."); *see also MacDonald v. Unisys Corp.,* 951 F.Supp.2d 729, 737 & n. 5 (E.D.Pa.2013) (Brody, J.); *Sager v. Hoffman La Roche, Inc.,* 2012 WL 3166630, at \*14 n. 9 (N.J.Sup.Ct., App.Div. Aug. 7, 2012) (per curiam).

### a. Subsumption of Tort, Warranty, and Consumer Fraud Claims for New Jersey and Tennessee Plaintiffs

Defendant argues that the tort, implied warranty, and consumer fraud claims asserted by Monica and the tort and warranty claims asserted by the Coles "unquestionably" constitute "product[s] liability action[s]," and, thus, are subsumed by the New Jersey Products Liability Act ("NJPLA") and the Tennessee Products Liability Act ("TPLA"), respectively. Def.'s Br. at 9–10.

Plaintiffs counter that the NJPLA's plain language is insufficient to determine if the NJPLA subsumes Monica's claim and that the TPLA does not subsume claims for damages arising from products that are "merely ineffectual," as opposed to dangerous. Pls.' Opp. Br. at 17 (citing *Lincoln Gen. Ins. Co. v. Detroit Deisel Corp.,* 293 S.W.3d 487 (Tenn.2009)).

### i. Monica (New Jersey)

The Court will begin by examining whether the NJPLA subsumes Monica's claims. The NJPLA was enacted "to limit the expansion of products-liability law" and "to limit the liability of manufacturers so as to balance[ ] the interests of the public and the individual with a view towards economic reality." *Zaza v. Marquess & Nell, Inc.,* 144 N.J. 34, 47–48, 675 A.2d 620 (1996) (quotations and citations omitted). The NJPLA, therefore, "established the sole method to prosecute

2015 WL 2414740, 86 UCC Rep.Serv.2d 700

a product liability action[,]" and after its enactment, "only a single product liability action remains." *Tirrell v. Navistar Int'l, Inc.,* 248 N.J.Super. 390, 398–99, 591 A.2d 643, (N.J.Super.Ct.App.Div.1991); *see also Repola v. Morbark Industries, Inc.,* 934 F.2d 483, 492 (3d Cir.1991) (explaining that the NJPLA "effectively creates an exclusive statutory cause of action for claims falling within its purview"). The NJPLA provides that "products liability actions" are "any claim[s] or action[s] brought by a claimant for harm caused by a product, irrespective of the theory underlying the claim." N.J. Stat. Ann. § 2A:58C–1(b) (3); *see U–Line Corp.,* No. 13–3203, 2013 WL 5503672, at *9. Therefore, if any of Plaintiff's claims are subsumed under the NJPLA, they will be dismissed.[3] *See, e.g., McDonough v. Bayer Healthcare, LLC,* No. CIV. 10–442, 2011 WL 2119107, at *3 (D.N.J. May 26, 2011).

**\*6** Indeed, courts have dismissed breach of implied warranty, NJCFA consumer fraud, unjust enrichment, and negligence claims—the claims asserted by Monica in Counts II, III, IV, V, and IX the FAC—based on NJPLA subsumption. *See Certain Underwriters at Lloyd's, London v. U–Line Corp.,* No. 13–3203, 2013 WL 5503672, at *4–5 (D.N.J. Oct.1, 2013) (dismissing negligence claims and implied warranty claims); *Smith v. Merial Ltd.,* No. 10–439, 2011 WL 2119100, at *5 (D.N.J. May 26, 2011) (dismissing NJCFA consumer fraud and unjust enrichment claims).

However, the NJPLA's reach is limited in one significant respect: the statute excludes any causes of action arising out of a harm solely to the defective product. N.J. Stat. Ann. § 2A:58C–1b(2); *see also Estate of Knoster v. Ford Motor Co.,* No. 01–3168, 2008 U.S. Dist. LEXIS 103342, at *14 n. 4, 2008 WL 5416399 (D.N.J. Dec. 22, 2008) (holding that "economic damages for destruction of the product are not recoverable under the NJPLA"). In order to ascertain whether the NJPLA subsumes a claim in which damage as a result of a defective product is alleged, the Court must determine the type of harm the Plaintiff is alleging: whether the harm includes property damage caused by the PEX Product or whether the harm was solely to the defective PEX Product itself.[4] *Sinclair v. Merck & Co., Inc.,* 195 N.J. 51, 66, 948 A.2d 587 (N.J.2008) ( "The language of the PLA represents a clear legislative intent that ... the PLA is paramount when the underlying claim is one for harm caused by a product."); *see also Arlandson v. Hartz Mountain Corp.,* 792 F.Supp.2d 691, 703 (D.N.J.2011) ("[R]egardless of

how a claim is pleaded, where the core issue is the harmfulness of the product's chemicals, the claim must be pleaded as an NJPLA claim.").

Here, it is clear from Plaintiffs' factual allegations that Monica's claims all sound in products liability and, moreover, that the harm alleged is not solely harm to the PEX Products themselves. Monica alleges that the PEX Fittings used in the construction of his home suffered from inherent design flaws. When the PEX Fittings failed, severe "water saturation" resulted. FAC at ¶ 33. The FAC specifically indicates that Monica's losses included both the destroyed PEX Fittings, as well as "loss associated with [the] catastrophic plumbing failure[ ]." *Id.* at ¶ 41. The FAC makes clear, then, that the physical replacement of the broken PEX Fittings or Monica's inability to use the PEX Fittings is not the thrust of Monica's injury. Instead, the injury primarily consists of the "catastrophic plumbing failure" that caused damage and water saturation throughout his home. *Id.* at ¶¶ 33, 41. As Monica's true harm is not to the product itself, his claims fall within the ambit of the NJPLA. *See Arlandson v. Hartz Mountain Corp.,* 792 F.Supp.2d 691, 703 (D.N.J.2011). For this reason, Monica's tort and implied warranty claims, in Counts II, III, and IV, are subsumed by the NJPLA. Monica's claim under the New Jersey Consumer Fraud Act, ("NJCFA"), in Count V, is also subsumed by the NJPLA.[5] Accordingly, Counts II, III, IV, and V as asserted by Monica, are dismissed. However, Monica is given leave to re-plead his claims as a single claim under the NJPLA.

### ii. The Coles (Tennessee)

**\*7** Next, the Court examines whether the Coles' claims are subsumed by the TPLA. As the Sixth Circuit has noted,

[T]he TPLA governs products liability actions in Tennessee and defines "product liability actions" as "all actions brought for or on account of personal injury, death or property damage caused by or resulting from the manufacture, construction, design, formula, preparation, assembly, testing, service, warning, instruction, marketing, packing, or labeling of any product." The TPLA also encompasses several different theories of products liability: "strict liability in tort; negligence; breach of warranty, express or implied; breach of or failure to discharge a duty to warn or instruct, whether negligent or innocent;

misrepresentation, concealment, or nondisclosure, whether negligent or innocent; or under any other substantive legal theory in tort or contract whatsoever.

*Strayhorn v. Wyeth Pharm., Inc.,* 737 F.3d 378, 392 (6th Cir.2013) (internal citation and quotation marks omitted). "The TPLA's definition of 'product liability action' has been interpreted broadly." *Id.* at 402.

Here, just as with Monica's claims, the Coles' claims clearly sound in products liability by alleging property damage caused by or resulting from the manufacture, design, and marketing of the PEX Products. Plaintiffs' argument that the Coles merely assert "economic loss" is inapposite: the "economic loss" doctrine relates to the interplay between tort and contract law and has no place in this analysis, which is solely focused on whether Plaintiffs' claims are subsumed by the TPLA. *See Lincoln Gen. Ins. Co. v. Detroit Diesel Corp.,* 293 S.W.3d 487, 488 (Tenn.2009); the Coles clearly allege property damage in the form of "water saturation and damage throughout their home." FAC ¶¶ 22. Therefore, Coles' claims in Counts I,[6] II, III, and IV are dismissed. However, the Coles are given leave to re-plead their claims as a single claim under the TPLA.

### b. Counts I and II–Express Warranty and Implied Warranty of Merchantability Claims–McMahon (Texas) and McCoy (Georgia)

Defendants next argue that McMahon and McCoy fail to state claims for breach of an express warranty and breach of the implied warranty of merchantability because they "have not fulfilled their contractual and legal duties to provide pre-suit notice of a failure and a demand for a replacement under the warranty." Def.'s Br. at 13. Specifically, Defendants argue that Texas and Georgia, the home states of McMahon and McCoy, respectively, require pre-suit notice of the breach and a request for a remedy as conditions precedent to asserting express and implied warranty claims under those state's laws.

NIBCO's express warranty, attached to the FAC, states that "[i]n the event that any defect occurs which the owner believes is covered by this warranty, the owner should immediately contact NIBCO Technical Services, either in writing or by telephone ... The owner will then be instructed to return said [product], at the owner's expense, to NIBCO.... In the event said inspection discloses to the satisfaction of NIBCO ... that said [product] is defective, a

replacement shall be mailed free of charge to the owner." NIBCO Warranty.

**\*8** Neither McMahon nor McCoy allege that they contacted NIBCO about any of the alleged defective PEX Products prior to filing this suit.[7] Both Georgia and Texas laws regarding the breach of the implied warranty of merchantability are taken from the same UCC provision. That provision states that "[t]he buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy." Ga.Code Ann. § 11–2–607; Tex. Bus. & Com.Code Ann. § 2.607.

#### 1. McMahon (Texas)

"To recover on a breach of warranty claim in Texas, 'the buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy.' " *McKay v. Novartis Pharm. Corp.,* 751 F.3d 694, 705 (5th Cir.2014) (citing Tex. Bus. & Com.Code Ann. § 2.607(c)(1)). Texas law applies Tex. Bus. & Com.Code Ann. § 2.607 to breach of express warranty and breach of implied warranty claims, and " 'commencement of litigation' does not satisfy the notice requirement" for either express or implied warranty claims. *See McKay,* 751 F.3d at 706.

"Although the Texas Supreme Court has not decided [the] issue of [whether notice must be given to a remote manufacturer or seller to satisfy § 2.607's requirements], the weight of intermediate Texas authority interprets the applicable version of § 2.607 to require" such notice. *Id.* at 707. The Texas appellate case that Plaintiffs cite for the opposite proposition, *Vintage Homes, Inc. v. Coldiron,* 585 S.W.2d 886, 888–89 (Tex.Civ.App.-El Paso 1979, no writ), interpreted a prior version of the statute at issue and goes against the clear majority of the Texas appellate courts that have considered the issue. *See, e.g., Bailey v. Smith,* No. 13–05–085–CV, 2006 WL 1360846, at *4–5 (Tex.App.-Corpus Christi May 18, 2006, no pet.); *U.S. Tire–Tech, Inc. v. Boeran, B. V.,* 110 S.W.3d 194, 199 (Tex.App.-Houston [1st Dist.] 2003, pet. denied); *Wilcox v. Hillcrest Memorial Park of Dall.,* 696 S.W.2d 423, 424 (Tex.App.-Dallas 1985, writ ref'd n.r.e.).

McMahon does not allege that he provided pre-suit notice to Defendant before bringing his breach of warranty claims, as required under Texas law. Thus, his breach

of express warranty and breach of the implied warranty of merchantability claims, asserted in Counts I and II, are dismissed without prejudice. *See, e.g.* *Martin v. Home Depot U.S.A., Inc.,* 369 F.Supp.2d 887, 893 (W.D.Tex.2005).

### 2. McCoy (Georgia)

Georgia courts analyze breach of written, or express, warranty and breach of implied warranty claims differently; accordingly, the Court will do the same. "Georgia law imposes two conditions before a breach of a written warranty can exist: (1) notice of the defect and (2) a reasonable opportunity to repair the defect." *Knight v. Am. Suzuki Motor Corp.,* 272 Ga.App. 319, 321–22, 612 S.E.2d 546 (2005). Accordingly, a warranty is not breached simply because a vehicle is found "on delivery or at some time thereafter within the warranty period to have a defective part or [an] operational deficiency." *Id.* (citing *Olson v. Ford Motor Co.,* 258 Ga.App. 848, 575 S.E.2d 743 (Ga.App.2002) (citation and footnote omitted)). "Assuming the purchaser has maintained his vehicle in the manner specified, it is the *refusal to remedy* within a reasonable time, or a *lack of success* in the attempts to remedy [that] would constitute a breach of warranty." *Id.* (citing *Olson,* 258 Ga.App. 848, 575 S.E.2d 743); *Culberson v. Mercedes–Benz USA, Ltd.,* 274 Ga.App. 89, 91, 616 S.E.2d 865 (2005) ("When a warrantee brings a breach of express warranty claim, the terms of the written warranty control. Thus, a warrantee can succeed on a breach of the warranty claim only if she has first satisfied the express conditions precedent for enforcement "as prescribed" by the warranty").

**\*9** Here, because McCoy has not pleaded that he provided notice or a reasonable opportunity to repair the allegedly defective PEX products to Defendant, pursuant to the terms of the warranty, his breach of an express warranty claim must fail. *See, e.g., id.* Accordingly, Count I as asserted by McCoy is dismissed without prejudice.

The Court now turns to McCoy's implied warranty of merchantability claim. The Georgia Court of Appeals has found that "delay alone [in providing reasonable notice to the seller] without prejudice caused by such delay is insufficient to bar relief to the plaintiff" under Georgia's statute pertaining to the breach of the implied warranty of merchantability. *Wal–Mart Stores, Inc. v. Wheeler,* 262 Ga.App. 607, 608, 586 S.E.2d 83 (2003) (analyzing a situation in which the plaintiff had only provided notice to

Wal–Mart upon filing a lawsuit, two years after the breach allegedly took place). Thus, the reasonable notice inquiry under Georgia law turns on whether the defendant has demonstrated prejudice as a result in the delayed notice.

Here, the Court lacks the requisite facts at the motion to dismiss stage to determine whether filing this lawsuit constitutes reasonable notice of McCoy's breach of the implied warranty of merchantability claim. Accordingly, the Court declines to dismiss Count II as asserted by McCoy. *See, e.g., In re Ford Motor Co. E–350 Van Products Liab. Litig. (No. II),* No. CIV. A. 03–4558, 2010 WL 2813788, at \*34 (D.N.J. July 9, 2010) *amended,* No. CIV.A. 03–4558 GEB, 2011 WL 601279 (D.N.J. Feb.16, 2011) (applying Georgia law regarding reasonable notice of breach of warranty claims on a motion for summary judgment); *see also Terrill v. Electrolux Home Prods.,* 753 F.Supp.2d 1272, 1287, (S.D.Ga.2010).

### c. Count III–Implied Warranty of Fitness

Next, Defendant argues that "[e]ach Plaintiff's claim for breach of the implied warranty of fitness for a particular purpose (Count III) fails because Plaintiffs used the PEX products for their ordinary purpose in residential plumbing systems and have failed to plead the requirements of a particular purpose claim" Def.'s Reply Br. at 3. Plaintiffs, however, claim that a "particular" purpose and an "ordinary" purpose are not mutually exclusive. Pls.' Opp. Br. at 13.

While Plaintiffs assert breach of implied warranty of fitness claims under various states' laws, it does appear that all of the states mentioned require that the product at issue be used for a "particular" purpose in order for a plaintiff to raise such a claim.[8] All of the relevant states utilize the following Uniform Sales Act provision to define a breach of the implied warranty of fitness:

> Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified under the next section an implied warranty that the goods shall be fit for such purpose.

**\*10** Tex. Bus. & Com.Code Ann. § 2.315; Okla. Stat. Ann. Tit. 12A, § 2–315; Ga.Code Ann. § 11–2–315;

Tenn.Code Ann. § 47–2–315; N.J.S.A. § 12A:2–315;
Ala.Code § 7–2–315; 13 Pa. Cons.Stat. Ann. § 2315.
In a comment regarding the most recent iteration of the
provision, it is noted that

> A "particular purpose" differs from
> the ordinary purpose for which
> the goods are used in that it
> envisages a specific use by the buyer
> which is peculiar to the nature of
> his business whereas the ordinary
> purposes for which goods are used
> are those envisaged in the concept
> of merchantability and go to uses
> which are customarily made of the
> goods in question. For example,
> shoes are generally used for the
> purpose of walking upon ordinary
> ground, but a seller may know that
> a particular pair was selected to be
> used for climbing mountains.

*Id.* cmt. 2. The FAC merely alleges that the PEX products,
which are ordinarily used in the course of installing a
plumbing system, were used as such by Plaintiffs, and
Plaintiffs concede as much in their opposition brief.
However, Plaintiffs argue that the ordinary purpose *was*
a particular purpose in that NIBCO advertised its PEX
products as containing "superior characteristics," making
them "the highest quality PEX tubing available today ... In
other words, PEX products are not only good for getting
around town, they will help you climb a mountain." Pls.'
Br. at 14.

Plaintiffs' argument is unconvincing. The cases to which
Plaintiffs cite (to the extent they are relevant, as the cited
cases regard laws of states that are not at issue here) do
not support Plaintiffs' position that "ordinary purpose"
and "particular purpose" need not be mutually exclusive;
they state that a product can be used for *both* an ordinary
and a particular purpose, not that an ordinary purpose
can be the same as a particular purpose. *See, e.g., Palmer
v. A.H. Robins Co.,* 684 P.2d 187, 208–09 (Col .1984);
*Gregory Woods Prods. v. Advanced Sawmill Mach. Equip.,
Inc.,* 2007 U.S. Dist. LEXIS 46245, 2007 WL 1825179
(W.D.N.C.2007). Further, Plaintiffs do not plead any
facts in their Amended Complaint to show that Defendant

had any reason to know that the PEX products were to be
used by Plaintiffs for a particular purpose. *See generally*
FAC. Therefore, Plaintiffs' implied warranty of particular
fitness claim in Count III is dismissed without prejudice.

#### d. Count IV–Negligence
Next, Defendants argue that Plaintiffs' negligence claims
must be dismissed. [9]

The FAC states that "Defendant owed Plaintiffs ... a
duty to exercise reasonable and ordinary care in the
formulation, testing, design, manufacture, warranting and
marketing of the PEX Products." Further, "[t]he failure
of the PEX Products ... was caused by poor and improper
workmanship and manufacture, negligence, and lack of
reasonable and ordinary care by NIBCO.... Defendant
failed to properly test and/or evaluate the PEX Products
to ensure they would not fail when they were used for
their intended purpose." Finally, "[a]fter being notified of
the foregoing breaches, NIBCO took no action to cure its
breaches of its duty ... As a direct and proximate result of
NIBCO's negligence ... Plaintiffs ... have been caused to
suffer losses and damages ..." FAC ¶¶ 169–172.

**\*11** This laundry list of duties that Defendant allegedly
breached does not suffice for asserting a negligence claim,
particularly for asserting separate negligence claims under
Plaintiffs' respective home states. Each state's negligence
jurisprudence varies; for example, Texas courts appear to
have found that where the gravamen of a plaintiff's claim
sounds in products liability, a plaintiff's general negligence
claim may not be permitted. *See Ford Motor Co. v.
Miles,* 141 S.W.3d 309, 315 (Tex.App.2004). However,
Pennsylvania law appears to allow for such claims, *see,
e.g., Scilvio v. Amgen, Inc.,* 810 F.Supp.2d 745, 755
(W.D.Pa.2011). Plaintiffs do not adequately specify how
their allegations meet the elements of each relevant state's
conception of negligence, and, as such, Count IV must be
dismissed without prejudice for failure to state a claim. [10]
*See, e.g., In re Wellbutrin XL Antitrust Litig.,* 260 F.R.D.
143, 167 (E.D.Pa.2009); *see also Nimley v. PTT Phone
Cards Inc.,* No. CIV. A. 13–2216, 2014 WL 1464311, at *6
(E.D.Pa. Apr.15, 2014).

#### e. Counts V, VI, VII, and VIII–Statutory Consumer
Fraud Claims

*Cole v. NIBCO, Inc.*, Not Reported in F.Supp.3d (2015)

2015 WL 2414740, 86 UCC Rep.Serv.2d 700

Next, Defendants argue that the New Jersey, Pennsylvania, Texas, and Oklahoma statutory consumer fraud claims, asserted in Counts V, VI, VII, and VIII, respectively, [11] should be dismissed for failure to state a claim.

"Independent of the standard applicable to Rule 12(b) (6) motions," Rule 9(b) of the Federal Rules of Civil Procedure requires a heightened pleading standard for claims sounding in fraud or mistake. *In re Rockefeller Ctr. Properties, Inc. Sec. Litig.,* 311 F.3d 198, 216 (3d Cir.2002); *see also* Fed.R.Civ.P. 9(b) ("In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."). All of the relevant consumer fraud claims are governed by Rule 9(b)'s heightened pleading requirements. *Crozier v. Johnson & Johnson Consumer Cos.,* 901 F.Supp.2d 494, 506 (D.N.J.2012) (analyzing the NJCFA); *Post v. Liberty Mut. Grp., Inc.,* Civ. No. 14–CV–238, 2014 WL 2777385, at *2– 4 (E.D. Pa. June 18, 2014) (analyzing the PUTPCPL); *Berry v. Indianapolis Ins. Co.,* 608 F.Supp.3d 785, 800 (N.D.Tex.2009) (analyzing the TDTPA).

The Third Circuit has adopted a flexible approach for evaluating whether a plaintiffs fraud claim meets Rule 9(b)'s heightened pleading standard. *Seville Indus. Mach. Corp. v. Southmost Mach. Corp.,* 742 F.2d 786, 791 (3d Cir.1984) ("Rule 9(b) requires plaintiffs to plead with particularity the 'circumstances' of the alleged fraud.... It is certainly true that allegations of 'date, place or time' [suffice], but nothing in the rule requires them. Plaintiffs are free to use alternative means of injecting precision and some measure of substantiation into their allegations of fraud."); *see also Frederico v. Home Depot,* 507 F.3d 188, 200 (3d Cir.2007) ("Pursuant to Rule 9(b), a plaintiff alleging fraud must state the circumstances of the alleged fraud with sufficient particularity to place the defendant on notice of the 'precise misconduct with which it is charged.'" (quoting *Lum v. Bank of America,* 361 F.3d 217, 223–24 (3d Cir.2004)).

### i. Count V–Monica's NJCFA Claim

**\*12** The Court decided *supra* that Monica's NJCFA claim sounded in product liability, and, as such, dismissed Count V as being subsumed by the NJPLA. Accordingly, the Court need not engage in further analysis of Count V.

