# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| HUMANA INC., | Case No. 19-cv-7532-ES-MAH |
| Plaintiff, | |
| v. | |
| CELGENE CORPORATION AND BRISTOL-MYERS SQUIBB COMPANY, | |
| Defendants. | |
| UNITED HEALTHCARE SERVICES, INC., | Case No. 20-cv-18531-ES-MAH |
| Plaintiff, | |
| v. | |
| CELGENE CORPORATION, | |
| Defendant. | |
| BCBSM, INC., HEALTH CARE SERVICE CORPORATION, AND BLUE CROSS AND BLUE SHIELD OF FLORIDA, INC., | Case No. 21-cv-6668-ES-MAH |
| Plaintiffs, | |
| v. | |
| CELGENE CORPORATION and BRISTOL-MYERS SQUIBB COMPANY, | |
| Defendants. | |

| | |
|---|---|
| BLUE CROSS AND BLUE SHIELD ASSOCIATION, IN ITS CAPACITY AS THE CARRIER FOR THE SERVICE BENEFIT PLAN, A/K/A THE "FEDERAL EMPLOYEE PROGRAM," A FEDERAL EMPLOYEE HEALTH BENEFITS ACT PLAN, | Case No. 21-cv-10187-ES-MAH |

> Plaintiff,

>     v.

CELGENE CORPORATION AND BRISTOL-MYERS SQUIBB COMPANY,

> Defendants.

| | |
|---|---|
| CIGNA CORP., | Case No. 21-cv-11686-ES-MAH |

> Plaintiff,

>     v.

CELGENE CORPORATION AND BRISTOL-MYERS SQUIBB COMPANY,

> Defendants.

| | |
|---|---|
| MSP RECOVERY CLAIMS, SERIES LLC.; MSPA CLAIMS 1, LLC; MAO-MSO RECOVERY II, LLC, SERIES PMPI, a segregated series of MAO-MSO RECOVERY II, LLC; MSP RECOVERY CLAIMS SERIES 44, LLC, MSP RECOVERY CLAIMS PROV, SERIES LLC, and MSP RECOVERY CLAIMS CAID, SERIES LLC, | Case No. 21-cv-20451-ES-MAH |

|  |  |
|---|---|
| Plaintiffs, | |
| v. | |
| CELGENE CORPORATION, BRISTOL-MYERS SQUIBB COMPANY, CHRONIC DISEASE FUND D/B/A GOOD DAYS FUND, AND PATIENT ACCESS NETWORK FOUNDATION, | |
| Defendants. | |
| MOLINA HEALTHCARE, INC., | Case No. 22-cv-04561-ES-MAH |
| Plaintiff, | HON. ESTHER SALAS, U.S.D.J. HON. MICHAEL A. HAMMER, U.S.M.J. |
| v. | |
| CELGENE CORPORATION AND BRISTOL-MYERS SQUIBB COMPANY | **<u>ORAL ARGUMENT REQUESTED</u>** |
| Defendants. | |

**MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANTS CELGENE CORPORATION AND**
<u>**BRISTOL-MYERS SQUIBB COMPANY'S MOTION TO DISMISS**</u>

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. iii

BACKGROUND .............................................................................................................. 5

    A.    The Patent-Related Allegations. ........................................................... 6

    B.    The Safety-Related Allegations. ........................................................... 8

    C.    The Charity-Related Allegations. ....................................................... 10

ARGUMENT ................................................................................................................ 11

I.    PLAINTIFFS STATE NO CLAIMS FOR ANTICOMPETITIVE CONDUCT. ..................................................................................... 11

    A.    Plaintiffs Fail To State a Claim for Sham Litigation. ................................ 11

        1.    The First Amendment Precludes Antitrust Claims for Patent Litigation Except in Rare Circumstances Not Present Here. ....... 14

        2.    Plaintiffs Fail To Plead Objectively Baseless Patent Litigation as to the Revlimid Patents. ..................................................... 16

        3.    Plaintiffs State No Claim as to Celgene's Thalomid Suits. ............ 24

    B.    Plaintiffs Fail To State a Claim Based on the Natco Settlement. ............. 27

        1.    Background on Plaintiffs' New Settlement Theory. ....................... 27

        2.    The Court Should Dismiss the Natco Settlement Claims. ............ 30

    C.    Plaintiffs' Allegations that Celgene Used Safety Considerations As a "Pretext" Fail To State a Claim. ................................................... 43

        1.    Plaintiffs' Refusal-To-Deal Theory Is Not Cognizable Because They Can Allege No Prior Course of Dealing. ............................... 44

        2.    Plaintiffs Can State No Claim with Respect to Celgene's Alleged Refusal To Sell Samples of Revlimid. ............................... 49

II.    THE CO-PAY ASSISTANCE CLAIMS FAIL. ................................................... 51

    A.    Both MSP and UHS Fail To Satisfy Rule 9(b). ..................................... 52

B.    MSP Lacks Standing for Its RICO Claims. ...................................................53

C.    The Co-Pay Assistance Claims Brought Under Deceptive Trade Practice Statutes Should Be Dismissed.........................................................................54

    1.    MSP's Laundry List of Statutes Fails To State a Claim.................54

    2.    UHS's Minnesota-Law Claim Should Be Dismissed.....................55

III.    NO CLAIMS ARE STATED AGAINST BMS. ..................................................57

CONCLUSION ............................................................................................................59

# TABLE OF AUTHORITIES[*]

## CASES

*AFN, Inc. v. Schlott, Inc.*, 798 F.Supp. 219 (D.N.J. 1992) ....................................................33

*Antioch Co. v. Scrapbook Borders, Inc.*, 291 F.Supp.2d 980 (D. Minn. 2003) .....................56

*Apotex, Inc. v. Cephalon, Inc.*, 255 F.Supp.3d 604 (E.D. Pa. 2017) ....................................50

*Apotex, Inc. v. Thompson*, 347 F.3d 1335 (Fed. Cir. 2003) ........................................... 21, 22

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985)...................... 44, 47

*Balthazar v. Atl. City Med. Ctr.*, 279 F.Supp.2d 574 (D.N.J. 2003), *aff'd*, 137 F.
   App'x 482 (3d Cir. 2005) ..............................................................................................52

*BE & K Constr. Co. v. NLRB*, 536 U.S. 516 (2002) .............................................................14

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) ..................................................... 54, 55

*Casa Dimitri Corp. v. Invicta Watch Co. of Am.*, 270 F.Supp.3d 1340 (S.D. Fla.
   2017) .............................................................................................................................55

*Cent. Admixture Pharmacy Servs. Inc., v. Advanced Cardiac Sols., P.C.*, 482 F.3d 1347
   (Fed. Cir. 2007) ....................................................................................................... 24, 25

*Covad Commc'ns Co. v. Bell Atl. Corp.*, 398 F.3d 666 (D.C. Cir. 2005) ..............................45

*Covad Commc'ns Co. v. BellSouth Corp.*, 374 F.3d 1044 (11th Cir. 2004)...........................45

*Cuozzo Speed Technologies, LLC v. Lee*, 579 U.S. 261 (2016) ............................................12

*DocMagic, Inc. v. Ellie Mae, Inc.*, 745 F.Supp.2d 1119 (N.D. Cal. 2010) ...........................48

*Duke Univ. v. Akorn, Inc.*, 2019 WL 4410284 (D.N.J. Sept. 16, 2019) ...............14, 15, 17

*Eisai Co. v. Dr. Reddy's Labs.*, 533 F.3d 1353 (Fed. Cir. 2008)...........................................18

*Est. of Harris v. Harris*, 218 F.3d 1140 (10th Cir. 2000) ............................................. 46, 47

---

[*] For the Court's convenience, all unpublished opinions cited in this Memorandum are attached in alphabetical order to the Certification of Daniel R. Guadalupe submitted and filed herewith in support of Defendants' Motion.

*Ethyl Gasoline Corp. v. United States,* 309 U.S. 436 (1940) ....................................39

*Evangelical Lutheran Church v. Spherion Pac. Workforce LLC,* 2005 WL 1041487 (D. Minn. May 4, 2005) ...............................................................57

*Exergen Corp. v. Wal-Mart Stores, Inc.,* 575 F.3d 1312 (Fed. Cir. 2009)....................... 19, 25

*Frederico v. Home Depot,* 507 F.3d 188 (3d Cir. 2007)..........................................52

*FTC v. AbbVie Inc.,* 976 F.3d 327 (3d Cir. 2020) ...............................................14

*FTC v. Actavis, Inc.,* 570 U.S. 136 (2013) ...........................................*passim*

*FTC v. Endo Pharms., Inc.,* 2022 WL 951640 (D.D.C. Mar. 30, 2022), *appeal docketed* ........................................................................ 38, 40

*Genetics Inst., LLC v. Novartis Vaccines & Diagnostics, Inc.,* 655 F.3d 1291 (Fed. Cir. 2011)........................................................................20

*Graphic Commc'ns Loc. 1B v. CVS Caremark Corp.,* 850 N.W.2d 682 (Minn. 2014).........57

*Grunenthal GmbH v. Alkem Labs. Ltd.,* 919 F.3d 1333 (Fed. Cir. 2019) ........................22

*Humana, Inc. v. Indivior Inc.,* 2021 WL 3101593 (E.D. Pa. July 22, 2021), *appeals docketed*, Nos. 21-2574, 21-2573 (3d Cir. Oct. 19, 2021)................................54

*Illinois Brick Co. v. Illinois,* 431 U.S. 720 (1977)...........................................53

*Impression Prods., Inc. v. Lexmark Int'l, Inc.,* 137 S. Ct. 1523 (2017) ....................................30

*In re Actos End Payor Antitrust Litig.,* 2015 WL 5610752 (S.D.N.Y. Sept. 22, 2015) ..................................33, 34, 41

*In re Adderall XR Antitrust Litig.,* 754 F.3d 128 (2d Cir. 2014) ..........................................45

*In re Humira Antitrust Litig.,* 465 F.Supp.3d 811 (N.D. Ill. 2020)................. 12, 24, 39, 43

*In re Loestrin 24 Fe Antitrust Litig.,* 261 F.Supp.3d 307 (D.R.I. 2017).............................35

*In re Novartis & Par Antitrust Litig.,* 2019 WL 3841711 (S.D.N.Y. 2019) ......................43

*In re Packaged Seafood Prods. Antitrust Litig.,* 242 F.Supp.3d 1033 (S.D. Cal. 2017) .........48

*In re Plavix Indirect Purchaser Antitrust Litig.,* 2011 WL 335034 (S.D. Ohio Jan. 31, 2011) ........................................................................48

iv

*In re Pre-Filled Propane Tank Antitrust Litig.*, 2019 WL 4796528 (W.D. Mo. Aug. 21, 2019) ..............................................................................................46

*In re Sensipar Antitrust Litig.*, 2020 WL 7022364 (D. Del. Nov. 30, 2020) ............... 37, 38

*In re Sensipar Antitrust Litig.*, 2022 WL 736250 (D. Del. Mar. 11, 2022) .................. 35, 42

*In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256 (3d Cir. 2006) ..................................52

*In re Takata Airbag Litig.*, 524 F.Supp.3d 1266 (S.D. Fla. 2021) ........................................54

*In re Wellbutrin*, 868 F.3d 132 (3d Cir. 2017) .......................................................*passim*

*In re Xyrem (Sodium Oxybate) Antitrust Litig.*, 555 F.Supp.3d 829 (N.D. Cal. 2021)..............................................................................................35

*In re Zetia Antitrust Litig.*, 2019 WL 1397228 (E.D. Va. 2019) ........................................43

*Jackson v. BellSouth Telecomms.*, 372 F.3d 1250 (11th Cir. 2004) ........................................54

*Jang v. Bos. Sci. Scimed, Inc.*, 729 F.3d 357 (3d Cir. 2013).....................................................46

*Kimble v. Marvel Ent.*, 576 U.S. 446 (2015) ....................................................................... 30, 38

*King Drug Co. of Florence v. Smithkline Beecham Corp.*, 791 F.3d 388 (3d Cir. 2015) ...................................................... 30, 35, 37, 41

*La. Health Serv. & Indem. Co. v. Janssen Biotech, Inc.*, 2021 WL 4988523 (D.N.J. Oct. 27, 2021).............................................................................14, 18, 27

*La. Wholesale Drug Co., Inc. v. Shire LLC*, 929 F.Supp.2d 256 (S.D.N.Y. 2013) ..............42

*LiveUniverse, Inc. v. MySpace, Inc.*, 304 F. App'x 554 (9th Cir. 2008)....................................45

*Mayor & City Council of Baltimore v. AbbVie Inc*, 42 F.4th 709 (7th Cir. 2022) ............................................................................*passim*

*McCarthy v. Recordex Serv., Inc.*, 80 F.3d 842 (3d Cir. 1996) ..............................................53

*McGarvey v. Penske Auto. Grp., Inc.*, 639 F.Supp.2d 450 (D.N.J. 2009) ...............48, 54, 55

*Microsoft Corp. v. AT&T Corp.*, 550 U.S. 437 (2007) ............................................................22

*Microsoft Corp. v. i4i Ltd. P'ship*, 564 U.S. 91 (2011) ............................................................15

*MSP Recovery Claims v. Abbott Labs.*, 2021 WL 2177548
(D.N.J. May 28, 2021) ..........................................................................53, 54, 55

*MSP Recovery Claims v. Sanofi Aventis U.S. LLC*, 2019 WL 1418129 (D.N.J. Mar.
29, 2019)..............................................................................................................53

*Mylan Pharms. Inc. v. Celgene Corp.*,
2018 WL 11299447 (D.N.J. Oct. 3, 2018) ......................................44, 49, 50

*Mylan Pharms. v. Celgene Corp.*, 2014 WL 12810322 (D.N.J. Dec. 23, 2014) ...................48

*Mylan Pharms v. Celgene Corp.*, 2015 WL 409655 (D.N.J. Jan. 30, 2015) ..........................48

*Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064 (10th Cir. 2013)...........................................45

*Park Irmat Drug Corp. v. Express Scripts Holding Co.*, 911 F.3d 505
(8th Cir. 2018) .............................................................................................. 45, 47

*Pearson v. Component Tech. Corp.*, 247 F.3d 471 (3d Cir. 2001) .................................... 58, 59

*Q-Tips, Inc. v. Johnson & Johnson*, 109 F.Supp. 657 (D.N.J. 1951).....................................40

*Select Comfort Corp. v. Tempur Sealy Int'l, Inc.*, 11 F.Supp.3d 933 (D. Minn. 2014)...........57

*St. Luke's Hosp. v. ProMedica Health Sys., Inc.*, 8 F.4th 479 (6th Cir. 2021) ......................45

*Steward Health Care Systems, LLC v. Blue Cross & Blue Shield*, 311 F.Supp.3d 468
(D.R.I. 2018)........................................................................................................47

*Takeda Pharm. v. Zydus Pharms. (USA) Inc.*, 2021 WL 3144897 (D.N.J. July 26,
2021) ...................................................................................................15, 20, 21

*Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276 (Fed. Cir. 2011)......................19

*Thorkelson v. Publ'g House*, 764 F.Supp.2d 1119 (D. Minn. 2011) .....................................56

*United Food & Com. Workers Loc. 1776 v. Teikoku Pharma USA, Inc.*, 74
F.Supp.3d 1052 (N.D. Cal. 2014)......................................................................34

*United States ex rel. Brown v. Celgene Corp.*, 226 F.Supp.3d 1032 (C.D. Cal. 2016)............51

*United States v. CIBA GEIGY Corp.*, 508 F.Supp. 1118 (D.N.J. 1976).............................40

*United States v. Johnson & Johnson*, 2017 WL 2367050 (D.N.J. May 31, 2017) ................59

*Verizon Commc'ns v. Law Off. of Curtis V. Trinko, LLP*
540 U.S. 398 (2004) ..................................................................... 42, 44, 45, 47

*Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429 (7th Cir. 2020), *cert. denied*, 141 S.
Ct. 2877 (2021)................................................................................... 45, 47

*Wayne Moving & Storage of N.J., Inc. v. Sch. Dist. of Phila.*, 625 F.3d 148 (3d Cir.
2010) ...............................................................................................................46

## STATUTES

CREATES Act of 2019, Pub. L. No. 116-94, 133 Stat. 2534, 3130 (West 2019) .... 9, 43

21 U.S.C. § 355–2 ................................................................................10, 43, 49

21 U.S.C. § 355.................................................................... 15, 27, 28, 36

35 U.S.C. § 271 ...............................................................................................15

35 U.S.C. § 314...............................................................................................12

35 U.S.C. § 316...............................................................................................12

42 U.S.C. § 1320a-7b(b).................................................................................51

Minnesota Consumer Fraud Act.........................................................52, 56, 57

Minnesota Private Attorney General Act .........................................................57

## RULES AND REGULATIONS

Fed. R. Civ. P. 9(b) ...............................................................................*passim*

Fed. R. Civ. P. 12(b)(6) .................................................................................33

*Patient Assistance Programs for Medicare Part D Enrollees*, 70 Fed. Reg. 70623-03
(Nov. 22, 2005) ...........................................................................................10

*Indep. Charity Patient Assistance Programs*, 79 Fed. Reg. 31120-23 (May 30, 2014) ..........11

## OTHER AUTHORITIES

Areeda & Hovenkamp, *An Analysis of Antitrust Principles and Their Applications*
(4th & 5th eds. 2013-2020) ..............................................................................39

54 Am. Jur. 2d *Monopolies and Restraints of Trade* § 104.......................................................44

Seven sets of Plaintiffs, health insurers and assignees, have sued Celgene Corporation (and Celgene's recent parent Bristol-Myers Squibb Company ("BMS")) in connection with payments for prescriptions of Celgene's products Thalomid and Revlimid. These drugs have been immensely effective in prolonging the lives of thousands of patients afflicted with blood-borne cancers, such as multiple myeloma. Plaintiffs here opted out of the class settlement in *In re Thalomid & Revlimid Antitrust Litigation*, 14-cv-6997 (D.N.J.), which followed *Mylan Pharmaceuticals Inc. v. Celgene Corp.*, 14-cv-2094, previously before this Court. But their claims have since transformed and expanded, in an apparent effort to avoid substantial merits obstacles that hindered those prior plaintiffs' prospects for recovery under the theories pursued in those cases. Plaintiffs now seek billions of dollars from Celgene on the basis of unprecedented and unsupportable theories of liability materially different than those evaluated before (even than the *Humana* complaint that the Court recently examined).[1] The complaints, each well exceeding 100 pages, span decades of alleged conduct and

---

[1] Opinion, *Humana Inc. v. Celgene Corp.*, 19-cv-7532, ECF 63 (Apr. 27, 2022) ("Limitations Op.") at 23. Following that decision, five Plaintiffs amended and a sixth (Molina Healthcare) filed in this Court. Only United Healthcare ("UHS") stands on its original complaint. Although this motion addresses all seven actions (*see* Appendix A), the Court does not need to study seven complaints. Lowey Dannenberg, P.C. is lead counsel in five actions, and has represented that those complaints are substantively the same for purposes of this motion; on most issues, those allegations largely track those of UHS and the MSP special-purpose entities as well. Defendants therefore generally use Humana's amendment as the exemplar, cited as "Humana AC," Case No. 19-cv-7532, ECF 68, and refer to this group collectively as the "Lowey Plaintiffs." UHS's complaint is referred to as "UHS Compl.," Case No. 20-cv-18531, ECF 1, and MSP's operative complaint is referred to as "MSP 2AC," Case No. 21-cv-20451, ECF 71.

invoke ranging theories of liability.  But breadth is no substitute for substance.  The Court should dismiss all counts.

The heart of the operative complaints is the contention that Celgene's enforcement of its Revlimid patents—including on the chemical compound itself for that medication (which Celgene scientists invented), crystalline forms of that compound, and methods of treatment using that compound—was *entirely* a "sham." Plaintiffs thus must plausibly allege that 15 different patent suits by Celgene were all objectively baseless, but they cannot come close to doing so.

These Plaintiffs are far from the first to scrutinize Celgene's Revlimid patents. Those patents were duly issued by the U.S. Patent and Trademark Office ("USPTO") after examination, and in many cases reexamined by the Patent Trial Appeal Board ("PTAB"), which in six separate proceedings held that the petitioners had failed to establish even a reasonable likelihood that they would prevail in their attempts to invalidate any claim of the challenged patents, and therefore refused even to institute proceedings.  If Plaintiffs' allegations suffice to plead sham litigation in that circumstance, *any* patent case that does not yield a final judgment for the patentee on every claim of every patent may be called a "sham."  That is not the law.

The simple reality is that Celgene has strong patents.  This is why generic manufacturers were unable to litigate the earlier generic entry that Plaintiffs want.  So Plaintiffs now come at it from the other side as well.  They contend that Celgene settled litigation on its Revlimid patents with an alleged "reverse payment" that

induced the first company (Natco) that filed for approval of a generic Revlimid product to delay the launch of its product.

The problem with this theory is that Plaintiffs allege no cognizable "reverse payment" from Celgene to Natco. The terms Plaintiffs complain about are ordinary, negotiated licensing parameters related to the timing and conditions for generic entry before Celgene's patents expire. And the irreconcilable tension between Plaintiffs' "reverse payment" and "sham litigation" theories confirms that neither states a claim: After alleging at length how Celgene's Revlimid patents were supposedly "shams," Plaintiffs insist, without a trace of irony, that Celgene made a "reverse payment" to Natco in not insisting on a 90% royalty for Natco's licensing of Celgene's patents. Thus, Plaintiffs would like the Court to take as true both that (a) these patents were so invalid that it was a sham for Celgene even to assert them, and (b) these patents were so strong that Celgene had the power—and the obligation, on pain of antitrust liability—to demand a 90% royalty. Plaintiffs' two theories defeat one another. In any event, no court has ever held a royalty-free license to be a "reverse payment" that invites antitrust scrutiny of a settlement, let alone one resulting in generic entry years before the last patent expires.

All Celgene and Natco are alleged to have done is exactly what the legal system wants them to do: resolve their dispute over whether Natco may introduce its generic product in the face of Celgene's patents through a settlement addressing only the conditions of that generic entry. Here too, if Plaintiffs' allegations state a claim, then

3

*any* compromises on patent license terms negotiated in a Hatch-Waxman settlement can be characterized as a "reverse payment." That is not the law either.

Apart from their patent allegations, Plaintiffs assert a version of the refusal-to-deal theory that animated the *Mylan* case. As did Mylan, they allege that Celgene used safety concerns around thalidomide as a pretext to deny the sale of product samples for clinical testing. Unlike in *Mylan*, though, Plaintiffs are not competitors of Celgene, but rather are almost entirely indirect purchasers; their claims under state law do not permit a refusal-to-deal theory absent a prior course of dealing. Even as to the few claims governed or informed by Third Circuit law, developments in the law since the Court's 2014 *Mylan* decision counsel for the Court to apply a prior course of dealing requirement. In any event, this Court already correctly held that, as a matter of law, Celgene may condition the sale of its dangerous products on FDA approval of the buyer's testing protocols, and Plaintiffs allege no such approvals as to the Revlimid requests.

Finally, two Plaintiffs—United Healthcare ("UHS") and a group of special-purpose entities pursuing claims allegedly assigned by various third-party payors (collectively, "MSP")—add another new theory. They observe that Celgene, like other pharmaceutical companies, has made donations to established co-pay assistance charities. They describe a wide-ranging federal investigation into whether particular such donations were illegal kickbacks under federal law. They observe that in 2016, Celgene was one of the companies subpoenaed in that investigation. And

4

they observe that in 2019, prosecutors reached settlement agreements with two charities relating to donations from *other* companies—*but not including Celgene*, against which the government did not pursue any such claims.  From this, UHS and MSP seek an inference that Celgene, too, was engaged in wrongful conduct.

That is not a plausible inference.  And even if it were, the legal theories into which MSP and UHS try to wedge these allegations are not viable; their claims, brought under RICO and state deceptive trade practice laws, fail as a matter of law for various reasons.  *First*, both UHS and MSP's claims sound in fraud, yet neither has come close to pleading the particulars necessary to meet Rule 9(b).  *Second*, MSP is an indirect purchaser, and its RICO claims therefore are barred.  *Third*, MSP's laundry list of state statutes fails to account for meaningful distinctions in the laws of those states. And *fourth*, UHS's allegations fail to meet the requirements of the Minnesota statute under which UHS has sued.

Lastly, BMS is tacked on here as a defendant.  It is present only vicariously as Celgene's parent through a 2019 acquisition, long post-dating the relevant conduct.

The Court should dismiss all counts with prejudice.

## BACKGROUND[2]

Celgene sells two relevant products—Thalomid and Revlimid—as therapies for various indications, most prominently blood-borne cancers such as multiple myeloma.

---

[2] All emphases are added and internal citations omitted unless otherwise noted.

