**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

|  |  |
|---|---|
| IN RE REVLIMID & THALOMID PURCHASE ANTITRUST LITIGATION | No. 19-cv-07532 (MEF)(MAH)  <br><br> **OPINION** |

**Table of Contents**

I.   **Background**

    A.   **The Allegations**

    B.   **Procedural History**

    C.   **The Motion**

II.  **Where To Start**

III. **The Cause of Action**

    A.   **The Public Benefit Rule**

    B.   **An Implication of the Rule**

IV.  **Can the Court Ask?**

V.   **Should the Court Ask?**

    A.   **Interest**

    B.   **Representation**

    C.   **Usefulness**

    D.   **Novelty**

VI.  **Conclusion**

\*     \*     \*

A pharmaceutical company funded charities that helped people afford its cancer drug --- and an insurance company that was often billed for the drug came to believe that the charity payments were a scheme, designed to get more doctors and patients to select the drug.

So the insurance company sued the pharmaceutical company, including under a Minnesota law.

The pharmaceutical company now moves to dismiss, arguing, among other things, that claims under the Minnesota law cannot go forward here because there is no cause of action.

But the scope of any potentially-available cause of action is tied to the scope of the Minnesota Attorney General's power to pursue his own enforcement actions.

So before the Court decides the motion to dismiss, it will solicit the AG's views.

*    *    *

I.    **Background**

    A.    **The Allegations**

This is a dispute between an insurance company[1] and a pharmaceutical company.[2]

The pharmaceutical company held the key patents on an important brand-name cancer drug.[3]  See Second Amended Complaint ("Complaint") (ECF 463) ¶¶ 2, 182, 166.

*    *    *

To see what the allegations here are about, start off by imagining three things.

First, imagine a cancer patient whose doctor prescribes her the drug.

Second, take it as a given that the drug costs, say, $10 per dose.[4]

---

[1]  United Healthcare Services, Inc.

[2]  Celgene Corporation.  Note that in 2019, Bristol-Myers Squibb Co. bought Celgene Corporation.  See Second Amended Complaint (ECF 463) ¶ 19.  But Bristol-Myers Squibb Co. is not a named defendant here.  See id. ¶¶ 11-26; see also Plaintiff United Healthcare Services, Inc's Memorandum of Law in Opposition to Defendant Celgene Corporation's Motion to Dismiss (Issue E) (ECF 537) at 1 n.1.

[3]  Revlimid.

[4]  The numbers used throughout this Opinion are just examples. They do not purport to be accurate.  Not at all.  Rather, they

2

And third, hypothesize that the cancer patient has an arrangement with the insurance company --- under which the insurance company will pay for the drug for the woman, but only after certain other boxes are checked, things like her deductibles and co-pays being taken care of.  Say these add up to $3.  And collectively call costs like these (deductibles, co-pays, etc.) "insurance-related-costs."

*    *    *

What follows are the allegations here.  They take up the remainder of this Part I.A.[5]

*    *    *

Insurance-related-costs were designed by the insurance company to work, in part, as a kind of speed bump.  To encourage the patient (and her doctor) to slow down a bit, and to consider lower-cost options --- something cheaper than the drug.[6]

But the pharmaceutical company did not want patients (and doctors) turning to "lower cost alternative[s]."  Id. ¶ 655.

Presumably for everyday commercial reasons.[7]

And also for an added reason.  The pharmaceutical company was "work[ing] to exclude generics from the market."  Id. ¶ 650.

---

are used just to boil things down and illustrate the allegations.

[5]  Because this is a motion to dismiss, the Court must treat all of the complaint's allegations as true.  See McTernan v. City of York, 577 F.3d 521, 526 (3d Cir. 2009).  Whether they are in fact true would be a question for later in the case.

[6]  See Complaint ¶ 658 (describing "cost-sharing obligations . . . as a market-based check on . . .  prescription volume"); see generally Nicole Fusco, et al., Cost-Sharing and Adherence, Clinical Outcomes, Health Care Utilization, and Costs: A Systematic Literature Review, 29 J. Managed Care & Specialty Pharmacy 4, 5 (2023) (noting the conventional view that "cost-sharing . . . compel[s] consumers to be more thoughtful and selective in their health care choices if they are required to shoulder a greater burden for such services").

[7]  The kinds of reasons that apply in all sorts of contexts, beyond the pharmaceutical industry.  The short of it: Ford wants people buying Fords, not Chevys.

3

This was to keep prices for the brand-name drug much higher than they otherwise would have been.  See id. ¶ 5.  So the pharmaceutical company had an extra reason to ensure that people were choosing its drug.  See id. ¶ 650.  Namely, given the pharmaceutical company's "exclu[sion]" of generics, each dose of the drug would be especially pricey, id. ¶¶ 293, 300, 651, 678 --- and the pharmaceutical company would therefore make significant per-unit profits on each sale.  See generally id. ¶ 318.

                    *     *     *

Against this backdrop, the pharmaceutical company allegedly subsidized some consumers' insurance-related-costs.  See id. ¶¶ 653, 672, 758.

If, through a subsidy, someone else covered the hypothetical cancer patient's $3 in insurance-related-costs, then there would be that much less reason for her (and her doctors) to steer away from the $10 drug.  See id. ¶ 655; see footnote 6.

This was a plus for the pharmaceutical company.

It allowed the company to sell more of the drug.  See Complaint ¶¶ 653, 655, 671-72, 682, 753, 756.

And it worked as a safety valve.  It released the pressure that would otherwise have built up --- the pressure on the pharmaceutical company from patients and doctors to put the drug within easier financial reach, by allowing generic drugs to more broadly compete with the brand-name drug.  See id. ¶¶ 653, 656-58, 756-57.  This pent up pressure might ultimately have caused the price of the drug to fall.  See generally id. ¶ 657, 756.  But the pressure was instead released, and so it dissipated.[8]

---

[8]  As to the safety valve, the "scheme" is alleged to have worked roughly as follows.  The pharmaceutical company constrained supply by limiting the availability of generic versions of the drug.  See Complaint ¶¶ 5, 293, 401, 414.  This kept prices for the drug high.  See id. ¶¶ 5, 283, 294, 303, 401.  And then, to relieve pressure that would have built up to lower across-the-board drug prices, the pharmaceutical company subsidized some people's demand, by using charities to cover their insurance-related-costs.  See id. ¶¶ 653, 655, 658, 672, 753, 758.  Cf., e.g., Arnold Kling, Specialization and Trade: A Re-Introduction to Economics 127-28 (2016) (describing what the author takes to be a similar dynamic in a range of other areas, a dynamic of

The pharmaceutical company's subsidies, in short, impacted both (i) the <u>volume</u> of the drug that was sold and (ii) the <u>price</u> at which it was sold.  <u>See</u> <u>id</u>. ¶¶ 655, 658, 672, 682, 753, 755-56.