### ii. Count VI—The Pepernos' UTPCPL Claim

"The UTPCPL generally prohibits unfair methods of competition and deceptive acts or practices in the conduct of trade or commerce." *Slapikas v. First Am. Title Ins. Co.,* 298 F.R.D. 285, 292 (W.D.Pa.2014) (citing 73 Pa. Stat. § 201–3); *see also Gardner v. State Farm Fire & Casualty Co.,* 544 F.3d 553, 564 (3d Cir.2008). "The UTPCPL lists twenty specifically prohibited practices in § 201–2(4)(i)- (xx), and also contains a catch-all provision." *Garczynski v. Countrywide Home Loans, Inc.,* 656 F.Supp.2d 505, 509 (E.D.Pa.2009). The catch-all provision provides a "private right of action in persons upon whom unfair methods of competition and unfair or deceptive acts or practices are employed and who, as a result, sustain an ascertainable loss." 73 Pa. Stat. § 201–9.2; *Slapikas,* 298 F.R.D. at 292.

"To establish liability under the UTPCPL's catchall provision a plaintiff must present evidence showing: (1) a deceptive act that is likely to deceive a consumer acting reasonably under similar circumstances; (2) justifiable reliance; and (3) that the plaintiffs justifiable reliance caused ascertainable loss." *Slapikas,* 298 F.R.D. at 292 (citing *Seldon v. Home Loan Servs.,* 647 F.Supp.2d 451, 470 (E.D.Pa.2009); *Hunt v. U.S. Tobacco Co.,* 538 F.3d 217, 223 (3d Cir.2008), *as amended* (Nov. 6, 2008)).

Defendants argue that the Pepernos fail to state a claim under the UTPCPL because they (1) do not identify a deceptive act with requisite specificity and (2) do not allege justifiable reliance.

The FAC states that

> Defendant has engaged in deceptive business practices prohibited by the UTPCPL, including (1) representing that the PEX Products have characteristics, use, benefits, and qualities which they do not have, (2) representing that PEX Products are of a particular standard, quality, and grade when they are not, (3) advertising the PEX Products with the intent not to sell them as advertised, and (4) engaging in acts and practices which are

*Cole v. NIBCO, Inc., Not Reported in F.Supp.3d (2015)*

2015 WL 2414740, 86 UCC Rep.Serv.2d 700

otherwise unfair, misleading, false, or deceptive to the consumer.

FAC ¶ 186. While the FAC further states that "NIBCO's unfair or deceptive practices were likely to and did in fact deceive reasonable consumers, including the Pepernos, about the true performance and characteristic of the PEX Products," FAC 187, the Pepernos include no specific factual allegations stating that they chose to have PEX Products installed in their home because of Defendant's allegedly deceptive business practices, let alone factual allegations about when, where, and how they were exposed to Defendant's allegedly deceptive practices. *See* FAC ¶¶ 90–103. Therefore, regardless of whether Pepernos have adequately alleged that NIBCO engaged in deceptive business practices, presumably by advertising their products were of high quality, their UTPCPL claim fails because they do not allege justifiable reliance on such practices. *See, e.g., Kee v. Zimmer, Inc.,* 871 F.Supp.2d 405, 412 (E.D.Pa.2012); *see also Militello v. Allstate Prop. & Cas. Ins. Co.,* 2014 WL 2892386, at *4 (M.D.Pa. June 26, 2014) ("Plaintiff's UTPCPL claim ... lacks supporting factual allegations demonstrating that Plaintiff justifiably relied on Defendant's representations or conduct"). Accordingly, Count VI is dismissed without prejudice.

### i. Count VII–McMahon and the Medders' TDTPA Claim

**\*13** The TDPTA "grants consumers a cause of action for false, misleading, or deceptive acts or practices." *Amstadt v. U.S. Brass Corp.,* 919 S.W.2d 644, 649 (Tex.1996); *see also* Tex. Bus. & Com Code Ann. § 17.50(a) (1) (2009). "The elements of a DTPA cause of action are: (1) the plaintiff is a consumer; (2) the defendant committed acts 'in connection with the purchase or lease of any goods or services'; (3) the defendant's acts were false, misleading or deceptive; and (4) the acts were a producing cause of plaintiff's injuries." *Cushman v. GC Servs., LP,* 657 F.Supp.2d 834, 842 (S.D.Tex.2009) *aff'd sub nom. Cushman v. GC Servs., L .P.,* 397 Fed. App'x 24 (5th Cir.2010) (quoting *Amstadt,* 919 S.W.2d at 649); *see also Washington v. U.S. HUD,* 953 F.Supp. 762, 777 (N.D.Tex.1996). "A producing cause is synonymous with natural result and has been defined as an efficient, exciting or contributing cause that, in a natural sequence, produced the complained of injuries or

damages." *McClung v. Wal–Mart,* 866 F.Supp. 306, 310 (N.D.Tex.1994).

Defendants argue that the Texas plaintiffs do not allege with requisite particularity (1) the allegedly unlawful acts in which Defendant engaged under the TDTPA, and (2) that any such acts caused their injuries.

In the FAC, Plaintiffs allege that "NIBCO's actions as set forth above occurred in the conduct of trade or commerce, and constitute deceptive trade practices under the TDTPA" and that "[a]ll procedural requisites, including notice, have been met." FAC ¶¶ 194, 196. Further, "[a] causal relationship exists between Defendant's unlawful, false, deceptive, and misleading conduct and Plaintiffs' and Texas Class members' injuries.... Had Defendant not engaged in the aforementioned deceptive conduct, Plaintiffs and the Texas Class would not have purchased and installed Defendant's PEX Products in their residential and commercial properties." FAC ¶ 198.

However, similar to the Pepernos, the Texas Plaintiffs do not provide factual allegations in support of their conclusory statement that Defendant's allegedly false, deceptive, or misleading conduct was a producing cause of Plaintiff's injuries. The Medders and McMahon merely state that their residential plumbing system was installed using NIBCO PEX Products and conclusorily allege that" "a causal relationship exists" between Defendant's conduct and their damages—they provide no specificity about any false, misleading, or deceptive statements or actions by Defendants and how such behavior would constitute a "producing cause" of their decision to install PEX Products in their home. FAC ¶¶ 59, 80. Therefore, regardless of whether Plaintiffs have identified allegedly false, misleading, or deceptive behavior on the part of Defendant, their claim fails on the TDTPA's causal element. *See, e .g., Robinson v. Match.com, L.L.C.,* No. 3:10–CV–2651–L, 2012 WL 5007777, at *10 (N.D.Tex. Oct.17, 2012) *aff'd sub nom. Malsom v. Match.com, L.L.C.,* 540 Fed. App'x 412 (5th Cir.2013). Accordingly, Count VI is dismissed without prejudice.

### ii. Count VIII—Sminkey's ODPTPA Claim

**\*14** Regarding Plaintiff's Sminkey's fraud claim under the ODTPA, Sminkey acknowledges in Plaintiff's opposition brief that the Oklahoma Deceptive Trade Practices Act does not create a private right of action for consumers, *see Thomas v. Metro. Life Ins. Co.,* 540

Cole v. NIBCO, Inc., Not Reported in F.Supp.3d (2015)
2015 WL 2414740, 86 UCC Rep.Serv.2d 700

F.Supp.2d 1212, 1228 (W.D. Okla. Jan 10, 2008), and seeks leave to re-plead his claim under the Oklahoma Consumer Protection Act ("OCPA"). Pl.'s Opp. Br. at 27. As such, Count VIII is dismissed without prejudice.

*f. Count IX–Unjust Enrichment*

Defendants next argue that Plaintiffs' unjust enrichment claims must fail for one of two reasons. First, the unjust enrichment claims asserted by McCoy, McMahon, the Medders, Boyd, and the Coles must fail, because "under the laws of their respective states, Plaintiff[s] ... cannot maintain their unjust enrichment claim ... because they allege the existence of an actual contract (the express warranty) governing their relationship" with Defendant. Def.'s Br. at 27. Second, Defendants argue that the unjust enrichment claims asserted by Boyd, Monica, and the Pepernos fail "because their home states do not recognize a claim for unjust enrichment against defendants from whom the plaintiff did not directly purchase the product." Def.'s Br. at 28. The Court will address each state's unjust enrichment laws in turn.

In Texas, Georgia, Tennessee, and Alabama, unjust enrichment actions may not succeed in the face of a governing contract, such as an express warranty. *In re Atlas Roofing Corp. Chalet Shingle Products Liab. Litig.,* No. 1:13–CV–2195–TWT, 2014 WL 3360233, at *3 (N.D.Ga. July 9, 2014) ("Under Georgia law, 'unjust enrichment is available only when there is no legal contract.' ") (quoting *American Casual Dining, L.P. v. Moe's Sw. Grill, L.L.C.,* 426 F.Supp.2d 1356, 1372 (N.D.Ga.2006)); [12] *Johnson v. Wells Fargo Bank, NA,* 999 F.Supp.2d 919, 929 (N.D.Tex.2014) ("Because a claim for unjust enrichment is "based on quasi-contract," it is "unavailable when a valid, express contract governing the subject matter of the dispute exists."); *Branch Banking & Trust Co. v. Howard,* No. CIV.A. 12–0175–WS–N, 2013 WL 951652, at *5 (S.D.Ala. Mar.8, 2013) ("Alabama law is clear that quasi-contractual, equitable remedies such as unjust enrichment are not cognizable in the presence of an express contract between the parties that governs the same subject matter."). Because the parties here do not dispute the existence of a governing express warranty, Count IX as asserted by McCoy, McMahon, the Medders, Boyd, and the Coles must be dismissed.

Meanwhile, in New Jersey, Pennsylvania, and Alabama, it is necessary to assert a "sufficiently direct relationship"

between the plaintiff and the defendant to recover on an unjust enrichment claim. *Snyder v. Farnam Companies, Inc.,* 792 F.Supp.2d 712, 724 (D.N.J.2011) ("Since Plaintiffs have failed to allege that they purchased the Products directly from Defendants, they cannot rightfully expect any remuneration from Defendants, since they never directly conferred a benefit on Defendants."). *Schmidt v. Ford Motor Co.,* 972 F.Supp.2d 712, 721 (E.D.Pa.2013) ("The 'benefit' must be conferred by the plaintiff directly-indirect benefits bestowed by third parties will not support a claim for unjust enrichment."); *Danny Lynn Elec. & Plumbing, LLC v. Veolia ES Solid Waste Se., Inc.,* No. 2:09CV192–MHT, 2011 WL 2893629, at *6 (M.D.Ala. July 19, 2011) ("[T]he plaintiffs' unjust-enrichment claim should be dismissed as to the individual defendants because the plaintiffs did not confer a direct benefit on those individuals. In Alabama, 'the essence of unjust enrichment is that a plaintiff can prove facts showing that defendant holds money which, in equity and good conscience, belongs to plaintiff or holds money which was improperly paid to defendant because of mistake or fraud.' " (quoting *Hancock–Hazlett General Const. Co., Inc. v. Trane Co.,* 499 So.2d 1385, 1387 (Ala.1986)). Here, a direct relationship between Plaintiffs and Defendants do not exist, because Plaintiffs did not directly purchase the PEX Products from Defendant. Therefore, Count IX, as asserted by Monica and the Pepernos, [13] must be dismissed.

**\*15** Because each Plaintiffs state law bars a claim for unjust enrichment under the circumstances, Count IX is dismissed in its entirety.

*g. Count X–Declaratory and Injunctive Relief*

Finally, in Count X, Plaintiffs include a claim for "declaratory and injunctive relief." FAC ¶¶ 213–214. However, declaratory relief and injunctive relief, as their names imply, are remedies, not causes of action. Accordingly, the Court dismisses Count X. *See Chruby v. Kowaleski,* 534 Fed. App'x 156, 160 n. 2 (3d Cir.2013) (affirming dismissal of a claim that was solely for a remedy).

**V. CONCLUSION**

For the foregoing reasons, Defendants' Partial Motion to Dismiss is GRANTED IN PART. Counts II, III, and IV are dismissed as asserted by Monica, and Counts I, II, III, and IV are dismissed as asserted by the Coles; both

Cole v. NIBCO, Inc., Not Reported in F.Supp.3d (2015)

2015 WL 2414740, 86 UCC Rep.Serv.2d 700

sets of plaintiffs are granted leave to file claims under the NJPLA and the TPLA, respectively. Count I is dismissed without prejudice as asserted by McCoy. Counts I and II are dismissed without prejudice as asserted by McMahon. As asserted by all Plaintiffs, Counts III, IV, VI, VII, and VIII are dismissed without prejudice, and Counts V, IX, and X are dismissed. Count II as asserted by McCoy, however, may proceed.

An appropriate order shall follow.

**All Citations**

Not Reported in F.Supp.3d, 2015 WL 2414740, 86 UCC Rep.Serv.2d 700

Footnotes

1    The Court notes that the paragraph numbering convention used by Plaintiff in the FAC is erroneous on pages 18–20. *See e.g.,* FAC at 18 (duplicate paragraph 103); *id.* at 19 (shift in numbering from 109 to 104). For clarity when citing to this portion of the record, a page number is provided along with the paragraph number.

2    The Court notes that, although Defendant does not raise the issue, the FAC's failure to specify which state's laws apply to their common law claims may not meet the Rule 8 pleading standard. *See, e.g., In re Wellbutrin XL Antitrust Litig.,* 260 F.R.D. 143, 167 (E.D.Pa.2009) ("The plaintiffs fail to link their claim to the law of any particular state. As a result of this deficiency, the plaintiffs fail to state a cause of action ...."); *see also Nimley v. PTT Phone Cards Inc.,* No. CIV.A. 13–2216, 2014 WL 1464311, at *6 n. 7 (E.D.Pa. Apr.15, 2014). However, out of an abundance of caution, the Court will proceed by analyzing Defendant's arguments on the merits of the FAC, particularly because the parties appear to be in agreement that each Plaintiff's home state laws apply to each common law cause of action.

3    Claims for breach of express warranty are specifically not subsumed by the NJPLA. N.J. STAT. ANN. 2A:58C–1(b)(3) (defining "products liability action" as "any claim or action brought by a claimant for harm caused by a product, irrespective of the theory underlying the claim, except actions for harm caused by breach of an express warranty.").

4    I note that Plaintiffs rely on a case in this district which found that the NJPLA does not subsume claims for damages consequentially caused by a defective product. *See Kuzian v. Electrolux Home Prods.,* 937 F.Supp.2d 599, 607–08 (D.N.J.2013). The facts of this case are very similar to the instant case: both concern an allegedly defective product that malfunctioned, broke, and caused water damage. *Id.* at 604–05. The plaintiff in *Kuzian* asserted various breaches of warranty and fraud claims, and those claims were determined to not have been subsumed by the NJPLA. *Id.* at 607–08. Plaintiffs analogize the instant case to the *Kuizan* case and argue that the NJPLA should similarly decline to subsume Plaintiffs' claims. Plaintiffs assert that, like the plaintiff in *Kuzian,* they have alleged harm to the product itself and consequential damage to Plaintiffs' property.

      However, the Court does not find this reasoning persuasive. *Kuzian* contradicts other cases in this district that have discussed this issue. *Montich v. Miele USA, Inc.,* 849 F.Supp.2d 439, 456–57 (D.N.J.2012) (a complaint alleging harm caused by a defective product would be subsumed by the NJPLA); *U–Line Corp.,* No. 13–3203, 2013 WL 5503672, at *4–5 (rejecting *Kuzian* ). Further, tellingly, the *Kuzian* Court granted reconsideration of its decision on this very issue. *Kuzian v. Electrolux Home Prods.,* No. 12–3341(NLH), 2013 WL 6865083 at *1 (D.N.J. Dec.30, 2013) ("finding after review of the submissions that it should re-examine the issue of whether plaintiffs' claims concerning the damages caused by the allegedly faulty ice makers to property other than the product itself, e.g., food, floors and walls are consequential, economic losses, but rather sound in tort and are subsumed by the NJPLA").

5    Plaintiffs argue that Monica's NJCFA claim cannot be subsumed by the NJPLA. But Defendant is correct: "there is no exception for NJCFA claims where, as here, the gravamen of the claim is that the challenged statements or omissions led to harm that falls within the scope of the NJPLA." Def.'s Reply Br. at 12; *see Sun Chem. Corp. v. Fike Corp.,* No. CIV. 13–4069 FSH, 2015 WL 881961, at *3 (D.N.J. Mar.2, 2015) (collecting cases); *Indian Brand Farms v. Novartis Crop Prot.,* 890 F.Supp.3d 524, 547–48; *McDarby v. Merk & Co.,* 401 N.J.Super. 10, 949 A.2d 223, 277–78 (N.J.Super.Ct.App.Div.2008).

6    Unlike the NJPLA, the TPLA subsumes claims for breach of an express warranty. *Strayhorn,* 737 F.3d at 392. Therefore, unlike for Monica, the Coles' claim of breach of express warranty in Count I is dismissed.

7    Unlike McMahon, the Medders, the other Texas plaintiffs, alleged that "[w]ithin a reasonable amount of time following the losses, the Medders provided NIBCO with actual notice of the failures of its PEX Products and NIBCO failed to replace the PEX Products within the Medders' home or otherwise fulfill its warranty obligations." FAC ¶ 86.

Cole v. NIBCO, Inc., Not Reported in F.Supp.3d (2015)

2015 WL 2414740, 86 UCC Rep.Serv.2d 700

8    *See* Tex. Bus. & Com.Code Ann. § 2.315 cmt. 2; Okla. Stat. Ann. Tit. 12A, § 2–315 cmt. 2; Ga.Code Ann. § 11–2–315 cmt. 2; Tenn.Code Ann. § 47–2–315 cmt. 2; N.J.S.A. § 12A:2–315 cmt. 2; Ala.Code § 7–2–315 cmt. 2; 13 Pa. Cons.Stat. Ann. § 2315 cmt. 2.

9    The Court has already dismissed the negligence claims of Monica and the Coles as subsumed under those plaintiffs' respective state products liability acts. *See supra* Section III.a.

10   Defendant argues that under the "gist of the action" doctrine, Plaintiffs' negligence claims are really breach of warranty claims and, as such, should be dismissed. However, a review of Count IV reveals that Plaintiffs' Count IV's allegations go beyond the scope of breach of warranty. *See* FAC ¶¶ 169 172.

11   Specifically, Plaintiffs assert claims under the NJCFA, the Pennsylvania Unfair Trade Practices and Consumer Protection Law (the "UTPCPL"), the Texas Deceptive Trade Practices Act ("TDTPA"), and the Oklahoma Consumer Deceptive Trade Practices Act ("ODTPA").

12   Plaintiffs points to *Clark v. Aaron's, Inc.,* 914 F.Supp.2d 1301, 1309 (N.D.Ga.2012), for the proposition that an unjust enrichment claim may be pled in the alternative under Georgia law. *See also WESI, LLC v. Compass Envtl., Inc.,* 509 F.Supp.2d 1353, 1363 & n. 12 (N.D.Ga.2007). While case law on this issue appears to be mixed, the Georgia Court of Appeals has found that an unjust enrichment claim, pled as an alternative to recovery under a contract claim, fails as a matter of law if a governing contractual provision is indisputably in place. *Tidikis v. Network for Med. Commc'n & Research LLC,* 274 Ga.App. 807, 619 S.E.2d 481, 486 (Ga.Ct.App.2005); *see also Huddle House, Inc. v. Two Views, Inc.,* No. 1:12–CV–03239–RWS, 2013 WL 1390611, at *4 (N.D.Ga. Apr.4, 2013). Because the parties do not dispute the validity or the applicability of the express warranty at issue here, the Court finds that an unjust enrichment claim cannot survive the Rule 12(b)(6) analysis even if pled in the alternative.

13   The Court already *supra* dismissed Boyd's unjust enrichment claim under Alabama law, on the basis of the existence of a governing express contract.

---

End of Document                                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT O

Case 2:19-cv-07532-ES-MAH   Document 18-5   Filed 05/22/19   Page 254 of 300 PageID: 562
Archer v. Holmes, Not Reported in Fed. Supp. (2018)
2018 WL 534475

2018 WL 534475
Only the Westlaw citation is currently available.
United States District Court,
N.D. Georgia, Atlanta Division.

Arsenio ARCHER, Plaintiff,
v.
London HOLMES p/k/a We Got
London on da Track, et al., Defendants.

CIVIL ACTION FILE NO. 1:17-CV-2051-TWT
|
Signed 01/23/2018

**Attorneys and Law Firms**

Lauren R. McAlpin, Thomas E. Reynolds, Jr., Reitler
Law Group, LLC, Atlanta, GA, for Plaintiff.

Brian Caplan, Reitler Kailas & Rosenblatt LLC, New
York, NY, Alan Stuckey Clarke, Harry Donival Dixon,
III, Taylor English Duma LLP, Eileen Elizabeth Hintz
Rumfelt, Miller & Martin, PLLC, Derek Mikal Wright,
Derek M. Wright, LLC Attorney at Law, Jordan Arkin,
Hayden R. Pace, Stokes Wagner, ALC, Atlanta, GA,
Namisha D. Patel, Roy Hyrum Maughan, Jr., The
Maughan Law Firm, LLC, Baton Rouge, LA, for
Defendants.

**OPINION AND ORDER**

THOMAS W. THRASH, JR., United States District
Judge

**\*1** This is a copyright infringement case. It is before
the Court on the Defendant London Holmes' Motion to
Dismiss [Doc. 20], and the Defendant Songs of YSL Music
Publishing's Motion to Dismiss [Doc. 24], to which other
Corporate Defendants have joined [Docs. 58, 65].[1] For
the following reasons, Holmes' Motion to Dismiss [20]
is GRANTED in part and DENIED in part, and the
Corporate Defendants' Motions to Dismiss [Docs. 24, 58,
65] are GRANTED.