These medicines have substantially extended the quality and duration of life for thousands of patients.  In late 2019, BMS purchased Celgene.  Humana AC ¶ 23.

Plaintiffs are health insurers (or assignees) who claim to have overpaid for Thalomid and Revlimid.  All Plaintiffs (or assignors) allegedly opted out of *In re Thalomid & Revlimid*, a class action litigated in this District until it settled in 2020.  The Court recently reviewed the original complaint in the first opt-out suit, but ruled only on timeliness (finding Humana's claims timely), and expressly left the sufficiency of the pleading to be evaluated in this consolidated briefing cycle.  Limitations Op. at 23.  After that order, all but one Plaintiff (UHS) amended, including by adding altogether new theories, as discussed below.

### A.    The Patent-Related Allegations.

The USPTO has granted Celgene patents for discoveries related to Thalomid and Revlimid.  Thalomid's active ingredient, thalidomide, is well known, but Celgene patented thalidomide formulations and methods of treating certain diseases with thalidomide.  The last of those patents expires in 2023.  Humana AC ¶ 109.  Lenalidomide is a distinct compound invented by Celgene scientists, and Celgene patented the compound itself (this uniquely strong patent expired only in 2019), as well as certain lenalidomide polymorphic forms—three-dimensional crystalline forms of a given medicine—and methods of treatment.  Celgene also holds patents on other discoveries, the latest of which extends until 2028.  *Id.*  When generic manufacturers have filed Abbreviated New Drug Applications (ANDAs) with the FDA seeking

approval of generic forms of Thalomid and Revlimid before the expiration of Celgene's patents, Celgene has initiated patent litigation in response, *see, e.g.*, *id.* ¶¶ 349, 378, 389, consistent with the Hatch-Waxman Act's framework for resolving such disputes, *id.* ¶¶ 45-47.

Plaintiffs recite the procedural history of 15 patent infringement suits litigated over 12 years, but fail to point to a single adverse ruling on the Revlimid patents described above.  In fact, the PTAB has repeatedly upheld many of those patents, refusing even to initiate *inter partes* review ("IPR") proceedings, finding the petitioners' allegations failed even to meet the low bar to do so.  *See infra* pp. 16-17.  (Only a subset of claims in a subset of Celgene's patents (two) relating to safe distribution of its medicines did not withstand such challenges, *id.* ¶¶ 302, 395, after which Celgene pursued no litigation on those patents, *id.* ¶ 302.)  Nevertheless, Plaintiffs' central argument is that across the board, Celgene's patents were procured by fraud and are invalid, and that all 15 of Celgene's Revlimid patent infringement suits were "shams" that no reasonable person could have believed had any chance of success.  Humana AC ¶¶ 337-46.

Plaintiffs have now added a new theory—that Celgene's 2015 settlement of its patent infringement suit against Natco (the first filer for approval of generic lenalidomide) was unlawful.[3]  *Id.* ¶¶ 3, 341, 418-433.  The patents in dispute in that

---

[3] The complaint that the Court recently reviewed—Humana's prior pleading—did not advance this theory.  *See infra* § I.B.1.c.  Plaintiffs also expressly disclaim having any

litigation extend until 2027.  *Id.* ¶¶ 109, 352.  As relevant here, that settlement licenses Natco to use Celgene's Revlimid patents on limited amounts of generic lenalidomide, which Natco may sell royalty-free between 2022 and 2026 (after which Natco may sell unlimited generic lenalidomide), and permits Natco to accelerate its entry if another filer successfully gets around Celgene's patents.  *Id.* ¶¶ 368, 432.

Plaintiffs contend that these terms are unlawful:  *First*, Plaintiffs allege (a) that Celgene had a legal obligation, on pain of antitrust liability, to charge Natco what Plaintiffs describe as a "standard" royalty, such that the absence of royalties is a so-called "reverse payment" from Celgene (patentee) to Natco (defendant); (b) that allowing Natco to sell *any* generic Revlimid before the expiration of Celgene's patents may be a reverse payment; and (c) that the clause permitting Natco to enter earlier under certain circumstances (the "acceleration clause") is a reverse payment as well. *Id.* ¶¶ 427-28, 432-33.  *Second*, although Celgene is permitted by law to exclude others from selling generic Revlimid until its patents expire, Plaintiffs argue that the compromise of a portion of that exclusivity—i.e., Natco's volume-limited early entry—is unlawful, "separate and apart" from the reverse payment claim.  *Id.* ¶ 418.

## B.    The Safety-Related Allegations.

Because of the public health risks surrounding thalidomide, the FDA's approval of Thalomid and Revlimid was conditioned on implementation of methods

---

"well-founded allegations" with respect to any other Celgene patent settlement, Humana AC ¶ 571 n.214.

of safe distribution, known as Risk Evaluation Mitigation Strategies ("REMS").

Humana AC ¶¶ 100-01, 104, 112. REMS are now reasonably common, but the

Thalomid and Revlimid REMS were among the first and were particularly robust

given the serious safety concerns with both medications. *Id.* ¶¶ 63, 101, 104, 112.

When certain generic manufacturers asked Celgene for thousands of capsules of

Thalomid, and then Revlimid, for purposes of bioequivalence testing on generic

alternatives, Celgene asked for information and assurances in return, such as copies of

FDA-approved testing protocols, as well as insurance and indemnification

commitments. *See, e.g.*, *id.* ¶¶ 140, 179, 223. Plaintiffs allege that Celgene's stated

rationales for these requests (protection both of patient safety and of Celgene's

liability and reputational interests) were pretextual, and that Celgene was trying to

inhibit development of competing generic medications, no more. *Id.* ¶¶ 111-234.

Plaintiffs do not allege that Celgene had prior courses of dealing with these

generic manufacturers. The last alleged refusal to sell samples dates back to 2014. *See*

*id.* ¶ 155. Since that time, however, recognizing an apparent gap in the

Hatch-Waxman framework, Congress passed the CREATES Act in December 2019,

which recognized both the interests of generic manufacturers in acquiring

restricted-distribution medications for testing and of brand manufacturers in avoiding

liability risk. *See* Pub. L. No. 116-94, 133 Stat. 2534, 3130 (West 2019). Thus, federal

law now requires the sale of REMS-governed products for testing by generic

manufacturers, provided certain conditions are met (including FDA approval of the

buyer's safety protocols), while also insulating sellers from any resulting liability. 21 U.S.C. § 3552(c). The CREATES Act also now provides that such sales, even if not expressly contemplated by the FDA-approved REMS, do not violate such REMS. *Id.* § 355–2(b)(2)(B).

## C.   The Charity-Related Allegations.

Two Plaintiffs, UHS and MSP, allege a theory based on Celgene's payments (claimed as charitable contributions) to two co-pay assistance funds (Chronic Disease Fund, Inc. ("CDF") and Patient Access Network Foundation ("PAN")).[4] MSP 2AC ¶¶ 583-626, 638-46, 659-96; UHS Compl. ¶¶ 478-492. UHS and MSP allege that these payments were improper because they allegedly were targeted at co-pays for Celgene's own medications for patients who otherwise would not have been able to afford Revlimid or Thalomid. *See, e.g.*, MSP 2AC ¶ 514; UHS Compl. ¶ 418.

Co-pay assistance funds are a well-established and expressly approved feature of the U.S. healthcare landscape.[5] But because it can in some instances violate federal law for a pharmaceutical manufacturer to pay for its own products reimbursable by a federal healthcare program, the Department of Health and Human Services has

---

[4] MSP (but not UHS) names CDF and PAN as defendants. MSP 2AC ¶¶ 34, 36.

[5] *See, e.g.*, *Patient Assistance Programs for Medicare Part D Enrollees*, 70 Fed. Reg. 70623-03 (Nov. 22, 2005) ("Patient assistance programs (PAPs) have long provided important safety net assistance . . . .").

repeatedly calibrated and honed its guidance around the operation of such programs.[6]

UHS and MSP allege that Celgene made significant donations to CDF and PAN between 2007 and 2017.  MSP 2AC ¶ 544; UHS Compl. ¶ 438.  They also describe at length the potential risks and hazards accompanying such contributions, and the guidance that the government has therefore put in place.  MSP 2AC ¶¶ 516-19; UHS Compl. ¶¶ 420-23.  They then note an extensive law enforcement investigation on this subject, in connection with which Celgene was subpoenaed in 2016.  MSP 2AC ¶¶ 527-43; UHS Compl. ¶¶ 434-37.  And they note that in 2019, the Department of Justice entered into settlement agreements with CDF and PAN pertaining to payments that those funds received from *other* identified pharmaceutical companies, *not including Celgene*.  MSP 2AC ¶ 527, Exs. P & Q; UHS Compl. ¶ 435.

## ARGUMENT

### I.   PLAINTIFFS STATE NO CLAIMS FOR ANTICOMPETITIVE CONDUCT.

#### A.   Plaintiffs Fail To State a Claim for Sham Litigation.

Focusing on Revlimid, Plaintiffs allege that every infringement suit Celgene filed on its Revlimid patents was a "sham."[7]  *E.g.*, Humana AC ¶¶ 337-38, 341-42.

---

[6] *See, e.g.*, *id.*; *Indep. Charity Patient Assistance Programs*, 79 Fed. Reg. 31120-23 (May 30, 2014).  MSP and UHS both cite such guidance.  *E.g.*, MSP 2AC ¶¶ 516 n.150, 517 n.152; UHS Compl. ¶¶ 420 n.93, 421 n.94.

[7] Celgene's lenalidomide compound patent, two patents on lenalidomide polymorphs, and ten method of treatment patents referenced by Plaintiffs are referred to as the "Revlimid Patents."  *See* Appendix B; *see also* Humana AC ¶ 109.  Two Thalomid patent suits are an afterthought in the Complaints, but are addressed *infra* § I.A.3.

The breadth of the claim is astounding, spanning more than a dozen patents repeatedly reaffirmed by the USPTO and 15 lawsuits in which Celgene enforced those patents. *Id.* ¶¶ 338-39. The question for a sham litigation claim is not even whether this Court would find those patents valid, as the USPTO repeatedly has, but rather is more demanding—whether "*no reasonable litigant* could realistically expect success on the merits" in asserting them. *In re Wellbutrin*, 868 F.3d 132, 148 (3d Cir. 2017). Plaintiffs' allegations do not approach that high bar.

Celgene's Revlimid Patents have been tested fully six times before the USPTO's specialist tribunal for reviewing the patentability of issued patents (the PTAB). In each instance, the PTAB found that the petitioners' invalidity allegations failed to even meet the low bar necessary to institute an IPR proceeding. Notably, the burden on an IPR petitioner is *lower* than in patent litigation, and the burden to institute an IPR proceeding is *lower still.*[8] Plaintiffs sit at the opposite extreme, as antitrust plaintiffs can plead sham litigation only by plausibly alleging that a lawsuit was so frivolous, so unreasonable, that no reasonable litigant could expect *any* chance of success on *any* asserted patent. After all, "[i]t only takes one valid, infringed patent to render all the rest . . . irrelevant." *In re Humira Antitrust Litig.*, 465 F.Supp.3d 811,

---

[8] IPRs were established to "screen out bad patents while bolstering valid ones." *Cuozzo Speed Technologies, LLC v. Lee*, 579 U.S. 261, 272 (2016). An IPR patent petitioner need only show invalidity by a preponderance of the evidence, and institution of an IPR requires only a "reasonable likelihood" of invalidation. 35 U.S.C. §§ 314, 316(e).

12

844 (N.D. Ill. 2020) (citing *Wellbutrin*, 868 F.3d at 165), *aff'd sub nom. Mayor & City Council of Baltimore v. AbbVie Inc*, 42 F.4th 709 (7th Cir. 2022).

Plaintiffs' theory supposes that as to every patent at issue, these health insurers have presented arguments so strong that Celgene *must* have known its patents were unenforceable. Yet none of the generic manufacturers who aggressively litigated the Revlimid Patents for years successfully invalidated *any*. "[A] separate antitrust suit by strangers to the patent litigation does not justify an effort to adjudicate by proxy what might have happened in the patent litigation, but didn't." *AbbVie*, 42 F.4th at 714.

Plaintiffs cannot plead around the PTAB's real-world rulings, so they speculate without foundation that the PTAB was biased. Humana AC ¶ 284. They also claim that the PTAB "provide[d] no support for" its rejection of the same points Plaintiffs assert here, and that its rulings were "contradict[ory]," unduly "sweeping," improperly "dismiss[ive]," "conclusory," and "erroneous." *Id.* ¶¶ 281, 283-84. But Plaintiffs' *ipse dixit* disagreement with the agency that issues patents, reexamines them, and considers challenges to their validity does not state an antitrust claim.

Lacking a plausible attack on the Revlimid Patents individually, Plaintiffs label Celgene's patents collectively as an anticompetitive "thicket," "protection web," or "impenetrable 'patent fortress.'" Humana AC ¶¶ 109, 259, 337. Whatever that is supposed to mean, it is not an antitrust claim. As the Seventh Circuit recently observed, "what's wrong with having lots of patents?" *AbbVie*, 42 F. 4th at 712 (affirming dismissal of sham litigation claim even after USPTO had invalidated

subsets of the patents at issue).  Patents reward new inventions.  Celgene researchers invented the compound lenalidomide, invented various crystalline forms of that compound, and invented methods of using that compound to treat numerous diseases.  Humana AC ¶ 109.  There is nothing "improper[]" about Celgene—after extensive and costly research and development—obtaining patents that the USPTO issued, reexamined, and upheld against challenges.  *Id.* ¶¶ 4, 232, 316-17, 322.

### 1.    The First Amendment Precludes Antitrust Claims for Patent Litigation Except in Rare Circumstances Not Present Here.

The First Amendment immunizes a patent holder suing to enforce its patent from antitrust liability except in the extraordinary instance of sham litigation—an "uphill battle" for an antitrust plaintiff.  *Wellbutrin*, 868 F.3d at 147; *FTC v. AbbVie Inc.*, 976 F.3d 327, 361 (3d Cir. 2020) (citing *Wellbutrin*), *cert. denied*, 141 S. Ct. 2838 (2021).  To overcome this immunity, an antitrust plaintiff must allege facts yielding the plausible inference that the patent lawsuit was "objectively baseless."  *Wellbutrin*, 868 F.3d at 148.  This immunity is intended to avoid "the chilling effect on First Amendment petitioning that might be caused by the treble-damages remedy and other distinct features of antitrust litigation."  *BE & K Constr. Co. v. NLRB*, 536 U.S. 516, 528-29 (2002).  "It is rightly difficult to prove that a lawsuit is a mere sham."  *La. Health Serv. & Indem. Co. v. Janssen Biotech, Inc.*, 2021 WL 4988523, at *8 (D.N.J. Oct. 27, 2021) (granting motion to dismiss); *see also Duke Univ. v. Akorn, Inc.*, 2019 WL 4410284, at *8 (D.N.J. Sept. 16, 2019) (same, noting concern about "chill[ing] the

exercise of the right to petition").

Each of Celgene's supposed "sham" suits was filed in response to the filing of an ANDA containing a certification that Celgene's patents were invalid or not infringed.  21 U.S.C. § 355(b)(2)(A)(iv).  Under the Hatch-Waxman framework, that certification is itself an act of infringement "encourag[ing]" Celgene to sue.  *Wellbutrin*, 868 F.3d at 158; *see* 35 U.S.C. § 271(e)(2)(A).  Congress "incentivize[d] brand-name drug manufacturers to promptly file patent infringement suits," as Celgene did, and such litigation "c[an] only be objectively baseless if no reasonable person could disagree with the [ANDA's] assertions of noninfringement or invalidity," lest courts "penalize a brand-name manufacturer whose litigiousness was a product of Hatch-Waxman."  *Wellbutrin*, 868 F.3d at 144, 149, 157-58.  Accordingly, Plaintiffs cannot plead merely that Celgene's lawsuits "would have been subject to a serious defense."  *Takeda Pharm. v. Zydus Pharms. (USA) Inc.*, 2021 WL 3144897, at *12 (D.N.J. July 26, 2021).  They must plead that Celgene had *no* "chance of winning," and would "necessarily" have expected to lose on *each* patent that could preclude generic entry.  *Id.* at *13-14.

Not only that but, where (as here) the theory of sham litigation is predicated on a claim that a patent was *invalid*, Plaintiffs must account for the presumption of patent validity, which can only be overcome by "clear and convincing evidence," *Microsoft Corp. v. i4i Ltd. P'ship*, 564 U.S. 91, 95 (2011).  It is a "rare case" when a patent is so clearly invalid that merely asserting it is an antitrust violation.  *Duke*, 2019 WL

4410284, at *7.  Here, Plaintiffs remarkably claim that "*all* of Celgene's patents on Revlimid are invalid," Humana AC ¶ 543, such that *every* suit on those patents had to have been a "sham."  No such inference is plausible.

### 2. Plaintiffs Fail To Plead Objectively Baseless Patent Litigation as to the Revlimid Patents.

Celgene's Revlimid Patents have been challenged in six petitions to institute IPRs, challenging six patents:  U.S. Patent No. 5,635,517 (the "'517 patent"), covering the lenalidomide compound, and U.S. Patent Nos. 7,189,740 (the "'740 patent"), 7,968,569 (the "'569 patent"), 8,404,717 (the "'717 patent"), 8,741,929 (the "'929 patent"), and 9,056,120 (the "'120 patent"), covering methods of treatment using lenalidomide.  *All six times, the PTAB unanimously declined to even institute a proceeding:*

| IPR | PTAB Ruling |
| --- | --- |
| *Coalition for Affordable Drugs VI LLC v. Celgene Corp.*, IPR2015-01169, 2015 WL 7304675 (P.T.A.B. Nov. 16, 2015) ('517 patent) | "[T]he information presented in the Petition and accompanying evidence does not establish a reasonable likelihood that Petitioner would prevail in showing the unpatentability of claims 1–10." |
| *Apotex Inc. v. Celgene Corp.*, IPR2018-00685, 2018 WL 4691258, at *11 (P.T.A.B. Sept. 27, 2018) ('929 patent) | Apotex's "challenges are based on substantially the same prior art and arguments previously presented." Apotex "has neither sufficiently pointed out how the Examiner erred, nor provided additional evidence or facts that warrant reconsideration of the Examiner's decision." |
| *Alvogen Pine Brook LLC v. Celgene Corp.*, IPR2018-01714, 2019 WL 1224681, at *1 (P.T.A.B. Mar. 14, 2019) ('569 patent) | "[A]n [IPR] may be instituted only where 'there is a reasonable likelihood that the petitioner would prevail with respect to at least 1 of the claims challenged in the petition.'  Petitioner does not meet that threshold showing." |

16

| *Dr. Reddy's Lab, Inc. v. Celgene Corp.*, IPR2018-01504, 2019 WL 548870, at *4 (P.T.A.B. Feb. 11, 2019) ('120 patent) | "[Dr. Reddy's] has not shown a reasonable likelihood of prevailing." |
| *Dr. Reddy's Labs., Inc. v. Celgene Corp.*, IPR2018-01507, 2019 WL 548873, at *5 (P.T.A.B. Feb. 11, 2019) ('717 patent) | "[Dr. Reddy's] has not shown a reasonable likelihood of prevailing." |
| *Dr. Reddy's Labs., Inc. v. Celgene Corp.*, IPR2018-01509, 2019 WL 548878, at *5 (P.T.A.B. Feb. 11, 2019) ('740 patent) | "[Dr. Reddy's] has not shown a reasonable likelihood of prevailing." |

Where a patent holder "sought to enforce patents whose validity had not yet been adjudicated by a court," "[i]t is unquestionable that the lawsuits . . . had objective merit." *Duke*, 2019 WL 4410284, at *10. That is true *a fortiori* where Celgene's patents were *upheld*. Plaintiffs themselves allege that the USPTO "routinely" invalidates patents, Humana AC ¶ 54—but not here. Plaintiffs, whose allegations largely copy unsuccessful prior challenges to Celgene's patents, selectively address certain Revlimid Patents. But they fail to plausibly allege objectively baseless conduct by Celgene in enforcing *any* patent—whether on the lenalidomide compound, its polymorphs, or any methods of treatment—much less *all* of them, as a sham litigation claim requires.

### a.    The Lenalidomide Compound Patent.

Celgene scientists invented lenalidomide, Revlimid's active ingredient; it does not exist in nature. That compound is claimed in the '517 patent, which did not expire until October 2019. Humana AC ¶ 109. Because any generic Revlimid must use this compound, Plaintiffs do not allege that any generic product could avoid infringing this patent. The validity of the '517 patent, meanwhile, has withstood all challenges. After it was issued, it was upheld after reexamination, Humana AC

¶¶ 261, 269, and then withstood an IPR proceeding in 2015, *id.* ¶¶ 277-85.  It is impossible for these Plaintiffs plausibly to allege that no reasonable litigant would even bother to assert a patent whose validity the USPTO has repeatedly upheld.

Plaintiffs allege without support that the PTAB took an "unduly narrow" view of the evidence in reaffirming the '517 patent in its 2015 decision, allegedly because it was "swayed by the identity of the Petitioner"—a charge of bias lacking any support, and contradicted by Plaintiffs' recognition that the PTAB *did* institute *other* IPRs from that same petitioner.  Humana AC ¶¶ 284, 301-02.  Any antitrust litigant could make this sort of conclusory allegation, which clearly cannot support a sham litigation claim. *Janssen*, 2021 WL 4988523, at *8 ("A winning lawsuit, of course, is not a sham.").

Next, Plaintiffs claim that the '517 patent was procured by "fraud."  Humana AC ¶¶ 282, 276.  But Plaintiffs fail to back up that serious allegation, let alone do so with particularity under Rule 9(b).  Plaintiffs allege that data submitted by Celgene to the USPTO did not support what Plaintiffs now characterize as the "most vital" part of that patent.  Humana AC ¶¶ 266-272.  But the Examiner reviewed the submitted data and found that it supported issuing the patent, *id.* ¶¶ 266-70, consistent with governing patent law, *Eisai Co. v. Dr. Reddy's Labs.*, 533 F.3d 1353, 1362 (Fed. Cir. 2008) (no "inequitable conduct in failing to include additional data").  Plaintiffs' mere disagreement with the USPTO's conclusions cannot state a sham litigation claim.

Even if Plaintiffs' allegation that the Examiner misread the submitted data were plausible, Plaintiffs have not remotely pleaded, as required, a misrepresentation

sufficiently material that the Examiner would not have issued the '517 patent *but for* the misrepresentation. *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1287, 1291 (Fed. Cir. 2011); *Exergen Corp. v. Wal-Mart Stores, Inc.*, 575 F.3d 1312, 1330-31 (Fed. Cir. 2009) (failure to plead materiality "fatal under Rule 9(b)"). Here, Plaintiffs cannot meet that requirement *because the PTAB upheld the '517 patent without relying on the subject data in any respect. See Coalition*, 2015 WL 7304675. That is, the data cannot have been but-for material to patentability, because the PTAB deemed each claim patentable without reinforcement from that data. Plaintiffs concede this in complaining that the PTAB took "an unduly narrow view of the relevant evidence," Humana AC ¶ 284, and their rote recitation of the elements notably omits any reference to materiality. *See id.* ¶¶ 259-76. That is fatal to their sham litigation claim.

### b.    Celgene's Method of Treatment Patents.

Celgene was awarded patents on methods of using Revlimid to treat certain diseases. Humana AC ¶ 109. Like the '517 compound patent, these patents were subject to repeated IPR attacks, yet in all five proceedings the PTAB ruled in Celgene's favor. *Supra* pp. 16-17. That includes the IPR challenge to the '929 patent covering methods of treating mantle cell lymphomas, the patent with the latest expiration (in 2028). Humana AC ¶ 109. Plaintiffs allege no basis to invalidate that patent, and ignore the PTAB's ruling. *See Apotex*, 2018 WL 4691258, at *11, *13.

As to the four other IPRs, Plaintiffs briefly acknowledge these rulings but label Celgene's victories a "technicality," whatever that means. Humana AC ¶ 384.

Plaintiffs ultimately do nothing more than parrot what generic manufacturers argued in defending against Celgene's patents. *Id.* But as a matter of law, even "showing that the infringement claim would have been subject to a serious defense or is doubtful" is not enough to plead sham litigation. *Takeda*, 2021 WL 3144897, at *12. Plaintiffs cannot even get that far. The PTAB considered these same arguments and concluded that they failed to establish even a "reasonable likelihood" of success and did not "warrant reconsideration of the Examiner's decision," *supra* pp. 16-17.

Even considered on their merits, Plaintiffs' regurgitated attacks on the Revlimid Patents support no claim of sham litigation. For example: As to the '569 patent (treatment of multiple myeloma), Plaintiffs complain that publications that Celgene submitted to the USPTO reporting on the unexpectedly good results of the invention were improper, because they post-dated the date of invention. Humana AC ¶¶ 328-29. But "evidence of unexpected results may be used to rebut a case of *prima facie* obviousness even if that evidence was obtained after the patent's filing or issue date." *Genetics Inst., LLC v. Novartis Vaccines & Diagnostics, Inc.*, 655 F.3d 1291, 1307 (Fed. Cir. 2011). Plaintiffs' argument is wrong as a matter of law.