This injured the insurance company.

When one of its insureds obtained the drug, the insurance company had to cover part of the cost.  So if more people were taking the drug, it would have to do more covering.

And when the insurance company had to cover the drug's cost, it was covering a relatively higher cost.  <u>See</u>, <u>e.g.</u>, <u>id</u>. ¶¶ 15, 655, 672.

*    *    *

As to the just-referenced subsidies: how were they paid by the pharmaceutical company?

"[S]ecretly."  <u>Id</u>. ¶¶ 655, 757.  Through "donations" from the pharmaceutical company to nominally "independent" charities.[9] <u>See</u> <u>id</u>. ¶¶ 652, 654, 672, 682.

The charities then allegedly used this money to help patients who had arrangements with the insurance companies.  How?  By covering some or all of the patients' insurance-related-costs[10] for the drug --- thereby producing an "illusion for physicians and patients that [the pharmaceutical company's drug] was 'free' (or close to it)."  <u>Id</u>. ¶ 658.

But although the drug might have <u>appeared</u> free, the insurance company still had to pay.  <u>See</u> <u>id</u>. ¶¶ 679, 758-59.  "[T]he entire price burden" was "shifted to third-party payors" like the insurance company.  <u>Id</u>. ¶ 658.

Once again, this allegedly impacted both price and volume.

---

restricting supply and then engaging in targeted subsidizing of demand).  To those people whose demand was subsidized, the drug would feel "'free' (or close to it)."  <u>Id</u>. ¶ 658.  So they would have no reason to add their voices to any chorus seeking lower top-line drug prices.

[9]  The Chronic Disease Fund, now called the Good Days Fund.  And the Patient Access Network Foundation.  <u>See</u> Complaint ¶ 652.

[10]  Defined above.

5

As to price, the pharmaceutical company was able "to artificially inflate [drug] prices . . . as ultimately paid by" the insurance company.  <u>Id</u>. ¶ 655.

And as to volume, the pharmaceutical company was also able "to steer patients away from . . . alternative oncology drugs."  <u>Id</u>. ¶ 655; <u>see also</u> <u>id</u>. ¶ 753.

### B.    <u>Procedural History</u>

In light of the allegations set out above, the insurance company[11] (from here "the Plaintiff") sued the pharmaceutical company[12] (from here "the Defendant").

There are eight claims.

Five federal claims, each under the antitrust laws.  <u>See</u> <u>id</u>. ¶¶ 683-732.  A common-law claim pressed in the alternative, but with no reference to whose law is in play.  <u>See</u> <u>id</u>. ¶¶ 764-85.  And two claims under the laws of Minnesota.[13]  <u>See</u> <u>id</u>. ¶¶ 733-63.

The focus here is on one of the Minnesota claims, under the state's Consumer Fraud Act.  <u>See</u> Minn. Stat. § 325F.68-70 (2025).

### C.    <u>The Motion</u>

The Defendant has now moved to dismiss the Plaintiff's Minnesota Consumer Fraud Act claim.  <u>See</u> Memorandum of Law in Support of Defendants Celgene Corporation and Bristol-Myers Squibb Company's Motion to Dismiss ("Defendants' Brief") (ECF 531-1) at 1.

It contends that the Minesota Consumer Fraud Act claim cannot go forward.[14]

---

[11]  Recall: United Healthcare Services, Inc.

[12]  Recall: Celgene Corporation.

[13]  Note that, per the complaint, the Plaintiff is a Minnesota-based corporation; it is incorporated under Minnesota law; and its corporate parent's HQ is in Minnesota.  <u>See</u> Complaint ¶ 11.

[14]  The Defendants previously raised similar arguments.  <u>See</u> Memorandum of Law in Support of Defendants Celgene Corporation and Bristol-Myers Squibb Company's Motion to Dismiss (ECF 104-1) at 51-53, 55-57.  The Court declined to reach those arguments then.  <u>See</u> <u>In re Revlimid & Thalomid Purchaser Antitrust Litig.</u>,

6

First, because it is meritless.  See id. at 3-8; Reply in Support of Defendant Celgene Corporation's Motion to Dismiss ("Defendant's Reply") (ECF 541) at 1-4.

And second, because there is no cause of action.  So whatever the Minesota Consumer Fraud Act does or does not prohibit --- the Plaintiff cannot seek relief in court based on it.  See Defendants' Brief at 8-9; Defendant's Reply at 4-5; Defendants' Sept. 22, 2025 Letter (ECF 566) at 1.

The Plaintiff sees things differently.

The claim has merit, it argues.  See Plaintiff United Healthcare Services, Inc.'s Memorandum of Law in Opposition to Defendant Celgene Corporation's Motion to Dismiss (Issue E) ("Plaintiff's Opposition") (ECF 537) at 1-9.  And there is a cause of action. See id. at 2, 9-10.

## II.  Where To Start

As this Part explains, to analyze the Defendant's motion, the natural place to begin is with the question of whether there is a cause of action here.

As to why, look to some basic principles.

*    *    *

Before an injured person can file a lawsuit, at least two things are usually required from him.

First, there must be a relevant body of substantive law that he can point to --- law that lays out the standards that were assertedly violated.

And second, the injured person must also have a cause of action --- a bit of legal authority[15] that gives him in particular the right to come into court, and to invoke the substantive law that is said to have been broken.[16]

_____

2024 WL 2861865, at *22 (D.N.J. June 6, 2024); see also Defendants' Brief at 1 n.2.  But it takes them up now.

[15]  In whatever form.  A statute, for example, or sometimes a common-law rule.  See footnotes 18 and 19.

[16]  "Cause of action" and "right of action" are often used as synonyms.  These terms have meant different things at different times.  See Samuel L. Bray & Paul B. Miller, Getting Into

7

* * *

To see all of this, walk through some examples.