**I. Background**

This dispute stems from the Defendant Holmes' alleged
refusal to give credit to or share profits with the Plaintiff
stemming from the Plaintiff's alleged co-authorship
or sole-authorship of twenty-nine different sound
recordings.[2] According to the Complaint, the Plaintiff,
Arsenio Archer, and Holmes began a professional
relationship in June of 2014 as music producers, the goal
of which was to co-author and co-produce songs for music
artists.[3] Archer agreed to the relationship in reliance on
Holmes' representation that he would receive an equal
share of any income generated from sound recordings
which he helped to produce.[4] During the course of their
working relationship, Archer exercised "complete creative
freedom" to alter the sound recordings and produced
"essential elements to complete each project."[5]

At some point, Holmes began to claim sole production
credits for both the works he created jointly with Archer
and the works Archer claims he authored himself.[6]
Holmes also began to make various licensing agreements
with publishers, distributors, and record labels without
obtaining Archer's consent to do so.[7] Meanwhile, Archer
claims he has not been compensated or credited as an
author or producer of the recordings.[8]

**\*2** Archer filed this action on June 5, 2017, against
Holmes and the Corporate Defendants. In his original
Complaint, Archer alleged eight counts in all. In
Count I, he sought a declaratory judgment against
all Defendants establishing his ownership rights in
the sound recordings. In Count II, he sought an
accounting of all income generated from the sound
recordings. In Counts III and IV, Archer claimed
copyright infringement against Holmes and the Corporate
Defendants, respectively. In Count V, Archer claimed
vicarious copyright infringement against the Corporate
Defendants. In Count VI, he alleged violations of the
Lanham Act. Lastly, Archer included a claim for fraud
against Holmes in Count VII, and claims for unjust
enrichment against all of the Defendants in Count VIII.

Since filing the Complaint, Archer has voluntarily
dismissed Counts IV-VI against all Defendants, and
partially dismissed Count III against Holmes. All that
remains, therefore, are claims for declaratory judgment
and accounting against all Defendants (Counts I-II),
a claim for copyright infringement against Holmes for

2018 WL 534475

the two songs Archer claims he solely authored (Count III), one claim for fraud against Holmes (Count VII), and claims for unjust enrichment against all Defendants (Count VIII). Holmes now moves to dismiss the fraud and unjust enrichment claims against him. The Corporate Defendants, [9] meanwhile, move to dismiss Archer's unjust enrichment claims. The Court will address the claims against Holmes and the Corporate Defendants separately.

## II. Legal Standard

A complaint should be dismissed under Rule 12(b)(6) only where it appears that the facts alleged fail to state a "plausible" claim for relief. [10] A complaint may survive a motion to dismiss for failure to state a claim, however, even if it is "improbable" that a plaintiff would be able to prove those facts; even if the possibility of recovery is extremely "remote and unlikely." [11] In ruling on a motion to dismiss, the court must accept the facts pleaded in the complaint as true and construe them in the light most favorable to the plaintiff. [12] Generally, notice pleading is all that is required for a valid complaint. [13] Under notice pleading, the plaintiff need only give the defendant fair notice of the plaintiff's claim and the grounds upon which it rests. [14]

## III. Discussion

### A. Claims against Holmes

Section 301(a) of the Copyright Act expressly preempts all legal or equitable rights that "are equivalent to any of the exclusive rights within the scope of copyright...." [15] The parties agree that the sound recordings at issue are governed by the Copyright Act. The only question is whether Archer's claims for fraud and unjust enrichment are "equivalent to" Archer's potential copyright claims.

**\*3** Courts in this Circuit have said that state laws are not preempted if they require plaintiffs to prove additional elements over and above those necessary for copyright claims. [16] As the Eleventh Circuit has made clear, however, not just any extra element will do. Rather, only that extra element which "changes the nature of the action so that it is qualitatively different from a copyright

infringement claim" will serve to prevent preemption. [17] Put another way, state law claims are equivalent to, and thus preempted by, copyright infringement claims unless they are substantively different from one another.

Turning to the case at hand, though the fraud and copyright claims are based on similar facts—Holmes' licensing of the recordings without Archer's permission—the fraud claim requires proof that Holmes intentionally misled Archer via a false representation. [18] This false representation, similar to breach of duty in trade secrets cases, is an essential element of a fraud claim that is not present in a copyright claim. [19] Because the false representation of a material fact is not only a required element, but in truth the "gravamen" of a fraud claim, it adds the extra element that qualitatively distinguishes Archer's fraud claim from copyright infringement. [20] The fraud claim, therefore, is not preempted by the Copyright Act.

But the same cannot be said for Archer's unjust enrichment claim. Under Georgia law, unjust enrichment applies where "there is no legal contract and when there has been a benefit conferred which would result in an unjust enrichment unless compensated." [21] These claims are generally regarded as equivalent to copyright claims and, therefore, preempted. [22] This is because, "under these quasi-contractual theories, the plaintiff need only prove that the defendant was unjustly enriched through the use of her idea or work." [23] The heart and soul of such a claim is the violation of the copyright.

Using the facts of this case as an example, the gist of Archer's claim for unjust enrichment is that Holmes failed to pay him money he was owed as a co-owner in the works, and that Holmes should not be allowed to be unjustly enriched by his unauthorized use of the sound recordings. No other elements—like a breach of fiduciary duty, a false representation, or a breach of a promise in a contract—need to be proven other than Holmes' violation of Archer's rights as the owner of the copyright. This is no different from a copyright claim.

**\*4** The Plaintiff counters that while quasi-contract claims (e.g., unjust enrichment) may be preempted, contracts implied-in-fact are not necessarily preempted. Because he alleged Holmes promised to pay him for his

2018 WL 534475

work in one paragraph of the Complaint, [24] the Plaintiff contends that Holmes breached a contractual promise and that because this is an element not present in a copyright claim, his claim should survive as a result. The Plaintiff is correct that there is a crucial distinction between quasi-contract claims and implied-in-fact contract claims. Whereas a quasi-contract is a "fictitious contract" created by courts to prevent injustice, a contract implied-in-fact is "a true contract that arises from the tacit agreement of the parties." [25] Claims based on quasi-contract are equitable claims, while claims based on contracts implied-in-fact are regular breach of contract claims. As discussed in the previous paragraph, quasi-contract claims—like unjust enrichment—are almost always preempted. Breach of contract claims, on the other hand, are not necessarily so if a plaintiff can show that rights separate from those he held as a copyright owner were violated. [26]

But while the Plaintiff certainly deserves credit for articulating this somewhat knotty distinction, the Court does not see how it is relevant here as the Plaintiff's Complaint never asserts a claim for breach of contract. The Plaintiff may not successfully argue in a response brief to a motion to dismiss that one throwaway allegation buried deep in the Complaint suddenly serves as the basis for an entirely new cause of action. But even if he could, this novel contract claim would still fail. While courts have found promises to pay contained in implied contracts sufficient to overcome preemption, [27] contract claims "which seek[ ] to enforce only rights that copyright law itself accords plaintiff" are preempted because a promise to do that which copyright law already requires does not contain the "extra element" required to prevent preemption. [28]

In this case, Holmes allegedly promised to "split the income generated from the sound recordings...." [29] He did not promise to pay Archer for his labor, to give Archer an interest in some unrelated asset, or to assign credit in any particular way. The only promise Holmes made was to pay Archer a co-owner's share of any income generated from works of which he was to be a co-owner. This "promise" is merely an acknowledgment of that which Archer would already enjoy as a co-owner or sole owner of the copyrights. [30] Any breach of this "promise" would also be a violation of the copyright, and vice-versa. The two claims are effectively the same. Thus, even if this

Court read the Complaint broadly and graciously, any purported breach of contract claim on the facts contained in the Complaint would be preempted.

In addition to his preemption arguments, Holmes also argues that the fraud claim has not been sufficiently pleaded under Rule 9(b). [31] In particular, citing *Brazil v. Janssen Research & Development, LLC*, 2016 WL 4844442 at *1 (N.D. Ga. Mar. 24, 2016) (Murphy, J.), Holmes argues that the Complaint does not allege specific statements by the Defendant on which the Plaintiff relied. But the Complaint in this case is very different from the complaint at issue in Brazil. In that case, which had multiple defendants, the plaintiff merely stated that there were misrepresentations without specifying what those misrepresentations were or who said them. But here, the Complaint states that Holmes made representations, before their working relationship began, that Archer would receive an equal share of any royalties earned from any sound recordings they produced together. [32] The Plaintiff has provided the who, what, where, when, and how of the alleged fraud. [33] As such, the Defendant has received the requisite notice as to which of his actions were allegedly fraudulent. This satisfies the pleading requirements of Rule 9(b). [34] For these reasons, Holmes' motion to dismiss is granted as to the unjust enrichment claim, but denied regarding the fraud claim.

## B. Unjust Enrichment Claims Against the Corporate Defendants

**\*5** The Plaintiff's unjust enrichment claims against the Corporate Defendants also fail, albeit for different reasons. The Plaintiff alleges that when the Corporate Defendants signed licensing agreements with Holmes, they were unjustly enriched because they never paid the Plaintiff as a co-owner. [35] The Plaintiff never alleges, however, that the Corporate Defendants negotiated with the Plaintiff or that they even knew he existed. In other words, there is no alleged relationship at all between the Corporate Defendants and the Plaintiff. Any benefits the Corporate Defendants received from the Plaintiff, therefore, were received indirectly through Holmes. But in Georgia, unjust enrichment claims lie only in those situations where a defendant has received a direct benefit from a plaintiff. [36] Indeed, any other result would lead to widespread liability for record companies who deal in good faith with those who they believe are the true owners

Case 2:19-cv-07532-ES-MAH Document 18-5 Filed 05/22/19 Page 257 of 300 PageID: 565

Archer v. Holmes, Not Reported in Fed. Supp. (2018)

2018 WL 534475

of copyrights. The unjust enrichment claim against the Corporate Defendants is inappropriate under Georgia law and is dismissed.

### IV. Conclusion

For the reasons stated above, the Defendant Holmes' Motion to Dismiss [Doc. 20] is GRANTED in part and DENIED in part. Songs of YSL Music Publishing, et al.'s Motions to Dismiss [Doc. 24, 58, 65] are GRANTED.

SO ORDERED, this 23 day of January, 2018.

### All Citations

Not Reported in Fed. Supp., 2018 WL 534475

### Footnotes

1    The Corporate Defendant TIG7 Publishing filed a motion [Doc. 65] to join in Holmes' and YSL's Motions to Dismiss. Meanwhile, the following Corporate Defendants filed a separate Motion to Dismiss [Doc. 58] that consists only of a statement adopting Holmes' and YSL's Motions to Dismiss in their entirety: Theory Entertainment, LLC d/b/a 300 Entertainment, BMG Rights Management (US) LLC d/b/a Gold Songs, WEA International Inc., Warner-Tamerlane Publishing Corp., Warner Music Group Corp., Atlantic Recording Corporation, Sony/ATV Music Publishing LLC, EMI Blackwood Music Inc., Songs of Universal Inc., Universal Music Group, Inc., and Grand Hustle, LLC.

2    Compl. ¶ 6. The songs are: "Section" by 2 Chainz feat. Lil Wayne; "Retaliation" by Boosie Badazz; "Street Shit", "Don't You Change", "Kodak", "Ride", "Black Lives Matter", "How You Feel", and "Bullshit" by Dae Dae; "Good Girls" by Verse Simmonds; "I Don't Belong to You" by KeKe Palmer; "About the Money" by T.I. feat. Young Thug; "Peanut Butter Jelly" by T.I.; "730", "Tell em", "Keep it Going", "Lifestyle", "Sho Me Love", and "Take Kare" by Rich Gang; "Gold Bottles", and "Hell you talkin bout" by Young Jeezy; "Check", "Numbers", "Memo", "Digits", "Worth It", "Tattoos", and "Again" by Young Thug; and "Sneakin" by Drake feat. 21 Savage. Archer claims that "How You Feel" and "Bullshit" were authored solely by him. *Id.* at ¶¶ 56, 62. The remainder were joint works between Archer and Holmes. *See, e.g., id.* at ¶ 60.

3    *Id.* at ¶ 33.

4    *Id.* at ¶ 37.

5    *Id.* at ¶¶ 34-35.

6    *Id.* at ¶ 39.

7    *Id.* at ¶¶ 40-41. Many of these third parties are joined as Defendants.

8    *Id.* at ¶ 44.

9    As mentioned above in note 1, a number of Defendants have joined YSL's motion to dismiss. Collectively, the Court refers to these as the "Corporate Defendants." Lest there be any confusion, however, it should be pointed out that there are a number of other corporate Defendants who have not moved to dismiss Archer's claims against them. This Order does not address those claims.

10   *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009); Fed. R. Civ. P. 12(b)(6).

11   *Bell Atlantic v. Twombly*, 550 U.S. 544, 556 (2007).

12   *See Quality Foods de Centro America, S.A. v. Latin American Agribusiness Dev. Corp., S.A.*, 711 F.2d 989, 994-95 (11th Cir. 1983); *see also Sanjuan v. American Bd. of Psychiatry & Neurology, Inc.*, 40 F.3d 247, 251 (7th Cir. 1994) (noting that at the pleading stage, the plaintiff "receives the benefit of imagination").

13   *See Lombard's, Inc. v. Prince Mfg., Inc.*, 753 F.2d 974, 975 (11th Cir. 1985), cert. denied, 474 U.S. 1082 (1986).

14   *See Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (citing *Twombly*, 550 U.S. at 555).

15   17 U.S.C. § 301(a).

16   *See, e.g., Howard v. Sterchi*, 725 F. Supp. 1572, 1578 (N.D. Ga. 1989).

17   *Bateman v. Mnemonics, Inc.*, 79 F.3d 1532, 1549 (11th Cir. 1996) (quotations omitted) (emphasis in original).

18   O.C.G.A. § 51-6-2(a).

19   *See Bateman*, 79 F.3d at 1549 ("[t]he defendant's breach of duty is the gravamen of such trade secret claims, and supplies the 'extra element' that qualitatively distinguishes such trade secret causes of action from claims for copyright infringement that are based solely upon copying.") (quoting *Computer Assocs. Int'l, Inc. v. Altai, Inc.*, 982 F.2d 693, 717 (2d Cir. 1992)).

Case 2:19-cv-07532-ES-MAH   Document 18-5   Filed 05/22/19   Page 258 of 300 PageID: 566
Archer v. Holmes, Not Reported in Fed. Supp. (2018)

2018 WL 534475

20   *Altai*, 982 F.2d at 717. *See also Maxient, LLC v. Symplicity Corp.*, 63 F. Supp. 3d 592, 598 (E.D. Va. 2014) (finding computer fraud claim not preempted for similar reasons).

21   *Clark v. Aaron's, Inc.*, 914 F. Supp. 2d 1301, 1309 (N.D. Ga. 2012) (quotation omitted).

22   *See* 1 Nimmer on Copyright § 1.01[B][1][g] (2017) ("a state law cause of action for unjust enrichment or quasi contract should be regarded as an 'equivalent right' and hence, pre-empted insofar as it applies to copyright subject matter.").

23   *Forest Park Pictures v. Universal Television Network, Inc.*, 683 F.3d 424, 432 (2d Cir. 2012).

24   *See* Compl. ¶ 37.

25   1-1 Corbin on Contracts § 1.20 (2017).

26   *See, e.g.*, *Forest Park Pictures*, 683 F.3d at 432 (finding breach of contract claim not preempted where there was a promise to pay for the use of the plaintiff's ideas); 5 Nimmer on Copyright § 19D.03[C][2] (arguing that implied-in-fact contract claims should not be preempted per se).

27   *See, e.g.*, *Forest Park Pictures*, 683 F.3d at 432.

28   5 Nimmer on Copyright § 19D.03[C][2][b] (2017)

29   Compl. ¶ 37.

30   *Thomson v. Larson*, 147 F.3d 195, 199 (2d Cir. 1998) ("Joint authorship entitles the co-authors to equal undivided interests in the whole work—in other words, each joint author has the right to use or to license the work as he or she wishes, subject only to the obligation to account to the other joint owner for any profits that are made.")

31   Fed. R. Civ. P. 9(b).

32   Compl. ¶ 37.

33   *Brazil*, 249 F. Supp. 3d at 1339 ("This means that to state an actionable claim for fraud, the plaintiff must state the who, what, when[,] where, and how.") (quoting *Jenkins v. BAC Loan Servicing LP*, 822 F.Supp.2d 1369, 1380 (M.D. Ga. 2011)).

34   *See Ackerman v. Nat'l Prop. Analysts, Inc.*, 887 F.Supp. 494, 505 (S.D.N.Y. 1992) ("Generally, to survive a Rule 9(b) motion, a plaintiff claiming fraud must apprise each defendant of the scope of his or her participation in the alleged fraud.").

35   Compl. ¶ 161.

36   *See Peterson v. Aaron's, Inc.*, No. 1:14-CV-1919-TWT, 2015 WL 5479877, at *2 (N.D. Ga. Sept. 16, 2015) (holding that indirect benefits are insufficient to sustain a claim for unjust enrichment); *In re White*, 559 B.R. 787, 807 (Bankr. N.D. Ga. 2016) ("... Georgia law does not support claims of unjust enrichment that arise from indirect benefits.").

---

End of Document                                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT P

2011 WL 5597327
Only the Westlaw citation is currently available.
United States District Court, W.D. Kentucky,
Louisville Division.

Roxann PIXLER, Plaintiff

v.

Anthony HUFF, et. al., Defendants.

Civil Action No. 3:11–CV–00207–JHM.
|
Nov. 17, 2011.

**Attorneys and Law Firms**

Gregory D. Simms, Gruner & Simms, PLLC, Steven R. Romines, Romines Weis & Young, PSC, Louisville, KY, for Plaintiff.

Judson B. Wagenseller, Louisville, KY, for Defendants.

*MEMORANDUM OPINION AND ORDER*

JOSEPH H. McKINLEY, JR., Chief Judge.

**\*1**  This matter is before the Court on Defendant Brian N. Sly's Motion to Dismiss [DN 10]; Defendants A. Huff, S. Huff, Michele Brown, Anthony Russo, River Falls Investments, LLC, Oxygen Unlimited, LLC, River Falls Equities, LLC, SDH Realty, Inc., W.A. Huff, LLC, and The Huff Grandchildren Trust's Motion for More Definite Statement [DN 12]; Defendant Thomas Bean's Motion to Dismiss [DN 30]; Defendant Huff Farm (Horsebranch) Inc.'s Motion to Dismiss [DN 34]; and Plaintiff Roxann Pixler's Motion to Strike [DN 33] and Motion for Extension of Time [DN 36]. Fully briefed, these matters are ripe for decision.

**I. BACKGROUND**

This case centers around the creation and operation of Midwest Merger Management, LLC ("MMM"). In 2001, Plaintiff Roxann Pixler's husband, Danny Pixler, and Anthony Huff ("A.Huff") formed MMM. (Amend. Compl. at ¶ 18.) For reasons that are not entirely clear to the Court, Pixler and A. Huff placed their shares in the company in their respective wives' names. (*Id.*) On July 20,

2001, MMM filed its Articles of Organization, which listed two members, Plaintiff and Sheri Huff ("S.Huff"). (*Id.* at ¶ 19.) It appears that MMM was run entirely by Pixler and A. Huff, and that Plaintiff had no involvement with the operations of the company. At some point, Michele Brown became the secretary and personal assistant to A. Huff and became involved with MMM. (*Id.* at ¶ 21.) In MMM's 2002 Annual Report, Brown was listed as a member or manager of MMM, along with Plaintiff and S. Huff. (*Id.* at ¶ 20.) When MMM was initially created, Brian N. Sly, a California business man, loaned the business approximately \$3.9 million dollars. (*Id.* at ¶ 43.)

MMM was established as a "risk manager." (*Id.* at ¶ 23.) In this line of work, MMM would collect premiums and fees from clients and would in turn pay premiums to insurance carriers that provided workers' compensation insurance coverage. (*Id.* at ¶ 24.) MMM also provided consulting services to various entities. (*Id.* at ¶ 25.)

In 2004, MMM acquired Certified Services, Inc., which itself owned several subsidiaries. (*Id.* at ¶ 27.) Beginning in 2005, A. Huff established several companies including, Oxygen Unlimited, LLC; Oxygen II, LLC (later renamed River Falls Investments, LLC); O2 HR, LLC; O2 HR Safety & Claims, LLC (later renamed W. Anthony Huff, LLC and renamed again River Falls Equities, LLC); W.A. Huff, LLC; and SDH Realty, Inc. (*Id.* at ¶¶ 29–32, 41, 42.) Thomas Bean, helped A. Huff establish and manage River Falls Investments, LLC and River Falls Equities, LLC. (*Id.* at ¶ 44.) In her Amended Complaint, Plaintiff alleges that A. Huff used at least two of these entities, SDH Realty, Inc. and W.A. Huff, LLC, to funnel money from MMM for illegal purposes. (*Id.* at ¶¶ 41–42.)

In 2006, Plaintiff was told that her share in MMM was virtually worthless. (*Id.* at ¶ 35.) However, A. Huff expressed interest in purchasing her share and paid Plaintiff \$170,000 as a partial buy-out. (*Id.*) Plaintiff eventually became suspicious of A. Huff and began to investigate the business dealings of MMM. She was able to obtain a copy of the MMM books in 2008 and discovered what she believed to be "accounting discrepancies that could not be reconciled." (*Id.* at ¶ 39.) Plaintiff filed suit against A. Huff and many other parties in April 2011.

Case 2:19-cv-07532-ES-MAH   Document 18-5   Filed 05/22/19   Page 261 of 300 PageID: 569
Pixler v. Huff, Not Reported in F.Supp.2d (2011)

2011 WL 5597327

## II. DISCUSSION

### A. Brian Sly

**\*2** Defendant Sly has challenged Plaintiff's Complaint on a number of grounds. Defendant Sly has moved for dismissal under Fed.R.Civ.P. 12(b)(2) for lack of personal jurisdiction, under Fed.R.Civ.P. 9(b) for failure to plead fraud with particularity, and under Fed.R.Civ.P. 12(b)(6) for failure to state a claim upon which relief can be granted.

### i. Lack of Personal Jurisdiction

The Supreme Court has held that personal jurisdiction "is an essential element of the jurisdiction of a district ... court,' without which the court is 'powerless to proceed to an adjudication.' " *Ruhrgas AG v. Marathon Oil Co.,* 526 U.S. 574, 584 (1999) (quoting *Emp'rs Reinsurance Corp. v. Bryant,* 299 U.S. 374, 382 (1937); *see also Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 94–95 (1998) ("The requirement that jurisdiction be established as a threshold matter spring[s] from the nature and limits of the judicial power of the United States and is inflexible and without exception.") (internal quotation marks omitted). Furthermore, if a court "can readily determine that it lacks jurisdiction over the cause or the defendant, the proper course would be to dismiss on that ground." *Sinochem Intern. Co. Ltd. v. Malaysia Intern. Shipping Corp.,* 549 U.S. 422, 436 (2007). Accordingly, the Court will address its jurisdiction over the defendant before addressing the merits of Plaintiff's individual claims.