Plaintiffs also claim that a declaration regarding the date of invention of the treatment of myelodysplastic syndrome with lenalidomide (the '740 patent) was not supported by sufficient documentation. Humana AC ¶¶ 313-21. This is no more than second-guessing the USPTO, which reviewed the declaration. Plaintiffs do not allege that the inventor's dates were incorrect; their argument is only that the

Examiner should have given the declaration less weight.  Such nitpicking provides no basis to infer that Celgene's patent is invalid, much less that "no reasonable litigant could realistically expect success" in litigating that patent.  *Wellbutrin*, 868 F.3d at 148.

Finally, Plaintiffs try to make something of the fact that certain generic manufacturers claimed that their products did not infringe Celgene's patents due to alleged "carve outs" in the labels the generic manufacturers had proposed to the FDA.  But Plaintiffs concede that such generic products could not "carve out" all relevant methods of treatment, and thus that they would infringe certain of these patents.  Humana AC ¶ 326.  Regardless, citing non-infringement *arguments* hardly states a claim for sham litigation.  *Takeda*, 2021 WL 3144897, at *12.

### c.   Celgene's Polymorph Patents.

Celgene was also awarded certain patents on polymorphic forms of lenalidomide.  Plaintiffs concede that one such patent (the "'800 patent") is "key," as it has among the "latest expiration dates" (2027) of any Revlimid Patent.  Humana AC ¶ 297.  Yet even in recognizing that this patent lawfully may prevent generic lenalidomide through 2027, Plaintiffs nowhere plead any reason why this patent was invalid, much less so clearly invalid that it was a sham for Celgene to even assert it.

This gap in pleading is no accident.  Plaintiffs concede that in the underlying patent litigation, Judge Wigenton *held in Celgene's favor* on the interpretation of a particular term in the '800 patent.  Humana AC ¶¶ 297, 358-59.  Plaintiffs suggest that by *winning* the claim construction, Celgene "exposed" its patent to new invalidity

defenses, thus rendering its litigation a sham *ex post facto*. *Id.* ¶¶ 359-60. *That makes no sense*. Even if it were taken as true that Celgene's victory backfired by opening the door to new invalidity defenses (a strained notion), as a matter of law, Celgene is not expected to have "divine[d] the outcome of claim construction," let alone all resulting implications, "before filing." *Wellbutrin*, 868 F.3d at 151 n.22. Indeed, even *losing* at claim construction "does not bear on whether [a] patent infringement suit was objectively baseless from the outset." *Id.* at 150-51. Here, Celgene won.

Next, Plaintiffs assert that polymorphs are "generally not separately patentable." Humana AC ¶ 296. But such patents are regularly issued and regularly affirmed by courts, and Plaintiffs' assertion is wrong as a matter of law. *See, e.g.*, *Grunenthal GmbH v. Alkem Labs. Ltd.*, 919 F.3d 1333, 1344-45 (Fed. Cir. 2019) (affirming finding that polymorph was not invalid as obvious). Plaintiffs' other allegations as to this category of patents fare no better. *First*, Plaintiffs' citations to foreign proceedings on foreign patents under foreign laws, Humana AC ¶¶ 286-94, have no bearing on whether enforcement of U.S. patents under U.S. law was a sham. *See Microsoft Corp. v. AT&T Corp.*, 550 U.S. 437, 455 (2007) ("[F]oreign [patent] law may embody different policy judgments about the relative rights of inventors, competitors, and the public in patented inventions." (cleaned up)). *Second*, Plaintiffs apparently seek some inference from the fact that certain polymorph patents were not listed in the FDA's Orange Book. Humana AC ¶ 110. But it is black letter law that patents that do not cover a brand product are not listed in the Orange Book, *Apotex*,

*Inc. v. Thompson*, 347 F.3d 1335, 1343-44 (Fed. Cir. 2003), even though the patents may still cover a generic product. Indeed, Plaintiffs acknowledge that one generic manufacturer *agreed* that its product infringed these "unlisted" patents. Humana AC ¶ 403. The absence of these patents from the Orange Book is irrelevant.

### d.    Celgene's Distribution Method Patents.

Finally, Plaintiffs criticize Celgene's patents directed to methods of distributing its medications safely. Certain claims of two of these patents—not all of the patents, and not all claims in either of the two patents—were invalidated in a 2016 PTAB proceeding. Humana AC ¶ 302. Plaintiffs concede that Celgene thereafter brought no new suits on those patents, stayed litigation on existing claims pending appellate review, and stopped litigating these patents after that appeal. Humana AC ¶¶ 302, 395. The PTAB's action as to those two patents alone does not render Celgene's prior litigation a "sham"; whether some (small) subset of Celgene's patents have fared worse than others is insufficient, as a matter of law, to plead a sham *litigation* based on *multiple* patents. Where alleged "sham litigations" involved multiple patents (as here, *see* Appendix B), an antitrust plaintiff must allege that the litigation "*as a whole* is objectively baseless." *Wellbutrin*, 868 F.3d at 156 n.34.[9]

---

[9] In *In re Thalomid and Revlimid* (the 2014 class action), Judge Hayden permitted a sham litigation claim to proceed solely on the basis of the alleged weakness of Celgene's distribution method patents. 2015 WL 9589217, at *13 (D.N.J. Oct. 29, 2015). But the Third Circuit subsequently rejected the idea that where multiple patents block generic entry, an antitrust claim can be grounded in the weakness of any one such

\* \* \* \* \*

At bottom, Plaintiffs present nothing more than a smattering of defenses that generic manufacturers already tried, many of which the USPTO expressly rejected.  If that were sufficient to plead sham litigation, the mere existence of patent litigation would inevitably lead to follow-on antitrust claims.  That is not the law.

### 3.    Plaintiffs State No Claim as to Celgene's Thalomid Suits.

Plaintiffs also briefly mention two Thalomid-related patent litigations that Celgene filed, in 2007 against Barr and in 2015 against Lannett.  Humana AC ¶¶ 343, 345.  These claims of sham litigation fail too.

### a.    Most Plaintiffs Withdrew Any Allegations Regarding the Thalomid Patents.

Celgene held two patents on Thalomid:  Nos. 7,230,012 (the "'012 patent") and 7,435,745 (the "'745 patent").  Humana AC ¶ 109.  While the Lowey Plaintiffs initially challenged the validity of these patents, *e.g.*, *Humana* ECF 1 ¶¶ 246, 320-21, they now omit reference to either.  UHS and MSP still purport to challenge these patents, but their attacks fail.  As to the '012 patent, UHS and MSP allege that Celgene withheld prior art from the USPTO, but fail to identify any such prior art—they simply refer to supposedly "[e]xtensive scientific literature."  UHS Compl. ¶ 242; MSP 2AC ¶¶ 265-66.  These vague allegations fail to "identify what relevant and undisclosed prior art was known to the patentee," and state no claim.  *Cent. Admixture Pharmacy Servs. Inc., v.*

---

patent.  *Wellbutrin*, 868 F.3d at 156 n.34; *see also Humira*, 465 F.Supp.3d at 844 (citing *Wellbutrin*, holding that "one valid, infringed patent" renders rest "irrelevant").

*Advanced Cardiac Sols., P.C.*, 482 F.3d 1347, 1356-57 (Fed. Cir. 2007).  As to the '745 patent, UHS and MSP identify other patents as alleged prior art (UHS Compl. ¶¶ 316-17; MSP 2AC ¶¶ 341-42), but fail to plead the materiality of that prior art, i.e., what those earlier patents supposedly taught that was both relevant to the elements claimed in Celgene's patents and not cumulative of the information already before the Examiner.  *Exergen*, 575 F.3d at 1329-31.  UHS and MSP also make no attempt to plead the other elements of fraud on the USPTO, including that a specific person knew that material information was withheld or misrepresented, and that he did so "with a specific intent to deceive the PTO."  *Id.* at 1328-29.

### b.    Barr Dropped Its ANDA.

Celgene sued Barr for patent infringement in 2008, and the parties litigated those claims for three years before Judge Arleo.  But in 2010, Barr voluntarily withdrew its ANDA for generic thalidomide.  All Plaintiffs previously (and groundlessly) speculated that the termination of Celgene's patent suit that followed may have been accompanied by a settlement that "may have included a reverse payment from Celgene."  *Humana* ECF 1, ¶ 335; MSP 2AC ¶¶ 356-57.  The Court found that barebones speculation insufficient, Limitations Op. at 21 n.4, and the public docket shows unambiguously that Barr simply withdrew its application to market the product, and so Celgene's patent case was dismissed—there was no

settlement.[10]  For their part, the Lowey Plaintiffs have now dropped their unsubstantiated suggestion that Celgene made a "reverse payment" to Barr to settle that suit, yet continue to allege that Celgene's suit was a sham.  Humana AC ¶ 541. But a patent litigation in which the alleged infringer voluntarily agrees to withdraw its application to market the product obviously is not a sham.  Moreover, having decided to withdraw its application, Barr lacked FDA approval to market generic thalidomide, and the absence of such approval bars any claim of antitrust injury: "It is not enough . . . to show that [Barr] wanted to launch its drug; [Plaintiffs] must also show that the launch would have been legal." *Wellbutrin*, 868 F.3d at 165.  Because Barr withdrew its ANDA, there could be no pleading of antitrust injury in any event.

For the same reasons, peripheral allegations that Celgene allegedly delayed Barr's generic product via a 2007 petition to the FDA, or via an alleged exclusive contract in 2004 with an ingredient supplier, *see* Humana AC ¶¶ 235-50, 331-36, 541, are of no legal consequence—Barr walked away, and never got FDA approval to sell.

### c. Plaintiffs Do Not Allege Objectively Baseless Litigation Against Lannett.

Plaintiffs also assert that Celgene's patent suit against Lannett in 2015 was a sham, Humana AC ¶ 542, but allege no facts in support of that claim.  As with Barr, Plaintiffs cite no adverse ruling against Celgene in that litigation, nor any allegations

---

[10] *Celgene Corp. v. Barr Labs.*, No. 07-cv-0286 (D.N.J.), ECFs 157 (May 13, 2010), 160 (May 21, 2010).

explaining why Celgene's suit was objectively baseless. *Id.* ¶¶ 343, 541. Such conclusory pleading cannot state a claim for sham litigation. *Janssen*, 2021 WL 4988523, at *6 n.18, *8.

Any claim as to "delayed" entry of Lannett's generic Thalomid fails for an additional reason: even with a license to Celgene's patents that began in 2019, Lannett never launched a generic Thalomid product. Humana AC ¶ 203.

## B.     Plaintiffs Fail To State a Claim Based on the Natco Settlement.

### 1.     Background on Plaintiffs' New Settlement Theory.

#### a.     Celgene and Natco Settled Patent Litigation.

In 2010, Natco was the first generic manufacturer to file an ANDA seeking approval to market generic lenalidomide. Humana AC ¶ 2. As the first filer, Natco stood to benefit from a 180-day period of statutory exclusivity. *Id.* ¶ 50; 21 U.S.C. § 355(j)(5)(B)(iv). Before filing, Natco sent Celgene certifications asserting that various Revlimid Patents, the last of which expires in 2027, were invalid or not infringed. Humana AC ¶¶ 109, 347, 352; 21 U.S.C. § 355(j)(2)(A)(vii); *supra* § I.A.1. Celgene accordingly filed suit. Plaintiffs allege that in 2015, the parties settled on terms licensing Natco to sell certain quantities of generic Revlimid beginning in March 2022, five years before patent expiry, with the following terms:

- Natco's patent license limits it to selling a specified amount of lenalidomide capsules, which periodically increases until January 2026, when Natco is licensed to sell an unlimited quantity of its product. Humana AC ¶ 368.

- The patent license granted by Celgene to Natco is royalty-free. *Id.* ¶ 370.

- Natco may "accelerat[e]" its patent license, i.e., may launch its product sooner, if a later-filing generic successfully invalidates Celgene's Revlimid patents. *Id.* ¶ 432.

### b.   Celgene Settled Patent Litigation with Later Filers.

After Celgene's settlement with Natco, 14 other generic manufacturers pursued Revlimid ANDAs, and Celgene filed infringement suits under the Hatch-Waxman framework. *E.g.*, Humana AC ¶¶ 339, 349, 378, 389. Plaintiffs observe that all but one of these cases settled. *Id.* ¶ 339. Although they assert claims that the Natco settlement was an unlawful restraint of trade (*see, e.g.*, *id.* Count I), Plaintiffs expressly disclaim any basis for that assertion as to these later settlements, *see id.* ¶ 571 & n.214, which are omitted from the causes of action asserted at the back of Plaintiffs' complaints.

### c.   Plaintiffs' Settlement-Related Claims.

When Humana filed the first of these suits, in March 2019, it alleged nothing more than that "Celgene entered into confidential settlements with its competitors that *may* have included anti-competitive reverse payments." *Humana*, ECF 1, ¶ 5. The Court found this allegation to be "insufficiently pled." Limitations Op. at 21 n.4. Humana had the same information then as now about the Natco settlement, taken from public reports in 2015 and 2016, *see* Humana AC ¶¶ 368, 432-33, yet made no allegation that this settlement contained any "reverse payment." Now, though, Plaintiffs purport to recast those settlement terms as actionable antitrust violations.

*First*, they contend that certain aspects of this settlement constitute unlawful

"reverse payments" from Celgene to Natco, Humana AC ¶¶ 3, 341:

**Royalty-free license.**  Plaintiffs allege that Celgene's patent license to Natco is a reverse payment because it does not require Natco to pay royalties to use Celgene's patents.  *Id.* ¶¶ 426-31.  The theory is that by "waiving" royalties, rather than charging an alleged "industry standard" 90%, Celgene made "a substantial reverse payment" to Natco by allowing it to keep its profits.  *Id.* ¶¶ 427-29.

**Early-Entry License.**  Plaintiffs contend that the settlement agreement is anticompetitive in allowing Natco to sell its generic Revlimid before Celgene's patents expire, in exchange for Natco not entering even earlier.  *See id.* ¶ 371.  They claim that Natco's right to come to market early is a "large reverse payment" because it "equates to hundreds of millions of dollars in the first year of generic sales alone."  *Id.*

**Acceleration Clause.**  Plaintiffs allege that under the settlement's "acceleration clause," Natco's compromise entry date moves up if a later-filing generic manufacturer defeats Celgene's patents.  *Id.* ¶ 432.  Plaintiffs claim this constitutes a reverse payment to Natco, because it allegedly disincentivizes other generic manufacturers from challenging Celgene's patents.  *Id.*

*Second*, Plaintiffs contend that "separate and apart from" their theories of reverse payments, the patent license's volume limits between 2022 and 2026 (after which Natco may sell unlimited amounts of generic Revlimid) amount to an "illegal market allocation."  Humana AC ¶¶ 418, 435, 441-44.

2.      **The Court Should Dismiss the Natco Settlement Claims.**

a.      **Plaintiffs Fail to Plead a "Reverse Payment."**

"Patents endow their holders with certain superpowers." *Kimble v. Marvel Ent.*, 576 U.S. 446, 451 (2015).  One such "superpower[ ]" is the right to settle disputes by licensing someone else to use the patent subject to certain conditions.  *Id.*  "[A] license . . . is about changing the contours of the patentee's monopoly:  The patentee agrees not to exclude a licensee from making or selling the patented invention, expanding the club of authorized producers and sellers.  Because the patentee is exchanging rights, not goods, it is free to relinquish only a portion of its bundle of patent protections." *Impression Prods., Inc. v. Lexmark Int'l, Inc.*, 137 S. Ct. 1523, 1534 (2017).

Thus, because patent holders are entitled to lawful monopolies, and therefore generally entitled to compromise a portion of those rights, antitrust liability does not attach to settlements resolving patent litigation except under the unusual circumstances set out by the Supreme Court in *FTC v. Actavis, Inc.*, 570 U.S. 136 (2013).  There, the Court recognized a narrow exception to the rule that patent settlements are beyond the reach of antitrust scrutiny:  When a brand drug company makes a "large and unjustified" payment to a generic drug manufacturer to delay generic competition, then (and only then) might antitrust liability follow.  *Id.* at 158.  A "large and unjustified" reverse payment is "an unusual, unexplained reverse transfer of considerable value from the patentee to the alleged infringer." *King Drug Co. of Florence v. Smithkline Beecham Corp.*, 791 F.3d 388, 394 (3d Cir. 2015).  Here, the

provisions that Plaintiffs characterize in Celgene's settlement with Natco as unlawful "reverse payments" are no such thing.

### 1) A Royalty-Free License Is Not a "Reverse Payment."

Plaintiffs ask this Court to be the first to rule that a royalty-free license constitutes a "reverse payment"—that a pharmaceutical patent holder *must* charge a generic manufacturer a royalty for the use of its patents, or else expose itself to treble damages. *See* Humana AC ¶¶ 418, 427. But Celgene's decision not to extract a royalty from Natco is not a cognizable reverse payment under *Actavis*.

Defendants are aware of no case that has held that a decision to forego a patent licensing royalty, standing alone, constitutes a reverse payment. The FTC's submissions to the Supreme Court in *Actavis* put this in stark relief: an agreement "on a compromise date of generic entry, *with or without a licensing royalty* . . . is an unalloyed good." Pet'r Reply Br., *FTC v. Actavis, Inc.*, No. 12-416, 2013 WL 1099171, at *8-9, *12 (U.S. Mar. 18, 2013) ("FTC Reply"). The Supreme Court agreed, recognizing that no antitrust liability attaches to "commonplace" settlements compromising disputed patents. *Actavis*, 570 U.S. at 151. *Actavis* was concerned with a different kind of settlement, where "a party with no claim for damages (something that is usually true of [a Hatch-Waxman] defendant) walks away with money simply so it will stay away from the patentee's market." *Id.* at 152. There is no logical way for Plaintiffs to cram a settlement under which Celgene paid Natco nothing, but simply agreed not to

charge a royalty for the use of its patents, into *Actavis*'s narrow focus of concern.

By recasting the nonpayment of royalties by Natco as a payment by Celgene, Plaintiffs blur *Actavis*'s line in precisely the way courts forbid. *Any* benefit that a generic manufacturer acquires in settling Hatch-Waxman litigation and negotiating a patent license—entry dates, royalties, whatever—could, in an absurd sense, "be characterized as a . . . payment to the would-be entrant." *AbbVie*, 42 F.4th at 716. But *Actavis* "rejected the possibility of treating an 'implicit net payment' as equivalent to an actual payment, characterizing the reverse-payment problem as 'something quite different' from" walking away from potential damages. *Id.* Plaintiffs cannot allege a reverse payment by pleading that Celgene declined to demand licensing payments from Natco for the use of the Revlimid patents.

Plaintiffs' contention that Celgene's agreement to a royalty-free license was a "reverse payment" to Natco also runs headlong into Plaintiffs' other allegations. Plaintiffs allege that the Revlimid Patents were so clearly invalid and not infringed by Natco's generic product that Celgene's mere assertion of such patents against Natco was objectively baseless. *See supra* § I.A.1-2. How could it simultaneously be true that Celgene was *obligated* to demand 90% of Natco's generic Revlimid profits for the use of those allegedly worthless patents?[11] That stretches alternative pleading past its

---

[11] This 90% figure is plucked from a 2011 FTC Report studying licensing agreements arising *outside of patent litigation*. *See* Humana AC ¶ 428 n.168. Plaintiffs' supposed "industry standard" is therefore implausible on its face.

breaking point, and reflects that Plaintiffs' newly-invented royalty theory is nothing more than a machination to get past Rule 12(b)(6). Plaintiffs cannot credibly claim that Celgene's patents were *so weak* that they could not objectively be asserted at all, yet *so strong* that Celgene acted anticompetitively by not demanding 90% of Natco's profits as the price for those allegedly "sham" patents. *See, e.g.*, *AFN, Inc. v. Schlott, Inc.*, 798 F.Supp. 219, 227 n.12 (D.N.J. 1992) (a party cannot "assert that A, which directly contradicts B, is true at one time for one purpose and later assert that B is also true at another time for another purpose.").

### 2) A License To Enter Before Patent Expiry Is Not a "Reverse Payment."

Nor is it legally viable to suggest, as Plaintiffs appear to do, that the money Natco earns by selling its ANDA product prior to the expiry of all of the Revlimid Patents qualifies as "a large reverse payment from Celgene to [Natco]." Humana AC ¶ 371. "[T]he *Actavis* Court expressly provided that a 'settlement on terms permitting the patent challenger to enter the market before the patent expires would bring about competition to the consumer's benefit.'" *In re Actos End Payor Antitrust Litig.*, 2015 WL 5610752, at *14 (S.D.N.Y. Sept. 22, 2015) (quoting *Actavis*, 570 U.S. at 154) (alterations omitted), *aff'd in part, vacated in part on other grounds*, 848 F.3d 89 (2d Cir. 2017). Indeed, in *Actavis*, the FTC (the plaintiff in the case) reiterated that "parties to litigation have broad freedom to settle by agreeing upon a compromise date of generic entry." FTC Reply, 2013 WL 1099171, at *8-9. And that is how courts have read *Actavis*,

recognizing that "while the right to sell a generic drug on the market before a patent expires is valuable, it is not itself a payment because it benefits consumers." *United Food & Com. Workers Loc. 1776 v. Teikoku Pharma USA, Inc.*, 74 F.Supp.3d 1052, 1067 (N.D. Cal. 2014) (citing *Actavis*, 570 U.S. at 153). Plaintiffs' apparent argument that Celgene "paid for delay" by letting Natco into the market *early* (whatever the associated royalty provisions) therefore fails.

The Southern District of New York's decision granting a motion to dismiss in *Actos* confirms why. There, plaintiffs brought reverse payment claims regarding patent settlements, like those here, pursuant to which the patent holder compromised on entry dates before the last-expiring patent. *Actos*, 2015 WL 5610752, at *14. On those allegations, as here, the court found that there could be no claim that the brand "paid" the generic manufacturers at all, much less that it paid them for "delay." The generic manufacturers were compensated "only through the market when they began selling their generic product." *Id.* at *15. Like Celgene's settlement with Natco, "the settlements at issue simply granted the Generic[s] . . . a compromise date of generic entry—the very type of settlement sanctioned by the *Actavis* Court." *Id.* at *12, *14.

### 3)   Accelerating Entry Is Not a "Reverse Payment."

An acceleration clause that, if triggered, allows Natco to enter the market *even earlier*, also is not a "reverse payment" from Celgene to Natco. Plaintiffs complain that this may permit Natco (as first filer) to launch ahead of its licensed entry date if a later-filing generic manufacturer successfully defeats Celgene's Revlimid patents,

allegedly "disincentiv[izing]" later filers from challenging the patents. Humana AC ¶¶ 96, 432-33. But Plaintiffs breeze past the threshold issue: licensing earlier generic entry is not a "reverse payment." *See King Drug*, 791 F.3d at 394 (*Actavis* concerns "unusual, unexplained reverse transfer of considerable value"). They also ignore the alternative—absent this provision, if some other company were to succeed in circumventing Celgene's Revlimid patents, Natco would be stuck on the sidelines with its later, negotiated entry date, meaning that there would be *less* generic competition.

The possibility of Natco obtaining earlier entry plainly does not render an acceleration provision a "reverse payment." As discussed above, *Actavis* took issue only with "payment[s] in return for staying *out of* the market." 570 U.S. at 154. The Supreme Court was not concerned with settlements allowing a patent challenger to enter the market *sooner*, which redounds "to the consumer's benefit." *Id.* That is what the challenged provision contemplates here. The only way Natco could be "compensated" by the acceleration clause is by selling its product at an even earlier date. *See* Humana AC ¶ 432. Plaintiffs do not plead that they would be better off with *less* generic competition, nor could they.[12]

---

[12] Some courts outside of this District have held that the *combination* of an acceleration clause with *other* allegedly anticompetitive clauses (such as a promise by a brand manufacturer not to introduce an authorized generic product) may be anticompetitive. *See In re Loestrin 24 Fe Antitrust Litig.*, 261 F.Supp.3d 307, 333-34 (D.R.I. 2017); *In re Sensipar Antitrust Litig.*, 2022 WL 736250, at *8 & n.12 (D. Del. Mar. 11, 2022); *In re Xyrem (Sodium Oxybate) Antitrust Litig.*, 555 F.Supp.3d 829, 862-63 (N.D. Cal. 2021). That type of combination is not present here.