Certain manufacturers have to make a report when particular products are defective.  Federal substantive law imposes this duty on them.  See 15 U.S.C. § 2064(b).

But a person injured by a defective product that was not reported cannot sue based on the non-report.  See, e.g., Kloepfer v. Honda Motors Co., 898 F.2d 1452, 1457 (10th Cir. 1990); In re All Terrain Vehicle Litig., 979 F.2d 755, 756-57 (9th Cir. 1992); Benitez-Allende v. Alcan Aluminio do Brasil, S.A., 857 F.2d 26, 35 (1st Cir. 1988); see also Newlin v. Invensys Climate Controls, 2006 WL 2385079, at *4-5, *7 (D.N.J. Aug. 16, 2006).

The reason why not: he has "no . . . cause of action." Kloepfer, 898 F.2d at 1457.[17]

Another example.

Per federal substantive law, eligible Medicaid beneficiaries can go to any "qualified" doctor.  See 42 U.S.C. § 1396a(a)(23)(A). But what if a state puts certain doctors out of bounds --- can a private person then go ahead and sue, invoking the substantive law rule?  No, because the private person has no cause of action.  See Medina v.  Planned Parenthood of S. Atl., 606 U.S. 357, 364, 385-86 (2026).

A last example.

As a matter of substantive constitutional law, there can be no "unreasonable searches."  See U.S. Const. amend. IV.  Federal officials have a duty to follow this rule, as part of their obligation to "take Care that the Laws be faithfully executed." Id. art. II, § 3.  But whether a person injured by an unlawful

_____

Equity, 97 Notre Dame L. Rev. 1763, 1770-72 (2022).  On today's main meaning, a person has a cause of action (or a right of action) if he in particular has "a legal entitlement to sue," if "there is some legal authority . . . that allows the plaintiff to come into court in the first place."  Id. at 1771.

[17]  Therefore, "enforcement of the . . . reporting requirement[] lies exclusively with the [government] and its pursuit of fines, injunctions or imprisonment."  Fitzgerald v. Mannington Carpets, Inc., 1994 WL 395743, at *4 (D. Md. July 12, 1994).

search has a right to come into court and sue --- that is a separate question.  It depends on whether there is an applicable cause of action available to her.  Under 42 U.S.C. § 1983.[18]  Or under <u>Bivens</u> v. <u>Six Unknown Named Agents of the Fed. Bureau of Narcotics</u>, 403 U.S. 388 (1971).[19]

*    *    *

The above examples illustrate the main takeaway.

Namely, to come into court, an alleged breach of the substantive law is generally necessary but not sufficient.  To sue, an injured person must <u>also</u> be able to point to a cause of action/right of action.  To a piece of legal authority that empowers the plaintiff --- the plaintiff in particular, himself --- to go to court, and to seek relief there based on a violation of the law.[20]

---

[18]  If the search was done by a state official.  (Note that the Section 1983 "cause of action carries with it certain limits on who can be sued and in what circumstances." <u>Pasquale</u> v. <u>Borough of Mountainside</u>, 2025 WL 3033989, at *2 (D.N.J. Oct. 30, 2025).  Similarly, the Minnesota cause of action put on the table here imports its own limits on how it can be used.  More on that in Part III.A.)

[19]  If the search was by a federal official.  For a case in which there was an allegedly unlawful search but the assertedly injured party could not come into court, for lack of a <u>Bivens</u> right of action, see, for example, <u>Hernandez</u> v. <u>Mesa</u>, 589 U.S. 93 (2020).

[20]  In some contexts, it is taken for granted that a right of action comes along with a particular substantive law duty.  The right of action and the substantive law duty are thought of as all but necessarily bundled together, irreducible parts of the same package.  Think of an everyday car-accident tort suit.  Is there a cause of action that allows the suit to go forward? Almost always: yes, and plainly so.  The question seems obscure (and the answer seems obvious) in part because it has been treated as a given for so long that "[a] tort assumes [<u>both</u>] that A has a duty to B not to interfere with certain cognizable interests, <u>and</u> [that] the breach of the duty by A gives B the legal power to seek compensation [in court]."  E. Garrett West, <u>Refining Constitutional Torts</u>, 134 Yale L.J. 858, 878 (2025) (emphasis added).  Why did this view first take hold?  Maybe, in part, because some of the classic parts of our private law are

9

As the Third Circuit has explained, "[t]o sue in federal court, a plaintiff" must arrive at the courthouse with "a cause of action." United States v. Hallinan, 75 F.4th 148, 151 (3d Cir. 2023). It is that cause of action that "gives the injured party the right to sue for redress." Id.

*    *    *

As a matter of federal law, determining whether there is a cause of action is generally something to work through at the beginning of a case. See, e.g., Vanderklok v. United States, 868 F.3d 189, 197 (3d Cir. 2017) ("the issue of whether a cause of action even exists . . . is a threshold question").[21]

---

built in a "relational" way. See E. Garrett West, Constitutional Private Law, 103 Wash. U. L. Rev. 409, 416-17, 419-23 (2025). And where that is the case, the substantive law not only assigns a duty to a possible defendant --- but also seems to indicate (implicitly, though with real specificity) who the possible plaintiff is. To make out a tort claim, for example, the substantive law generally requires A to have had a duty to B --- to B in particular. And that largely answers the who-can-sue question. B can. Because the substantive law veers close, on its own, to implicitly answering the who-can-sue question, there has perhaps been less of a felt need to separately address that question --- through a free-standing cause of action/right of action analysis. Same rough points as to contract law. The substantive law is generally that C has a duty to abide by contracts, but only those she has signed --- for example, a contract with counterparty D. Under the substantive law, C is not allowed to violate her contractual obligation to D. And that essentially answers the who-can-sue question. D can. If that is cleared up by the substantive law, why go down the road of a free-standing cause of action/right of action analysis?