When addressing a motion to dismiss for lack of personal jurisdiction, "there is no statutory direction ..., [therefore,] the mode of its determination is left to the trial court." *Gibbs v. Buck,* 307 U.S. 66, 71–72 (1939). However,

> case law establishes a settled procedural scheme to guide trial courts in the exercise of this discretion. If it decides that the motion can be ruled on before trial, the court "may determine the motion on the basis of affidavits alone; or it may permit discovery in aid of the motion; or it may conduct an evidentiary hearing on the merits of the motion." *Marine Midland Bank, N.A. v. Miller,* 664 F.2d 899, 904 (2d Cir.1981). However the court handles the motion, the plaintiff always bears the burden of establishing that jurisdiction exists.

*Serras v. First Tennessee Bank Nat'l Ass'n,* 875 F.2d 1212, 1214 (6th Cir.1989). If the court determines the jurisdictional issue on written submissions only, the plaintiff "need only make a prima facie showing of jurisdiction." *Compuserve, Inc. v. Patterson,* 89 F.3d 1257, 1262 (6th Cir.1996). When making such a determination without an evidentiary hearing, "the court must consider the pleadings and affidavits in a light most favorable to the plaintiff." *Id.* Furthermore, the court must "not consider facts proffered by the defendant that conflict with those offered by the plaintiff." *Neogen Corp. v. Neo Gen Screening, Inc.,* 282 F .3d 883, 887 (6th Cir.2002).

In a diversity case, a federal court determines whether personal jurisdiction exists over a nonresident defendant by applying the law of the state in which it sits. *Third Nat'l Bank v. WEDGE Group Inc.,* 882 F.2d 1087, 1089 (6th Cir.1989). The Court applies a two-step inquiry to determine whether it may exercise personal jurisdiction over a non-resident defendant: "(1) whether the law of the state in which the district court sits authorizes jurisdiction, and (2) whether the exercise of jurisdiction comports with the Due Process Clause." *Brunner v. Hampson,* 441 F.3d 457, 463 (6th Cir.2006). The district court's exercise of jurisdiction over an out-of-state defendant must be consistent with both the forum state's long-arm statute and the constitutional requirements of due process. *Id.; CompuServe, Inc. v. Patterson,* 89 F.3d 1257, 1262 (6th Cir.2007); *Appriss Inc. v. Information Strategies, Inc.,* 2011 WL 3585890, at \*2 (W.D.Ky. Aug. 16, 2011). Furthermore, "[p]ersonal jurisdiction must be established with respect to each cause of action." *Morris Aviation, LLC v. Diamond Aircraft Indus ., Inc.,* 730 F.Supp.2d 683, 694 (W.D.Ky.2010).

**\*3** Until recently, the Kentucky long-arm statute, K.R.S. § 454.210, had been interpreted "to reach to the full constitutional limits of due process in entertaining jurisdiction over non-resident defendants." *Wilson v. Case,* 85 S.W.3d 589, 592 (Ky.2002). In *Caesars Riverboat Casino, LLC v. Beach,* 336 S.W.3d 51 (Ky.2011), the Kentucky Supreme Court expressly overruled Wilson and held that the Kentucky long-arm statute does not extend to the full limit of due process and requires its own separate analysis. *Caesars,* 336 S.W.3d at 57.

Kentucky's long-arm statute requires a two-prong showing before a court can exercise personal jurisdiction over a non-resident. First, the court must find that a

2011 WL 5597327

non-resident's conduct or activities fall within one of nine enumerated provisions in K.R.S. § 454.210. Only three of those provisions are applicable to the facts underlying the present motion against Defendant Sly; K.R.S. § 454.210(2) (a)(1), (3), and (4). [1] If this first prong is satisfied then the second prong requires the Court to determine if the plaintiff's claim arises from the defendant's actions. *See* K.R.S. § 454.210(2)(b) ("When jurisdiction over a person is based solely upon this section, only a claim arising from acts enumerated in this section may be asserted against him.") Accordingly, "even when the defendant's conduct and activities fall within one of the enumerated categories, the plaintiff's claim still must 'arise' from that conduct or activity before long-arm jurisdiction exists." *Caesars,* 336 S.W.3d at 56. The court in *Caesars* conceded that "[t]he phrase 'arising from' may reasonably be subject to various interpretations." *Id.* at 58. In evaluating the meaning of that phrase, the Kentucky Supreme Court found that "[i]f there is a reasonable and direct nexus between the wrongful acts alleged in the complaint and the statutory predicate for long-arm jurisdiction, then jurisdiction is properly exercised." *Id.* at 59. The court went on to say that "the analysis must necessarily be undertaken on a case by case basis" and that "[t]rial courts will ultimately have to depend upon a common sense analysis, giving the benefit of the doubt in favor of jurisdiction." *Id.*

In the instant case, Plaintiff has alleged two claims against Defendant Sly, breach of fiduciary duty and unjust enrichment. The following factual allegations related to Defendant Sly are contained within the Amended Complaint: (1) Defendant Brian Sly is a citizen of the State of California, (Amend.Compl.¶ 11); (2) Defendant Sly loaned approximately $3.9 million dollars to A. Huff, however, he was re-paid $5.3 million with funds from MMM, (*Id.* at ¶ 43); and (3) Plaintiff relied on representations of Sly that the company was being operated lawfully (*Id.* at ¶ 46). In support of Count III, Breach of Fiduciary Duty, Plaintiff alleges that she reposed trust and confidence in Sly who therefore had a duty of utmost good faith, trust, confidence and candor to the Plaintiff, and that Sly breached that duty and caused damage to the Plaintiff. (*Id.* at ¶ 62–62.) In support of Count VI, Unjust Enrichment, Plaintiff alleges that Sly received benefits from the Plaintiff's participation in MMM for which the Plaintiff has not been adequately compensated, which benefits were to the detriment of Plaintiff. (*Id.* at ¶¶ 75–76.)

**\*4** Both Plaintiff and Defendant Sly have submitted two declarations, sworn to under penalty of perjury, in an attempt to demonstrate or dispel the notion that the Court has personal jurisdiction over Defendant Sly. While the Federal Rules of Civil Procedure specifically address the use of affidavits and declarations to support or oppose a motion for summary judgment, the Rules are silent regarding their use to support or oppose a motion to dismiss under Rule 12(b). *Compare* Fed.R.Civ.P. 56(c), *with* Fed.R.Civ.P. 12(b). "Because there are no specific procedures or rules governing evidentiary rulings in connection with a motion to dismiss, courts consistently look to Rule 56 for guidance." *Foshee v. Forethought Fed. Sav. Bank,* 2010 WL 2158454, at \*3 (W .D.Tenn. May 7, 2010); *see also Ohio Nat'l Life Ins. Co. v. United States,* 922 F.2d 320, 327 (6th Cir.1990) (finding that "[a]lthough the district court has considerable discretion in devising procedures for resolving questions going to subject matter jurisdiction, courts frequently look to Rule 56 for guidance in ruling upon evidentiary matters under 12(b)(1).").

Under Rule 56(c), "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed.R.Civ.P. 56(c). The Court sees no reason why an affidavit or declaration submitted in connection with a motion to dismiss under Rule 12(b)(2) should be treated any differently. Therefore, to the extent any affidavit or declaration submitted by the parties is not based upon personal knowledge or contains inadmissible evidence, the Court will not consider such portions in determining the issue of personal jurisdiction. *See United Tech. Corp. v. Mazer,* 556 F.3d 1260, 1277 (11th Cir.2009) (finding that when a court is determining a Rule (12)(b)(2) motion to dismiss that it should "consider[ ] 'only those portions of the [affidavit] that set forth specific factual declarations within the affiant's personal knowledge.' "); *Cooper v. McDermott Int'l, Inc.,* 62 F.3d 395, at \*5 (5th Cir.1995) (unpublished) (holding that "[h]earsay is not properly included in an affidavit" submitted with a Rule 12(b)(2) motion.).

In support of his motion to dismiss, Defendant Sly has submitted two sworn declarations wherein he states that he is a resident of California who has never lived, owned real property, owned any other assets

2011 WL 5597327

or personal property, maintained any bank or other accounts, maintained any regular business activities, paid taxes, or maintained any employees, contractors or agents in the Commonwealth of Kentucky. (Sly's Decl. in Support of Mot. to Dismiss ¶¶ 2–3 [DN 10].) Defendant Sly further maintains that he never spoke to Plaintiff regarding business while either of them were in Kentucky, rather, all of his contacts with Plaintiff in Kentucky were of a social nature. (*Id.* at ¶¶ 4–7.)

**\*5** Sly does admit that he was in Kentucky to attend a regular business meeting involving Oxygen Unlimited II, LLC in May 2006, but that Plaintiff was not at that business meeting. (*Id.* at ¶ 5.) Sly further declares that he did, in fact, loan MMM approximately $3,924,808.00 in 2001, an action that he considered and executed from his California home. (Sly's Supp. Decl. ¶ 2 [DN 39].) Sly states that he has only received $2,708,029.03 as a return on his loan, and that he has lost approximately $1,216,779, which he does not expect to recover. (*Id.* at ¶¶ 4–5.) The payments that he did receive from MMM were all received by Sly at his home in California and deposited in his California bank accounts by him. (*Id.* at ¶ 4.) The last of these repayments was received in 2005.(*Id.*) Defendant Sly further states that he does not recall ever speaking with Plaintiff regarding MMM, until approximately 2009 when Plaintiff threatened to sue him. (*Id.* at ¶ 3.)

Plaintiff also filed two declarations opposing Defendant Sly's motion to dismiss. Plaintiff's declarations are prefaced with the statement that "[t]he following facts are within my own personal knowledge, and if called upon I could and would testify competently to these facts, except as to those matters stated herein upon information and belief, and as to those matter [sic] I have a good faith and reasonable basis to believe that they are true." (Pl.'s Decl. in Supp. Pl.'s Resp. to Def. Brian Sly's Mot. to Dismiss ¶ 2 [DN 23].) Plaintiff states that she was a partial owner of MMM beginning from its inception in 2001, and that she owned a significant portion of the company during the time relevant to her Complaint. (*Id.* at ¶ 5.) The remaining statements contained in her declaration are not made from personal knowledge but are made based on Plaintiff's "knowledge and belief." (*Id.* at ¶¶ 6–13.) Plaintiff states that it is her "knowledge and belief" that Defendant Sly has had "systematic and continuous" contacts with the state of Kentucky since 1990, (*Id.* at ¶ 6), including being a business affiliate of A. Huff since the early 1990's, (*Id.* at ¶ 8). Plaintiff also states that is her "knowledge and belief"

that Defendant Sly invested at least $4,000,000 in MMM between 2001 and the present. (*Id.* at ¶ 10.)

In her Supplemental Declaration filed approximately six weeks after her initial declaration, Plaintiff again makes a number of statements based upon her "knowledge and belief." (*See* Pl.'s Decl. in Supp. Pl.'s Supp. Resp. to Def. Brian Sly's Mot. to Dismiss [DN 37].) In this second declaration, Plaintiff states that it is her "knowledge and belief" that Defendant Sly held and sold an "equity position" in MMM, back to MMM for over $15 million dollars in 2002. (*Id.* at ¶ 13.) Using the same "knowledge and belief" preface, Plaintiff further states that Defendant Sly was part of a large fraudulent scheme that included soliciting investments for MMM and Oxygen Unlimited, LLC, and agreeing to make large transfers of funds for "investment" purposes in these entities, which never resulted in business uses. (*See id.* at ¶¶ 9–15.) Plaintiff claims that Defendant A. Huff purposely acted to perpetrate fraud against MMM by engaging in circular accounting practices, that benefitted Defendant Sly, and that Defendant Sly was aware of such fraudulent practices. (*Id.* at ¶¶ 16–17, 22.)

**\*6** These "factual allegations" made by Plaintiff do not appear to be based upon personal knowledge, rather, they appear to be based upon conjecture, speculation, and belief. Although Plaintiff intentionally prefaced the majority of her statements with the phrase "knowledge and belief" instead of "information and belief," the use of such wording is insufficient to satisfy the requirement of personal knowledge. These statements made upon "knowledge and belief" stand in stark contrast to the other statements made by Plaintiff based upon personal knowledge, which do not contain such a preface. (*See e.g. id.* at 6.) Statements not made upon personal knowledge are not to be considered by courts in determining a motion for summary judgement under Rule 56 and such statements should not be considered in a motion to dismiss under Rule 12(b)(2). *See Totman v. Louisville Jefferson Cnty. Metro Gov't,* 391 F. App'x 454, 464 (6th Cir.2010) (finding that statements made to the best of a party's knowledge and belief go beyond personal knowledge and do not meet the evidentiary standard set forth in Rule 56); *Plaskolite, Inc. v. Zhejiang Taizhou Eagle Mach. Co., Ltd.,* 2008 WL 5190049, at \*5 (S.D.Ohio Dec. 9, 2008) (addressing a Rule 12(b)(2) motion to dismiss and refusing to consider portions of an affidavit based upon the belief of the affiant); *Doe I v. Al Maktoum,* 2008

2011 WL 5597327

WL 4965169, at *5 (E.D.Ky. Nov. 18, 2008) (finding an affidavit based upon news stories and websites was not based upon personal knowledge and was insufficient to defeat a motion to dismiss under Rule 12(b)(2); *Neewra, Inc. v. Manakh Al Khaleeg Gen. Trading and Contracting Co.,* 2004 WL 1620874, at *2 n.3 (S.D.N.Y. July 20, 2004) (finding an affidavit based upon information and belief was not based upon personal knowledge and was not to be considered in the determination of the Rule 12(b)(2) motion to dismiss).

Disregarding those "factual assertions" made upon Plaintiff's knowledge and belief, the Court finds that there are few facts connecting Defendant Sly to the Commonwealth of Kentucky for purposes of Plaintiff's claims of breach of fiduciary duty and unjust enrichment. While the Court must draw all reasonable inferences in favor of Plaintiff, it need not disregard statements and facts made by the Defendant that are not contradicted. Plaintiff's claim for breach of fiduciary duty is premised upon Defendant Sly allegedly misrepresenting to her the legality of MMM's operation. Plaintiff has produced no evidence demonstrating when, where or how this misrepresentation was made. She has failed to produce evidence that it was made while either she or Defendant Sly was in the Commonwealth of Kentucky. Defendant Sly has submitted a declaration stating that he has never spoken to Plaintiff over the phone when either he or she was in the Commonwealth of Kentucky. (Def. Sly's Decl. ¶ 7.) He further states that the one time that he interacted with Plaintiff in Kentucky was in May 2006 when he saw her at a social function following a business meeting involving Oxygen Unlimited II, LLC. (*Id.* at ¶ 5.) Defendant Sly states that this contact with Plaintiff was purely a social one. [2]

 **\*7**  Looking first to Plaintiff's breach of fiduciary duty claim, the Court can quickly eliminate K.R.S. § 454.210(2)(a)(3) and (4) as creating jurisdiction. Plaintiff has failed to demonstrate that the misrepresentation occurred in the Commonwealth, therefore jurisdiction cannot be found under subsection (2)(a)(3). As for subsection 2(a)(4), assuming that the misrepresentation in some way affected Plaintiff in Kentucky, the Court finds that Plaintiff has failed to demonstrate that Defendant Sly "regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered in this Commonwealth[.]" K.R.S. § 454.210(2)

(a)(4). Furthermore, Plaintiff has not demonstrated that Defendant Sly's alleged misrepresentation arose "out of the doing or soliciting of business or a persistent course of conduct or derivation of substantial revenue within the Commonwealth." *Id.* Therefore, jurisdiction cannot be found under subsection (2)(a)(4).

Nor does K.R.S. § 454.210(2)(a)(1), transacting any business in the Commonwealth, provide the Court with the necessary jurisdiction. As the Kentucky Supreme Court only recently stated that Kentucky's long-arm statute must be analyzed separately from due process, there is little precedent by Kentucky courts analyzing the phrase "transacting any business" in K.R.S. § 454.210(2)(a)(1). Under Kentucky law, statutes are to be "liberally construed with a view to promote their objects and carry out the intent of the legislature...." K.R.S. § 446.080(1). Furthermore, "words and phrases are to 'be construed according to the common and approved usage of language' unless a word has a certain technical meaning." *Workforce Dev. Cabinet v. Gaines,* 276 S.W.3d 789, 792 (Ky.2008) (quoting K.R.S. § 446.080(4)).

The term "transact" is defined as "to carry on or conduct (business, negotiations, activities, etc.) to a conclusion or settlement." Random House Unabridged Dictionary 2008 (2d ed.1993). In the instant case, the Amended Complaint alleges that Defendant Sly made a loan to A. Huff. (Amend.Compl.¶ 43.) Defendant Sly's Supplemental Declaration states that the loan was actually issued to MMM, a Kentucky corporate entity. (Def. Sly's Supp. Discl. ¶ 2.) Regardless of who initially received the funds, A. Huff or MMM, it is clear from the declarations that the money was intended to be a loan to MMM. Defendant Sly's declaration states that this decision and the actual transfer of funds took place from his home in California. Regardless of where the loan was considered or executed, Defendant Sly placed $3.9 million dollars into Kentucky corporation. The Court is satisfied that the loan at issue constitutes transacting business in the Commonwealth.

However, it is not enough that a defendant transact business in the Commonwealth, a plaintiff must also demonstrate that her claim arises from such a transaction. *See* K.R.S. § 454.210(2)(b); *Caesars,* 336 S.W.3d at 56. Plaintiff has not done so in the instant case. There are no factual allegations that support an inference that Defendant Sly's alleged breach of a fiduciary duty is

2011 WL 5597327

connected to his transacting business by issuing MMM a loan. The Court is unable to find a reasonable nexus between Defendant Sly's loan and the Plaintiff's claim. A fiduciary duty is not imposed upon a lender by the simple act of making a loan. Furthermore, there are no facts alleged that suggest that the misrepresentation that MMM was being operated lawfully is connected whatsoever to Defendant Sly's loan. Without facts demonstrating how her claim for breach of a fiduciary duty arises from Defendant Sly's making of a loan, the Court finds that personal jurisdiction over this claim cannot be exercised under K.R.S. § 454.210(2)(a)(1). Accordingly, the Court finds that Plaintiff has failed to demonstrate a prima facie case of personal jurisdiction over Defendant Sly for the breach of fiduciary duty claim.

**\*8** Defendant Sly also challenges the Court's personal jurisdiction regarding Plaintiff's unjust enrichment claim. The Amended Complaint states that Defendant Sly made a loan of approximately $3.9 million dollars to Defendant A. Huff, but was repaid $5.3 million dollars from MMM. (Amend.Compl.¶ 43.) Thirty-two paragraphs later, the Complaint states in conclusory terms that the "Defendants [including Sly] received benefits from the Plaintiff's participation in 'MMM' for which the Plaintiff has not been adequately compensated." (*Id.* at ¶ 75.)

Plaintiff contends that the Court has jurisdiction over Defendant Sly for purposes of the unjust enrichment claim under the transacting business provision in K.R.S. § 454.210(2)(a)(1). As discussed above, Defendant Sly's loan to a Kentucky company through A. Huff, is sufficient at this prima facie stage to constitute transacting business in the Commonwealth. However, there still must be a reasonable and direct nexus between the claim that Defendant Sly was unjustly enriched and his loan to MMM. The Kentucky Supreme Court has found that the determination of this prong "will ultimately depend upon a common sense analysis, giving the benefit of the doubt in favor of jurisdiction." *Caesars,* 336 S.W.3d at 59. With these instructions in mind, the Court finds that there is a sufficient nexus for the Court to exercise personal jurisdiction under the Kentucky long-arm statute. While the Amended Complaint is rather bare, it appears that the unjust enrichment claim is directly related to the business Sly transacted in Kentucky. The Court finds that this demonstrates enough of a nexus between Plaintiff's claim of unjust enrichment and Defendant Sly's loan to exercise personal jurisdiction.

Having found that the Kentucky long-arm statute applies, the Court must also find that the exercise of personal jurisdiction conforms with due process. "The relevant inquiry is whether the facts of the case demonstrate that the nonresident defendant possesses such minimum contacts with the forum state that the exercise of jurisdiction would comport with 'traditional notions of fair play and substantial justice.' " *Theunissen,* 935 F.2d 1454, 1459 (6th Cir.1991) (quoting *Int'l Shoe Co. v. State of Washington,* 326 U.S. 310, 316 (1945)). The Sixth Circuit has identified three criteria for determining whether specific in personam jurisdiction may be exercised.

> First, the defendant must purposefully avail himself of the privilege of acting in the forum state or causing a consequence in the forum state. Second, the cause of action must arise from the defendant's activities there. Finally, the acts of the defendant or consequences caused by the defendant must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable.

*Southern Mach. Co. v. Mohasco Indus., Inc.,* 401 F.2d 374, 381 (6th Cir.1968). *See also Theunissen,* 930 F.2d at 1460; *Franklin Roofing, Inc. v. Eagle Roofing and Sheet Metal, Inc.,* 61 S.W.3d 239, 240 (Ky.Ct.App.2001).

**\*9** In order to determine whether personal jurisdiction over Defendant Sly would be appropriate in this forum, the Court must examine his contacts in terms of the three criteria outlined in *Mohasco.* "The three prong test is intended to be a framework for analysis and is not susceptible to mechanical application." *Info–Med, Inc. v. Nat'l Healthcare, Inc.,* 669 F.Supp. 793, 796 (citing *Welsh v. Gibbs,* 631 F.2d 436, 440 (6th Cir.1980)). "Furthermore, the first and second prongs may be considered as one due to their inter-relatedness." *Id.* These prongs may be satisfied if a substantial business contract is present. *Id.*

2011 WL 5597327

Jurisdiction is proper under the purposeful availment requirement where the contacts proximately result from actions by the defendant himself that create a 'substantial connection' with the forum state. *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 475 (1985). Moreover, the defendant's conduct and connection with the forum must be of a character that he or she should reasonably anticipate being haled into court there. *Id.* at 474. This purposeful availment requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of "random," "fortuitous," or "attenuated" contacts. *Id.* at 475.

"A defendant may be said to have purposefully availed himself of the benefits of the forum state if he has either 'deliberately' engaged in significant activities within a state or created 'continuing obligations' between himself and the citizens of a forum ." *Info–Med,* 669 F.Supp. at 796 (quoting *Burger King,* 471 U.S. at 475–76). "[P]arties who 'reach out beyond one state and create continuing relationships and obligations with citizens of another state' are subject to regulation and sanctions in the other State for the consequences of their activities." *LAK, Inc. v. Deer Creek Enters.,* 885 F.2d 1293, 1300 (6th Cir.1989) (quoting *Burger King,* 471 U.S. at 473). "[J]urisdiction may not be avoided merely because the defendant did not physically enter the forum state, so long as a commercial actor's efforts are purposefully directed toward residents of another state." *Info–Med,* 669 F.Supp. at 796.