Plaintiffs' theory makes even less sense when compared against the default established by the Hatch-Waxman Act. As the first-filer for generic Revlimid, Natco stood to enjoy a 180-day period of exclusivity—a reward established by Congress to incentivize prompt development of generic medications. *See* 21 U.S.C. § 355(j)(5)(B)(iv). Plaintiffs concede that the FDA awarded Natco first-filer exclusivity because Natco filed the first ANDA for generic Revlimid. Humana AC ¶ 97 n.50; *id.* ¶ 325 (citing Natco's FDA Final Approval Letter). Under Plaintiffs' preferred world—a Natco settlement *without* an acceleration clause—the normal Hatch-Waxman procedures would apply: If another generic manufacturer later defeated Celgene's Revlimid patents, that challenger would not be able to enter the market immediately, because it would be stuck behind Natco's exclusivity. Meanwhile, Natco would have 75 days to launch or else forfeit its exclusivity, *id.* § 355(j)(5)(D)(i)(I)(bb); Humana AC ¶ 433, but would *not* be able to do so by virtue of Plaintiffs' preferred settlement structure. Thus, in the absence of the challenged acceleration clause, a later successful challenge could yield at least a 75-day period in which consumers had access to *no* generic product at all.

Plaintiffs nevertheless insist that the acceleration clause is an unlawful reverse payment because it purportedly "disincentiviz[es]" later filers from challenging Celgene's patents. Humana AC ¶ 96. Because Natco could come to market right away should another challenger come along and defeat Celgene's Revlimid patents, the theory goes, that later hypothetical generic allegedly might think twice before jumping

into the patent fight.  *See id.* ¶¶ 432-33.  But there is no legal principle that required Celgene and Natco to *limit* Natco's entry rights—i.e.*, to reduce competition*—in order to encourage *other* challengers to file ANDAs.  The prospect of *increased* competition is not unlawful under the antitrust laws.  Even crediting Plaintiffs' speculation about how the acceleration clause affects the "incentive[s]" of third parties, *id.* ¶ 96, "*Actavis* does not stand for the proposition that parties must reach the most procompetitive settlements possible," but rather, that they cannot "without justification . . . delay competition for longer than the patent's strength would otherwise permit." *King Drug*, 791 F.3d at 408-09.  *Accelerating* generic competition if the subject patents are invalidated fits this principle to a tee.

    In any event, Plaintiffs' own allegations squarely undermine their purported concerns about how this acceleration clause might disincentivize other potential challengers from stepping forward.  *After* the public announcement of the challenged clause, *14* other companies filed ANDAs on Revlimid; clearly, no one was "disincentivized" from challenging Celgene's patents.[13]  *E.g.*, Humana AC ¶¶ 370, 378.  "ANDA filers understand the nature of competition in the pharmaceutical market," and the situation here played out with "other manufacturers of generic drugs . . . fil[ing] ANDAs seeking to market their own generic versions." *In re Sensipar Antitrust*

---

[13] Several generic manufacturers also pursued additional (unsuccessful) challenges with the PTAB after this announcement.  *See supra* pp. 16-17.

*Litig.*, 2020 WL 7022364, at *8 (D. Del. Nov. 30, 2020). Plaintiffs' allegations are at odds with their conclusory suggestion that this settlement provision deterred other filers from taking a run at Celgene's Revlimid patents; it clearly did no such thing. *See id.* at *8 n.13 (the "undisputed realities" of other generic launches corroborated rejection of deterrence theory).

### b.   Plaintiffs' "Separate" Market Allocation Claim Fails.

Plaintiffs allege that "separate and apart" from any reverse payment, the Celgene-Natco settlement is "an illegal market allocation among competitors." Humana AC ¶ 418; *see id.* ¶ 573. Fundamental principles of patent law refute that contention. As a patent holder is entitled to a lawful monopoly over *all* sales of its product, antitrust law has never been interpreted to somehow prevent the patent holder from licensing another person to make some of those sales. The claim also fails because settlements of patent litigation are not subject to antitrust scrutiny unless, under *Actavis*, the patentee plaintiff made an unlawful "reverse payment" to the generic manufacturer defendant.

### 1)   Volume Limits Are a Valid Exercise of Patents.

By definition, a patent permits the patent holder to exclude competitors and to decide whether and on what terms to license its patents. *Kimble*, 576 U.S. at 451; *see also FTC v. Endo Pharms., Inc.*, 2022 WL 951640, at *9 (D.D.C. Mar. 30, 2022) ("exclusion of competitors" is "at the core of the patentee's rights" and a "legitimate reward[] of the patent monopoly" (alterations adopted)), *appeal docketed*. Celgene

plainly was entitled to stand on its patent rights and litigate to judgment whether Natco could enter the market at all during certain periods of time while Celgene's patents are in force (before March 2022); Plaintiffs do not and cannot dispute that. And Celgene plainly was entitled to license Natco to sell unlimited amounts of generic Revlimid during other periods of time when Celgene's asserted patents are still in force (between January 2026 and 2027). Plaintiffs fail to explain why it is actionable for Celgene to do *in part* what it unquestionably was entitled to do *in full*— license Natco to use Celgene's patents, for a limited volume, between March 2022 and January 2026 prior to the 2027 expiration of the patents at issue in Celgene's litigation with Natco.

"[I]t seems almost inherent in the concept of the sale of [the] license . . . that the [licensor] can [license] as little or as much as it pleases." Areeda & Hovenkamp, *An Analysis of Antitrust Principles and Their Applications* ¶ 2042 (4th & 5th eds. 2013-2020);[14] *Ethyl Gasoline Corp. v. United States,* 309 U.S. 436, 456 (1940) ("[A patent holder] may grant licenses to make, use or vend, restricted in point of space or time, *or with any other restriction upon the exercise of the granted privilege*"); *Humira*, 465 F.Supp.3d at 837. A patent confers a lawful monopoly to 100% of sales, and the law has never required a patentee to license an infringer to make either 100% or 0% of those sales.

---

[14] Courts have long enforced such volume-limited patent licenses by finding licensees liable for infringement where they produce beyond their licensed allotment. *See id.* (citing *Aspinwall Mfg. Co. v. Gill*, 32 F. 697 (C.C.D.N.J. 1887)).

Just as a patentee may decide whether and to whom to license its patent, so too may it "by license restrict production of the licensee to a specified quantity, at a specified place," *United States v. CIBA GEIGY Corp.*, 508 F.Supp. 1118, 1151 n.17 (D.N.J. 1976).

The notion that Celgene was obligated either to grant an unrestricted license to its patents or no license at all finds no support in the cases. Celgene thus operated within its patent rights when it licensed Natco to sell limited quantities of its generic Revlimid product. Humana AC ¶ 368. Just as a patent holder may grant exclusive or multiple licenses, *see Endo*, 2022 WL 951640, at *11, nothing in either patent or antitrust law *requires* a patent license to be "unlimited," *CIBA*, 508 F.Supp. at 1151-52 ("The restraint on competition inheres in the patent monopoly itself."). To the contrary, a patent holder "has the right to prevent licensees from utilizing its patent in a manner that would derogate from the lawful monopoly granted to it." *Q-Tips, Inc. v. Johnson & Johnson*, 109 F.Supp. 657, 660 (D.N.J. 1951). Requiring that a patent holder license its patent "in as unlimited a fashion as [i]s possible is to impose a duty upon the patentee that simply is not justifiable." *CIBA*, 508 F.Supp. at 1151.

The Seventh Circuit's recent *AbbVie* decision, affirming dismissal on the pleadings of claims of territorial market allocation based on allegedly anticompetitive settlements, underscores this point. The brand manufacturer and various generic competitors agreed that the challengers could enter the market before the brand manufacturer's patents expired, but not immediately—the brand manufacturer maintained a period of exclusivity. *See AbbVie*, 42 F.4th at 713-14. Antitrust plaintiffs

40

then sued, complaining that the arrangement violated the Sherman Act. The Seventh Circuit disagreed. "If this is a cartel (AbbVie [the patent holder] and its potential competitors carving up the market, 100% in [the patent holder's] favor, from 2017 through 2022), then all settlements of patent cases violate the Sherman Act." *Id.* at 714. Here, Natco claimed the right to enter the market immediately, and Celgene claimed the right to exclude Natco until 2027. The parties litigated that dispute and then compromised: Natco may not enter at all until 2022, may enter in part between 2022 and 2026, and may enter in full in 2026. That outcome unambiguously *increased* competition; it certainly did not *reduce* it.

The allegations here boil down to a complaint that Celgene and Natco should have entered into some other settlement that would have been even better for health insurers reimbursing Revlimid claims. Humana AC ¶¶ 427-28, 444. Plaintiffs do not explain why a rational patent holder in Celgene's position would have been willing to enter into this same settlement—i.e., licensing its patents several years ahead of expiry—but without any limit on volume. But even had the Plaintiffs pled such a theory, it would not be viable: "*Actavis* does not stand for the proposition that parties must reach the most procompetitive settlements possible." *King Drug*, 791 F.3d at 408-09; *Actos*, 2015 WL 5610752, at *16 ("*Actavis* . . . does not demand that the brand maximize competition.").

Plaintiffs' theory supposes that courts may subject *every* patent settlement to antitrust second-guessing as long as a plaintiff can hypothesize *any* alternative, more

41

"procompetitive" settlement.  That is not, and has never been, the law:  "The mere fact that pricing for the public *could have been lower* under the terms of a particular settlement agreement does not mean that an antitrust violation results when that theoretical optimal result for consumers is not met."  *La. Wholesale Drug Co., Inc. v. Shire LLC*, 929 F.Supp.2d 256, 262 (S.D.N.Y. 2013), *aff'd sub nom. In re Adderall XR Antitrust Litig.*, 754 F.3d 128 (2d Cir. 2014).  Simply put, the Sherman Act does not authorize Plaintiffs to rewrite settlement agreements just because "some other approach might yield greater competition."  *Verizon Commc'ns v. Law Off. of Curtis V. Trinko, LLP*, 540 U.S. 398, 415-16 (2004).

### 2) Plaintiffs' Only Path To Challenging the Settlement Is Through *Actavis*.

*Actavis* is the only exception to the rule that patent settlements are not subject to antitrust scrutiny.  It provided that "*one kind of settlement*, in which the patent holder pays the potential entrant to defer entry, could be unlawful[.]"  *AbbVie*, 42 F.4th at 714.  Courts routinely reject attempts, like Plaintiffs' here, to invent new exceptions to the baseline rule that patent settlements are not antitrust violations absent a reverse payment under *Actavis*.  Where plaintiffs bring "antitrust claims alleging defendants have allocated a market for a patented drug," the "case law uniformly supports the application of *Actavis*," not Plaintiffs' "separate" market allocation approach.  *In re Sensipar*, 2022 WL 736250, at *12 (D. Del. Mar. 11, 2022).  "Because the alleged conduct unfolded in the context of and depended on an intricate statutory regime, the

42

Supreme Court's teaching on that regime applies, and not general principles of market allocation agreements." *In re Novartis & Par Antitrust Litig.*, 2019 WL 3841711, at *4 (S.D.N.Y. 2019); *Humira*, 465 F.Supp.3d at 837.  A "market allocation theory" fails as a matter of law because it "ignore[s] [Celgene's] existing patent rights."  *In re Zetia Antitrust Litig.*, 2019 WL 1397228, at *19-20 (E.D. Va. 2019).

Imposing antitrust scrutiny on ordinary licensing terms (timing, quantity, and royalties) reached in compromising patent infringement claims would invite attacks on *every* patent settlement as a potential Sherman Act violation.  If every such patent license were cast as a "cartel," that would subject to antitrust liability "all settlements of patent cases," despite the narrow exception created by *Actavis*.  *AbbVie*, 42 F.4th at 714.  In a judicial system that encourages settlement, there is no antitrust principle requiring a party to litigate its patent case to judgment.  Plaintiffs' "separate" market allocation theory fails because it has no separate leg to stand on.

### C.   Plaintiffs' Allegations that Celgene Used Safety Considerations As a "Pretext" Fail To State a Claim.

Plaintiffs allege that between 2004 and 2014,[15] Celgene acted anticompetitively by refusing to sell samples of its products to generic manufacturers for clinical trials

---

[15] As noted *supra* pp. 8-10, this alleged conduct all took place during the uncertain time before the CREATES Act of 2019 crafted a legislative balance, obligating manufacturers such as Celgene to sell samples of dangerous products under certain conditions, including FDA approval of safety protocols, and exempting them from liability if those products were mishandled.  21 U.S.C. § 355–2(b)-(c).

based on "pretextual" safety and liability concerns, thus inhibiting the development of generic products. *E.g.*, Humana AC ¶¶ 39-41, 111-226. This claim is both legally deficient and inadequately pleaded. *First*, under the statutes at issue, a company is not liable for refusing to do business with another company with which it has never done business before. *Second*, this Court has already held as a matter of law that Celgene was justified in refusing to sell testing samples to a generic manufacturer that had not obtained FDA approval for its testing protocol for these heavily regulated drugs. *Mylan Pharms. Inc. v. Celgene Corp.*, 2018 WL 11299447, at *21 (D.N.J. Oct. 3, 2018).

### 1. Plaintiffs' Refusal-To-Deal Theory Is Not Cognizable Because They Can Allege No Prior Course of Dealing.

Federal law recognizes that a "manufacturer engaged in an entirely private business" is "free[] to exercise his own independent discretion as to parties with whom he will deal." *Trinko*, 540 U.S. at 408. For this reason, a refusal-to-deal claim is "at or near the outer boundary" of liability, *id.* at 409, among the narrowest and most disfavored claims in antitrust law, and generally viable only where that refusal terminated a prior course of dealing. *Compare Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 610-11 (1985) (ski-slope owner violated Section 2 by repudiating existing venture with competitor), *with Trinko*, 540 U.S. at 409 (*Aspen Skiing* was premised on defendant's termination of an existing, "voluntary . . . course of dealing"); *see also* 54 Am. Jur. 2d *Monopolies and Restraints of Trade* § 104 ("The sole exception to the broad right of a single firm to refuse to deal with its competitors

under the Sherman Act comes into play only when a monopolist seeks to terminate *a prior voluntary course of dealing* with a competitor.").  Indeed, *every* federal circuit court to have considered the question—the Second, Sixth, Eighth, Ninth, Tenth, Eleventh, and D.C. Circuits, plus the Seventh Circuit in clearly expressed dicta—has rejected the viability of a unilateral refusal to deal claim absent a prior course of dealing.[16]  This is because the "unilateral termination of a voluntary (*and thus presumably profitable*) course of dealing suggest[s] a willingness to forsake short-term profits to achieve an anti-competitive end."  *Trinko*, 540 U.S. at 409 (emphasis in original).

Here, Plaintiffs (all of whom are indirect purchasers) are principally suing under state, not federal, law in thirty different jurisdictions.  *See* Humana AC ¶¶ 600-10; MSP

---

[16] *See In re Adderall XR Antitrust Litig.*, 754 F.3d 128, 134 (2d Cir. 2014) (refusal to deal actionable "only when a monopolist seeks to terminate a prior (voluntary) course of dealing with a competitor"); *St. Luke's Hosp. v. ProMedica Health Sys., Inc.*, 8 F.4th 479, 486–87 (6th Cir. 2021) (where "the monopolist [did not] enter a voluntary course of dealing with its rival," the lack of a voluntary, prior course of dealing "signals that the antitrust laws do not apply"); *Park Irmat Drug Corp. v. Express Scripts Holding Co.*, 911 F.3d 505, 518 (8th Cir. 2018) (same, where parties "did not have a voluntary, years-long relationship"); *LiveUniverse, Inc. v. MySpace, Inc.*, 304 F. App'x 554, 556 (9th Cir. 2008) ("[T]he narrow scope of the refusal to deal exception . . . requires, inter alia, 'the unilateral termination of a voluntary and profitable course of dealing.'"); *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1074 (10th Cir. 2013) (claim requires "a preexisting voluntary and presumably profitable course of dealing); *Covad Commc'ns Co. v. BellSouth Corp.*, 374 F.3d 1044, 1049 (11th Cir. 2004) ("unilateral termination of a voluntary course of dealing" is a "requirement for a valid refusal-to-deal claim"); *Covad Commc'ns Co. v. Bell Atl. Corp.*, 398 F.3d 666, 673 (D.C. Cir. 2005) (refusal to deal claim requires prior course of dealing); *see also Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 460 (7th Cir. 2020) (permitting claim to proceed where allegations included "key element[]" of "prior course of voluntary conduct"), *cert. denied*, 141 S. Ct. 2877 (2021).

2AC ¶¶ 627-37; UHS Compl. ¶¶ 467-77.[17]  But none of those state statutes, nor case law from those states' courts, recognizes a refusal to deal absent a prior course of dealing.  Each such state, though, follows the common harmonization principle where, in the absence of controlling state authority, its antitrust statute is interpreted based on federal law.  *See* Appendix C.  Thus, in evaluating the viability of Plaintiffs' refusal-to-deal theory under these state laws, this Court "must predict how the . . . highest court in [these states] would decide the issue at hand."  *Wayne Moving & Storage of N.J., Inc. v. Sch. Dist. of Phila.*, 625 F.3d 148, 154 (3d Cir. 2010); *see also Jang v. Bos. Sci. Scimed, Inc.*, 729 F.3d 357, 361-62 (3d Cir. 2013) (predicting analysis of Massachusetts court of last resort).  In doing so, and in conjunction with harmonization principles, the Court is guided by the law of the circuit of those respective states, *see, e.g.*, *In re Pre-Filled Propane Tank Antirust Litig.*, 2019 WL 4796528, at *12 (W.D. Mo. Aug. 21, 2019) (interpreting Arizona monopolization statute according to Ninth Circuit law), or otherwise must predict how that circuit would rule, *see, e.g.*, *Est. of Harris v. Harris*, 218 F.3d 1140, 1146 (10th Cir. 2000) (in absence of on-point state law, courts turn to "federal decisions[] and the general weight and trend of authority").

As to Plaintiffs' refusal-to-deal claims under the 18 jurisdictions at issue within

---

[17] Humana, UHS, and Cigna also sue under federal law as direct purchasers on behalf of certain assignees.  Humana AC ¶¶ 582-87; UHS Compl. ¶¶ 20-21, 444-53; Cigna Am. Compl. ¶¶ 582-87, Case No. 21-11686, ECF 40.  This smaller set of claims is addressed *infra* pp. 47-49.

the Second, Sixth, Eighth, Ninth, Tenth, Eleventh and D.C. Circuits, the answer therefore is straightforward:  Such a claim unambiguously may not proceed in the absence of a prior course of dealing.  *See supra* p. 45 & n.16.  Plaintiffs' refusal-to-deal claims under Illinois, Indiana and Wisconsin law fail for the same reason, where the Seventh Circuit recently noted expressly that a "prior course of voluntary conduct" is a "key element[]" of such a claim.  *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 460, 463 (7th Cir. 2020).  And where the First, Fourth, and Fifth Circuits have not spoken on the question, given the unbroken track record of every other circuit court, *supra* p. 45 n.16,[18] this Court, in rendering a view on how those courts *would* answer the question based on "the general weight and trend of authority," *Harris*, 218 F.3d at 1146, should find that the states located in those circuits, too, would not permit such a claim.

That leaves only the Third Circuit, the law of which will govern Humana's,

---

[18] Across the First, Fourth, and Fifth Circuits, Defendants located a single opinion considering the question.  In *Steward Health Care Systems, LLC v. Blue Cross & Blue Shield*, 311 F.Supp.3d 468, 485 (D.R.I. 2018), the plaintiffs alleged a unilateral refusal to deal based on the defendant's termination of a business relationship.  The *holding* of the court was that the defendant's "terminat[ion of] a longstanding, presumably profitable course of dealing" was evidence of an unlawful refusal to deal.  *Id.*  The court added in dicta its view that the Courts of Appeals that uniformly have found a prior course of dealing *necessary* to state a refusal-to-deal claim had either "misread" or were trying to "deliberately extend" *Aspen Skiing* and *Trinko*.  *Id.* at 483.  Since that one outlier dictum, three more Courts of Appeals—the Sixth, Seventh, and Eighth Circuits—have adopted the uniform view of their sister circuits.  This Court is not bound by that dictum, and can and should find that the First Circuit would follow the holdings of every Court of Appeals to have considered the question.

UHS's, and Cigna's direct-purchaser claims under federal law.[19]  Defendants recall, of

course, the Court's opinion eight years ago, holding that Mylan did not need to allege

a prior course of dealing to state a refusal-to-deal claim against Celgene.  *Mylan*

*Pharms. v. Celgene Corp.*, 2014 WL 12810322, at *6 (D.N.J. Dec. 23, 2014).  But even at

that time, the Court itself viewed the answer as uncertain, and expressly noted

in-Circuit authority coming out the other way.  *Id.* at *5 (citing *In re Suboxone Antitrust*

*Litig.*, 64 F.Supp.3d 665, 687 (E.D. Pa. 2014) (antitrust liability does not attach to a

refusal to deal absent "a long-standing, preexisting course of dealing")).  Given this

uncertainty, the Court certified interlocutory review.  *Mylan Pharms v. Celgene Corp.*,

2015 WL 409655, at *1 (D.N.J. Jan. 30, 2015).  Since then, three more circuits have

---

[19] Plaintiffs allege no state-law claim for refusal to deal under the antitrust laws of
states in the Third Circuit.  Plaintiffs do identify a long list of allegedly violated state
consumer protection statutes (Pennsylvania's and others), albeit without identifying
the disparate elements of those varied state laws.  *See infra* § II.C.1 (discussing
*McGarvey v. Penske Auto. Grp., Inc.*, 639 F.Supp.2d 450, 465 (D.N.J. 2009)).  But where
the same conduct allegedly supports both antitrust and unfair competition claims, a
ruling that no antitrust claim is stated precludes a tag-on claim for unfair competition.
*See, e.g., In re Plavix Indirect Purchaser Antitrust Litig.*, 2011 WL 335034, at *4-5 (S.D.
Ohio Jan. 31, 2011) (dismissing state law consumer protection and antitrust claims
based on same theories as insufficiently pleaded federal antitrust claim); *DocMagic, Inc.
v. Ellie Mae, Inc.*, 745 F.Supp.2d 1119, 1147 (N.D. Cal. 2010) (dismissing unfair
competition claim because no Sherman Act claim was stated).

Relatedly, the Court need not devote its time to parsing Plaintiffs' common-law
unjust enrichment claims under "the laws of all states and territories in the United
States."  Humana AC ¶ 623.  The "vast majority of courts rightly hold that unjust
enrichment may not supply a valid cause of action in states where plaintiffs are
otherwise barred from recovery under relevant antitrust and consumer protection
statutes."  *In re Packaged Seafood Prods. Antitrust Litig.*, 242 F.Supp.3d 1033, 1088 (S.D.
Cal. 2017) (granting motion to dismiss and collecting cases).

agreed with Defendants' position (and none has disagreed).  Defendants respectfully

submit that based on the continued evolution of the law, the question warrants a new

look, and the Court should find that *as a matter of antitrust law*, Celgene had no duty to

sell its products on demand to its competitors.

### 2. Plaintiffs Can State No Claim with Respect to Celgene's Alleged Refusal To Sell Samples of Revlimid.

Independent of their inability to allege prior courses of dealing, Plaintiffs state

no claim as to Celgene's alleged refusal to sell Revlimid samples, because they do not

allege that any requester had provided to Celgene proof of FDA approval of its study

protocols.  As this Court held, "Celgene had an objectively legitimate business

justification for requiring FDA approval of study protocols before turning over

Revlimid® samples," and thus cannot be subject to antitrust liability prior to such

approvals.  *Mylan*, 2018 WL 11299447, at *21.[20]  Plaintiffs do not allege that any

company requesting samples of Revlimid (other than Mylan, addressed next) had such

approval, only that those companies "assured Celgene [that] any testing [they]

performed would comply with FDA guidelines."  *E.g.*, Humana AC ¶ 207.  Such

"assurances" are far from an allegation that the FDA had signed off on testing

protocols for thalidomide-related products presenting risks of birth defects.  Without

---

[20] In the CREATES Act, Congress codified this common-sense point into law, providing that where a generic manufacturer seeks samples of a product subject to a REMS program, the requester is not entitled to relief unless it first receives FDA approval of its testing protocols.  21 U.S.C. § 355–2(b)(2)(A)(i)(II)(aa-bb).

*that* allegation, Plaintiffs fail to allege that Celgene acted without an objectively reasonable business justification in refusing samples of Revlimid.[21]

Plaintiffs' allegations as to Mylan's request for Revlimid, Humana AC ¶¶ 148-57, are on a different footing, because Mylan eventually did get FDA approval of its protocols. But Mylan only obtained that approval in 2013, and did not tell Celgene about it until 2014. *Mylan*, 2018 WL 11299447, at \*21; *see also* Humana AC ¶¶ 153-54, 157. It was on this basis that the Court rejected Mylan's claim that Celgene unlawfully prevented Mylan from selling generic Revlimid. The Court also expressly noted Mylan's concession that, in view of Celgene's patents, the earliest that Mylan would have been able to come to market in a "but-for world" was in 2022. *See Mylan*, 2018 WL 11299447, at \*21-22. Plaintiffs cannot plausibly claim damages from Mylan's inability to come to market with a generic product that *Mylan itself said, and the Court found, Mylan could not have sold until now.* That is not a cognizable antitrust injury. *See, e.g.*, *Wellbutrin*, 868 F.3d at 165 ("[I]f the launch were stopped because it was illegal, then the Appellants' injury (if it could still be called that) would be caused not by the settlement but by the patent laws prohibiting the launch."); *Apotex, Inc. v. Cephalon, Inc.*, 255 F.Supp.3d 604, 613-614 (E.D. Pa. 2017) (same).