[21] See also, e.g., Elhady v. Unidentified CBP Agents, 18 F.4th 880, 881 (6th Cir. 2021) ("the first question a court should ask is whether a cause of action exists"); R.I. Dep't of Env't Mgmt. v. United States, 304 F.3d 31, 40 (1st Cir. 2002) ("the question of whether the [plaintiff] . . . has a valid cause of action is an important one that we address as a threshold issue"); see also Crane Co. v. Am. Standard, Inc., 603 F.2d 244, 248 (2d Cir. 1979) (referring to "the threshold determination of whether the plaintiff possesses a cause of action"); Raypath, Inc. v. City

10

Similarly, Minnesota law takes the cause of action question as one to resolve early on.  Under Minnesota law, the cause of action question can be a jurisdictional one.[22]  See State ex rel. McClure v. Sports & Health Club, Inc., 370 N.W.2d 844, 850 (Minn. 1985); accord Marine Credit Union v. Detlefson-Delano, 830 N.W.2d 859, 864 n.3 (Minn. 2013) (same); Bank of Am., N.A. v. Smith, 2014 WL 3801306, at *2 (Minn. Ct. App. Aug. 4, 2014) (same); cf. State v. Dist. Ct. of Ramsey Cnty., 114 Minn. 364, 366 (1911) ("The jurisdiction of the district court . . . depend[s] . . . upon the right of action.").

And under Minnesota law,[23] such jurisdictional issues must come first.  See Martin v. Simon, 6 N.W.3d 443, 450 (Minn. 2024).

*    *    *

In a nutshell: the question of whether there is a cause of action should generally be resolved at the outset of the case, under both federal law and Minnesota law.

So the Court will start there.

### III.  The Cause of Action

Is there a cause of action that lets the Plaintiff-insurance company --- itself, in particular --- sue here under the Minnesota Consumer Fraud Act?

The Minnesota Consumer Fraud Act "does not generally provide a private right of action."  Defendants' Brief at 8-9; see, e.g., In re Nat'l Arb. F. Trade Pracs. Litig., 704 F. Supp. 2d 832, 838-39 (D. Minn. 2010) (citing Wiegand v. Walser Auto. Grps., Inc., 683 N.W.2d 807, 809 (Minn. 2004)); Stone v. Invitation Homes, Inc., 986 N.W.2d 237, 250 (Minn. Ct. App. 2023).

---

of Anchorage, 544 F.2d 1019, 1021 (9th Cir. 1976) ("As a threshold matter, we may examine the question whether a private cause of action exists in favor of a particular plaintiff.").

[22]  This is a bit different than federal law.  See, e.g., Burks v. Lasker, 441 U.S. 471, 476 n.5 (1979) ("The question whether a cause of action exists is not a question of jurisdiction, and therefore may be assumed without being decided."); Hallinan, 75 F.4th at 151 ("a cause of action is not jurisdictional").

[23]  As under federal law.  See Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 94-95 (1998).

11

Therefore, private litigants who want to file a Minnesota Consumer Fraud Act claim must generally look elsewhere for a cause of action.[24]

Typically, plaintiffs aim to use Minnesota's Private Attorney General Statute ("the Private AG statute"), Minn. Stat. § 8.31 subdiv. 3a (2025). See Event Sales, Inc. v. TJX Cos., 793 F. Supp. 3d 1013, 1040 (D. Minn. 2025).

The Private AG statute sometimes gives private entities a cause of action that allows them to sue based on alleged violations of the Minnesota Consumer Fraud Act. See Semler v. Eastbay Inc., 2021 WL 1245266, at *1 (Minn. Ct. App. Apr. 5, 2021); Kramer v. Ford Motor Co., 2016 WL 827746, at *25 (D. Minn. Feb. 29, 2016); see also Graphic Commc'ns Loc. 1B Health & Welfare Fund A v. CVS Caremark Corp., 850 N.W.2d 682, 693 (Minn. 2014); Plaintiff's Opposition at 9.

And that is the cause of action that the Plaintiff invokes in this case. See Complaint ¶ 752; see also Plaintiff's Opposition at 9.

*    *    *

Can the Plaintiff use the Private AG statute cause of action here?

The parties disagree. Compare Plaintiff's Sept. 22, 2025 Letter (ECF 567) at 1 (yes), with Defendants' Sept. 22, 2025 Letter at 1 (no).

To begin resolving this dispute, look to the statute and the Minnesota Supreme Court's interpretation of it.

### A.    The Public Benefit Rule

In its key case in this area, Ly v. Nystrom, the Minnesota Supreme Court explained that the Private AG statute makes "sweeping remedies" available to private litigants. 615 N.W.2d 302, 311 (Minn. 2000). And the Minnesota Supreme Court

---

[24] "Generally" because in 2023= Minnesota added a Consumer Fraud Act cause of action, but only for "natural person[s] or family farmer[s]." Minn. Stat. § 325F.70, subdiv. 3 (2025); see also Event Sales, Inc. v. TJX Cos., 793 F. Supp. 3d 1013, 1040 (D. Minn. 2025). That has no bearing here. The Plaintiff is a corporation. See Complaint ¶ 11.

suggested that this spun off "concern about how broadly the legislature intended the statute to be applied."  Id.

With this in mind, the high court looked to the "history of the passage of the Private AG [s]tatute" --- and concluded that "the statutory purpose" of the law was only to empower "injured private parties to enforce the unlawful business practices statutes as a substitute for the attorney general."  Id. (emphasis added).

The state's Attorney General, the Supreme Court suggested, was understood to be too busy to handle all meaningful consumer fraud in Minnesota.  See id. (discussing the history).

So the Private AG statute, per the Court, was put there to seal up the enforcement gap --- by allowing private entities to go into the breach themselves, and to sue as the Attorney General himself would have been able to.  See id. at 313 ("[the Private AG statute] provides a reward to private parties for . . . functions that, to that point, had been the responsibility of the attorney general").

And because the Private AG statute "grants private citizens the right to act as a 'private' attorney general," it follows --- and this is critical --- that "the role and duties of the attorney general with respect to enforcing the fraudulent business practices laws must define the limits of the private claimant under the statute."  Id. (emphasis added).[25]

On this understanding, a "private attorney general" can step into the actual Attorney General's shoes.  But the private AG cannot try on a bigger pair --- purporting to assume powers that the actual Attorney General does not himself have.