The first prong of the *Mohasco* test requires the Court to determine if Defendant Sly purposely availed himself of the privilege of acting within Kentucky. Taking all reasonable inferences in favor of Plaintiff, the Court finds that Defendant Sly reached out beyond the state of California and loaned $3.9 million dollars to a Kentucky company. This action created continuing obligations between himself and a Kentucky citizen. This was not a "random," "fortuitous," or "attenuated" contact, but was instead a purposefully direct and deliberate action on Defendant Sly's part. As such, Sly should have reasonably anticipated being haled into a Kentucky court in a matter related to that loan. *See McGee v. Int'l Life Ins. Co.,* 355 U.S. 220, 223 (1957) (finding the issuance of a single life insurance policy to by a non-resident was sufficient purposeful availment). As discussed above, the Court has already found that Plaintiff's claim for unjust enrichment arises from this contact, thus satisfying the second prong of the *Mohasco* test. As for the final prong, the Court

finds that infusing nearly $4 million dollars into the state of Kentucky demonstrates sufficient effects within Kentucky to make the exercise of personal jurisdiction over Defendant Sly reasonable.

**\*10** The Court notes that its finding of personal jurisdiction is based only on Plaintiff's ability to demonstrate a prima facie case. The finding of personal jurisdiction at this stage of the litigation does not preclude Defendant Sly from raising the defense again at trial. *See Serras v. First Tenn. Bank Nat'l Assoc.,* 875 F.2d 1212, 1214–15 (6th Cir.1989) ("A threshold determination that personal jurisdiction exists 'does not relieve [the plaintiff] ... at the trial of the case-in-chief from proving the facts upon which jurisdiction is based by a preponderance of the evidence.' ")

### ii. Failure to State a Claim

Having found that it has personal jurisdiction over Defendant Sly for purposes of the unjust enrichment claim, the Court will now address the merits of Plaintiff's claim. Defendant Sly contends that Plaintiff has failed to state a claim upon which relief can be granted, and has moved to dismiss this claim under Fed.R.Civ.P. 12(b)(6).

Upon a motion to dismiss for failure to state a claim pursuant to Fed.R.Civ.P. 12(b)(6), a court "must construe the complaint in the light most favorable to plaintiff," *League of United Latin Am. Citizens v. Bredesen,* 500 F.3d 523, 527 (6th Cir.2007) (citation omitted), "accept all well-pled factual allegations as true[,]" *id.,* and determine whether the "complaint states a plausible claim for relief[,]" *Ashcroft v. Iqbal,* 129 S.Ct. 1937, 1950 (2009). Under this standard, the plaintiff must provide the grounds for its entitlement to relief, which "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007). A plaintiff satisfies this standard only when it "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 129 S.Ct. at 1949. A complaint falls short if it pleads facts "merely consistent with a defendant's liability" or if the alleged facts do not "permit the court to infer more than the mere possibility of misconduct." *Id.* at 1949, 1950. Instead, the allegations must " 'show [ ] that the pleader is entitled to relief.' " *Id.* at 1950 (quoting Fed.R.Civ.P. 8(a)(2)).

Pixler v. Huff, Not Reported in F.Supp.2d (2011)
2011 WL 5597327

While the Court considered evidence outside of the pleadings, in the form of declarations, for purposes of Defendant Sly's Fed.R.Civ.P. 12(b)(2) challenge, such consideration was limited to that analysis, and does not convert this motion to dismiss into one for summary judgment. *See Wilson–Cook Med., Inc. v. Wilson,* 942 F.2d 247, 251–52 (4th Cir.1991) (finding that trial court's consideration of affidavits for purposes of 12(b)(2) motion did not convert a 12(b)(6) motion into one for summary judgment); *Kerns v. Caterpillar, Inc.,* 583 F.Supp.2d 885, 891 n.1 (M.D.Tenn.2008) (finding the consideration of external evidence in support of a 12(b)(2) motion does not require conversion to summary judgment). The Court will not consider such evidence for purposes of this analysis, but will instead look solely to the pleadings. *See Kerns,* 583 F.Supp.2d at 891, 895 (considering pleadings and affidavits for purposes of 12(b)(2) motion, but only considering pleadings for purposes of 12(b)(6) motion).

**\*11** Defendant Sly contends that Plaintiff has failed to allege sufficient facts to establish a claim for unjust enrichment under Kentucky law. For a plaintiff to succeed on her unjust enrichment claim she must prove three elements: "(1) benefit conferred upon defendant at plaintiff's expense; (2) a resulting appreciation of benefit by defendant; and (3) inequitable retention of benefit without payment for its value." *Guerin v. Fulkerson,* —– S.W.3d —–, 2011 WL 4633090, at \*3 (Ky.Ct.App. Oct. 7, 2011).

In application, Kentucky courts have consistently found that the first element not only requires a benefit be conferred upon the defendant, but also that the plaintiff be the party conferring that benefit. *See Jones v. Sparks,* 297 S.W.3d 73, 78 (Ky.Ct.App.2009) (affirming trial court's dismissal of unjust enrichment claim because the court found that plaintiff did not confer a benefit upon the defendant or his property); *JP White, LLC v. Poe Co., LLC,* 2011 WL 1706751, at \*5 (Ky.Ct.App. May 6, 2011) (affirming directed verdict because plaintiff failed to demonstrate that it conferred a benefit on defendant); *Mattingly v. Primerica Life Ins. Co.,* 2007 WL 2792197, at \*7 (W.D.Ky. Sept. 21, 2007) (stating that the first element of an unjust enrichment claim requires "a benefit conferred on the defendant *by the plaintiff.*" (emphasis added)); *see also* 66 Am.Jur.2d Restitution and Implied Contracts § 12 (2011) (Under the section titled "requirement of benefit at the expense of another," stating that "[a]n essential element in recovering

under a theory of unjust enrichment is the receipt of a benefit by the defendant *from the plaintiff* that would be inequitable to retain without paying for its value." (emphasis added)).

In *Dixie Fuel Company v. Straight Creek, LLC,* 2011 WL 845828 (E.D.Ky. Mar. 8, 2011), the court conducted a detailed analysis of the first element in an unjust enrichment claim under Kentucky law. The court found that "[a]lthough not always expressly stated by courts, the requirement that the benefit be conferred on the defendant *by the claimant* seems to always be a requirement in practice." *Id.* at \*4. The court cited *Jones v. Sparks* and several other state and federal cases that analyzed the first prong as requiring that the plaintiff be the party who conferred the benefit. *See id.* (collecting cases). The *Dixie Fuel* court found that the term "confer" means "to bestow from or as if from a position of superiority or to give[,]" and that the plaintiff had not bestowed or given anything to the defendant. *Id.* at \*5 (internal quotation marks omitted). Therefore, the court in *Dixie Fuel* dismissed the plaintiff's claim. Having reviewed those cases and sources, the Court agrees with the analysis in *Dixie Fuel* and finds that under Kentucky law, a claim for unjust enrichment requires that a plaintiff prove that she conferred a benefit upon the defendant.

**\*12** In the instant case, the Court finds that Plaintiff has failed to allege sufficient facts to demonstrate that she is entitled to relief for a claim of unjust enrichment against Defendant Sly. The factual allegations established in the Amended Complaint are as follows: (1) Plaintiff held at least a 49% interest in MMM from its formation in July 2001 to 2006, when she was partially bought out, (Amend.Compl.¶¶ 22, 35); and (2) that Defendant Sly loaned $3.9 million dollars to A. Huff and was repaid $5.3 million dollars from MMM funds, (*Id.* at ¶ 43). Plaintiff then groups nine defendants together under Count VI, Unjust Enrichment, and states the following "the Defendants received benefits from the Plaintiff's participation in 'MMM' for which the Plaintiff has not been adequately compensated" and "the Defendants benefitted from Plaintiff's involvement in 'MMM', to the detriment of the Plaintiff." (*Id.* at ¶¶ 75–76.)

These factual allegations taken together fall far short of demonstrating that Plaintiff is entitled to relief for unjust enrichment from Defendant Sly. Formulaic recitation of the elements is not sufficient to state a claim,

however, Plaintiff's pleadings fail to even properly state the necessary elements. Furthermore, there are insufficient facts demonstrating that Defendant Sly was conferred a benefit at the expense of Plaintiff, let alone that Plaintiff was the party who conferred that benefit. Plaintiff claims that Defendant Sly was repaid $5.3 million dollars in exchange for a loan made in the amount of $3.9 million dollars. There are no facts indicating when the loan was made, when it was repaid, or what the terms of the loan were that made repayment of $5 .3 million dollars unjust. Nor has Plaintiff pled facts indicating whether or how she was entitled to any of the funds that were repaid. These pleadings fail to demonstrate, in any meaningful way, that Defendant Sly was unjustly enriched by a benefit conferred by the Plaintiff. Accordingly, the Court finds that Plaintiff's claim for unjust enrichment fails to state a claim upon which relief can be granted. Therefore, the Court **GRANTS** Defendant Sly's Motion to Dismiss.

**B. Thomas Bean**

Plaintiff has alleged one claim of unjust enrichment against Defendant Bean. Defendant Bean has moved for dismissal of that claim under Fed.R.Civ.P. 12(b)(2) for lack of personal jurisdiction, under Fed.R.Civ.P. 9(b) for failure to plead fraud with particularity, and under Fed.R.Civ.P. 12(b)(6) for failure to state a claim upon which relief can be granted.

**i. Personal Jurisdiction**

Because the Court is making the determination of personal jurisdiction on written submissions alone, Plaintiff's burden for demonstrating personal jurisdiction is only a prima facie showing. *Compuserve,* 89 F.3d at 1262. Plaintiff contends that Defendant Bean's actions in creating and managing two corporate entities in Kentucky sufficiently demonstrate that Defendant Bean transacted business in Kentucky, as required by K.R. S. § 454.210(2)(a)(1). In support of her argument, Plaintiff has submitted a declaration. However, much like the declaration submitted against Defendant Sly, Plaintiff's declaration against Defendant Bean consists mostly of statements made upon "knowledge and belief." As the Court has ruled above, such statements do not meet the threshold requirements of personal knowledge to be considered by the Court. *See supra* Part III.A.i; *Totman v. Louisville Jefferson Cnty. Metro Gov't,* 391 F. App'x 454, 464 (6th Cir.2010). Defendant Bean, in his Reply, discusses and references his own sworn declaration.

However, the Court is unable to find any such declaration attached to the filing or in the Record.

**\*13** Therefore, the only information that the Court can use to analyze this issue are the pleadings within the Amended Complaint and the few statements contained in Plaintiff's sworn declaration that are made with sufficient personal knowledge. Considering that evidence and taking all inferences in favor of Plaintiff the Court finds that it does not have personal jurisdiction over Defendant Bean for purposes of Plaintiff's unjust enrichment claim. Plaintiff has alleged that Defendant Bean helped establish and manage two Kentucky corporate entities that operated in Kentucky. Assuming without deciding that this limited allegation is sufficient to demonstrate transacting business, the Court finds that Plaintiff has failed to demonstrate that there is a reasonable and direct nexus between this activity and her unjust enrichment claim.

The allegations found in the Amended Complaint against Defendant Bean are (1) that he acted with Defendant A. Huff to establish and manage River Falls Investment, LLC and River Falls Equities, LLC, (Amend.Compl.¶ 44); (2) that Defendant Bean received benefits from the Plaintiff's participation in MMM for which the Plaintiff has not been adequately compensated (*Id.* at ¶ 75); and (3) that Defendant Bean benefitted from Plaintiff's involvement in MMM, to the detriment of Plaintiff, (*Id.* at ¶ 76). As for Plaintiff's declaration, the Court finds that the only allegation of any importance that is based upon sufficient personal knowledge is that Plaintiff owned a 50% interest in MMM during the times relevant to the Complaint. (*See* Plaintiff's Decl. Against Def. Bean ¶ 5 [DN 38].)

Those factual allegations are insufficient to demonstrate a reasonable nexus between a claim for unjust enrichment and Defendant Bean's status as a manager of two Kentucky corporate entities. Plaintiff argues that these companies were used to funnel money from MMM to Defendant Bean's personal use, however, such allegations are nowhere within the Amended Complaint. The Amended Complaint states that SDH Realty, Inc., and W.A. Huff, LLC were used to funnel money from MMM. (*See* Amend. Compl. ¶¶ 41–42.) Neither of those entities are or were ever named River Falls Investments, LLC or River Falls Equities, LLC. [3] Nor is Defendant Bean alleged to have been involved with those two

Pixler v. Huff, Not Reported in F.Supp.2d (2011)
2011 WL 5597327

entities. Quite simply, there are no allegations based upon personal knowledge contained either within the Amended Complaint or Plaintiff's sworn declaration that link Defendant Bean's management of River Falls Investments, LLC or River Falls Equities, LLC to Plaintiff's claim for unjust enrichment. The bare assertions that Plaintiff attempts to link together are insufficient to demonstrate that the Court has personal jurisdiction over Defendant Bean.

### ii. Failure to State a Claim

Notwithstanding the Court's lack of personal jurisdiction, the Court finds that the bare assertions contained within the Amended Complaint fail to state a claim upon which relief may be granted. As discussed above, a claim for unjust enrichment requires a plaintiff to demonstrate a "(1) benefit conferred upon defendant at plaintiff's expense; (2) a resulting appreciation of benefit by defendant; and (3) inequitable retention of benefit without payment for its value." *Guerin v. Fulkerson,* ––– S.W.3d ––––, 2011 WL 4633090, at *3 (Ky.Ct.App. Oct. 7, 2011).

**\*14** The factual allegations alleged against Defendant Bean are that he acted with Defendant A. Huff to establish and manage River Falls Investment, LLC and River Falls Equities, LLC and that he received benefits from Plaintiff's participation in MMM. These allegations do not demonstrate sufficient facts upon which the Court could find that Plaintiff is entitled to relief for unjust enrichment. Plaintiff's memorandum opposing Defendant Bean's motion attempts to lump Defendant Bean's actions together with allegations against Defendant A. Huff, and to then cite the portions of the Amended Complaint that speak of "Defendants" actions in a general manner. However, the Court is not persuaded by Plaintiff's attempt to piggy-back claims using Defendant A. Huff, or to use generalities to imply that every Defendant engaged in a specific action. Therefore, the Court finds that the Amended Complaint fails to state a claim upon which relief can be granted. Accordingly, the Court **GRANTS** Defendant Bean's Motion to Dismiss.

### C. Huff Farm (Horsebranch) Inc.

Defendant Huff Farm has moved to dismiss Plaintiff's claims of fraud and unjust enrichment. Defendant Huff Farm contends that Plaintiff's Amended Complaint fails to state a claim upon which relief can be granted.

Plaintiff's Amended Complaint contains the following allegations against Defendant Huff Farm: (1) Defendant Huff Farm made representations of material fact to Plaintiff with the knowledge that they were false and the intent that Plaintiff would rely upon them, which the Plaintiff reasonably did, (Amend.Compl.¶ 65); and (2) Defendant Huff Farm received benefits from the Plaintiff's participation in MMM for which the Plaintiff was not adequately compensated, which was to Plaintiff's detriment, (*Id.* at ¶¶ 75–76).

There are no factual allegations that describe Defendant Huff Farm's involvement in either of these claims. Rather Defendant Huff Farm is included in general recitations of claims against multiple defendants. As discussed above, the plaintiff must provide the grounds for its entitlement to relief, which "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007). A plaintiff satisfies this standard only when it "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 129 S.Ct. at 1949. Plaintiff's Amended Complaint is woefully inadequate regarding allegations against Defendant Huff Farm and her claims cannot survive a motion to dismiss.

In her Response to Defendant Huff Farm's motion, as well as the other Defendants' motions, Plaintiff argues that the lack of factual content supporting her claims should not be fatal to her Amended Complaint because her claims fall within the exclusive control doctrine. In support of her argument, Plaintiff cites this Court's opinion in *Union Underwear Company, Inc v. Wilson,* 2005 WL 3307098 (W.D.Ky. Dec. 1, 2005). In *Union Underwear,* the Court found that

**\*15** [A]n exception to the particularity requirement of *Fed.R.Civ.P. 9(b)* exists when the relevant facts "lie exclusively within the knowledge and control of the opposing party." *United States ex rel. Wilkins v. State of Ohio,* 885 F.Supp. 1055, 1061 (S.D.Ohio 1995). In such a case, pleading upon information and belief is permissible, although the plaintiff must still plead a statement of facts upon which the belief is based. *Craighead v. E.F. Hutton & Co.,* 899 F.2d 485, 489 (6th Cir.1990). A court should hesitate to dismiss an action when the facts underlying the claim are within the defendant's control, especially when no discovery has been conducted. *Michaels Bldg. Co.,* 848 F.2d at 680.

*Pixler v. Huff,* Not Reported in F.Supp.2d (2011)

2011 WL 5597327

*Id.* at \*4 (quoting *Beard v. Worldwide Mortg. Corp.,* 354 F.Supp.2d 789, 799 (W.D.Tenn.2005).[4] In discussing the exclusive control exception to Fed.R.Civ.P. 9(b), the Sixth Circuit stated that it is "reluctant to amputate [a] plaintiff['s] claim as long as there is a reasonable basis upon which to make out a cause of action from the events narrated in the complaint." *Michaels Bldg. Co. v. Ameritrust Co., N.A.,* 848 F.2d 674, 680 (6th Cir.1988).

In the instant case, the Court finds that the exclusive control exception does not apply. This exception is intended to save a claim from dismissal under the heightened pleading standard of Rule 9(b). However, as discussed above, Plaintiff's fraud claim against Defendant Huff Farm does not even meet the initial pleading threshold of Rule8(a). Plaintiff's claim of fraud against Defendant Huff Farm does not make out a cause of action, it simply uses generalities and a formulaic recitation of elements. There is no reasonable basis upon which to make out a cause of action from anything articulated in the Amended Complaint. There are no events narrated in the Amended Complaint that indicate that there is a reasonable claim against Defendant Huff Farm. Furthermore, the Court finds that Plaintiff has failed to demonstrate that the information necessary to cure her claims is in the exclusive control of the Defendants.

The exclusive control exception was intended to save those claims that appear to have a reasonable basis, but lack the necessary factual support required by Rule 9(b). Plaintiff's fraud claim against Defendant Huff Farm is not such a claim. Therefore, the Court finds that the exclusive control exception does not apply in this case.

Considering the total lack of factual allegations against Defendant Huff Farm contained within the Amended Complaint and the bare formulaic assertion of the elements constituting her causes of action, the Court finds that Plaintiff's claims for fraud and unjust enrichment against Defendant Huff Farms fail to state claims upon which relief can be granted. Therefore, the Court **GRANTS** Defendant Huff Farm's Motion to Dismiss.

### D. Leave to Amend

In each of her responsive motions, Plaintiff requests that in lieu of the dismissal of her claims against Defendants Sly, Bean, and Huff Farm, that she be granted leave to amend her complaint. Under Fed.R.Civ.P. 15(a)(1)(B), a plaintiff may amend her pleading once as a matter of course within 21 days after service of a motion under Rule 12(b). "In all other cases, a party may amend its pleading only with the opposing party's written consent or the court's leave. The court should freely give leave when justice so requires." Fed.R.Civ.P. 15(a)(2). However, a district court may deny a motion to amend where there is "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc." *Foman v. Davis,* 371 U.S. 178, 182 (1962).

**\*16** In the instant case, the Court notes that Defendant Sly's Motion to Dismiss, based upon Rule 12(b) was filed on June 7, 2011. On June 24, 2011, Plaintiff Amended her Complaint as a matter of course, as permitted under Rule 15(a). However, rather than address the severe deficiencies in her Complaint, which were identified in Defendant Sly's motion to dismiss, Plaintiff made only minor changes in correctly identifying Defendant Huff Farm, LLC's principal place of business. Notwithstanding, the Court finds that justice requires that Plaintiff be granted leave to amend her Amended Complaint one more time. As Plaintiff failed to tender a Second Amended Complaint to the Court in conjunction with her request, the Court orders her to submit a Second Amended Complaint **NO LATER THAN 20 DAYS** from the entry of this order.

### E. Motion for More Definite Statement

Defendants A. Huff, S. Huff, Michele Brown, Anthony Russo, River Falls Investments, LLC, Oxygen Unlimited, LLC, River Falls Equities, LLC, SDH Realty, Inc., W.A. Huff, LLC, and The Huff Grandchildren Trust have moved under Fed.R.Civ.P. 12(e) for a more definite statement. These Defendants contend that the Amended Complaint fails to comply with the pleading standards of Fed.R.Civ.P. 8(a), and that clarification is required so that they may assert good faith responses and mandatory affirmative defenses.

Rule 12(e) states that a motion for more definite statement is proper only if "a pleading to which a responsive pleading is allowed [ ] is so vague or ambiguous that the party cannot reasonably prepare a response." F.R.C.P. 12(e). A motion for a more definite statement must state the defects in the pleading and the details desired. *Id.*

Pixler v. Huff, Not Reported in F.Supp.2d (2011)

2011 WL 5597327

A party, however, may not use a Rule 12(e) motion as a substitute for discovery. *Mitchell v. E–Z Way Towers, Inc.,* 269 F.2d 126, 132 (5th Cir.1959). Given the liberal pleading standard set forth in Rule 8, Rule 12(e) motions are disfavored. *See id.* At the same time, the Supreme Court has noted that "if a pleading fails to specify the allegations in a manner that provides sufficient notice," then a Rule 12(e) motion may be appropriate. *Swierkiewicz v. Sorema, N.A.,* 534 U.S. 506, 514 (2002).

The Court finds that the Amended Complaint is too vague on all counts for the Defendants to properly form a responsive pleading. The Defendants have identified the many defects contained within the Amended Complaint and the details desired so that they may formulate a worthwhile response. Therefore, the Court grants the Defendants' motion and orders Plaintiff to address the issues identified by these Defendants in her Second Amended Complaint, which is to be filed no later than 20 days from entry of this order.