---

[21] Plaintiffs clearly are aware of this deficiency in their pleading as to Revlimid, as they expressly plead that some (though not all) generics requesting *Thalomid* had by that time received FDA approval of *those* safety protocols. *See, e.g.*, Humana AC ¶ 177 (alleging that the FDA had approved Exela's testing protocol for Thalomid).

## II.     THE CO-PAY ASSISTANCE CLAIMS FAIL.

MSP and UHS alone include allegations concerning Celgene's donations to

CDF and PAN.  But while *other* companies' donations to co-pay charities have been

the subject of DOJ settlements over the past decade, Celgene's have not.  MSP and

UHS offer a sleight-of-hand, noting (a) a DOJ subpoena Celgene received in 2016,

and (b) settlements by CDF and PAN with DOJ in 2019 in connection with

donations from *other* companies (not Celgene), to argue (c) that Celgene's donations

must have been unlawful.[22]  MSP and UHS contend that such donations run afoul of

the Anti-Kickback Statute ("AKS"), 42 U.S.C. § 1320a-7b(b), if donated funds are

used to help Medicare patients pay for the donor's products.  But MSP and UHS are

private companies, not federal agencies, and cannot bring claims under the AKS,

which carries no private right of action.  Nonetheless, MSP and UHS seek to

capitalize on the DOJ's enforcement activity around *other companies'* donations by

alleging that Celgene's lawful donations to co-pay charities run afoul of the federal

RICO statute, Florida's RICO statute, and state unfair competition laws.  MSP 2AC

¶¶ 583-626, 638-46, 659-96; UHS Compl. ¶¶ 478-92.  These claims fail for multiple

---

[22] MSP notes that "Celgene also settled a *qui tam* matter that included allegations" relating to the same scheme alleged here.  MSP 2AC ¶ 529 n.161.  That is a strikingly misleading way of characterizing a case where *Celgene won summary judgment on this issue*, because there was "no evidence that [Celgene's] donations were contingent on [co-pay] foundations' agreement to purchase or recommend Celgene's drugs."  *United States ex rel. Brown v. Celgene Corp.*, 226 F.Supp.3d 1032, 1057 & n.33 (C.D. Cal. 2016).  The settlement concerned claims that Celgene had promoted its medicines for off-label uses.  There are no such claims here.  *BCBSM*, Case No. 21-cv-6668, ECF 102.

reasons, which may be why no other plaintiff pursues this theory.

### A.   Both MSP and UHS Fail To Satisfy Rule 9(b).

MSP and UHS allege that Celgene "intentionally and fraudulently concealed" from them a "scheme" to "underwrite" co-payments for its own drugs by falsely reporting those payments, made to CDF and PAN, as charitable contributions.  MSP 2AC ¶¶ 502-52; UHS Compl. ¶¶ 411-43.  This theory is expressly grounded in allegations of fraud—MSP claims RICO predicate acts including violations of federal mail and wire fraud statutes, and UHS sues under the Minnesota Consumer Fraud Act, MSP 2AC ¶¶ 549, 602; UHS Compl. ¶¶ 478-92.  But neither MSP nor UHS come close to satisfying the "stringent" particularity requirements of Rule 9(b), which applies to all claims related to this alleged fraudulent scheme.  *Frederico v. Home Depot*, 507 F.3d 188, 200 (3d Cir. 2007) (Rule 9(b) applies to state law claims); *Balthazar v. Atl. City Med. Ctr.*, 279 F.Supp.2d 574, 591 (D.N.J. 2003) (Rule 9(b) applies to RICO claims grounded in fraud), *aff'd*, 137 F. App'x 482 (3d Cir. 2005).

MSP and UHS identify just two alleged misrepresentations.  The first is one sentence in Celgene's 10-K filings stating that Celgene made "donations to independent non-profit Patient Assistance organizations."  MSP 2AC ¶ 544; UHS Compl. ¶ 438.  Nothing more is alleged to supply the "essential factual background" required by Rule 9(b)—i.e., the "who, what, when, where and how."  *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 276-77 (3d Cir. 2006).  Neither Plaintiff alleges that any employee read that sentence and took detrimental action relying on it.

The second supposed "fraud" consists of allegedly false "certifications"—that CDF and PAN falsely certified "that they used uniform measures of financial eligibility," *see, e.g.*, MSP Compl. ¶¶ 605(f), 605(g), 606, 618-19, and that "each time a pharmacy filled a prescription for someone using CDF's co-pay assistance, any certifications the pharmacist made that he or she would abide by federal law would be false," *id.* at ¶¶ 620-23. Not only are no false certifications by CDF or PAN identified with particularity (let alone any person who relied on such certification), there are no allegations of any "certification" that *Celgene* made to *anyone*, *ever*.

The Court should dismiss the co-pay claims for failure to satisfy Rule 9(b).

## B.     MSP Lacks Standing for Its RICO Claims.

MSP's RICO claims fail for the additional reason that the MSP assignors consist entirely of indirect purchasers. MSP 2AC ¶ 32. As such, MSP lacks standing to pursue RICO claims. *McCarthy v. Recordex Serv., Inc.*, 80 F.3d 842, 851, 855 (3d Cir. 1996) (the "[in]direct purchaser rule" of *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977), applies "equally to allegations of RICO violations").

MSP knows this well, because its RICO claims repeatedly have been dismissed on this basis. *MSP Recovery Claims v. Abbott Labs.*, 2021 WL 2177548, at *7 (D.N.J. May 28, 2021) (dismissing RICO claims for lack of standing); *MSP Recovery Claims v. Sanofi Aventis U.S. LLC*, 2019 WL 1418129, at *14 (D.N.J. Mar. 29, 2019) (same). Here, as in both cases above, MSP has been assigned recovery rights for various assignors. *See Abbott*, 2021 WL 2177548, at *7; *Sanofi*, 2019 WL 1418129, at *2; MSP

53

2AC ¶¶ 21-32, 504.  And as in both cases, MSP's assignors are "multiple purchasers down the distribution chain" and thus "quintessential indirect purchasers for the purposes of the indirect purchaser rule." *Abbott*, 2021 WL 2177548, at *7.  MSP therefore lacks standing for its RICO claim.[23]

This rule bars MSP's claim under Florida's RICO equivalent as well. "[I]nterpretation of Florida's RICO law is informed by case law interpreting the federal RICO statute," thus requiring dismissal of MSP's Florida RICO claim.  *Jackson v. BellSouth Telecomms.*, 372 F.3d 1250, 1263-64 (11th Cir. 2004); *see, e.g.*, *In re Takata Airbag Litig.*, 524 F.Supp.3d 1266, 1285 (S.D. Fla. 2021) (dismissing RICO claims).

### C.   The Co-Pay Assistance Claims Brought Under Deceptive Trade Practice Statutes Should Be Dismissed.

#### 1.   MSP's Laundry List of Statutes Fails To State a Claim.

MSP also purports to pursue its co-pay theory under ten state statutes, MSP 2AC ¶ 646, but does not set out the elements of these statutes (which differ materially) or how Celgene's conduct allegedly satisfies those elements.  That is fatal to these claims under *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007).  *See McGarvey v. Penske Auto. Grp.*, 639 F.Supp.2d 450, 465 (D.N.J. 2009), *vacated in part on other grounds*, 2010 WL 1379967 (D.N.J. Mar. 29, 2010).

---

[23] An appeal is pending in the Third Circuit of the dismissal of civil RICO claims under the indirect purchaser rule.  *See Humana, Inc. v. Indivior Inc.*, 2021 WL 3101593 (E.D. Pa. July 22, 2021), *appeals docketed*, Nos. 21-2574, 21-2573 (3d Cir. Oct. 19, 2021).  Until and unless the Third Circuit departs from the settled precedent barring MSP's claims here, nothing about that pending appeal changes the analysis here.

In *McGarvey*, like here, the plaintiffs sought to plead a single "collective" count for consumer fraud. 639 F.Supp.2d at 465. The Court dismissed all state statutory claims for the plaintiffs' failure to "even set forth the elements," let alone "explain how the 15 listed statutes apply to the facts of this case." *Id.* After all, under *Twombly*, a plausible claim necessarily "requires more than labels and conclusions." 550 U.S. at 555.

This is not a mere technical argument. The statutes that MSP cites require significantly different showings. For example, the Wisconsin statute at issue (MSP 2AC ¶ 646(j)), has been expressly held—*in a case dismissing claims by MSP itself*—not to apply to this exact context of claims against a pharmaceutical manufacturer by assignees of indirect purchaser health plans. *Abbott*, 2021 WL 2177548, at *18. As a second example, the Florida statute at issue (MSP 2AC ¶ 646(c)) is not intended to cover alleged "competitive harm," *Casa Dimitri Corp. v. Invicta Watch Co. of Am.*, 270 F.Supp.3d 1340, 1352 (S.D. Fla. 2017). Thus, MSP's failure to even set out the elements of its claims conceals fatal defects in pleading. The Court should dismiss MSP's "collective" consumer fraud claims pursuing its co-pay assistance theory. *McGarvey*, 639 F.Supp.2d at 465.

## 2. UHS's Minnesota-Law Claim Should Be Dismissed.

UHS sues only under the Minnesota Consumer Fraud Act ("MCFA"). UHS Compl. ¶¶ 411-43, 478-92. This claim fails for additional reasons beyond Rule 9(b). *First*, it would require a misrepresentation *about the products at issue*, and no such thing is

alleged.  *Second*, UHS's claim is brought to benefit UHS and not the public; UHS is trying to squeeze a round peg into a square hole.  With neither the standing nor the facts to contend that Celgene violated federal kickback law, UHS strains to present donations to IRS § 501(c)(3) organizations as consumer fraud.  That effort fails.

### a.  UHS Alleges No Relevant Misrepresentation.

"A fundamental requirement for claims made under [the MCFA] is that the defendant has made a representation of fact *about the product*."  M.K. Steenson et al., Minn. Prac. Prod. Liab. L. § 6.13 (2022 ed.).  That is, such misrepresentation must have been "made in reference to a sale of merchandise."  *Antioch Co. v. Scrapbook Borders, Inc.*, 291 F.Supp.2d 980, 1003 (D. Minn. 2003).  UHS fails to allege any misstatement made by Celgene "in reference to a sale" of Thalomid or Revlimid.

The only purported misrepresentation that UHS identifies is one sentence in Celgene's 10-K filings.  UHS Compl. ¶ 438.  But a 10-K is not a statement "in connection with the sale of any merchandise."  *Thorkelson v. Publ'g House*, 764 F.Supp.2d 1119, 1131 (D. Minn. 2011) (dismissing claim; retirement statements were unconnected to merchandise).

Perhaps cognizant of its pleading deficiencies, UHS tries an end run, alleging that Celgene's relationship to CDF and PAN was "surreptitious[]," "covert[]," and "secret[]," UHS Compl. ¶¶ 447, 487, hinting at a fraudulent omissions theory.  But UHS does not allege any representation to UHS made untrue because of a material omission, and UHS has pleaded no special circumstances that would trigger a *duty to*

*disclose* by Celgene to UHS.  Without alleging such a special duty, a plaintiff does not state a claim for fraudulent omission under the MCFA.  *Graphic Commc'ns Loc. 1B v. CVS Caremark Corp.*, 850 N.W.2d 682, 696 (Minn. 2014) (affirming dismissal).

### b.   UHS Claims No Public Benefit.

The MCFA does not generally provide a private right of action.  *Evangelical Lutheran Church v. Spherion Pac. Workforce LLC*, 2005 WL 1041487, at *3 (D. Minn. May 4, 2005).  In limited circumstances, the Minnesota Private Attorney General Act ("MPAGA"), relied on by UHS (Compl. ¶ 431), permits private remedies where a suit is brought for a "public benefit."  *Id.* at *3-4.  But where, as here, "recovery is sought for the exclusive benefit of the plaintiff, there is no public benefit."  *Id.* at *4.  UHS seeks damages only for itself and alleges no relevant conduct after 2017, UHS Compl. ¶ 438, p. 147, so its request for injunctive relief is not a public benefit either.  *See Select Comfort Corp. v. Tempur Sealy Int'l, Inc.*, 11 F.Supp.3d 933, 940 (D. Minn. 2014) (dismissing for lack of public benefit despite request for injunction, as relief sought was "primarily aimed at . . . damages").

## III.   NO CLAIMS ARE STATED AGAINST BMS.

Plaintiffs (other than UHS) purport to sue both Celgene and its parent BMS.  But the conduct alleged is Celgene's conduct, essentially all of which predated BMS's acquisition of Celgene in November 2019.  Humana AC ¶ 23; MSP 2AC ¶ 33.  Plaintiffs make no cognizable allegations of relevant conduct *by BMS*.

"[M]ere ownership of a subsidiary does not justify the imposition of liability on

the parent" for its subsidiary's conduct, *Pearson v. Component Tech. Corp.*, 247 F.3d 471, 484 (3d Cir. 2001), and that principle applies with particular force here, where the conduct at issue largely predates Defendants' corporate relationship. *First*, there is no allegation of Celgene refusing to sell samples of its products after 2014. *E.g.*, Humana AC ¶ 155. *Second*, Plaintiffs acknowledge that it was *Celgene* that obtained the patents at issue, filed the alleged "sham" suits to enforce those patents, and settled those cases. *E.g.*, *id.* ¶ 1. All patents at issue were issued before 2019. *See id.* ¶¶ 251-329. Celgene's alleged sham suits were largely filed before 2019 as well, *e.g.*, *id.* ¶¶ 349, 378, 389, and those since then have been brought by Celgene, not BMS. *E.g.*, *id.* ¶ 497. And Celgene's settlement with Natco (the only one for which Plaintiffs even *claim* to make "well-founded allegations") dates to 2015. *Id.* ¶¶ 364, 571 n.214.[24] *Third*, the latest allegations regarding Celgene's charitable contributions date to 2017. MSP 2AC ¶ 544 & n.162.

Thus, Plaintiffs are left with nothing but their "information and belief," based on BMS's alleged "extensive due diligence" in acquiring Celgene, that BMS must therefore have "directed, oversaw, and/or ratified the monopolistic scheme," Humana AC ¶ 346, or even worse, repeated *ipse dixit* that Celgene is "synonymous with BMS," *e.g.*, MSP 2AC ¶ 474. This plainly does not suffice. A company does not

---

[24] As to later settlements, Plaintiffs say only that BMS "likely" "approved" them. *E.g.*, *id.* ¶¶ 385 n.141, 407 n.155. Such meaningless allegations would not be sufficient to draw in BMS even if anything cognizable had been said about Celgene.

"direct," "oversee," or "ratify" 15 years of conduct by means of "due diligence" for a merger years later. *See, e.g.*, *Pearson*, 247 F.3d at 484; *United States v. Johnson & Johnson*, 2017 WL 2367050, at *7 (D.N.J. May 31, 2017) (dismissing claims against parent where plaintiff failed to provide "requisite notice as to what specifically is being alleged against" parent and failed to make allegations "that set forth agency liability in adequate detail"). Plaintiffs have failed to put forward any plausible allegations sufficient to state a claim against BMS, which should be dismissed.

## CONCLUSION

For the foregoing reasons, the Complaints should be dismissed with prejudice.

_/s/ Daniel Guadalupe_
Daniel Guadalupe (NJ ID 014581986)
PASHMAN STEIN WALDER
HAYDEN, P.C.
Court Plaza South, East Wing
21 Main Street, Suite 200
Hackensack, NJ 07601
Tel: 201-488-8200
Email: dguadalupe@pashmanstein.com

John E. Schmidtlein (_pro hac vice_)
David S. Kurtzer-Ellenbogen (_pro hac vice_)
Benjamin M. Greenblum (_pro hac vice_)
Carol Joan Pruski (_pro hac vice_)
WILLIAMS & CONNOLLY LLP
680 Maine Avenue, SW
Washington, DC 20024
Tel: (202) 434-5000
jschmidtlein@wc.com
dkurtzer@wc.com
bgreenblum@wc.com
cpruski@wc.com

_Counsel for Defendants Celgene Corporation and
Bristol-Myers Squibb Company_

# Appendix A

## APPENDIX A – Overview of Claims

Table 1, *BCBSA v. Celgene Corp.*, 21-cv-10187, ECF 53.[1]

| Counts | Specific Law(s) Invoked | | Basis for Dismissal |
|---|---|---|---|
| **FIRST CAUSE OF ACTION** Conspiracy and Combination in Restraint of Trade Under State Law | a. Arizona Rev. Stat. §§ 44-1401, et seq.<br>b. Cal. Bus. & Prof. Code §§ 16700, et seq.<br>c. C.G.S.A. §§ 35-26 and 28, et seq.<br>d. D.C. Code §§ 28-4501, et seq.<br>e. Haw. Rev. Stat. §§ 480-1, et seq.<br>f. 740 Ill. Comp. Stat. 10/1, et seq.<br>g. Iowa Code § 553.1, et seq.<br>h. Kan. Stat. Ann. § 50-101, et seq.<br>i. Me. Rev. Stat. Ann. 10, §§ 1101, et seq.<br>j. Md. Code Ann., Com. Law, §§ 11-204, et seq.<br>k. Mich. Comp. Laws Ann. §§ 445.771, et seq.<br>l. Minn. Stat. §§ 325D.49, et seq.; *id.* §§ 8.31, et seq.<br>m. Miss. Code Ann. §§ 75-21-1, et seq.<br>n. Neb. Rev. Stat. Ann. §§ 59-801, et seq.<br>o. Nev. Rev. Stat. Ann. §§ 598A.010, et seq.<br>p. N.H. Rev. Stat. Ann. §§ 356:1, et seq.<br>q. N.M. Stat. Ann. §§ 57-1-1, et seq. | r. N.Y. Gen. Bus. Law § 340, et seq.<br>s. N.C. Gen. Stat. §§ 75-1, et seq.<br>t. N.D. Cent. Code §§ 51-08.1-01, et seq.<br>u. Or. Rev. Stat. §§ 646.705, et seq.<br>v. P.R. Laws Ann. tit. 10 §§ 258, et seq.<br>w. R.I. Gen. Laws §§ 6-36-1 et seq.<br>x. S.D. Codified Laws §§ 37-1-3.1, et seq.<br>y. Tenn. Code Ann §§ 47-25-101, et seq.<br>z. Utah Code Ann. §§ 76-10-3101, et seq.<br>aa. W.Va. Code §§ 47-18-1, et seq.<br>bb. Wis. Stat. §§ 133.01, et seq. | MTD Arg. § I(B) |
| **SECOND CAUSE OF ACTION** Monopolization and Monopolistic Scheme under State Law | a. Arizona Rev. Stat. §§ 44-1403, et seq.<br>b. Cal. Bus. & Prof. Code §§ 17200, et seq.<br>c. C.G.S.A. §§ 35-27 and 29, et seq.<br>d. D.C. Code §§ 28-4503, et seq.<br>e. Fla. Stat. §§ 501.201, et seq. | r. N.M. Stat. Ann. §§ 57-1-2, et seq.<br>s. N.C. Gen. Stat. §§ 75-2.1, et seq.<br>t. N.D. Cent. Code §§ 51-08.1-03, et seq.<br>u. Or. Rev. Stat. §§ 646.705, et seq. | MTD Arg. § I(A), (B) & (C) |

---

[1] Defendants seeks dismissal of all claims against Defendant Bristol-Myers Squibb Company ("BMS") on the grounds that Plaintiffs do not allege any relevant conduct on BMS's part and the events giving rise to Plaintiffs' claims almost entirely predate BMS's 2019 acquisition of Celgene Corporation. *See* MTD Arg. § III. This basis for dismissal as to BMS applies to every claim listed in Tables 1-5 and 7.

## APPENDIX A – Overview of Claims

| Counts | Specific Law(s) Invoked | | Basis for Dismissal |
|---|---|---|---|
| | f. Hawaii Code §§ 480, et seq.<br>g. 740 Ill. Comp. Stat. 10/3, et seq.<br>h. Iowa Code §§ 553.5 et seq.<br>i. Mass. Gen. L. Ch. 93A, et seq.<br>j. Me. Rev. Stat. Ann. 10, §§ 1102, et seq.<br>k. Md. Code Ann., Com. Law, §§ 11-204, et seq.<br>l. Mich. Comp. Laws Ann. §§ 445.773, et seq.<br>m. Minn. Stat. §§ 325D.52, et seq.; *id.* §§ 8.31, et seq.<br>n. Miss. Code Ann. §§ 75-21-3, et seq.<br>o. Neb. Code Ann. §§ 59-802, et seq.<br>p. Nev. Rev. Stat. Ann. §§ 598A.060, et seq.<br>q. N.H. Rev. Stat. Ann. §§ 356.1, et seq. | v. 10 L.P.R.A. §§ 257, et seq.<br>w. R.I. Gen. Laws §§ 6-36-1, et seq.<br>x. S.D. Codified Laws §§ 37-1-3.2, et seq.<br>y. Utah Code Ann. §§ 76-10-911, et seq.<br>z. Vt. Stat. Ann. 9, §§ 2453, et seq.<br>aa. W.Va. Code §§ 47-18-4, et seq.<br>bb. Wis. Stat. §§ 133.03, et seq. | |
| **THIRD CAUSE OF ACTION**<br>**Attempted Monopolization Under State Law** | a. Arizona Rev. Stat. §§ 44-1403, et seq.<br>b. Cal. Bus. & Prof. Code §§ 17200, et seq.<br>c. Conn. Gen. Stat. §§ 35-27 and 29, et seq.<br>d. D.C. Code §§ 28-4503, et seq.<br>e. Fla. Stat. §§ 501.201, et seq.<br>f. Hawaii Code §§ 480, et seq.<br>g. 740 Ill. Comp. Stat. 10/3, et seq.<br>h. Iowa Code §§ 553.5 et seq.<br>i. Me. Rev. Stat. Ann. 10, §§ 1102, et seq.<br>j. Md. Code, Com. Law §§ 11-204, et seq.<br>k. Mass. Gen. L. Ch. 93A, et seq.<br>l. Mich. Comp. Laws Ann. §§ 445.773, et seq.<br>m. Minn. Stat. §§ 325D.52, et seq.; *id.* §§ 8.31 et seq.<br>n. Miss. Code Ann. §§ 75-21-3, et seq. | r. N.M. Stat. Ann. §§ 57-1-2, et seq.<br>s. N.Y. Gen. Bus. Law §§ 340, et seq.<br>t. N.C. Gen. Stat. §§ 75-2.1, et seq.<br>u. N.D. Cent. Code §§ 51-08.1-03, et seq.<br>v. Or. Rev. Stat. §§ 646.705, et seq.<br>w. 10 L.P.R.A. §§ 257, et seq.<br>x. R.I. Gen. Laws §§ 6-36-1 et seq.<br>y. S.D. Codified Laws §§ 37-1-3.2, et seq.<br>z. Utah Code Ann. §§ 76-10-911, et seq.<br>aa. Vt. Stat. Ann. 9, §§ 2453, et seq.<br>bb. W.Va. Code §§ 47-18-4, et seq.<br>cc. Wis. Stat. §§ 133.03, et seq. | MTD Arg. § I(A), (B) & (C) |