---

[25]  See also Jensen v. Duluth Area YMCA, 688 N.W.2d 574, 578 (Minn. Ct. App. Nov. 16, 2004); Khoday v. Symantec Corp., 858 F. Supp. 2d 1004, 1016 (D. Minn. 2012); Andersen ex rel. Peter J. Andersen, Sr. Fam. Tr. v. Karahalios, 2018 WL 1247063, at *5 (Minn. Ct. App. Mar. 12, 2018); see also Behrens v. United Vaccines, Inc., 228 F. Supp. 2d 965, 969 (D. Minn. 2002) ("Since the private litigant would be acting in lieu of the Attorney General, the scope of the Attorney General's roles and duties, would properly define the scope of the private litigant's roles and duties."); Berczyk v. Emerson Tool Co., 291 F. Supp. 2d 1004, 1019 (D. Minn. 2003).

13

"[T]he sweep of the [Private AG] statute can be no broader than the source of its authority --- that of the attorney general[.]" Ly, 615 N.W.2d at 313.[26]

\*     \*     \*

"[T]he role and duties of the attorney general . . . must define the limits of the private [attorney general]."  Ly, 615 N.W.2d at 313.

What are those?

"The duty of the attorney general's office, and thus the purpose of any statute granting private citizens authority to bring a lawsuit in lieu of the attorney general, is the protection of public rights and the preservation of the interests of the state."  Id. (emphasis added).

It follows that a private plaintiff who wants to bring a claim via the Minnesota Private AG statute must satisfy the same "public" test as the Attorney General.

And so the bottom line: private plaintiffs can use the Private AG statute cause of action only if they first "demonstrate that their cause of action benefits the public."  Id. at 314 (emphasis added); see also 27 Michael K. Steenson, J. David Price & Shane A. Anderson, Minnesota Practice: Products Liability Law §§ 6.12-13 (2025-2026 ed.).

### B.    An Implication of the Rule

Applying the just-referenced "public benefit" rule, courts have developed fine-spun doctrines as to the kinds of cases in which there is a private-party right of action under the Minnesota Private AG statute.

But the details of these doctrines can distract from the key 30,000-foot fact: in a given circumstance, a private party's ability to go into court in an affirmative-enforcement capacity

---

[26]  To be sure, there are some differences when a lawsuit is brought by the Minnesota Attorney General rather than by a private plaintiff.  Differences as to settlement, for example. See Curtis v. Altria Grp., Inc., 813 N.W.2d 891, 901 (Minn. 2012).  And remedies.  See Findling v. Grp. Health Plan, Inc., 998 N.W.2d 1, 7 n.4 (Minn. 2023).  But these do not matter here.

14

seems to be coterminous with the ability of the Minnesota AG to himself affirmatively go into court.

Subject to some exceptions not relevant here,[27] private and public enforcement powers rise and fall together.  They are a yoked pair.

This means that any decision by the Court here, about whether the Plaintiff has a cause of action on the allegations in this case --- that is tantamount to a decision as to whether the Minnesota Attorney General could himself proceed in a case like this one.[28]

*    *    *

A federal court should be especially careful when it comes to issuing a decision that necessarily rests on a particular understanding of the scope of a key state official's authority --- a decision that, later, might be cited as precedent for limiting the state official's power, or for expanding it.

Before issuing a decision here that is implicitly predicated on a view as to the reach of the Minnesota Attorney General's power, common sense suggests that the Court should consider asking the Attorney General for his views.

Can this be done?  Take that up in Part IV.  Should it be done? Work that through in Part V.

## IV.    Can the Court Ask?

Can a federal court, sua sponte, seek to learn the legal position of an impacted non-party, like the Minnesota Attorney General here?

Yes.  "[D]istrict courts possess inherent authority to appoint 'friends of the court' to assist in their proceedings."  In re Bayshore Ford Truck Sales, Inc., 471 F.3d 1233, 1249 n.34 (11th Cir. 2006) (citations omitted); see also In re Domestic Airline

---

[27]  See footnote 26.

[28]  As to the Minnesota Attorney General's affirmative enforcement powers, see, for example, Head v. Special Sch. Dist. No. 1, 288 Minn. 496, 503 (1970) (describing his powers to "institut[e] proper proceedings to secure the enforcement of law"), abrogated on other grounds by, Nyhus v. Civ. Serv. Bd., 305 Minn. 184 (1975).

15

Travel Antitrust Litig., 2025 WL 2760374, at *7 (D.D.C. Sept. 29, 2025); Price v. Corzine, 2006 WL 2252208, at *2 (D.N.J. Aug. 7, 2006); Smith v. Chrysler Fin. Co., 2003 WL 328719, at *8 (D.N.J. Jan. 15, 2003).

And federal courts have exercised this "inherent authority" to seek outside input on a sua sponte basis, unprompted by a party.

The Supreme Court has done this.[29]  So have the courts of appeals.[30]  And the district courts, too.[31]

---

[29]  See, e.g., Chase Bank USA, N.A. v. McCoy, 562 U.S. 195, 209 (2011); Levinson v. Spector Motor Serv., 330 U.S. 649, 654 (1947).

[30]  See, e.g., Ashby v. Warrick Cnty. Sch. Corp., 908 F.3d 225, 227 (7th Cir. 2018) ("Because resolution of the appeal turns on the proper interpretation and application of statutory and regulatory language on which we have little precedent, we invited the Department of Justice, the agency charged with the administration of the statute, to submit a brief as amicus curiae."); Qwest Corp. v. Colo. Pub. Utils. Comm'n, 656 F.3d 1093, 1098 (10th Cir. 2011) ("At our invitation, the FCC filed an amicus brief."); Empire Rayon Yarn Co. v. Am. Viscose Corp., 364 F.2d 491, 492 (2d Cir. 1965) ("Because of the importance of the issue involved, the Court, sua sponte, requested the Federal Trade Commission to submit a brief amicus curiae on the issues raised by this case.") (cleaned up); Goldberg v. Faber Indus., Inc., 291 F.2d 232, 235 (7th Cir. 1961) ("This Court sua sponte invited the Interstate Commerce Commission to file a brief amicus curiae."); J.M. Huber Corp. v. Denman, 367 F.2d 104, 111 (5th Cir. 1966) ("In this and the other case this Court was of the view that the public interest in this question loomed so large, that the Court should have at least the tentative views of the FPC. Accordingly, this Court requested that agency to file a brief amicus.").