**F. Motion to Strike**

Plaintiff has moved to strike the Defendants Reply to Plaintiff's Response to Defendants' Motion for More Definite Statement. Fed.R.Civ.P. 12(f) provides that upon a motion made by a party, "[t]he court may strike from a pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." "Because striking a portion of a pleading is a drastic remedy, such motions are generally viewed with disfavor and are rarely granted." *Watkins & Son Pet Supplies v. Iams Co.,* 107 F.Supp.2d 883, 887 (S.D.Ohio 1999). "The application of this rule, which is in the discretion of the trial judge, should be resorted to only where the pleading contains such allegations that are obviously false and clearly injurious to a party to the action because of the kind of language used or that the allegations are unmistakably unrelated to the subject matter." *Pessin v. Keeneland Ass'n,* 45 F.R.D. 10, 13 (E.D.Ky.1968).

 *17 Plaintiff contends that substantial portions of the Reply contain improper introduction of new arguments, evidence and issues by the Defendants and that the information is irrelevant and prejudicial. Defendants

contend that the portions of the Reply identified by Plaintiff are relevant to rebut Plaintiff's argument that the exclusive control doctrine applies to this case and that Plaintiff has failed to demonstrate any prejudice. The Court agrees with Defendants that the information is relevant and that there is an insufficient showing of prejudice to strike the Reply. Therefore, Plaintiff's Motion to Strike is **DENIED.**

**III. CONCLUSION**

For the reasons set forth above, **IT IS HEREBY ORDERED** that Defendant Brian N. Sly's Motion to Dismiss [DN 10] is **GRANTED,** without prejudice.

**IT IS FURTHER ORDERED** that Defendants A. Huff, S. Huff, Michele Brown, Anthony Russo, River Falls Investments, LLC, Oxygen Unlimited, LLC, River Falls Equities, LLC, SDH Realty, Inc., W.A. Huff, LLC, and The Huff Grandchildren Trust's Motion for More Definite Statement [DN 12] is **GRANTED.**

**FURTHER** that Defendant Thomas Bean's Motion to Dismiss [DN 30] is **GRANTED,** without prejudice.

**FURTHER** that Defendant Huff Farm (Horsebranch) Inc.'s Motion to Dismiss [DN 34] is **GRANTED,** without prejudice.

**FURTHER** that Plaintiff Roxann Pixler's Motion to Strike [DN 33] is **DENIED.**

**FURTHER** that Plaintiff Roxann Pixler's Motion for Extension of Time [DN 36] is **GRANTED.**

**FURTHER** that Plaintiff file her Second Amended Complaint **NO LATER THAN 20 DAYS** from the entry of this Order.

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 5597327

Footnotes

1    The long-arm statute states in pertinent part that

Pixler v. Huff, Not Reported in F.Supp.2d (2011)

2011 WL 5597327

(2)(a) A court may exercise personal jurisdiction over a person who acts directly or by an agent, as to a claim arising from the person's:

1. Transacting any business in this Commonwealth;

...

3. Causing tortious injury by an act or omission in this Commonwealth;

4. Causing tortious injury in this Commonwealth by an act or omission outside this Commonwealth if he regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered in this Commonwealth, provided that the tortious injury occurring in this Commonwealth arises out of the doing or soliciting of business or a persistent course of conduct or derivation of substantial revenue within the Commonwealth[.]

K.R.S. § 454.210(2)(a).

2    Noticeably, Defendant Sly does not go so far in his declaration as to state that he has never discussed MMM with Plaintiff, only that such communication never took place while either of them was in the Commonwealth of Kentucky.

3    Plaintiff's Amended Complaint states that River Falls Equities, LLC was at one time titled W. Anthony Huff, LLC. (Amend.Compl.¶ 32 .) However, Plaintiff alleges that money was funneled through W.A. Huff, LLC, not through W. Anthony Huff, LLC. (*See* Amend. Compl. ¶ 42.) These are two separate entities.

4    It should be noted that this Court in *Union Underwear* found the exclusive control exception did not apply.

---

**End of Document**                                      © 2019 Thomson Reuters. No claim to original U.S. Government Works.

---

# EXHIBIT Q

Rivers v. Amato, Not Reported in A.2d (2001)

2001 WL 1736498

KeyCite Yellow Flag - Negative Treatment

Declined to Follow by Sergeants Benevolent Association Health & Welfare Fund v. Actavis, plc, S.D.N.Y., December 26, 2018

2001 WL 1736498
Only the Westlaw citation is currently available.
Superior Court of Maine.

David F. RIVERS, Plaintiff

v.

Jerry AMATO, et al., Defendants

No. CIV. A. CV-00-131.
|
June 22, 2001.

**Attorneys and Law Firms**

Steven E. Cope, Esq.-Pl.

Jacqueline W. Rider, Esq.-Def.

ORDER

BRENNAN, Justice.

**\*1** Pending are Defendants' Motion for Summary Judgment and Defendants' Motion to Strike Portions of Plaintiff's Affidavits. Following hearing, the Motion for Summary Judgment is Granted.

FACTUAL BACKGROUND

In 1999, Defendants owned property located at York Beach commonly referred to as "Nubble Point" ("the property") DSMF ¶ 1. Defendant Jerry Amato engaged Rivers by the Sea to act as the agent for Defendants to market the property for sale. Complaint ¶ 6. Plaintiff David Rivers alleges that he entered into an enforceable agreement with Amato, on or about June 18, 1999, to buy the property. Complaint ¶ 8. The offer was for the full asking price of $ 3,000,000 and was accompanied by an earnest money deposit of $20,000. PSMF ¶ 3, Complaint ¶ 7. A final agreement was signed by Amato and Rivers on June 28, 1999. PSMF ¶ 4. [1]

On July 10, 1999, Jerry Amato and his son James Amato met with Rivers concerning the property. DSMF ¶ 3.

According to Rivers, the Amatos stated that they would not go through with the contract because the property was worth more than when the contract was signed. PSMF ¶ 7. [2] According to Rivers, at the July 10 meeting, Jerry Amato stated that he intended to develop the property himself and that he would sell the property to Rivers for $4,800,000. PSMF ¶ 14. James Amato suggested that he and his father would discuss the matter further, and would let Rivers know if they had a change of position. [3] PSMF ¶ 7.

Immediately following the July 10 meeting, Rivers sent a letter (dated July 10) to Defendants' broker, Rivers by the Sea [4] (Plaintiff's brother's real estate agency) stating that he wanted to "cancel the Purchase and Sale Agreement for the property located at 235 Nubble Road, York, Maine initiated by me on 6/28/99" and that this "action is being taken based on the outcome of my 7/10/99 meeting and on the advice of my lawyer". DSMF ¶ 4. Rivers also wrote a memorandum dated July 10, in which he stated that his intention was to "walk away from this deal." DSMF ¶ 5. Also on July 10, Rivers requested a return of the earnest money deposit that he had paid to Rivers by the Sea in the amount of $20,000 and on or about July 12, 1999 he received a full refund of this deposit. DSMF ¶ 6. Rivers has alleged that he knew that pursuing the sale was futile and that a lawsuit to compel performance of the Agreement would be expensive and protracted. PSMF ¶ 8. He alleges, therefore, that he canceled the contract intending to pursue a breach of contract claim. Id.

Rivers further alleges that after the Agreement was signed (but prior to the July 10 meeting), at the direction of Amato he had discussions with Paul Hollis, a local developer, regarding development of the property. PSMF ¶ 15. Subsequently, Rivers alleges, Hollis persuaded Amato to develop the property in a joint venture with him in derogation of the contract with Rivers. Id. This offer, it is alleged, was part of the reason why Amato reneged on the contract with Rivers. Id. Defendants counter that Hollis began discussions with Amato in the summer of 1998 and that these discussions culminated in an agreement between Amato and Hollis on August 16, 1999, more than a month after Plaintiff canceled the purchase and sale agreement. Defendants' Reply SMF ¶ 15. The amount to be received by Amato under the agreement was $3,000,000-the same amount offered by

2001 WL 1736498

Plaintiff, except that Hollis agreed to pay a sewer lien on the property at a cost of $41,000. Id.

**\*2** Count I of the Complaint alleges breach of contract and requests monetary damages. Count II of the Complaint alleges unjust enrichment. Essentially, Rivers has brought suit to "recover the benefit of the bargain under the Agreement in the form of lost net profits." Plaintiff's Objection to Defendants' Motion for Summary Judgment p. 5. Rivers alleges that after subtracting all development and acquisition costs, the net profit he could have realized was not less than $ 1,700,000. PSMF ¶ 13.

### COUNT I-BREACH OF CONTRACT

Defendants argue that Rivers' breach of contract theory is that Defendants anticipatorily breached the alleged Agreement. However, it is undisputed that Rivers canceled the alleged Agreement on July 10, 1999 and received the return of his earnest money deposit on July 12, 1999. Rivers cannot recover for an alleged breach of contract that he himself canceled. It is undisputed that Rivers canceled and accepted the rescission of the alleged Agreement.

Assuming that Defendants repudiated the alleged Agreement, Rivers, the non-breaching party, could have either accepted the contract as rescinded or waited and brought a lawsuit when the time for performance has arrived. Because Rivers chose to rescind the agreement, he retains no right to performance nor does he retain any right to damages based on Defendants' alleged anticipatory breach. Rivers cannot now have it both ways by rescinding the contract based on Defendants' alleged anticipatory breach and receiving a refund of his earnest money deposit and suing for damages.

Plaintiff argues that an agreement to rescind a contract is itself a contract and must be evaluated by principals of contract law. Whether Rivers' cancellation of the Agreement is tantamount to an acceptance of rescission of the Agreement is a factual matter to be resolved by the trier of fact. Defendants have the burden of proof on the issue of rescission. Defendants have failed to provide any facts from which the Court could conclude that Rivers agreed to discharge all of Amatos' contractual obligations following Amatos' admitted anticipatory breach.

### DISCUSSION

An anticipatory repudiation of a contract is "a definite and unequivocal manifestation of intention on the part of the repudiator that he will not render the promised performance when the time fixed for it in the contract arrives." *Wholesale Sand & Gravel, Inc. v. Decker,* 630 A.2d 710, 711 (Me.1993)(citing 4 CORBIN, *Corbin on Contracts,* § 973 (1951); RESTATEMENT (SECOND) OF CONTRACTS § 250). Defendants have admitted, for the purpose of this their summary judgment motion, that Amato repudiated the contract with Rivers. Rivers agrees that Amato repudiated the contract. Plaintiff's Objection to Defendants' Motion for Summary Judgment, p. 3 -4 ("[t]he Amatos unilaterally, unequivocally and unambiguously repudiated Amatos' obligations under the Agreement").

Where there has been a renunciation of a contract by one party, the other party has a right to pursue one of three remedies: (1) to rescind the contract and pursue remedies based on such a rescission, (2) to treat the contract as binding until the time for performance arrives, and at such time bring an action on the contract for breach, or (3) to treat the renunciation as an immediate breach and sue immediately for any damages sustained. 17B C.J.S. *Contracts* §§ 534, 535 (1999); *see also* 17A AM.JUR. 2D *Contracts* § 737. "The party not in default has alternative remedies open to him or her, and he or she may not pursue all of them." *Id.* § 535; *see also* 17A AM.JUR. 2D *Contracts.* § 744 ("Where one party has, before the time for performance, repudiated an executory contract, the adverse party has an election to treat the contract as broken or not so to treat it, and upon such repudiation the latter must make his choice between the courses open to him"); *Harmony Homes Corp. v. Cragg,* 390 A.2d 1033, 1035 (Me.1978)("a party may not affirm, or make use of, a contract to recover damages for breach thereof consistently with treating the contract as having been disaffirmed and proceeding on a 'money had and received' (restitution) rationale of recovery"). In *Harmony Homes,* the Law Court specifically stated that "a return of the down payment would be inconsistent with a breach of contract rationale of recovery." *Harmony Homes Corp. v. Cragg,* 390 A.2d at 1036.

**\*3** Based on the above principles, Defendants argue that Rivers elected the remedy of rescinding the Agreement

Rivers v. Amato, Not Reported in A.2d (2001)

2001 WL 1736498

and cannot now pursue a breach of contract claim. Rivers argues, however, that the Agreement was not effectively rescinded because there was no meeting of the minds with respect to terminating the agreement-that there was no offer and acceptance of rescission. If there was an offer of rescission, Rivers argues that whether his conduct is tantamount to an acceptance of rescission is a factual matter to be resolved by the trier of fact. Plaintiff's Objection to Defendants' Motion for Summary Judgment, p. 4, 6.

"Rescission is the unmaking of a contract, which not only terminates the contract but abrogates it and undoes it from the beginning." 17A AM. JUR. 2D *Contracts* § 539. An agreement to rescind a contract is itself a contract and must be evaluated by principles of contract law. *Drinkwater v. Patten Realty Corp.,* 563 A.2d 772, 775 (Me.1989)(citing RESTATEMENT (SECOND) OF CONTRACTS § 283 & comment a (1981)). The agreement need not be expressed in words. RESTATEMENT (SECOND) OF CONTRACTS § 283, comment a. Generally, a contract cannot be rescinded without the consent of both parties. *Listman Mill Co. v. Dufresne,* 111 Me. 104, 106 (1913). "The rescission of a contract by one party thereto is permitted for the other party's repudiation of the contract." 17A AM. JUR. 2D *Contracts* § 582 (1991).

In *Drinkwater v. Patten Realty Corp.,* 563 A.2d 772 (Me.1989), the Defendant announced unilaterally that it was terminating the purchase and sale agreement and sent the Drinkwaters a cheque refunding the earnest money deposit. *Id.* The Drinkwaters negotiated this cheque. The Law Court stated that whether cashing the cheque manifested an intention to rescind the contract could not be determined by resort to any per se rule or conclusive presumption; the relevant facts must be ascertained from the totality of the circumstances. *Id.* The Law Court found that summary judgment, entered against the Drinkwaters, was inappropriate because a factual issue remained whether or not the Drinkwaters, by cashing the cheque, manifested an acceptance of the rescission of their contract or whether the Drinkwaters merely believed that because Defendant had sold the property to someone else, that failing to cash the check would be a futile act. *Id.*

Applying the general principles of rescission and holding of Drinkwater, the question becomes: did Rivers and Amato mutually agree to rescind the contract (if so, Rivers is precluded from electing the remedy of damages under a breach of contract theory as noted above), or, does a factual issue exist regarding whether or not Rivers merely believed that pursuing the sale was futile and that he could cash the cheque and pursue a breach of contract claim. There is essentially no dispute regarding the material facts-rather, there is only an issue regarding the legal significance of the facts. There are two possible scenarios to consider when evaluating whether or not the contract was rescinded. First, did Defendants' renunciation of the Agreement amount to an offer to rescind that was accepted by Plaintiff. Or, second, did Plaintiff's conduct amount to an offer to rescind which was accepted by Defendants when Amato entered a purchase and sale agreement with Hollis. [5]

**\*4** Under the first scenario, as noted, there is no dispute that Defendants repudiated the agreement. The question is did Rivers accept this repudiation by rescinding the agreement. It would appear that Rivers' acts only can be construed as acceptance of the repudiation. Rivers not only requested and received a full refund of his deposit [6], but (going beyond the facts of *Drinkwater* ), expressly stated that he wanted to "cancel the Purchase and Sale Agreement" and that he intended to "walk away from [the] deal." Given these actions/words it would seem that Rivers did not merely acquiesce to Defendants repudiation, but that Rivers affirmatively accepted the repudiation and thereby effectively rescinded the Agreement.

Under the second scenario, Rivers' actions, stated above, could be construed as an offer to rescind. The action of Defendants-entering into an agreement with Hollis-could be construed as accepting the offer to rescind.

In either situation, it would appear that the contract was effectively rescinded. Because Rivers elected this remedy, he may not also pursue damages under a breach of contract theory. Summary Judgment should be granted on Count I of the Complaint.

## COUNT II-UNJUST ENRICHMENT

Plaintiff's factual support for his unjust enrichment claim is two-fold. First, the evidence offered by the Plaintiff establishes that through Plaintiff's communications and

efforts in working out a development plan with Paul Hollis, the Plaintiff induced Hollis to make an offer to purchase the Nubble Road property for a higher amount than the purchase price set forth in the Agreement between Amato and Rivers. The effort resulted in Amato repudiating his contract with the Plaintiff and entering into a new contract with Hollis.

Second, Defendants are unjustly enriched because Defendants will receive a portion of the purchase price from the contract with Hollis that Defendants would not have received if they had not repudiated and had closed on the Agreement with Plaintiff. The benefit conferred on the Defendants by the Plaintiff is the additional profit that properly belonged to the Plaintiff, but for the wrongful conduct of the Defendants. A person is not permitted to profit by his own wrong at the expense of another. Defendants are unjustly enriched by the contract with a third party to the detriment of Plaintiff. Plaintiff is harmed by Defendants' contract with the third party because Plaintiff lost the net profit he could have realized from the development of the property.

## DISCUSSION

The three elements of an unjust enrichment claim are: "(1) a benefit conferred upon the defendant *by the plaintiff;* (2) appreciation or knowledge by the defendant of the benefit; and (3) acceptance or retention by the defendant under such circumstances as to make it inequitable for the defendant to retain the benefit without payment of its value." *Simpson v. Central Maine Motors, Inc.,* 669 A.2d 1324, 1326 (Me.1996)(emphasis added). Rivers does not allege that *he* (at least directly), conferred a benefit on Defendants. Rather, Rivers' unjust enrichment claim is based on an indirect (and speculative) theory that through his efforts, Hollis conferred a benefit on Amato. No authority can be found for this "indirect benefit" theory, which is, in any case, based on speculation. Furthermore, as Defendants argue, Plaintiff has not offered any facts that demonstrate that Defendants had knowledge of any purported benefit indirectly conferred on them by Plaintiff. Summary judgment is granted on Count II of the Complaint.

 **\*5** Because Defendant's Motion for Summary Judgment is granted, the motion to strike portions of plaintiff's affidavit is moot.

The clerk may incorporate this order in the docket by reference.

**All Citations**

Not Reported in A.2d, 2001 WL 1736498

## Footnotes

1  Defendants do not necessarily agree that the purchase and sale agreement was valid (due the alleged fact that Jerry Amato's son signed the Agreement, not Jerry Amato and because Defendants' contract with realtor Rivers by the Sea had expired), but for the purposes of summary judgment, Defendants are not disputing that a valid agreement existed.

2  In Rivers' Affidavit # 3, ¶ 16, Rivers speculates that the Amatos' position was based on developer Paul Hollis' proposal to develop the property through a joint venture that would have netted Amato more than $3,000,000 for the property. However, this allegation is not based on personal knowledge and as such, may not be considered.

3  The Defendants do not dispute that a meeting took place on July 10, but deny the substance of the conversation as alleged by Plaintiff. Defendants' Reply SMF ¶ 5. However, for the purposes of summary judgment, Defendants admit that they repudiated the purchase and sale agreement on July 10. Id.

4  As noted, Defendants allege that their agreement with Rivers by the Sea had expired. However, for the purposes of summary judgment, they will not dispute the fact that Rivers by the Sea was still their agent.

5  This scenario may apply because Rivers alleges that at the July 10 meeting James Amato suggested that he and his father would "discuss the matter further, and let Rivers know if they had a change of position." PSMF ¶ 7. Immediately thereafter (i.e. without allowing time for the Amatos to discuss the matter and get back to Rivers) Rivers requested his deposit back and stated his intentions to cancel the contract.

6  Note, in *Drinkwater,* Defendants sent Plaintiffs the cheque refund of their deposit along with a notice terminating the agreement. *Drinkwater v. Patten Realty Corp.,* 563 A.2d at 775. Plaintiffs felt they had no choice but to cash the cheque. *Id.* In the present case, Rivers demanded a refund of his deposit.

**Rivers v. Amato, Not Reported in A.2d (2001)**

2001 WL 1736498

---

**End of Document**

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

---

# EXHIBIT R

A & M Supply Co. v. Microsoft Corp., Not Reported in N.W.2d (2008)

2008 WL 540883

KeyCite Yellow Flag - Negative Treatment

Declined to Follow by In re Santa Fe Natural Tobacco Company
Marketing & Sales Practices and Products Liability Litigation, D.N.M.,
December 21, 2017

2008 WL 540883
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK
COURT RULES BEFORE CITING.

UNPUBLISHED
Court of Appeals of Michigan.

A & M SUPPLY CO., a Michigan corporation,
Individually and as Representative of all
persons similarly situated, Plaintiff-Appellant,
v.
MICROSOFT CORPORATION, Defendant-Appellee.

Docket No. 274164.
|
Feb. 28, 2008.

West KeySummary

1    **Pretrial Procedure**
     👉 Particular Applications, Delay or Time
     Limitation
     Lack of progress required dismissal
     of corporation's anti-trust action against
     computer software company for failure to
     prosecute. The proceedings had been stayed
     pending determination of class certification
     issues involving another plaintiff and the
     computer software company, but even
     after these class certification issues had
     been resolved the corporation failed to
     appropriately advance the case. M.C.L.A. §
     445.771 et seq.; MCR 2.502(A)(1).

     Cases that cite this headnote

Wayne Circuit Court; LC No. 00-031123-NZ.

Before: BANDSTRA, P.J., and DONOFRIO and
SERVITTO, JJ.

**Opinion**

PER CURIAM.

**\*1** Plaintiff A & M Supply Company appeals the lower
court's order denying its motion to amend its complaint
and granting defendant Microsoft Corporation's motion
to dismiss. We affirm.

Plaintiff first argues that the trial court erred in dismissing
the case for "lack of progress." MCR 2.502. We review the
trial court's action in this regard for an abuse of discretion.
Eliason Corp., Inc. v. Dep't of Labor, 133 Mich.App.
200, 203, 348 N.W.2d 315 (1984). No abuse of discretion
occurs unless the action of the trial court was outside of
a range of principled outcomes considering the facts and
circumstances of the case. Saffian v. Simmons, 477 Mich.
8, 12, 727 N.W.2d 132 (2007); Maldanado v. Ford Motor
Co., 476 Mich. 372, 388, 719 N.W.2d 809 (2006). Applying
that standard here, we do not find an abuse of discretion.

We recognize that the lower court entered a stay
of proceedings in this matter in early 2003, pending
determination of class certification issues in related
litigation involving another plaintiff, Fish, and defendant
Microsoft. That would certainly provide justification for
plaintiff's failure to prosecute its claims until the Fish
certification issue had been resolved. However, the logic
of the trial court's decision, with which we agree, was
that plaintiff thereafter failed to appropriately advance the
case.