## APPENDIX A – Overview of Claims

| Counts | Specific Law(s) Invoked | | Basis for Dismissal |
|---|---|---|---|
| | o. Neb. Code Ann. §§ 59-802, et seq.<br>p. Nev. Rev. Stat. Ann. §§ 598A.060, et seq.<br>q. N.H. Rev. Stat. Ann. §§ 356.1, et seq. | | |
| **FOURTH CAUSE OF ACTION**<br>**Unfair and Deceptive Trade Practices Under State Law** | a. Ark. Code §§ 4-88-101, et seq.<br>b. Ariz. Code §§ 44-1522, et seq.<br>c. Cal. Bus. & Prof. Code §§ 17200, et seq.<br>d. Colo. Rev. Stat § 6-1-105, et seq.<br>e. Conn. Gen. Stat. §§ 35-26, 27 and 28, et seq.<br>f. D.C. Code §§ 28-3901, et seq.<br>g. Fla. Stat. §§ 501.201, et seq.<br>h. Idaho Code §§ 48-601, et seq.<br>i. 815 ILCS §§ 505/1, et seq.<br>j. Ind. Code §§ 24-5-0.5-1, et seq.<br>k. Kan. Stat. §§ 50-623, et seq.<br>l. La. Rev. Stat. Ann. § 51:1401, et seq.<br>m. 5 Me. Rev. Stat. §§ 207, et seq.<br>n. Md. Code, Com. Law §§ 11-204, et seq.<br>o. Mass. Ann. Laws ch. 93A, et seq.<br>p. Mich. Stat. §§ 445.901, et seq.<br>q. Minn. Stat. § 325D.43, et. seq.; *id.* §§ 325F.69, et seq.; *id.* §§ 8.31, et seq.<br>r. Miss. Code. Ann. §§ 75-24-1, et seq.<br>s. Missouri Stat. §§ 407.010, et seq.<br>t. Neb. Rev. Stat. §§ 59-1601, et seq. | u. Nev. Rev. Stat. §§ 598.0903, et seq.<br>v. N.H. Rev. Stat. §§ 358-A:1, et seq.<br>w. N.M. Stat. §§ 57-12-1, et seq.<br>x. N.Y. Gen. Bus. Law §§ 349, et seq.<br>y. N.C. Gen. Stat. §§ 75-1.1, et seq.<br>z. N.D. Cent. Code §§ 51-15-01, et seq.<br>aa. Or. Rev. Stat. §§ 646.605, et seq.<br>bb. 73 Pa. Stat. Ann. §§ 201-1, et seq.<br>cc. S.C. Stat. Ann. §§ 39-5-10, et seq.<br>dd. S.D. Code Laws §§ 37-24-1, et seq.<br>ee. Utah Code §§ 13-11-1, et seq.<br>ff. 9 Vt. §§ 2451, et seq.<br>gg. Va. Code Ann. §§ 59.1-196, et seq.<br>hh. W.Va. Code §§ 46A-6-101, et seq.<br>ii. Wis. Stat. § 100.18; *id.* § 100.20, et. Seq.<br>jj. Wyo. Stat. Ann. §§ 40-12-101, et seq. | MTD Arg. § I(A), (B) & (C) |

**APPENDIX A – Overview of Claims**

| Counts | Specific Law(s) Invoked | Basis for Dismissal |
|---|---|---|
| **FIFTH CAUSE OF ACTION**<br>**Unjust Enrichment Under State Law** | Unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana. | MTD Arg. § I(A), (B) & (C) |
| **SIXTH CAUSE OF ACTION**<br>**Declaratory and Injunctive Relief Under Clayton and Sherman Acts** | 15 U.S.C. §§ 1-2<br>15 U.S.C. § 26 | MTD Arg. § I(A), (B) & (C) |

Appendix A-4

## APPENDIX A – Overview of Claims

Table 2, *BCBSM, Inc. v. Celgene Corp.*, 21-cv-6668, ECF 93.[2]

| Counts | Specific Law(s) Invoked | | Basis for Dismissal |
|---|---|---|---|
| **FIRST CAUSE OF ACTION** Conspiracy and Combination in Restraint of Trade Under State Law | a. Arizona Rev. Stat. §§ 44-1401, et seq. b. Cal. Bus. & Prof. Code §§ 16700, et seq. c. C.G.S.A. §§ 35-26 and 28, et seq. d. D.C. Code §§ 28-4501, et seq. e. Haw. Rev. Stat. §§ 480-1, et seq. f. 740 Ill. Comp. Stat. 10/1, et seq. g. Iowa Code § 553.1, et seq. h. Kan. Stat. Ann. § 50-101, et seq. i. Me. Rev. Stat. Ann. 10, §§ 1101, et seq. j. Md. Code Ann., Com. Law, §§ 11-204, et seq. k. Mich. Comp. Laws Ann. §§ 445.771, et seq. l. Minn. Stat. §§ 325D.49, et seq.; *id.* §§ 8.31, et seq. m. Miss. Code Ann. §§ 75-21-1, et seq. n. Neb. Rev. Stat. Ann. §§ 59-801, et seq. o. Nev. Rev. Stat. Ann. §§ 598A.010, et seq. p. N.H. Rev. Stat. Ann. §§ 356:1, et seq. q. N.M. Stat. Ann. §§ 57-1-1, et seq. | r. N.Y. Gen. Bus. Law § 340, et seq. s. N.C. Gen. Stat. §§ 75-1, et seq. t. N.D. Cent. Code §§ 51-08.1-01, et seq. u. Or. Rev. Stat. §§ 646.705, et seq. v. P.R. Laws Ann. tit. 10 §§ 258, et seq. w. R.I. Gen. Laws §§ 6-36-1 et seq. x. S.D. Codified Laws §§ 37-1-3.1, et seq. y. Tenn. Code Ann §§ 47-25-101, et seq. z. Utah Code Ann. §§ 76-10-3101, et seq. aa. W.Va. Code §§ 47-18-1, et seq. bb. Wis. Stat. §§ 133.01, et seq. | MTD Arg. § I(B) |
| **SECOND CAUSE OF ACTION** Monopolization and Monopolistic Scheme under State Law | a. Arizona Rev. Stat. §§ 44-1403, et seq. b. Cal. Bus. & Prof. Code §§ 17200, et seq. c. C.G.S.A. §§ 35-27 and 29, et seq. d. D.C. Code §§ 28-4503, et seq. e. Fla. Stat. §§ 501.201, et seq. f. Hawaii Code §§ 480, et seq. | r. N.M. Stat. Ann. §§ 57-1-2, et seq. s. N.C. Gen. Stat. §§ 75-2.1, et seq. t. N.D. Cent. Code §§ 51-08.1-03, et seq. u. Or. Rev. Stat. §§ 646.705, et seq. v. 10 L.P.R.A. §§ 257, et seq. | MTD Arg. § I(A), (B) & (C) |

---

[2] Plaintiff Health Care Service Corporation stipulated to dismissal of the Amended Complaint's off-label marketing claims, Counts VI through VIII, which only HCSC had asserted. *See* ECF 102.

## APPENDIX A – Overview of Claims

| Counts | Specific Law(s) Invoked | | Basis for Dismissal |
|---|---|---|---|
| | g. 740 Ill. Comp. Stat. 10/3, et seq.<br>h. Iowa Code §§ 553.5 et seq.<br>i. Mass. Gen. L. Ch. 93A, et seq.<br>j. Me. Rev. Stat. Ann. 10, §§ 1102, et seq.<br>k. Md. Code Ann., Com. Law, §§ 11-204, et seq.<br>l. Mich. Comp. Laws Ann. §§ 445.773, et seq.<br>m. Minn. Stat. §§ 325D.52, et seq.; *id.* §§ 8.31, et seq.<br>n. Miss. Code Ann. §§ 75-21-3, et seq.<br>o. Neb. Code Ann. §§ 59-802, et seq.<br>p. Nev. Rev. Stat. Ann. §§ 598A.060, et seq.<br>q. N.H. Rev. Stat. Ann. §§ 356.1, et seq. | w. R.I. Gen. Laws §§ 6-36-1, et seq.<br>x. S.D. Codified Laws §§ 37-1-3.2, et seq.<br>y. Utah Code Ann. §§ 76-10-911, et seq.<br>z. Vt. Stat. Ann. 9, §§ 2453, et seq.<br>aa. W.Va. Code §§ 47-18-4, et seq.<br>bb. Wis. Stat. §§ 133.03, et seq. | |
| **THIRD CAUSE OF ACTION**<br>**Attempted Monopolization Under State Law** | a. Arizona Rev. Stat. §§ 44-1403, et seq.<br>b. Cal. Bus. & Prof. Code §§ 17200, et seq.<br>c. Conn. Gen. Stat. §§ 35-27 and 29, et seq.<br>d. D.C. Code §§ 28-4503, et seq.<br>e. Fla. Stat. §§ 501.201, et seq.<br>f. Hawaii Code §§ 480, et seq.<br>g. 740 Ill. Comp. Stat. 10/3, et seq.<br>h. Iowa Code §§ 553.5, et seq.<br>i. Me. Rev. Stat. Ann. 10, §§ 1102, et seq.<br>j. Md. Code, Com. Law §§ 11-204, et seq.<br>k. Mass. Gen. L. Ch. 93A, et seq.<br>l. Mich. Comp. Laws Ann. §§ 445.773, et seq.<br>m. Minn. Stat. §§ 325D.52, et seq.; *id.* §§ 8.31, et seq.<br>n. Miss. Code Ann. §§ 75-21-3, et seq.<br>o. Neb. Code Ann. §§ 59-802, et seq. | r. N.M. Stat. Ann. §§ 57-1-2, et seq.<br>s. N.Y. Gen. Bus. Law §§ 340, et seq.<br>t. N.C. Gen. Stat. §§ 75-2.1, et seq.<br>u. N.D. Cent. Code §§ 51-08.1-03, et seq.<br>v. Or. Rev. Stat. §§ 646.705, et seq.<br>w. 10 L.P.R.A. §§ 257, et seq.<br>x. R.I. Gen. Laws §§ 6-36-1, et seq.<br>y. S.D. Codified Laws §§ 37-1-3.2, et seq.<br>z. Utah Code Ann. §§ 76-10-911, et seq.<br>aa. Vt. Stat. Ann. 9, §§ 2453, et seq.<br>bb. W.Va. Code §§ 47-18-4, et seq.<br>cc. Wis. Stat. §§ 133.03, et seq. | MTD Arg. § I(A), (B) & (C) |

## APPENDIX A – Overview of Claims

| Counts | Specific Law(s) Invoked | | Basis for Dismissal |
|---|---|---|---|
| | p. Nev. Rev. Stat. Ann. §§ 598A.060, et seq.<br>q. N.H. Rev. Stat. Ann. §§ 356.1, et seq. | | |
| **FOURTH CAUSE OF ACTION**<br>**Unfair and Deceptive Trade Practices Under State Law** | a. Ark. Code §§ 4-88-101, et seq.<br>b. Ariz. Code §§ 44-1522, et seq.<br>c. Cal. Bus. & Prof. Code §§ 17200, et seq.<br>d. Colo. Rev. Stat § 6-1-105, et seq.<br>e. Conn. Gen. Stat. §§ 35-27, et seq.<br>f. D.C. Code §§ 28-3901, et seq.<br>g. Fla. Stat. §§ 501.201, et seq.<br>h. Idaho Code §§ 48-601, et seq.<br>i. 815 ILCS §§ 505/1, et seq.<br>j. Ind. Code §§ 24-5-0.5-1, et seq.<br>k. Kan. Stat. §§ 50-623, et seq.<br>l. La. Rev. Stat. Ann. § 51:1401, et seq.<br>m. 5 Me. Rev. Stat. §§ 207, et seq.<br>n. Md. Code, Com. Law §§ 11-204, et seq.<br>o. Mass. Ann. Laws ch. 93A, et seq.<br>p. Mich. Stat. §§ 445.901, et seq.<br>q. Minn. Stat. § 325D.43, et. seq.; *id.* §§ 325F.69, et seq.; *id.* §§ 8.31, et seq.<br>r. Miss. Code. Ann. §§ 75-24-1, et seq.<br>s. Missouri Stat. §§ 407.010, et seq.<br>t. Neb. Rev. Stat. §§ 59-1601, et seq. | u. Nev. Rev. Stat. §§ 598.0903, et seq.<br>v. N.H. Rev. Stat. §§ 358-A:1, et seq.<br>w. N.M. Stat. §§ 57-12-1, et seq.<br>x. N.Y. Gen. Bus. Law §§ 349, et seq.<br>y. N.C. Gen. Stat. §§ 75-1.1, et seq.<br>z. N.D. Cent. Code §§ 51-15-01, et seq.<br>aa. Or. Rev. Stat. §§ 646.605, et seq.<br>bb. 73 Pa. Stat. Ann. §§ 201-1, et seq.<br>cc. S.C. Stat. Ann. §§ 39-5-10, et seq.<br>dd. S.D. Code Laws §§ 37-24-1, et seq.<br>ee. Utah Code §§ 13-11-1, et seq.<br>ff. 9 Vt. §§ 2451, et seq.<br>gg. Va. Code Ann. §§ 59.1-196, et seq.<br>hh. W.Va. Code §§ 46A-6-101, et seq.<br>ii. Wis. Stat. § 100.18; *id.* § 100.20, et. Seq.<br>jj. Wyo. Stat. Ann. §§ 40-12-101, et seq. | MTD Arg. § I(A), (B) & (C) |

**APPENDIX A – Overview of Claims**

| Counts | Specific Law(s) Invoked | Basis for Dismissal |
|---|---|---|
| **FIFTH CAUSE OF ACTION** **Unjust Enrichment Under State Law** | Unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana. | MTD Arg. § I(A), (B) & (C) |

## APPENDIX A – Overview of Claims

Table 3, *Cigna Corp. v. Celgene Corp.*, 21-11868, ECF 40.

| Counts | Specific Law(s) Invoked | | Basis for Dismissal |
|---|---|---|---|
| **FIRST CAUSE OF ACTION** **For Violations of Section 1 of the Sherman Act** | 15 U.S.C. § 1. | | MTD Arg. § I(B) |
| **SECOND CAUSE OF ACTION** **For Violations of Section 2 of the Sherman Act** | 15 U.S.C. § 2. | | MTD Arg. § I(A), (B) & (C) |
| **THIRD CAUSE OF ACTION** **Conspiracy and Combination in Restraint of Trade Under State Law** | a. Arizona Rev. Stat. §§ 44-1401, et seq. b. Cal. Bus. & Prof. Code §§ 16700, et seq. c. C.G.S.A. §§ 35-26, 28, et seq. d. D.C. Code §§ 28-4501, et seq. e. Haw. Rev. Stat. §§ 480-1, et seq. f. 740 Ill. Comp. Stat. 10/1, et seq. g. Iowa Code § 553.1, et seq. h. Kan. Stat. Ann. § 50-101, et seq. i. Me. Rev. Stat. Ann. 10, §§ 1101, et seq. j. MD Code Ann., Com. Law, §§ 11-204, et seq. k. Mich. Comp. Laws Ann. §§ 445.771, et seq. l. Minn. Stat. §§ 325D.49, et seq.; *id.* §§ 8.31, et seq. m. Miss. Code Ann. §§ 75-21-1, et seq. n. Neb. Rev. Stat. Ann. §§ 59-801, et seq. o. Nev. Rev. Stat. Ann. §§ 598A.010, et seq. p. N.H. Rev. Stat. Ann. §§ 356:1, et seq. q. N.M. Stat. Ann. §§ 57-1-1, et seq. | r. N.Y. Gen. Bus. Law § 340, et seq. s. N.C. Gen. Stat. §§ 75-1, et seq. t. N.D. Cent. Code §§ 51-08.1-01, et seq. u. Or. Rev. Stat. §§ 646.705, et seq. v. P.R. Laws Ann. tit. 10 §§ 258, et seq. w. R.I. Gen. Laws §§ 6-36-1 et seq. x. S.D. Codified Laws §§ 37-1-3.1, et seq. y. Tenn. Code Ann §§ 47-25-101, et seq. z. Utah Code Ann. §§ 76-10-3101, et seq. aa. W.Va. Code §§ 47-18-1, et seq. bb. Wis. Stat. §§ 133.01, et seq. | MTD Arg. § I(A), (B) & (C) |
| **FOURTH CAUSE OF ACTION** | a. Arizona Rev. Stat. §§ 44-1403, et seq. b. Cal. Bus. & Prof. Code §§ 17200, et seq. | r. N.M. Stat. Ann. §§ 57-1-2, et seq. s. N.C. Gen. Stat. §§ 75-2.1, et seq.; | MTD Arg. § I(A), (B) & (C) |

## APPENDIX A – Overview of Claims

| Counts | Specific Law(s) Invoked | | Basis for Dismissal |
|---|---|---|---|
| **Monopolization and Monopolistic Scheme under State Law** | c. Conn. Gen. Stat. §§ 35-27 and 29, et seq.<br>d. D.C. Code §§ 28-4503, et seq.<br>e. Fla. Stat. §§ 501.201, et seq.<br>f. Hawaii Code §§ 480, et seq.<br>g. 740 Ill. Comp. Stat. 10/3, et seq.<br>h. Iowa Code §§ 553.5 et seq.<br>i. Md. Code, Com. Law §§ 11-204, et seq.<br>j. Mass. Gen. L. Ch. 93A, et seq.<br>k. Me. Rev. Stat. Ann. 10, §§ 1102, et seq.<br>l. Mich. Comp. Laws Ann. §§ 445.773, et seq.<br>m. Minn. Stat. §§ 325D.52, et seq.; *id.* § 8.31, et seq.<br>n. Miss. Code Ann. §§ 75-21-3, et seq.<br>o. Neb. Code Ann. §§ 59-802, et seq.<br>p. Nev. Rev. Stat. Ann. §§ 598A.060, et seq.<br>q. N.H. Rev. Stat. Ann. §§ 356.1, et seq. | t. N.D. Cent. Code §§ 51-08.1-03, et seq.<br>u. Or. Rev. Stat. §§ 646.705, et seq.<br>v. 10 L.P.R.A. §§ 257, et seq.<br>w. R.I. Gen. Laws §§ 6-36-1, et seq.<br>x. S.D. Codified Laws §§ 37-1-3.2, et seq.<br>y. Utah Code Ann. §§ 76-10-911, et seq.<br>z. Vt. Stat. Ann. 9, §§ 2453, et seq.<br>aa. W.Va. Code §§ 47-18-4, et seq.<br>bb. Wis. Stat. §§ 133.03, et seq. | |
| **FIFTH CAUSE OF ACTION**<br>**Attempted Monopolization Under State Law** | a. Arizona Rev. Stat. §§ 44-1403, et seq.<br>b. Cal. Bus. & Prof. Code §§ 17200, et seq.<br>c. Conn. Gen. Stat. §§ 35-27 and 29, et seq.<br>d. D.C. Code §§ 28-4503, et seq.<br>e. Fla. Stat. §§ 501.201, et seq.<br>f. Hawaii Code §§ 480, et seq.<br>g. 740 Ill. Comp. Stat. 10/3, et seq.<br>h. Iowa Code §§ 553.5 et seq.<br>i. Me. Rev. Stat. Ann. 10, §§ 1102, et seq.<br>j. Md. Code, Com. Law §§ 11-204, et seq.<br>k. Mass. Gen. L. Ch. 93A, et seq.<br>l. Mich. Comp. Laws Ann. §§ 445.773, et seq.<br>m. Minn. Stat. §§ 325D.52, et seq.; *id.* § | r. N.M. Stat. Ann. §§ 57-1-2, et seq.<br>s. N.Y. Gen. Bus. Law §§ 340, et seq.<br>t. N.C. Gen. Stat. §§ 75-2.1, et seq.<br>u. N.D. Cent. Code §§ 51-08.1-03, et seq.<br>v. Or. Rev. Stat. §§ 646.705, et seq.<br>w. 10 L.P.R.A. §§ 257, et seq.<br>x. R.I. Gen. Laws §§ 6-36-1, et seq.<br>y. S.D. Codified Laws §§ 37-1-3.2, et seq.<br>z. Utah Code Ann. §§ 76-10-911, et seq.<br>aa. Vt. Stat. Ann. 9, §§ 2453, et seq. | MTD Arg. § I(A), (B) & (C) |

## APPENDIX A – Overview of Claims

| Counts | Specific Law(s) Invoked | Basis for Dismissal |
|---|---|---|
| | 8.31, et seq.<br>o. Neb. Code Ann. §§ 59-802, et seq.<br>p. Nev. Rev. Stat. Ann. §§ 598A.060, et seq.<br>q. N.H. Rev. Stat. Ann. §§ 356.1, et seq. | bb. W.Va. Code §§ 47-18-4, et seq.<br>cc. Wis. Stat. §§ 133.03, et seq. | |
| **SIXTH CAUSE OF ACTION**<br>**Unfair and Deceptive Trade Practices Under State Law** | a. Ark. Code §§ 4-88-101, et seq.<br>b. Ariz. Code §§ 44-1522, et seq.<br>c. Cal. Bus. & Prof. Code §§ 17200, et seq.<br>d. Colo. Rev. Stat § 6-1-105, et seq.<br>e. Conn. Gen. Stat. §§ 35-26, 27 and 28, et seq.<br>f. D.C. Code §§ 28-3901, et seq.<br>g. Fla. Stat. §§ 501.201, et seq.<br>h. Idaho Code §§ 48-601, et seq.<br>i. 815 ILCS §§ 505/1, et seq.<br>j. Ind. Code §§ 24-5-0.5-1, et seq.<br>k. Kan. Stat. §§ 50-623, et seq.<br>l. La. Rev. Stat. Ann. § 51:1401, et seq.<br>m. 5 Me. Rev. Stat. §§ 207, et seq.<br>n. Md. Code, Com. Law §§ 11-204, et seq.<br>o. Mass. Ann. Laws ch. 93A, et seq.<br>p. Mich. Stat. §§ 445.901, et seq.<br>q. Minn. Stat. § 325D.43, et. seq., Minn. Stat. §§ 325F.69, et seq., and Minn. Stat. §§ 8.31, et seq.<br>r. Miss. Code. Ann. §§ 75-24-1, et seq.<br>s. Missouri Stat. §§ 407.010, et seq.<br>t. Neb. Rev. Stat. §§ 59-1601, et seq. | u. Nev. Rev. Stat. §§ 598.0903, et seq.<br>v. N.H. Rev. Stat. §§ 358-A:1, et seq.<br>w. N.M. Stat. §§ 57-12-1, et seq.<br>x. N.Y. Gen. Bus. Law §§ 349, et seq.<br>y. N.C. Gen. Stat. §§ 75-1.1, et seq.<br>z. N.D. Cent. Code §§ 51-15-01, et seq.<br>aa. Or. Rev. Stat. §§ 646.605, et seq.<br>bb. 73 Pa. Stat. Ann. §§ 201-1, et seq.<br>cc. S.C. Stat. Ann. §§ 39-5-10, et seq.<br>dd. S.D. Code Laws §§ 37-24-1, et seq.<br>ee. Utah Code §§ 13-11-1, et seq.<br>ff. 9 Vt. §§ 2451, et seq.<br>gg. Va. Code Ann. §§ 59.1-196, et seq.<br>hh. W.Va. Code §§ 46A-6-101, et seq.<br>ii. Wis. Stat. § 100.18; Wis. Stat. § 100.20, et. seq. | MTD Arg. § I(A), (B) & (C) |

APPENDIX A – Overview of Claims

| Counts | Specific Law(s) Invoked | Basis for Dismissal |
|---|---|---|
| | jj. Wyo. Stat. Ann. §§ 40-12-101, et seq. | |
| **SEVENTH CAUSE OF ACTION** **Unjust Enrichment Under State Law** | Unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana. | MTD Arg. § I(A), (B) & (C) |
| **EIGHTH CAUSE OF ACTION** **Declaratory and Injunctive Relief Under Section 16 of the Clayton Act for Celgene's Violations of Sections 1 and 2 of the Sherman Act** | 15 U.S.C. §§ 1-2; 15 U.S.C. § 26. | MTD Arg. § I(A), (B) & (C) |

## APPENDIX A – Overview of Claims

Table 4, *Humana Inc. v. Celgene Corp.*, 19-cv-7532, ECF 68.

| Counts | Specific Law(s) Invoked | | Basis for Dismissal |
|---|---|---|---|
| **FIRST CAUSE OF ACTION** **For Violations of Section 1 of the Sherman Act** | 15 U.S.C. § 1. | | MTD Arg. § I(B) |
| **SECOND CAUSE OF ACTION** **For Violations of Section 2 of the Sherman Act** | 15 U.S.C. § 2.; 15 U.S.C. § 15. | | MTD Arg. § I(A), (B) & (C) |
| **THIRD CAUSE OF ACTION** **Conspiracy and Combination in Restraint of Trade Under State Law** | a. Arizona Rev. Stat. §§ 44-1401, et seq. b. Cal. Bus. & Prof. Code §§ 16700, et seq. c. C.G.S.A. §§ 35-26 and 28, et seq. d. D.C. Code §§ 28-4501, et seq. e. Haw. Rev. Stat. §§ 480-1, et seq. f. 740 Ill. Comp. Stat. 10/1, et seq. g. Iowa Code § 553.1, et seq. h. Kan. Stat. Ann. § 50-101, et seq. i. Me. Rev. Stat. Ann. 10, §§ 1101, et seq. j. Md. Code Ann., Com. Law, §§ 11-204, et seq. k. Mich. Comp. Laws Ann. §§ 445.771, et seq. l. Minn. Stat. §§ 325D.49, et seq.; *id.* §§ 8.31, et seq. m. Miss. Code Ann. §§ 75-21-1, et seq. n. Neb. Rev. Stat. Ann. §§ 59-801, et seq. o. Nev. Rev. Stat. Ann. §§ 598A.010, et seq. p. N.H. Rev. Stat. Ann. §§ 356:1, et seq. q. N.M. Stat. Ann. §§ 57-1-1, et seq. | r. N.Y. Gen. Bus. Law § 340, et seq. s. N.C. Gen. Stat. §§ 75-1, et seq. t. N.D. Cent. Code §§ 51-08.1-01, et seq. u. Or. Rev. Stat. §§ 646.705, et seq. v. P.R. Laws Ann. tit. 10 §§ 258, et seq. w. R.I. Gen. Laws §§ 6-36-1, et seq. x. S.D. Codified Laws §§ 37-1-3.1, et seq. y. Tenn. Code Ann §§ 47-25-101, et seq. z. Utah Code Ann. §§ 76-10-3101, et seq. aa. W.Va. Code §§ 47-18-1, et seq. bb. Wis. Stat. §§ 133.01, et seq. | MTD Arg. § I(B) |
| **FOURTH CAUSE OF ACTION** | a. Arizona Rev. Stat. §§ 44-1403, et seq. b. Cal. Bus. & Prof. Code §§ 17200, et seq. | s. N.C. Gen. Stat. §§ 75-2.1, et seq. t. N.D. Cent. Code §§ 51-08.1-03, | MTD Arg. § I(A), (B) & (C) |