[31]  See, e.g., Lopez v. Bank of Orrick, 2024 WL 6952824, at *2 (N.D. Ill. Sept. 26, 2024) ("The Court invited the [Consumer Financial Protection] Bureau to file an amicus brief on this question of statutory and regulatory interpretation."); Cheetham v. CSX Transp., 2012 WL 1424168, at *2 (M.D. Fl. Feb. 13, 2012) ("the Court invited the Commissioner of Internal Revenue to file an amicus curiae brief"); Costello v. Dugger, 353 F. Supp. 1324, 1325 (M.D. Fl. 1972) (sua sponte appointing the United States as amicus curiae in civil actions brought by inmates against the Florida Division of Corrections); Pegues v. Miss. State Emp. Serv., 57 F.R.D. 102, 103 (N.D. Miss. 1972) ("At the invitation

16

And courts at every level of the federal judiciary have asked state attorneys general to file amicus briefs.  See, e.g., Melrose Distillers, Inc. v. United States, 358 U.S. 878, 878 (1958); Wenger v. Frank, 266 F.3d 218, 225 (3d Cir. 2001); United States v. Castillo, 896 F.3d 141, 147 (2d Cir. 2018); Gowanus Indus. Park, Inc. v. Hess Corp., 2011 WL 1431621, at *1, *8 (E.D.N.Y. Apr. 8, 2011).

In short: sua sponte, a federal district court can ask a nonparty --- including a state attorney general --- to weigh in on a pending legal question.

That tees up the next question: should the Court exercise that authority in this case, as to the Minnesota AG's position on the Minnesota Private AG statute?

Take that up now.

## V.    Should the Court Ask?

There is no "statute, rule or binding judicial precedent controlling a district court's power[s]" with respect to "amicus participation."  Dobson Mills Apartments, L.P. v. City of Philadelphia, 2022 WL 558348, at *1 (E.D. Pa. Feb. 23, 2022); see also, e.g., Behar v. Pa. Dep't of Transp., 791 F. Supp. 2d 383, 389 n.1 (M.D. Pa. 2011); Sec. & Exch. Comm'n v. Ripple Labs, Inc., 2021 WL 4555352, at *5 (S.D.N.Y. Oct. 4, 2021); Flaws v. Akal Sec., Inc., 2020 WL 3317611, at *1 (W.D. Mo. June 18, 2020); Club v. Fed. Emergency Mgmt. Agency, 2007 WL 3472851, at *1 (S.D. Tex. Nov. 14, 2007); U.S. ex rel. Gudur v. Deloitte Consulting LLP, 512 F. Supp. 2d 920, 927 (S.D. Tex. 2007).

Instead, whether to allow amicus briefing is a discretionary call.  See, e.g., Waste Mgmt. of Pa., Inc. v. City of York, 162 F.R.D. 34, 36 (M.D. Pa. 1995); Ferguson v. Shinn, 2023 WL 10512175, at *24 (D. Ariz. Oct. 27, 2023); Sec. & Exch. Comm'n v. Bittrex Inc., 2023 WL 4866373, at *1 (W.D. Wash. July 31, 2023); Texas v. United States, 2021 WL 2172837, at *1 (S.D. Tex. Mar. 5, 2021); Jin v. Ministry of State Sec., 557 F. Supp. 2d 131, 136 (D.D.C. 2008); Am. Humanist Ass'n v. Md.-Nat'l Cap. Park & Planning Comm'n, 303 F.R.D. 266, 269 (D. Md. 2014).

---

of the court the Secretary [of Labor] has filed a brief amicus.").

17

In deciding how to exercise that discretion, federal courts tend to consider three main factors.[32]  See, e.g., Kyocera Document Sols. Am., Inc. v. Div. of Admin., 708 F. Supp. 3d 531, 542 n.16 (D.N.J. 2023); Bernard v. Cosby, 2022 WL 3273877, at *1 (D.N.J. Aug. 11, 2022); Granillo v. FCA US LLC, 2018 WL 4676057, at *4 (D.N.J. Sept. 28, 2018); Pro. Drug Co. v. Wyeth Inc., 2012 WL 4794587, at *1 (D.N.J. Oct. 3, 2012); McVicker v. King, 2009 WL 10674503, at *1 (W.D. Pa. Apr. 30, 2009); Feesers, Inc. v. Michael Foods, Inc., 2006 WL 8448763, at *1 (M.D. Pa. Mar. 21, 2006); Liberty Res., Inc. v. Phila. Hous. Auth., 395 F. Supp. 2d 206, 209 (E.D. Pa. 2005); Sciotto v. Maple Newtown Sch. Dist., 70 F. Supp. 2d 553, 555 (E.D. Pa. 1999); Save the Manatee Club v. U.S. Env't Prot. Agency, 2022 WL 19918052, at *1 (M.D. Fla. Nov. 22, 2022).

Move through these three factors below, plus a fourth.

### A.   Interest

The first factor: does the proposed "amicus curiae ha[ve] a 'special interest' in the particular case"?  Bernard, 2022 WL 3273877, at *1 (cleaned up).

Here, yes.

As explained above, Minnesota's Attorney General would seem to have a practical stake in the resolution of the cause of action question on the table here.  Determining whether there is a

---

[32]  Some cases also speak of another factor: whether "the [nonparty] is not partial to a particular outcome in the case."  Bernard v. Cosby, 2022 WL 3273877, at *1 (D.N.J. Aug. 11, 2022). Amicus briefs may, perhaps, be especially valuable when they are filed by an impartial entity.  See Voices for Choices v. Ill. Bell Tel. Co., 339 F.3d 542, 545 (7th Cir. 2003); Ryan v. Commodity Futures Trading Comm'n, 125 F.3d 1062, 1063 (7th Cir. 1997); United States v. Michigan, 940 F.2d 143, 164-65 (6th Cir. 1991); U.S. ex rel. Hooper v. Lockheed Martin Corp., 2014 WL 12561070, at *4 (C.D. Cal. Jan. 17, 2014); United States v. Bayer Corp., 2014 WL 12625934, at *1 (D.N.J. Oct. 23, 2014); United States v. Alkaabi, 223 F. Supp. 2d 583, 592 (D.N.J. 2002).  But the requirement that an amicus be disinterested is "outdated."  Neonatology Assocs., P.A. v. C.I.R., 293 F.3d 128, 129, 131 (3d Cir. 2002); see also Tenafly Eruv Ass'n, Inc. v. Borough of Tenafly, 195 F. App'x 93, 99 n.8 (3d Cir. 2006).

cause of action under the Minnesota Private AG statute will generate, by a kind of bank shot, a de facto statement as to the scope of the Minnesota Attorney General's affirmative-enforcement powers.