The Fish certification issue was initially decided when the
application for certification was denied by the trial court.
Our Court denied an application for leave to review that
decision in July 2004, and the Supreme Court similarly
denied leave in November 2005. Notwithstanding those
determinations of the Fish certification question and
the fact that the record here clearly shows this was the
question underlying the stay, plaintiff took no action to lift
the stay until September 2006. [1] In other words, plaintiff
took no action to lift the stay in response to the Fish
decision until more than two years after that decision was
first made and until almost 11 months after the Supreme
Court entered an order finally resolving the possibility
of any appeal of that decision. That lengthy inaction
on plaintiff's part certainly justified dismissal under the
Rule, which provides that an action "in which no steps or

Case 2:19-cv-07532-ES-MAH   Document 18-5   Filed 05/22/19   Page 281 of 300 PageID: 589
A & M Supply Co. v. Microsoft Corp., Not Reported in N.W.2d (2008)
2008 WL 540883

proceedings ... have been taken within 91 days" may be dismissed for lack of progress. MCR 2.502(A)(1).

Further, the record here clearly indicates that there was ample notice that dismissal was likely to occur in the face of plaintiff's failure to prosecute the case. Already in October 2003, the trial court indicated in its ruling denying plaintiff's premature motion to lift the stay, see n 1, that the case was probably subject to dismissal as a result of our Court's prior decision, *A & M Supply Co. v. Microsoft Corp.,* 252 Mich.App. 580, 654 N.W.2d 572 (2002) (*A & M I* ), or that it should be remanded to the district court for consideration as an individual action rather than a class action as a result of *A & M I.* The record also shows that, shortly after the Supreme Court denied the application for review in the Fish case, the trial court initiated a telephone conference with the parties. It asked what plaintiff's plans for the case were, and whether the case should be dismissed, to which plaintiff responded that it would make a determination and undertake further proceedings . [2] The "notice of proposed dismissal" that MCR 2.502 requires "shall be given in the manner provided in MCR 2.501(C) for notice of trial." MCR 2.502(A)(3). MCR 2.501(C) specifies that notice may be provided orally if the party is before the court and only requires a 28 days notice period, both of which provisions were amply satisfied here.

**\*2** We conclude that dismissal of this action for lack of progress was warranted because plaintiff made no showing that progress was being made. MCR 2.502(A)(1). Instead, the trial court correctly determined that:

> So-and from my perspective, there has been a complete and total failure of the plaintiff to make any effort to prosecute the case since the Fish application was denied. Plaintiff knew all along and I told him all along that hey, we're going to see what happens on the Fish case and then it's going to be your responsibility to put the ball in play. You never did. You just let it sit on my docket and were perfectly happy to do that.

In light of the facts and circumstances surrounding the lower court's decision in this regard, we do not find an abuse of discretion.

Further, even if the lower court had erred in dismissing a plaintiff's action for lack of progress, it was properly subject to dismissal on the merits. In *A & M I,* a panel of our Court determined that plaintiff failed to make an appropriate showing that the persons within the proposed class suffered "actual damages" under the Michigan Anti-Trust Reform Act, MCL 445.778(2) ("MARA"). *A & M I, supra* at 635-642. [3] Upon remand, plaintiff attempted to avoid the "actual damages" requirement of the MARA by seeking to amend its complaint to allege an unjust enrichment theory of recovery. However, we agree with defendant that an unjust enrichment claim is not viable under the facts of this case.

In Michigan, [4] because the unjust enrichment doctrine relies upon the fiction of a quasi-contract which "vitiates normal contract principles," our courts employ the doctrine "with caution ." *Kammer Asphalt Paving Co. v. East China Twp. Schools,* 443 Mich. 176, 185-186, 504 N.W.2d 635 (1993). Ordinarily, the doctrine is employed in cases where a benefit is received by the defendant from the plaintiff, see, e.g., *Bell Isle Grill Corp. v. Detroit,* 256 Mich.App. 463, 478, 666 N.W.2d 271 (2003), and there was no direct receipt of any benefit by defendant here from the persons seeking class certification. Plaintiff relies on a passing reference in *Kammer, supra* at 187, 504 N.W.2d 635, that "plaintiff indirectly provided defendant a benefit." However, the facts of that case clearly show that the defendant and the plaintiff were in contact with one another during the course of plaintiff's paving activities at athletic facilities owned by the defendant, and the defendant certainly benefited directly from plaintiff's work on those facilities. *Id.* at 179, 504 N.W.2d 635. Plaintiff here can point to no similar direct contact between Microsoft and the indirect purchasers in the class they seek to have certified. Nor can they show that Microsoft received any direct payment or other benefit from those purchasers. We conclude that the unjust enrichment doctrine does not apply under the facts alleged by plaintiff here. Thus, plaintiff's attempt to amend its complaint in this fashion was futile, and the motion to make the amendment could properly have been denied on that basis. *PT Today, Inc. v. Comm'r of Office of*

*Financial and Insur. Services,* 270 Mich.App. 110, 142-143, 715 N.W.2d 398 (2006).

 **\*3**  Plaintiff also tried, following remand, to comply with *A & M I's* direction regarding the proof needed on the "actual damages" requirement, by submitting a new affidavit from its expert Dr. Leffler ("2003 affidavit"). [5] In *A & M I,* the panel extensively reviewed previous affidavits submitted by Dr. Leffler and concluded that the statistical analyses and economic theories upon which they were based could not suffice to establish "actual damages" as required by the statute with respect to the indirect purchasers constituting the plaintiff class seeking certification here. *A & M I, supra* at 637-642. We have reviewed the 2003 affidavit and conclude, once again, that it does not establish that plaintiff will be able to show "actual damages" with proofs common to all the plaintiffs within the class and with the degree of specificity and rigor required under the "skeptical" approach mandated by MARA. *Id.* at 635, 715 N.W.2d 398.

*A & M I* noted that the prior Leffler affidavits were not based on "regression analyses [that] might be used to calculate the rate at which Microsoft's direct purchasers passed on the overcharge to indirect purchasers." *Id.* at 639, 715 N.W.2d 398. In an apparent response, the 2003 affidavit describes the results of five regression analyses performed after remand. However, Dr. Leffler quite honestly admitted in that affidavit that the data that he was working with did not account for all relevant variables and that, therefore, his results were only illustrative rather than definitive. His final, summary statement regarding

his analysis claimed only that it suggested that "there is a near full pass on" of Microsoft's overcharges to indirect purchasers. And he acknowledged that even that somewhat tentative conclusion would not apply in the subset of transactions, the extent of which he suggested no way of measuring, where final sales to users were made on a "loss leader," below cost basis. Thus, while Dr. Leffler's 2003 affidavit undoubtedly was markedly more convincing than the earlier affidavits, it still only evidenced a way to "estimate damages for the class" and, thus, again "failed to bridge the gap between economic theory and the reality of economic damages." *Id.* at 639-640, 715 N.W.2d 398.

In sum, neither the amended complaint that plaintiff sought to file nor the new Leffler affidavit substantially negated the reasons upon which the *A & M I* panel determined that this matter could not proceed as a class action. Plaintiff took no action to pursue its claim as an individual rather than as a class representative, even though the *A & M I* panel clearly suggested that was a better approach. *Id.* at 642, 715 N.W.2d 398. For those reasons, the trial court could properly have dismissed this action even without concluding that plaintiff had failed to appropriately pursue it in a timely fashion.

We affirm.

### All Citations

Not Reported in N.W.2d, 2008 WL 540883

Footnotes

1    Plaintiff filed a motion to lift the stay *prior* to a decision on the Fish certification question, which was thus unfounded and unsuccessful for that reason, in September 2003.

2    And, as explained above, notwithstanding the trial court's initiative, plaintiff still took no steps to lift the stay and advance the case for 11 months.

3    Although plaintiff criticizes *A & M I,* we conclude that it properly determined that MARA's requirement that even "indirect purchasers" like plaintiff must show "actual damages" means that a "skeptical" approach should be followed here in Michigan. See *A & M I, supra* at 635. In light of that conclusion, *A & M I* is binding upon us in this regard. MCR 7.215(J). Further, as this case does not involve any important claim of constitutional rights such as in *Locricchio v. Evening News Ass'n of MI,* 438 Mich. 84, 476 N.W.2d 112 (1991), *A & M I* also constitutes the binding law of the case.

4    Plaintiff relies on foreign case law to support its unjust enrichment theory but this cause of action is a matter of state law and we are compelled to follow Michigan authorities.

5    Plaintiff's amended complaint also sought to limit the class, purportedly to aid Dr. Leffler's analysis. We conclude below that the 2003 affidavit, like its predecessors, was lacking under *A & M I.* Similarly, the related attempt to limit the class, which plaintiff does not suggest had any other import, is unavailing.

A & M Supply Co. v. Microsoft Corp., Not Reported in N.W.2d (2008)

2008 WL 540883

---

**End of Document**                                                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

---

# EXHIBIT S

Block v. Jaguar Land Rover North America, LLC, Not Reported in Fed. Supp. (2016)

2016 WL 3032682

2016 WL 3032682
Only the Westlaw citation is currently available.
NOT FOR PUBLICATION
United States District Court, D. New Jersey.

Amy BLOCK and Victorya Manakin,
on behalf of themselves and all
others similarly situated, Plaintiff,

v.

JAGUAR LAND ROVER NORTH
AMERICA, LLC, Defendant.

Civil Action No. 15-5957 (SRC)
|
Signed 05/26/2016

**Attorneys and Law Firms**

Bruce Heller Nagel, Greg Michael Kohn, Nagel Rice, LLP, Roseland, NJ, for Plaintiff.

Brian D. Sullivan, Fox Rothschild LLP, Roseland, NJ, for Defendant.

**OPINION & ORDER**

CHESLER, U.S.D.J.

**\*1** This matter comes before this Court on the motion to dismiss the Amended Complaint for failure to state a valid claim for relief, pursuant to Federal Rule of Civil Procedure 12(b)(6), by Defendant Jaguar Land Rover North America, LLC ("Jaguar"). For the reasons stated below, the motion will be granted in part and denied in part.

This case arises from a dispute between Plaintiffs, purchasers of Land Rover vehicles, and the manufacturer, Jaguar. In short, the Amended Complaint alleges that the purchased vehicles were defective and asserts six counts: 1) violation of the New Jersey Consumer Fraud Act ("NJCFA"); 2) common law fraud; 3) unjust enrichment; 4) breach of the implied covenant of good faith and fair dealing; 5) breach of express warranty; and 6) breach of implied warranty. Jaguar now moves to dismiss all six claims for failure to state a valid claim for relief. [1]

Jaguar first argues that the NJCFA does not apply to Plaintiff Manakin's consumer fraud claim. The Amended Complaint alleges that Manakin is a citizen of Massachusetts, Manakin purchased a Land Rover from a dealer in Massachusetts, and Jaguar is a citizen of New Jersey, where it maintains its principal place of business. The parties dispute which state's consumer fraud law this Court should apply: that of New Jersey, or that of Massachusetts.

The Third Circuit has stated the fundamental legal principles for such a choice-of-law analysis as follows:

A federal court sitting in diversity applies the choice-of-law rules of the forum state—here, New Jersey—to determine the controlling law. *Klaxon Co. v. Stentor Elec. Mfg. Co. Inc.*, 313 U.S. 487, 496 (1941); *Thabault v. Chait*, 541 F.3d 512, 535 (3d Cir. 2008). New Jersey has adopted the "most significant relationship" test set forth in the Restatement (Second) of Conflict of Laws. *P.V. v. Camp Jaycee*, 197 N.J. 132, 962 A.2d 453, 459-60 (N.J. 2008). This is a two-part test.

The first part of the choice-of-law inquiry is to determine whether or not an actual conflict exists between the laws of the potential forums...

Under the second part of the inquiry, the court must determine which jurisdiction has the "most significant relationship" to the claim. *Camp Jaycee*, 962 A.2d at 461. Where a fraud or misrepresentation claim has been alleged, the court looks to the factors set forth in § 148 of the Restatement (Second) of Conflict of Laws. Under subsection (1) of § 148, when the "plaintiff's action in reliance took place in the state where the false representations were made and received," there is a presumption that the law of that state applies. Under subsection (2), when the plaintiff's action in reliance takes place in a different state than where the false representations were made and received, courts weigh the following factors:

**\*2** (a) the place, or places, where the plaintiff acted in reliance upon the defendant's representations,

(b) the place where the plaintiff received the representations,

(c) the place where the defendant made the representations,

Bloor v. Jaguar Land Rover North America, LLC, Not Reported in Fed. Supp. (2016)

2016 WL 3032682

(d) the domicil, residence, nationality, place of incorporation and place of business of the parties,

(e) the place where a tangible thing which is the subject of the transaction between the parties was situated at the time, and

(f) the place where the plaintiff is to render performance under a contract which he has been induced to enter by the false representations of the defendant.

§ 148(2). The factors enumerated in [the Restatement] should be evaluated on a qualitative rather than a quantitative basis.

Maniscalco v. Brother Int'l (USA) Corp., 709 F.3d 202, 206-207 (3d Cir. 2013).

The parties agree that there is an actual conflict of laws and that this Court must apply the "most significant relationship" test stated in § 148 of the Restatement (Second) of Conflict of Laws to determine which state's consumer fraud law applies to Manakin's consumer fraud claim. The parties also agree that Manakin's action in reliance took place in Massachusetts, while the allegedly false representations were made in New Jersey. Thus, Manakin's action in reliance did not take place in the state where the allegedly false representations were made, and so the Court must look to § 148(2). It is at this point that the parties' positions on this issue diverge.

Looking at the six factors in § 148(2), Jaguar contends that only factor (c) favors New Jersey, while the remaining factors favor Massachusetts. Plaintiffs contend that both factors (c) and (d) favor New Jersey. In support of its position, Jaguar persuasively cites Maniscalco: [2]

Although [Plaintiff] is a domiciliary of South Carolina and [Defendant]'s place of business is in New Jersey, factor (d) weighs slightly in favor of applying South Carolina law. See § 148 cmt. i. (noting, in cases of pecuniary loss, that "[t]he domicil, residence and place of business of the plaintiff are more important than are similar contacts on the part of the defendant" because "financial loss will usually be of greatest concern to the state with which the person suffering the loss has the closest relationship").

Maniscalco, 709 F.3d at 208. This reasoning holds true in this case: the case involves financial loss, which would be of greater concern to Massachusetts, the state with which Manakin, who suffered the loss, has the closest relationship. Thus, of the six factors, only factor (c) favors New Jersey as the state with the most significant relationship to Manakin's claim.

As Jaguar points out, similarly, in Maniscalco, the Third Circuit found that only factor (c) weighed in favor of New Jersey. Id. The Third Circuit then stated:

The only remaining questions are whether the place where [Defendant]'s alleged omissions took place, factor (c), weighs in favor of applying New Jersey law, and, if so, whether this contact is of such significance that it outweighs the contacts in favor of applying South Carolina law. We find that it does not.

*3 Accepting [Plaintiff]'s premise that there were actionable omissions by [Defendant] at its headquarters in New Jersey, we conclude that this single contact—factor (c)—does not warrant applying New Jersey law. Nothing else about the relationship between the parties, other than the fortuitous location of [Defendant]'s headquarters, took place in the state of New Jersey. [Plaintiff]'s home state, in which he received and relied on [Defendant]'s alleged fraud, has the "most significant relationship" to his consumer fraud claim. In so concluding, we adopt the overwhelming majority of courts' application of New Jersey choice-of-law rules under similar circumstances.

Id. at 208-209. Just as in Maniscalco, as regards Plaintiff Manakin, nothing, other than the location of Defendant's headquarters, took place in New Jersey. This Court follows Maniscalco and finds that Massachusetts has the most significant relationship with Manakin's consumer fraud claim.

In Maniscalco, the Third Circuit held that, because New Jersey law did not apply to the plaintiff's consumer fraud claim, the district court had properly granted summary judgment in favor of defendant. Id. at 211. In view of this, this Court finds that the Amended Complaint does not state a valid claim for relief under the NJCFA for Manakin. As to Manakin's NJCFA claim, the motion to dismiss will be granted, and that claim will be dismissed without prejudice.

Block v. Jaguar Land Rover North America, LLC, Not Reported in Fed. Supp. (2016)

2016 WL 3032682

Jaguar next argues that the common law fraud claims, which are the Second Count, and Block's NJCFA claim, which is the First Count, fail to meet the pleading requirements of Federal Rule of Civil Procedure 9(b), which states: "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." The Third Circuit has explained:

> In order to satisfy Rule 9(b), plaintiffs must plead with particularity the 'circumstances' of the alleged fraud in order to place the defendants on notice of the precise misconduct with which they are charged, and to safeguard defendants against spurious charges of immoral and fraudulent behavior. Plaintiffs may satisfy this requirement by pleading the date, place or time of the fraud, or through alternative means of injecting precision and some measure of substantiation into their allegations of fraud. Plaintiffs also must allege who made a misrepresentation to whom and the general content of the misrepresentation.

Lum v. Bank of Am., 361 F.3d 217, 223-224 (3d Cir. 2004) (citations omitted).

The First and Second Counts of the Amended Complaint contain only abstract and general statements, alleging conscious misrepresentation. (Am. Compl. ¶¶ 93, 99.) No specifics of the alleged misrepresentation are given in the claims. The Amended Complaint does not allege any specific facts about the misrepresentations in other sections, either. The section which alleges specific facts about Block's and Manakin's experiences with their Land Rover vehicles deals largely with the alleged manufacturing defects and repair history and contains no specific allegations about misrepresentations made to the Plaintiffs.

In opposition, Plaintiffs argue that the Third Circuit applies a "relaxed" pleading standard in cases in which factual information is in the exclusive control of the defendant. Even if true, this is unpersuasive: Plaintiffs here would be the parties in the best position to know the specifics of what misrepresentations were made to them. A consumer alleging fraudulent misrepresentation should not need discovery to allege the basic facts of what the fraudulent misrepresentation was. Plaintiffs also contend that the Amended Complaint does plead the "who, what, how, when and where" of the omissions. This is not so: as discussed, the specific factual allegations in paragraphs 17 through 37 of the Amended Complaint do not identify when and how, what omissions produced what specific misrepresentations to either Plaintiff. This Court finds that the Amended Complaint fails to plead with particularity the circumstances of the alleged fraud, as required by Federal Rule of Civil Procedure 9(b). As to Counts One and Two, the motion to dismiss the Amended Complaint will be granted, and Counts One and Two will be dismissed without prejudice.

**\*4** As to the Third Count, for unjust enrichment, Jaguar contends that New Jersey courts require a direct relationship between a plaintiff and a defendant, and the Amended Complaint does not allege one. In opposition, Plaintiffs contend that New Jersey courts require only a "sufficient nexus between the conferrer of the benefit and the recipient." (Pls.' Opp. Br. 36.) Plaintiffs cite two cases in support: In re K-Dur Antitrust Litig., 338 F. Supp. 2d 517, 546 (D.N.J. 2004) and Nelson v. Xacta 3000 Inc., No. CIV.A.08-5426 (MLC), 2009 WL 4119176, at *7 (D.N.J. Nov. 24, 2009). In both cases, federal district courts used the qualification "sufficient" or "sufficiently" in *dicta*; in neither case did that court deny a motion to dismiss on the ground that New Jersey law does not require a direct relationship between the conferrer and the recipient, but only a <u>sufficiently</u> direct relationship. These two cases do not persuade this Court that New Jersey law uses a "sufficiently direct relationship" standard. Jaguar, in contrast, cites a number of district court cases in which courts have granted a motion to dismiss an unjust enrichment claim because the complaint failed to allege a direct relationship between the conferrer and the recipient. See, e.g., Glass v. BMW of N. Am., LLC, No. CIV.A. 10-5259 ES, 2011 WL 6887721, at *16 (D.N.J. Dec. 29, 2011). Although it does not appear that the New Jersey Supreme Court has addressed this issue, the Appellate Division has, in several cases, held that a direct

Block v. Jaguar Land Rover North America, LLC, Not Reported in Fed. Supp. (2016)

2016 WL 3032682

relationship is required, such that it would be reasonable for one party to expect remuneration from the other. See, e.g., Fasching v. Kallinger, 211 N.J. Super. 26, 35 (N.J. Super. Ct. App. Div. 1986) (citing Callano v. Oakwood Park Homes Corp., 91 N.J. Super. 105, 109 (N.J. Super. Ct. App. Div. 1966)). This Court finds that New Jersey law requires a claim for unjust enrichment to allege a direct relationship between the conferrer of a benefit and the recipient. Because the Amended Complaint does not meet this requirement, the motion to dismiss the Third Count will be granted, and the Third Count will be dismissed without prejudice.

Jaguar next argues that, as to the Fifth Count, for breach of express warranty, the Amended Complaint fails to plead sufficient facts to support a claim. A complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). Jaguar contends that the Amended Complaint does not plead that the alleged defect manifested itself within the warranty period, nor that each Plaintiff brought her vehicle to a dealership for service during the warranty period, in compliance with the express warranty's terms.

The Amended Complaint does not support Jaguar's position. As to Block, paragraphs 19 and 20 plead sufficient facts to state a claim for relief that is plausible on its face: the alleged defect manifested itself within the warranty period, etc. As to Manakin, paragraph 31 alleges that the defect manifested itself during the warranty period, that the vehicle was brought to a dealership, and that the defect continue to manifest after that visit. Iqbal requires no more than sufficient factual assertions to make an express warranty claim plausible, and the Amended Complaint meets this standard. As to the Fifth Count, the motion to dismiss will be denied.

As to the Sixth Count, for breach of implied warranty, Jaguar contends again that Plaintiffs failed to plead that the defect arose during the warranty period. For the reasons just stated, this Court rejects this argument as unsupported by the Amended Complaint. Jaguar further argues that Block's implied warranty claim is time-barred by New Jersey's four-year statute of limitations. In opposition, Plaintiffs contend that the running of the limitation period is tolled in cases of fraudulent concealment of a cause of action, quoting Footown v. Sigma Marketing Systems, Inc., 518 F. Supp. 485, 488

(D.N.J. 1980): "It is well established in New Jersey that where there is fraudulent concealment of a cause of action the period of limitation will not commence until discovery of wrong or of facts which reasonably put one on notice."

Both sides find support for their arguments in the language of the New Jersey statute, part of the Uniform Commercial Code, applicable to this claim:

Statute of limitations in contracts for sale

(1) An action for breach of any contract for sale must be commenced within four years after the cause of action has accrued. By the original agreement the parties may reduce the period of limitation to not less than one year but may not extend it.