## APPENDIX A – Overview of Claims

| Counts | Specific Law(s) Invoked | | Basis for Dismissal |
|---|---|---|---|
| **Monopolization and Monopolistic Scheme under State Law** | c. C.G.S.A. §§ 35-27 and 29, et seq.<br>d. D.C. Code §§ 28-4503, et seq.<br>e. Fla. Stat. §§ 501.201, et seq.<br>f. Hawaii Code §§ 480, et seq.<br>g. 740 Ill. Comp. Stat. 10/3, et seq.<br>h. Iowa Code §§ 553.5, et seq.<br>i. Mass. Gen. L. Ch. 93A, et seq.<br>j. Me. Rev. Stat. Ann. 10, §§ 1102, et seq.<br>k. Md. Code Ann., Com. Law, §§ 11-204, et seq.<br>l. Mich. Comp. Laws Ann. §§ 445.773, et seq.<br>m. Minn. Stat. §§ 325D.52, et seq.; *id.* § 8.31, et seq.<br>n. Miss. Code Ann. §§ 75-21-3, et seq.<br>o. Neb. Code Ann. §§ 59-802, et seq.<br>p. Nev. Rev. Stat. Ann. §§ 598A.060, et seq.<br>q. N.H. Rev. Stat. Ann. §§ 356.1, et seq.<br>r. N.M. Stat. Ann. §§ 57-1-2, et seq. | et seq.<br>u. Or. Rev. Stat. §§ 646.705, et seq.<br>v. 10 L.P.R.A. §§ 257, et seq.<br>w. R.I. Gen. Laws §§ 6-36-1, et seq.<br>x. S.D. Codified Laws §§ 37-1-3.2, et seq.<br>y. Utah Code Ann. §§ 76-10-911, et seq.<br>z. Vt. Stat. Ann. 9, §§ 2453, et seq.<br>aa. W.Va. Code §§ 47-18-4, et seq.<br>bb. Wis. Stat. §§ 133.03, et seq. | |
| **FIFTH CAUSE OF ACTION**<br>**Attempted Monopolization Under State Law** | a. Arizona Rev. Stat. §§ 44-1403, et seq.<br>b. Cal. Bus. & Prof. Code §§ 17200, et seq.<br>c. Conn. Gen. Stat. §§ 35-27 and 29, et seq.<br>d. D.C. Code §§ 28-4503, et seq.<br>e. Fla. Stat. §§ 501.201, et seq.<br>f. Hawaii Code §§ 480, et seq.<br>g. 740 Ill. Comp. Stat. 10/3, et seq.<br>h. Iowa Code §§ 553.5, et seq.<br>i. Me. Rev. Stat. Ann. 10, §§ 1102, et seq.<br>j. Md. Code, Com. Law §§ 11-204, et seq.<br>k. Mass. Gen. L. Ch. 93A, et seq.<br>l. Mich. Comp. Laws Ann. §§ 445.773, et | r. N.M. Stat. Ann. §§ 57-1-2, et seq.<br>s. N.Y. Gen. Bus. Law §§ 340, et seq.<br>t. N.C. Gen. Stat. §§ 75-2.1, et seq.<br>u. N.D. Cent. Code §§ 51-08.1-03, et seq.<br>v. Or. Rev. Stat. §§ 646.705, et seq.<br>w. 10 L.P.R.A. §§ 257, et seq.<br>x. R.I. Gen. Laws §§ 6-36-1, et seq.<br>y. S.D. Codified Laws §§ 37-1-3.2, et seq.<br>z. Utah Code Ann. §§ 76-10-911, et | MTD Arg. § I(A), (B) & (C) |

## APPENDIX A – Overview of Claims

| Counts | Specific Law(s) Invoked | | Basis for Dismissal |
|---|---|---|---|
| | seq.<br>m. Minn. Stat. §§ 325D.52, et seq., and Minn. Stat. § 8.31, et seq.<br>n. Miss. Code Ann. §§ 75-21-3, et seq.<br>o. Neb. Code Ann. §§ 59-802, et seq.<br>p. Nev. Rev. Stat. Ann. §§ 598A.060, et seq.<br>q. N.H. Rev. Stat. Ann. §§ 356.1, et seq. | seq.<br>aa. Vt. Stat. Ann. 9, §§ 2453, et seq.<br>bb. W.Va. Code §§ 47-18-4, et seq.<br>cc. Wis. Stat. §§ 133.03, et seq. | |
| **SIXTH CAUSE OF ACTION**<br>**Unfair and Deceptive Trade Practices Under State Law** | a. Ark. Code §§ 4-88-101, et seq.<br>b. Ariz. Code §§ 44-1522, et seq.<br>c. Cal. Bus. & Prof. Code §§ 17200, et seq.<br>d. Colo. Rev. Stat § 6-1-105, et seq.<br>e. Conn. Gen. Stat. §§ 35-27, et seq.<br>f. D.C. Code §§ 28-3901, et seq.<br>g. Fla. Stat. §§ 501.201, et seq.<br>h. Idaho Code §§ 48-601, et seq.<br>i. 815 ILCS §§ 505/1, et seq.<br>j. Ind. Code §§ 24-5-0.5-1, et seq.<br>k. Kan. Stat. §§ 50-623, et seq.<br>l. La. Rev. Stat. Ann. § 51:1401, et seq.<br>m. 5 Me. Rev. Stat. §§ 207, et seq.<br>n. Md. Code, Com. Law §§ 11-204, et seq.<br>o. Mass. Ann. Laws ch. 93A, et seq.<br>p. Mich. Stat. §§ 445.901, et seq.<br>q. Minn. Stat. § 325D.43, et. seq.; *id.* §§ 325F.69, et seq.; *id.* §§ 8.31, et seq.<br>r. Miss. Code. Ann. §§ 75-24-1, et seq.<br>s. Missouri Stat. §§ 407.010, et seq.<br>t. Neb. Rev. Stat. §§ 59-1601, et seq. | u. Nev. Rev. Stat. §§ 598.0903, et seq.<br>v. N.H. Rev. Stat. §§ 358-A:1, et seq.<br>w. N.M. Stat. §§ 57-12-1, et seq.<br>x. N.Y. Gen. Bus. Law §§ 349, et seq.<br>y. N.C. Gen. Stat. §§ 75-1.1, et seq.<br>z. N.D. Cent. Code §§ 51-15-01, et seq.<br>aa. Or. Rev. Stat. §§ 646.605, et seq.<br>bb. 73 Pa. Stat. Ann. §§ 201-1, et seq.<br>cc. S.C. Stat. Ann. §§ 39-5-10, et seq.<br>dd. S.D. Code Laws §§ 37-24-1, et seq.<br>ee. Utah Code §§ 13-11-1, et seq.<br>ff. 9 Vt. §§ 2451, et seq.<br>gg. Va. Code Ann. §§ 59.1-196, et seq.<br>hh. W.Va. Code §§ 46A-6-101, et seq.<br>ii. Wis. Stat. § 100.18; Wis. Stat. § | MTD Arg. § I(A), (B) & (C) |

**APPENDIX A – Overview of Claims**

| Counts | Specific Law(s) Invoked | Basis for Dismissal |
|---|---|---|
| | 100.20, et. Seq.<br>jj. Wyo. Stat. Ann. §§ 40-12-101, et seq. | |
| **SEVENTH CAUSE OF ACTION**<br>**Unjust Enrichment Under State Law** | Unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana. | MTD Arg. § I(A), (B) & (C) |
| **EIGHTH CAUSE OF ACTION**<br>**Declaratory and Injunctive Relief Under Section 16 of the Clayton Act for Celgene's Violations of Sections 1 and 2 of the Sherman Act** | 15 U.S.C. §§ 1-2;<br>15 U.S.C. § 26. | MTD Arg. § I(A), (B) & (C) |

## APPENDIX A – Overview of Claims

Table 5, *Molina Healthcare Inc. v. Celgene Corp.*, 22-cv-04561, ECF 7.

| Counts | Specific Law(s) Invoked | Basis for Dismissal |
|---|---|---|
| **FIRST CAUSE OF ACTION**<br>**Conspiracy and Combination in Restraint of Trade Under State Law** | a. Arizona Rev. Stat. §§ 44-1401, et seq.<br>b. C.G.S.A. §§ 35-26 and 28, et seq.<br>c. D.C. Code §§ 28-4501, et seq.<br>d. Haw. Rev. Stat. §§ 480-1, et seq.<br>e. 740 Ill. Comp. Stat. 10/1, et seq.<br>f. Iowa Code § 553.1, et seq.<br>g. Kan. Stat. Ann. § 50-101, et seq.<br>h. Me. Rev. Stat. Ann. 10, §§ 1101, et seq.<br>i. MD Code Ann., Com. Law, §§ 11-204, et seq.<br>j. Mich. Comp. Laws Ann. §§ 445.771, et seq.<br>k. Minn. Stat. §§ 325D.49, et seq.; *id.* §§ 8.31, et seq.<br>l. Miss. Code Ann. §§ 75-21-1, et seq.<br>m. Neb. Rev. Stat. Ann. §§ 59-801, et seq.<br>n. Nev. Rev. Stat. Ann. §§ 598A.010, et seq.;<br>o. N.H. Rev. Stat. Ann. §§ 356:1, et seq. | p. N.M. Stat. Ann. §§ 57-1-1, et seq.<br>q. N.Y. Gen. Bus. Law § 340, et seq.<br>r. N.C. Gen. Stat. §§ 75-1, et seq.<br>s. N.D. Cent. Code §§ 51-08.1-01, et seq.<br>t. Or. Rev. Stat. §§ 646.705, et seq.<br>u. P.R. Laws Ann. tit. 10 §§ 258, et seq.<br>v. R.I. Gen. Laws §§ 6-36-1, et seq.<br>w. S.D. Codified Laws §§ 37-1-3.1, et seq.<br>x. Tenn. Code Ann §§ 47-25-101, et seq.<br>y. Utah Code Ann. §§ 76-10-3101, et seq.<br>z. W.Va. Code §§ 47-18-1, et seq.<br>aa. Wis. Stat. §§ 133.01, et seq. | MTD Arg. § I(B) |
| **SECOND CAUSE OF ACTION**<br>**Monopolization and Monopolistic Scheme under State Law** | a. Arizona Rev. Stat. §§ 44-1403, et seq.<br>b. D.C. Code §§ 28-4503, et seq.<br>c. Fla. Stat. §§ 501.201, et seq.<br>d. Hawaii Code §§ 480, et seq.<br>e. 740 Ill. Comp. Stat. 10/3, et seq.<br>f. Iowa Code §§ 553.5 et seq.<br>g. Mass. Gen. L. Ch. 93A, et seq.<br>h. Me. Rev. Stat. Ann. 10, §§ 1102, et seq.<br>i. Mich. Comp. Laws Ann. §§ 445.773, et seq.<br>j. Minn. Stat. §§ 325D.52, et seq. | o. N.M. Stat. Ann. §§ 57-1-2, et seq.<br>p. N.C. Gen. Stat. §§ 75-2.1, et seq.<br>q. N.D. Cent. Code §§ 51-08.1-03, et seq.<br>r. Or. Rev. Stat. §§ 646.705, et seq.<br>s. 10 L.P.R.A. §§ 257, et seq.<br>t. R.I. Gen. Laws §§ 6-36-1, et seq.<br>u. S.D. Codified Laws §§ 37-1-3.2, et seq.<br>v. Utah Code Ann. §§ 76-10-911, et seq. | MTD Arg. § I(A), (B) & (C) |

## APPENDIX A – Overview of Claims

| Counts | Specific Law(s) Invoked | | Basis for Dismissal |
|---|---|---|---|
| | k. Miss. Code Ann. §§ 75-21-3, et seq.<br>l. Neb. Code Ann. §§ 59-802, et seq.<br>m. Nev. Rev. Stat. Ann. §§ 598A.060, et seq.<br>n. N.H. Rev. Stat. Ann. §§ 356.1, et seq. | w. Vt. Stat. Ann. 9, §§ 2453, et seq.<br>x. W.Va. Code §§ 47-18-4, et seq.<br>y. Wis. Stat. §§ 133.03, et seq. | |
| **THIRD CAUSE OF ACTION**<br>**Attempted Monopolization Under State Law** | a. Arizona Rev. Stat. §§ 44-1403, et seq.<br>b. Conn. Gen. Stat. §§ 35-27, et seq.<br>c. D.C. Code §§ 28-4503, et seq.<br>d. Fla. Stat. §§ 501.201, et seq.<br>e. Hawaii Code §§ 480, et seq.<br>f. 740 Ill. Comp. Stat. 10/3, et seq.<br>g. Iowa Code §§ 553.5 et seq.<br>h. Me. Rev. Stat. Ann. 10, §§ 1102, et seq.<br>i. Md. Code, Com. Law §§ 11-204, et seq.<br>j. Mass. Gen. L. Ch. 93A, et seq.<br>k. Mich. Comp. Laws Ann. §§ 445.773, et seq.<br>l. Minn. Stat. §§ 325D.52, et seq.; *id.* § 8.31, et seq.<br>m. Miss. Code Ann. §§ 75-21-3, et seq.<br>n. Neb. Code Ann. §§ 59-802, et seq.<br>o. Nev. Rev. Stat. Ann. §§ 598A.060, et seq.<br>p. N.H. Rev. Stat. Ann. §§ 356.1, et seq.<br>q. N.M. Stat. Ann. §§ 57-1-2, et seq. | r. N.Y. Gen. Bus. Law §§ 340, et seq.<br>s. N.C. Gen. Stat. §§ 75-2.1, et seq.<br>t. N.D. Cent. Code §§ 51-08.1-03, et seq.<br>u. Or. Rev. Stat. §§ 646.705, et seq.<br>v. 10 L.P.R.A. §§ 257, et seq.<br>w. R.I. Gen. Laws §§ 6-36-1 et seq.<br>x. S.D. Codified Laws §§ 37-1-3.2, et seq.<br>y. Utah Code Ann. §§ 76-10-911, et seq.<br>z. Vt. Stat. Ann. 9, §§ 2453, et seq.<br>aa. W.Va. Code §§ 47-18-4, et seq.<br>bb. Wis. Stat. §§ 133.03, et seq. | MTD Arg. § I(A), (B) & (C) |
| **FOURTH CAUSE OF ACTION**<br>**Unfair and Deceptive Trade Practices Under State Law** | a. Ark. Code §§ 4-88-101, et seq.<br>b. Ariz. Code §§ 44-1522, et seq.<br>c. Colo. Rev. Stat § 6-1-105, et seq.<br>d. Conn. Gen. Stat. §§ 35-27, et seq.<br>e. D.C. Code §§ 28-3901, et seq.<br>f. Fla. Stat. §§ 501.201, et seq.<br>g. Idaho Code §§ 48-601, et seq. | u. N.H. Rev. Stat. §§ 358-A:1, et seq.<br>v. N.M. Stat. §§ 57-12-1, et seq.<br>w. N.Y. Gen. Bus. Law §§ 349, et seq.<br>x. N.C. Gen. Stat. §§ 75-1.1, et seq.<br>y. N.D. Cent. Code §§ 51-15-01, et | MTD Arg. § I(A), (B) & (C) |

APPENDIX A – Overview of Claims

| Counts | Specific Law(s) Invoked | Basis for Dismissal |
|---|---|---|
| | h. 815 ILCS §§ 505/1, et seq.<br>i. Ind. Code §§ 24-5-0.5-1, et seq.<br>j. Kan. Stat. §§ 50-623, et seq.<br>k. La. Rev. Stat. Ann. § 51:1401, et seq.<br>l. 5 Me. Rev. Stat. §§ 207, et seq.<br>m. Md. Code, Com. Law §§ 11-204, et seq.<br>n. Mass. Ann. Laws ch. 93A, et seq.<br>o. Mich. Stat. §§ 445.901, et seq.<br>p. Minn. Stat. § 325D.43, et. seq.; *id.* §§ 325F.69, et seq.; *id.* §§ 8.31, et seq.;<br>q. Miss. Code. Ann. §§ 75-24-1, et seq.;<br>r. Missouri Stat. §§ 407.010, et seq.<br>s. Neb. Rev. Stat. §§ 59-1601, et seq.<br>t. Nev. Rev. Stat. §§ 598.0903, et seq. | seq.<br>z. Or. Rev. Stat. §§ 646.605, et seq.<br>aa. 73 Pa. Stat. Ann. §§ 201-1, et seq.<br>bb. S.C. Stat. Ann. §§ 39-5-10, et seq.<br>cc. S.D. Code Laws §§ 37-24-1, et seq.<br>dd. Utah Code §§ 13-11-1, et seq.<br>ee. 9 Vt. §§ 2451, et seq.<br>ff. Va. Code Ann. §§ 59.1-196, et seq.<br>gg. W.Va. Code §§ 46A-6-101, et seq.<br>hh. Wis. Stat. § 100.18; *id.* § 100.20, et. seq.<br>ii. Wyo. Stat. Ann. §§ 40-12-101, et seq. | |
| **FIFTH CAUSE OF ACTION**<br>**Unjust Enrichment Under State Law** | Unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana. | MTD Arg. § I(A), (B) & (C) |
| **SIXTH CAUSE OF ACTION**<br>**Injunctive Relief under Section 16 of the Clayton Act for Violations of Sections 1 and 2 of the Sherman Act** | 15 U.S.C. § 26;<br>15 U.S.C. §§ 1-2. | MTD Arg. § I(A), (B) & (C) |

## APPENDIX A – Overview of Claims

Table 6, *MSP Recovery Claims, Series LLC v. Celgene Corp.*, 21-cv-20451, ECF 71.

| Counts | Specific Law(s) Invoked | | Basis for Dismissal |
|---|---|---|---|
| **FIRST CLAIM OF RELIEF** **Declaratory and Injunctive Relief Under Section 16 of the Clayton Act for Celgene's Violations of Section 2 of the Sherman Act** | 15 U.S.C. § 2; 15 U.S.C. § 26. | | MTD Arg. § I(A), (B) & (C) |
| **SECOND CLAIM OF RELIEF** **Violation of Racketeering Influence Corrupt Organization Act ("RICO") 18 U.S.C. § 1962(c) Through the Use of the Co-Payment Charity Scheme** | 18 U.S.C. § 1962(c). | | MTD Arg. § II |
| **THIRD CLAIM OF RELIEF** **Violation of RICO 18 U.S.C. § 1962(d) Through the Co-Payment Circumvention Enterprise** | 18 U.S.C. § 1962(d). | | MTD Arg. § II |
| **FOURTH CLAIM OF RELIEF** **Monopolization and Monopolistic Scheme under State Law** | a. Cal. Bus. & Prof. Code §§ 17200 b. C.G.S. § 35-24, et seq., *id.* § 42-110a, et seq. c. Fla. Stat. §§ 501.201, et seq. d. 740 Ill. Comp. Stat. 10/3, et seq. e. Mass. Gen. L. Ch. 93, et seq. f. Mich. Comp. Laws Ann. §§ 445.773, et seq. | g. N.Y. Gen. Bus. Law §§ 340, et seq. h. Ohio Rev. Code Ann. § 4165, et seq. i. 10 L.P.R.A. § 257, et seq. j. R.I. Gen. Laws §§ 6-36-1, et | MTD Arg. § I(A), (B) & (C) |

### APPENDIX A – Overview of Claims

| Counts | Specific Law(s) Invoked | Basis for Dismissal |
|---|---|---|
| | seq.<br>k. Wis. Stat. § 133.03, et seq. | |
| **FIFTH CAUSE OF ACTION**<br>**Attempted Monopolization Under State Law** | a. Cal. Bus. & Prof. Code §§ 17200<br>b. C.G.S. § 35-24 et seq.; *id.* § 42-110a, et seq.<br>c. Fla. Stat. §§ 501.201, et seq.<br>d. 740 Ill. Comp. Stat. 10/3, et seq.<br>e. Mass. Gen. L. Ch. 93, et seq.<br>f. Mich. Comp. Laws Ann. §§ 445.773, et seq. | g. N.Y. Gen. Bus. Law §§ 340, et seq.<br>h. Ohio Rev. Code Ann. § 4165, et seq.<br>i. 10 L.P.R.A. § 257, et seq.<br>j. R.I. Gen. Laws §§ 6-36-1, et seq.<br>k. Wis. Stat. § 133.03, et seq. | MTD Arg. § I(A), (B) & (C) |
| **SIXTH CAUSE OF ACTION**<br>**Unfair and Deceptive Trade Practices Under State Law** | a. Cal. Bus. Code §§ 16700, et seq.; *id.* §§ 17200, et seq.<br>b. C.G.S. § 35-24, et seq.; *id.* § 42-110a, et seq.<br>c. Fla. Stat. §§ 501.201, et seq.<br>d. 815 Ill. Comp. Stat §§ 505/1, et seq.<br>e. Mass. Gen. L. Ch. 93A, et seq. | f. Mich. Stat. §§ 445.901, et seq.<br>g. N.Y. Gen. Bus. Law §§ 349, et seq.<br>h. Ohio Rev. Code Ann. § 4165, et seq.<br>i. 10 L.P.R.A. § 257, et seq.<br>j. Wis. Stat. § 100.18, *id.* § 100.20, et seq. | MTD Arg. §§ I-II |
| **SEVENTH CAUSE OF ACTION**<br>**Unjust Enrichment Under State Law** | Unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana. | | MTD Arg. §§ I-II |
| **EIGHTH CLAIM OF RELIEF**<br>**Violations of the Florida Civil Remedies for Criminal Practices Act** | Fla. Stat. 772.101, et seq. | | MTD Arg § II |

# APPENDIX A – Overview of Claims

Table 7, *United HealthCare Svcs., Inc. v. Celgene Corp.*, ECF 1.

| Counts | Specific Law(s) Invoked | | Basis for Dismissal |
|---|---|---|---|
| **FIRST CAUSE OF ACTION**<br>**Violation of Federal Antitrust Law - Section 2 of the Sherman Act** | 15 U.S.C. § 2. | | MTD Arg. § I(A), (B) & (C) |
| **SECOND CAUSE OF ACTION**<br>**Violation of Minnesota Antitrust Law** | Minn. Stat. §§ 325D.49, et seq. | | MTD Arg. § I(A), (B) & (C) |
| **THIRD CAUSE OF ACTION**<br>**Violation of Various State Antitrust and Consumer Protection Laws (Damages/Monetary Relief for All Indirect Purchasers/Payments, In the Alternative)** | Antitrust Laws<br><br>a. Arizona Rev. Stat. §§ 44-1403, et seq.<br>b. Cal. Bus. & Prof. Code §§ 16600, et seq., Cal. Bus. & Prof. Code §§ 17200, et seq.<br>c. D.C. Code §§ 28-4503, et seq.<br>d. Fla. Stat. §§ 501.201, et seq.<br>e. Hawaii Code §§ 480, et seq.<br>f. 740 Ill. Comp. Stat. 10/3, et seq.<br>g. Iowa Code §§ 553.5, et seq.<br>h. Mass. Gen. L. Ch. 93A, et seq.<br>i. Me. Rev. Stat. Ann. 10, §§ 1102, et seq.<br>j. Mich. Comp. Laws Ann. §§ 445.773, et seq.<br>k. Minn. Stat. §§ 325D.52, et seq.<br>l. Miss. Code Ann. §§ 75-21-3, et seq.<br>m. Neb. Code Ann. §§ 59-802, et seq.<br>n. Nev. Rev. Stat. Ann. §§ 598A.060, et seq.<br>o. N.H. Rev. Stat. Ann. §§ 356.1, et seq. | Consumer Protection Laws<br><br>a. Ark. Code §§ 4-88-101, et seq.<br>b. Ariz. Code §§ 44-1522, et seq.<br>c. Cal. Bus. & Prof. Code §§ 17200, et seq.<br>d. Colo. Rev. Stat § 6-1-105, et seq.<br>e. D.C. Code §§ 28-3901, et seq.<br>f. Fla. Stat. §§ 501.201, et seq.<br>g. Idaho Code §§ 48-601, et seq.<br>h. 815 ILCS 505/1, et seq.<br>i. Ind. Code §§ 24-5-0.5-1, et seq.<br>j. Kan. Stat. §§ 50-623, et seq.<br>k. La. Rev. Stat. Ann. § 51:1401, et seq.<br>l. 5 Me. Rev. Stat. §§ 207, et seq.<br>m. Mass. Ann. Laws ch. 93A, et seq.<br>n. Mich. Stat. §§ 445.901, et seq.<br>o. Minn. Stat. § 325D.43, et. seq.; *id.* § 325F.69, et seq<br>*id.* § 8.31, et seq. | MTD Arg. § I(A), (B) & (C) |