### B.    Representation

In thinking through possible amicus participation, a second question is whether the potential "amicus curiae's interest is . . . [already] represented . . . in the case." Bernard, 2022 WL 3273877, at *1 (cleaned up).

Not here.

The parties' legal papers do not allude to the possibility noted in this Opinion --- that a Private AG statute ruling in this case could have implicit knock-on effects on the reach of the Attorney General's affirmative-enforcement power.

Accordingly, amicus briefing from the Minnesota Attorney General would likely surface a viewpoint that is not reflected what has been put before the Court.

### C.    Usefulness

A third factor: whether the possible amicus' views could be "useful." Bernard, 2022 WL 3273877, at *1 (cleaned up).

Yes. The Minnesota Attorney General surely has great expertise as to the relevant issue. And he may well have a considered, long-standing[33] set of legal positions in this area --- that are reflected in, say, internal guidance documents[34] or filings from other litigations.

---

[33] Under Minnesota law, a "longstanding application" of the law by the state executive branch can sometimes get deference. See 21 William J. Keppel, Minnesota Practice: Administrative Practice & Procedure § 14.05.1 (2d ed. 2025); see also In re Est. of Ecklund, 20 N.W.3d 351, 360 (Minn. 2025); Lagasse v. Horton, 982 N.W.2d 189, 199 (Minn. 2022).

[34] It is possible that the parties cannot readily access these sorts of internal materials. But as an amicus, the Minnesota Attorney General might opt to bring them forward, and that could prove "useful."

19

In addition, part of the "use" here of amicus participation might be learning about the Attorney General's track record and what it says about the scope of his authority.

For example, are there enforcement actions that the Minnesota Attorney General has previously brought that rest on a broader conception of his power than might be suggested by a holding, in this case, that there is no cause of action under the Private AG statute?

On the flip side, has the Minnesota Attorney General taken the position that he lacks the power to pursue certain enforcement actions --- and in doing so has endorsed a narrower view of his power than might be implied by a holding, here, that there is a Private AG statute cause of action?

And note that, per the Plaintiff, certain government enforcement entities have pursued actions against the "independent" charities that fund patients' co-pays --- zeroing in on "precisely the type of conduct" alleged in this case. See Complaint ¶¶ 673-676, 675 n.229. Has the Minnesota Attorney General pressed any such actions?[35]

---

[35] The Minnesota Attorney General's views might be especially "useful" if it gets deference. As to whether it does, there might be arguments on both sides. For example, the Minnesota Supreme Court has instructed that, in cases where "the meaning of a statute is doubtful, courts should give great weight to a construction placed upon it by the Department charged with its administration." Mammenga v. State Dep't of Hum. Servs., 442 N.W.2d 786, 792 (Minn. 1989) (cleaned up); see also Est. of Atkinson v. Minn. Dep't of Hum. Servs., 564 N.W.2d 209, 213 (Minn. 1997) (same); Minn. Transitions Charter Sch. v. Comm'r of Minn. Dep't of Educ., 844 N.W.2d 223, 231 (Minn. Ct. App. 2014) (same). Given the relationship between (i) the Minnesota Private AG statute and (ii) the scope of the powers of the Minnesota Attorney General --- might Minnesota's "charged with administration" deference be in play? Or does the (i)/(ii) relationship cut the other way, and suggest that there can be no deference here? After all, the scope of the Private AG statute speaks indirectly to the scope of the Minnesota Attorney General's power. And Minnesota agencies get no deference as to statutes that map out their own jurisdiction. See, e.g., Frost-Benco Elec. Ass'n v. Minn. Pub. Utils. Comm'n, 358 N.W.2d 639, 642 (Minn. 1984); see also In re Hubbard, 778 N.W.2d 313, 318 n.4 (Minn. 2010).

20

### D.    <u>Novelty</u>

Look now to a fourth and final reason to solicit the views of the Minnesota Attorney General.

The core question here, as noted, is whether there can be a cause of action under the Minnesota Private AG statute in the circumstances of this case.

That seems to raise a novel question.  To see the point, take it from two sides --- the price aspect of the Plaintiff's theory here, and the volume aspect.  <u>See</u> <u>generally</u> Part I.A.

*    *    *

Price <u>first</u>.

Recall that the Plaintiff's Minnesota Consumer Fraud Act claim rests in part on the idea that charities' subsidies of insurance-related-costs[36] helped the Defendant to keep the price of the drug high --- by releasing the pressure that otherwise would have welled up to get the drug's price down.  This is the safety-valve theory discussed in Part I.A.[37]

---

[36]  As defined in Part I.A.

[37]  The theory is <u>not</u> that the Defendant sought to have charities pay patients' insurance-related-costs so that patients would have a strong reason to buy <u>today</u> (while prices are higher, because of the monopoly-like conditions allowed to an extent by patent law) rather than <u>tomorrow</u> (when prices would potentially be lower, as generics come online and the monopoly accordingly loosens up).  To a pharmaceutical company, the economic logic of such a set-up would not be hard to see.  If prices will predictably fall over time, a monopolist will generally wish to set prices at time one with an eye to what they will be at time two --- because otherwise consumers will sit on the sidelines at time one, waiting for a price-drop at time two.  <u>Cf</u>. Francesco Nava & Pasquale Schiraldi, <u>Differentiated Durable Goods Monopoly: A Robust Coase Conjecture</u>, 109 Am. Econ. Rev. 1930, 1930 (2019) (discussing the Coase conjecture); R.H. Coase, <u>Durability and Monopoly</u>, 15 J.L. & Econ. 143-49 (1972).  But that would probably make little sense here --- a cancer patient cannot simply wait for a drug she needs now.  And in any event, the Court does not take the Plaintiff to be pressing this argument.

21

This is not an everyday, off-the-rack legal theory.  The parties' briefs do not spotlight any cases that address it in an on-point way.

Thinking about whether the Minnesota Private AG statute allows for a lawsuit as to this relatively novel substantive claim makes, itself, for a relatively novel cause of action question.

*    *    *

Note now the <u>second</u> aspect of the Plaintiff's Minnesota Consumer Fraud Act claim.  This is the volume-related theory.  <u>See generally</u> Part I.A.