**\*5** (2) A cause of action accrues when the breach occurs, *regardless of the aggrieved party's lack of knowledge of the breach.* A breach of warranty occurs when tender of delivery is made, except that where a warranty explicitly extends to future performance of the goods and discovery of the breach must await the time of such performance the cause of action accrues when the breach is or should have been discovered.

...

(4) This section does not alter the law on tolling of the statute of limitations ...

N.J. Stat. Ann. § 12A:2-725 (italics added). Jaguar contends that subsection (2) supports their position, while Plaintiffs say that subsection (4) supports theirs. Fortunately, the Third Circuit has just issued a decision which offers helpful guidance about understanding the two subsections in the identical provision in the U.C.C. of the Virgin Islands. MRL Dev. I, LLC v. Whitecap Inv. Corp., 2016 U.S. App. LEXIS 8987, 2016 WL 2865730 (3d Cir. May 17, 2016). In MRL, the Third Circuit made clear that, notwithstanding the language of subsection (2), subsection (4) allows for equitable tolling of the limitations period. Id. at \*20.

New Jersey courts recognize the doctrine of equitable tolling: "[t]ypically the doctrine is applied where the complainant has been induced or tricked by his adversary's misconduct into allowing the filing deadline to pass." Villalobos v. Fava, 342 N.J. Super. 38, 50 (N.J. Super. Ct. App. Div. 2001). The Amended Complaint does not plead facts to make plausible the assertion that

Block v. Jaguar Land Rover North America, LLC, Not Reported in Fed. Supp. (2016)
2016 WL 3032682

Block was induced or tricked by Jaguar's misconduct into allowing the filing deadline to pass. There is no basis for equitable tolling of the four-year statute of limitations.

Absent a basis for equitable tolling, this Court applies subsection (2), which provides that the cause of action accrued when the tender of delivery was made. The Amended Complaint alleges that Jaguar delivered the vehicle to Block in April of 2010. (Am. Compl. ¶ 17.) Because this is a claim for breach of an implied warranty, it cannot fall within the exception for warranties which explicitly extend to future performance. The four-year statute of limitations ended not later than April of 2014. The initial Complaint in this case was filed on August 3, 2015, at which time the statute of limitations had already run.

"A statute of limitations defense is an affirmative one, and in order to undergird a dismissal, must appear on the face of the complaint." Benak v. Alliance Capital Mgmt. L.P., 435 F.3d 396, 400 (3d Cir. 2006). Defendant's statute of limitations defense to Block's implied warranty claim appears on the face of the Amended Complaint. As to the Sixth Count for Plaintiff Block only, the motion to dismiss will be granted, and the Sixth Count will be dismissed without prejudice.

Lastly, as to the Fourth Count, for breach of the implied warranty of good faith and fair dealing, Jaguar contends that Plaintiffs have not sufficiently alleged an actionable misrepresentation by Jaguar, or that Jaguar knew of the alleged defect. Furthermore, Jaguar argues that the Amended Complaint does not allege a sufficient basis to make a claim of unfair dealing plausible. In Wilson v. Amerada Hess Corp., 168 N.J. 236, 251 (2001), the New Jersey Supreme Court stated the standard for claims of breach of the implied warranty of good faith and fair dealing:

> [W]e state the test for determining whether the implied covenant of good faith and fair dealing has been breached as follows: a party exercising its right to use discretion in setting price under a contract breaches the duty of good faith and fair dealing if that party exercises its discretionary authority arbitrarily,

> unreasonably, or capriciously, with the objective of preventing the other party from receiving its reasonably expected fruits under the contract. Such risks clearly would be beyond the expectations of the parties at the formation of a contract when parties reasonably intend their business relationship to be mutually beneficial. They do not reasonably intend that one party would use the powers bestowed on it to destroy unilaterally the other's expectations without legitimate purpose.

**\*6** Id. at 251. The Amended Complaint does not plead sufficient facts to make plausible a claim that Jaguar acted with the objective of preventing Plaintiffs from receiving their reasonably expected fruits under the contract. Nor does the Amended Complaint allege facts supporting the inference that Jaguar unilaterally destroyed Plaintiffs' expectations under the contract without legitimate purpose. Jaguar's motion to dismiss the Fourth Count will be granted.

In conclusion, as to the First, Second, Third and Fourth Counts, Jaguar's motion to dismiss will be granted. As to the Sixth Count, for Plaintiff Block only, the motion to dismiss will be granted. As to the remaining claims, the motion to dismiss will be denied.

For these reasons,

**IT IS** on this 26th day of May, 2016

**ORDERED** that Defendant's motion to dismiss the Amended Complaint (Docket Entry No. 17) is **DENIED** in part and **GRANTED** in part; and it is further

**ORDERED** that Defendant's motion to dismiss the Complaint (Docket Entry No. 9) is **DENIED** as moot; and it is further

**ORDERED** that, as to the First, Second, Third and Fourth Counts in the Amended Complaint, the motion to dismiss is **GRANTED**, and these claims are hereby **DISMISSED** without prejudice; and it is further

2016 WL 3032682

**ORDERED** that, as to the Sixth Count in the Amended Complaint for Plaintiff Block only, the motion to dismiss is **GRANTED**, and the Sixth Count for Plaintiff Block only is hereby **DISMISSED** without prejudice; and it is further

**ORDERED** that, as to the remaining claims in the Amended Complaint, the motion to dismiss is **DENIED**.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 3032682

Footnotes

1   The Court notes that Plaintiffs begin their opposition with the general statement that motions to dismiss are disfavored in this context, quoting Elias v. Ungar's Food Prods., Inc., 252 F.R.D. 233, 239 (D.N.J. 2008). Plaintiffs have quoted Elias out of context: the Elias court was not addressing a Rule 12(b)(6) motion to dismiss, but a motion to certify a class. Id.

2   There are important similarities between the facts in Maniscalco and those alleged here: at issue in both is a claim under the NJCFA by an out-of-state consumer/purchaser of merchandise sold by a company with a principal place of business in New Jersey. Maniscalco, 709 F.3d at 203.

**End of Document**

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT T

2003 WL 22250424
Only the Westlaw citation is currently available.
Court of Common Pleas of Pennsylvania.

Harry STUTZLE, et. al., Individually and on
behalf of all others Similarly Situated, Plaintiffs,

v.

RHONEPOULENC S.A.(n/k/a/Aventis S.A.), et. al.

No. 002768OCT.TERM2002, CONTROL 062165.
|
Sept. 26, 2003.

ORDER and MEMORANDUM OPINION

COHEN, J.

*1 AND NOW, this 26th day of September, 2003, upon consideration of Defendants' Preliminary Objections to Plaintiffs' complaint, all responses in opposition, all matters of record, and in accordance with the Memorandum Opinion being filed contemporaneously with this Order, it is hereby Ordered and Decreed that Defendants' preliminary objections are Sustained. Plaintiffs' complaint is dismissed.

MEMORANDUM OPINION

Before this Court are defendants' preliminary objections pursuant to Pa. R. Civ. P. 1028(a)(4) to plaintiffs' class action complaint. For the reasons set forth below, this Court sustains defendants' preliminary objections.

DISCUSSION

Defendants attempt to have each of the two claims in plaintiffs' class action complaint dismissed. These claims, which the court will address in order, are unjust enrichment and conspiracy.

A. Unjust Enrichment

In the complaint, plaintiffs allege that defendants have engaged in activities that caused the plaintiffs and the class members to pay more for Methoinine [1] than they should

have absent the illegal conduct. (Plts. Complaint ¶ 68). Plaintiffs also allege that defendants received excessive and unreasonable profits by virtue of the higher prices paid by plaintiffs and that equity and good conscious requires that defendants return these excess profits to the plaintiffs and the class members. (Id.). Defendants argue that the claim is legally insufficient because plaintiffs as indirect purchasers did not confer a benefit upon defendants.

To state a claim for unjust enrichment, the plaintiffs must allege that they conferred a benefit on the defendant, that defendant appreciated the benefit under the circumstances and that the defendant accepted and retained the benefit without payment for value. *BurgettstownSmith Twp. Joint Sewage Auth. v. Langeloth Townsite Co.,* 403 Pa.Super. 84, 588 A.2d 43, 45 (Pa.Super.1991).

In the case *sub judice,* plaintiffs did not confer a benefit upon defendants. Plaintiffs are indirect purchasers and had no direct dealings with defendants. (Plts. Compliant ¶ 1). Perhaps defendants appreciated the value of the benefits, but any unjust enrichment claim would belong to the direct purchasers, not to indirect purchasers such as plaintiffs. See e. g. *Phillips v. Selig,* 2001 WL 1807951, *8 (Sept. 19, 2001) (Sheppard).

Notwithstanding the fact that plaintiffs did not confer a benefit upon defendants, the plaintiffs have also failed to allege how the enrichment is unjust. The most significant element of the unjust enrichment doctrine is whether the enrichment of the defendant is unjust; the doctrine does not apply simply because the defendant may have benefited as a result of the actions of the plaintiff. *Styler v. Hugo,* 422 Pa.Super. 262, 610 A.2d 347, 350 (Pa.Super.1993). Plaintiffs allege that defendants were unjustly enriched from excessive and unreasonable profits which resulted from defendant's illegal conduct. (Plts. Complaint ¶ 68). The "illegal conduct" described in the complaint is "a horizontal agreement and conspiracy between defendants and their co-conspirators to fix or maintain the price of Methionine and/or allocate markets and customers in connection with the sale of Methionine." (Plts complaint ¶ 1). In essence, plaintiffs allege that defendant's illegal conduct amounts to an antitrust violation. To date, no court in Pennsylvania has held that a private remedy is available for damages under Pennsylvania's common law on antitrust violations. *XF Enterprises, Inc. v. BASF Corp.,* 47 Pa. D. & C. 4th 147,

WESTLAW © 2019 Thomson Reuters. No claim to original U.S. Government Works. 1

2003 WL 22250424

150 (2000) (Levin). Additionally, Pennsylvania has no legislation which provides for these damages. *Id.*

> **\*2** "The common law doctrines relating to contracts and combinations in restraint of trade were well understood long before the enactment of the Sherman Law ... Such contracts were deemed illegal and were unenforceable at common law. But the resulting restraints of trade were not penalized and gave rise to no actionable wrong."

*XF Enterprises Inc. v. BASF Corp.,* 47 Pa. D & C. 4th 147, 150 (2000)(quoting *Apex Hosiery Co. v. Leader,* 310 U.S. 469, 497 (1940)). Since the Pennsylvania legislature and the courts have not created a cause of action for damages sustained as a result of the antitrust violations, than plaintiffs failed to allege within their complaint how the benefit to defendants was unjust. Moreover, to allow plaintiffs to use a claim for unjust enrichment as a means for collecting damages which are not allowable by Pennsylvania's antitrust law, is not a proper use of the claim and can only lead to mischief. *XF Enterprises,* supra. 152 (use of a civil conspiracy claim as a means of collecting damages which are not allowable by Pennsylvania's antitrust law is not a proper use of the claim). Accordingly, plaintiff's unjust enrichment claim is dismissed with prejudice.

B. Civil Conspiracy

Defendants also assert preliminary objections to plaintiffs' cause of action for civil conspiracy. Plaintiffs allege that defendants engaged in an unlawful combination and conspiracy to fix, raise, maintain and stabilize at artificial and non competitive levels the price of Methionine and to conceal this unlawful activity. (Plts. Complaint ¶ 69). In their brief, plaintiffs argue that the civil conspiracy claim is legally sufficient because unjust enrichment is the predicate act for the conspiracy. (Plts. memorandum of law pp. 12–13). Since the court sustained defendants' preliminary objection with respect to plaintiffs' cause of action for unjust enrichment, the court also sustains defendants preliminary objections plaintiffs cause of action for civil conspiracy count.

CONCLUSION

For these reasons, this court finds that defendants' preliminary objections are sustained. Plaintiffs' complaint is dismissed.

**All Citations**

Not Reported in A.2d, 2003 WL 22250424

Footnotes

1    Methionine is sold as an animal feed additive, including DL-methionine, calcium salt of methionine hydroxy analog and any product that contains methionine sold as an animal feed additive. (Plts complaint ¶ 2).

**End of Document**                                                © 2019 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT U

2011 WL 4351584

2011 WL 4351584
Only the Westlaw citation is currently available.
United States District Court, D. Rhode Island.

J.P. MORGAN CHASE BANK, N.A.
v.
M/y Brittany LEIGH II (O.N.1073831), in
rem, and Jonathan P. Rayburn, in personam.

CA No. 11–246ML.
|
Aug. 23, 2011.

**Attorneys and Law Firms**

Michael J. Daly, Pierce Atwood LLP, Steven D. Dilibero, Dilibero and Associates, Providence, RI, for J.P. Morgan Chase Bank, N.A.

Steven D. Dilibero, Dilibero and Associates, Providence, RI, for M/y Brittany Leigh II, Jonathan P. Rayburn.

**REPORT AND RECOMMENDATION**

LINCOLN D. ALMOND, United States Magistrate Judge.

 **\*1** Pending before me for a report and recommendation (28 U.S.C. § 636(b)(1)(B); LR Cv 72(a)) is Plaintiff's Motion to Dismiss Count IV of Greenwich Bay Enterprises Inc.'s (the "Marina") Intervenor Complaint. (Document No. 16). The Marina opposes the Motion. (Document No. 18). Neither party has requested oral argument, and it is not necessary to resolve this Motion.

**Background**

Plaintiff (the "Bank") commenced this admiralty action on June 16, 2011 to arrest a 1998 thirty-five foot Carver motor yacht and to foreclose on a preferred ship mortgage. The Bank alleges an outstanding indebtedness of $103,406.89 and asserts that, "[g]iven its age and present condition, the vessel is worth substantially less than the mortgage indebtedness owed to [the Bank]." (Document No. 1 at ¶ 14 and No. 16 at p. 3).

On July 18, 2011, the Marina intervened with leave of court [1] and made claims against the vessel, the owner and the Bank/Mortgagee, for $7,544.26 plus interest, collection and recovery costs, fees and expenses. (Document No. 15). The Marina appends a "Ledger Card" to its Intervenor Complaint which identifies Mr. Rayburn as the customer and the Brittany Leigh II as the boat. (Document Nos. 10–1 and 10–2). The Ledger Card is dated June 24, 2011 and itemizes various dockage and storage fees (as well as numerous late fees) incurred between December 19, 2006 and May 31, 2011. *Id.* These fees total $7,544.26. [2]

**Discussion**

The Bank moves to dismiss Count IV of the Marina's Intervenor Complaint alleging unjust enrichment. In Count IV, the Marina alleges that in 2006 Mr. Rayburn requested that it provide "certain goods and services to him and for his benefit and the benefit and preservation of" the vessel. (Document No. 15 at ¶ 25). The Marina alleges that the goods and services "directly benefited" [sic] the Bank/Mortgagee since they "were directly related to the protection and preservation of" the vessel. *Id.* at ¶ 28. Thus, the Marina alleges that the Bank has been unjustly enriched at its expense and seeks a judgment directly against the Bank for the dockage and storage fees allegedly owed by Mr. Rayburn. The Bank asserts that its preferred ship mortgage has priority under federal law over a claimed lien for storage services provided to the vessel at the owner's request after the mortgage was recorded. Further, it argues that the Marina's attempt to sue the Bank directly for unjust enrichment under such circumstances fails as a matter of law and is a legally flawed attempt to circumvent the Bank's priority lien. I agree.

"Under the Ship Mortgage Act, the holder of a preferred mortgage on a maritime vessel that is in default may enforce the terms of that mortgage by bringing an action against the vessel *in rem* and an action against the owner *in personam*." Goldfish Shipping, S.A. v. HSH Nordbank AG, No. 07–3518, 2008 U.S. Dist. Lexis 93135 at \*12 (E.D.Pa. Nov. 3, 2008) (citing 46 U.S.C. § 31325(b)). "In the *in rem* action, the mortgagee names the vessel itself as a defendant, and the vessel is seized and sold in a judicial sale ." *Id.* "The proceeds of the sale, the "res," are deposited with the court and used to compensate the preferred mortgage holder and other creditors, with the preferred mortgage holder having priority over the claims of other creditors." *Id.* (citing 46 U .S.C. § 31326(b)).

WESTLAW   © 2019 Thomson Reuters. No claim to original U.S. Government Works.                    1

2011 WL 4351584

**\*2** Here, in 1998, the Bank's predecessor publicly recorded or filed its preferred ship mortgage for the Brittany Leigh II with the Coast Guard's National Vessel Documentation Center. (Document No. 1–3). On September 7, 2004, an assignment of such preferred mortgage to the Bank was also publicly recorded. Pursuant to 46 U.S.C. § 31321(a)(2), a filed ship mortgage "is valid against any person from the time it is filed...." Further, under federal law, a preferred ship mortgage has "priority over *all* claims against the vessel (except for expenses and fees allowed by the court, costs imposed by the court, and preferred maritime liens)." 46 U.S.C. § 31326(b)(1) (emphasis added). Preferred maritime liens are delineated in 46 U.S.C. § 31301(5) and do not include any categories that would potentially cover accrued storage expenses of the nature claimed by the Marina. Further, the Marina does not allege the existence of a "preferred maritime lien" which would have priority over a preferred ship mortgage.

While federal law also recognizes the existence of a general maritime lien when a person provides "necessaries" to a vessel on the order of its owner or the owner's agent, 46 U.S.C. § 31342(a)(1), such lien is subordinate to a preferred ship mortgage. *See Faneuil Advisors, Inc. v. O/S Sea Hawk,* 50 F.3d 88, 92 (1st Cir.1995) (holding that liens for necessaries are ordinary and subordinate to a preferred ship mortgage); and *Key Bank of Puget Sound v. Alaskan Harvester,* 738 F.Supp. 398, 401 (W.D.Wash.1989) (recognizing that a general maritime lien for necessaries is subordinate to a lien created by a preferred ship mortgage). Thus, even if the storage services provided by the Marina constituted "necessaries" under the law, *see* 46 U.S.C. § 31301(4) (defining necessaries), the Marina's claim would still be subordinate to the Bank's preferred ship mortgage as a matter of federal law.

Even accepting the Marina's allegations as true, as the Court must in construing a motion to dismiss under Fed.R.Civ.P. 12(b)(6), the Marina fails to state any legally viable claim for unjust enrichment against the Bank under these circumstances. The Marina alleges that it provided marine storage services to its customer, Mr. Rayburn, over several years and he did not fully pay. There is no allegation that the Bank requested the storage services or promised payment for such services to the Marina. The Bank held a previously recorded ship mortgage on the vessel which placed the Marina on "constructive notice" of the Bank's lien before it provided the storage services in issue to Mr. Rayburn for the vessel. *See L & L Electronics, Inc. v. M/V Osprey,* 764 F.Supp.2d 270, 274 (D.Mass.2011) (recognizing that a recorded ship mortgage places a party on "constructive notice" of the existence of the priority lien).

In essence, the Marina is attempting to shift the financial business risk of providing services to Mr. Rayburn without prepayment or other security from it to the Bank —a third-party, secured creditor. While the Bank may have accrued some indirect benefit in preserving the value of its secured collateral from the Marina's storage services, such indirect benefit does not, as a matter of federal maritime law, trump the Bank's preferred ship mortgage, and, as a matter of state law, does not constitute unjust enrichment. "To establish a claim for unjust enrichment under Rhode Island law, a plaintiff must prove three elements: (1) a benefit must be conferred upon the defendant by the plaintiff; (2) there must be appreciation by the defendant of such benefit; and (3) there must be an acceptance of such benefit in such circumstances that it would be inequitable for a defendant to retain the benefit without paying the value thereof." *Metro. Life Ins. Co. v. Drainville,* No. CA 07–427ML, 2009 WL 1209473 at \*3 (D.R.I. May 4, 2009) *(citing APG, Inc. v. MCI Telecomms. Corp.,* 436 F.3d 294, 305 (1st Cir.2006)). The Marina did not directly confer any benefit on the Bank. Rather, it provided storage services to Mr. Rayburn at his request, and he did not pay. Thus, in Counts II and III, the Marina brings claims for breach of contract and unjust enrichment directly against Mr. Rayburn. Since the Bank did not guarantee Mr. Rayburn's payment for such services, his failure to perform, i.e., to make timely payment for the services, does not create a cause of action against the Bank for payment in the form of an unjust enrichment claim merely because the Bank was a secured creditor of Mr. Rayburn. The Marina's allegations do not plead any circumstances which could reasonably be construed as unjust or inequitable. The Bank holds a recorded mortgage on the vessel which has priority over the Marina's claims as a matter of federal maritime law. The Marina alleges no contract or communication with the Bank suggesting its responsibility for payment of Mr. Rayburn's storage bill. The Marina provided storage services to Mr. Rayburn and has a direct claim against him for nonpayment. The Marina simply does not state any legally viable claim against the Bank for the payment of such expenses or any claim for payment against the

2011 WL 4351584

vessel superior to the Bank's secured lien. Further, the Marina does not cite any legal precedent in its Opposition (Document No. 18) which supports the existence of such a claim against a secured creditor in this admiralty context. Thus, I recommend that its claim against the Bank for unjust enrichment (Count IV) be dismissed pursuant to Fed.R.Civ.P. 12(b)(6).

**Conclusion**

**\*3** For the foregoing reasons, I recommend that the Bank's Motion to Dismiss Count IV of the Marina's Intervenor Complaint (Document No. 16) be GRANTED. Any objection to this Report and Recommendation must be specific and must be filed with the Clerk of the Court within fourteen (14) days of its receipt. *See* Fed.R.Civ.P. 72(b); LR Cv 72. Failure to file specific objections in a timely manner constitutes waiver of the right to review by the District Court and the right to appeal the District Court's decision. *See United States v. Valencia–Copete,* 792 F.2d 4, 6 (1st Cir.1986); *Park Motor Mart, Inc. v. Ford Motor Co.,* 616 F.2d 603, 605 (1st Cir.1980).

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 4351584

Footnotes

1   Although the Marina was allowed to intervene, Chief Judge Lisi left the issue of the viability of the Marina's unjust enrichment claim to another day. (Document No. 14).

2   The Ledger Card reflects several partial payments made by Mr. Rayburn in 2007 and 2008. Interestingly, there is a notation dated June 3, 2011 indicating receipt of an "amex pmnt" in the amount of $7,450.75 (leaving a balance due of only $93.51) but then on June 10, 2011 a notation of a "cust refund" of the full amount of the payment.

© 2019 Thomson Reuters. No claim to original U.S. Government Works.