## APPENDIX A – Overview of Claims

| Counts | Specific Law(s) Invoked | | Basis for Dismissal |
|---|---|---|---|
| | p. N.M. Stat. Ann. §§ 57-1-2, et seq.<br>q. N.C. Gen. Stat. §§ 75-2.1, et seq.<br>r. N.D. Cent. Code §§ 51-08.1-03, et seq.<br>s. Or. Rev. Stat. §§ 646.705, et seq.<br>t. 10 L.P.R.A. §§ 257, et seq.<br>u. R.I. Gen. Laws §§ 6-36-1, et seq.<br>v. S.D. Codified Laws §§ 37-1-3.2, et seq.<br>w. Utah Code Ann. §§ 76-10-911, et seq.<br>x. Vt. Stat. Ann. 9, §§ 2453, et seq.<br>y. W.Va. Code §§ 47-18-4, et seq.<br>z. Wis. Stat. §§ 133.03, et seq. | p. Miss. Code. Ann. § 75-24-1, et seq.<br>q. Missouri Stat. §§ 407.010, et seq.<br>r. Neb. Rev. Stat. §§ 59-1601, et seq.<br>s. Nev. Rev. Stat. §§ 598.0903, et seq.<br>t. N.H. Rev. Stat. §§ 358-A:1, et seq.<br>u. N.M. Stat. §§ 57-12-1, et seq.<br>v. N.Y. Gen. Bus. Law §§ 349, et seq.<br>w. N.C. Gen. Stat. §§ 75-1.1, et seq.<br>x. N.D. Cent. Code § 51-15-01, et seq.<br>y. Or. Rev. Stat. §§ 646.605, et seq.<br>z. 73 Pa. Stat. Ann. §§ 201-1, et seq.<br>aa. S.C. Stat. Ann. § 39-5-10, et seq.<br>bb. S.D. Code Laws §§ 37-24-1, et seq.<br>cc. Utah Code §§ 13-11-1, et seq.<br>dd. 9 Vt. § 2451, et seq.<br>ee. Va. Code Ann. §§ 59.1-196, et seq.<br>ff. W.Va. Code §§ 46A-6-101, et seq.<br>gg. Wis. Stat. § 100.18; *id.* § 100.20, et. seq.<br>hh. Wyo. Stat. Ann. § 40-12-101, et seq. | |
| **FOURTH CAUSE OF ACTION**<br>**Violation of Minnesota Consumer Fraud Act** | Minnesota's Consumer Fraud Act, Minn. Stat. § 325F.69, et seq.; Minnesota Private Attorney General Act, Minn. Stat. § 8.31, subd. 3a. | | MTD Arg. § II |
| **FIFTH CAUSE OF ACTION**<br>**Unjust Enrichment** | Unjust enrichment principles of Minnesota, or alternatively, all States and territories in the United States except, Ohio and Indiana. | | MTD Arg. §§ I-II |

# Appendix B

**APPENDIX B - Patents at Issue in Celgene's Patent Litigations Alleged To Be "Shams"**

This appendix lists the patents at issue as of case conclusion in the fifteen Revlimid-related lawsuits Plaintiffs identify.

| Case Name / Date Filed | Patents at Issue as of Case Conclusion | Allegations in Humana AC |
|---|---|---|
| *Natco*, Case Nos. 10-5197, 12-4571 (D.N.J.) (Oct. 8, 2010) | Compound: **'517**[1]<br>Treatment: **'717**<br>Polymorph: '800, '357, '598,<br>Distribution Method:     '886 | ¶¶ 347-63 |
| *Dr. Reddy's*, Case Nos. 16-7704, 17-5314, 18-6378 (D.N.J.) (Oct. 20, 2016) | Treatment:   **'740, '717, '120, '569**, '498, '095, '621, '622<br>Polymorph: '800, '217 | ¶¶ 377-87 |
| *Zydus*, Case Nos. 17-2528, 18-8519 (D.N.J.) (Apr. 12, 2017) | Treatment:   **'569**, '498, '095, '621, '622<br>Polymorph: '800, '357, '219, '598 | ¶¶ 470-83 |
| *Cipla*, Case Nos. 17-6163, 18-8964, 19-14731, 20-7759 (D.N.J.) (Aug. 15, 2017) | Treatment:   **'740, '717, '120, '569**, '498, '095, '621, '622<br>Polymorph: '800, '357, '219, '598 | ¶¶ 399-409 |
| *Lotus/Alvogen*, Case Nos. 17-6842, 18-11518 (D.N.J.) (Sept. 6, 2017) | Compound: **'517**<br>Treatment:   **'740, '717, '120, '569**, '498, '095, '621, '622<br>Polymorph: '800, '357, '219, '598 | ¶¶ 388-98 |
| *Apotex*, Case Nos. 18-461, 19-6999, 19-13994 (D.N.J.) (Jan. 11, 2018) | Treatment:   **'740, '717, '120, '929**, '363<br>Polymorph: '800, '357, '219, '598 | ¶¶ 446-69 |
| *Sun*, Case Nos. 18-11630, 19-10099, 21-1734 (D.N.J.) (July 13, 2018) | Treatment:   **'569**, '498, '095, '621, '622<br>Polymorph: '800, '357, '219, '598 | ¶¶ 410-17 |

[1] Patents emphasized in bold were subject to *inter partes review* challenges before the Patent Trial Appeal Board.  *See* Motion to Dismiss at pp. 16-17.

| | | |
|---|---|---|
| *Hetero*, Case Nos. 18-17463, 19-15449, 20-14389 (D.N.J.) (Dec. 20, 2018) | Treatment: **<u>'740</u>**, **<u>'717</u>**, **<u>'569</u>**, '498, '095, '621, '622<br>Polymorph: '800, '357, '219 | ¶¶ 484-500 |
| *Mylan*, Case Nos. 19-22231 (D.N.J.) (Dec. 31, 2019), 20-3 (N.D. W.Va.) | Treatment: **<u>'740</u>**, **<u>'717</u>**, **<u>'120</u>**, **<u>'569</u>**, '498, '095, '621, '622<br>Polymorph: '800 | ¶¶ 501-06 |
| *Aurobindo*, Case Nos. 20-315, 21-624 (D.N.J.) (Jan. 8, 2020) | Treatment: **<u>'569</u>**, '498, '095, '621, '622<br>Polymorph: '800, '217, '357, '219, '598 | ¶¶ 507-14 |
| *Lupin*, Case No. 20-8570 (D.N.J.) (July 9, 2020) | Treatment: **<u>'569</u>**, '498, '095, '621, '622<br>Polymorph: '800, '217 | ¶¶ 515-21 |
| *Hikma*, Case Nos. 21-10398, 21-20459 (D.N.J.) (Apr. 28, 2021) | Treatment: **<u>'740</u>**, **<u>'717</u>**, **<u>'120</u>**, **<u>'569</u>**, '498, '095, '621, '622<br>Polymorph: '800, '217, '357, '219, '598 | ¶¶ 522-28 |
| *Biocon*, Case No. 21-11261 (D.N.J.) (May 14, 2021) | Treatment: **<u>'740</u>**, **<u>'717</u>**, **<u>'120</u>**, **<u>'569</u>**, '498, '095, '622<br>Polymorph: '800, '217 | ¶¶ 529-32 |
| *Torrent*, Case No. 21-12927 (D.N.J.) (June 23, 2021) | Treatment: **<u>'740</u>**, **<u>'717</u>**, **<u>'120</u>**, **<u>'569</u>**, '498, '095, '621, '622<br>Polymorph: '800, '217 | ¶¶ 533-35 |
| *Alembic*, Case No. 21-20099 (D.N.J.) (June 23, 2021) | Treatment: **<u>'569</u>**, '498, '095, '622<br>Polymorph: '800, '217 | ¶¶ 536-39 |

# Appendix C

**APPENDIX C – Harmonization Principles for Plaintiffs' State Law Monopolization Claims**

| | State Monopolization Statute(s)[1] | | Harmonization Principle |
|---|---|---|---|
| **State** | **Citation** | | **Citation** |
| Arizona | Ariz. Rev. Stat. §§ 44-1403, *et seq.* | | Ariz. Rev. Stat. § 44-1412 ("This article shall be applied and construed to effectuate its general purpose to make uniform the law with respect to the subject of this article among those states that enact it.  It is the intent of the legislature that in construing this article, the courts may use as a guide interpretations given by the federal courts to comparable federal antitrust statutes."). |
| California | Cal. Bus. & Prof. Code §§ 16700, 17200, *et seq.* | | *Lenhoff Enters., Inc. v. United Talent Agency, Inc.*, 729 F. App'x 528, 531 (9th Cir. 2018) ("Where a complaint alleges the same conduct as both a violation of the Sherman Act and a violation of California's Cartwright |

---

[1] To avoid unduly burdensome briefing, litigants commonly file appendices of this kind organizing variations or commonalities in state laws.  *See, e.g.*, *In re Ford Motor Co. Switch Prods. Liab. Litig.*, 174 F.R.D. 332, 350-51 (D.N.J. 1997) (analyzing appendix detailing variations in, *inter alia*, consumer protection statutes); *In re Wellbutrin*, No. 08-cv-02433, ECF 81-6 (E.D. Pa. May 5, 2009) (attaching state-law appendix to motion to dismiss).

Collectively, Plaintiffs bring claims of "Monopolization and Monopolistic Scheme," "Attempted Monopolization," and "Antitrust and Competition" based on thirty jurisdictions' state laws.  *See* BCBSA AC (Counts II, III), BCBSM AC (Counts II, III), Cigna AC (Counts IV, V), Humana AC (Counts IV, V), Molina Compl. (Counts II, III), MSP 2AC (Counts IV, V), UHS Compl. (Count III).

**APPENDIX C – Harmonization Principles for Plaintiffs' State Law Monopolization Claims**

| | State Monopolization Statute(s)[1] | Harmonization Principle |
|---|---|---|
| **State** | **Citation** | **Citation** |
| | | Act and UCL, the determination that the alleged conduct is not an unreasonable restraint of trade under the Sherman Act necessarily implies that the conduct is not unlawful under the Cartwright Act or the 'unlawful' prong of the UCL."); *Marin Cnty. Bd. of Realtors, Inc. v. Palsson*, 549 P.2d 833, 835 (Cal. 1976) (en banc) (explaining "federal cases interpreting the Sherman Act are applicable to problems arising under the Cartwright Act"). |
| Connecticut | Conn. Gen. Stat. §§ 35-24, 35-27, 35-29, 42-110a, *et seq.* | Conn. Gen. Stat. § 35-44b ("It is the intent of the General Assembly that in construing sections 35-24 to 35-46, inclusive, the courts of this state shall be guided by interpretations given by the federal courts to federal antitrust statutes."). |
| District of Columbia | D.C. Code §§ 28-4503, *et seq.* | D.C. Code § 28-4515 ("It is the intent of the Council of the District of Columbia that in construing this chapter, a court of competent jurisdiction may use as a guide interpretations given by federal courts to comparable antitrust statutes."). |

**APPENDIX C – Harmonization Principles for Plaintiffs' State Law Monopolization Claims**

| State | State Monopolization Statute(s)[1] | Harmonization Principle |
|---|---|---|
| | Citation | Citation |
| Florida | Fla. Stat. §§ 501.201, *et seq.* | Fla. Stat. § 542.32[2] ("It is the intent of the Legislature that, in construing this chapter, due consideration and great weight be given to the interpretations of the federal courts relating to comparable federal antitrust statutes. In particular, the failure to include in this chapter the substantive provisions of § 3 of the Clayton Act, 15 U.S.C. § 14, shall not be deemed in any way to limit the scope of § 542.18 or § 542.19."). |
| Hawaii | Haw. Rev. Stat. §§ 480, *et seq.* | Haw. Rev. Stat. § 480-3 ("This chapter shall be construed in accordance with judicial interpretations of similar federal antitrust statutes, except that lawsuits by indirect purchasers may be brought as provided in this chapter."). |
| Illinois | 740 Ill. Comp. Stat. 10/3, *et seq.* | 740 Ill. Comp. Stat. 10/11 ("When the wording of this Act is identical or similar to that of a federal antitrust law, the courts of this State shall use the construction of the |

---

[2] Although Plaintiffs allege state-law monopolization and attempted monopolization under Fla. Stat. § 501.201, *e.g.*, Humana AC ¶¶ 604(e), 610(e), Florida's law against monopolization is found, rather, at Fla. Stat. § 542.19, and Florida's harmonization principle is found in that chapter as well.

**APPENDIX C – Harmonization Principles for Plaintiffs' State Law Monopolization Claims**

| | State Monopolization Statute(s)[1] | Harmonization Principle |
|---|---|---|
| **State** | **Citation** | **Citation** |
| | | federal law by the federal courts as a guide in construing this Act."). |
| Iowa | Iowa Code §§ 553.5, *et seq.* | Iowa Code § 553.2 ("This chapter shall be construed to complement and be harmonized with the applied laws of the United States which have the same or similar purpose as this chapter.  This construction shall not be made in such a way as to constitute a delegation of state authority to the federal government, but shall be made to achieve uniform application of the state and federal laws prohibiting restraints of economic activity and monopolistic practices."). |
| Maine | Me. Rev. Stat. Ann. tit. 10, §§ 1102, *et seq.* | *Davric Me. Corp. v. Rancourt*, 216 F.3d 143, 149 (1st Cir. 2000) (involving a state-law claim of attempted monopolization, noting that "Maine antitrust statutes parallel the Sherman Act," and thus analyzing "claims thereunder according to the doctrines developed in relation to federal law"). |
| Maryland | Md. Code Ann., Com. Law §§ 11-204, *et seq.* | Md. Code Ann., Com. Law § 11-202(a)(2) ("It is the intent of the General Assembly that, in construing this subtitle, the courts be guided by the interpretation given |

**APPENDIX C – Harmonization Principles for Plaintiffs' State Law Monopolization Claims**

| | State Monopolization Statute(s)[1] | | Harmonization Principle |
|---|---|---|---|
| **State** | **Citation** | | **Citation** |
| | | | by the federal courts to the various federal statutes dealing with the same or similar matters . . . . "). |
| Massachusetts | Mass. Gen. Laws ch. 93A, *et seq.* | | Mass. Gen. Laws ch. 93A, § 1 ("This chapter shall be construed in harmony with judicial interpretations of comparable federal antitrust laws insofar as practicable."). |
| Michigan | Mich. Comp. Laws §§ 445.773, *et seq.* | | Mich. Comp. Laws § 445.784, Sec. 14(2) ("It is the intent of the legislature that in construing all sections of this act, the courts shall give due deference to interpretations given by the federal courts to comparable antitrust statutes, including, without limitation, the doctrine of per se violations and the rule of reason."). |
| Minnesota | Minn. Stat. §§ 325D.52, *et seq.*, *id.* §§ 8.31, *et seq.* | | *Lorix v. Crompton Corp.*, 736 N.W.2d 619, 626 (Minn. 2007) ("Minnesota antitrust law is generally interpreted consistently with federal antitrust law. As the purposes of Minnesota and federal antitrust law are the same, it is sensible to interpret them consistently. … The desire for harmony between federal and state antitrust law relates more to prohibited conduct than to who can bring a lawsuit.  The purpose behind both state and federal antitrust law is to apply a uniform standard of conduct so |

**APPENDIX C – Harmonization Principles for Plaintiffs' State Law Monopolization Claims**

| | State Monopolization Statute(s)[1] | Harmonization Principle |
|---|---|---|
| **State** | **Citation** | **Citation** |
| | | that businesses will know what is acceptable conduct . . . .""). |
| Mississippi | Miss. Code Ann. §§ 75-21-3, *et seq.* | *NAACP v. Claiborne Hardware Co.,* 393 S.2d 1290, 1301 (Miss. 1980), *rev'd on other grounds*, 458 U.S. 886 (1982) (indicating that Mississippi state antitrust law is "patterned" after the Sherman Act and that the state supreme court has been "influenced by the decisions of the [U.S. Supreme Court] in interpreting and applying" the state statute). |
| Nebraska | Neb. Rev. Stat. §§ 59-802, *et seq.* | Neb. Rev. Stat. § 59-829 ("When any provision of sections 59-801 to 59-831 and sections 84-211 to 84-214 or any provision of Chapter 59 is the same as or similar to the language of a federal antitrust law, the courts of this state in construing such sections or chapter shall follow the construction given to the federal law by the federal courts."). |
| Nevada | Nev. Rev. Stat. §§ 598A.060, *et seq.* | Nev. Rev. Stat. § 598A.050 ("The provisions of this chapter shall be construed in harmony with prevailing judicial interpretations of the federal antitrust statutes."). |

**APPENDIX C – Harmonization Principles for Plaintiffs' State Law Monopolization Claims**

| | State Monopolization Statute(s)[1] | Harmonization Principle |
|---|---|---|
| **State** | **Citation** | **Citation** |
| New Hampshire | N.H. Rev. Stat. Ann. §§ 356:1, *et seq.* | N.H. Rev. Stat. Ann. § 356:14 ("In any action or prosecution under this chapter, the courts may be guided by interpretations of the United States' antitrust laws."). |
| New Mexico | N.M. Stat. Ann. §§ 57-1-2, *et seq.* | N.M. Stat. Ann. § 57-1-15 ("Unless otherwise provided in the Antitrust Act, the Antitrust Act shall be construed in harmony with judicial interpretations of the federal antitrust laws. This construction shall be made to achieve uniform application of the state and federal laws prohibiting restraints of trade and monopolistic practices."). |
| New York | N.Y. Gen. Bus. Law §§ 340, *et seq.* | *Sperry v. Crompton Corp.*, 863 N.E.2d 1012, 1018 (N.Y. 2007) (explaining that the New York Court of Appeals generally construes New York's Donnelly Act "in light of federal antitrust case law," but that it will interpret state law differently "where State policy, differences in statutory language or legislative history justify such a result"); *see Aimcee Wholesale Corp. v. Tomar Prods., Inc.*, 237 N.E.2d 223, 225 (N.Y. 1968) (recognizing that New York's antitrust law was modeled on the Sherman Act). |

**APPENDIX C – Harmonization Principles for Plaintiffs' State Law Monopolization Claims**

| | State Monopolization Statute(s)[1] | Harmonization Principle |
|---|---|---|
| **State** | **Citation** | **Citation** |
| North Carolina | N.C. Gen. Stat. §§ 75-2.1, *et seq.* | *N.C. Steel, Inc. v. Nat'l Council on Comp. Ins.*, 472 S.E.2d 578, 582 (N.C. Ct. App. 1996) ("Our Supreme Court has held that federal precedent is instructive in interpreting Chapter 75 due to the similarity between provisions of Chapter 75 and the federal antitrust laws."), *rev'd in part on other grounds*, 496 S.E.2d 369 (N.C. 1998). |
| North Dakota | N.D. Cent. Code §§ 51-08.1-03, *et seq.* | *In re Pre-Filled Propane Tank Antitrust Litig.*, 2019 WL 4796528, at *15 (W.D. Mo. Aug. 21, 2019) ("While not expressly endorsed, the North Dakota Supreme Court has used federal law in [the context of applying state antitrust law]" (citing *Ag Acceptance Corp. v. Glinz*, 684 N.W.2d 632, 639 (N.D. 2004)); *see also id.* (concluding that "the North Dakota Supreme Court would likely look to federal caselaw interpreting [analogous sections of] the Sherman Act"). |
| Ohio | Ohio Rev. Code Ann. §§ 1331.01, 4165.01, *et seq.* | *Johnson v. Microsoft Corp.*, 834 N.E.2d 791, 794-95 (Ohio 2005) ("[T]he Ohio General Assembly patterned Ohio's antitrust provisions in accordance with federal antitrust provisions … [and] Ohio has long followed federal law in interpreting the Valentine Act."). |

**APPENDIX C – Harmonization Principles for Plaintiffs' State Law Monopolization Claims**

| | State Monopolization Statute(s)[1] | | Harmonization Principle |
|---|---|---|---|
| **State** | **Citation** | | **Citation** |
| Oregon | Or. Rev. Stat. §§ 646.705, *et seq.* | | Or. Rev. Stat. § 646.715(2) ("Without limiting the scope of ORS 646.705 to 646.805 and 646.990, it is the legislative purpose that it apply to intrastate trade or commerce, and to interstate trade or commerce involving an actual or threatened injury to a person or property located in this state. The decisions of federal courts in construction of federal law relating to the same subject shall be persuasive authority in the construction of ORS 646.705 to 646.805 and 646.990."). |
| Puerto Rico | P.R. Laws Ann. tit. 10, §§ 257, *et seq.* | | *G.G. & Supplies Corp. v. S. & F. Sys., Inc.*, 153 D.P.R. 861, 861-62 (P.R. 2001) ("The doctrines and interpretations born of the Sherman Act and of the Clayton Act [] will help us determine and establish, under our own legislation, the local antitrust provisions that prohibit monopolistic practices and protect free and fair competition in trade and commerce," but noting that "these federal statutes [are] not preemptive" and "[w]hen applying local laws, Puerto Rico courts may construe them differently to effectively address our particular economic reality."). |

Appendix C-9

**APPENDIX C – Harmonization Principles for Plaintiffs' State Law Monopolization Claims**

| State | State Monopolization Statute(s)[1] | Harmonization Principle |
|---|---|---|
| | Citation | Citation |
| Rhode Island | R.I. Gen. Laws §§ 6-36-1, *et seq.* | R.I. Gen. Laws § 6-36-2(b) ("This chapter shall be construed in harmony with judicial interpretations of comparable federal antitrust statutes insofar as practicable, except where provisions of this chapter are expressly contrary to applicable federal provisions as construed."). |
| South Dakota | S.D. Codified Laws §§ 37-1-3.2, *et seq.* | S.D. Codified Laws § 37-1-22 ("It is the intent of the Legislature that in construing this chapter, the courts may use as a guide interpretations given by the federal or state courts to comparable antitrust statutes."). |
| Utah | Utah Code Ann. §§ 76-10-3101, *et seq.* | Utah Code Ann. § 76-10-3118 ("The Legislature intends that the courts, in construing this act, will be guided by interpretations given by the federal courts to comparable federal antitrust statutes and by other state courts to comparable state antitrust statutes."). |
| Vermont | Vt. Stat. Ann. tit. 9, §§ 2453, *et seq.* | *Elkins v. Microsoft Corp.,* 817 A.2d 9, 17 (Vt. 2002) ("The purpose behind both state and federal antitrust law is to apply a uniform standard of conduct so that businesses will know what is acceptable conduct and what is not acceptable conduct.  To achieve this uniformity or |

**APPENDIX C – Harmonization Principles for Plaintiffs' State Law Monopolization Claims**

| | State Monopolization Statute(s)[1] | Harmonization Principle |
|---|---|---|
| **State** | **Citation** | **Citation** |
| | | predictability, we are not required to define who may sue in our state courts in the same way federal courts have defined who may maintain an action in federal court." (quoting *Comes v. Microsoft Corp.*, 646 N.W.2d 440, 446 (Iowa 2002)). |
| West Virginia | W. Va. Code §§ 47-18-4, *et seq.* | W. Va. Code § 47-18-16 ("This article shall be construed liberally and in harmony with ruling judicial interpretations of comparable federal antitrust statutes."). |
| Wisconsin | Wis. Stat. §§ 133.03, *et seq.* | *Conley Pub. Grp., Ltd. v. J. Commc'ns, Inc.*, 665 N.W.2d 879, 885-86 (Wis. 2003) ("Recognizing the relative infrequency of actions under Chapter 133, Wisconsin courts have followed federal court interpretations of Sections 1 and 2 of the Sherman Act and have construed Wisconsin antitrust statutes in conformity with these federal court interpretations.  This is longstanding policy."), *abrogated on other grounds by Olstad v. Microsoft Corp.*, 700 N.W.2d 139 (Wis. 2005); *see also Eichenseer v. Madison-Dane Cnty. Tavern League, Inc.*, 748 N.W.2d 154, 174 (Wis. 2008) ("Federal precedents are often instructive and persuasive in analyzing Wisconsin antitrust law."). |