The theory is that the charities allegedly funded by the Defendant-pharmaceutical company induced people to buy more of the drug in the aggregate than they otherwise might have, with the Plaintiff-insurance company left to cover the cost of that many more prescriptions.  <u>See</u> Complaint ¶¶ 653, 655, 671-72, 682, 753, 756.

As a matter of substantive law, this is arguably somewhat more analogous to familiar sorts of fraud.

But it still raises novel questions as to whether there is a cause of action.

Some cases, for example, suggest that a private party cannot use the Minnesota Private AG statute where the underlying fraud claim stems from "private contracts."[38]  That might potentially suggest that there can be no cause of action here.  Because at the heart of this case are the insurance contracts that linked the Plaintiff-insurance company with the cancer patients who received the drug.  <u>See</u> <u>id</u>. ¶ 760.

But what if that is the wrong contractual relationship to look to?  Maybe what matters is whether there was or was not a contract between the cancer patients and the charities that allegedly paid part of their insurance-related-costs?  The caselaw does not directly answer.

---

[38]  <u>Adams</u> v. <u>Rosensteel</u>, 2013 WL 6223562, at *6 (Minn. Ct. App. Dec. 2, 2013); <u>see also</u>, e.g., <u>Tyler Holdings, Inc.</u> v. <u>JJT, LLC</u>, 2008 WL 5136443, at *1, *8 (Minn. Ct. App. Dec. 9, 2008).

22

Or maybe "private contracts" do not weigh against a cause of action if the alleged fraud is especially widespread?[39]  But is a fraud widespread enough if, as here, it has only one main alleged victim that is a party to the case?[40]

The Court expresses no view here on any of this.  The point of raising these questions is only to suggest that there are potentially novel issues in the mix.  How they map onto the existing caselaw may not be obvious.

---

[39]  See, e.g., Workers' Comp. Reinsurance Ass'n v. Wells Fargo Bank, N.A., 2012 WL 1253094, at *11 (Minn. Ct. App. Apr. 16, 2012); Mooney v. Allianz Life Ins. Co. of N. Am., 2009 WL 511572, at *3 (D. Minn. Feb. 26, 2009).

[40]  See, e.g., Schaaf v. Residential Funding Corp., 2006 WL 2506974, at *16 (D. Minn. Aug. 29, 2006) (no cause of action where "Plaintiffs s[ought] to pursue relief on behalf of [only] a number of investors"); Burtch v. Oakland Park, Inc., 2006 WL 1806196, at *6 (Minn. Ct. App. July 3, 2006) (no cause of action because "the mere fact that certain misrepresentations would affect a finite group of tenants was not enough from which to infer that the general public would be benefited by the action"); Thorkelson v. Publ'g House of Evangelical Lutheran Church in Am., 764 F. Supp. 2d 1119, 1132 (D. Minn. 2011); Cedillo v. Igbanugo, 2019 WL 2168766, at *1, *8 (Minn. Ct. App. May 20, 2019) (no cause of action in a malpractice suit by three former clients, because there was no public benefit).  But see Schaff v. Chateau Communities, Inc., 2005 WL 1734031, at *4 (Minn. Ct. App. July 26, 2005) (confirming the existence of a cause of action where the defendant "is in a business that has the potential to affect an even larger number of people, and the resolution of th[e instant] case could extend to . . . other" similarly situated persons); Varela v. State Farm Mut. Auto. Ins. Co., 655 F. Supp. 3d 813, 824-25 (D. Minn. 2023) (same, where relief might require an insurer "to change all its contracts with insureds"); McDougall v. CRC Indus., Inc., 523 F. Supp. 3d 1061, 1075-76 (D. Minn. 2021) (same, where a win for the plaintiff "may lead to changes that have a distinct public benefit by deterring . . . abuse").  Note that if an alleged fraud plausibly kept prices artificially high across the board, it could potentially have had many more victims --- not just the customers of the Plaintiff-insurance company, but everyone who paid more for the drug.  The higher-prices aspect of this case might conceivably involve a public benefit in ways that the higher-volume aspect of the case does not.

And that is another reason to seek the Minnesota Attorney General's views.

\*    \*    \*

To see why, take an analogy.

Under the supplemental jurisdiction statute, when a plaintiff presses a claim that "raises a novel . . . issue of [s]tate law"[41] --- that can be a reason for a federal court to let the case run forward in state court.  See, e.g., Combs v. Homer-Ctr. Sch. Dist., 540 F.3d 231, 253-54 (3d Cir. 2008); Specht v. Suarez, 798 F. Supp. 3d 485, 508 (D.N.J. 2025); see also Pinkston v. City of Jersey City, 699 F. Supp. 3d 298, 305 (D.N.J. 2023).

The federal court can resolve the novel state-law issue.  But why not allow the state court to handle it?  After all, "[s]tate judges are the experts on state law."  Courney v. City of Englewood, 793 F. Supp. 3d 615, 628 n.23 (D.N.J. 2025) (collecting cases).

The analogy to Section 1367 is not perfect.  But it sheds light anyway.

Given the "novel[ty]" of some of the questions here, and the Minnesota Attorney General's undoubted "expert[ise]" as to the scope of his own powers --- why not invite him to participate here as an amicus?[42]

## VI.   Conclusion

For the reasons set out above, the Court will invite the Attorney General of Minnesota to submit an amicus brief as to

---

[41]   28 U.S.C. § 1367(c)(1).

[42]   Minnesota is "a sovereign entity in our federal system." Seminole Tribe of Fla. v. Florida, 517 U.S. 44, 54 (1996). Federal courts must show appropriate respect for "the dignity . . . inhering in that [sovereign] status."  Alden v. Maine, 527 U.S. 706, 714 (1999).  And "comity is not limited to the judicial branch of a state government."  Calderon v. Thompson, 523 U.S. 538, 552 (1998).  The views of a state's executive branch should also be given due weight.  See id.  And the Attorney General is at the heart of Minnesota's.  See Minn. Const. art. V, § 1.

whether, on the allegations in this case, the Plaintiff can use the cause of action in the Minnesota Private AG statute to bring the Minnesota Consumer Fraud Act claim that it seeks to press.

An appropriate Order will issue later today.

On this 18th day of March, 2026.

_____
Michael E. Farbiarz, U.S.D.J.

25